UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TRACY JAHR, BRENDA THOMAS,
TIMOTHY LEE YORK, AND W. BRETT
ROARK,

                    Plaintiffs,

v.

UNITED STATES OF AMERICA,

                  Defendant.

CIVIL ACTION No.:

**COMPLAINT**

1
2
3
4
5
6

# **COMPLAINT**

Plaintiffs Tracy Jahr, Brenda Thomas, Timothy Lee York, and W. Brett Roark, as the parents and sole survivors of Tiffany York and Michael Roark, file this complaint against the United States of America pursuant to the Federal Tort Claims Act for damages arising from the negligent and intentional acts and omissions of United States Army employees that resulted in the deaths of Plaintiffs' children. In support of this complaint, Plaintiffs state as follows:

Adler Vermillion
45 Main St., Ste. 500, Brooklyn, NY 11201
(347) 725-0362

## NATURE OF THE ACTION

1.      This is an action to recover the value of the lives of Michael Roark, 19, and Tiffany York, 17, who were shot and killed on December 5, 2011 by four active members of the United States Army.  Their killers—Private Isaac Aguigui, Private Christopher Salmon, Private First Class Michael Burnett, and Sergeant Anthony Peden—were members or accomplices of a terrorist conspiracy called "FEAR," supposedly standing for "Forever Enduring, Always Ready."  Army officials recklessly allowed FEAR to form and fester within its ranks at Fort Stewart, Georgia, despite abundant signs that Pvt. Aguigui and his cohorts were dangerous and mentally unstable soldiers in desperate need of arrest and treatment.  As a result of the Army's negligence, two promising young people lost their lives on the cusp of adulthood.  This action seeks to hold the Army accountable for this heartbreakingly preventable tragedy.

## PARTIES

2.      Plaintiff Tracy Jahr is the biological mother of Michael Roark and resides in this district at 7823 59th Avenue NE, Marysville, Washington.

3.      Plaintiff Brenda Thomas is the biological mother of Tiffany York and is a resident of Richmond Hill, Georgia.

4.      Plaintiff Timothy Lee York is the biological father of Tiffany York and is a resident of Kerman, California.

5.      Plaintiff W. Brett Roark is the biological father of Michael Roark and is a resident of Daytona Beach, Florida.

6.      As this case is brought pursuant to the Federal Tort Claims Act ("FTCA"), the United States of America is the only proper defendant.  At all relevant times, each individual responsible for the tortious acts detailed herein was an employee of the United States government and acting within the scope of employment or the line of duty as defined by 28 U.S.C. § 2671.

Adler Vermillion
45 Main St., Ste. 500, Brooklyn, NY 11201
(347) 725-0362

1            **J**URISDICTION, **V**ENUE, AND **A**DMINISTRATIVE **N**OTICE

2         7.       This Court has jurisdiction over Plaintiffs' claims for relief pursuant to 28 U.S.C.

3 §§ 1346(b) and 2674.

4         8.       Venue is proper in this Court pursuant to 28 U.S.C. § 1402(b) because Plaintiff

5 Tracy Jahr is a resident of this judicial district.

6         9.       Plaintiffs have fully complied with the applicable provisions of 28 U.S.C. § 2675.

7 Plaintiffs' claims for relief accrued no earlier than December 5, 2011, the date on which Michael

8 Roark and Tiffany York were killed. Pursuant to § 2675(a), and within the two-year limitations

9 period imposed by 28 U.S.C. § 2401(b), Plaintiffs presented their claims in writing to the

10 appropriate federal agency, the Department of the Army, on August 27, 2013. The Army

11 acknowledged receipt on August 29, 2013. The Army has made no final disposition of Plaintiffs'

12 claims, and more than six months have elapsed since those claims were filed.

13                     **S**TATEMENT OF **F**ACTS

14               **Murders of Michael Roark and Tiffany York**

15         10.      On the night of December 5, 2011, Michael Roark, a discharged member of the

16 U.S. Army, and Tiffany York, his girlfriend, were killed by four active duty soldiers in the woods

17 outside of Fort Stewart, Georgia.

18         11.      The killers—Pvt. Isaac Aguigui, Pvt. Christopher Salmon, Pvt. 1st Class (PFC)

19 Michael Burnett, and Sgt. Anthony Peden—were members or accomplices of a terrorist conspiracy

20 they referred to as "FEAR," which supposedly stood for "Forever Enduring, Always Ready."

21         12.      FEAR was led by Pvt. Aguigui, a Washington native. He targeted impressionable

22 or troubled soldiers at Fort Stewart, Georgia with an anti-federalist message and bold, violent

23 plans. FEAR's supposed objective was "to give the government back to the people" through a

24 paramilitary coup. To effectuate their objective, this group of soldiers plotted, among other things,

25 to poison Washington's apple crop; to explode a bomb in a heavily-frequented park in Savannah,

26 Georgia; and, ultimately, to kill the President of the United States.

13.     Michael Roark had been stationed at Fort Stewart when he learned of the existence of FEAR from Pvt. Aguigui.  Roark had also brought Tiffany York, a minor civilian, to Fort Stewart and had introduced her to Pvt. Aguigui.

14.     In the fall of 2011, Roark was discharged from the U.S. Army for minor misconduct that fell far short of the misconduct by Pvt. Aguigui, Sgt. Peden, and Pvt. Salmon prior to December 2011, as outlined below.

15.     Fearing that Roark might report FEAR's activities to law enforcement authorities, Pvt. Aguigui and other FEAR members lured Roark and York to the woods of south Georgia on December 5, 2011 on the premise of going "night shooting" with tracer ammunition obtained by Pvt. Aguigui.

16.     In reality, according to statements by Pvt. Aguigui and other confessing FEAR members, Pvt. Aguigui planned to murder Roark and York.  That decision was made at the home of Pvt. Salmon, on base at Fort Stewart.  Pvt. Aguigui specifically ordered the murder of York to traumatize Roark prior to his execution and to protect FEAR against the possibility that York knew about their plans.

17.     In the alternative, Sgt. Peden claims that he was not part of FEAR, and that he unthinkingly shot Tiffany York while training Pvt. Aguigui, Pvt. Salmon, and PFC Burnette on how to conduct a military-style interrogation of Roark known as "pressing."  By this account, the death of Tiffany York was not a planned or intentional tort.

18.     Whether planned or accidental, the events of December 5, 2011 should never have come to pass.  Long before Aguigui and his cohorts lured Roark and York into the Georgia woods, they left a trail of tragedy and misconduct that, through exercise of reasonable care, should have led to intervention by Army commanders and disruption of the FEAR terrorist conspiracy.  Had such intervention occurred, Roark and York would not have been killed.

COMPLAINT - 4

Adler Vermillion
45 Main St., Ste. 500, Brooklyn, NY 11201
(347) 725-0362

### Murder of Sgt. Deirdre Aguigui

19.     The most significant failure by the U.S. Army was also the most shocking.  On July 17, 2011—almost six months before the murders of Roark and York—Pvt. Aguigui killed his active-duty wife, Sgt. Deirdre Aguigui, in cold blood.  Like the murders of Roark and York, this was a preventable tragedy that should not have occurred.

20.     The Army was aware that Isaac and Deirdre Aguigui had a violent and troubled marriage.  For example, the couple had removed each other from their respective Army death benefits policies multiple times.  And in April 2011—just three months before she was killed—Sgt. Aguigui visited Stephanie Varripor, Fort Stewart's lead victim advocate for domestic abuse. She appeared nervous and scared, and reported being the victim of physical and verbal abuse by her husband, Pvt. Aguigui.

21.     The Army was also aware of Isaac Aguigui's history of disciplinary problems. From January to June 2011, Pvt. Aguigui received a series of punishments under Article 15 of the Uniform Code of Military Justice (UCMJ).  According to Staff Sgt. Richard Casaton, Pvt. Aguigui's supervisor, his behavior reflected a pattern of misconduct.  In June 2011, Staff Sgt. Casaton informed Pvt. Aguigui that he would be receiving a field grade Article 15.  Casaton also informed Pvt. Aguigui that he would be dismissed from the Army.  Inexplicably, however, neither of these threatened actions were taken by the Army.

22.     One month later, on July 17, 2011, Pvt. Isaac Aguigui called 911 to report finding his wife dead on the floor of their home after he supposedly awoke from a "nap."

### Evidence of Pvt. Aguigui's Guilt

23.     The Army's Criminal Investigation Command ("CID") and one or more Army commanding officers voluntarily undertook to investigate Sgt. Aguigui's death.  The investigation should have quickly resulted in the arrest of Pvt. Aguigui, as the evidence and the circumstances surrounding Sgt. Aguigui's death overwhelmingly indicated that she had been murdered by her abusive husband.

Adler Vermillion
45 Main St., Ste. 500, Brooklyn, NY 11201
(347) 725-0362

1    24.    For example, Sgt. Aguigui's body showed signs of a struggle, including more than

2    twenty bruises and scrapes on her wrists, arms, head, back, and inside her mouth, as well as signs

3    of a sexual assault.  Pvt. Aguigui reportedly told Army investigators that he and his wife had simply

4    engaged in "rough sex" a few hours prior to her death—a dubious claim since Sgt. Aguigui was

5    five months pregnant at the time.  That claim was even more improbable since it was well known

6    among friends and family—all witnesses who were or should reasonably have been interviewed

7    by CID—that the Aguiguis' marriage was on the rocks, with the couple rarely seeing each other.

8    25.    Moreover, CID investigators believed at the time that the crime scene surrounding

9    Sgt. Aguigui's body appeared "staged" in a manner to support Pvt. Aguigui's story.

10   26.    CID investigators also recovered empty bottles of potassium iodide—a supplement

11   that can interfere with thyroid function—along with a receipt for the bottles in Pvt. Aguigui's car.

12   CID investigators and Army commanders knew or should have known that Sgt. Aguigui was

13   allergic to iodine, since she had reported her allergy in the course of receiving medical care at Fort

14   Stewart's Winn Army Community Hospital.  According to friends of Pvt. Aguigui who were

15   interviewed by or reasonably available to CID investigators at the time of the investigation,

16   Aguigui had made a trip to a mall in Rincon, South Carolina two days before his wife's death

17   specifically to purchase the supplements.

18   27.    While hanging out with these friends in South Carolina, Pvt. Aguigui also described

19   his desire to divorce Sgt. Aguigui and expressed his expectation that he was about to come into a

20   large amount of money.  Pvt. Aguigui's comments were so disturbing to Angela Boland, the

21   mother of these friends, that she contacted CID the day after Sgt. Aguigui's death to report what

22   she had heard.

23   28.    Even more disturbing, Pvt. Aguigui expressed his desire to kill his wife and reap

24   the proceeds of her insurance policy to individuals he lived with from March to May 2011.  An

25   interview with these individuals would have revealed this information.  It would also have revealed

26   Pvt. Aguigui's rampant drug use and the fact that he threw a large party at his house barely two

COMPLAINT - 6

Adler Vermillion
45 Main St., Ste. 500, Brooklyn, NY 11201
(347) 725-0362

1  weeks after Sgt. Aguigui's death.  Yet CID failed to timely conduct such interviews prior to the

2  murders of Roark and York.

3       29.     Finally, and most damningly, Pvt. Aguigui bragged about his expectation of an

4  imminent receipt of money to his lover, Samantha Coxs, just *hours* before Sgt. Aguigui's death.

5  Pvt. Aguigui had engaged in an affair with Coxs in 2010 after meeting her at a restaurant where

6  she worked.  The affair ended when Coxs discovered that Pvt. Aguigui was married, but Pvt.

7  Aguigui reestablished contact with Coxs in July 2011.  He showered her with passionate text

8  messages and, on the day he killed Sgt. Aguigui, texted Coxs:  "Baby, you want to know something

9  sexy?  I'm not working another day, baby.  We'll have plenty of money.  All I need is your body

10  whenever I want it."

11       30.     Since Pvt. Aguigui consented to a search of his cell phone after his wife's death,

12  CID had access to all of these messages and/or access to Coxs.

13       31.     Despite this wealth of incriminating evidence, the Army negligently failed even to

14  classify Sgt. Deirdre Aguigui's death as a homicide, much less arrest and prosecute Pvt. Isaac

15  Aguigui for her murder, until April 3, 2013—*sixteen months* after Pvt. Aguigui ordered the

16  murders of Roark and York.  On that date, the Army arrested Pvt. Aguigui based on evidence that

17  was known or available to the Army prosecutors long before December 5, 2011, the date of Roark

18  and York's murders.  Accordingly, had the Army acted reasonably on the evidence in its

19  possession, the murders of Roark and York could have been avoided.

20  **The Autopsy of Sgt. Deirdre Aguigui**

21       32.     A substantial contributing factor in the Army's failure to arrest Pvt. Aguigui for

22  nearly two years was the negligent forensic examination of Sgt. Aguigui by Lt. Commander Lisa

23  Rivera.  At the time of the autopsy, Rivera had been a deputy medical examiner for just one year.

24  She was in a fellowship requiring supervision, and had performed less than 200 autopsies.

25       33.     Lt. Cdr. Rivera's report negligently failed to consider all relevant information and

26  negligently failed to diagnose Sgt. Aguigui's cause of death.  Despite ruling out natural causes

27  such as illness, allergies, or pregnancy-related risks, and despite cataloguing "blunt force injuries"

Adler Vermillion
45 Main St., Ste. 500, Brooklyn, NY 11201
(347) 725-0362

all over Sgt. Aguigui's body, Lt. Cdr. Rivera did not rule Sgt. Aguigui's death a homicide.  Instead, her report was inconclusive.

34.     Lt. Cdr. Rivera's inconclusive autopsy should have placed Pvt. Aguigui under severe scrutiny and prevented him from further organizing a terrorist conspiracy in the Army's ranks.  At the very least, it should have caused the Army to seek a second autopsy by a more experienced examiner.  Eventually, the Army did do so, nearly two years later.

35.     In May 2013, the Army's CID finally contacted Dr. James Downs, a medical examiner in Savannah, Georgia.  In stark contrast to Lt. Cdr. Rivera's limited experience, Dr. Downs had performed over 4,500 autopsies and assisted in another 17,000 autopsies.  After examining the medical record, Dr. Downs concluded to a medical certainty that Sgt. Aguigui died as a result of "manual strangulation with multiple injuries caused by blunt force trauma from binding ligatures."  According to Dr. Downs, Sgt. Aguigui's injuries and death were most likely caused by a carotid sleeper hold, a form of strangulation the Army taught to Pvt. Aguigui.

36.     After receiving Dr. Downs's report, the Fort Stewart General Court-Martial Convening Authority referred Pvt. Aguigui to a General Court-Martial on July 26, 2013, where he was convicted of the premeditated murder of his wife and unborn child.  Had Lt. Cdr. Rivera exercised the requisite degree of skill and care in the exercise of her professional duties, she would have properly and timely identified manual strangulation as the cause of Sgt. Aguigui's death and ruled her death a homicide.  Had she done so, Pvt. Aguigui would have been immediately arrested, and the lives of Michael Roark and Tiffany York would have been saved.

37.     Even without a "conclusive" cause of death, CID and Army commanders should have treated Sgt. Aguigui's death as a homicide.  Instead, the Army treated the "inconclusive" autopsy as if it were a finding that no homicide occurred.  Doing so was particularly unreasonable in light of the remarkable non-medical evidence implicating foul play by Pvt. Aguigui and the Army's knowledge that carotid sleeper holds leaves no discernable physical cause of death.

Adler Vermillion
45 Main St., Ste. 500, Brooklyn, NY 11201
(347) 725-0362

**The Army Negligently Financed Aguigui's Terroristic Ambitions**

38.    Pvt. Aguigui did not even wait 24 hours after his wife's murder to apply for the death benefits about which he had repeatedly bragged.  Even more shockingly, the Army paid him $519,400 in benefits despite clear evidence of his guilt.  This payment included $400,000, which was the maximum payout allowed by the Servicemembers Group Life Insurance (SGLI); a $100,000 condolence payment; a $10,000 payment for the death of his unborn child; and $9,400 in unpaid leave allowance.

39.    These payments should never have occurred.  Under Georgia law, federal policy, and common sense, murderers are prohibited from receiving death benefits from their own murder victims.  Consistent with this policy, the Army's Casualty Assistance Center (CAC) initially placed a hold on payments to Pvt. Aguigui.  However, CID negligently informed CAC that Pvt. Aguigui was not a person of interest in his wife's death, so it issued the payments.

40.    The over $500,000 in death benefits the Army negligently provided to Pvt. Aguigui was critical to the development of FEAR.  As a private in the Army, Pvt. Aguigui earned a base salary of less than $18,000 a year; but flush with death benefits provided by the Army, he was able to spend lavishly on potential recruits, earning their appreciation, respect, and trust.

41.    According to Adam Dearman, a military policeman recruited by Pvt. Aguigui, Pvt. Aguigui gave Dearman $5,000 to buy a car with "no questions asked."  On another occasion, Pvt. Aguigui gave Dearman a debit card and told him to go shopping for his daughter's Christmas presents.  Pvt. Aguigui also spent tens of thousands of dollars on drugs and strip clubs, wining and dining his recruits.  He spent over $16,000 in one night at "Temptations," a local strip club, entertaining and winning over his friends.  Pvt. Aguigui's known acquaintances could have brought this spending to the attention of CID investigators had they been asked.

42.    The funds provided by the Army also allowed FEAR to acquire significant numbers of weapons and munitions, enabling it to project an image of legitimacy and sophistication to potential recruits.  For example, on a home visit to his native Washington, Pvt. Aguigui purchased over $32,000 in weapons from High Mountain Hunting Supply in Wenatchee.  On another

Adler Vermillion
45 Main St., Ste. 500, Brooklyn, NY 11201
(347) 725-0362

1   occasion, two FEAR recruits spent $16,000 on sixteen guns, including a Taurus revolver known

2   as "The Judge."  Tragically, these weapons would later be used to murder Michael Roark and

3   Tiffany York.

4       43.    The Army knew that Pvt. Aguigui was suspiciously purchasing these stockpiles of

5   weapons on the heels of his wife's suspicious death.  When he bought his cache of weapons in

6   Washington, a relative reported the purchase to the local Wenatchee, Washington police.  The

7   police referred the matter to the Federal Bureau of Investigation (FBI) in Spokane and to the Army

8   CID in Tacoma.  The FBI investigated the purchase and relayed misgivings to its counterparts in

9   Georgia and at Fort Stewart.  Despite this warning, and the Army's voluntary assumption of the

10  investigation Sgt. Aguigui's death, the Army took no action against Pvt. Aguigui.

11      44.    Finally, these funds gave Pvt. Aguigui the resources to bribe his superiors.  At least

12  one such superior, Staff Sgt. Scott Zipp, is known to have accepted bribes from Pvt. Aguigui in

13  exchange for turning a blind eye to his dereliction of duty and criminal activity.  According to Pvt.

14  Aguigui, he paid $6,000 to SSgt. Zipp in two videotaped payments.

15  **Recruiting of FEAR Members**

16      45.    With money, weapons, and a revolutionary message, Pvt. Aguigui set out to recruit

17  fellow soldiers into a terrorist militia within the Army's ranks.  Like Pvt. Aguigui, the recruits who

18  ultimately became members or accomplices of FEAR were troubled soldiers with disciplinary or

19  mental health histories who should have been interdicted, treated, or discharged long before they

20  took part in the murders of Michael Roark and Tiffany York.  Pvt. Aguigui was allowed to

21  specifically target these emotionally vulnerable, disgruntled soldiers since he was placed together

22  with them in the rear guard and on extra duty, which is typically reserved for soldiers with

23  disciplinary problems.

24      46.    For example, Pvt. Salmon, the soldier who actually pulled the trigger on Michael

25  Roark, had 12 misdemeanor arrests prior to joining the Army, and had been caught committing

26  travel-voucher fraud during a tour in Iraq.  Salmon was demoted in 2011 for reasons that have not

27  been made public.

COMPLAINT - 10

47.     Similarly, PFC Burnett received an Article 15 punishment for possessing an unregistered handgun and was known by his colleagues and superiors as having expressed a passionate desire to overthrow the government.

48.     Adam Dearman, an MP and a member of FEAR, suffered from post-traumatic stress disorder (PTSD) and suicidal thoughts since returning from Iraq.  Pvt. Aguigui bonded with Dearman by giving him thousands of dollars in gifts and illegal drugs, without consequence by the Army.

49.     Finally, and most egregiously, Sgt. Anthony Peden, who shot Tiffany York, had a long record (readily available to his commanding officers) of violent incidents, drug abuse, and mental health issues as a result of his poorly treated PTSD and traumatic brain injury.

**Criminal Conduct by FEAR and its Associates**

50.     When Pvt. Aguigui's death benefits ran low, FEAR began engaging in criminal conduct that was widely known within the Army.

51.     Dearman, Dearman's brother, and another soldier who was not a member of FEAR, Sergeant Timothy Joiner, broke into several homes and stole large items for resale.

52.     Pvt. Aguigui purchased over $15,000 in cocaine and began exploring various ventures with a local drug dealer.

53.     At one point, Pvt. Aguigui and three other soldiers formed a plan to kill local competitor drug dealers.  Although the Army investigated him for conspiracy to commit murder in connection with this plot, it took no action to halt Aguigui's crimes, despite the overwhelming evidence that he had already killed his wife and was preparing for even more bloodshed.

54.     Instead, Pvt. Aguigui and FEAR operated with complete impunity at Fort Stewart. Around the base, Pvt. Aguigui spoke openly about his plans to develop his militia and conduct terroristic operations.  According to one soldier interviewed by CID, the entire intelligence group in Pvt. Aguigui's squadron knew about his plans, and many were willing to be a part of them. None of Pvt. Aguigui's fellow soldiers reported his terroristic plans or illegal conduct up the chain of command, however.

Adler Vermillion
45 Main St., Ste. 500, Brooklyn, NY 11201
(347) 725-0362

55.     Nor did Pvt. Aguigui's superiors take any action to curtail his criminal conduct. Indeed, Sgt. Joiner committed crimes with FEAR, and agreed not to report its members' rampant drug use.  Likewise, SSgt. Zipp, as noted above, had been bribed with Sgt. Aguigui's death benefits and agreed to turn a blind eye to his crimes.

### Negligent Treatment and Supervision of Sgt. Peden

56.     In the fall of 2011, as FEAR expanded its criminal activities and terroristic plans, it increasingly relied upon Sgt. Peden for his combat training and experience, which most FEAR members lacked, as they had only been stationed in non-combat rear deployment—.

57.     Peden was deployed in Afghanistan from February 2006 to April 2007 and from March 2009 to February 2010.  During these tours, he witnessed and treated numerous casualties involving his fellow soldiers, as well as innocent children as young as four years old.  He also received severe blows to his head as a result of shrapnel and improvised explosive devices.  These injuries and experiences left Peden a shell of a soldier suffering from severe PTSD and traumatic brain injury (TBI).

58.     Although Army medical staff diagnosed Peden's TBI, they failed to adequately monitor him and ensure his treatment, or, alternatively, to chapter him out of active duty service to protect him and others.  Instead, they left him to drift into a dangerous fog of sleeplessness, self-medication, and severe alcohol and drug abuse.

59.     Sgt. Peden's instability came to the fore while he was deployed in Iraq in August 2010.  Unable to sleep for days on end, Peden became irritated at another soldier for slamming the door at night.  Peden told the soldier that if he slammed the door again he was going to kill him, and then repeated the threat to all of the other soldiers in the barracks.  When the soldier began to argue with Peden, Peden put a bullet in the chamber of his firearm, cocked it, and prepared to fire.  When his platoon sergeant heard the commotion and asked what was going on, Peden told him he was getting ready to shoot the soldier.  The next day, Peden had several meetings with Army staff over what to do about him.  In one prescient call with the Army chaplain, Peden's wife expressed her concern that Peden was unstable and might kill someone.

Adler Vermillion
45 Main St., Ste. 500, Brooklyn, NY 11201
(347) 725-0362

60.     As a result of this incident, Peden was stripped of his weapon and recalled from Iraq.  He underwent a series of psychological evaluations and received a slew of medications, including Zoloft, Xanax, and Oxycontin.  Peden was not monitored in his drug intake by his treating physicians, however, even when he confessed to abusing Oxycontin and illegal narcotics. Instead, he was allowed to resume active duty, and in fact was given substantial new responsibilities for training soldiers for combat.

61.     Peden's condition worsened in January 2011, when he stopped going to his psychiatrists and began abusing heroin.  No Army doctors or supervisors contacted him regarding his missed appointments, even after he informed his unit commander that he had stopped going. Indeed, even when Peden showed up drunk for work, his commanding officer simply told him to "sleep it off" in the parking lot.  Such callous disregard for the deteriorating health of Sgt. Peden put him and others at extreme risk.

62.     A few months later, Peden's instability again manifested itself in an incident with his wife.  By that point, Peden had separated from his wife and was reduced to living in the woods. He returned to his house to gather supplies to make a hut in the woods, where he encountered a male friend of his wife.  He immediately retrieved a shotgun, cocked it, and began threatening to shoot the man in front of his two young child.  His wife called the police, who arrived shortly thereafter.  Peden was required to see a social worker about the incident, but did not face any disciplinary investigation or punishment, even though it was the second time he had threatened someone with a weapon in less than a year.  Commanding officers at Fort Stewart were informed of this incident shortly after it occurred.

63.     As a combat veteran suffering from PTSD and TBI, Sgt. Peden was entitled to professional and reasonable treatment according to national standards of care.  Instead of receiving such treatment, Sgt. Peden was left substantially untreated and/or encouraged not to seek treatment by his superiors and by medical professionals employed by the U.S. Army.  Moreover, Sgt. Peden was allowed to remain in his position of authority in this fragile state, despite living in the woods and spending all of his money on drugs and alcohol.

COMPLAINT - 13

64.     While Sgt. Peden was in this untreated and continually deteriorating state, his duties included responsibility for training subordinates in combat, reconnaissance and intelligence gathering techniques.

65.     According to Sgt. Peden, the reason he accompanied Pvt. Aguigui, Pvt. Salmon, and PFC Burnett to the woods on the night of December 5, 2011 was to instruct them on military interrogation techniques so that they could interrogate Michael Roark, who had been discharged days earlier from the Army.  In Peden's account, the death of Tiffany York was a tragic accident resulting from the triggering of his PTSD by a flash of light he mistook for a gunshot.  Seeing the light, he instinctively reacted by firing several rounds into York without knowing what he was doing.  The killing of Michael Roark minutes later was a direct consequence of Tiffany's death, since the others knew that he could not be trusted to keep quiet after seeing his sweetheart gunned down.

66.     Regardless of whether Sgt. Peden accidentally shot Tiffany York, as he claims, or intentionally killed her, as Pvt. Aguigui and other FEAR members claimed, her death was a direct and foreseeable result of Sgt. Peden's unstable psychological state and history of violent threats.  By wrongfully keeping Sgt. Peden on active duty at Fort Stewart in a state of extreme untreated psychological trauma despite two incidents in which he threatened others with firearms, the Army put those around him in severe danger of being killed—including, ultimately, Tiffany York.  It also enabled other troubled soldiers, including Pvt. Aguigui and his FEAR conspirators, to have access to an unstable veteran with significant combat and interrogation expertise, which strengthened their conspiracy and ultimately led to the death of Michael Roark.

**The Army's Tolerance for Criminality**

67.     Sadly, the tragic deaths of Michael Roark, Tiffany York, and Sgt. Deirdre Aguigui are not anomalies that took the Army by surprise.  Rather, they reflect a pattern over the last decade in which the military has accepted more and more recruits with criminal records while retaining more and more who behaved egregiously in uniform.

COMPLAINT - 14

Adler Vermillion
45 Main St., Ste. 500, Brooklyn, NY 11201
(347) 725-0362

68.     In 2006, for example, the Army issued 30,615 special dispensations to allow otherwise ineligible applicants to enlist—double the total of a decade earlier.  Simultaneously, discharge for misconduct numbers fell dramatically, from 2,560 in 1998 to 1,435 in 2006. And denials of reenlistment disappeared almost completely, dropping from 4,000 in 1994 to only 81 in 2006.  The predictable result, which has been acknowledged and studied by the Army, is record numbers of violent crimes committed by active duty soldiers.

69.     Moreover, as the Army knew, soldiers returning from Iraq and Afghanistan posed a particular risk for recruitment into anti-government militias.  As early as 2009, the U.S. Department of Homeland Security predicted that "[r]ight-wing extremists will attempt to recruit and radicalize returning veterans in order to exploit their skills and knowledge," and warned of "the willingness of a small percentage of military personnel to join extremist groups," because they are "disgruntled, disillusioned, or suffering from the psychological effects of war."

70.     In light of these trends and warnings by U.S. government, the Army's continued reliance on Pvt. Aguigui and the disgruntled, derelict, drug-addicted, and disturbed soldiers comprising his FEAR militia, is inexcusable.  As author Matt Kennard has chronicled in his book, *Irregular Army: How the U.S. Military Recruited Neo-Nazis, Gang Members and Criminals to Fight the War on Terror*, the Army has willfully and negligently "turned a blind eye to organized and violent groups within its ranks."  Tragically, Michael Roark, Tiffany York, and Sgt. Deirdre Aguigui paid for the Army's negligence with their lives.

### Plaintiffs' Damages

71.     As a direct and proximate result of the wrongful and negligent conduct and omissions described herein, Plaintiffs, individually and as personal representatives of the estates of Michael Roark and Tiffany York, have suffered general damages, including but not limited to the full value of Michael Roark's and Tiffany York's lives, as well as the physical, mental, and emotional pain and suffering borne by Michael Roark and Tiffany York before their deaths, and special damages, including but not limited to lost wages and funeral and burial expenses.

Adler Vermillion
45 Main St., Ste. 500, Brooklyn, NY 11201
(347) 725-0362

## COUNT I

**(Wrongful Death – Negligent Hiring, Supervision, and Retention)**

72.     Plaintiffs reallege the material facts alleged in the preceding paragraphs against Defendant as if fully set forth herein.

73.     The Army personnel responsible for the hiring, retention and supervision of Pvt. Aguigui, Sgt. Peden, and Pvt. Salmon at Fort Stewart, including Pvt. Aguigui's senior commanding officer, Lt. Colonel Reynolds, among others, had a nondiscretionary duty to exercise ordinary care in the selection of employees, to not retain dangerous or unfit employees after knowledge of their dangerousness has been, or by the exercise of due diligence should have been, acquired, and to exercise ordinary care in supervising its employees to avoid exposing others to harm from unfit and dangerous employees acting within the scope of their employment.

74.     The responsible Army personnel knew, or by the exercise of reasonable diligence should have known, that Pvt. Isaac Aguigui was an incompetent soldier whose history of violence, rampant drug abuse, terroristic plans, and stockpiling of weapons made him a significant danger to his fellow soldiers and civilians.

75.     Prior to December 5, 2011, it was reasonably foreseeable to the responsible Army personnel, based on Pvt. Aguigui's history of and propensity for violence against and corruption of fellow soldiers, his plans for violence against civilians, and his repeated infractions and dereliction of duty, that Pvt. Aguigui was likely to cause the type of violent harm inflicted on Tiffany York and Michael Roark.

76.     The responsible Army personnel knew, or by the exercise of reasonable diligence should have known, that Sgt. Peden was an incompetent and psychologically disturbed soldier whose history of violence, rampant drug abuse, and untreated PTSD and TBI made him a significant danger to his fellow soldiers and civilians.

77.     Prior to December 5, 2011, it was reasonably foreseeable to the responsible Army personnel, based on Sgt. Peden's propensity for violence against fellow soldiers and civilians, his

Adler Vermillion
45 Main St., Ste. 500, Brooklyn, NY 11201
(347) 725-0362

1  abuse of alcohol and drugs, and his documented medical/psychiatric history, that Sgt. Peden was

2  likely to cause the type of violent harm inflicted on Tiffany York and Michael Roark.

3       78.   The responsible Army personnel knew, or by the exercise of reasonable diligence

4  should have known, that Pvt. Salmon had a propensity for criminal behavior and harbored

5  terroristic ambitions that made him a significant danger to others, particularly in association with

6  Pvt. Aguigui and other members of FEAR.

7       79.   Prior to December 5, 2011, it was reasonably foreseeable to the responsible Army

8  personnel, based on Pvt. Salmon's propensity for criminal conduct and association with FEAR,

9  that Pvt. Salmon was likely to cause the type of violent harm inflicted on Tiffany York and Michael

10 Roark.

11      80.   The responsible Army personnel breached their nondiscretionary duty to exercise

12 ordinary care in the hiring, retention, and supervision of Defendant's employees, including

13 Pvt. Aguigui, Sgt. Peden, and Pvt. Salmon.

14      81.   These breaches by Defendant's supervisory employees of the duty to exercise

15 ordinary care in hiring, retention, and supervision of Defendant's employees, including Pvt.

16 Aguigui, Sgt. Peden, and others, created an unreasonable risk of foreseeable harm to others,

17 including Tiffany York and Michael Roark.

18      82.   That unreasonable risk came to pass in the killings of Tiffany York and Michael

19 Roark at the direction of Pvt. Aguigui and at the hands of other of Defendant's employees.

20      83.   In the alternative, that unreasonable risk came to pass in the accidental killing of

21 Tiffany York by Sgt. Peden.

22      84.   Neither Tiffany York nor Michael Roark is survived by a spouse or child.

23 Accordingly, pursuant to Ga. Code § 19-7-1(c)(2), plaintiffs Timothy Lee York and Brenda

24 Thomas, as the parents of Tiffany York, hold the right of recovery for her wrongful death, and

25 plaintiffs W. Brett Roark and Tracy Jahr, as the parents of Michael Roark, hold the right of

26 recovery for his wrongful death.

Adler Vermillion
45 Main St., Ste. 500, Brooklyn, NY 11201
(347) 725-0362

# COUNT II

### (Wrongful Death – Negligent Failure to Report)

85.     Plaintiffs reallege the material facts alleged in the preceding paragraphs against Defendant as if fully set forth herein.

86.     Long before the killings of Tiffany York and Michael Roark, numerous soldiers and/or civilian employees at Ft. Stewart were aware of Pvt. Aguigui's criminal activity, including, *inter alia*, murder, bribery, possession and distribution of illicit narcotics, suspicious stockpiling of weapons, and criminal conspiracy to commit acts of terrorism, as well as the criminal activities of his compatriots in the FEAR conspiracy.

87.     Pvt. Aguigui disclosed specific criminal plans with numerous soldiers at Fort Stewart, including telling Spec. David E. Rosario about how he intended to conduct active shooter situations on Fort Stewart, and that he had already mapped out the sewer system to facilitate the carnage.  Others who knew about Pvt. Aguigui's criminal intentions included PFC K. Davis, PFC J.Davis, Staff Sgt. Castleton, Spec. Castleton, Spec. Holland, Spec. Frechette, and PFC Almaguer, among others.

88.     Prior to the night of December 5, 2011, PFC Burnett knew that Pvt. Aguigui intended to kill Michael Roark.  PFC Burnett did not agree with Pvt. Aguigui's plans, and attempted to convince Pvt. Aguigui not to go through with it.

89.     Numerous soldiers aware of Pvt. Aguigui's plans believed him to be psychologically disturbed and dangerous, but no records of psychological concerns were ever identified while Pvt. Aguigui was on active duty.

90.     Upon learning of Pvt. Aguigui's criminal activity, and that of his co-conspirators, these soldiers and/or civilian employees were subject to a nondiscretionary duty to report those criminal acts and/or plans to appropriate authorities and superiors.

91.     Defendant's employees, acting within the scope of their employment, breached that duty by failing to report any of the criminal acts of Pvt. Aguigui or any of his FEAR co-

Adler Vermillion
45 Main St., Ste. 500, Brooklyn, NY 11201
(347) 725-0362

1    conspirators of which they had or should have had knowledge to appropriate law-enforcement

2    authorities.

3        92.    Defendant's employees, in breaching their nondiscretionary duty to report the

4    criminal acts and plans of Pvt. Aguigui and his FEAR co-conspirators, acted without even the

5    degree of care which every man of common sense, however inattentive he may be, exercises under

6    the same or similar circumstances, and so were grossly negligent with respect to that duty.

7        93.    Pvt. Aguigui's immediate supervisor, SSgt. Zipp, went so far as to accept bribes

8    from Pvt. Aguigui in exchange for improperly excusing Pvt. Aguigui from duty and failed to report

9    this criminal activity and dereliction of duty by Pvt. Aguigui to his superiors.

10       94.    As a direct, foreseeable, and proximate result of the negligent failure by

11   Defendant's employees to report the known criminal activities of Pvt. Aguigui and his co-

12   conspirators, the Army allowed the conspirators to proceed unimpeded in their plan to murder

13   Michael Roark and Tiffany York.

14       95.    In the alternative, the Army allowed Pvt. Aguigui and his co-conspirators to remain

15   on active-duty while they sought after and corrupted vulnerable, mentally-unstable soldiers such

16   as Sgt. Peden, who claims to have accidentally shot Tiffany York during a planned military

17   interrogation.

18       96.    Plaintiffs have suffered damages and are entitled to recovery for the full value of

19   the lives of their children pursuant to Ga. Code § 19-7-1(c)(2).

20                                    ## COUNT III

21                        **(Wrongful Death – Negligent Investigation)**

22       97.    Plaintiffs reallege the material facts alleged in the preceding paragraphs against

23   Defendant as if fully set forth herein.

24       98.    Army commanders and CID investigators voluntarily undertook to investigate the

25   death of Deirdre Aguigui. Defendant recognized that that investigation was necessary for the

26   protection of third parties to the extent that it revealed that Deirdre Aguigui's death was the result

27   of foul play.

COMPLAINT - 19

Adler Vermillion
45 Main St., Ste. 500, Brooklyn, NY 11201
(347) 725-0362

99.     Having undertaken to investigate the death of Deirdre Aguigui, Defendant's employees were subject to a nondiscretionary duty to members of the public, including Tiffany York and Michael Roark, to exercise reasonable care in the conduct of that investigation.

100.     Defendant's employees breached that duty by, *inter alia*, failing to timely question witnesses to which it had access, ignoring copious evidence of Pvt. Aguigui's guilt, failing to arrest or even monitor Pvt. Aguigui after he suddenly purchased over $30,000 in weapons shortly after his wife's suspicious death, and failing to request a second autopsy by an adequately-experienced forensic examiner after receiving an inconclusive initial report.

101.     As a direct, foreseeable, and proximate result of the negligent investigation undertaken by Defendant's employees, the Army allowed Pvt. Aguigui, a murderer with terroristic ambitions, to remain on active-duty, foreseeably resulting in the murders of additional people, including Michael Roark and Tiffany York.

102.     In the alternative, the Army allowed a murderer with terroristic ambitions to remain on active-duty while he sought after and corrupted vulnerable, mentally-unstable soldiers such as Sgt. Peden, who accidentally shot Tiffany York during a planned military interrogation.

103.     Plaintiffs have suffered damages and are entitled to recovery for the full value of the lives of their children pursuant to Ga. Code § 19-7-1(c)(2).

## COUNT IV

### (Wrongful Death – Negligent Financing of Domestic Terrorists)

104.     Plaintiffs reallege the material facts alleged in the preceding paragraphs against Defendant.

105.     Defendant voluntarily undertook to provide death benefits to bereaved Army spouses through the SGLI, and that undertaking remained in place at the time of Sgt. Aguigui's death.

106.     Defendants' employees responsible for paying death benefits to bereaved Army spouses had a non-discretionary duty—based on Georgia law, federal policy, and, upon

Adler Vermillion
45 Main St., Ste. 500, Brooklyn, NY 11201
(347) 725-0362

1  information and belief, SGLI policies, procedures, and training—to avoid paying death benefits to

2  individuals who were suspected of murdering the deceased soldier.

3      107.   Defendant's investigative employees had knowledge in July 2011 of evidence

4  proving beyond a reasonable doubt that Pvt. Aguigui was responsible for the death of his wife,

5  Sgt. Aguigui, including text messages in which Pvt. Aguigui discussed his expectation of receiving

6  a substantial amount of money.  This knowledge was, at the minimum, more than sufficient to

7  consider Aguigui a murder suspect.

8      108.   Despite this knowledge, Defendants' employees responsible for investigating Sgt.

9  Aguigui's death negligently failed to inform the SGLI and Defendants' employees responsible for

10  paying death benefits about the fact that Pvt. Aguigui was (or should have been) a murder suspect

11  ineligible to receive death benefits.

12      109.   Defendants' employees breach of their non-discretionary duties caused the Army

13  to provide Pvt. Aguigui with $519,400 in death benefits in violation of Georgia law and federal

14  policy.

15      110.   By negligently furnishing Pvt. Aguigui with this substantial windfall, the Army

16  provided Pvt. Aguigui with the means and opportunity to build FEAR into a bona fide terrorist

17  gang/militia, enabling him to recruit members, build an arsenal, and plot terrorist attacks against

18  civilians.

19      111.   After providing Pvt. Aguigui with this huge sum of money, and despite the fact that

20  Sgt. Aguigui's death remained the subject of an open investigation, Defendants' responsible

21  employees failed to monitor or investigate how Pvt. Aguigui used these funds.  Under these

22  circumstances, this failure constituted a breach of duty.

23      112.   As a direct, foreseeable, and proximate result of the Army's negligence,

24  Pvt. Aguigui and his co-conspirators proceeded unimpeded to murder Michael Roark and Tiffany

25  York.

Adler Vermillion
45 Main St., Ste. 500, Brooklyn, NY 11201
(347) 725-0362

113.    In the alternative, the Army's negligence provided Pvt. Aguigui with the means to corrupt vulnerable, mentally-unstable soldiers such as Sgt. Peden, who claims to have accidentally shot Tiffany York during a planned military interrogation.

114.    These acts and omissions by the Army regarding Pvt. Aguigui led directly to the tragic deaths of Michael Roark and Tiffany York.

115.    Plaintiffs have suffered damages and are entitled to recovery for the full value of the lives of their children pursuant to Ga. Code § 19-7-1(c)(2).

## COUNT V

### (Wrongful Death – Negligence by Sgt. Peden)

116.    Plaintiffs reallege the material facts alleged in the preceding paragraphs against Defendant as if fully set forth herein.

117.    Acting within the line of duty, Sgt. Peden provided advice and training to his subordinates, Pvt. Aguigui, Pvt. Salmon, and PFC Burnett, regarding combat and interrogation techniques.

118.    Sgt. Peden was aware when he provided this advice and training that Pvt. Aguigui, Pvt. Salmon, and PFC Burnett were intent on forming a violent terrorist militia.

119.    Sgt. Peden negligently continued to provide such instruction despite this knowledge, including instruction regarding a planned interrogation of former soldier Michael Roark, which he provided prior to and during the night of December 5, 2011.

120.    Sgt. Peden knew or should have known that using the planned interrogation of Michael Roark as training opportunity was substantially likely to result in Michael Roark's death, such that a reasonable person in Sgt. Peden's position would not have acted as he did.

121.    Sgt. Peden knew or should have known that conducting such training with Tiffany York present created an unreasonable likelihood of death or serious bodily injury to Tiffany York.

122.    According to Sgt. Peden, he accidentally shot Tiffany York during a planned military interrogation on the night of December 5, 2011.

Adler Vermillion
45 Main St., Ste. 500, Brooklyn, NY 11201
(347) 725-0362

123.    As a direct and foreseeable result of Sgt. Peden's negligent conduct during the course of training Pvt. Aguigui, Pvt. Salmon, and PFC Burnett—conduct which was within the scope of his employment—Michael Roark and Tiffany York lost their lives.

124.    Plaintiffs have suffered damages and are entitled to recovery for the full value of the lives of their children pursuant to Ga. Code § 19-7-1(c)(2).

## <u>COUNT VI</u>

### (Wrongful Death – Civil Conspiracy for Assault, Battery, False Imprisonment)

125.    Plaintiffs reallege the material facts alleged in the preceding paragraphs against Defendant as if fully set forth herein.

126.    At all relevant times to this Complaint, Military Policeman Adam Dearman was an investigative or law enforcement officer of the United States Government empowered by law to execute searches, to seize evidence, or to make arrests for violations of federal law.

127.    In the course of his employment and in the line of duty, MP Dearman and several other members of the U.S. Army—including, *inter alia*, Pvt. Aguigui, Sgt. Peden, Pvt. Salmon, and PFC Burnett—combined under a common design to create a terrorist conspiracy within the ranks of the U.S. Army.

128.    The members of this terrorist conspiracy arrived at a mutual understanding as to how they would accomplish their unlawful design, including an express or tacit agreement to falsely imprison, assault, and ultimately murder Tiffany York and Michael Roark.

129.    During and in furtherance of the conspiracy, individual members of the conspiracy did falsely imprison, assault, and murder Tiffany York and Michael York.

130.    Under Georgia law, MP Dearman is jointly and severally liable for the intentional tortious acts of his co-conspirators committed in furtherance of the conspiracy, including the false imprisonment, assault, and murder of Tiffany York and Michael York.

131.    Plaintiffs have suffered damages and are entitled to recovery for the full value of the lives of their children pursuant to Ga. Code § 19-7-1(c)(2).

Adler Vermillion
45 Main St., Ste. 500, Brooklyn, NY 11201
(347) 725-0362

# Count VII

**(Wrongful Death – Medical Negligence in Forensic Examination)**

132.     Plaintiffs reallege the material facts alleged in the preceding paragraphs against Defendant as if fully set forth herein.

133.     Defendant voluntarily undertook to investigate the death of Sgt. Deirdre Aguigui and her unborn child.

134.     As part of that investigation, Lt. Cdr. Rivera conducted a forensic examination of Sgt. Aguigui and produced an autopsy report.

135.     Lt. Cdr. Rivera's report did not adhere to the accepted standards of practice in her profession in that it negligently failed to consider all relevant information and negligently failed to diagnose Sgt. Aguigui's cause of death.

136.     As a direct, foreseeable, and proximate result of Lt. Cdr. Rivera's negligence, the Army allowed a murderer with terroristic ambitions to remain on active-duty, foreseeably resulting in the further murders of Michael Roark and Tiffany York.

137.     In the alternative, the Army allowed a murderer with terroristic ambitions to remain on active-duty while he sought after and corrupted vulnerable, mentally-unstable soldiers such as Sgt. Peden, who claims to have accidentally shot Tiffany York during a planned military interrogation.

138.     Plaintiffs have suffered damages and are entitled to recovery for the full value of the lives of their children pursuant to Ga. Code § 19-7-1(c)(2).

Adler Vermillion
45 Main St., Ste. 500, Brooklyn, NY 11201
(347) 725-0362

1

## PRAYER FOR RELIEF

2     WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

3     a.     An award of compensatory damages for each Plaintiff, in the amounts to which

4           each may be found to be entitled under law;

5     b.     Post-judgment interest;

6     c.     Costs of suit; and

7     d.     Any and all other relief, legal or equitable, to which plaintiffs may be entitled and

8           the Court deems appropriate.

Dated: December 12, 2014

Respectfully submitted,

**ADLER VERMILLION**

By:   /s/    *Gerald Derevyanny*
      GERALD DEREVYANNY (SBN: 45778)
      45 MAIN STREET, SUITE 500
      BROOKLYN, NY 11201
      (347) 725-0362

Brian C. Brook (*pro hac vice* to be filed)
CLINTON BROOK & PEED
641 Lexington Ave., 13th Floor
New York, NY 10022
(212) 328-9559
brian@clintonbrook.com

Matthew J. Peed (*pro hac vice* to be filed)
CLINTON BROOK & PEED
1455 Pennsylvania Ave., Suite 400
Washington, DC 20004
(202) 621-1828
matt@clintonbrook.com

*Attorneys for Plaintiffs*
