The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TRACY JAHR, et. al.,<br><br>      Plaintiffs,<br><br>      v.<br><br>UNITED STATES OF AMERICA<br><br>      Defendant. | No. C14-1884-BJR<br><br>**UNITED STATES' MOTION FOR SUMMARY JUDGMENT** |

## I.  INTRODUCTION

Plaintiffs filed this wrongful death action against the United States under the Federal Tort Claims Act ("FTCA") after their daughter was murdered by several enlisted Army soldiers.[1]  Plaintiffs seek to hold the United States liable for the soldiers' crimes, but the intentional tort exception to the FTCA bars claims for assault or arising out of the assault.  To get around the FTCA's intentional tort bar, Plaintiffs have tried to frame this lawsuit as one sounding in negligence.  First, they allege that Army employees were negligent in hiring, supervising, and training the soldiers involved in Ms. York's murder.  Second, they allege that Army employees were negligent in investigating the death of the wife of one of the soldiers.

---

[1] The Court has dismissed all claims brought by Plaintiffs Tracy Jahr and Brett Roark pertaining to the death of their son Michael Roark under the *Feres* doctrine.  Dkt. No. 31.

Both of Plaintiffs' negligence claims must fail.  First, these claims are barred by the discretionary function exception to the FTCA.  Discretionary decisions made by federal employees within the scope of their employment, even those that may be negligent, are protected if they are susceptible to public policy considerations.  Here, decisions on how best to train and supervise soldiers are left to the sole discretion of Army commanders.  Similarly, decisions on how best to investigate the death of a soldier are left to the discretion of the military police, the Staff Judge Advocate, and Army commanders.  Furthermore, it is well-established that hiring, supervision, and training decisions, as well as investigative decisions by federal law enforcement officials, involve weighing public policy considerations and are exactly the type of decisions that the discretionary function exception was designed to protect from judicial second-guessing.  As such, this Court lacks subject matter jurisdiction over these claims.

Second, even if Plaintiffs could avoid the discretionary function exception, they cannot establish a claim for negligence under Georgia law, the substantive law that applies in this action, and a prerequisite to liability under the FTCA.  The Army did not owe Ms. York a duty to prevent the soldiers' criminal acts because the Army did not have a "special relationship" with Ms. York.  Not only was Ms. York a civilian who had no connection to the military, other than the fact that she was in a relationship with a soldier, but the murder occurred off-base and was wholly unconnected to the soldiers' status as Army employees.  Rather, Ms. York's murder was carried out in connection with the soldiers' illegal activities; the antithesis of their service as soldiers in the United States Army.

Finally, even if Plaintiffs could establish that the Army owed Ms. York a duty under Georgia law, they cannot establish that the government's own negligence, allegedly occurring months and even years before the murder, proximately caused Ms. York's murder.  Rather, the

UNITED STATES' MOTION
FOR SUMMARY JUDGMENT - 2
(C14-1884-BJR)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

soldiers' independent, intervening criminal acts were the proximate cause of Ms. York's injury superseding any negligence of the Army.  Ms. York's murder was not a reasonably foreseeable consequence of the negligence alleged by Plaintiffs.  Not only was Ms. York's murder unforeseeable to the Army, it was not foreseeable to either her or Pvt. Roark even though they associated with the soldiers involved.  Thus, Plaintiffs cannot establish proximate cause under Georgia law and as a result, their claims fail under the FTCA.

## II.   STANDARD OF REVIEW

### A.  Summary Judgment

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  The moving party has the initial burden of demonstrating that summary judgment is proper. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The moving party must identify the pleadings, depositions, affidavits, or other evidence that it "believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982).

The burden then shifts to the opposing party to show that summary judgment is not appropriate. *Celotex*, 477 U.S. at 324.  The opposing party's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  However, to avoid summary judgment, the opposing party cannot rest solely on conclusory allegations. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986).  Instead, it must designate specific facts showing there is a genuine issue for trial. *Id.*; *see also Butler v. San Diego District Attorney's Office*, 370 F.3d 956, 958 (9th Cir. 2004) (stating if defendant

UNITED STATES' MOTION
FOR SUMMARY JUDGMENT - 3
(C14-1884-BJR)

**UNITED STATES ATTORNEY**
**700 Stewart Street, Suite 5220**
**Seattle, Washington 98101-1271**
**(206) 553-7970**

produces enough evidence to require plaintiff to go beyond pleadings, plaintiff must counter by producing evidence of his own).

## B.   Discretionary Function

The FTCA's waiver of sovereign immunity is limited when the government is performing a discretionary function.  The discretionary function exception to the FTCA precludes government liability for any claim based upon the exercise or performance, or failure to exercise or perform, a discretionary function or duty whether or not the discretion involved be abused.  *See* 28 U.S.C. § 2680(a).  The exception restores the government's immunity in situations where its employees are carrying out governmental or regulatory duties.  *See Blackburn v. United States*, 100 F.3d 1426, 1428 (9th Cir. 1996); *see also Faber v. United States*, 56 F.3d 1122, 1124 (9th Cir. 1995).  The exception applies regardless of whether the government agent was negligent in his duties, so long as his duties were discretionary. *Kennewick Irrigation District v. United States*, 880 F.2d 1018, 1029 (9th Cir. 1989).

The Supreme Court set forth a two-part test to govern application of the discretionary function exception in *Berkovitz v. United States*, 486 U.S. 531, 536 (1988), and expounded on the test in *United States v. Gaubert*, 499 U.S. 315, 324 (1991).  The Ninth Circuit has adopted the *Berkovitz* test.  *See Olson v. United States*, 362 F.3d 1236, 1239 (9th Cir. 2004).  The test is:

1.   Whether the challenged conduct is discretionary whether it involves an element of judgment or choice; and

2.   Whether the judgment is of the kind that the discretionary function was designed to shield, one based on considerations of public policy.

*Gaubert*, 499 U.S. at 322-23.

UNITED STATES' MOTION
FOR SUMMARY JUDGMENT - 4
(C14-1884-BJR)

**UNITED STATES ATTORNEY**
**700 Stewart Street, Suite 5220**
**Seattle, Washington 98101-1271**
**(206) 553-7970**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.   ARGUMENT

**A.  Hiring, Retaining, Supervising, and Training Decisions Are Protected by the Discretionary Function Exception to the FTCA.**

Plaintiffs allege that Army employees committed various acts of negligence pertaining to hiring, retaining, supervising, and training the soldiers involved in Ms. York's murder.  *See* Dkt. No. 1, pg. 10-23.  It is undisputed that the soldiers involved in Ms. York's murder had been involved in various acts of misconduct in the years and months before her murder, and that Army employees supervised, counseled, and disciplined these soldiers on multiple occasions.

With respect to the first prong of the discretionary function exception, there are no mandatory regulations or directives that Army officials were required to follow in making decisions pertaining to hiring, retaining, supervising, and/or training the soldiers.  In fact, the regulations vest complete command authority and disciplinary authority in commanding officers on how best to handle personnel issues involving soldiers.

Army Regulation ("AR") 27-10 Military Justice vests the authority in commanding officers to handle soldier misconduct.  *See* Exhibit A.  There are generally three grants of authority: (1) nonpunitive measures; (2) nonjudicial punishment; and (3) judicial punishment under Article 15.  *Id.* at Ch. 3, Section 1.  A commander should use nonpunitive measures to the fullest extent to further the efficiency of the command before resorting to nonjudicial punishment.  *Id.* at § 3-2.  Use of nonjudicial punishment is proper in all cases involving minor offenses in which nonpunitive measures are considered inadequate or inappropriate.  *Id.*  If it is clear that nonjudicial punishment will not be sufficient to meet the ends of justice, more stringent measures must be taken.  *Id.*

Commanding officers must exercise their discretion in deciding which measure is appropriate under the circumstances. "A commander will personally exercise discretion in the nonjudicial punishment process by" (1) evaluating the case to determine whether proceedings under the Uniform Code of Military Justice ("UCMJ"), Art. 15 should be initiated; (2) determining whether the soldier committed the offense(s) where UCMJ, Art. 15 proceedings are initiated and the soldier does not demand trial by court-martial; and (3) determining the amount and nature of any punishment, if punishment is appropriate. *Id.* at § 3-4. The commander must take into account the needs of discipline as well as other factors. *Id.* "Nonjudicial punishment should be administered at the lowest level of command commensurate with the needs of discipline, after thoroughly considering - (1) The nature and circumstances of the offense; (2) The age, previous record, maturity, and experience of the offender." *Id.* at § 3-5.

Even decisions whether or not to file a record of nonjudicial punishment on a soldier's official military personnel file is discretionary.

In making a filing determination, the imposing commander must weigh carefully the interests of the Soldier's career against those of the Army to produce and advance only the most qualified personnel for positions of leadership, trust, and responsibility. In this regard, the imposing commander should consider the Soldier's age, grade, total service (with particular attention to the Soldier's recent performance and past misconduct), and whether the Soldier has more than one record of nonjudicial punishment directed for filing in the restricted section (see b, below). However, the interests of the Army are compelling when the record of nonjudicial punishment reflects unmitigated moral turpitude or lack of integrity, patterns of misconduct, or evidence of serious character

deficiency or substantial breach of military discipline. In such cases, the record should

be filed in the performance section.

*Id.* at § 3-6.  The decision whether or not to impose punishment and the nature of the

punishment are "the sole decisions of the imposing commander" and they are encouraged to

consider the opinions of the soldier's non-commissioned officer or NCO.  *Id.* at § 3-19.

Here, Army commanders were aware that the soldiers involved in Ms. York's murder

had committed various acts of misconduct during the course of their careers with the Army.

Army command exercised their discretion in determining what measures were appropriate to

discipline the soldiers in any given situation.  There are no mandatory regulations that required

commanders to follow a specific course of action based on the specific circumstances of the

misconduct.  Rather, the regulations governing supervision and training vest commanders with

the discretion to determine the best course of action while taking into account the nature and

circumstances of the offense, and the age, previous record, maturity, and experience of the

soldier.  The commanding officers must use their discretion in commanding the unit and

determining what, if any, administrative or disciplinary action should be taken with respect to a

soldier in any given situation.

With respect to the second prong of the discretionary function exception, the Ninth

Circuit, and several other courts, have held that the hiring, supervision, and training of

employees, as well as the decision whether to warn the public about potentially dangerous

employees, are discretionary acts protected by the discretionary function exception.  *See Tookes

v. United States*, 811 F.Supp.2d 322, 330-31 (D.D.C., Sept. 19, 2011) (training and supervision

of Deputy Marshals protected by discretionary function); *Burkhart v. Wash. Metro. Area

Transit Auth.*, 112 F.3d 1207, 1217 (D.C.Cir. 1997) (hiring, training, and supervision of public

transportation personnel protected); *Bostic v. U.S. Capitol Police*, 644 F.Supp.2d 106, 110

(D.D.C. 2009) (training and supervision of Capitol Police protected); *Daisley v. Riggs Bank, N.A.*, 372 F.Supp.2d 61, 81-82 (D.D.C, 2005) (decisions regarding how much training should be given to guards and embassy employees protected).

The Ninth Circuit considered facts similar to the case at hand in *Vickers v. United States*, 228 F.3d 944 (9th Cir. 2000), where the former wife of a detention enforcement officer with the Immigration and Naturalization Service ("INS") brought an FTCA action claiming the INS was liable for injuries she suffered when the officer shot her with his service-issued revolver. The plaintiff argued that the INS negligently supervised and retained the officer citing a series of alleged negligent decisions including that INS allowed him to carry a gun although he had missed his most recent round of firearms testing, and INS did not terminate the officer even though his supervisor had determined more than a year before the shooting that the officer had engaged in a sexual relationship with an inmate under his guard and he had hit her and shot his gun at her. *Id.* at 947-949.

The Ninth Circuit stated, "[t]his court and others have held that decisions relating to the hiring, training, and supervision of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield." *Id.* at 950 (*citing Gager v. United States*, 149 F.3d 918, 920-22 (9th Cir. 1998); *Nurse v. United States*, 226 F.3d 996 (9th Cir. 2000); *Burkhart*, 112 F.3d at 1216-17; *Tonelli v. United States*, 60 F.3d 492, 496 (8th Cir. 1995); *Richman v. Straley*, 48 F.3d 1139, 1146 (10th Cir. 1995); *Attallah v. United States*, 955 F.2d 776, 784-85 (1st Cir. 1992)). The Ninth Circuit held that both the contention that the INS negligently trained and supervised the officer with regard to his use of firearms, and negligently delayed in discharging him, came within the discretionary function exception to the FTCA. *Id.*

Similarly, in *Doe v. Holy See*, 557 F.3d 1066, 1084 (9th Cir. 2009), a parishioner brought suit against the catholic church alleging that he was sexually abused by a priest in the

UNITED STATES' MOTION
FOR SUMMARY JUDGMENT - 8
(C14-1884-BJR)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

Archdiocese.  The plaintiff alleged that the Holy See negligently retained the priest and failed

to warn those coming into contact with him, even though it knew or should have known that the

priest had a history of sexually abusing his daughter.  *Id.* at 1083.  Although the case was

brought under the Foreign Sovereign Immunities Act ("FSIA"), the Ninth Circuit analyzed

FTCA case law because both acts have a similar discretionary function exception.  *Id.*  The

Ninth Circuit held, "the decision of whether and how to retain and supervise an employee, as

well as whether to warn about his dangerous proclivities, are the type of discretionary

judgments that the exclusion was designed to protect."  *Id.* at 1084 (*citing Nurse*, 226 F.3d at

1001 (9th Cir. 2000); *Burkhart*, 112 F.3d at 1217 (D.C.Cir. 1997)).  It held that the "failure to

warn about an individual's dangerousness is discretionary."  *Id.* at 1084-85 (*citing Sigman v.*

*United States*, 217 F.3d 785, 797 (9th Cir. 2000); *Weissich v. United States*, 4 F.3d 810, 814-15

(9th Cir. 1993)).

Again, in *Sigman v. United States*, 217 F.3d 785, 797 (9th Cir. 2000), the Ninth Circuit

held that the failure to warn individuals on Air Force Base about a potentially dangerous

serviceman was a discretionary function, because it "brought into play sensitive and competing

policy considerations of protecting safety while preserving resources and preventing

unwarranted alarm."  Finally, in *Weissich v. United States*, 4 F.3d 810, 814-15 (9th Cir. 1993),

the Ninth Circuit held that the failure of probation officers to warn a prosecutor that probationer

was a threat to him was a discretionary decision.

As in these precedents, Army command decisions regarding hiring, supervising, and

training the soldiers involved in Ms. York's murder were guided by discretionary policy

concerns as to how to accomplish the Army's mission by best utilizing available personnel.

This decision is the kind that *Gaubert* stresses is not to be second-guessed by courts "through

the medium of an action in tort."  *Gaubert*, 499 U.S. at 323 (quotation omitted).  Thus, even if

UNITED STATES' MOTION
FOR SUMMARY JUDGMENT - 9
(C14-1884-BJR)

**UNITED STATES ATTORNEY**
**700 Stewart Street, Suite 5220**
**Seattle, Washington 98101-1271**
**(206) 553-7970**

Plaintiffs could establish that an Army acted negligently in the course of these soldiers' careers, in hiring, retaining, supervising, and/or training them, such decisions were discretionary and susceptible to policy considerations and the discretionary function exception applies to bar Plaintiffs' claims. *See Kennewick*, 880 F.2d at 1029.

**B. Criminal and Investigative Decisions Are Protected by the Discretionary Function Exception to the FTCA.**

Plaintiffs also allege that Army employees committed various acts of negligence pertaining to the investigation into the death of Sergeant Deidra Aguigui, Pvt. Aguigui's wife. *See* Dkt. No. 1, pg. 5, 19-21, 24. It is undisputed that military police were investigating Sgt. Aguigui's death in the months leading up to Ms. York's murder, and that they worked on this investigation in connection with Army command and the Staff Judge Advocate ("SJA"). In doing so, Army employees made numerous decisions on how best to conduct the investigation given the facts and circumstances known to them at the time. With respect to the first prong of the discretionary function exception to the FTCA, there are no mandatory regulations or directives that Army employees were required to adhere to regarding specific aspects of the investigation into the death of one of its soldiers.

The investigation of Sgt. Aguigui's death was conducted by U.S. Army Criminal Investigation Command ("CID"), which investigates serious crimes and incidents including noncombat deaths. AR195-2 §§ 1-4, 1-6. *See* Exhibit B. In conducting these investigations, CID special agents are guided by the Army Techniques Publication ("ATP") 3-39.12 (Law Enforcement Investigations) and Field Manual ("FM") 3-19.13 (Law Enforcement Investigations). *See* Exhibits C & D. The ATP "is intended as a toolkit" for CID special agents conducting law enforcement investigations. ATP 3-39.12, Preface. The Field Manual "is a guide" for CID special agents. FM 3-19.13, Preface. Both the ATP and the FM acknowledge

that "[c]riminal investigation is both an art and a science."  ATP 3-39.12 § 1-6; FM 3-19.13 § 1-3.

In addition to the techniques and procedures described in the FM, law enforcement personnel are encouraged to seek guidance on police and investigative matters from other approved law enforcement sources.  FM 3-19.13, Preface.  Throughout an investigation, CID special agents coordinate with appropriate judge advocate personnel at the SJA office concerning the investigation.  ATP 3-19.13 § 1-63.

CID special agents conducting criminal investigation must rely on their training, experience, and common sense in conducting investigations; investigations require "a wide range of knowledge and using common sense in its application."  FM 3-19.13 § 1-58.  "It is a wise investigator who understands and applies the knowledge, skills, and techniques learned for a particular investigation and uses them wherever they are most useful in any investigation."  *Id.*

With regard to the death investigation of Sgt. Aguigui, CID special agents are tasked with investigating noncombat deaths as potential homicides until evidence establishes otherwise.  AR195-2 § 3-3a(4).  Death investigations are discussed in Chapter 7 of the ATP and Chapter 12 of the FM.  They both state that close liaison must be made between investigative, medical and related forensic personnel to have an effective death investigation.  CID special agents will conduct the criminal investigation to collect evidence, identify the responsible parties, and support criminal prosecution.  ATP 3-39.12 §§ 7-7, 7-8.  The initial objective of a death investigation is to determine the manner of death.  *Id.* at § 7-26; FM 3-19.13 § 12.7.  The circumstances, conditions, and events before the death, the event surrounding the death itself, and those events following the death are investigated.  *Id.*  Learning and tracing the events and actions involving a victim before their death, and the events and actions of possible suspects

UNITED STATES' MOTION
FOR SUMMARY JUDGMENT - 11
(C14-1884-BJR)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    before and after the death, can provide information that enables investigators to determine the

2    manner of death.  *Id.*

3         The regulations, publications, or manuals governing a death investigation of a soldier by

4    CID special agents vest discretion in the investigators to use the tools provided to them, their

5    training, experience, and expertise on how best to conduct the investigation; they do not

6    prescribe a specific manner in which a special agent must investigate a noncombat death.

7    Rather, they provide general authority to conduct such investigations and serve as "guides" or

8    "toolkits" to investigators who must use their training, experience, and common sense to

9    determine how best to conduct any investigation given the circumstances presented to them.

10        Indeed, at least one Court has evaluated Army regulations pertaining to criminal

11   investigations and found that they do not contain mandatory directives on how to conduct an

12   investigation.  *See Salafia v. United States*, 578 F.Supp.2d 435 (D.Conn., Sept. 26, 2008).  In

13   *Salafia*, a business owner brought an FTCA action alleging that the Army's investigation into

14   whether an officer acted improperly in starting a competing business using Army resources and

15   while on active duty.  The Court reviewed AR195-1 and 195-2, as well as other regulations,

16   and found that these regulations show that the investigations were conducted pursuant to the

17   "same kind of framework that other courts have consistently found to be discretionary and

18   within the scope of [the discretionary function exception to the FTCA.]"  *Id.* at 439-41.

19   Specifically, the Court found that AR195-1 and 195-2 "set out general policies for criminal

20   investigations which necessarily require discretion on the part of the investigators, including

21   when they gather information and make recommendations for appropriate action."

22        Plaintiffs also argue that one of the autopsies performed during Sgt. Aguigui's death

23   investigation was performed negligently.  It is undisputed that the first autopsy performed on

24   Sgt. Aguigui's body resulted in a finding that the manner of death was undetermined, and the

1    second autopsy found the manner of death as manual strangulation.  But the guidelines

2    followed by the examiners in this case acknowledge that manner of death classification can

3    produce different opinions and that they require the examiner to exercise his or her judgment in

4    reaching an opinion.  The guidelines do not provide mandatory directives that examiners must

5    abide by in reaching their conclusions.

6        The Armed Forces Medical Examiner ("AFME") has sole responsibility for determining

7    the cause and manner of death for noncombat deaths.  *See* Exhibit B, AR 195-2 § 3-3a(4)(b);

8    *see also* 10 U.S.C. § 1471 (The AFME may conduct a forensic pathology investigation to

9    determine the cause or manner of death of a deceased person if such an investigation is

10   determined to be justified).  In performing forensic autopsies, AFME examiners are guided by

11   The Guide for Manner of Death Classification and the Forensic Autopsy Performance

12   Standards published by the National Association of Medical Examiners.  *See* Exhibits E & F.

13       These "guides" explicitly recognize and state that each autopsy performed and cause of

14   death conclusion reached requires the exercise of the independent judgment and discretion of

15   the examiner.  The Guide states:

16       This book is a Guide.  The recommendations contained herein are not standards and

17       should not be used to evaluate the performance of a given certifier in a given case.

18       Death certification and manner-of death classification require judgment, and room must

19       be allowed for discretion on a case by case basis.

20   *See* Exhibit E, pg. 2.  The Guide states that differing opinions can occur regarding the manner

21   of death classification and there is often no "right" or "wrong" answer or specific classification

22   that is better than its alternatives.  *Id.*

23       The Guide recognizes that "[b]ecause the cause and manner of death are opinions,

24   judgment is required to formulate both for reporting on the death certificate."  *Id.* at pg. 4.  The

UNITED STATES' MOTION
FOR SUMMARY JUDGMENT - 13
(C14-1884-BJR)

**UNITED STATES ATTORNEY**
**700 Stewart Street, Suite 5220**
**Seattle, Washington 98101-1271**
**(206) 553-7970**

Standards "provide a constructive framework that defines the fundamental services rendered by a professional forensic pathologist practicing his or her art." *See* Ex. F, pg. 5. "Performance of a forensic autopsy is the practice of medicine. Forensic autopsy performance includes the discretion to determine the need for additional dissection and laboratory tests." *Id.* at pg. 10. "Interpretations and opinions must be formulated only after consideration of available information and only after all necessary information has been obtained." *Id.*

Finally, Plaintiffs argue that the Army should not have paid benefits to Pvt. Aguigui when he was a "person of interest" in his wife's murder. It is undisputed that Pvt. Aguigui was paid a "death gratuity" and the proceeds of Sgt. Aguigui's Service-members Group Life Insurance policy ("SGLI") despite the fact that the Army was investigating her death and Pvt. Aguigui was a person of interest. But there are no mandatory regulations or policies that Army employees are required to follow in determining whether or not to pay benefits under these circumstances.

Federal statutes require the Secretary of the Department of Veterans Affairs to have a death gratuity paid to or for the survivor immediately upon receiving official notification of the death of a member of the armed forces who dies while on active duty. *See* 10 U.S.C. § 1475. Similarly, any amount of insurance under the SGLI in force on the date of the insured's death shall be paid, upon the establishment of a valid claim therefor, to the person or persons surviving at the date of the insured's death. *See* 38 U.S.C. § 1970.

Neither statute contains a provision that prohibits payment of the benefits to a survivor or beneficiary who is involved in the soldier's death. But there are written VA policies that prohibit SGLI benefits from being paid to a beneficiary who "is convicted or pleads guilty to involvement in" the decedents death. *See* Part I: General Provisions of the Family SGLI Program. In such cases, when the designated beneficiary is prohibited from receiving benefits,

the beneficiary or beneficiaries are determined under 38 U.S.C. § 1970(a).  But there are no regulations, policies, or statutes that provide mandatory provisions for Army employees, or VA employees, on how or when to make that determination.  Furthermore, when Pvt. Aguigui was paid the benefits following Sgt. Aguigui's death, he had not yet been convicted nor had he pled guilty to any involvement in Sgt. Aguigui's death.

Therefore, there are no mandatory regulations, policies, or statutes that proscribed specific steps for government officials to take during (a) the investigation of Sgt. Aguigui's death; (b) the autopsy performed during that investigation; and (c) the payment of benefits after her death.  Government employees were vested with discretion in deciding how and when to make these decisions, and they were required to use their training, experience, and common sense in making these decisions.  The first prong of the discretionary function exception is satisfied in this case.

With respect to the second prong of the discretionary function exception, the Ninth Circuit has held that criminal investigations, such as the one here involving the death of a soldier, involve the types of social and political judgments that Congress meant to shield from FTCA challenges.  "Investigations by federal law enforcement officials, particularly those involving the U.S. military, clearly require investigative officers to consider relevant political and social circumstances in making decisions about the nature and scope of a criminal investigation."  *Sabow v. United States*, 93 F.3d 1445, 1454-55 (9th Cir. 1996) (*citing Flax v. United States*, 847 F.Supp. 1183, 1190-91 (D.N.J. 1994) (holding that surveillance activity by FBI requires discretion and social, economic, and political judgments, so exception applies); *Pooler v. United States*, 787 F.2d 868, 871 (3rd Cir.), *cert. denied* 479 U.S. 849 (1986)), *abrogated on other grounds in Millbrook v. United States*, 185 L.Ed.2d 531 (2013) (holding that "Congress did not intend to provide for judicial review of the quality of investigative

UNITED STATES' MOTION
FOR SUMMARY JUDGMENT - 15
(C14-1884-BJR)

**UNITED STATES ATTORNEY**
**700 Stewart Street, Suite 5220**
**Seattle, Washington 98101-1271**
**(206) 553-7970**

efforts")).  "The overwhelming consensus of federal case law establishes that criminal law enforcement decisions - investigative and prosecutorial alike - are discretionary in nature and, therefore, by Congressional mandate, immune from judicial review."  *Mesa v. U.S.*, 837 F.Supp. 1210 (S.D.Fla. Oct. 29, 1993) (*citing Pooler*, 787 F.2d 868).

In *Sabow*, the family of a Marine Corps officer who died of a gunshot wound while under investigation for alleged misuse of military aircraft brought an FTCA action alleging that investigators from the Naval Investigative Service ("NIS") and the Judge Advocate General ("JAG") committed negligence in determining that the death was a suicide.  *Sabow*, 93 F.3d at 1490.  The Ninth Circuit found that the NIS and JAG manuals did not require a specific course of action in conducting the investigation and that the investigation into the officer's death "involved the types of social and political judgments that Congress meant to shield from FTCA challenges."  *Id.* at 1453.  The Court stated, "[a]lthough some of the actions and inactions alleged by the [plaintiff], if true, represent alarming instances of poor judgment and a general disregard for sound investigative procedure, the investigative agents took discretionary action involving considerations of social and political policy" and as such, the discretionary function barred claims of negligence pertaining to their investigation.  *Id.* at 1454.

Similarly, in *Pooler*, the plaintiffs brought a claim against the United States, alleging that the government's investigation, and its decision to file criminal charges, was deficient in several respects.  *Pooler*, 787 F.2d at 869.  The district court dismissed the complaint at the pleading stage, holding that the actions complained of fell within the discretionary function exception to the FTCA.  *Id.* at 870.  On appeal, the Third Circuit affirmed.  Discussing the claim for negligent investigation, the Court noted that the agent "was placed in charge of an investigation, and was required to decide how that investigation would be pursued.  That required consideration of the use and availability of potential informants, and of the competing

UNITED STATES' MOTION
FOR SUMMARY JUDGMENT - 16
(C14-1884-BJR)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

uses of personnel who might be needed for surveillance." *Id.* at 871.  The Court held that

"[w]hen the sole complaint is addressed, as here, to the quality of the investigation as judged by

its outcome, the discretionary function should, and we hold, does apply.  Congress did not

intend to provide for judicial review of the quality of investigative efforts." *Id.*

Similarly, in *Williams v. United States*, 314 Fed.Appx. 253 (11th Cir. 2009), the Court

held that an FBI agent's decision to use his vehicle to block the path of the plaintiff was

covered by the discretionary function exception.  *Id.* at pg. 256-58.  The Court held, "[i]n

general, because it is the mandatory duty of law enforcement agents to enforce the law,

decisions as to how to best fulfill that duty are protected by the discretionary function

exception.  *Id.* at pg. 257 (*citing Mid-South Holding Co., Inc. v. United States*, 225 F.3d 1201

(11th Cir. 2000) (holding that U.S. Customs Service's decision to board and search a particular

vessel met both prongs of the discretionary function test); *Mesa v United States*, 123 F.3d 1435

(11th Cir. 1997) (holding that the manner in which agents executed an arrest warrant was

covered by the discretionary function exception); *United States v. Faeca*, 332 F.2d 872, 875 (5th

Cir. 1964) (holding that the exception applied to federal agents' allegedly negligent firing into a

riot)).  The *Williams* Court found that the Agent's decision to use his vehicle was discretionary

because he was required to consider his training, the need to restrain the plaintiff, the concern

for the plaintiff's safety, the public's safety, his available resources, and the information at

hand in determining the proper course of action.  *Id.* at 258.

Indeed, decisions by agency officials in investigating other agency personnel are also

protected.  *See Tabman v. F.B.I.*, 718 F.Supp.2d 98 (D.D.C., June 22, 2010).  In *Tabman*, a

former FBI agent brought an FTCA claim alleging that the FBI's investigation of the agent and

proposed removal of him constituted intentional infliction of emotional distress.  *Id.* at 104.

The court held that "many decisions by agency officials to investigate personnel – just as the

UNITED STATES' MOTION
FOR SUMMARY JUDGMENT - 17
(C14-1884-BJR)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

decision to initiate a criminal prosecution has long been considered a discretionary function and that agency officials performing certain functions analogous to those of a prosecutor are not subject to suit under the discretionary function exception to the FTCA.  *Id.* (*citing Sloan v. United States Dep't of Housing and Urban Development*, 236 F.3d 756, 760 (D.C.Cir. 2001); *Butz v Economou*, 438 U.S. 478, 515 (1978); *Gray v. Bell*, 712 F.2d 490 (D.C.Cir. 1983)).  The Court held that, even if the plaintiff could prove that agency officials violated standards for investigation, "[w]here the investigator's conduct during an investigation is 'inextricably tied' to the overall discretionary decision to investigate and then prosecute a plaintiff, such actions are included within the discretionary function exception."  *Id.* at 105 (*citing Gustave-Schmidt v. Chao*, 226 F.Supp.2d 191, 199 (D.C.C. Sept. 30, 2002)).  And this is true "even if there was an 'improper, tortious, ad constitutionally defective manner in which the investigation was carried [out]." *Id.* (*quoting Gray*, 712 F.2d at 515-16); *see also Murphy v. United States*, 121 F.Supp.2d 21, 26 (D.C.C. Sept. 29, 2000) (Secret Service's investigation into supervisor's assault on subordinate during work hours necessarily involved policy choices "fraught with" social judgments involving personnel management and use of investigatory resources).

Therefore, even if Plaintiffs could establish that an Army employee was negligent during the course of Sgt. Aguigui's death investigation, including the investigative techniques employed, the autopsies performed, or the payment of benefits, because their decisions were discretionary and susceptible to policy considerations, the discretionary function exception applies to bar their claims.  *See Kennewick*, 880 F.2d at 1029.

**C.  Plaintiffs' Claims Are Barred Because Georgia Law Does Not Impose a Duty Upon the Army to Prevent the Criminal Act of its Soldiers Against a Person With Whom the Army Had no Special Relationship.**

UNITED STATES' MOTION
FOR SUMMARY JUDGMENT - 18
(C14-1884-BJR)

**UNITED STATES ATTORNEY**
**700 Stewart Street, Suite 5220**
**Seattle, Washington 98101-1271**
**(206) 553-7970**

1      The FTCA permits liability where the United States, if a private person, would be liable

2  to the claimant in accordance with the law of the place where the act or omission occurred.  *Id.*

3  Accordingly, the issue before this Court is whether, under Georgia law, the facts of this case

4  support a claim for negligence against the government.  To state a cause of action for

5  negligence under Georgia law, the following elements are essential: (1) A legal duty to

6  conform to a standard of conduct raised by the law for the protection of others against

7  unreasonable risk of harm; (2) a breach of this standard; (3) a legally attributable causal

8  connection between the conduct and the resulting injury; and, (4) some loss or damage flowing

9  to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty.  *See*

10

11  *Phillips v. South West Mechanical Contractors*, 254 Ga.App. 144, 145-146 (2002).

12

13      Georgia law does not impose a duty to protect a person from the criminal act of a third

14  party absent a special relationship between the defendant and the victim or between the

15  defendant and the assailant.  Neither private individuals, nor the police, nor employers, have a

16  duty to protect another individual absent a special relationship.  *See Malone v. United States*, 61

17  F.Supp.2d 1372, 1381 (S.D.Ga., Aug. 27, 1999) (*citing City of Rome v. Jordan*, 263 Ga. 26

18  (1993)).  A private person does not have a duty to control the conduct of a third person who is a

19  potential tortfeasor, so as to prevent that person from harming another person unless "(a) a

20  special relation exists between the actor and, the third person which imposes a duty upon the

21  actor to control the third person's conduct, or (b) a special relation exists between the actor and

22  the other which gives to the other a right to protection."  *Associated health Sys., Inc. v. Jones*,

23  366 S.E.2d 147, 151 (Ga.App. 1988) (quoting Restatement (Second) of Torts § 315 (1965)).

24

25      The police do not have a duty to keep a person safe from criminal violence absent a

26  "special relationship between the individual and the municipality which sets the individual

27  apart from the general public and engenders a *special duty* owed to that individual...."  *Jordan*,

28

UNITED STATES' MOTION
FOR SUMMARY JUDGMENT - 19
(C14-1884-BJR)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

263 Ga. at 28; *see also Gregory v. Clive*, 282 Ga. 476, 477 (2007); *Butler v. Carlisle*, 299 Ga.App. 815, 824 (2009); *Partain v. Oconee County*, 293 Ga.App. 320, 321 (2008).

Similarly, employers are shielded from liability for torts that their employees commit on the public in general, that is to say, people who have no special relation to or association with the employer's business. *See TGM Ashley Lakes, Inc. v. Jennings*, 264 Ga.App. 456, 462 (2003) (*citing Lear Siegler, Inc. v. Stegall*, 184 Ga.App. 27, 28-29 (1987); *Harvey Freeman & Sons, Inc. v. Stanley*, 189 Ga.App. 256, 257-258(1) (1988), *aff'd in part and rev'd in part on separate grounds*, 259 Ga. 233, 378 S.E.2d 857 (1989)). Even for employers who should have known of the dangerous propensities of an employee, they will not be liable if the employee acts on those propensities in a setting or under circumstances wholly unrelated to his employment. *Id.* at 459.

In a case similar to the case at hand, the District Court for the Southern District of Georgia found that the Army had no special relationship with a civilian plaintiff who was raped by a soldier. *See Malone*, 61 F.Supp. 2d at 1381. Similar to Ms. York, the plaintiff in *Malone* was a civilian. *Id.* at 1374. But unlike this case, the attack and rape in *Malone* occurred outside of the NCO Club *on* the Hunter Army Airfield. *Id.* at 1376. The plaintiff was on the base and socialized with the soldier at the club before she was attacked. *Id.* Even then, the District Court found that there was no "special relationship between [the plaintiff] and the United States Army that would give rise to a duty to protect." *Id.* at 1381.

Here, the Army had no special relationship with Ms. York, a seventeen-year-old civilian. Ms. York did not come into contact with the soldiers involved in her murder because of her relationship with the Army. Rather, she came into contact with these soldiers because of her romantic relationship with Pvt. Roark. Ms. York's murder did not occur during the soldiers' working hours or under the color of employment. The soldiers were off duty and

UNITED STATES' MOTION
FOR SUMMARY JUDGMENT - 20
(C14-1884-BJR)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

were not engaged in any duties related to their Army service when they murdered Ms. York. Rather, the soldiers were engaged in wholly personal activities related to a criminal organization that was for their own personal benefit and that was the antithesis of their service as Army soldiers. The soldiers did not use their positions as Army soldiers as a means to commit the murders. They did not gain access to Plaintiff or exert control over her based on their status as soldiers but more likely as their status of leaders of a criminal organization to which Pvt. Roark was involved in or knew about. The weapons used to kill Ms. York were allegedly purchased illegally by the soldiers in furtherance of their criminal organization, and were not service-issued weapons.

One primary theme of Plaintiffs' negligence case is that, at the time of Ms. York's murder, Army law enforcement was investigating the death of Pvt. Aguigui wife, and Pvt. Aguigui was a person of interest. Plaintiffs argue that the Army should have determined that Pvt. Aguigui murdered his wife sooner and/or should have detained Pvt. Aguigui during the investigation, and if they had, he would not have murdered Ms. York. But Georgia courts have repeatedly rejected similar claims finding no special relationship with an unidentified future victim of someone the police had previously come into contact with.

For example, in *Holcomb v. Walden*, 270 Ga.App. 730 (2004). a motorcycle passenger brought an action against two sheriffs alleging that had the sheriff arrested a motorist for not having valid driver's license, rather than allowing him to drive away, the accident that killed the motorcycle driver would not have occurred. *See Holcomb*, 270 Ga.App at 731-32. The court found that the officer's duty was to the public and no special relation with the motorcycle driver. Similarly, in *Partain,* the plaintiff brought a negligence action against county, sheriff's department, sheriff, and deputy after plaintiff's wife and daughter died as a result of injuries suffered when their vehicle was struck by a vehicle operated by a driver who had a blood-

UNITED STATES' MOTION
FOR SUMMARY JUDGMENT - 21
(C14-1884-BJR)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

alcohol content of more than twice the legal limit, and who had been stopped by deputy 45 minutes before the collision.  *See Partain*, 293 Ga.App. at 321.  The court found that no special relationship existed between the wife and daughter and the defendants and thus, the public duty doctrine prohibited the plaintiff's action.

Similarly, in *Landis v. Rockdale County*, 212 Ga.App. 700 (1994), the widow of a motorist killed in a collision with a drunk driver brought an action against the county, sheriff, and deputy alleging that they failed to arrest or otherwise restrain the individual from driving. *See Landis*, 212 Ga.App. at 700.  The court found that when the deputy was confronted with the intoxicated driver, plaintiff's decedent was not an identifiable victim in immediate danger of harm.  At that point, the deputy had no contact with plaintiff's decedent.  Although the deputy may have been present at the scene of a crime in that he observed an intoxicated driver, the deputy's duty to enforce the drunk driving laws was to the public in general, not specifically to plaintiff's decedent, who was killed hours later in a collision with the intoxicated driver at another location. The court in *Landis* held:

> The special duty required to maintain the action cannot be established by the mere fact that someone with whom the official had prior contact subsequently injured the plaintiff or the plaintiff's decedent.  In deciding the issue of when, if ever, an official's public duty precipitates into a special one to prevent harm to an individual, the law requires, to maintain the action, a showing of imminent harm to an identifiable victim.

*Id.* at pg. 702 (*quoting Shore v. Town of Stonington*, 444 A.2d 1379, 1383 (Conn. 1982) (no liability although police stopped and released drunk driver, who later caused fatal accident)).

Here, Plaintiffs are without evidence sufficient to show the requisite special relationship.  There is no record evidence to suggest that any Army official ever explicitly assured Ms. York that they would act on her behalf.  Moreover, there is no record evidence

UNITED STATES' MOTION
FOR SUMMARY JUDGMENT - 22
(C14-1884-BJR)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

suggesting that Ms. York detrimentally relied on any affirmative remedial actions taken by the Army.  In fact, the record demonstrates that before Ms. York's murder, she was unaware that the Army was investigating Pvt. Aguigui for the death of his wife.  Ms. York had no connection at all with the military, except for her social relationship with one of its serviceman, Pvt. Roark.  Indeed, Plaintiffs have not even established that Pvt. Roark's supervisors were aware of his relationship with Ms. York.

The fact that Ms. York was the victim of a crime by a soldier that the Army was investigating for the possible murder of his wife, did not create a special relationship with Ms. York.  The Army had a general duty to the public to conduct that investigation properly, but did not have a special relationship with Ms. York, a completely unknown future potential victim.  Georgia courts have considered this scenario on multiple occasions and have held that the police do not owe a duty to an unknown future potential victim.  Thus, no special relationship existed in this case.  Ms. York was a completely unknown potential future victim of Pvt. Aguigui's. The fact that the Army was previously investigating him for his wife's murder does not transform the Army's duty into a special one to prevent harm to Ms. York.  There is simply not showing that there was imminent harm to an identifiable victim.

Therefore, because the Army did not have a special relationship with Ms. York, it had no duty to protect her from the potential criminal actions of the soldiers.  Because Plaintiffs cannot establish a duty under Georgia law, the FTCA claim must fail.  *See Ochran v. United States*, 273 F.3d 1315, 1317 (11th Cir. 2001) (FTCA claim dismissed because under Florida law, an Assistant United States Attorney did not have a special relationship to protect a witness from attack by a criminal defendant).

**D.  Plaintiffs' Claims Are Barred Because They Cannot Establish Proximate Cause Under Georgia Law.**

UNITED STATES' MOTION
FOR SUMMARY JUDGMENT - 23
(C14-1884-BJR)

**UNITED STATES ATTORNEY**
**700 Stewart Street, Suite 5220**
**Seattle, Washington 98101-1271**
**(206) 553-7970**

1    Even if Plaintiffs could prove that the Army owed Ms. York a duty under Georgia law,

2    and that any Army employee committed a negligent act, they cannot prove that the negligence

3    was the proximate cause of her death.  Instead, the soldiers' independent intervening criminal

4    acts was the proximate cause.  Georgia law holds that, "generally, an independent, intervening

5    criminal act of a third party, without which the injury would not have occurred, will be treated

6    as the proximate cause of the injury superseding any negligence of the defendant, unless the

7    intervening criminal act is a reasonably foreseeable consequence of the defendant's negligent

8    act." *Brown v. All-Tech Inv. Group, Inc.*, 265 Ga.App. 889, 893 (2003) (*quoting Thomas v.*

9    *Food Lion*, 256 Ga.App. 880, 882-883 (Ga.App. 2002) (*citing FPI Atlanta, L.P. v. Seaton*, 240

10   Ga.App. 880, 884 (1999) (the "intervening criminal act of a third party, which directly caused

11   the injury, will be treated as the supervening proximate cause of such injury" unless the act was

12   a reasonably foreseeable consequence of defendant's negligence)).  In other words, the

13   intervening criminal act of a third party, "without which the injury would not have occurred,"

14   "break[s] the causal connection between the defendants' negligence and the injury unless the

15   criminal act was a reasonably foreseeable consequence of the defendants' conduct."  *Davis v.*

16   *Blockbuster, Inc.*, 258 Ga.App. 677, 679 (2002).

17   Here, not one, but several intervening criminal acts occurred.  First, the soldiers

18   conspired to kill Pvt. Roark.  Second, the soldiers suddenly agreed to kill Ms. York after Pvt.

19   Roark brought her to the scene with him that night.  And third, Sgt. Peden shot and killed Ms.

20   York.  Each of these three criminal acts, committed by at least five different people, constitutes

21   an intervening criminal act between the Army's conduct and Ms. York's injuries.

22   The question for this Court is whether these specific criminal acts were a reasonably

23   foreseeable consequence of the Army's allegedly negligent conduct.  Foreseeable consequences

24   are those which are "probable, according to ordinary and usual experience," those which,

UNITED STATES' MOTION
FOR SUMMARY JUDGMENT - 24
(C14-1884-BJR)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

"because they happen so frequently [,] ... may be expected to happen again." *Food Lion*, 256 Ga.App. at 882; *see also Cope v. Enterprise Rent-A-Car*, 250 Ga.App. 648, 651 (2001) (the law judges foreseeability of consequences "according to the usual experience of mankind"). "[O]ne is not bound to anticipate or foresee and provide against that which is unusual or that which is only remotely and slightly probable." *Strickland v. DeKalb Hosp. Auth.*, 197 Ga.App. 63, 68 (1990). "Damages which are the legal and natural result of the act done, though contingent to some extent, are not too remote to be recovered.  However, damages traceable to the act, but which are not its legal and natural consequence, are too remote and contingent to be recovered." OCGA § 51-12-9

Although under Georgia law questions of negligence and proximate cause are ordinarily for the jury, plain and indisputable cases may be decided by the court as a matter of law.  In such plain cases the inquiry is not whether the defendant's conduct constituted a cause in fact of the injury, but rather whether the causal connection between that conduct and the injury is too remote for the law to countenance a recovery.  *See Strickland*, 197 Ga.App. at 67.  Here, this Court is the trier of fact under the FTCA.  The Court can and should find that Ms. York's damages are too remote and too contingent to be recovered.

In *Simmons v. Dept. of Human Resources*, 213 Ga.App. 98 (1994), the plaintiff's daughter was murdered after she ran away from a group home in which she had been placed.  The plaintiff's daughter ran away from the home with another girl, and a short time later, the girls met and went away with two teenage boys who had no connection with the group home.  *Id.* at 98.  The girls and boys stayed for a while at the home of one of the boy's grandparents until the other girl and the two boys murdered the plaintiff's daughter.  *Id.*  All three were convicted of murder and sentenced to life in prison.  *Id.*  The Georgia Court of Appeals held that "neither Theresa's placement nor the supervision at the home caused her death.  Instead,

UNITED STATES' MOTION
FOR SUMMARY JUDGMENT - 25
(C14-1884-BJR)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

the record shows that Theresa's death, six days after she voluntarily ran away from the group home, was caused by the criminal acts of three people with whom she voluntarily elected to associate and who later murdered her." *Id.*

In *Gammage v. Graham*, 221 Ga.App. 383 (1996), a convicted child molester was murdered in prison. The prisoner opened his cell door, which had a defective lock and invited a fellow inmate into his cell and began telling him about the child molestation incidents leading to his incarceration. *Id.* at 384. The fellow inmate became enraged and later admitted to beating him to death. *Id.* The Georgia Court of Appeals held that the prisoner's death was caused by the criminal acts of someone which whom he voluntarily elected to associate, and who later murdered him. *Id.* The court held that even accepting that violence occurs in prisons "the particular chain of events resulting in Graham's murder were not foreseeable."

Similarly, in *Dowdell v. Wilhelm*, 305 Ga.App. 102 (2010), a defendant escaped sheriff deputies while awaiting trial at a courthouse and later shot and killed a man in his home. Prior to the escape, the sheriff deputies had been warned by a church pastor that the defendant planned to overpower an officer and take the officer's weapon in order to escape from custody. *Id.* at 103. The deputy informed a detention officer that the defendant might "act out" if the jury returned a verdict against him but did not specifically report to anyone that the defendant planned to overpower an officer and take a weapon to escape. The Georgia Court of Appeals held that the Defendant's criminal acts at the courthouse during the escape involving violence against the judge and courthouse staff were foreseeable as probable consequences of his escape attempt. *Id.* at 106. But his subsequent criminal act of shooting another person much later in the day six miles away from the courthouse was not a probable consequence. *Id.* The court held, "Appellants were warned that Nichols would attempt to violently escape, not that he would thereafter commit a crime later in the day in a different part of the city." *Id.*

UNITED STATES' MOTION
FOR SUMMARY JUDGMENT - 26
(C14-1884-BJR)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

In this case, Ms. York's death was caused by the criminal acts of people with whom Ms. York voluntarily elected to associate with and who later murdered her.  Neither Ms. York nor Pvt. Roark could foresee the attack having voluntarily met the soldiers in the Georgia woods in the middle of the night.  Ms. York's mother, Brenda Thomas, testified that Ms. York had been living with Pvt. Roark since November 21, 2011.  *See* Exhibit G, pg. 3.  Ms. York had met Pvt. Aguigui through Pvt. Roark.  Id. at pg. 4.  Ms. York reportedly told her mother she felt bad for Pvt. Aguigui because "his wife died on the sofa."  Id.  Ms. York never told her mother she was concerned or afraid for her safety, or the safety of Pvt. Roark.  Id. at pg. 4-6.  If Ms. York and Pvt. Roark could not have foreseen the attack by their own associates, how could the Army have foreseen it?

Therefore, even assuming Plaintiffs could prove that the Army's actions were negligent, the soldiers' independent, intervening criminal acts, without which the injury would not have occurred, are the proximate cause of the injury superseding any alleged negligence of the Army.

### E.  CONCLUSION

After Plaintiffs' daughter was murdered, the soldiers were arrested and tried for their crimes in Georgia state court.  Sgt. Aguigui was also tried by the Army for the murder of his wife.  A lot of information came to light about the soldiers involved in Ms. York's murder during these criminal investigations and prosecutions; some of it true and some possibly just bravado.

Nevertheless, the information caused Plaintiffs to question whether their daughter's murder could have been prevented.  Plaintiffs, now armed with all of the information that came out after the murder, ask --- why didn't anybody do anything before the murder, why didn't

UNITED STATES' MOTION
FOR SUMMARY JUDGMENT - 27
(C14-1884-BJR)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

anybody put all the pieces together, why didn't anybody recognize that these soldiers posed a danger to their daughter.

Hindsight is wonderful.  It's always easy to second guess after the fact.  Indeed, it is often said, "hindsight bias makes surprises vanish."  But the Army lacked the benefit of hindsight and Ms. York's murder was in fact a surprise.  Ms. York's murder was not foreseeable to Ms. York, Pvt. Roark, or the Army.  Her murder was not caused by some act of negligence in supervising the soldiers in the years and months before the murder.  Her murder was not caused by some act of negligence in investigating the death of Sgt. Aguigui.  Ms. York's murder was caused because the soldiers were paranoid Pvt. Roark would tell the authorities about their activities and/or plans for illegal acts.  It was a cover-up crime initially only aimed at Pvt. Roark and Ms. York was only a victim because Pvt. Roark brought her to the scene that night.  This kind of senseless murder cannot be predicted absent the benefit of 20/20 hindsight.

DATED this 28th day of November, 2016.

Respectfully submitted,

ANNETTE L. HAYES
United States Attorney

s/ Kristin B. Johnson
KRISTIN B. JOHNSON, WSBA #28189
Assistant United States Attorney
700 Stewart Street, Suite 5220
Seattle, WA  98101-1271
Telephone No. (206) 553-7970
E-mail: kristin.b.johnson@usdoj.gov
Attorney for the United States

UNITED STATES' MOTION
FOR SUMMARY JUDGMENT - 28
(C14-1884-BJR)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Western District of Washington and is a person of such age and discretion as to be competent to serve papers;

That on the below date she electronically filed the foregoing document(s) with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the attorney(s) of record as follows:

Brian C. Brook                    brian@clintonbrook.com

Gerald Derevyanny                 jerry@adlervermillion.com
                                  Jerry@nwcs425.com


DATED this 28th day of November, 2016.


                                  *s/ Tara Faulds*
                                  TARA FAULDS
                                  Legal Assistant
                                  United States Attorney's Office
                                  700 Stewart Street, suite 5220
                                  Seattle, Washington 98101-1271
                                  Phone: 206-553-7970
                                  Fax: 206-553-4067
                                  E-mail: tara.faulds@usdoj.gov

UNITED STATES' MOTION
FOR SUMMARY JUDGMENT - 29
(C14-1884-BJR)

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970