UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TRACY JAHR, et al.,

          Plaintiff,

v.

UNITED STATES OF AMERICA,

          Defendant.

Civil Action No. 2:14-cv-01884-BJR

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

Plaintiffs Brenda Thomas and Timothy York[1] bring this wrongful death action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*, alleging negligence by the United States Army resulting in the December 2011 murder of their daughter, Tiffany York ("York"). The Government moves for summary judgment on Plaintiffs' claims, asserting they are barred by the discretionary function exception to the FTCA and must be dismissed. Alternatively, the Government argues that Plaintiffs' negligence claims fail as a matter of law because the Army did not have a duty to protect York from third-party criminal acts. Finally, the Government

---

[1] The claims of co-plaintiffs Tracy Jahr and W. Brett Roark were dismissed earlier in this suit under the *Feres* doctrine. *See* Dkt. 31. The appeal of that dismissal is now pending. *See* Dkt. 61.

1

contends that Plaintiffs cannot demonstrate that any negligent acts on the part of the Army proximately caused York's murder. Having reviewed the parties' briefing, the record of the case, as well as the relevant legal authority, the Court will grant in part and deny in part the Government's Motion for Summary Judgment [Dkt. #47]. Further, the Court orders additional briefing, a schedule for which will be set forth in a companion order.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Seventeen year-old Tiffany York was murdered by four active-duty soldiers on December 5, 2011, in the woods outside of the Army's base at Fort Stewart, Georgia. York was on base visiting her boyfriend, Michael Roark,[2] who was also murdered that night. Plaintiffs allege that the soldiers responsible for the murders—Isaac Aguigui, Christopher Salmon, Michael Burnett, and Anthony Peden—were part of an anti-government militia group called "Forever Enduring Always Ready" or "FEAR," and that Roark was murdered because he threatened to expose the group. Cmplt. Dkt. 1, ¶¶ 11–12, 15.

It is undisputed that, at the time of York's murder, the U.S. Army Criminal Investigative Command (CID) had identified Aguigui as a "person of interest" in the July 2011 death of his wife, Deirdre Aguigui, who was also a soldier in the Army.[3] It is also undisputed that, after his wife's death, Aguigui received a package of death benefits from the Army—a death gratuity, as well as the proceeds of his wife's Servicemember Group Life Insurance Policy (SGLI)—totaling over $500,000. Plaintiffs allege that Aguigui—the ringleader of FEAR—used this sum of money to purchase a stockpile of weapons for his fledgling citizens' militia, including the gun that was used to kill York. *Id.* ¶ 42.

---

[2] Roark was discharged from the Army a few days before the murder.

[3] Aguigui was later prosecuted in a military court-martial and convicted of his wife's murder.

2

Plaintiffs bring this suit under the FTCA alleging that the Army was negligent in its investigation of Aguigui's activities and failed to mitigate the threat that he posed to members of the public, including York. Specifically, Plaintiffs allege that the Army is responsible for the following negligent acts, all of which, Plaintiffs allege, contributed to the death of their daughter: (1) the disbursement of death benefits to Aguigui in spite of his status as a person of interest in his wife's death; (2) the mishandling of the investigation of the death of Aguigui's wife—in particular, the delay in conducting "canvass interviews" of soldiers in Aguigui's unit and obtaining records explaining why Aguigui was expelled from the West Point preparatory academy; (3) the failure of Aguigui's commanding officer, Sgt. Scott Zipp, to report Aguigui's day-to-day misconduct; (4) the failure to discharge Aguigui from the Army prior to York's murder; and (5) the failure of soldiers to report Aguigui's antigovernment comments and behavior. [4]

### III.  DISCUSSION

**A. Summary judgment standard**

Summary judgment is proper "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of any issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty*

---

[4] Plaintiffs advanced several other theories of negligence in their initial Complaint, but the briefing on the Government's motion indicates that Plaintiffs have distilled their claims to those listed here.

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of a dispute of material fact in two ways: (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). If the moving party meets its burden of production, the burden then shifts to the nonmoving party to identify specific facts from which a fact finder could reasonably find in the nonmoving party's favor. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 252.

The Court is "required to view the facts and draw reasonable inferences in the light most favorable to the [nonmoving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh evidence or make credibility determinations in analyzing a motion for summary judgment because these responsibilities belong to the fact-finder. *Anderson*, 77 U.S. at 249–50. Nevertheless, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380 (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986)). Accordingly, "mere allegation and speculation do not create a factual dispute for purposes of summary judgment." *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081 (9th Cir. 1996).

**B. The FTCA framework**

4

The FTCA waives the Government's sovereign immunity "for tort claims arising out of negligent conduct of government employees acting within the scope of their employment." *Terbush v. United States*, 516 F.3d 1125, 1129 (9th Cir. 2008). The Government can be sued "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The Government's waiver is limited by a number of exceptions, including the discretionary function exception, which precludes any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Where the exception applies, sovereign immunity is restored, and the Court does not have subject matter jurisdiction to consider the plaintiff's claims under the FTCA. *Lesoeur v. United States*, 21 F.3d 965, 967 (9th Cir. 1994).

Courts undertake a two-step analysis in determining whether the discretionary function is applicable. *Terbush*, 516 F.3d at 1129. First, the Court must determine "whether the challenged actions involve an 'element of judgment or choice.'" *Id.* (quoting *United States v. Gaubert*, 499 U.S. 315, 322 (1991)). This first prong is not met if "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). "If there is such a statute or policy directing mandatory and specific action, the inquiry comes to an end because there can be no element of discretion when the employee 'has no rightful option but to adhere to the directive.'" *Terbush*, 516 F.3d at 1129 (quoting *Berkovitz*, 486 U.S. at 536). The proper level of inquiry as to whether a function is discretionary is "act by act." *In re Glacier Bay*, 71 F.3d 1447, 1451 (9th Cir. 1995). The

5

question "is not whether the Government as a whole had discretion at any point, but whether its allegedly negligent agents did in each instance." *Id.*

If there is no specific course of action prescribed, then the Court must next consider whether the element of choice or judgment involved in the challenged decision or action "is of the kind that the discretionary function was designed to shield." *Berkovitz*, 486 U.S. at 536. In order to fall under the discretionary function exception, the choice or judgment exercised must be "one involving social, economic, or political policy." *Vickers v. United States*, 228 F.3d 944, 949 (9th Cir. 2000). "Because the purpose of the exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort, . . . the exception protects only governmental actions and decisions based on considerations of public policy." *Gaubert*, 499 U.S. at 323 (internal citations and quotations omitted). When "established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324. "Both the discretionary act prong and the policy judgment prong of the discretionary function exception must be satisfied." *Sabow v. United States*, 93 F.3d 1445, 1451 (9th Cir. 1996).

**C. The discretionary function exception as applied to Plaintiffs' claims**

**1. The disbursement of life-insurance proceeds**

It is undisputed that the U.S. Army Casualty Affairs Office (CAO) disbursed over half-a-million dollars to Aguigui after his wife's death. Plaintiffs allege that this disbursement of funds was negligent because, at that time, Aguigui was a person of interest in the investigation of his

wife's death.[5] The Government contends that the disbursement of life-insurance proceeds is at the discretion of the Army. The statute governing SGLI payments instructs only that life-insurance proceeds be paid to the policyholder's surviving beneficiary "upon the establishment of a valid claim." 38 U.S.C. § 1970(a). The corresponding regulation does not provide any additional guidance for determining whether a beneficiary's claim is "valid," nor does it prohibit payment to a person of interest such as Aguigui. *See* 38 C.F.R. § 9.5.[6]

Nonetheless, Plaintiffs contend that it was mandatory that CAO withhold the life-insurance payment from Aguigui. In support of their argument, Plaintiffs rely not on any federal statute or regulation, but on deposition testimony from casualty assistance officer Rosa Oates and CID Special Agent Wes Toole, both of whom were involved in Aguigui's case. Plaintiffs have not provided, nor has the Court found, any case in which a court has concluded from *only* deposition testimony that a mandatory directive prescribed—or proscribed—certain conduct by a Government actor. In any case, the testimony that Plaintiffs offer does not demonstrate that

---

[5] Plaintiffs refer generally to "death benefits," which the record indicates comprises two distinct sets of funds—the "death gratuity" created by statute and the life-insurance proceeds paid to a designated beneficiary under the SGLI program. Plaintiffs argue that the CAO was prohibited from releasing *any* benefits to Aguigui because of his person-of-interest status. But the death gratuity and the SGLI program are governed by two discrete statutory and regulatory schemes. The death gratuity scheme is, in fact, mandatory, but not in the way that Plaintiffs argue. The relevant statute mandates that "the Secretary [of the Army] *shall* have a death gratuity paid to or for the survivor prescribed . . . immediately upon receiving official notification of the death of a member of the armed force . . . who dies while on active duty," and does not provide for any exception other than for survivors of servicemembers put to death as punishment for a crime. 10 U.S.C. §§ 1475(a), 1480 (emphasis added). It is clear from the language of the statute that the Government was required to pay the death gratuity to Aguigui. Therefore, the Court only applies the discretionary-function analysis to Plaintiffs' claim that the Government was prohibited from paying Aguigui the proceeds of his wife's SGLI policy.

[6] Plaintiffs note that a provision was added to the regulation in 2012 prohibiting payment of insurance benefits to persons "convicted of intentionally and wrongfully killing the decedent or determined in a civil proceeding to have intentionally and wrongfully killed the decedent." 38 C.F.R. § 9.5(e)(2)(i). Plaintiffs argue that this so-called "slayer's rule" has always been implied as part of federal common law, even if it was not articulated in the Code of Federal Regulations at the time the Army released death benefits to Aguigui. However, even assuming that the slayer's rule was applicable in 2011, it lends no support to Plaintiffs' claim, as Aguigui had not yet been convicted of his wife's murder.

7

CAO was subject to a "fixed or readily ascertainable standard" prohibiting it from disbursing life-insurance proceeds to Aguigui. *Powers v. United States*, 996 F.2d 1121, 1124 (11th Cir. 1993) (quoting *Alabama Elec. Coop., Inc. v. United States*, 769 F.2d 1523, 1529 (11th Cir. 1985)). Further, the lack of statutory or regulatory guidance regarding what constitutes a "valid" SGLI claim indicates that casualty affairs officers must exercise an element of judgment in determining the validity of a beneficiary's claim. Having concluded that the disbursement of SGLI proceeds involved discretion, the Court looks to see if it is grounded in public policy. *See Gaubert*, 499 U.S. at 324. The Court finds that the administration of the SGLI program implicates sensitive policy questions about how best to provide for the families of servicemembers who die while on active duty. Finding both prongs of the *Gaubert* test to be satisfied, the Court concludes that the discretionary function exception precludes Plaintiffs' negligent disbursement claim.

### 2. The conduct of the investigation of Aguigui

Plaintiffs allege two specific acts of negligence by CID special agents investigating Deirdre Aguigui's death: (1) delay in conducting canvass interviews of soldiers in Isaac Aguigui's unit; and (2) delay in obtaining information about Isaac Aguigui's expulsion from the West Point preparatory academy. The Government contends that these claims are barred by the discretionary function exception because Army regulations and investigative manuals "vest discretion in the investigators to use the tools provided to them, their training, experience, and expertise on how best to conduct the investigation" and "do not prescribe a specific manner in which a special agent must investigate a noncombat death." Govt's Mot., Dkt. 47 at 12**.** Indeed, the portion of the Army Techniques Publication (ATP) pertaining to death investigations gives generic instructions to special agents to "conduct the criminal investigation to collect evidence,

8

identify the responsible parties, and support criminal prosecution." Dkt. 47-4, Ex. C, § 7-7. Likewise, the ATP describes the investigative process as "both an art and a science" and does not appear to prescribe a more detailed pattern for an investigation. *Id.* § 1-6

Plaintiffs do not claim that canvass interviews or requests for records from a soldier's prior educational institution are mandatory steps for investigations generally and do not cite any regulations or formal investigative guidance to support their argument. Rather, Plaintiffs argue that investigators were required to take these steps in *this* particular case because they were ordered by senior personnel to do so. Plaintiffs rely on a document entitled "Case Activity Summary" (CAS) in support of their argument. An entry dated July 24, 2011 and attributed to Special Agent Andrew Dale states, in relevant part, "Coordiante [sic] with CPT DANIELS and obtain a list of all Rear D 6-8 Cav soldiers since Jan 11 to current. Then conduct canvass interviews of all of them." Dkt. 82-3, Ex. 11 at 27. The CAS also contains an entry attributed to Special Agent Don Bauman in which Bauman lists a series of notes on the ongoing investigation. Dkt. 82-5, Ex. 13 at 57–60. One of the items on the list reads, "Coordinate with West Point and determine why they [Isaac and Deirdre Aguigui] were both released. Did she voluntarily leave because he was released? Was he released because he refused to turn in his friends for drinking?" *Id.* at 57. Finally, Plaintiffs point to an entry attributed to Cassandra Ivery relaying the text of an email from Cpt. Nicole Borchardt indicating that she had "follow-up" questions about the investigation. Dkt. 82-3, Ex. 11 at 35. Borchardt's first question was: "Did either Aguigui attend West Point at any time and if so, why/when did they leave?" *Id.*

Plaintiffs contend that this series of entries in the CAS indicates that investigators had no choice but to pursue these avenues of investigation because they were ordered to do so. Plaintiffs note that the Uniform Code of Military Justice (UCMJ) makes it a crime to violate or

9

disobey "any lawful general order or regulation" as well as "any other lawful order issued by a member of the armed forces" that a servicemember has the duty to obey. 10 U.S.C. § 892(1), (2). While it is quite apparent that a servicemember may not refuse a legitimate order directing her to take specific action, it is not so apparent that a CAS entry constitutes such an order or even indicates that such an order was given at any point in time. Further, the balance of cases addressing law enforcement and investigative decisions like those here have concluded that investigations are fluid processes in which agents are empowered to make decisions "in light of specific circumstances surrounding a particular investigation." *Sabow*, 93 F.3d at 1452; *see also Vickers*, 228 F.3d at 951; *Hobdy v. United States*, 762 F.Supp. 1459, 1461 (D. Kan. 1991), *aff'd* 968 F.2d 20 (10th Cir. 1992). "[T]he discretionary function exception protects agency decisions concerning the scope and manner in which [the Government] conducts an investigation so long as the agency does not violate a mandatory directive." *Vickers*, 228 F.3d at 951. "[T]he decision how to investigate, who to investigate, and how to present evidence to the proper authorities are classic examples of discretionary conduct." *Hobdy*, 762 F.Supp. at 1461 (internal quotations omitted).

The Court's conclusion, however, should not be mistaken for approval of the investigators' seeming disregard for the guidance given to them by more senior personnel; it is merely a recognition that policy judgments regarding how best to allocate investigative time and resources are the kind that Congress intended to insulate from judicial second-guessing, thus meeting the second prong of the discretionary function test. "Investigations by federal law enforcement officials, particularly those involving the U.S. military, clearly require investigative officers to consider relevant political and social circumstances in making decisions about the nature and scope of a criminal investigation." *Sabow*, 93 F.3d at 1453–54. "That holding

applies to any criminal or quasi-criminal investigation," even when investigators' discretion is exercised as poorly as it was in this case. *Alfrey v. United States*, 276 F.3d 557, 566 (9th Cir. 2002); 28 U.S.C. § 2680(a). The Court would be remiss if it did not note that the record in this case "represent[s] alarming instances of poor judgment and a general disregard for sound investigative procedure." *Sabow*, 93 F.3d at 1454. An investigative report compiled after York's murder and after canvass interviews were conducted revealed that: (1) Aguigui was attempting to recruit fellow soldiers to join a citizens' militia in Washington State; (2) Aguigui "discussed openly how he would conduct active shooter situations on Ft. Stewart"; (3) Aguigui mapped out the sewer system on Fort Stewart, hoping to smuggle weapons through those channels; (4) Aguigui and Salmon had spent tens of thousands of dollars at firearms dealers; (5) Aguigui "talked constantly about anarchy"; and (6) Aguigui had attempted to construct a pipe bomb at Salmon's on-post residence.[7] Dkt. 79-7, Ex. 9 at 1–3. Whether this knowledge would have changed the Army's course of action with respect to Aguigui is not clear. What is clear, however, is that the Court does not have jurisdiction to review the investigators' decisions, no matter how misguided they may have been. Plaintiffs' claims alleging negligence in the investigative process are therefore dismissed.

### 3. Failure to report day-to-day misconduct

Plaintiffs next allege that Aguigui's non-commissioned officer (NCO) supervisor, Sgt. Scott Zipp, violated a mandatory directive by failing to report Aguigui's persistent misconduct—including leaving the appointed time and place of duty and not showing up for work. Plaintiffs again fail to cite any federal statute or policy prescribing a mandatory course of action for NCOs

---

[7] This revelation came from Salmon's wife, who was not a member of Aguigui's unit. Dkt. 79-7, Ex. 9 at 3. However, it appears that the interview of Mrs. Salmon took place in conjunction with the long-delayed interviews of those unit members. *Id.*

11

handling their subordinates' disciplinary problems. Whether and when to report disciplinary problems up the chain of command appears to be left entirely to the NCO's discretion. In their response to the Government's motion, Plaintiffs assert that Zipp had "a clear legal obligation" under the UCMJ to report Aguigui's misconduct, but do not cite any provision of the Code. Pls' Resp., Dkt. 79 at 17. Again, Plaintiffs point to deposition testimony[8] as support for their claim that a mandatory directive dictated how Zipp was to handle Aguigui's misconduct. The Court has already concluded that deposition testimony cannot itself suffice to demonstrate the existence of a mandatory directive under *Gaubert*.

Having failed to demonstrate that any mandatory reporting requirement compelled Zipp to report Aguigui's misconduct up the chain of command, Plaintiffs seek to hold Zipp accountable for allegedly taking bribes from Aguigui in exchange for his silence, arguing that Zipp was not authorized to abuse his disciplinary discretion in this way. However, the FTCA does not distinguish between discretionary functions that are executed properly and those that are executed wrongfully. The language of the statute explicitly precludes claims attacking a Government actor's exercise of discretion "whether or not th[at] discretion . . . be abused." 28 U.S.C. § 2680(a). Thus, the fact that Zipp may have allowed himself to be improperly

---

[8] Plaintiffs cite the following colloquy from the deposition of Cpt. Zonie Daniels:

> Q: . . . [A]s far as the UCMJ goes, if a sergeant knows that there's a pattern of misconduct by a private but they intentionally do not report that because they want to protect the private from the consequences that they know will be dealt to the person? Is that a problem?
> A: Yes. That's a problem for – for the – definitely for a noncommissioned officer.
> Q: Is that a violation of the UCMJ?
> A: Yes.
> Q: Do you know what part of the UCMJ?
> A: I'm not sure exactly the article or nothing, but I would have to like, actually look into it as far as what article that would be.

Daniels Dep., Dkt. 82-16, Ex. 16 at 26:3–16.

12

influenced in exercising his disciplinary discretion does not save Plaintiffs' claim from dismissal under the discretionary function exception.

### 4. Failure to discharge Aguigui

Plaintiffs allege that staff judge advocate Cpt. Nicole Borchardt violated a mandatory directive requiring her to discharge Aguigui from the Army when she placed Aguigui's discharge paperwork on hold. Plaintiffs allege that, had Aguigui been discharged as required, York's murder would not have occurred. The Government contends that the decision to place a soldier's discharge paperwork on hold pending a criminal investigation of that soldier is within the discretion of Army officers. As in the case of their negligent-investigation claim, Plaintiffs' claim rests not on a federal statute or regulation, but on a CAS entry by a CID special agent noting the following:

> Briefed LTC HADLEY and CSM POWELL on this investigation relevant to PFC AGUIGUI. LTC HADLEY stated he was currently in the process of a Chapter[9] packet of PFC AGUIGUI as he seems to have multiple disciplinary issues and does not believe he should be in the Army. SA FOXX briefed in further detail the investigations involving PFC AGUIGUI and recommended waiting on the chapter until additional information was developed and SJA provided an opine. LTC HADLEY states if SJA preferred charges and recommended pretrail [sic] confinement he would agree, however if not, LTC HADLEY stated he would continue the chapter at the current rate. LTC HADLEY stated he feels PFC AGUIGUI is a high risk and does not want him to be in the Army any longer.

Dkt. 82-3, Ex. 11 at 32. Plaintiffs contend that this entry constitutes an "order" by Hadley to his subordinates to discharge Aguigui and that Borchardt "flout[ed]" this order when, as indicated later in the CAS, she put the chapter paperwork on hold. *Id.* at 33–34; Pls.' Surreply, Dkt. 89 at 9.

---

[9] "Chapter" is Army parlance for administrative separation from the service. *See United States v. West*, 2005 WL 6524316, at \*1 (A. Ct. Crim. App. Feb 23, 2005).

13

This CAS entry does not establish a mandatory, non-discretionary requirement that Borchardt discharge Aguigui from the Army. Rather, the entry explicitly contemplates the input of the SJA in determining whether the discharge process should go forward or whether it should be stopped pending investigation. Plaintiffs' argument that Borchardt was bound by a mandatory directive fails. Furthermore, the Ninth Circuit has determined that employment claims of this nature "fall squarely within the discretionary function exception." *Nurse v. United States*, 226 F.3d 996, 1001 (9th Cir. 2000). "Issues of employee supervision and retention generally involve the permissible exercise of policy judgment." *Tonelli v. United States*, 60 F.3d 492, 496 (8th Cir. 1995). Finding no mandatory directive prohibiting Borchardt from exercising discretion in the discharge process, the Court concludes that the discretionary function exception bars Plaintiffs' claim.

### 5. **Failure to report antigovernment activity**

Finally, Plaintiffs assert that soldiers in Aguigui's unit were negligent in failing to report suspicious activity and comments by Aguigui, including his efforts to marshal recruits to join a citizens' militia he was forming in Washington State. Plaintiffs contend that these soldiers were required to report this information under Army Regulation (AR) 381-12, which provides that all Department of the Army (DA) personnel "will report" certain categories of "threat-related incidents," including: (1) "[a]ttempts to encourage military or civilian personnel to violate laws or disobey lawful orders or regulations for the purpose of disrupting military activities (subversion)"; and (2) "[a]ny DA personnel participating in activities advocating or teaching the overthrow of the U.S. Government by force or violence, or seeking to alter the form of government by unconstitutional means (sedition)." Dkt. 79-15, Ex. 41 at 14.

Members of Aguigui's unit were interviewed after the murders, and an investigative report was compiled in February 2012. The report indicates that, prior to York's murder, soldiers in Aguigui's unit were recruited to join or had knowledge of Aguigui's professed intent to form an antigovernment citizens' militia and to commit acts of violence. Dkt. 79-7, Ex. 9 at 2. One soldier stated in his interview that Aguigui "talked constantly about anarchy and how he disliked the Army," as well as his plans to "conduct active shooter situations on Ft. Stewart." *Id.* at 3. Another soldier Aguigui attempted to recruit told investigators that Aguigui "said he was buying weapons and land" in order to start his militia. *Id.* at 2. The Government does not dispute these facts, nor does it dispute the applicability of AR 381-12 to soldiers serving with Aguigui. The regulation is clear—soldiers had no rightful option but to report Aguigui's efforts to recruit them to join his antigovernment cadre and his plans to commit acts of violence to the relevant authorities. Therefore, the discretionary function exception does not preclude Plaintiffs' claim that Aguigui's unit-members violated AR 381-12. The Court has jurisdiction to hear this claim.

## IV. CONCLUSION

Having evaluated each of Plaintiffs' claims under the discretionary function exception, the Court ORDERS as follows:

(1) The Government's Motion for Summary Judgment is GRANTED as to the following claims of negligence:

   a. Disbursement of death benefits

   b. Investigation of Deirdre Aguigui's death

   c. Failure to report Isaac Aguigui's misconduct

   d. Failure to discharge Isaac Aguigui while investigating his involvement in the death of his wife.

These claims are HEREBY DISMISSED.

(2) The Court has jurisdiction to consider Plaintiffs' claim alleging a breach of the duty to report extremist activity under Army Regulation 381-12 and will analyze this claim in accordance with Georgia tort law. The Government's Motion as to this claim is, therefore, DENIED.

Dated this 2nd day of May, 2017.

Barbara Jacobs Rothstein
U.S. District Court Judge