IN THE SUPERIOR COURT OF LONG COUNTY

STATE OF GEORGIA

STATE OF GEORGIA,          *
                        *
      vs.               *     CASE NO.: 2012-R-61
                        *
MICHAEL ABRAHAM BURNETT,   *
        Defendant.       *



Heard before the Hon. Robert L. Russell,

Judge, Atlantic Judicial Circuit,

in Long County, Ludowici, Georgia,

on the 27th day of August, 2012.

* * * * * * * * * * * *

TRANSCRIPT OF PROCEEDINGS

GUILTY PLEA

* * * * * * * * * * * *

**LIBERTY COURT REPORTING**
**Post Office Box 232**
**Ludowici, GA 31316**
**(912) 427-7786**
**libertycourtreporting@hotmail.com**

**Exhibit 46**

<u>APPEARANCES:</u>

FOR THE STATE:         TOM DURDEN, ESQ.
                       District Attorney, AJC
                       945 E.G. Miles Parkway
                       Hinesville, Georgia  31313


                       MS. ISABEL PAULEY
                       Assistant District Attorney, AJC
                       945 E.G. Miles Parkway
                       Hinesville, Georgia  31313


FOR THE DEFENDANT:     MS. TRACY MULLIS
                       Mullis & Oliver LLC
                       117 Roger Shaw Street
                       P.O. Box 98
                       Swainsboro, Georgia 30401
                       Phone (478) 237-9009
                       Fax (478) 237-9010


REPORTER:              Danny C. Sayer
                       LIBERTY COURT REPORTING
                       P. O. Box 232
                       Ludowici, Georgia 31316

**Exhibit 46**

1    THE COURT:  This is the matter of The State of

2    Georgia versus Michael Abraham Burnett.  This is Case

3    No.: 2012-R-61 in the Superior Court of Long County.

4    I'm Robert L. Russell the presiding Superior Court

5    Judge in this matter.  Mr. Burnett is present here in

6    the courtroom with his attorney, Ms. Mullis.  We have

7    Tom Durden, the -- the District Attorney for the

8    Atlantic Judicial Circuit and Isabel Pauley, Assistant

9    District Attorney for the Atlantic Judicial Circuit

10   present.  Now, Mr. Durden, what are we doing today?

11   MR. DURDEN:  Your Honor, we're prepared to enter

12   a plea on the indictment that Your Honor just sounded,

13   a guilty plea to -- and I -- Ms. Pauley will outline --

14   THE COURT:  All right.  Ms. Pauley, --

15   MR. DURDEN:  -- and this is -- this is pursuant to

16   plea negotiations.

17   THE COURT:  Ms. Pauley -- Ms. Pauley, you tell me

18   what's going on.

19   MS. PAULEY:  Yes, sir.  Your Honor, we do have a

20   negotiated guilty plea for approval by the Court.  Your

21   Honor has a copy.  I will hand you now the original

22   that has been signed by counsel and by the defendant,

23   Mr. Burnett.  Your Honor, we are prepared at this time

24   to also tender to the Court a nol pros.  As the Court

25   may be aware, this case was re-indicted and is now

**Exhibit 46**

1    before the Court on 2012-R-61.  The re-indictment --

2         THE COURT:  Yeah.  So I'll change -- if I said --

3    I did say 61 I believe when I called the case.

4         MS. PAULEY:  Yes, sir.  The original indictment

5    was 2012-R-0044.  The case was re-indicted earlier this

6    month to include, in addition to the murder counts,

7    some gang counts.  So we would, at this time, tender a

8    nol pros on the first indictment and we are proceeding

9    on the second indictment.

10        THE COURT:  That's fine.  I'll sign it right now

11   and give it -- file it with the Clerk of Superior

12   Court, Frank Middleton.

13        MS.  PAULEY:   Your  Honor,  as  part  of  the

14   negotiations the defendant is charged in Counts One and

15   Two with malice murder, two counts for the two victims

16   in this case, Michael Rork and Tiffany York.  He's

17   charged in Counts Three and Four with felony murder and

18   Counts Five and Six with the violation of The Street

19   Gang Terrorism and Prevention Act; Count Seven and

20   Eight, possession of a firearm during the commission of

21   a felony; Counts Nine and Ten, violation of The Street

22   Gang Terrorism and Prevention Act and Counts Eleven and

23   Twelve are aggravated assaults, one per victim.  As

24   part of the negotiations, Your Honor, we are tendering

25   at this time a nol pros as to the felony murder counts,

**Exhibit 46**

1   Three and Four and the two aggravated assault counts,

2   Eleven and Twelve.  The defendant would plead guilty to

3   the remaining counts.  As Your Honor can see, Counts

4   One and Two, malice murder, as part of the plea

5   negotiations would be reduced to voluntary

6   manslaughter.  I would tender the nol pros at this

7   time, Your Honor, to the counts we negotiated.

8        THE COURT:  I'll sign them right now.

9        MS. PAULEY:  Your Honor, at this time -- again the

10   defendant would be pleading guilty to Counts One and

11   Two, reduced charges of voluntary manslaughter.  He

12   would plead guilty to all remaining counts as indicted

13   in the indictment returned by the Grand Jury here in

14   Long County on August 10, 2012.  Your Honor, in a

15   moment I will recite a factual basis to support the

16   plea.  This of course is our office, the attorney's

17   summary and it is a condensed summary.  This case file

18   is voluminous.  This is not exhaustive of the facts or

19   the evidence that the State has against this defendant

20   or the other defendants.  It simply is a summary to be

21   utilized for the Court for an acceptance of the plea

22   today.

23        MR. DURDEN:  And if I may, Your Honor, not to

24   preempt the work that we've done on this case, but the

25   -- or the statement that Ms. Pauley is making, we have

**Exhibit 46**

1    been in constant communication with the federal

2    authorities and with their investigation and this is,

3    as Ms. Pauley said, a condensed summary, not to

4    including [sic] everything else that may come out of

5    this whole investigation.

6        THE COURT:  Very well.

7        MS. PAULEY:  Sir, on the morning of December 6th,

8    2011 teenage sweethearts Michael Rork and Tiffany York

9    were found shot in the head off Morgan Lake Road in

10    Long County, Georgia.  A walkie talkie is located at

11    victim Michael Rork's hand.  His body is found outside

12    and next to his vehicle.  Victim Tiffany York's body is

13    found inside the car.  Evidence at autopsy reveals the

14    victim -- victims both were murdered by 410 shotgun

15    rounds.  Further investigation by the Georgia Bureau of

16    Investigations, which here on after I will refer to as

17    the GBI, determines the murder weapon as a Taurus Judge

18    Pistol, which fires either 45 caliber rounds or 410

19    shotgun shells.  Investigators further learn victim

20    Michael Rork had, only days before his murder, been --

21    been discharged from the Army.  He had been stationed

22    at nearby Fort Stewart and planned to return to his

23    home state of Washington.  Victim Tiffany York was his

24    17 year old girlfriend of only a few months.  She was

25    a high school student and Michael Rork was her first

**Exhibit 46**

1    love.   She  had  plans  to  move  back  to  her  home  of
2    California.     The   GBI,   through   its   exhaustive
3    investigation, now knew who had been murdered execution
4    style.  The agency knew where the murders happened and
5    how they were carried out.  The GBI had to next answer
6    the questions of who committed these heinous murders
7    and why.   Evidence gathered by the GBI, local law
8    enforcement, The US Army Criminal Investigators and the
9    Federal Agencies of the FBI and ATF provide answer to
10   these questions.  The answers to these questions of who
11   and  why  center  around  one  man,  Isaac  Aguigui.
12   Defendant  Isaac  Aguigui  is  active  duty  Army  and
13   assigned to the same unit as Victim Rork.  Defendant
14   Aguigui formed and organized an anarchist group and
15   militia.  All members of the group were active duty
16   military  or  former  military.   The  total  number  of
17   members remains unknown.  Defendant Aguigui actively
18   recruited  new  members  at  Fort  Stewart  and  targeted
19   soldiers  who  were  in  trouble  or  disillusioned.   He
20   utilized  a  gaming  magazine  article  featuring  the
21   release of a video game, Rainbow VI True Patriots, to
22   gauge the soldier's reactions.  The game features a
23   domestic  terrorist  organization  comprised  of  US
24   Soldiers who attack our own government, contending the
25   attacks  are  necessary  to  return  this  country  to

**Exhibit 46**

1    greatness.   Hence,   the   soldiers   were   the   "True

2    Patriots."  Aguigui called this process the Awakening

3    and   if   those   approached   were   sympathetic   or   in

4    agreement with the concept they would be brought into

5    the folds of the organization.   The closest members of

6    the   organization   were   referred   to   as   The   Family   and

7    included   this   defendant   and   the   other   remaining

8    defendants, Christopher and Heather Sammon and Anthony

9    Pedin.   All these males, Your Honor, are active duty

10   Army.   Heather Sammon had been recently discharged from

11   the Army.   The militia or Auguigui's army had a name,

12   the   acronym   FEAR.    The   name   had   a   literal   meaning

13   because   it   was   what   they   instilled   in   their   enemies.

14   Additionally   it's   letters   stood   for   Forever   Enduring,

15   Always Ready.   Having been trained by the military they

16   planned on utilizing their skills and training to now

17   attack it at all costs.   Your Honor, the expressed goal

18   of FEAR, this militia/anarchist group, was to overthrow

19   the United States Government and execute the president

20   of the United States.   The group knew these objectives

21   would not be achieved overnight so they set their sight

22   -- sights on other acts of domestic terrorism in the

23   interim.   According to this defendant, Michael Burnett,

24   the Defendant Aguigui committed [sic] -- communicated

25   with   other   militia   movements   and   like-minded

**Exhibit 46**

1  organizations in several other states.  FEAR structured

2  their organization, plotted attacks and acquired the

3  means to carry out the attacks.  Acts of domestic

4  terror included forcibly taking over the ammo control

5  point at Fort Stewart to take the post; bombing

6  vehicles of local and state judicial and political

7  figureheads and federal representatives to include the

8  local department of homeland security.  Members also

9  plotted to bomb the fountain in Forsyth Park in

10 Savannah.  Upon getting out of the Army all planned to

11 move to Washington State and live together on a

12 compound.  A security company would serve as a facade

13 for the true nature of their organization and its

14 criminal activities.  Elaborate and further terrorist

15 attacks and planning stages included bombing a dam in

16 Washington State to kill civilians and destabilize the

17 state's economy; alternatively the group schemed to

18 poison the apple crop with the same terrorist goal of

19 chaos, death and financial collapse for the state.

20 Your Honor, this domestic terrorism organization did

21 not simply plan and talk prior to these murders that

22 occurred here in Long County.  The group in fact took

23 action.  Evidence shows the group possessed the

24 knowledge, means and motive to carry out their plans.

25 The group committed local drug and theft crimes by its

**Exhibit 46**

1    members lower in the hierarchy than this defendant and
2    these criminal activities initially funded the group.
3    Then in July of 2011, approximately and less than four
4    months prior to the murders here, defendant Isaac
5    Aguigui's pregnant wife who was also in the Army and
6    stationed at Fort Stewart died under highly suspicious
7    circumstances while alone with him on post.  At her
8    death he acquired a-half-a-million-dollars, $500,000 --
9    $500,000 in benefits and insurance proceeds.  Shortly
10   there after Defendant Aguigui returned to his home
11   state of Washington for bereavement leave and purchased
12   -- excuse me -- approximately $32,000 worth of military
13   grade   assault   rifles   and   other   weaponry   and
14   accessories.  He subsequently purchased approximately
15   another $28,000 of weaponry of the same nature by phone
16   up to and through the end of November, 2011, just days
17   before these murders.  His actions there caught the
18   attention of a joint terrorism task force.  Upon his
19   return to his duty post in Georgia he alerted the other
20   FEAR members to the federal government's response.
21   Defendant  Aguigui,  as  the  leader  of  FEAR,  then
22   structured a firearms (Indicating) purchasing network
23   in violation of Federal Law to effectuate the extensive
24   firearms  stockpiling  needed  for  his  group  without
25   drawing further attention from the federal government.

**Exhibit 46**

1    The defendant now before the Court, Your Honor, along

2    with defendants Christopher and Heather Sammon all

3    purchased firearms in Hinesville, Georgia in violation

4    of Federal Law for the FEAR gang or organization.

5    These firearm and explosive purchases occur between

6    early October, 2011 and up to and including the very

7    day before the murders in question.  Defendant Aguigui

8    gave the other FEAR members his credit and debit cards

9    to illegally purchase these items.  Defendant Aguigui

10   had FEAR's symbol engraved on a number of the weapons.

11   This symbol is the Greek letters of alpha and omega in

12   an overlapping fashion.   It resembles the anarchy

13   symbol and it's meaning was elaborate and known to its

14   members.  Under the symbol, Your Honor, and as it can

15   be seen on an assault rifle -- a military grade assault

16   rifle seized from one of the defendant's residence are

17   the numbers 666 and PLT.  Six-six-six is considered the

18   elite platoon within FEAR or the militia's special

19   forces unit.   Symbolically, 666 is evil and the

20   antichrist and Aguigui chose it for this symbolism.

21   This same symbol for FEAR is tattooed on a number of

22   members, including, Your Honor, this defendant and some

23   others to demonstrate their loyalty to the cause.

24   Among the approximate $27,000 spent on the arsenal here

25   in Hinesville, Georgia and thousands of rounds of

**Exhibit 46**

1    ammunition is the murder weapon utilized in this case,

2    a Taurus Judge Handgun.    This defendant, Michael

3    Burnett purchased the murder weapon on November 25,

4    2011, just days before the murder -- murders.   Your

5    Honor, the group has also assembled and manufactured

6    destructive devices and purchased components for other

7    bombs which were seized from the defendant's homes and

8    a storage unit.    Your Honor, now that the GBI had

9    reached a determination as to who had shot and killed

10   Michael Rork and Tiffany York they learned why and how

11   the murders were carried out.   Defendant Aguigui had

12   befriended Rork.  Michael Rork, associated with him and

13   was trusted with Aguigui's credit cards for purchases

14   for the group.   Aguigui came to believe that Rork had

15   used FEAR's funds for personal uses.   The closest

16   members of the militia, The Family, became concerned

17   and fearful -- fearful that with Rork's discharge from

18   the Army and leaving in advance of the others that he

19   may disclose the organization's -- organization's

20   terrorist activities.   The group determined Rork had

21   betrayed them and posed a serious threat to their

22   plans.   Consequent -- consequently he had to be

23   murdered.   Likewise, his girlfriend posed a risk of

24   disclosure so she had to be killed too to preserve

25   their activities.   The victims went to visit Michael

**Exhibit 46**

1   Rork's father in Florida upon exiting the Army on
2   Friday, December 2nd. The couple returned to Georgia
3   on Monday, December 5th, the very day they were
4   murdered. The victim, Michael Rork communicated with
5   the defendants during the day. Your Honor, that
6   evening the evidence would show Defendant Aguigui
7   decided they needed to kill them now and he determined
8   there was urgency to the matter. The defendants
9   assembled at Defendant Christopher –– Defendant's
10  Christopher and Heather Sammon's residence on Fort
11  Stewart. They told Michael Rork they were simply going
12  night shooting as a ploy to lure him out to an isolated
13  area of woods here in Long County. Your Honor, this
14  defendant and the other three male defendants all rode
15  out to the woods here in Long County in Defendant
16  Aguigui's vehicle. The two victims rode in victim
17  Michael Rork's car. They communicated with each other
18  by way of walkie talkie. Upon arriving at the location
19  all four men exited the car. Defendants Christopher
20  Sammon and Anthony Pedin each shot one of the victims
21  in the head. Defendant Aguigui directed, participated
22  and enjoyed his role as the leader and the murders
23  themselves. Your Honor, he is a self proclaimed cold-
24  blooded murderer before these murders occurred and has
25  said of himself prior to the murders in question, "That

**Exhibit 46**

1    he is" "the nicest cold-blooded murderer you will ever

2    meet."

3         MR. DURDEN:  And that was from the CID.

4         MS. PAULEY:  Yes, sir.  That's actually on an

5    audio recorded device that the State has in its

6    evidence.  The State has obtained, Your Honor, physical

7    evidence to corroborate Defendant Aguigui's vehicle was

8    utilized to kill the victims and that the defendants in

9    question rode in that vehicle and that's based upon

10   biological evidence found within that car.  Your Honor,

11   this defendant exited with the other defendants but did

12   not actively participate in the murders.  He did not

13   shoot either victim, nor did he direct the others to do

14   so.  This defendant, Your Honor, the evidence shows,

15   actually began walk -- to walk back to the car after

16   victim York was murdered and as they prepared to -- to

17   murder Michael Rork.  Your Honor, this defendant is the

18   least legally and morally culpable defendant with

19   regard to the murders.  Of the four defendant

20   participants present at the murders some have given

21   confessions or made admissions, but not all of them, to

22   include one of the shooters.  This defendant's

23   testimony of what transpired at the crime scene itself

24   and in route to the murders is critical to the

25   prosecution of the other defendants.  The State has

**Exhibit 46**

1   reviewed the plea offer before the Court with both

2   victim's families at length and the State's reasons for

3   the recommendation to this Court and its terms.  Your

4   Honor, the families are in agreement with the State's

5   offer and support this outcome in full as to this

6   defendant alone.  Likewise, the GBI as the lead law

7   enforcement agency in this case supports the plea.

8        MR. DURDEN:  Your Honor, what Ms. Pauley has

9   recited for the Court was a stipulated and agreed to

10  set of facts for the Court but I did want the Court to

11  also notice that the families are -- or representatives

12  of the victim's are in court and they are in agreement

13  if --

14       THE COURT:  Very well.

15       MR. DURDEN:  -- if the Court has any questions.

16       THE COURT:  All right.  Ms. --

17       MS. PAULEY:  Your Honor, do you want me to review

18  the terms now or should I wait until after your

19  questioning?

20       THE COURT:  No.  Let's wait on the terms.

21       MR. DURDEN:  I would wait on it.

22       MS. PAULEY:  Yes, sir.

23       THE COURT:  Let's -- Ms. Mullis, have your client

24  and yourself stand at the podium please.

25       MS. MULLIS:  Yes, Your Honor.

**Exhibit 46**

1      THE COURT:  Now ask Ms. Mullis if she agrees with

2   the stipulation.

3      MS. PAULEY:  Ms. Mullis, would you agree that that

4   is a factual -- that there is a factual basis to

5   support the pleas -- pleas that your client is going to

6   enter, minus any defenses your client might have had

7   had the case gone to trial?

8      MS. MULLIS:  Yes, Your Honor.  We so stipulate.

9      THE COURT:  Yeah.  Yes, Mr. Durden?

10      MR. DURDEN:  And also, Tracy -- Ms. Mullis, your

11   in agreement with what Ms. Pauley has said, that is a

12   factual -- an accurate factual foundation --

13      MS. MULLIS:  That is correct.

14      MR. DURDEN:  -- for the plea?

15      MS. MULLIS:  That is correct.

16      MR. DURDEN:  Okay.  All right.  Okay.

17      THE COURT:  All right.  Mr. Burnett, best you can,

18   raise your right hand and be sworn in by the Clerk of

19   Superior Court.

20      MR. BURNETT:  (Complies)

21      CLERK:  Do you swear or affirm your answers to the

22   Judge's questions will be the truth, the whole truth

23   and nothing but the truth so help you God?

24      MR. BURNETT:  Yes.

25      THE COURT:  All right.  Now, Mr. Burnett, what's

**Exhibit 46**

1   going on right now is -- is y'all have told me -- Ms.

2   Pauley has set out a factual basis for the crimes

3   you're charged with.   Your attorney has agreed with

4   that and you have too and now I'm -- my job is to make

5   sure that you are knowingly, intelligently and

6   voluntarily pleading guilty and that you understand

7   what's going on and what rights you're giving up.   The

8   reason -- the way I handle this is ask you a series of

9   questions.   Do you understand?

10          MR. BURNETT:   Yes.

11          THE COURT:   Okay.   Now speak up loud enough so

12   everybody can hear you and that the court reporter over

13   here can take all of this down.   Tell me your full

14   name.

15          MR. BURNETT:   Michael Abraham Burnett.

16          THE COURT:   How old are you?

17          MR. BURNETT:   Twenty-six.

18          THE COURT:   Can you understand my statements and

19   questions?

20          MR. BURNETT:   Yes.

21          THE COURT:   Are you suffering from any physical or

22   mental problems?

23          MR. BURNETT:   No.

24          THE COURT:   Are you under the influence of

25   anything like crack cocaine; cocaine; marijuana;

**Exhibit 46**

Page 17

1    alcohol;  narcotics;  prescription  drugs;  or  any

2    substance?

3           MR. BURNETT:  No.

4           THE  COURT:   So  you're  thinking  clearly  and

5    rationally this morning?

6           MR. BURNETT:  Yes, sir.

7           THE COURT:  Can you communicate effectively with

8    your attorney, Ms. Mullis?

9           MR. BURNETT:  Yes, sir.

10          THE  COURT:   Can  you  make  important  decisions

11   involving your life?

12          MR. BURNETT:  Yes.

13          THE COURT:  Is anybody forcing you to do this?

14          MR. BURNETT:  No.

15          THE  COURT:   Is  anybody  promising  you  anything,

16   other than these negotiations, to get you to do this?

17          MR. BURNETT:  No.

18          THE  COURT:   Okay.   Let's  discuss  this  a  little

19   bit, Mr. Burnett, so you know what the situation is as

20   far as what you're dealing with.   On the indictment

21   2012—R—61 they —— there are twelve counts.  Now, Counts

22   One and Two is malice murder.  Both of those carries a

23   life penalty in the penitentiary.   Counts Three and

24   Four,  felony  murder,  carry  a  life  penalty  in  the

25   penitentiary.   Counts Five and Six are violation of

**Exhibit 46**

1    Street Gang Terrorism Prevention Act and Five and Six,

2    the range of punishment on that I believe is one -- one

3    to 15 years, Ms. Pauley?

4         MS. PAULEY:   Five.

5         THE COURT:   Five to 15 years --

6         MS. PAULEY:   Yes, sir.

7         THE COURT:   -- each.   Then Count Seven and Eight

8    is possession of a firearm during the commission of a

9    felony.   That's up to five years consecutive on both of

10   those to any other -- any other sentence.   Count Nine

11   is violation of The Street Gang Terrorism and

12   Prevention Act.   The range of punishment on that is

13   five to 15.   Count Ten is violation of The Street Gang

14   Terrorism and Prevention Act.   That's five to 15.   And

15   Count Eleven is aggravated assault.   It's one to 20.

16   And Count Twelve, aggravated assault, is one to 20.

17   Now the way I have it figured up is that either the

18   malice murder or the felony murder would merge with

19   each other so you're looking at two life sentences in

20   jail, plus 120 years if all of these matters went to a

21   jury trial.   Now under the terms of the negotiated plea

22   there are a number of matters that would be dismissed

23   or nol prossed.   Counts Three and Four, the malice

24   [sic] -- the felony murders would be nol prossed.   The

25   -- Counts Eleven and Twelve, aggravated assaults would

**Exhibit 46**

1   be nol prossed or dismissed but the other penalties

2   remain the same and that's -- that's what is on the

3   table for you to make a decision on this morning as to

4   whether you want to plead guilty or not guilty to

5   Counts One; Two; Five; Six; Seven; Eight; Nine and Ten.

6   What do you want to do, Mr. Burnett?

7           MR. BURNETT:  Plead guilty.

8           THE COURT:  When you plead guilty you give up some

9   rights you have and I want to go over some of these

10  rights to make sure you understand them.  One of the

11  rights you give up is the right to a jury trial;

12  understand?

13          MR. BURNETT:  Yes, sir.

14          THE COURT:  Another right you give up is the right

15  to have an attorney represent you and if you can't

16  afford an attorney one will be appointed for you at no

17  cost.  Do you understand?

18          MR. BURNETT:  Yes.

19          THE COURT:  Another right you give up is the right

20  for you and your attorney to always be in the courtroom

21  when there's anything going on involving your case and

22  you would be allowed to confront and cross-examine the

23  State's witnesses called against you.  Do you

24  understand?

25          MR. BURNETT:  Yes.

**Exhibit 46**

1   THE COURT:  You're giving up the right to remain

2 silent and what that means is you don't have to testify

3 at a trial.  The State can't call you as a witness.

4 It's your decision to testify or not.  You are presumed

5 innocent.  You have no burden of proof.  The State is

6 the one with the burden of proof and this burden of

7 proof is beyond a reasonable doubt and you're giving up

8 these rights.  Do you understand?

9   MR. BURNETT:  Yes.

10   THE COURT:  You're also giving up the right to

11 subpoena witnesses to come to court to testify for you;

12 understand?

13   MR. BURNETT:  Yes.

14   THE COURT:  Now have you had enough time to talk

15 to Ms. Mullis and think about all of this today?

16   MR. BURNETT:  Yes.

17   THE COURT:  Okay.  Have you got any questions for

18 Ms. Mullis or myself about your rights or what is going

19 on here?

20   MR. BURNETT:  No.

21   THE COURT:  Are you satisfied with the legal

22 representation that you have received from Ms. Mullis?

23   MR. BURNETT:  Yes.

24   THE COURT:  Now, Ms. [sic] -- now, Mr. Burnett, I

25 want you to tell me what was going on about all of this

**Exhibit 46**

1    to -- for me to establish that -- that there is a fact

2    pattern here.  Tell me how you first got involved with

3    this organization.

4       MR. BURNETT:  I had recently been divorced and had

5    custody of my son.  I needed a baby sitter and Heather

6    Sammon, I knew her husband from work.  She offered to

7    baby sit my son.  She started watching my son.  I spent

8    more time over there.  I've -- I've known both Chris

9    and Isaac for an extended period of time.  They

10   introduced me to -- it started out as just going out

11   and shooting guns, just guy stuff and then introduced

12   me to the -- the manuscript is what he called it, the

13   book about true patriots.  I believed in some of the

14   stuff; didn't believe in other things.  It just

15   progressed from there to going out buying more guns.

16   They talked of doing radical things, things that -- a

17   lot of things that I didn't agree upon like hurting

18   innocent people.  I didn't agree with that.  Other

19   things I did agree upon, I did -- I did think that the

20   government needed a change and I thought we were the

21   people to be able to change it.  I don't know how it

22   got to the point where two people got murdered.

23      THE COURT:  Say that again.

24      MR. BURNETT:  I don't know how it got to the point

25   where two people got murdered.

**Exhibit 46**

1    THE COURT:  Did you -- did you discuss murder with

2    these -- the people you were in this group with?

3    MR. BURNETT:  I tried to -- I tried to take them

4    away from that on two separate occasions.

5    THE COURT:  Yeah.  Tell me what was -- tell me

6    about how the words FEAR and how that gang or group

7    came -- came to be and how you were involved with that.

8    MR. BURNETT:  Isaac came up with the acronym for

9    FEAR and my initial involvement was pretty slim and

10   then progressively got more and more to --

11   THE COURT:  What -- what were the goals of the

12   FEAR group?

13   MR. BURNETT:  To give the government back to the

14   people.

15   THE COURT:  So you're -- you're talking about

16   revolution?

17   MR. BURNETT:  Yes, patriotism.

18   THE COURT:  I understand.  Now so you had -- you

19   had automatic rifle -- y'all had automatic weapons in

20   your possession?

21   MR. BURNETT:  No, semi-automatic rifles.

22   THE COURT:  Semi-automatic; all right.  So how did

23   it finally come down to -- to murder?  Tell me what

24   happened.

25   MR. BURNETT:  The night of the murder I went home

**Exhibit 46**

1    around 6:00 from picking my son up from the Sammon's

2    residence.  Stayed at home until 9:06.  I got a phone

3    call from Pedin telling me to come over to their house.

4    So I had to wake my son up; took him over there.  The

5    decision had already been made to murder those two.

6         THE COURT:  How -- who had made this decision?

7         MR. BURNETT:  Pedin, Isaac and Chris.

8         THE COURT:  Okay.  And why did y'all make the

9    decision to --

10        MR. BURNETT:  I didn't make any decisions, sir.

11        THE COURT:  Okay.  Why was the decision made to

12   murder these people?

13        MR. BURNETT:  A loose end is one way that Isaac

14   put it.  Michael was witness to another murder previous

15   to this murder.

16        THE COURT:  Michael -- you mean --

17        MR. BURNETT:  Michael -- Mr. Rork.

18        THE COURT:  -- Michael Rork was a witness to

19   another murder that this group had done?

20        MR. BURNETT:  That Isaac had done.

21        THE COURT:  Yeah.  And what -- what murder was

22   that?

23        MR. BURNETT:  I don't have full stipulation to

24   that.  I don't exactly what happened.

25        THE COURT:  It was here in Georgia?

**Exhibit 46**

Page 24

1        MR. BURNETT:  Yeah.

2        THE COURT:  Yeah.  All right.  So how did it end

3    up that you were in the car that took -- took the

4    parties out to where the shooting was going to occur?

5        MR. BURNETT:  I tried to talk them out of it at

6    first.  At first I went to Heather because Isaac seemed

7    to listen to Heather a lot.  I went to her first and

8    pretty much pleaded with her not to do this and she

9    said the decision has already been made.  I went to

10   Chris and did the same thing.  Once again, I was kind

11   of just shooed off.

12       THE COURT:  Where -- where were Rork -- Michael

13   Rork and Tiffany York?  I mean, were they tied up?

14       MR. BURNETT:  They hadn't come -- they hadn't

15   showed up at the house yet.

16       THE COURT:  They were what?

17       MR. BURNETT:  They weren't there yet.

18       THE COURT:  Okay.  They had -- they were living as

19   a couple in a house?

20       MR. BURNETT:  I -- I don't know.

21       THE COURT:  Well did you -- well did you go in the

22   car to pick them up?

23       MR. BURNETT:  No.

24       THE COURT:  Who -- who did that?

25       MR. BURNETT:  They -- I think they showed up on

**Exhibit 46**

1  their own in a car.

2  THE COURT:  They showed up over at whose house?

3  MR. BURNETT:  At Heather and Chris' house.

4  THE COURT:  Okay.  And what happened when they

5  showed up there?

6  MR. BURNETT:  I was outside for most of it but I

7  guess they talked about going night shooting and

8  then --

9  THE COURT:  I mean, were they tied up?

10  MR. BURNETT:  No.

11  THE COURT:  Okay.  They were just voluntarily

12  going along?

13  MR. BURNETT:  Yes, sir.

14  THE COURT:  And -- and you did too or did somebody

15  order you to come along?

16  MR. BURNETT:  Isaac ordered me to come along and

17  then he threatened to kill my son.  I have a two year

18  old son and --

19  THE COURT:  What, he threatened right then if you

20  didn't come along?

21  MR. BURNETT:  Yeah.  He threatened Pedin's son too

22  from what Pedin has told me and --

23  THE COURT:  Yeah.

24  MR. BURNETT:  Pedin has a young child as well and

25  then --

**Exhibit 46**

1        THE COURT:   So -- so this is -- y'all live

2   somewhere in the city of -- this was -- this -- where

3   everybody was was somewhere in the city of Hinesville?

4        MR. BURNETT:   On post.

5        THE COURT:   On post?

6        MR. BURNETT:   Yes, sir.

7        THE COURT:   Okay.  And so you left Fort Stewart

8   and -- and drove to Hinesville and then into Long

9   County?

10       MR. BURNETT:   Yes, sir.

11       THE COURT:   Okay.  And where did you go in Long

12  County?

13       MR. BURNETT:   I don't really know Long County very

14  well.  They just picked a place that was kind of off

15  the side of the road.  I guess Michael Rork, he knew

16  that area a little bit and he actually drove to the

17  destination.

18       THE COURT:   Michael Rork was actually driving --

19  how many cars were there, one or two?

20       MR. BURNETT:   Two.

21       THE COURT:   And Michael Rork was driving one car?

22       MR. BURNETT:   Yes, sir.

23       THE COURT:   And -- and Ms. Tiffany York was also

24  in that car?

25       MR. BURNETT:   Yes, sir.

**Exhibit 46**

Page 27

```
1          THE COURT:  Who else was in that car?

2          MR. BURNETT:  No one else.

3          THE COURT:  Yeah.  So and then who -- and y'all

4     followed them?

5          MR. BURNETT:  Yes, sir.

6          THE COURT:  And who was in that car?

7          MR. BURNETT:  Pedin was driving.  I was sitting in

8     the passenger seat and then Chris and Isaac were in the

9     back seat.

10         THE COURT:  Okay.  Tell me what happened when Mr.

11    Rork stopped the car.

12         MR. BURNETT:  The car stopped and both Pedin and

13    Chris Sammon went up to both sides of the car and Mr.

14    Rork was starting to get out and Pedin shot her and

15    then --

16         THE COURT:  I mean, did -- did Ms. York and Mr.

17    Rork have guns in their hands?

18         MR. BURNETT:  I don't know.

19         THE COURT:  Where -- you just sat in the passenger

20    side?

21         MR. BURNETT:  I got out.  I got out and walked

22    around to the front of the -- of the jeep and then

23    after Ms. York got shot, that's when I started --

24         THE COURT:  Now who shot Ms. York?

25         MR. BURNETT:  Mr. Pedin.
```

**Exhibit 46**

Page 28

1      THE COURT:  And did you see that?

2      MR. BURNETT:  Yes.

3      THE COURT:  And -- and then what happened?

4      MR. BURNETT:  He reached in and checked her pulse

5  and then shot her again.

6      THE COURT:  And then what happened?

7      MR. BURNETT:  I started to walk back towards the

8  car and they put Michael Rork on his knees and then

9  shot him.

10      THE COURT:  One time?

11      MR. BURNETT:  No, twice.

12      THE COURT:  He shot Michael York [sic] several

13  times?

14      MR. BURNETT:  Chris -- Chris shot him twice.

15      THE COURT:  What?

16      MR. BURNETT:  Chris shot him twice.

17      THE COURT:  Okay.  So there's Mr. Rork and -- and

18  Ms. York laying on the ground and so what happened

19  next?

20      MR. BURNETT:  I was already in the car.

21      THE COURT:  Did -- did they -- did you leave --

22  did y'all leave Michael Rork's car there?

23      MR. BURNETT:  Yes, sir.

24      THE COURT:  You did.  And so everybody got in the

25  car you were in and -- and left at that point?

**Exhibit 46**

Page 29

1      MR. BURNETT:  Yes, sir.

2      THE COURT:  Did you -- did you take anything of

3   Michael Rork's and Tiffany York's, like guns?

4      MR. BURNETT:  Not to my knowledge.  No.

5      THE COURT:  Didn't -- didn't do anything to hide

6   the bodies?

7      MR. BURNETT:  No, sir.

8      THE COURT:  And just left the car there?

9      MR. BURNETT:  Yes, sir.

10     THE COURT:  And so where did you go when you left?

11     MR. BURNETT:  They wanted to go straight back to

12   the house.  So that's what they decided to do.

13     THE COURT:  Straight back to the house on base?

14     MR. BURNETT:  Yes, sir.

15     THE COURT:  Is that what happened?

16     MR. BURNETT:  Yes, sir.

17     THE COURT:  What, and then you later went home?

18     MR. BURNETT:  Yes.

19     THE COURT:  How did you come to be arrested?

20     MR. BURNETT:  We got called to a morning formation

21   on Saturday, December 10th.

22     THE COURT:  Say -- say that again.

23     MR. BURNETT:  We came to a -- they called us in

24   for a morning formation on December 10th.

25     THE COURT:  Who -- who called you in?

**Exhibit 46**

1        MR. BURNETT:  My sergeant did.

2        THE COURT:  Okay.

3        MR. BURNETT:  And then that's when The Special

4    Response Team on post came and arrested us.

5        THE COURT:  Special Response Team, is that -- I'm

6    -- I'm not -- I've never been in the military.  Is that

7    the CID group?

8        MR. BURNETT:  Yeah.  CID is responsible for those.

9        THE COURT:  Criminal Investigation?

10       MR. BURNETT:  Yes, sir.

11       THE COURT:  Uh-huh.  And so did they arrest you?

12       MR. BURNETT:  Yes, sir.

13       THE COURT:  Okay.  And so how did you and -- come

14   to be arrested by the State of Georgia authorities?

15       MR. BURNETT:  They transferred us into GBI custody

16   at Liberty County Jail.

17       THE COURT:  To the Liberty County Jail?

18       MR. BURNETT:  Yes, sir.

19       THE COURT:  And now you -- where have you been

20   housed, at the Liberty County Jail?

21       MR. BURNETT:  Liberty County.  I've just recently

22   been moved.

23       THE COURT:  Yeah.  And where -- okay.  Whose

24   firearm was that that killed Ms. York and Mr. Rork?

25       MR. BURNETT:  Mine.

**Exhibit 46**

1        THE COURT:  Your gun?

2        MR. BURNETT:  Yes, sir.

3        THE COURT:  And you brought it along?

4        MR. BURNETT:  No.  I kept all of my guns --

5   because I have a small child I kept all of my guns at

6   Pedin's house.

7        THE COURT:  Yeah.  Did you get your gun back after

8   the shooting?

9        MR. BURNETT:  No.

10        THE COURT:  Where -- where is it?

11        MR. BURNETT:  At the bottom of the Sunbury Marina.

12        THE COURT:   At the bottom of what now?

13        MR. BURNETT:  Sunbury Marina.

14        THE COURT:  Okay.  Sunbury Marina is -- is where

15   the saltwater hits Liberty County and there's a marina

16   there in the old town of Sunbury, Georgia.

17        MR. BURNETT:  Yes, sir.

18        THE COURT:  So who rode out there to the Sunbury

19   Marina?

20        MR. BURNETT:  Pedin did.  He took the weapon -- he

21   took the murder weapon back to his house and chopped it

22   up into a bunch of pieces he said.  I never saw it.

23        THE COURT:  Yeah.  And then were you with him when

24   it --

25        MR. BURNETT:  No.

**Exhibit 46**

Page 32

1      THE COURT:  -- rode out to Sunbury Marina and

2   threw it?

3      MR. BURNETT:  No, sir.

4      THE COURT:  There's a restaurant there at Sunbury.

5   Is it right by that spot or --

6      MR. BURNETT:  I don't know where he threw it.

7      THE COURT:  Okay.

8      MR. BURNETT:  That's just what he told me.

9      THE COURT:  All right.

10     MR. BURNETT:  Sir, if I could have stopped this

11  from happening I would have.

12     FEMALE VOICE:  You could have.

13     THE COURT:  Ms. Pauley, have you got any

14  additional questions you want to ask him?

15     MS. PAULEY:  No, sir.  The defendant is going to,

16  as part of the agreement, make himself available to the

17  State.

18     THE COURT:  Speak a little louder.

19     MS. PAULEY:  Sir, not at this time in open court.

20  The defendant is -- has agreed -- a part of the

21  conditions of his sentence is that he is to make

22  himself available at anytime for further interviews by

23  the State or any agency.

24     THE COURT:  Yeah.  Yeah.  I'm ready to talk about

25  what the deal --

**Exhibit 46**

1    MS. PAULEY:  Yes, sir.

2    THE COURT:  -- deal is now.

3    MS. PAULEY:  Yes, sir.  So not at this time unless

4    Mr. Durden --

5    MR. DURDEN:  I have --

6    MS. PAULEY:  I don't think that this setting --

7    MR. DURDEN:  Well, I think Your Honor -- when you

8    were questioning Michael here -- Mr. Burnett, there was

9    some events that -- that happened after the shootings

10   took place at the home of Mr. Pedin, off post; right?

11   MR. BURNETT:  (Non-verbal response)

12   MR. DURDEN:  With the burning of some clothes?

13   MR. BURNETT:  Yes.

14   MR. DURDEN:  Were you there?

15   MR. BURNETT:  Yes.

16   MR. DURDEN:  Would you mind telling the Court

17   about that?

18   THE COURT: Yeah.  Okay.  I asked about the pistol

19   and -- and now what else happened that you know about?

20   MR. DURDEN:  Yeah.

21   MR. BURNETT:  Isaac ordered everybody to take

22   their clothes off that were at the -- at the scene of

23   the crime and the next night they burned them.

24   THE COURT:  What, they burned them in like a --

25   just out in the yard?

**Exhibit 46**

1    MR. BURNETT:  Yes, sir.

2    THE COURT:  Okay.  And you just heard about

3    that, you weren't there?

4    MR. BURNETT:  No.  I was there.

5    THE COURT:  You were there and participated in

6    that?

7    MR. BURNETT:  No.

8    THE COURT:  You were just there?

9    MR. BURNETT:  I was just there.

10    THE COURT:  Yeah.  Mr. Durden?

11    MR. DURDEN:  No.  I just wanted to make -- make

12    sure -- clear for the record that that was off post at

13    a residence in Liberty County --

14    MR. BURNETT:  Yes, sir.

15    MR. DURDEN:  -- I mean Hinesville.

16    THE COURT:  That wasn't the same house?

17    MR. DURDEN:  No, sir.

18    MR. BURNETT:  No.  That was at --

19    MR. DURDEN:  Two separate houses.  One was on Fort

20    Stewart.  One was off post --

21    THE COURT:  Okay.

22    MR. DURDEN:  -- in Liberty County.  Am I correct?

23    MR. BURNETT:  Yes, sir.

24    MR. DURDEN:  All right.

25    THE COURT:  All right.  Well, Mr. Burnett, I --

**Exhibit 46**

1   all this is pretty -- pretty shocking to me but I feel

2   that you have knowingly, intelligently and voluntarily

3   pled guilty to -- and this is the plea bargain we're

4   talking about now -- Count One, malice murder being

5   reduced to voluntarily [sic] manslaughter.   That you

6   pled guilty to voluntary manslaughter.   Count Two,

7   malice murder, that would be reduced to voluntary

8   manslaughter and that you have knowingly, intelligently

9   and voluntarily pled guilty to that.   Count Three would

10  be nol prossed or dismissed.   Count Four would be nol

11  prossed or dismissed.    Count Five, which is the

12  violation of The Street Gang Terrorism Act, that you

13  pled guilty to that.   Count Six, violation of The

14  Street Gang Terrorism and Prevention Act, that you pled

15  guilty to that.   Count Seven, possession of a firearm

16  during the commission of a felony, you pled guilty.

17  Count Eight, possession of a firearm during the

18  commission of a felony, that you've pled guilty.   Count

19  Nin [sic] -- Count Nine, violation of Street Gang

20  Terrorism and Prevention Act, you pled guilty and Count

21  Ten, violation of Street Gang Terrorism and Prevention

22  Act, that you pled guilty.   Now -- and then Count

23  Eleven and Twelve, the aggravated assaults would be nol

24  prossed or dismissed.   Now in return for your guilty

25  pleas I have a negotiated plea recommendation that's

**Exhibit 46**

been worked out by you and your attorney on one side and The State of Georgia on the other side and here's what the recommendation to me is and I don't have to take this recommendation.  You understand that?

MR. BURNETT:  Yes, sir.

THE COURT:  All right.  Now the recommendation on the reduced charge of voluntary manslaughter is 20 years, split sentence:  Ten to serve, ten on probation. Count Two, voluntary manslaughter, twenty years:  Ten to serve, ten on probation.  Count Five would be 15 years probation, consecutive to Count One and Two. Count Six would be 15 years probation, consecutive to Count Five.  Count Seven would be five years on probation, consecutive to Count One.  Count Eight: Five years on probation, consecutive to Count Two. Count Nine:  Fifteen years on probation, concurrent to Count Five and Count Ten, fifteen years on probation, concurrent to Count Six.  Now, Ms. Mullis and Ms. Pauley, have I got that right as to what the recommendation is?

MS. PAULEY:  Yes, sir.  And with the total sentence then being -- since it's so many counts we did put the total sentence in bold underneath the minimum and maximum.

THE COURT:  Yeah.

**Exhibit 46**

1    MS. PAULEY:  So the overall sentence would be 50

2    years with ten years to serve in prison, followed by 40

3    years on probation.

4         THE COURT:  All right.  That's cool with me.

5         MR. DURDEN:  And also --

6         THE COURT:  Go ahead.

7         MR. DURDEN:  If I may, Your Honor, that is

8    conditional upon --

9         MS. MULLIS:  Yes, sir.

10        MR. DURDEN:  -- his cooperation in -- as we

11   proceed against the other people involved in this crime

12   -- these crimes and you know that -- that -- if he does

13   not do that then this -- this agreement is conditional

14   upon that.  We want the Court to know that.

15        THE COURT:  Yeah.  Well I'm not -- the only way I

16   -- we'll deal with that, Mr. Burnett, is I'm not going

17   to sentence you at this time.

18        MR. DURDEN:  Right.

19        THE COURT:  I'm going to -- I'm going to --

20        MR. DURDEN:  Either deferral (Inaudible), Your

21   Honor, if that's okay.

22        THE COURT:  Yeah.  I'm going to defer sentencing

23   until your agreement under this recommendation has been

24   concluded satisfactorily to the district attorney's and

25   the State of Georgia's decision.  Now -- and all -- and

Exhibit 46                                             Page 38

1  telling you also, I feel that you can -- the State can

2  withdraw this recommendation before sentencing and at

3  that point you could still be facing the death penalty

4  or if you wish, you can withdraw your guilty plea until

5  I sentence you.  Do you understand?

6       MR. BURNETT:  Yes, sir.

7       THE COURT:  Now if this goes through and you're on

8  probation, I want to let you know that while you're on

9  probation  you  have  --  you  would  have  no  Fourth

10 Amendment right of privacy.  Your home; your car; your

11 body could be searched at any time by -- if you got out

12 on parole, by parole officers or probation officers or

13 law enforcement officers without a search warrant.  If

14 you're not a US Citizen what we've done here today

15 could be used to deport you out of the United States or

16 effect your rights and if you don't think at -- at the

17 end of the sentencing if you don't think what we've

18 done is valid you've got four years from today's date

19 to  file  a  habeas  corpus  petition  challenging  the

20 validity of this or if you appeal this you'd have four

21 years from the date of the denial of appeal to file a

22 habeas corpus petition challenging the validity of

23 this.  Now, Mr. Burnett, I'm getting ready to conclude

24 these proceedings.  The way I understand will happen

25 now is you will stay in custody in a State of Georgia

**Exhibit 46**

1  facility as such time the other matters came to trial

2  and -- against the other -- other defendants in this

3  matter and -- and it's my understanding those cases

4  have been assigned to me and I would proceed to

5  schedule these matters to trial as -- as soon as I

6  could.  Now is there any questions you have for Ms.

7  Mullis or myself about anything that we've done here

8  today?

9       MR. BURNETT:  No, sir.

10       THE COURT:  Anything else you wish to add, Ms.

11  Mullis?

12       MS. MULLIS:  No, Your Honor.

13       THE COURT:  Ms. Pauley or Mr. Durden, anything you

14  wish to add?

15       MR. DURDEN:  Nothing further from the DA, Your

16  Honor.

17       THE COURT:  Anybody else have anything else to add

18  to these matters?  Court is adjourned.

19            (PROCEEDINGS CONCLUDED)

**Exhibit 46**

1     ( C E R T I F I C A T E   O F   R E P O R T E R )

2     STATE OF GEORGIA

3     COUNTY OF WAYNE

4

5          I, **DANNY C. SAYER,** Certified Court Reporter, B-

6     395, acting as such, hereby certify that the within and

7     foregoing transcript of proceedings was taken down by

8     me and then transcribed under my supervision, and that

9     same is a true, correct and complete transcript of said

10    proceedings.

11

12         I **FURTHER CERTIFY,** that I am a disinterested party

13    to this action and am in nowise interested in the event

14    of the cause.

15

16         **IN WITNESS WHEREOF,**  I  hereby  affix my hand and

17    seal on September 17, 2012.

18

.19

20                              _____ (SEAL)
21                              Danny C. Sayer, C. C. R. B-395
22
23    DCS/lt\lt

**Exhibit 46**