1

```
            UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF WASHINGTON
                    AT SEATTLE

    CIVIL ACTION FILE NO.:  2:14-CV-01884-MJP




TRACY JAHR, BRENDA THOMAS,
TIMOTHY LEE YORK, and W. BRETT
ROARK,


                    Plaintiffs,
        -vs-

UNITED STATES OF AMERICA,

                    Defendant.
-------------------------------


                DEPOSITION OF
                DONALD BAUMAN


            Tuesday, October 25, 2016
             Commencing at 9:00 a.m.
             Concluding at 11:43 a.m.

        United States Attorney's Office
                22 Barnard Street
            Savannah, Georgia  31401



    Reported by Barbara J. Memory, RPR, CCR
```

Bauman, Donald

October 25, 2016

2 (Pages 2 to 5)

---

**2**

A P P E A R A N C E S

BRIAN C. BROOK, ESQUIRE
Clinton Brook & Peed
641 Lexington Avenue, 13th Floor
New York, New York 10022
212.328.9559
Brian@clintonbrook.com

Appearing on behalf of the Plaintiffs

KRISTIN B. JOHNSON, ESQUIRE
Assistant United States Attorney
U.S. Department of Justice
700 Stewart Street, Suite 5220
Seattle, Washington 98101
206.553.7970
Kristin.b.johnston@usdoj.gov

Appearing on behalf of the Defendant

Also Present:  Brenda Thomas, Plaintiff

---

**4**

INDEX OF PLAINTIFFS' EXHIBITS

| No. | Description | Page |
|---|---|---|
| Exhibit 33 | Bates numbers DA0001 through DA00012 | 76 |
| Exhibit 34 | Bates numbers JAHR0043521 through JAHR0043529 | 78 |
| Exhibit 35 | Bates numbers JAHR0043386 through JAHR0043515 | 81 |

- - -

(EXHIBITS RETAINED BY MR. BROOK)

---

**3**

INDEX OF EXAMINATIONS
Page

DONALD BAUMAN
    Examination By Mr. Brook          5

- - -

---

**5**

DONALD BAUMAN,
having been produced and first duly sworn,
testified as follows:
EXAMINATION
BY MR. BROOK:
    Q.  Good morning.  Will you please state your
name and spell it for the record?
    A.  CW4 Donald Bauman, B-A-U-M-A-N.
    Q.  Have you ever been deposed before?
    A.  No, sir.  First time.
    Q.  Okay.  So I'll start by going over some of
the basics of how this will work.
        Your testimony is under oath.
    A.  Yes, sir.
    Q.  You understand what that means, of course.
    A.  Yes.
    Q.  Unlike a normal conversation, there's a
court reporter trying to transcribe everything that
we say, so, one of the things that means is it's
important to give verbal answers, like "yes."
        Do you understand?
    A.  Yes.
    Q.  Okay.  So nodding and "uh-huh" is another
thing that drives them crazy so --
    A.  Yes.

---

Bauman, Donald                                    October 25, 2016

3 (Pages 6 to 9)

---

**6**

1    Q.   -- they'll -- she'll probably correct us on
2  that if we go off script.
3         Another problem that sometimes occurs is
4  talking over each other.  For example, I might be
5  still trying to finish a question and you know
6  exactly where I'm going.  It's important to try to
7  let me finish, assuming I can get there.  Okay?
8    A.   Okay.
9    Q.   So I will do the same thing for you.
10        It's also important that when I ask you a
11  question that you give me a complete answer.  That's
12  sort of the whole truth notion.  So, for example, if
13  I asked you what you had for breakfast today and you
14  had breakfast -- or you had toast, orange juice and
15  bacon and you just said "orange juice," that would
16  not be a complete answer, although that would still
17  be technically true.
18    A.   Right.
19    Q.   Do you understand that?
20    A.   Yes.
21    Q.   There may be objections that are made by
22  the attorney sitting next to you during the course of
23  this deposition.  Unless she specifically instructs
24  you not to answer a question, you should go ahead and
25  answer the questions to the best of your ability.

---

**7**

1    A.   Yes.
2    Q.   If any of my questions, whether objected to
3  or not, don't make sense to you, or there's something
4  you're not sure about, please ask me to rephrase it.
5    A.   Okay.
6    Q.   If you answer the question, though, I will
7  assume that you understood it.  Okay?
8    A.   Yes.
9    Q.   Okay.  Have you ever given testimony
10  before?
11    A.   Yes, I have testified in court before.
12    Q.   And what was that in relation to?
13    A.   Cases I've worked in the past; drug cases,
14  sexual assault cases mainly.
15    Q.   Have you ever been a party to any type of
16  lawsuit?
17    A.   No, sir.
18    Q.   Have you ever been arrested?
19    A.   No.
20    Q.   What did you do to prepare for your
21  testimony today?
22    A.   I first became aware of this maybe one to
23  two weeks ago when Ms. Johnson reached out to me.
24  And so we met yesterday briefly to discuss for two to
25  three hours.  That was the only preparation.

---

**8**

1    Q.   Did you review any documents in
2  preparation?
3    A.   Some of the entries that I made we
4  reviewed.
5    Q.   Are you referring to entries in the AAS or
6  CAS?
7    A.   CAS nowadays, yes.
8    Q.   Okay.  Anything else?
9    A.   We briefly looked at a couple of emails,
10  but I don't think there was anything really we saw
11  that was relevant to the investigation at hand.
12    Q.   Did you bring any documents with you here
13  today?
14    A.   I did not.  We did look at some -- a couple
15  of AIR entries, Agent's Investigative Reports, also.
16    Q.   Let's go into a little bit about you.
17        Where were you born?
18    A.   Brookings, South Dakota.
19    Q.   And where did you grow up?
20    A.   I grew up in Brookings, South Dakota.  Same
21  home town until I came in the Army at the age of 17.
22    Q.   And what was your first, I guess,
23  assignment in the Army?
24    A.   First duty assignment I was in aviation.  I
25  was a helicopter mechanic.  My first duty assignment

---

**9**

1  was in Fort Lewis, Washington in 1986 to '88.
2    Q.   And how long -- or you said until '88?
3    A.   I was -- I was there 14 months.
4        And then my second duty assignment was
5  Korea.  I was there a little over two years.
6    Q.   Where did you go after Korea?
7    A.   Fort Carson, Colorado.  I was there two
8  years.
9    Q.   What was your responsibility at that time?
10    A.   General -- our title was crew chief, but we
11  were just a general helicopter mechanic on the
12  aircraft that I worked on, OH58.
13    Q.   At what point did your interests change to
14  criminal enforcement?
15    A.   I first started interning with CID in 1997.
16  I had an interest about one or two years before that,
17  but your unit has to give you up for six months for
18  an internship, and it took about one to two years
19  before I was in a unit that was willing to do that.
20  But I started full-time interning with CID in 1997,
21  and then at the end of 1998 I went to CID school.
22    Q.   Where was that?
23    A.   Fort McClellan, Alabama.
24    Q.   How long did that last?
25    A.   It was about four-and-a-half months.

---

Bauman, Donald                                          October 25, 2016

---

**10**

Q.   What did you do after that was up?

A.   My first assignment as an agent was in Hawaii.  I was on economics crime team for awhile and then general crimes team.  I did that for a little over one year and then went to Korea where I worked on a drug team.

Q.   What was your rank at the time that you first began working for CID?

A.   I was a staff sergeant.

Q.   And when you were in Korea, what was your rank?

A.   In Korea I was a sergeant first class, and then shortly after that, in 2001, I went to warrant officer candidate school.

Q.   How long did that last?

A.   Warrant officer candidate school is seven weeks, and then the follow-on school, which is -- it would be more CID specific -- is one month.

Q.   Did that change your rank when you came out?

A.   After the seven-week course, warrant officer school, then you become a warrant officer, W01.

Q.   So that replaces sergeant first class?

A.   Yes.  That's enlisted rank.  So warrant

---

**11**

officer is an officer rank.

Q.   So after you finished your warrant officer school and the follow-on school, where did you go next?

A.   I stayed in Korea for two years.  I was the drug team chief.  And then after that, in 2003 -- 2003, I went to Carlisle Barracks, Pennsylvania.  And I was stationed there two years as the assistant special agent in charge, however, one year out of that I was deployed.

Q.   Where were you deployed to?

A.   Afghanistan, Bagram.  I was a personal security officer for one of the commanding generals.

Q.   So during that time did you have any role in criminal investigations?

A.   No, sir.  Strictly personal security.

Q.   And when did you return from that deployment?

A.   I returned in early part of 2005.  And then mid-2005 I was transferred to Fort McPherson, Georgia, for three years where I was the special agent in charge of the office.

Q.   How big was that CID office?

A.   That was considered a three to four-person office.

---

**12**

Q.   What do you mean by it was considered as that?

A.   Your manning documents will say you're authorized four people, but generally you don't always have four.  We usually had about two to three at any given time.

Q.   In your experience, was it -- throughout your career in CID, is it often the case that there is less staffing than is authorized?

A.   Yes.  Usually it's -- I don't want to say it's just CID.  It's more of an Army manning requirements.  They usually man at about 80 percent.

Q.   So this is something throughout all Army departments, as far as you know, or...

A.   To my knowledge, yes.

Q.   So after Fort McPherson, where did you go?

A.   I was back to Korea.  I spent three years there.  For about one-and-a-half years I was a special agent in charge of the Camp Casey CID office, and then the other year-and-a-half I was special agent in charge of a Yongson CID office in Seoul.

Q.   How large were each of those offices?

A.   About 10 to 12 agents each.

Q.   And what did you do after Seoul?

A.   In 2011 I moved to Fort Stewart, Georgia,

---

**13**

took over the office.  I was a special agent in charge there for one year.

Q.   What did you do after that year?

A.   In 2012 I transferred up to our group headquarters, which is in Hunter Army Airfield in Savannah.  My position there was assistant operations officer.

Q.   What were the responsibilities of assistant operations officer?

A.   Mainly quality assurance reviews on -- on the cases.  Our group headquarters, we have about 40 subordinate offices between the eastern part of the U.S., Europe and deployed, so we conduct quality assurance reviews on the cases, and then we're kind of liaison, if need be, between the office and our command headquarters.

Q.   By "the office," you mean a specific CID office?

A.   Our subordinate offices, yes.

Q.   And what did you do after that role?

A.   That's my current position now.

Q.   Okay.  But since 2012 you've been deployed once or twice?

A.   Yes, 2014 I was deployed.  I was the assistant battalion operations officer on the

---

Bauman, Donald                                          October 25, 2016

5 (Pages 14 to 17)

14

1   deployment.
2       Q.   Where were you deployed to?
3       A.   Again, Bagram, Afghanistan.
4       Q.   As the battalion operations officer, were
5   you doing any criminal investigation work?
6       A.   Not personal investigations, but, again, it
7   was more of a supervisory role, assisting the offices
8   and the agents in charge of the subordinate offices.
9       Q.   And that was in Afghanistan or back here?
10      A.   Well, in Afghanistan and Kuwait, where we
11  had our offices.
12      Q.   And when did you return from your
13  deployment?
14      A.   August of 2014.
15      Q.   So about how long were you there?
16      A.   Eight months.
17      Q.   And have you been deployed since then?
18      A.   No, sir.
19      Q.   Were you deployed earlier this year?
20      A.   I was not.
21      Q.   Can you think of any reason why someone
22  might have been under the impression you were
23  deployed earlier this year?
24      A.   In 2014?
25      Q.   Yes, sir.

15

1       A.   No, sir.  I've been on some short TDY trips
2   for a week at a time, but never been deployed since
3   2014.
4       Q.   What does TDY stand for?
5       A.   Temporary duty.
6       Q.   Okay.
7           MR. BROOK:      Let's go off the record
8   for a second.
9           (Whereupon, there was an off-the-record
10  discussion.)
11          (Plaintiff Brenda Thomas enters conference
12  room.)
13          MR. BROOK:      Back on the record.
14  BY MR. BROOK:
15      Q.   Okay.  I'd like to direct your attention
16  back to the time period around 2011 when you got
17  stationed in Fort Stewart and through the next year.
18      A.   Yes.
19      Q.   What ways of communicating did you have
20  with other agents in the CID?
21      A.   Within my office?
22      Q.   Yes.  Within your office.
23      A.   Well, we had a relatively small office, so
24  I had day-to-day interaction.  When I reviewed their
25  cases I would put an official review in the -- in the

16

1   case file to memorialize my review.  And we had
2   weekly meetings where we would go over the cases as a
3   group, and I would also always have day-to-day
4   interaction with my agents on a continual basis
5   regarding our case.
6       Q.   Is the review in the case file, does that
7   always go into the CAS?
8       A.   Yes.
9       Q.   Did you ever communicate via email with any
10  of the agents in your office?
11      A.   Not normally -- regarding decisions on a
12  case?
13      Q.   Regarding anything going on in a case.
14      A.   Well, we'd always send emails back and
15  forth.  But regarding a case, not normally.  We were
16  so close together in the office you could just walk
17  down the hall and discuss it in person.
18      Q.   So what kinds of things would you email
19  about?
20      A.   The only thing I can think of case-related
21  would be if we were corresponding with somebody on
22  the outside, we might CC each other so we were all up
23  on the emails that were coming in and out.
24          I can't really think of any instances where
25  we would directly just communicate with each other

17

1   within the office about a case other than talking
2   about it in person.
3       Q.   So by communications with somebody on the
4   outside, do you mean outside the CID office?
5       A.   Yes.
6       Q.   So if you were to communicate with someone
7   in the command structure, would that be by email,
8   potentially?
9       A.   Potentially, yes, or a phone call.
10      Q.   And how were communications with the
11  medical examiners typically handled?  Were those
12  through emails or phone calls?
13      A.   Both.  I remember -- I don't remember who
14  the ME was with AFME's office.  It was a female.  But
15  I know we had both email and phone conversations.
16      Q.   What is your understanding of what this
17  case that we're in a deposition here today for is
18  about?
19      A.   Well, it's regarding the -- Private Aguigui
20  and his patriots that killed Ms. York and Mr. Roark
21  after the death of his wife.
22      Q.   When did you first learn about this
23  lawsuit?
24      A.   I was reached out a couple months ago by a
25  captain, I can't remember his name, that emailed

Bauman, Donald

October 25, 2016

6 (Pages 18 to 21)

---

**18**

1  several people and said if we had any emails or
2  anything regarding the case at all, to keep it.  I
3  really wasn't aware of anything else until about one
4  or two weeks ago when Ms. Johnson reached out to me.
5      Q.  Prior to receiving that email about asking
6  whether you had any emails, had you heard anything
7  about a claim being made relating to the deaths of
8  Michael Roark or Tiffany York?
9      A.  Not to my recollection.  If there was, it
10 wouldn't have been anything that I thought involved
11 me, so I don't recall.
12     Q.  Now, when you received the email asking if
13 you had any emails, did you look to see if you did?
14     A.  I did.
15     Q.  And did you find anything?
16     A.  The only thing I found that I replied back
17 was, I think, some briefings that we had done
18 throughout the progress of the investigation.
19     Q.  These were briefings that were sent via
20 email to --
21     A.  Yes.  They would have been briefing to our
22 commanding general.
23     Q.  Who was that?
24     A.  At the time, I believe it was General
25 Johnson.

---

**19**

1      Q.  And were those emails that were sent before
2  or after the murders of Michael Roark and Tiffany
3  York?
4      A.  It would have been after because they would
5  be involving the deaths.
6      Q.  Did you find any emails from before
7  December 2011?
8      A.  No, sir.
9      Q.  What is your usual practice as far as
10 keeping emails relating to cases that you've had?
11     A.  If they're relevant, they would be copied
12 and put in the case file.
13     Q.  Now, does that mean they would be copied
14 into the CAS or is there a separate case file you're
15 referring to?
16     A.  Printed out.  We'd print out a copy and put
17 it on the right-hand side of the case file.
18     Q.  How long is a case file retained for after
19 a case is closed?
20     A.  A death case would be -- the original would
21 be maintained indefinitely.  At least it would be
22 retained until all adjudication is completed.  But
23 the CAS entries, statements, things like that, would
24 be copied, sent to our crime records center, and they
25 would be maintained indefinitely.

---

**20**

1      Q.  What about for a non-death case?
2      A.  What we call them is the attached exhibits,
3  which would be the CAS -- sorry, not the CAS
4  entries -- the AIRs statements; the attached exhibits
5  that would be used as basically anything that would
6  be submitted in trial.  Those were copied and sent to
7  crime records center to be maintained indefinitely.
8          The case file itself, after adjudication
9  was completed, if there was, would be maintained for
10 three years and then destroyed after adjudication.
11     Q.  And does adjudication include if there's a
12 decision not to prefer charges?
13         I'm not sure -- forget my last question.
14         If there's ultimately a decision not to
15 prefer charges based on -- based on an open
16 investigation, and the investigation closes, how long
17 is that case file maintained for?
18     A.  What would happen is we would send, we call
19 it a 4833, but it's a Commander's Report of
20 Disciplinary Action to a commander.  And they would
21 fill it out, and if they chose not to take any
22 action, then we would put that in our case file and
23 then that would start the three years.  But the main
24 copies would -- would still be maintained with the
25 crime records center.

---

**21**

1      Q.  Okay.  But as far as emails, for example,
2  those would be only --
3      A.  Those would not be maintained permanently.
4  They would be maintained for the life of the file,
5  but they would be destroyed after the three years.
6      Q.  Okay.  When did you first hear the name
7  Isaac Aguigui or Private Aguigui?
8      A.  I arrived at the office at Fort Stewart in
9  September 2011 and we had about a one to two-week
10 transition period between myself and the special
11 agent in charge that I was replacing.  I believe I
12 took over officially as the agent in charge on the
13 1st of October in 2011.  So within that transition
14 period, I would have been -- become familiar with his
15 name.  And it was one of the first cases that I
16 reviewed when I came into the office.
17     Q.  Did you meet Private Aguigui?
18     A.  Never met him where I spoke with him.  I
19 believe the first time I ever actually -- I did talk
20 to him on the phone when I had to give him casualty
21 liaison briefings regarding the death of his wife.  I
22 don't recall when the first time I ever met him was.
23 The first one that comes to mind is when we
24 apprehended him, but I don't recall if I met him
25 before that.

---

Bauman, Donald

October 25, 2016

7 (Pages 22 to 25)

---

**22**

1    Q.  When you first heard about Private Aguigui
2 were you aware at that time that he was a suspect in
3 his wife's murder?
4    A.  We wouldn't classify him as a suspect.  It
5 would be a person of interest.  And throughout the
6 course of reviewing the case, he -- we believed -- we
7 couldn't rule him out, so we had him as a person of
8 interest that we would say, but there was no credible
9 information at the time where we would list him as
10 the subject/suspect.
11    Q.  How do you define "credible information"?
12    A.  Credible information is sort of a low
13 threshold.  It's information that would lead an
14 investigator to believe that the facts presented are
15 true.  So it's a lower threshold than probable cause,
16 which probable cause is a legal determination.
17 Credible information is an administrative or
18 operational decision.
19    Q.  So that is the standard for listing someone
20 as a subject of an investigation or --
21    A.  Credible information would be, yes.
22    Q.  And that's also called titling someone?
23    A.  Yes.
24    Q.  And do you consider the word "suspect" and
25 "subject" to be interchangeable?

---

**23**

1    A.  Yes.  While the -- while the case is going
2 on, if they're in the subject block, they're subject
3 or suspect.
4    Q.  Were there any other persons of interest in
5 the Deirdre Aguigui death case?
6    A.  Her specific case?  Not that come to mind.
7 I don't recall, but I don't remember anybody else
8 other than Private Aguigui.
9    Q.  Now, at some point, CID determined that
10 there was credible information that he had murdered
11 Deirdre Aguigui, right?
12    A.  Yes.
13    Q.  Do you recall what that new credible
14 information was?
15    A.  It was several months later.  I first
16 reviewed the case in October.  But everything that
17 was showing in the case file was more or less
18 circumstantial evidence -- autopsy reports,
19 toxicology.  There was nothing.
20    And after a while, I had Mr. Kapinus as my
21 primary case agent on it.  He had good knowledge of
22 conducting death investigations.  But I believe it
23 was more of just a totality of all the circumstantial
24 evidence that we had at the time that we were able to
25 gather where we finally made the decision that we

---

**24**

1 would list him as the subject.
2    Q.  Do you recall when that was?
3    A.  Exact day, no.  I believe December of 2011.
4    Q.  Was it before or after the deaths of
5 Michael Roark and Tiffany York?
6    A.  It was after.
7    Q.  Who in the CID office at Fort Stewart do
8 you recall discussing the Aguigui case with prior to
9 the deaths of Tiffany York and Michael Roark?
10    A.  I had an Agent Jeremy Foxx at the time, I
11 believe was the primary case agent on it.  His team
12 chief was Ms. Ivery-Morris.  I don't recall when Mr.
13 Kapinus came into play, if that was before or after
14 those deaths.
15    Q.  Is there anyone else?
16    A.  You mean specifically that would have
17 worked on the case?
18    Q.  Yes.
19    A.  Because we would have all maybe had
20 discussions within the office when we discussed our
21 cases weekly.  But I can't think off the top of my
22 head who I would have specifically talked to other
23 than the primary agent and the team chief.
24    Q.  Do you know of any investigators, not
25 special agents, who worked on the case?

---

**25**

1    A.  Not that I recall.
2    Q.  Other than the Deirdre Aguigui homicide
3 investigation, do you recall any of the other open
4 matters that related to Private Aguigui prior to the
5 deaths in question?
6    A.  I don't remember when it was, but after I
7 had reviewed that case, it was sometime after.  When
8 I came into the office we had about 80 open
9 investigations at the time with 20 or less agents, so
10 it took a while to -- to know those cases, because
11 those revolve on a daily basis.
12    But later on, I was made aware of the --
13 our drug team had a case where Aguigui had supposedly
14 or alleged to have purchased a weapon to kill a drug
15 dealer.
16    Q.  And what else do you recall about that
17 investigation?
18    A.  That one, I'm trying to recall if it was
19 even still open when I took over.  If it was, it was
20 closed shortly after, so I didn't have as much
21 involvement with that case.
22    Q.  Is conspiracy to commit murder considered a
23 serious offense by CID?
24    A.  Yes.
25    Q.  And as you sit here today, do you recall

---

Bauman, Donald                                          October 25, 2016

26

what about that case you've thought was coming up
short for purposes of it being something that led to
charges?
    A.  I don't recall why -- why it was -- I don't
even remember if it was closed as unfounded or if it
was insufficient evidence, what we used to have as an
option, or if it was a founded.  I don't remember how
it was closed, so I can't tell you if there was a
decision by the office or if it was a decision by the
trial counsel not to take action.
    Q.  Can you explain the differences between the
three categories you just mentioned -- founded,
unfounded, and insufficient evidence?
    A.  So when you close a case as founded, that
would mean we've made our coordination with the trial
counsel on the case and it was opined probable cause
to believe that the subject committed the offense
listed, which would be founded.
         Unfounded would mean after a review of the
totality of the investigation, the opined opinion is
that the subject did not commit the crime.
         Insufficient evidence would mean can't make
the determination between founded or unfounded; we
just -- we were not able to -- to positively say
"yes, founded" or "no, unfounded."  It would just be

27

undetermined.
    Q.  Is a sworn statement from a suspect a
source of credible information?
    A.  It can be, yes.
    Q.  Okay.  If that statement -- let's say a
sworn statement is incriminating.  Do you consider
that to be credible information in supporting
founding -- finding a charge founded?
    A.  Like I said, possibly.  That in and of
itself may not necessarily give you a credible
information by itself.  You have to look at the
totality of the allegation.  So depending on what it
is.  It could be, yes.  But is that the only factor?
Not necessarily.
    Q.  Right.  Putting aside coerced confessions
and such like that.
    A.  Right.
    Q.  Any allegations about that.
         Do you often find that people lie to
incriminate themselves?
    A.  Generally, no.
    Q.  Have you ever seen that happen?
    A.  Not that I can recall.
    Q.  Do you recall whether Isaac Aguigui had
signed any sworn statements that incriminated

28

himself?
    A.  I believe on that case he did provide a
statement where he said that he purchased a weapon
with an intent to shoot a drug dealer.
    Q.  Was that statement shared with members of
his command?
    A.  Whenever a case is closed, we would provide
the commander with a copy of the entire investigation
with all the attached exhibits that would include the
sworn statement.
    Q.  So prior to it being closed, though, that
would not be given; is that right?
    A.  We could.  We're not precluded from sharing
it with the commander beforehand.  I can't tell you
specifically when that statement was shared with him
or the trial counsel, but they would eventually
receive -- both receive a copy of that.
    Q.  Is it important in the CID offices where
you're in charge for the agents who are working for
you to close cases in a timely fashion or to work
towards doing so?
    A.  Yes.  Well, without rushing, but yes, in a
timely fashion, yes, we have -- we have requirements
to continue moving on a case until we complete it;
however, if there is any outlying action that needs

29

to be completed, then we would keep it open.
    Q.  And what sort of incentives or controls do
you put in place to ensure that cases that have
things that are left open to get done actually have
those things get done?
    A.  So when we have a case, most -- most of the
cases are assigned to an agent within the office, so
at least once a month or every two weeks they should
have a supervisory review.  Team chief will generally
review it and then the assistant agent in charge or
the agent in charge will review the case on the other
two weeks.  So it should have two reviews a month
where they're providing guidance to the agent.
    Q.  What happens to an agent who does not do
what a review tells that agent to do, if anything?
    A.  Well, it should be followed up on by the
supervisor, so we'd try to find out what was the
reasoning was, if there's a valid reason.  If we tell
somebody to go out and interview an Individual A, it
may be that they're not in an area or they're not
available for a certain amount of time, or it could
be that something else needs to be completed on the
case before we can interview that individual.  So we
would need to discuss it to find out why there was
a -- a delay.

Bauman, Donald                                      October 25, 2016

9 (Pages 30 to 33)

---

30

1    Q.   Okay.  And when you find out the reason for
2  the delay, is that something that ordinarily goes in
3  the CAS?
4    A.   It's not required, but generally if I do a
5  review and tell an agent to do certain activity, we
6  may discuss it in person or they could respond in
7  their review, their acknowledgment of the review, and
8  describe why it couldn't be done.
9      So both ways.  It could be documented or it
10  could have been just a verbal conversation between
11  the supervisor and the agent.
12    Q.   Have you ever had an agent who did not
13  complete tasks that were assigned and did not have a
14  good reason for failing to do so?
15    A.   Yes.
16    Q.   When?
17    A.   But we -- usually in the military, any time
18  you have a -- somebody of a higher rank that tells a
19  subordinate something, that's -- that's considered a
20  directive, but doesn't always necessarily need to
21  mean that there should be some follow-on disciplinary
22  action.  Usually try to get them on line.  I mean,
23  that's the best case scenario, is to get the agent
24  working on the case.  So, yes, there's usually times
25  when things aren't done.

---

31

1      However, when you look at the totality
2  of -- of the case load that the agents would have,
3  it's usually because there are other cases that
4  they're working at the same time and not a
5  disrespectful way of not completing the task.
6      Does that make sense?
7    Q.   So you said that there were instances, or
8  at least one instance, where you did have someone
9  that didn't give you a good reason.  What did you do
10  in that instance or instances?
11    A.   We'd try to sit down with the soldier or
12  agent and -- and get him back on track, whether that
13  meant retraining or additional training or just some
14  supervisory guidance in the form of a counseling.  So
15  if it has come down to counseling, sometimes that
16  would be written or verbal.  But generally we just
17  try to keep the agent on track to get the job done.
18    Q.   Did that happen during your tenure at Fort
19  Stewart?
20    A.   I'm trying to think off the top of my head,
21  but it's hard to say.  I mean, several agents coming
22  in and out of the office, there were some agents that
23  needed more attention than others and -- but I
24  usually left that up to the team chiefs to take care
25  of those -- their soldiers.  So in that aspect, I

---

32

1  would try to not be as directly involved unless I
2  really needed to.  And at the office at Fort Stewart,
3  I don't know of an instance where it got to that
4  serious level where I had to be involved with agents
5  not doing what they were supposed to be doing.
6    Q.   Was Agent Kapinus one of those agents who
7  required more attention?
8    A.   No.  I would say not.
9    Q.   Was Agent Foxx an agent like that, who
10  needed more attention?
11    A.   Not that I recall.  He was -- I wouldn't
12  say he was a younger agent, but he was an enlisted
13  agent, so may not have been to the degree of Mr.
14  Kapinus.  But he was definitely not an individual who
15  directly disobeyed guidance or who needed attention
16  or who needed to be disciplined.
17    Q.   Do you recall, particularly after having
18  reviewed the CAS recently relating to the Aguigui
19  investigations, whether there were tasks that were
20  assigned to Agent Foxx that he did not complete in
21  a -- within a month or two of the task being assigned
22  to him?
23      MS. JOHNSON:      Objection.  Assumes
24  facts not in evidence.
25      Let me just put on the record that he did

---

33

1  not review that entire CAS.
2      You can answer.
3      THE WITNESS:      The only thing that
4  I -- that I do recall I saw, was there was one
5  instance where I think I was on my first review
6  where I provided guidance to conduct canvas
7  interviews of Sergeant Aguigui's friends.  I
8  don't know when or if that was -- was followed
9  up on.  But that's the only one that I recall.
10  However, there were other interviews that were
11  done of people that she knew, but I don't
12  remember that the canvas interview, that we
13  would call it, of the friends were completed.
14  That's the only one that I recall.
15  BY MR. BROOK:
16    Q.   Do you recall whether you informed Agent
17  Foxx or the team chief for the Deirdre Aguigui
18  investigation that that was to be a priority
19  investigation at some point?
20    A.   The canvas?
21    Q.   I'm sorry.  The overall investigation
22  relating to the Deirdre Aguigui --
23    A.   At one point I appointed Agent Foxx as --
24  well, he was the primary on it.  But at one point, I
25  believe that was his only -- only case for a while.

---

Bauman, Donald                                October 25, 2016

**34**

1  I don't know if that was before or after the -- the
2  other murders.
3      Q.  Do you recall Agent Foxx's background,
4  whether he was particularly trained with criminal
5  investigations prior to joining Fort Stewart?
6      A.  No.  I know he was a -- a reserve agent,
7  but I don't know what his prior background was, no.
8      Q.  Do you recall why you asked Agent Foxx to
9  conduct canvas interviews of Private Aguigui's
10  friends?
11     A.  At this time, no.  That review was over
12  five years ago.  I don't remember why or what I would
13  have been thinking at the time.
14     Q.  Are canvas interviews something that are
15  generally ordered in connection with death
16  investigations?
17     A.  For most cases we like to do a canvas
18  interview if we believe there was somebody that may
19  have seen or heard something.  We would try to go to,
20  if there was a scene, to the neighbors, to see if
21  they seen or heard something.  And we may try to go
22  to friends, family members, and talk to them to see
23  anything in general, if we can come out with the
24  mindset of the individual or just anything that might
25  help --

**35**

1      Q.  When a soldier is a suspect or person of
2  interest --
3      A.  Yes.
4      Q.  -- how common is it to conduct a canvas
5  interview of other members of that soldier's unit?
6      A.  I would say it's common.
7      Q.  And why is that done?
8      A.  Like I said, just do a -- find out what
9  their demeanor was, if we suspect them of a crime.  I
10  guess to find out what their demeanor was, if they
11  had been -- maybe if they had said something or done
12  something that may help us tie the elements of the
13  crime together where we could move that person from a
14  suspect to a -- to a subject.  Just try to put the
15  pieces together is the main reason.
16     Q.  The term "unit" has a lot of different
17  meanings in the Army, wouldn't you agree?
18     A.  Yes.
19     Q.  When you talk about doing canvas interviews
20  of a unit or other people in your CAS offices, do you
21  have a sense of what that means in that context, how
22  big a group of people you're talking about?
23     A.  If it was a soldier, if I say -- well, if I
24  say "unit," yes, it is a very large meaning.  But we
25  would start with probably at the platoon level.

**36**

1  Generally that would probably be their -- their
2  closest friends or the people that they hang out with
3  most.  But we may take it up higher.  We would talk
4  to supervisors as well, chain of command.  But we
5  would start at a platoon level, and then if need be,
6  we would take it to an entire company level.  But
7  you'll find a lot of platoons don't interact as much,
8  so you'll get most of your information from the
9  platoon level.
10         THE COURT REPORTER:  "From the platoon
11  level"?
12         THE WITNESS:     Platoon level, yes.
13         THE COURT REPORTER:  Thank you.
14  BY MR. BROOK:
15     Q.  Do you recall whether at any point in time
16  either before or after the deaths of Michael Roark
17  and Tiffany York there was a canvas done of Isaac
18  Aguigui's unit members?
19     A.  I do not recall.
20     Q.  Can you think of any reason why that would
21  not be done?
22     A.  I know the main body of the unit was
23  deployed at the time, so Private Aguigui was part of
24  a rear detachment, which was a much smaller element.
25  And after the murders, I know there was four

**37**

1  individuals involved, so we didn't know -- we
2  wouldn't have known what the extent was of who else
3  would have been involved with that, so we would have
4  had to have been very careful afterwards about
5  canvassing for the possibility of talking to someone
6  who may have been involved with it.
7         Prior to those deaths, no.
8      Q.  So help me understand.  Why would you need
9  to be careful about canvassing if there were other
10  people potentially involved?
11     A.  I'm trying to recall back, but if -- if we
12  have up to four people involved in one unit with
13  deaths, we didn't know what the extent was of anybody
14  else's involvement.  So just asking basic canvas
15  questions may not be harmful, but we didn't want
16  to -- wouldn't have wanted to tip anybody off if we
17  knew anything else.
18     Q.  So how did you go about trying to determine
19  whether anyone else was involved with the Isaac
20  Aguigui and other folks who he was committing crimes
21  with?
22     A.  Before?
23     Q.  Talking about now, after the -- the murders
24  occurred.
25     A.  After?  I have to say I don't recall.

Bauman, Donald

October 25, 2016

11 (Pages 38 to 41)

---

**38**

1  Because at that time it was several agencies
2  involved -- the GBI, ATF, local sheriff's department
3  was involved, the FBI.  So at that time it was
4  afterwards the GBI was doing a lot of the -- they did
5  the main interviews on the -- on the subject
6  interviews.  So a lot of it was coordinations between
7  our agencies, and I just don't recall the subsequent
8  interviews with the friends and who made those -- who
9  made those determinations.
10     Q.  Do you recall whether it turned out that
11  there were more people involved than just the four
12  who were arrested on December 10th?
13     A.  And the one spouse.  I don't recall anybody
14  else that had involvement.
15     Q.  And you're talking about just involvement
16  in the murder itself, correct?
17     A.  Correct.
18     Q.  Did you learn about involvement in other
19  crimes in connection with Isaac Aguigui and a group
20  that he had formed that occurred prior to?
21     A.  That they had already committed?
22     Q.  Yes.
23     A.  The only thing that comes to mind is the
24  straw purchases, which the ATF looked at, where he
25  was paying some of his friends money to buy weapons

---

**39**

1  locally.
2     Q.  Do you recall how many guns, give or take,
3  that was?
4     A.  I do not.
5     Q.  Who was the lead investigator on that?
6  Which agency?
7     A.  ATF would have taken that.
8     Q.  And when did you learn about that
9  investigation?
10     A.  Would have been shortly after the deaths.
11     Q.  Did that investigation begin before the
12  deaths or only after the deaths?
13     A.  The illegal straw purchases?
14     Q.  Yes.
15     A.  I'm not aware of them until after the
16  deaths.
17     Q.  Prior to the deaths did you learn of any
18  other agencies outside the Army investigating Isaac
19  Aguigui?
20     A.  The only one was at one point he went on
21  leave to Washington State and purchased a number of
22  weapons up there.  And I believe it was one of his
23  aunts was concerned.  And I don't know if she called
24  the locals or if she called the FBI, but she called
25  someone with concerns that he had purchased weapons.

---

**40**

1     Q.  Do you recall what her articulated concern
2  was?
3     A.  Specifically, no.  I know she had concerns
4  that he bought a large number of weapons.  I don't
5  recall if she had concerns what he was going to do
6  with them.
7        His answer was he was going to start up a
8  security business.
9        Specifically what she told them, I do not
10  know.  I never read any statement that she had given
11  them.
12        But I do know the FBI went out and talked
13  to him, and those weapons never -- to my knowledge,
14  never left the establishment where he purchased them,
15  and they concluded that those were all legally
16  purchased.
17     Q.  So how did your CID office get involved
18  with that?
19     A.  When we were notified, we contacted our
20  counterparts at the CID office on Fort Lewis,
21  Washington.  And I don't remember what their -- what
22  the extent of their involvement was because the
23  FBI -- I believe it was part of the joint terrorism
24  task force -- but somebody from the FBI had looked
25  into it there in the Washington State area and

---

**41**

1  determined that they were legal purchases.
2     Q.  Do you know whether the FBI was informed
3  about the open investigations that your office had on
4  Isaac Aguigui?
5     A.  I don't recall at this time.
6     Q.  Is that the type of information that would
7  potentially be shared or is it something that you
8  were not able to share with another agency?
9     A.  We would be able to share it, but it came
10  back to legal purchases.  It wouldn't have assisted
11  or changed their determination that I could see.
12        MR. BROOK:      Let's go off the record
13  a second.
14        (Whereupon, there was an off-the-record
15  discussion.)
16        MR. BROOK:      Back on the record.
17  BY MR. BROOK:
18     Q.  Okay.  Did you ever speak with any of the
19  Fort Lewis counterparts regarding the gun purchases?
20     A.  I did.  I believe -- I don't remember if it
21  was agent in charge or one of the supervisors at the
22  time, but I know when we were first made aware of it,
23  we immediately drove to Aguigui's unit and talked to
24  his sergeant major, who told us he was on leave at
25  the time.  We obtained a copy of his leave form and

---

Bauman, Donald

October 25, 2016

12 (Pages 42 to 45)

---

**42**

1  then we contacted the local CID office.  I believe
2  they were the liaison with the FBI there.
3      Q.   Was that because there was concern he'd
4  been AWOL potentially?
5      A.   No, he was on leave.  But we just wanted to
6  find his location because his leave form would have
7  his location on there.
8      Q.   Who else in your CID office was involved in
9  looking into Aguigui and the gun purchases at that
10  time?
11      A.   I don't recall which agent it was.
12      Q.   Do you recall who drove with you to talk to
13  Aguigui's sergeant major?
14      A.   I do not.
15      Q.   Outside of CID do you recall who the trial
16  counsel was regarding the Aguigui matters?
17      MS. JOHNSON:      You mean for the State
18  or...
19      THE WITNESS:      You mean on Fort
20  Stewart?
21  BY MR. BROOK:
22      Q.   I mean on Fort Stewart, yes.  The SJA.
23      A.   I believe the SJA was Major Greizer,
24  G-R-E-I-Z-E-R.
25      Q.   And does the name Captain Borchardt ring a

---

**43**

1  bell?
2      A.   I saw the name yesterday.  It rings a bell
3  but I don't remember if he was the trial counsel for
4  the unit.  Major Greizer would have been the senior
5  trial counsel over the -- over the captains.  And I
6  do recall discussing it with him before, but I don't
7  remember as much about Captain Borchardt.
8      Q.   And when did you discuss Aguigui with Major
9  Greizer?
10      A.   Well, it would have been a continual basis
11  because we usually had -- at least every two weeks we
12  would have meetings where we would discuss most of
13  our open cases.  So I don't remember any one specific
14  incident where we spoke with him about the case, but
15  it would have been several instances where we would
16  have discussed it.
17      Q.   And this was prior to the deaths of Michael
18  Roark and Tiffany York?
19      A.   Both.  Before and after.
20      Q.   Were those discussions in person or over
21  the phone?
22      A.   Sometimes when we had meetings, the
23  bi-weekly meetings, we would do those in person, but
24  it wouldn't be unusual at all to have a telephone
25  conversation about the case.  But, again, any one

---

**44**

1  specific conversation I don't recall.
2      Q.   And who is Colonel Bagwell?
3      A.   Colonel Bagwell was the third division
4  staff judge advocate.
5      Q.   Was he involved in the Aguigui case at any
6  time?
7      A.   I remember talking to him at least once or
8  twice.  I don't remember when he became involved.
9  I'm pretty sure it was after the two deaths.
10      Q.   Is that common for someone at his level of
11  seniority to get involved in a case?
12      A.   A normal case, no, but a very high-profile
13  or potentially high-profile case, it's not uncommon
14  for the senior level JAG to be involved, because they
15  would be the direct legal adviser to the commanding
16  general for the installation.
17      Q.   So the commanding general would be speaking
18  directly to Colonel Bagwell in this instance?
19      A.   They would, yes.
20      Q.   Now, do you recall anyone in Aguigui's
21  command structure that you spoke with about any of
22  his cases prior to the deaths?
23      A.   I remember the rear detachment batallion
24  commander.  I don't recall his name.  But I do know
25  we spoke with him.  And when we did make the

---

**45**

1  apprehensions after the deaths, he was directly
2  involved, because the way we did the apprehensions we
3  did it at the unit level so the senior leadership was
4  there and we discussed that.
5      Q.   Does the name Zonie Daniels ring a bell?
6      A.   Zonie Daniels?
7      Q.   Captain Zonie Daniels?
8      A.   I don't recall, no, sir.
9      Q.   How about Lieutenant Colonel Hadley?
10      A.   It sounds familiar.  He may have been the
11  battalion commander that we talked to.  That name
12  does sound familiar.
13      Q.   And as of right now you can't think of
14  anyone else?
15      A.   At the unit?
16      Q.   At the command level.
17      A.   His command?  Other than the sergeant
18  major, and I don't remember his name.  I only recall
19  that one conversation with him when he was on leave.
20      Q.   Did you ever speak with anyone from the
21  casualty assistance office regarding the Deirdre
22  Aguigui investigation?
23      A.   Yes.
24      Q.   And when did that first happen?
25      A.   I don't recall when.  At some point we had

---

Bauman, Donald                                    October 25, 2016

13 (Pages 46 to 49)

---

**46**

1  a telephone conversation, because I don't believe --
2  I don't believe she was local.  I think she was out
3  of the state, so we had a conversation about the
4  monetary payments that were made.
5      Q.  Is that before or after the deaths?
6      A.  This was before.  After the death of
7  Deirdre obviously.
8      Q.  Right.  I'm assuming, since you didn't get
9  involved before Deirdre Aguigui was killed --
10     A.  Right.
11     Q.  -- that when we talk about the deaths,
12 we're talking about --
13     A.  Yes, yes.
14     (Simultaneous speaking.)
15     THE COURT REPORTER:  I'm sorry.  Y'all
16 talked over each other.
17     "I'm assuming, since you didn't get
18 involved before Deirdre Aguigui was killed" and
19 then y'all talked over each other.
20     MR. BROOK:        December 5th was the
21 date.
22     THE WITNESS:       I don't remember what
23 he said.
24     THE COURT REPORTER:  I can only take one
25 person at a time.

---

**47**

1  BY MR. BROOK:
2      Q.  I don't know exactly where we left off, but
3  the point is "the deaths," I'm referring to the
4  deaths of Michael Roark and Tiffany York on December
5  5th, 2011?
6      A.  Yes.
7      Q.  We've understood this whole time, correct?
8      A.  Yes, sir.
9      So I don't recall when I talked to the
10 casualty assistance on casualty affairs, the
11 individuals that were responsible for paying the
12 death gratuity and SGLI, but I do recall at least one
13 phone conversation with them.  I believe -- I don't
14 remember if I called them, but I believe they reached
15 out to me regarding the payments.  And that's when I
16 was made aware that they had already talked to
17 Mr. Toole before that and the death gratuity had been
18 paid, and informed them that he was still a person of
19 interest in Sergeant Aguigui's death, and I believe
20 they said that the SGLI had already been paid or was
21 going to be paid.
22     But at that point, I believe it was too
23 late to pull the money back.  I don't remember what
24 month that was, so I don't remember when they paid it
25 and when that had to do with the conversation.  But

---

**48**

1  we did inform them that he was a person of interest
2  in the case.
3      Q.  Did you look into the possibility of
4  pulling the money back or freezing the money?
5      A.  I recall that we asked, but I want to say
6  it was already paid and by the time -- I wish I knew
7  exact dates because as soon as he received that money
8  it was -- it was -- it was being spent.  But I don't
9  recall the time frame.
10     Q.  Did you pull or have someone pull Aguigui's
11 financials to see what he was doing with the money?
12     A.  One of the agencies had pulled it, and it
13 took us a while before we were able to freeze the
14 accounts.  I don't believe that was actually
15 completed until probably after the first of the year.
16 And by that time, there was only about
17 a-hundred-and-some-thousand left in the account.  But
18 I don't remember dates and even months.
19     Q.  Do you recall whether you looked into
20 freezing the accounts before or after the deaths?
21     A.  I don't recall.
22     Q.  And what was the basis on which the
23 accounts were frozen?
24     A.  When they were frozen?
25     Q.  Yes.

---

**49**

1      A.  I'm trying to remember which agency even
2  had it done, because that wasn't -- wasn't us, it was
3  one of the other agencies that we worked with that
4  was able to get that accomplished.  And I don't
5  remember which agency it was, but they were the ones
6  that completed that.
7      Q.  So one of the other agencies, maybe federal
8  or state?
9      A.  Yes.
10     Q.  You're not sure?
11     A.  I don't recall.  But one -- it was a joint
12 case with several agencies and one of them was able
13 to get the accounts frozen.
14     Q.  Do you recall the name Sergeant Scott Zipp?
15     A.  Yes.
16     Q.  Who was he?
17     A.  Sergeant Zipp was one of Aguigui's
18 supervisors.  I don't know if he was a squad leader.
19     He was one of his supervisors who --
20 Private Aguigui had came to us one day, and he had --
21 I believe he recorded it on his phone after Aguigui
22 had received the money.  Sergeant Zipp was trying to
23 get him to make him payments so he could get out of
24 work.  So he brought us a video showing him, I
25 believe in a vehicle, asking for money.

---

Bauman, Donald                                           October 25, 2016

14 (Pages 50 to 53)

---

50

1    Q.   And what did you do when you got that
2    video?
3       A.   I don't recall if we worked that under a
4    separate investigation or if we worked it under the
5    death case.
6       Q.   But did you work it as a case?
7       A.   I don't recall.  I want to say we would
8    have, but I -- I don't recall specifically.
9       Q.   If you did not investigate it, is there
10   someone else who would have investigated it besides
11   CID?
12      A.   Possibly MPI.  I honestly don't recall
13   where that -- where that -- that incident led.
14      Q.   And so as you sit here today, you can't
15   recall any of your agents who were working that case?
16      A.   I don't recall, no.
17      Q.   Okay.  Is that something that you had ever
18   seen before, where a soldier had, I guess, accused
19   his supervising officer of, I guess --
20      A.   Extorting money from him?
21      Q.   Yes.
22      A.   That was the first extortion case like that
23   that I've ever seen.
24      Q.   Do you think it had anything to do with the
25   fact that soldiers don't typically have a ton of

---

51

1    money to give?
2       A.   I would say so, yes.
3       Q.   Do you recall approximately how long before
4    the deaths occurred that you had Aguigui coming in
5    and trying to get you guys to go after Zipp?
6          MS. JOHNSON:      Objection.
7    Mischaracterizes his testimony; assumes facts
8    not in evidence.
9          THE WITNESS:      I do not recall.
10   BY MR. BROOK:
11      Q.   Did -- did Aguigui come to you about the
12   Scott Zipp incident?
13      A.   If I recall, yes, he brought his -- his
14   phone in with -- with the video.  If I remember
15   correctly, that's -- he would have informed us.
16      Q.   What did he want you to do?
17      A.   Well, if he brought it in, then he would
18   have wanted us to investigate it.  But I just don't
19   recall how that investigation was handled.
20      Q.   Can you recall another soldier who you've
21   seen pop up so often in CID matters?
22          MS. JOHNSON:      Objection.  Assumes
23   facts not in evidence.
24   BY MR. BROOK:
25      Q.   Let me rephrase.

---

52

1          Is it fair to say that Isaac Aguigui had a
2    lot of different interactions with CID in different
3    cases?
4       A.   I'm aware of three -- well, the three where
5    he was a primary in.  But in the years I've been with
6    CID, I've seen cases where -- where individuals would
7    come multiple times, either subjects or victims or
8    involved in a case.  Definitely more than once;
9    sometimes multiple times.  So it's not common, but
10   it's not highly unusual for -- for someone to get in
11   trouble and then get in trouble a second or third
12   time.  It's not -- it's not highly unusual, no.
13      Q.   In some of the other instances where you
14   recall a soldier coming in multiple times for
15   different reasons, what happened to those soldiers?
16      A.   Well, disciplinary action, we would always
17   investigate, we would always -- we're obligated to
18   initiate investigation whether it's a soldier who
19   comes in multiple times for drug allegations or
20   sexual assault allegations on multiple victims.
21          Our job is to investigate the case and to
22   make the determination if they met the elements under
23   the Uniform Code of Military Justice.  We conduct the
24   investigation itself.  But any administrative action
25   is the sole responsibility of the unit in

---

53

1    coordination with their trial counsel, and we don't
2    have any say in -- in the action that's going to be
3    taken.
4       Q.   Turning back to Private Aguigui, do you
5    recall what action his unit wanted to take with
6    respect to him prior to the deaths?
7       A.   No.  There was -- there would have been
8    discussion between us and -- and the trial counsel
9    and the -- his command.  But I do know that there
10   was no chapter because if we were going to have a
11   positive resolution on the Sergeant Aguigui's death
12   and he was already out of the Army, it would have
13   been much more difficult for them to call him back,
14   so we wanted to thoroughly investigate the death case
15   before he was out.  But, again, the -- the decision
16   on that would be between the command and the trial
17   counsel.
18      Q.   And do you recall who was making those
19   decisions in the case of Isaac Aguigui?
20      A.   His battalion commander would have been the
21   individual who made the ultimate decision.
22      Q.   Now, if a battalion commander or another
23   person who is making a decision about a particular
24   soldier that's being investigated tells CID they want
25   an investigation to be given priority or wrapped up

---

Bauman, Donald

October 25, 2016

15 (Pages 54 to 57)

---

**54**

1  quickly, is that something that CID listens to or is
2  it something that CID has discretion to ignore?
3       A.  We have our own discretion on how fast
4  we're going to work a case, work an investigation --
5  that's why we call ourselves a stovepipe
6  organization -- so we don't have to answer to
7  authority over senior commanders who are directly
8  involved with the case or may have an interest in it.
9       But it's very uncommon for a commander to
10  try to influence us to -- to close a case quickly.
11  They usually know when we -- when we brief them, they
12  know that we have other aspects that we're waiting
13  on.
14       Like in this case, it took us a long time
15  to get the autopsy and toxicology results and
16  coordinations with AFME's office and things like
17  that.  So there's other aspects beyond our control --
18  laboratory analysis.  There's simply we -- we have no
19  control over it.
20       Q.  In your experience how long does it
21  typically take to get a laboratory analysis completed
22  and results back?
23       A.  That's a very difficult question to answer.
24  It depends on what type of -- I don't remember what
25  the going time frame was back in 2011.  But if we had

---

**55**

1  sent it to our lab, DNA analysis can sometimes take
2  months.  AFME's office, if they're waiting on
3  toxicology, that's their timeline.  But it can be
4  into the months.
5       Q.  Who is Larry Turso?
6       A.  Larry Turso, at the time, for a brief
7  period was the battalion's operations officer that
8  our officer fell under.
9       Q.  So was that essentially the position that
10  you currently hold?
11       A.  He was at a battalion level.  I'm at a
12  group level.  So the battalion would have had about
13  five subordinate officers underneath him that he
14  would have managed.  He would have been the
15  operations officer over those five offices.  So at
16  that time the Fort Stewart office fell under the
17  Benning battalion, which Larry Turso was the
18  operations officer for that battalion.
19       Q.  Do you recall whether he had any
20  involvement in the Aguigui cases?
21       A.  I do recall his one -- one CAS entry that
22  we reviewed.  He put an entry in there.  And I forget
23  what his exact wording was, but at the time when he
24  put his review in, he felt that we had met the
25  credible information standard prior to that.

---

**56**

1       After he put that entry in, we did have a
2  conversation and explained to him difficulties with
3  this one because of the lack of any physical evidence
4  on Sergeant Aguigui's body and the lack of anything
5  in toxicology, the autopsy report was inconclusive.
6  So after we had a conversation, he -- he did agree
7  that it would have been too soon prior to that to
8  list him as a subject.
9       Q.  When did that conversation take place?
10       A.  It would have been within a day or two of
11  him putting that entry in there.
12       Q.  Was it by phone?
13       A.  Yes.  He was on Fort Benning and I was on
14  Fort Stewart.
15       Q.  Was anyone else on the phone call?
16       A.  No.  It was just me and him.
17       Q.  About how long did it last?
18       A.  I don't recall.  I do remember -- I do
19  remember us having the conversation, and I explained
20  to him the difficulties and -- and why it took that
21  long to reach the credible information standard, but
22  I don't remember the time length in the phone call.
23       Q.  Do you recall whether you personally
24  reviewed the autopsy photos of Deirdre Aguigui's body
25  at that point?

---

**57**

1       A.  I remember some photos, but I don't
2  remember if they were the autopsy or the death scene
3  photos.  I don't remember.
4       Q.  Okay.  So the death scene photos you would
5  have seen?
6       A.  I would have seen those, yes.
7       Q.  Do you recall what the condition of Deirdre
8  Aguigui's body was in terms of whether there were any
9  bruises or abrasions?
10       A.  I do recall seeing some slight bruises on
11  her wrists.  I believe there was a slight abrasion
12  under her lip.  I don't recall any other that stand
13  out for abrasions or -- or bruises to her body.
14       Q.  So a moment ago you said there was lack of
15  any physical evidence.  There was some physical
16  evidence, though, if there were bruises on her
17  wrists, correct?
18       A.  Yes.  There was bruises.  There was mild
19  bruising on her wrists and the lip.  But to reach the
20  credible information standard -- I guess what I meant
21  was, to reach credible information standard, we
22  didn't have that for -- for a death.
23       MR. BROOK:       Now would be a good
24       time to take a break, I guess.  We've been
25       going for an hour and 45 minutes.

---

Bauman, Donald                                    October 25, 2016

---

**58**

1    MS. JOHNSON:    How much longer do you
2  have?
3    MR. BROOK:    Probably about 45
4  minutes.
5    (Recess, 10:47 a.m.)
6    (Reconvened, 11:01 a.m.)
7    MR. BROOK:    Back on the record.
8  BY MR. BROOK:
9    Q.  I want to show you what's been previously
10  marked as Exhibit 13.  This is the CAS for the
11  Deirdre Aguigui homicide (tenders document) .
12    Do you recognize this?
13    A.  Yes.
14    Q.  Okay.  If you could please flip to Page 56
15  of 187.
16    A.  (Witness complies with the request of
17  counsel).
18    Q.  And there in the middle of the page it
19  appears to be an entry by you dated October 9th,
20  2011; is that right?
21    A.  Yes.
22    Q.  Do you remember making this entry?
23    A.  Yes.
24    Q.  And why did you put this entry in?
25    A.  It was a standard review.  When I took over

---

**59**

1  the office, I tried to review all the cases.  And
2  then a supervisory review should be documented with
3  the guidance for the agents for what they need to
4  continue with.  So this would be a standard
5  supervisory review that I put in the case.
6    Q.  Okay.  And you stated, quote, "I have some
7  concerns over her death."
8    A.  Yes.
9    Q.  Is it correct that -- did you list all of
10  your concerns in this statement or did you have other
11  concerns as well?
12    A.  To the best of my recollection, I would
13  have put anything that I thought needed to be
14  addressed in there, yes.
15    Q.  Were you aware at that time that Aguigui
16  had made statements to witnesses prior to Deirdre
17  Aguigui's death indicating that he was going to come
18  into some money soon?
19    MS. JOHNSON:    Objection.  Assumes
20  facts not in evidence.
21    THE WITNESS:    I don't recall.
22  BY MR. BROOK:
23    Q.  As you sit here today, do you recall
24  whether such statements had been made by Aguigui?
25    A.  I don't remember how many.  There was

---

**60**

1  interviews that were conducted by individuals that
2  had said he had joked about that.  I don't know if
3  the quote was coming into money soon, but I believe
4  there was at least one person that said they joked,
5  maybe I'll just kill my wife and get the insurance
6  money, something to that effect.  But I don't
7  remember him ever saying it was going to happen and
8  it was going to be soon.
9    Q.  And at the time do you know whether
10  Aguigui's text messages had been retrieved from his
11  phone?
12    MS. JOHNSON:    I'm sorry.  What was
13  that?
14  BY MR. BROOK:
15    Q.  At the time do you know whether Aguigui's
16  text messages had been retrieved from his cell phone?
17    A.  I do not recall.
18    Q.  As you sit here today, do you recall
19  whether any of the text messages on Aguigui's cell
20  phone were incriminating?
21    MS. JOHNSON:    Objection as to form.
22    THE WITNESS:    I don't recall.
23  BY MR. BROOK:
24    Q.  Item No. 3, you said that you wanted her
25  close friends interviewed, quote, "Don't hold off any

---

**61**

1  further on the canvas interviews; get them
2  completed," end quote.
3    Is this the same canvas interviews you
4  referred to earlier in your testimony today?
5    A.  Yes, it would be.
6    Q.  Okay.  And, to your knowledge, these canvas
7  interviews were not completed prior to the deaths of
8  Michael Roark and Tiffany York; is that right?
9    A.  I don't recall when they were, if they were
10  completed.
11    Q.  Looking at Item No. 9, you said that you
12  wanted to -- I'll just quote it -- quote, "I want you
13  to prepare a timeline surrounding her death,
14  specifically the day of and the day prior to her
15  death.  Make sure everything known in" -- and I
16  assume that means "is annotated" -- "i.e., his
17  locations, her locations, time of phone calls and
18  texts, et cetera."
19    A.  Yes.
20    Q.  Why was this important to you?
21    A.  I believe -- I don't remember what day --
22  there was a day when he went to South Carolina.  I
23  believe that was the day prior to he went to South
24  Carolina and came back.  And I wanted to put just --
25  it's common for us to do a timeline of just as close

---

Bauman, Donald

October 25, 2016

17 (Pages 62 to 65)

---

**62**

1  as we can minute by minute of the actions leading up
2  to the death.  So we wanted to find out where his
3  whereabouts was leading up to that.
4       And I believe he had just returned back
5  from South Carolina just prior to her death, so I was
6  trying to -- and there was -- now that I read this,
7  there was either text or phone calls between them two
8  back and forth while he was -- while he was in South
9  Carolina.
10      Q.   And who are you speaking to here when you
11 say "I want you to prepare a timeline"?
12      A.   This would be the primary case agent, which
13 would have been Agent Foxx at the time.
14      Q.   Going right back up to Item No. 8 that
15 says, quote, "Where are all the extractions of the
16 cell phones and memory cards?  Get them on a CD and
17 post it to the file," end quote.
18      So does that refresh your recollection at
19 all about whether you were aware of any text messages
20 at that time?
21      A.   It honestly doesn't, but it would tell me
22 that I read something to where it said that -- that
23 we did have cell phones and memory cards.  But to the
24 best of my memory, I don't recall when we collected
25 phones and memory cards.

---

**63**

1       Q.   Item No. 11, you said, quote, "Coordinate
2  with West Point and determine why they were both
3  released.  Did she voluntarily leave because he was
4  released?  Was he released because he refused to turn
5  in his friends for drinking," end quote.
6       Do you recall what that was about?
7       A.   Briefly.  What we were told at the time was
8  they had met each other at West Point and he was
9  released from the academy for some type of
10 disciplinary action.  And what we were told was she
11 left voluntarily to go with him, and we wanted to
12 clarify if she, in fact, left voluntarily or if she
13 was released for some sort of other reasons.
14      Any other -- I don't recall any other
15 reasons.  That's what comes to mind as to why they --
16 why they left, if it was disciplinary or other.
17      Q.   And is it correct that you were questioning
18 whether Aguigui's story about refusing to turn in his
19 friends for drinking, if that was the correct reason
20 for which he was discharged from West Point?
21      A.   I don't recall what the conclusion was why
22 he was released, because I remember there was also an
23 allegation of some sexual misconduct.  But I don't
24 recall what the reason was that he was -- was
25 released.

---

**64**

1       Q.   Okay.  But is it correct that you're
2  telling Agent Foxx to go find out what that reason
3  was?
4       A.   Yes.
5       Q.   Do you know whether he found out what that
6  reason was?
7       A.   I don't recall.
8       Q.   As you sit here today, you don't know what
9  that reason was?
10      A.   I don't remember what the specific reason
11 they were released was, no.
12      Q.   Okay.  Do you believe that you learned at
13 some point in time what the reason for his discharge
14 was?
15      A.   I don't want to say I don't recall.  I know
16 there was coordination with West Point eventually,
17 but I don't remember what the outcome was.
18      Q.   Would it have been significant to you if he
19 was discharged for threatening the life of a fellow
20 cadet?
21      A.   Yes.
22      Q.   Okay.  Would it be even more significant if
23 he had threatened the life of two cadets at West
24 Point?
25      A.   I would say it would be significant, yes.

---

**65**

1       Q.   What is the "IP"?
2       A.   Investigative plan.
3       Q.   Where is the IP kept for a case?
4       A.   So in the case file you have a left and
5  right side when you open it up and, on top of the
6  left side would be the investigative plan.  That
7  would be basically your to-do list.
8       Q.   And as items are completed on the IP and
9  the IP gets updated, do some items that have already
10 been completed get lost from the file?
11      A.   Lost?
12      Q.   Yes.  Or, well, another way to put it is,
13 are the old IPs ever discarded as the case
14 progresses?
15      A.   Not to my knowledge.  Normally what we do
16 is we'll have a running IP and when items are
17 completed on there, they put the date they're
18 completed.  But then when that's done, they should go
19 to the bottom and they would stay with the file.
20      Q.   So when you gave these instructions to
21 Agent Foxx, was your expectation that he would add
22 them to the IP to get them done?
23      A.   Normally, yes.
24      Q.   Do you know whether he added them to the
25 IP?

---

Bauman, Donald                                                    October 25, 2016

---

66

1    A.   I don't recall.
2    Q.   And would you please flip to Page 59 of
3  187?
4    A.   (Witness complies with the request of
5  counsel.)
6    Q.   The second entry here, it says "TC Review"
7  and it's by Cassandra Ivery.
8    A.   Yes.
9    Q.   Did you earlier refer to her as
10  Ms. Ivery-Morris?
11    A.   Her name is hyphenated.
12    Q.   Okay.
13    A.   In here it's Ivery, but it's Ivery-Morris.
14    Q.   Same person?
15    A.   Same person, yes.
16    Q.   Okay.  And this is how long after your
17  entry?
18    A.   Two weeks roughly?  The 9th to the 24th.
19    Q.   And -- well, I guess the first
20  instruction is "Add all leads identified by last SAC
21  review to the IP."
22       So is it fair to infer that at that point
23  in time the IP had not been updated with your
24  instructions?
25    A.   It's --

---

67

1       MS. JOHNSON:       Objection.
2       THE WITNESS:    -- really hard to say.
3  BY MR. BROOK:
4    Q.   In your experience, do your team chiefs
5  give instructions about what to add to the IP before
6  looking at the IP?
7    A.   No.  It's hard to say if he didn't put any
8  of them on the IP or only a number of them.
9    Q.   Understood.
10       Please turn to Page 64.
11    A.   (Witness complies with the request of
12  counsel.)
13    Q.   The first entry there is by Darren.
14    A.   Succone.
15    Q.   Who is Darren Succone?
16    A.   He was our battalion forensic science
17  officer, so he would have been out of Fort Benning at
18  the battalion.
19    Q.   And what was he doing here at this entry?
20    A.   I have to read it (reading document).
21       I'm sorry.  The question again?
22    Q.   What was the purpose of this entry?
23    A.   If they did a face-to-face interview, I
24  would assume that they had probably come down for a
25  face-to-face inspection of the office, which is

---

68

1  common, quarterly inspection of the office, and they
2  would pull a certain number of files to review.  But
3  as a forensic science officer, he would be
4  responsible for conducting a review of all death
5  investigations.  So it looks like he was just putting
6  his comment in here.
7       Yes, this would be a standard review
8  comment.
9    Q.   And one of the things that references is
10  that there was a face-to-face review with SA Ivery --
11    A.   Yes, sir.
12    Q.   -- and, quote, "discussed her concerns."
13       Do you recall what those concerns were?
14    A.   No, sir, I do not.
15    Q.   I think you indicated that "FSO" stands for
16  forensic science officer?
17    A.   Yes.
18    Q.   What does "BN" stand for?
19    A.   Battalion.
20    Q.   And "SAV"?
21    A.   Staff assistance visit, which would be the
22  quarterly visits where they go to each office and
23  pull a certain number of files.
24    Q.   Okay.  And "ICI"?
25    A.   Initial command inspection.  So when I took

---

69

1  over in October, as a new agent in charge for
2  detachment commander, within the first 90 days, your
3  higher headquarters, which would be the battalion,
4  comes and does an initial command inspection.  They
5  do an overall look at your unit, and then within one
6  year, they will do a subsequent inspection to see if
7  you've progressed or went the other way.
8       So this would have been an initial command
9  inspection of me at the office.
10    Q.   And about a year later you got promoted,
11  right?
12    A.   No, sir.  I -- I came here as a CW4.
13    Q.   You just moved to a different position?
14    A.   Yes.  Position move, yeah.
15    Q.   But is your current position supervisory of
16  the current SAC at the Fort Stewart base?
17    A.   So now we're at a group level, so we would
18  be over the battalion who supervises the office.  So
19  technically we're over 40 offices.  But I wouldn't
20  say it's direct supervisory guidance.  We conduct
21  our own inspections down to the office level, but our
22  role is more now quality assurance reviews.  But we
23  will provide guidance needed, but it's more holistic
24  quality assurance reviews than looking for systematic
25  problems.

---

Bauman, Donald                                              October 25, 2016

19 (Pages 70 to 73)

70

1    Q.  So when you do a quality assurance review,
2  you're not telling someone what to do, you're giving
3  them advice; is that fair to say?
4    A.  We can -- are you talking about my position
5  now?
6    Q.  Yes.
7    A.  So my position now is we generally review a
8  case after it's been completed.  So then we'll --
9  we'll look at it after the whole thing has been
10  final, or closed, and then we'll do a complete review
11  of the whole case and conduct a quality assurance
12  review and provide guidance.  If it does need to be
13  reopened, we'll direct down through the battalion
14  through the office that they would need to reopen it.
15  What we generally concentrate on is the -- what we
16  talked about before, with the unfounded cases, to see
17  if there's anything that was missed.  That's our main
18  concern.
19    Q.  Was a quality assurance review ever
20  conducted on any of the cases involving Isaac
21  Aguigui?
22    A.  Well, battalion reviews are quality
23  assurance reviews, yes.  And when Mr. Turso did a
24  review, that would be -- in a sense it's a quality
25  assurance review.  It's a supervisory review.  It is

71

1  above our level, so it's -- yes.
2    Q.  Besides Mr. Turso's review and the phone
3  call that you had with him afterwards, was there any
4  other quality assurance review conducted on any of
5  these cases?
6    A.  I don't recall off the top of my head;
7  however, at one point, I believe it was May of 2012,
8  where we had a -- a shift within CID so we no
9  longer -- in May, we no longer fell under the Benning
10  battalion.  In May we fell under the Fort Bragg
11  battalion, so that would have been under a different
12  battalion operations officer.
13    Q.  Have you at any point in time in the last
14  several years taken a look back at any of the
15  Aguigui-related cases, based on your experience now
16  in reviewing other people's cases, and tried to
17  assess what went wrong here?
18    A.  I have --
19       MS. JOHNSON:     Objection.
20  Mischaracterizes the evidence.
21       THE WITNESS:     I have not looked at
22  the case.
23  BY MR. BROOK:
24    Q.  Do you think that CID made any mistakes in
25  connection with any of the Aguigui investigations?

72

1    A.  That would have changed the outcome of
2  anything that occurred, I do not.
3    Q.  And, again, that's based on not having done
4  a review, though, correct?
5    A.  Correct.
6    Q.  Have you talked with anyone aside from the
7  lawyer sitting next to you about whether CID did
8  anything right or wrong in connection with any of the
9  Aguigui investigations?
10    A.  No.
11    Q.  Turning to Page 77 of this Exhibit 13.
12    A.  (Witness complies with the request of
13  counsel).
14    Q.  Rather, 75 to 77.  This is the entry by
15  Larry Turso that you had referred to earlier.
16    A.  Okay.
17    Q.  I want to direct your attention to the line
18  at the bottom of Page 76 and the first line on the
19  top of Page 77.  It says, quote, "Good call by
20  Mr. Toole on delaying payment.  How did we screw this
21  up?  Perhaps we need to look into freezing his
22  accounts."
23       Do you recall this statement?
24    A.  I don't specifically recall this, but I can
25  discuss it.

73

1    Q.  Do you know whether this was something that
2  you or anyone in your office responded to try to look
3  into answering Mr. Turso's question?
4    A.  This was in November -- or December.
5  Sorry.  So to the best of my recollection, we did,
6  but it was the other agency who was able to
7  successfully get the accounts frozen.  But I don't
8  remember which agency that was.
9    Q.  As far as his first question, was regarding
10  delaying payment, he asked, "How did we screw this
11  up?"
12       Is that something that you looked into or
13  had someone look into?
14    A.  I had spoken with Mr. Toole regarding his
15  conversation with the CAO, and I remember my
16  conversation with the CAO where we said he was a
17  person of interest.  And that would be a call for an
18  answer that the CAO needs to address.  But I do know
19  when I had my conversation with the CAO, we did
20  advise that he was a person of interest.  But we have
21  no say in whether a death gratuity or the SGLI gets
22  paid.  We have no call in that whatsoever.
23    Q.  You do have an information-providing role,
24  though, in those decisions?
25    A.  Yes.  We -- we were able to tell them he

Bauman, Donald

October 25, 2016

20 (Pages 74 to 77)

---

74

1  was a person of interest.  But the decision to make
2  payment would not be on us.  And we can --
3      Q.  And when did -- sorry.
4      A.  We can -- we can tell them, at least,
5  that -- if he was a subject or a person of interest,
6  in which we could tell he was a person of interest at
7  the time.
8      Q.  And, to your knowledge, was Private Aguigui
9  at any time not a person of interest in his wife's
10  death?
11     A.  To my knowledge he was always a person of
12  interest from the -- from the death of Sergeant
13  Aguigui.
14     Q.  When did you speak to Agent Toole about
15  what he had said to the casualty affairs office?
16     A.  It would have been subsequent to my
17  receiving a phone call from the CAO, because she had
18  told me about the payment and I had asked her what
19  was annotated and she said that her annotation,
20  whoever Mr. Toole talked to, was that he was not a
21  person of interest.  And I said he was still, and I
22  talked to Mr. Toole and he said he told them that
23  Private Aguigi was a person of interest.
24     Q.  Did you make any judgment calls about
25  whether Agent Toole was telling you the truth or not?

---

75

1      A.  I didn't doubt his word.
2      Q.  Did you look into whether someone at the
3  CAO had been potentially corrupted into making a
4  payment that they should not have?
5      A.  No.
6      Q.  So what did you conclude about the reason
7  why the payment was made?
8      A.  A miscommunication or an annotation that
9  was incorrect on the -- on the CAO.  I concluded it
10  was a misannotation from the CAO or misunderstanding
11  of a person of interest.
12     Q.  Did you personally ever speak with the
13  person who had made the annotation for the CAO?
14     A.  I remember at least one phone call with the
15  CAO, but I don't know if that was the same person
16  that talked with Mr. Toole.  I only remember my
17  conversation with one individual at the CAO.
18     Q.  And what do you remember about the
19  individual that you spoke to?
20     A.  I don't recall a name.  I know it was a
21  female that I talked to, and I don't know -- for some
22  reason, I want to believe that she was not in
23  Georgia, that she was out of state.  But specifically
24  what I remember is telling her that she (sic) was a
25  person of interest, and then she looked back in her

---

76

1  files and they added an annotated where Mr. Toole had
2  said was not a person of interest.  And we discussed
3  that and I said, no, he had always been.  So that's
4  the extent of the conversation that I recall.
5      Q.  Are you aware of whether Private Aguigui
6  ever claimed to have corrupted a CID agent?
7      A.  I don't recall that.
8      Q.  You don't recall whether --
9      A.  I don't recall hearing that.
10     Q.  Is that something that you would have
11  responded to and investigated if you had heard
12  someone making the allegation?
13     A.  Possibly.  It depends on what the exact
14  allegation was.
15     Q.  Okay.  Just to ask if it refreshes your
16  recollection, do you recall a statement by Private
17  Aguigui reported by another person as being made that
18  he had a CID agent in his pocket?
19     A.  I don't recall that.
20         MR. BROOK:      Let's mark this as
21  Exhibit 33.
22         (Plaintiffs' Exhibit No. 33 marked
23  for identification.)
24  BY MR. BROOK:
25     Q.  I'm showing you Exhibit 33, which bears

---

77

1  Bates numbers DA0001 through DA00012.
2      Do you recognize that document?
3      A.  No, sir.
4      Q.  Have you ever seen a document like this?
5      A.  Not exactly like this, no, sir.
6      Q.  What have you seen that is similar to this?
7      A.  I'm trying to think if it looks like a
8  TALON report or something that the FBI would put out.
9  I don't recognize this, no.
10     Q.  Okay.  At the top right on the first page
11  it has some sort of an emblem saying "CTD."  Do you
12  know what that may stand for?
13     A.  No.
14     Q.  Below it says counter-terrorism assessment.
15     A.  Okay.
16     Q.  Does that mean anything to you?
17     A.  I don't know who would have generated it.
18     Q.  Turning to the last page, there's a black
19  bar referring to Sentinel uploads.  Do you know what
20  Sentinel is?
21     A.  I don't recall.  I believe it's a database,
22  but I don't recall.
23     Q.  Do you know which agency maintains that
24  database?
25     A.  I'd say it should be the FBI, I believe.  I

---

Bauman, Donald                                    October 25, 2016

21 (Pages 78 to 81)

78

1  don't recall.
2      Q.   I don't have any more questions about that.
3          MR. BROOK:      Let's mark this Exhibit
4  34.
5          (Plaintiffs' Exhibit No. 34 marked
6      for identification.)
7  BY MR. BROOK:
8      Q.   I'm showing you Exhibit 34, which you're
9  seeing is Bates numbers JAHR0043521 through
10 JAHR0043529.
11         Have you seen this document before?
12     A.   This exact one or --
13     Q.   This case, it says --
14     A.   Case activity summary.  I'm familiar with
15 case activity summary, yes, but not this
16 investigation.
17     Q.   Okay.  Do you know which CID office would
18 be CID 016?
19     A.   Not off the top of my head, no.
20     Q.   Do different CID offices have access to
21 case activity summaries that are generated by other
22 offices?
23     A.   Yes.
24     Q.   At any point in time did you look at the
25 case activity summary that was generated in

79

1  connection with the Fort Lewis assistance on the
2  Aguigui gun purchases in Washington State?
3      A.   I don't recall.
4      Q.   If you would, please turn to the second
5  page of this document.  There's an entry there that
6  I'll read aloud for the record.  "Coordinated with SA
7  Justin Kapinus, Fort Stewart CID Office, who related
8  that PFC Aguigui was a West Point dropout and is very
9  intelligent and deceptive.  He is not militant, but
10 undisciplined.  He purchased security guard uniforms
11 and stated that he was going to open a security guard
12 business upon discharge from the Army."
13         Does that refresh your recollection at all
14 about who the other agent that you had involved with
15 you on the Aguigui gun purchases matter was?
16     A.   Like I said before, Agent Foxx and Agent
17 Kapinus were the primary agents on -- on the cases
18 regarding Aguigui.  Any other agents in the office, I
19 don't recall, that had direct involvement.
20     Q.   I'm asking specifically, was Justin Kapinus
21 the agent -- now having read this, do you recall
22 whether he was the agent who went with you to speak
23 to Aguigui?
24     A.   To the staff major?  I don't remember.  I
25 know I wasn't alone, but I don't remember which

80

1  agents went with me.
2      Q.   In this entry, does any of this entry sound
3  incorrect based upon what your knowledge was of
4  Justin Kapinus's assessment of Aguigui at that time?
5      A.   No.
6      Q.   Do you have an understanding of why Justin
7  Kapinus characterized Aguigui as very intelligent and
8  deceptive?
9          MS. JOHNSON:      Objection.
10         THE WITNESS:      I don't know his
11     rationale.
12 BY MR. BROOK:
13     Q.   Did you ever discuss with Agent Kapinus at
14 or around the time of this entry, September 30th,
15 2011, whether Aguigui was a credible person?
16     A.   I don't recall specific conversation about
17 that.
18     Q.   How important is an experienced agent like
19 Justin Kapinus's assessment of a person's credibility
20 to you?
21     A.   I would trust his assessment.
22     Q.   Have you ever heard Agent Kapinus refer to
23 anyone as deceptive?
24     A.   Not that I recall.
25     Q.   So it's not something he commonly

81

1  characterizes people as being?
2          MS. JOHNSON:      Objection.
3  Mischaracterizes his testimony.
4          THE WITNESS:      Not that I recall.
5          MR. BROOK:      Let's mark this as
6  Exhibit 35.
7          (Plaintiffs' Exhibit No. 35 marked
8      for identification.)
9  BY MR. BROOK:
10     Q.   What's been marked as Exhibit 35 is the CAO
11 Staff Journal, Bates numbered JAHR0043386 through
12 JAHR0043515.
13         Have you ever seen this document before?
14     A.   No, sir.
15     Q.   Have you seen a document like this before,
16 a staff journal from the CAO?
17     A.   From the CAO?  No, not that I recall.
18     Q.   Is the staff journal a type of form that is
19 used by groups or departments other than the CAO?
20     A.   Yes.  General staff journals, yes.
21     Q.   Okay.  Are the staff journals of the CAO
22 available to or accessible to CID?
23     A.   We would have to go through the request
24 process just like any other agency, but, yes, they
25 would be available.

Bauman, Donald                                          October 25, 2016

22 (Pages 82 to 85)

---

82

1    Q.  But is it fair to say that it's not as
2  readily available as a CAS from another CID office?
3    A.  Correct.  They're a different agency.
4    Q.  For a CAS, do you need to put in any sort
5  of request to see what another office has created?
6    A.  No.  I have access to those on our
7  database.
8    Q.  Would you please turn to what's marked on
9  the bottom left-hand side of the page as Page 70 of
10 130?
11   A.  (Witness complies with the request of
12 counsel).
13   Q.  There's an entry in staff journal dated
14 November 30th, 2011, and it refers to a CID ROI
15 dated, 29 November 2011, second status report.  And
16 then it has a bunch of lines of text below that in
17 all caps.
18       Is this, as far as you can tell, text that
19 is taken directly from a CID ROI?
20   A.  It appears to be, yes.
21   Q.  And where are CID ROIs made available to
22 the CAO that it would end up in this staff journal?
23   A.  I don't know how they would have obtained a
24 copy.  I don't recall putting them on a distri line
25 when we sent it out.  I don't know who would have

---

83

1  provided them a copy.
2    Q.  Was it common practice to provide ROIs to
3  the CAO in connection with a death investigation?
4    A.  Not to my knowledge, no.
5    Q.  Do you recall having provided an ROI to the
6  CAO?
7    A.  I don't recall providing them a copy.
8    Q.  It says "second status report."  So
9  assuming that this text is the same thing as on a CID
10 ROI, what does it mean to be a second status report?
11   A.  Well, the initial report would have been
12 sent out within 24 hours of the -- of the death, or
13 of us being reported of the death.  That would be the
14 initial report.  Any subsequent reports on top of
15 that that weren't the leadership knowing would be a
16 second, third, fourth status reports.  Any continuing
17 reports would be so numbered.
18   Q.  Is there any sort of time frame or
19 guidelines in which you're supposed to issue a second
20 status report after opening an ROI?
21   A.  On death investigations and serious sexual
22 assaults, generally after the initial report is sent
23 out, 120 days later we usually do an investigative
24 update should be the second report.
25   Q.  So in this case, the death occurred in July

---

84

1  of 2011 and this --
2    A.  July --
3    Q.  -- is sent in November?
4    A.  So, yes, that would be in line.
5    Q.  And you may have already said this, but who
6  was, at the time, in December of 2011, the Benning
7  CID battalion operations officer?
8    A.  I believe it was still Larry Turso.
9    Q.  Would you please turn to Page 73 of 130?
10   A.  (Witness complies with the request of
11 counsel).
12   Q.  And this is -- the second entry there is
13 referring to something on December 15th, 2011, and it
14 says CID ROI, dated 14 December 2011, third status
15 report.
16       Does this also look like the text of a CID
17 ROI to you?
18   A.  Yes, it looks like it.
19   Q.  Okay.  It says, "This report identifies PFC
20 Aguigui as the subject of murder.  The special agent
21 in charge and the Benning CID Battalion Operations
22 Officer determined that there was more than
23 sufficient credible information to believe PFC
24 Aguigui murdered his wife and their unborn child."
25       I'm not going to read the rest.  But what

---

85

1  was it that -- let me first ask this:  Is that a
2  correct statement about what your opinion was at the
3  time, mid-December 2011?
4    A.  Yes.
5    Q.  Okay.  This was after having had a phone
6  call with Larry Turso where you informed him, or you
7  convinced him, you say that he -- that there was not
8  sufficient credible information earlier; is that
9  right?
10   A.  Enough to list him as a subject, yes.
11   Q.  Okay.  So what was the new evidence that
12 you considered?
13   A.  I don't recall off the top of my head what
14 transpired between November and December.  I do just
15 know it was a lot of just circumstantial evidence
16 that we had.  It was just -- at the time it was
17 enough to get to the credible information threshold
18 and list him, but I don't recall off the top of my
19 head what the triggering mechanism -- or what the
20 triggering information was that said, yes, we can put
21 him in now.
22   Q.  Okay.  Was this text that you were involved
23 in writing or reviewing before it was submitted?
24   A.  Yes.
25   Q.  So at that point it wasn't just that you

---

Bauman, Donald                                    October 25, 2016

23 (Pages 86 to 89)

---

86

1  met the credible information standard; there was more
2  than sufficient credible information, right?
3       A.  Yes.
4       Q.  Did you ever speak with Sergeant First
5  Class Lapsley?
6       A.  The name is familiar, but I don't recall.
7       Q.  The casualty assistance officer assigned to
8  Private Aguigui?
9       A.  Okay.
10      Q.  Does that ring a bell now?
11      A.  I would have spoken with the casualty
12  assistance officer that was assigned to him, but I
13  don't remember any specific conversations.
14      Q.  Are you familiar with the CID Regulation
15  195-1?
16      A.  Yes.
17      Q.  Okay.  Am I correct that it's Chapter 16-1
18  that covers death investigations?
19      A.  Chapter 16 covers deaths, yes.
20      Q.  Are there any other chapters that are
21  relevant when you're conducting a death
22  investigation?
23      A.  There are several that would be relevant to
24  any case.  Chapter 16 is specific for deaths and
25  specific actions, but Chapters 4 through 8 are

---

87

1  report-writing and how you document things and
2  interviews of subjects and witnesses and things.  So,
3  yes, there are other chapters that are relevant.
4       Q.  And is it correct that things that are
5  generally stated in some of those other chapters
6  would not be repeated in Chapter 16?
7       A.  It could be.
8       Q.  It could be, but not necessarily?
9       A.  I can't tell you for sure off the top of my
10  head, but there are instances where, yes, the
11  regulation does repeat itself word for word from one
12  chapter to another, so, yes, it could happen.
13      Q.  Okay.  And how would you determine whether
14  there were different regulations between, say,
15  Chapter 4 and Chapter 16?
16      A.  Oh, I'm talking about the same regulation.
17      Q.  Oh, okay.
18      A.  You're talking about, like, Chapter 16 may
19  be word for word from something from Chapter 4.  Not
20  a different regulation, no.  Sorry.  I misunderstood
21  you.
22      Q.  I understand then.  I was misspeaking.
23          So Chapter 4 might have something word for
24  word that's in Chapter 16?
25      A.  Yes.

---

88

1       Q.  So other than comparing 4 against Chapter
2  16, is there any other way you would know that text
3  that's in Chapter 16 is also in Chapter 4?
4       A.  In the same regulation?
5       Q.  Yes.
6       A.  I guess I'm not understanding your
7  question.  I thought -- that's what I meant.
8       Q.  If someone was an outsider --
9       A.  Yes.
10      Q.  -- and trying to understand how CID does
11  its job --
12      A.  Yes.
13      Q.  -- in a death investigation, would it be
14  sufficient for that person to read Chapter 16 and
15  nothing else?
16      A.  No.
17      Q.  What else would you need to see?
18      A.  Like I said, you would need to do a
19  holistic look at it, how we conduct an investigation.
20  You know, like Chapter 5 deals with interviews and
21  the conduct of victim and subject interviews.
22  Chapter 8 would be the report-writing and how you
23  document.  So you wouldn't be able to look at one
24  chapter and know how to investigate a death case from
25  start to finish, no.

---

89

1       Q.  And so the entire regulation is pretty
2  huge; is that right?
3       A.  Yes.
4       Q.  How often do you refer back to it in your
5  job?
6       A.  I would say for working, daily.
7       Q.  In connection with death investigations, is
8  it correct that the regulation specifies that the
9  manner of death is determined by the special agent in
10  charge?
11          MS. JOHNSON:    You might need to give
12      him a regulation rather than asking him from
13      memory.
14          MR. BROOK:    I'm just asking if he
15      knows.
16          THE WITNESS:    Well, a determination
17      is made in conjunction with the autopsy report
18      and the death certificate, what the cause and
19      manner would be.  And normally how we word it
20      is the determination is made by either the AFME
21      or what's on the death certificate and we
22      concur with that decision, so...
23  BY MR. BROOK:
24      Q.  In the case of Deirdre Aguigui's death, at
25  the time when the SAC determined that her death was a

---

Bauman, Donald                                      October 25, 2016

24 (Pages 90 to 93)

90

1  homicide, you were no longer the SAC at Fort Stewart;
2  is that right?
3     A.  In December of '12?
4     Q.  When did --
5     A.  I'm sorry.
6     Q.  When did -- do you know when Deirdre
7  Aguigui's death was declared a homicide?
8     A.  It was after I left, yes.
9     Q.  So is it fair to say, then, that you did
10  not determine her manner of death to be a homicide as
11  the SAC --
12     A.  I did not, no.
13     Q.  Okay.  Were you asked to do so?
14     A.  No.  That would have been my predecessor.
15     Q.  And that was Agent Toole?
16     A.  I'm sorry.  The one that replaced me.
17     Q.  Successor.
18     A.  Yeah.  Would have been Agent -- successor.
19  Sorry.  Yeah, it would have been Agent Yeatts,
20  Y-E-A-T-T-S.  Sorry.
21     Q.  Do you --
22     A.  When was the determination made?  I can
23  tell you if I was at the office or not then.
24     Q.  I --
25     A.  I don't recall.

91

1        MS. JOHNSON:      He doesn't know.
2  BY MR. BROOK:
3     Q.  I'm not -- yeah, I'm not going to testify
4  on that.
5     A.  Oh, sorry.
6     Q.  If you don't recall making it, then that's
7  fine for your testimony.
8     A.  When we listed him as the subject, that
9  would have been in December of 2011.  I was -- I was
10  the SAC then.  But I don't remember what the offense
11  we used was at the time because there was still work
12  for several more months with -- in conjunction
13  with -- in cooperation with the GBI.
14     Q.  Did you ever speak with Isabel Pauly?
15     A.  I don't recall.
16     Q.  Do you recall the names of anyone
17  associated with the State of Georgia, GBI or DA's
18  office that you interacted with?
19     A.  Specifically by name, no, I don't.
20     Q.  Did you interact with some people from
21  those offices?
22     A.  Some, yes.  There was two or three that
23  came down right after the -- the deaths.  I don't
24  remember their names.  It was at least one male and
25  one female.  And we worked with them closely for a

92

1  while.  I don't recall their names.
2     Q.  Do you know whether the CID regulation
3  195-1 requires you to have face-to-face coordination
4  with the SJA?
5     A.  On certain cases, yes.
6     Q.  And for death cases, is that the case?
7     A.  Yes, when we're trying to get the opine,
8  the legal opinion, it requires face-to-face.
9     Q.  And in this case, how was that requirement
10  met?
11     A.  I don't recall.  That would be a
12  determination before the case was closed, and I
13  believe when I left the office the case was still
14  open.
15     Q.  Going back to the time period after the
16  deaths of Michael Roark and Tiffany York --
17     A.  Yes.
18     Q.  -- when GBI was conducting an investigation
19  along with other agencies --
20     A.  After the deaths.
21     Q.  -- did CID have an ROI for purposes of
22  trying to identify possible insurgents or militants
23  or terrorists within the Army?
24     A.  At the Fort Stewart office?
25     Q.  Yes.

93

1     A.  No.
2     Q.  Were you aware that -- or were you aware of
3  whether any soldiers had indicated that there had
4  been sort of an antigovernment group formed within
5  the Army at Fort Stewart?
6     A.  Not that I recall.
7     Q.  Is investigating extremism within the
8  purview of CID?
9     A.  Yes.
10     Q.  Is there any other office within the Army
11  or agency in the Army that would have responsibility
12  for investigating that?
13     A.  For the local area, would normally be the
14  local office.
15     Q.  Of CID?
16     A.  Yes.
17     Q.  Okay.  Do MPs investigate extremism?
18     A.  No.  That should fall under CID's purview.
19     Q.  And just to be clear, to your knowledge,
20  there was never an extremism investigation that was
21  conducted by CID while you were SAC there regarding
22  people associated with (inaudible); is that right?
23        THE COURT REPORTER:  Associated with
24  what?
25        MR. BROOK:      Isaac Aguigui.

Bauman, Donald

October 25, 2016

25 (Pages 94 to 96)

94

1      (Thereupon, the court reporter requests
2   clarification.)
3      THE WITNESS:      Correct.
4   BY MR. BROOK:
5      Q.  Okay.
6      MR. BROOK:      Give me just one
7   second.
8      (Recess, 11:51 a.m.)
9      (Reconvened, 11:43 a.m.)
10     MR. BROOK:      No further questions by
11  me.
12     Kristin, anything you want to put on the
13  record?
14     MS. JOHNSON:      No.
15     MR. BROOK:      Thank you.
16     (Whereupon, there was an off-the-record
17  discussion.)
18     MS. JOHNSON:      We'll read.
19     (Thereupon, the deposition was concluded at
20  11:43 a.m. and signature was reserved.)
21
22               - - -
23
24
25

96

1                  CERTIFICATE
2
3   STATE OF GEORGIA:
4   GEORGIA, PIERCE COUNTY:
5
6      I, Barbara J. Memory, Certified Court
7   Reporter, State of Georgia, Certificate No. B-2063,
8   CERTIFY that acting in such capacity, I reported the
9   testimony herein, and on the foregoing pages have
10  transcribed a true and correct transcript thereof.  A
11  review of the transcript was requested.
12     I FURTHER CERTIFY that I am not counsel
13  for, nor am I related to any party to the above case;
14  nor am I interested in the event or outcome.
15     WITNESS my hand and official seal as
16  Certified Court Reporter, State of Georgia,
17  Certificate No. B-2063 this 1st day of November 2016.
18
19
20
21
22
23
24  _____
    Barbara J. Memory, RPR, CCR
25  Certificate No. B-2063

95

1                  DISCLOSURE
2   STATE OF GEORGIA:
3   COUNTY OF PIERCE:
    Regulations of the Board of Court Reporting of the
4   Judicial Council of Georgia, I make the following
    disclosure:
5      I am a Georgia Certified Court Reporter and
    Registered Professional Reporter, reporting for
6   Memory Reporting, Inc., P.O. Box 453, Blackshear,
    Georgia 31516, 912.449.8486.
7
8      Memory Reporting, Inc. is not disqualified
    from a relationship of interest under the provisions
    of O.C.G.A. 9-11-28(c).
9
10     Memory Reporting, Inc. was contacted by the
    offices of Henderson Legal Services to provide court
11  reporting services for this deposition.
12     Memory Reporting, Inc. will not be taking
    this deposition under any contract that is prohibited
13  by O.C.G.A. 15-14-37 (a) and (b).
14     Memory Reporting, Inc. has no exclusive
    contract to provide reporting services with any party
15  to the case, any counsel in the case, or any reporter
    or reporting agency from whom a referral might have
    been made to cover this deposition.
16
17     Memory Reporting, Inc. will charge its
    usual and customary rates to all parties in the case,
18  and a financial discount will not be given to any
    party to this litigation.
19     A review of the transcript was requested.
20
21
22
23
24  _____
    Barbara J. Memory, RPR, CCR
25  Certificate No. B-2063

96

1          ACKNOWLEDGMENT OF DEPONENT
2
3
4
5      I, _____, do hereby
6   acknowledge that I have read and examined the
7   foregoing testimony, and the same is a true, correct
8   and complete transcription of the testimony given by
9   me, and any corrections appear on the attached Errata
10  Sheet signed by me.
11
12
13
14
15
16
17  _____    _____
18  (DATE)          (SIGNATURE)
19
20
21
22
23
24
25
26

Bauman, Donald

October 25, 2016

1

**A**

a-hundred-a...
48:17
a.m 1:15,16
58:5,6 94:8,9
94:20
AAS 8:5
ability 6:25
able 23:24
26:24 41:8,9
48:13 49:4
49:12 73:6
73:25 88:23
abrasion
57:11
abrasions
57:9,13
academy 63:9
access 78:20
82:6
accessible
81:22
accomplished
49:4
account 48:17
accounts
48:14,20,23
49:13 72:22
73:7
accused 50:18
acknowledge
96:6
acknowledg...
30:7 96:1
acting 96:8
action 1:3
20:20,22
26:10 28:25
30:22 52:16
52:24 53:2,5
63:10
actions 62:1
86:25
activity 30:5

78:14,15,21
78:25
add 65:21
66:20 67:5
added 65:24
76:1
additional
31:13
address 73:18
addressed
59:14
adjudication
19:22 20:8
20:10,11
administrative
22:17 52:24
advice 70:3
advise 73:20
adviser 44:15
advocate 44:4
affairs 47:10
74:15
Afghanistan
11:12 14:3,9
14:10
AFME 89:20
AFME's 17:14
54:16 55:2
age 8:21
agencies 38:1
38:7 39:18
48:12 49:3,7
49:12 92:19
agency 39:6
41:8 49:1,5
73:6,8 77:23
81:24 82:3
93:11 95:15
agent 10:2
11:9,22
12:19,21
13:1 21:11
21:12 23:21
24:10,11,23
29:7,10,11

29:13,14,15
30:5,11,12
30:23 31:12
31:17 32:6,9
32:9,12,13
32:20 33:16
33:23 34:3,6
34:8 41:21
42:11 62:12
62:13 64:2
65:21 69:1
74:14,25
76:6,18
79:14,16,16
79:21,22
80:13,18,22
84:20 89:9
90:15,18,19
Agent's 8:15
agents 12:23
14:8 15:20
16:4,10
24:25 25:9
28:19 31:2
31:21,22
32:4,6 50:15
59:3 79:17
79:18 80:1
ago 7:23 17:24
18:4 34:12
57:14
agree 35:17
56:6
Aguigi 74:23
Aguigui 17:19
21:7,7,17
22:1 23:5,8
23:11 24:8
25:2,4,13
27:24 32:18
33:17,22
36:23 37:20
38:19 39:19
41:4 42:9,16
43:8 44:5

45:22 46:9
46:18 49:20
49:21 51:4
51:11 52:1
53:4,19
55:20 58:11
59:15,24
70:21 71:25
72:9 74:8,13
76:5,17 79:2
79:8,15,18
79:23 80:4,7
80:15 84:20
84:24 86:8
93:25
Aguigui's 33:7
34:9 36:18
41:23 42:13
44:20 47:19
48:10 49:17
53:11 56:4
56:24 57:8
59:17 60:10
60:15,19
63:18 89:24
90:7
Aguigui-rela...
71:15
ahead 6:24
AIR 8:15
aircraft 9:12
Airfield 13:5
AIRs 20:4
Alabama 9:23
allegation
27:12 63:23
76:12,14
allegations
27:18 52:19
52:20
alleged 25:14
aloud 79:6
AMERICA 1:10
amount 29:21
analysis 54:18

54:21 55:1
annotated
61:16 74:19
76:1
annotation
74:19 75:8
75:13
answer 6:11
6:16,24,25
7:6 33:2 40:7
54:6,23
73:18
answering
73:3
answers 5:20
antigovernm...
93:4
anybody 23:7
37:13,16
38:13
appear 96:9
Appearing 2:7
2:13
appears 58:19
82:20
appointed
33:23
apprehended
21:24
apprehensio...
45:1,2
approximately
51:3
area 29:20
40:25 93:13
Army 8:21,23
12:11,13
13:5 35:17
39:18 53:12
79:12 92:23
93:5,10,11
arrested 7:18
38:12
arrived 21:8
articulated

40:1
**aside** 27:15
72:6
**asked** 6:13
34:8 48:5
73:10 74:18
90:13
**asking** 18:5,12
37:14 49:25
79:20 89:12
89:14
**aspect** 31:25
**aspects** 54:12
54:17
**assault** 7:14
52:20
**assaults** 83:22
**assess** 71:17
**assessment**
77:14 80:4
80:19,21
**assigned** 29:7
30:13 32:20
32:21 86:7
86:12
**assignment**
8:23,24,25
9:4 10:2
**assistance**
45:21 47:10
68:21 79:1
86:7,12
**assistant** 2:10
11:8 13:6,8
13:25 29:10
**assisted** 41:10
**assisting** 14:7
**associated**
91:17 93:22
93:23
**assume** 7:7
61:16 67:24
**assumes**
32:23 51:7
51:22 59:19

**assuming** 6:7
46:8,17 83:9
**assurance**
13:10,14
69:22,24
70:1,11,19
70:23,25
71:4
**ATF** 38:2,24
39:7
**attached** 20:2
20:4 28:9
96:9
**attention**
15:15 31:23
32:7,10,15
72:17
**attorney** 2:10
6:22
**Attorney's**
1:17
**August** 14:14
**aunts** 39:23
**authority** 54:7
**authorized**
12:4,9
**autopsy** 23:18
54:15 56:5
56:24 57:2
89:17
**available**
29:21 81:22
81:25 82:2
82:21
**Avenue** 2:5
**aviation** 8:24
**aware** 7:22
18:3 22:2
25:12 39:15
41:22 47:16
52:4 59:15
62:19 76:5
93:2,2
**awhile** 10:3
**AWOL** 42:4

**B**
**b** 2:9 95:12
**B-2063** 95:25
96:7,17,25
**B-A-U-M-A-N**
5:8
**back** 12:17
14:9 15:13
15:16 16:14
18:16 31:12
37:11 41:10
41:16 47:23
48:4 53:4,13
54:22,25
58:7 61:24
62:4,8,14
71:14 75:25
89:4 92:15
**background**
34:3,7
**bacon** 6:15
**Bagram** 11:12
14:3
**Bagwell** 44:2,3
44:18
**bar** 77:19
**Barbara** 1:20
95:24 96:6
96:24
**Barnard** 1:17
**Barracks** 11:7
**base** 69:16
**based** 20:15
20:15 71:15
72:3 80:3
**basic** 37:14
**basically** 20:5
65:7
**basics** 5:12
**basis** 16:4
25:11 43:10
48:22
**batallion** 44:23
**Bates** 4:3,6,8

77:1 78:9
81:11
**battalion**
13:25 14:4
45:11 53:20
53:22 55:11
55:12,17,18
67:16,18
68:19 69:3
69:18 70:13
70:22 71:10
71:11,12
84:7,21
**battalion's**
55:7
**Bauman** 1:13
3:3 5:1,8
**bears** 76:25
**began** 10:8
**behalf** 2:7,13
**believe** 18:24
21:11,19
22:14 23:22
24:3,11
26:17 28:2
33:25 34:18
39:22 40:23
41:20 42:1
42:23 46:1,2
47:13,14,19
47:22 48:14
49:21,25
57:11 60:3
61:21,23
62:4 64:12
71:7 75:22
77:21,25
84:8,23
92:13
**believed** 22:6
**bell** 43:1,2
45:5 86:10
**Benning** 55:17
56:13 67:17
71:9 84:6,21

**best** 6:25
30:23 59:12
62:24 73:5
**beyond** 54:17
**bi-weekly**
43:23
**big** 11:23
35:22
**bit** 8:16
**black** 77:18
**Blackshear**
95:6
**block** 23:2
**BN** 68:18
**Board** 95:3
**body** 36:22
56:4,24 57:8
57:13
**Borchardt**
42:25 43:7
**born** 8:17
**bottom** 65:19
72:18 82:9
**bought** 40:4
**Box** 95:6
**Bragg** 71:10
**break** 57:24
**breakfast** 6:13
6:14
**Brenda** 1:6
2:16 15:11
**BRETT** 1:6
**BRIAN** 2:4
**Brian@clint...**
2:6
**brief** 54:11
55:6
**briefing** 18:21
**briefings**
18:17,19
21:21
**briefly** 7:24 8:9
63:7
**bring** 8:12
**Brook** 2:4,4

Bauman, Donald

October 25, 2016

3

3:4 4:13 5:5
15:7,13,14
33:15 36:14
41:12,16,17
42:21 46:20
47:1 51:10
51:24 57:23
58:3,7,8
59:22 60:14
60:23 67:3
71:23 76:20
76:24 78:3,7
80:12 81:5,9
89:14,23
91:2 93:25
94:4,6,10,15
**Brookings**
8:18,20
**brought** 49:24
51:13,17
**bruises** 57:9
57:10,13,16
57:18
**bruising** 57:19
**bunch** 82:16
**business** 40:8
79:12
**buy** 38:25

**C**

**C** 2:1,4
**cadet** 64:20
**cadets** 64:23
**call** 17:9 20:2
20:18 33:13
53:13 54:5
56:15,22
71:3 72:19
73:17,22
74:17 75:14
85:6
**called** 22:22
39:23,24,24
47:14
**calls** 17:12

61:17 62:7
74:24
**Camp** 12:19
**candidate**
10:14,16
**canvas** 33:6
33:12,20
34:9,14,17
35:4,19
36:17 37:14
61:1,3,6
**canvassing**
37:5,9
**CAO** 73:15,16
73:18,19
74:17 75:3,9
75:10,13,15
75:17 81:10
81:16,17,19
81:21 82:22
83:3,6
**capacity** 96:8
**caps** 82:17
**captain** 17:25
42:25 43:7
45:7
**captains** 43:5
**cards** 62:16,23
62:25
**care** 31:24
**career** 12:8
**careful** 37:4,9
**Carlisle** 11:7
**Carolina** 61:22
61:24 62:5,9
**Carson** 9:7
**CAS** 8:6,7 16:7
19:14,23
20:3,3 30:3
32:18 33:1
35:20 55:21
58:10 82:2,4
**case** 12:8 16:1
16:5,6,12,13
16:15 17:1

17:17 18:2
19:12,14,17
19:18,19,20
20:1,8,17,22
22:6 23:1,5,6
23:16,17,21
24:8,11,17
24:25 25:7
25:13,21
26:1,14,16
28:2,7,24
29:6,11,23
30:23,24
31:2 33:25
43:14,25
44:5,11,12
44:13 48:2
49:12 50:5,6
50:15,22
52:8,21
53:14,19
54:4,8,10,14
59:5 62:12
65:3,4,13
70:8,11
71:22 78:13
78:14,15,21
78:25 83:25
86:24 88:24
89:24 92:6,9
92:12,13
95:14,14,17
96:13
**case-related**
16:20
**cases** 7:13,13
7:14 13:11
13:14 15:25
16:2 19:10
21:15 24:21
25:10 28:20
29:3,7 31:3
34:17 43:13
44:22 52:3,6
55:20 59:1

70:16,20
71:5,15,16
79:17 92:5,6
**Casey** 12:19
**Cassandra**
66:7
**casualty** 21:20
45:21 47:10
47:10 74:15
86:7,11
**categories**
26:12
**cause** 22:15
22:16 26:16
89:18
**CC** 16:22
**CCR** 1:20
95:24 96:24
**CD** 62:16
**cell** 60:16,19
62:16,23
**center** 19:24
20:7,25
**certain** 29:21
30:5 68:2,23
92:5
**certificate**
89:18,21
95:25 96:1,7
96:17,25
**Certified** 95:5
96:6,16
**CERTIFY** 96:8
96:12
**cetera** 61:18
**chain** 36:4
**change** 9:13
10:19
**changed** 41:11
72:1
**chapter** 53:10
86:17,19,24
87:6,12,15
87:15,18,19
87:23,24

88:1,3,3,14
88:20,22,24
**chapters**
86:20,25
87:3,5
**characterized**
80:7
**characterizes**
81:1
**charge** 11:9,22
12:19,21
13:2 14:8
21:11,12
27:8 28:19
29:10,11
41:21 69:1
84:21 89:10
95:16
**charges** 20:12
20:15 26:3
**chief** 9:10 11:6
24:12,23
29:9 33:17
**chiefs** 31:24
67:4
**child** 84:24
**chose** 20:21
**CID** 9:15,20,21
10:8,18
11:23 12:8
12:11,19,21
13:17 15:20
17:4 23:9
24:7 25:23
28:18 40:17
40:20 42:1,8
42:15 50:11
51:21 52:2,6
53:24 54:1,2
71:8,24 72:7
76:6,18
78:17,18,20
79:7 81:22
82:2,14,19
82:21 83:9

Bauman, Donald

October 25, 2016

4

84:7,14,16
84:21 86:14
88:10 92:2
92:21 93:8
93:15,21
**CID's** 93:18
**circumstantial**
23:18,23
85:15
**CIVIL** 1:3
**claim** 18:7
**claimed** 76:6
**clarification**
94:2
**clarify** 63:12
**class** 10:12,24
86:5
**classify** 22:4
**clear** 93:19
**Clinton** 2:4
**close** 16:16
26:14 28:20
54:10 60:25
61:25
**closed** 19:19
25:20 26:5,8
28:7,11
70:10 92:12
**closely** 91:25
**closes** 20:16
**closest** 36:2
**Code** 52:23
**coerced** 27:15
**collected**
62:24
**Colonel** 44:2,3
44:18 45:9
**Colorado** 9:7
**come** 23:6
31:15 34:23
51:11 52:7
59:17 67:24
**comes** 21:23
38:23 52:19
63:15 69:4

**coming** 16:23
26:1 31:21
51:4 52:14
60:3
**command**
13:16 17:7
28:6 36:4
44:21 45:16
45:17 53:9
53:16 68:25
69:4,8
**commander**
20:20 28:8
28:14 44:24
45:11 53:20
53:22 54:9
69:2
**Commander's**
20:19
**commanders**
54:7
**commanding**
11:13 18:22
44:15,17
**Commencing**
1:15
**comment** 68:6
68:8
**commit** 25:22
26:21
**committed**
26:17 38:21
**committing**
37:20
**common** 35:4
35:6 44:10
52:9 61:25
68:1 83:2
**commonly**
80:25
**communicate**
16:9,25 17:6
**communicat...**
15:19
**communicat...**

17:3,10
**company** 36:6
**comparing**
88:1
**complete** 6:11
6:16 28:24
30:13 32:20
70:10 96:8
**completed**
19:22 20:9
29:1,22
33:13 48:15
49:6 54:21
61:2,7,10
65:8,10,17
65:18 70:8
**completing**
31:5
**complies**
58:16 66:4
67:11 72:12
82:11 84:10
**concentrate**
70:15
**concern** 40:1
42:3 70:18
**concerned**
39:23
**concerns**
39:25 40:3,5
59:7,10,11
68:12,13
**conclude** 75:6
**concluded**
40:15 75:9
94:19
**Concluding**
1:16
**conclusion**
63:21
**concur** 89:22
**condition** 57:7
**conduct** 13:13
33:6 34:9
35:4 52:23

69:20 70:11
88:19,21
**conducted**
60:1 70:20
71:4 93:21
**conducting**
23:22 68:4
86:21 92:18
**conference**
15:11
**confessions**
27:15
**conjunction**
89:17 91:12
**connection**
34:15 38:19
71:25 72:8
79:1 83:3
89:7
**consider**
22:24 27:6
**considered**
11:24 12:1
25:22 30:19
85:12
**conspiracy**
25:22
**contacted**
40:19 42:1
95:9
**context** 35:21
**continual** 16:4
43:10
**continue**
28:24 59:4
**continuing**
83:16
**contract** 95:12
95:14
**control** 54:17
54:19
**controls** 29:2
**conversation**
5:17 30:10
43:25 44:1

45:19 46:1,3
47:13,25
56:2,6,9,19
73:15,16,19
75:17 76:4
80:16
**conversations**
17:15 86:13
**convinced**
85:7
**cooperation**
91:13
**Coordinate**
63:1
**Coordinated**
79:6
**coordination**
26:15 53:1
64:16 92:3
**coordinations**
38:6 54:16
**copied** 19:11
19:13,24
20:6
**copies** 20:24
**copy** 19:16
28:8,17
41:25 82:24
83:1,7
**correct** 6:1
38:16,17
47:7 57:17
59:9 63:17
63:19 64:1
72:4,5 82:3
85:2 86:17
87:4 89:8
94:3 96:10,7
**corrections**
96:9
**correctly**
51:15
**correspondi...**
16:21
**corrupted** 75:3

Henderson Legal Services, Inc.

76:6
**Council** 95:4
**counsel** 26:10
26:16 28:16
42:16 43:3,5
53:1,8,17
58:17 66:5
67:12 72:13
82:12 84:11
95:14 96:12
**counseling**
31:14,15
**counter-terr...**
77:14
**counterparts**
40:20 41:19
**COUNTY** 95:3
96:4
**couple** 8:9,14
17:24
**course** 5:15
6:22 10:21
22:6
**court** 1:1 5:18
7:11 36:10
36:13 46:15
46:24 93:23
94:1 95:3,5
95:10 96:6
96:16
**cover** 95:15
**covers** 86:18
86:19
**crazy** 5:24
**created** 82:5
**credibility**
80:19
**credible** 22:8
22:11,12,17
22:21 23:10
23:13 27:3,7
27:10 55:25
56:21 57:20
57:21 80:15
84:23 85:8

85:17 86:1,2
**crew** 9:10
**crime** 10:3
19:24 20:7
20:25 26:21
35:9,13
**crimes** 10:4
37:20 38:19
**criminal** 9:14
11:15 14:5
34:4
**CTD** 77:11
**current** 13:21
69:15,16
**currently**
55:10
**customary**
95:17
**CW4** 5:8 69:12

━━━━ **D** ━━━━
**DA's** 91:17
**DA0001** 4:3
77:1
**DA00012** 4:4
77:1
**daily** 25:11
89:6
**Dakota** 8:18
8:20
**Daniels** 45:5,6
45:7
**Darren** 67:13
67:15
**database**
77:21,24
82:7
**date** 46:21
65:17 96:18
**dated** 58:19
82:13,15
84:14
**dates** 48:7,18
**day** 24:3 49:20
56:10 61:14

61:14,21,22
61:23 96:17
**day-to-day**
15:24 16:3
**days** 69:2
83:23
**dealer** 25:15
28:4
**deals** 88:20
**death** 17:21
19:20 21:21
23:5,22
34:15 46:6
47:12,17,19
50:5 53:11
53:14 57:2,4
57:22 59:7
59:17 61:13
61:15 62:2,5
68:4 73:21
74:10,12
83:3,12,13
83:21,25
86:18,21
88:13,24
89:7,9,18,21
89:24,25
90:7,10 92:6
**deaths** 18:7
19:5 24:4,9
24:14 25:5
36:16 37:7
37:13 39:10
39:12,12,16
39:17 43:17
44:9,22 45:1
46:5,11 47:3
47:4 48:20
51:4 53:6
61:7 86:19
86:24 91:23
92:16,20
**December**
19:7 24:3
38:12 46:20

47:4 73:4
84:6,13,14
85:14 90:3
91:9
**deceptive** 79:9
80:8,23
**decision** 20:12
20:14 22:18
23:25 26:9,9
53:15,21,23
74:1 89:22
**decisions**
16:11 53:19
73:24
**declared** 90:7
**Defendant**
1:11 2:13
**define** 22:11
**definitely**
32:14 52:8
**degree** 32:13
**Deirdre** 23:5
23:11 25:2
33:17,22
45:21 46:7,9
46:18 56:24
57:7 58:11
59:16 89:24
90:6
**delay** 29:25
30:2
**delaying** 72:20
73:10
**demeanor**
35:9,10
**department**
2:10 38:2
**departments**
12:14 81:19
**depending**
27:12
**depends** 54:24
76:13
**deployed**
11:10,11

13:13,22,24
14:2,17,19
14:23 15:2
36:23
**deployment**
11:18 14:1
14:13
**DEPONENT**
96:1
**deposed** 5:9
**deposition**
1:13 6:23
17:17 94:19
95:10,12,15
**describe** 30:8
**Description**
4:2
**destroyed**
20:10 21:5
**detachment**
36:24 44:23
69:2
**determination**
22:16 26:23
41:11 52:22
89:16,20
90:22 92:12
**determinati...**
38:9
**determine**
37:18 63:2
87:13 90:10
**determined**
23:9 41:1
84:22 89:9
89:25
**differences**
26:11
**different** 35:16
52:2,2,15
69:13 71:11
78:20 82:3
87:14,20
**difficult** 53:13
54:23

difficulties 56:2,20
direct 15:15 44:15 69:20 70:13 72:17 79:19
directive 30:20
directly 16:25 32:1,15 44:18 45:1 54:7 82:19
discarded 65:13
discharge 64:13 79:12
discharged 63:20 64:19
disciplinary 20:20 30:21 52:16 63:10 63:16
disciplined 32:16
disclosure 95:1,4
discount 95:17
discretion 54:2,3
discuss 7:24 16:17 29:24 30:6 43:8,12 72:25 80:13
discussed 24:20 43:16 45:4 68:12 76:2
discussing 24:8 43:6
discussion 15:10 41:15 53:8 94:17
discussions 24:20 43:20
disobeyed

32:15
disqualified 95:7
disrespectful 31:5
distri 82:24
DISTRICT 1:1 1:1
division 44:3
DNA 55:1
document 58:11 67:20 77:2,4 78:11 79:5 81:13 81:15 87:1 88:23
documented 30:9 59:2
documents 8:1,12 12:3
doing 14:5 28:21 32:5,5 35:19 38:4 48:11 67:19
Donald 1:13 3:3 5:1,8
doubt 75:1
drinking 63:5 63:19
drives 5:24
dropout 79:8
drove 41:23 42:12
drug 7:13 10:6 11:6 25:13 25:14 28:4 52:19
duly 5:2
duty 8:24,25 9:4 15:5

**E**

E 2:1,1
earlier 14:19 14:23 61:4

66:9 72:15 85:8
early 11:19
eastern 13:12
economics 10:3
effect 60:6
Eight 14:16
either 36:16 52:7 62:7 89:20
element 36:24
elements 35:12 52:22
else's 37:14
email 16:9,18 17:7,15 18:5 18:12,20
emailed 17:25
emails 8:9 16:14,23 17:12 18:1,6 18:13 19:1,6 19:10 21:1
emblem 77:11
enforcement 9:14
enlisted 10:25 32:12
ensure 29:3
enters 15:11
entire 28:8 33:1 36:6 89:1
entries 8:3,5 8:15 19:23 20:4
entry 55:21,22 56:1,11 58:19,22,24 66:6,17 67:13,19,22 72:14 79:5 80:2,2,14 82:13 84:12

Errata 96:9
ESQUIRE 2:4 2:9
essentially 55:9
establishment 40:14
et 61:18
Europe 13:13
event 96:14
eventually 28:16 64:16
evidence 23:18,24 26:6,13,22 32:24 51:8 51:23 56:3 57:15,16 59:20 71:20 85:11,15
exact 24:3 48:7 55:23 76:13 78:12
exactly 6:6 47:2 77:5
Examination 3:4 5:4
EXAMINATI... 3:1
examined 96:6
examiners 17:11
example 6:4 6:12 21:1
exclusive 95:13
Exhibit 4:3,6,8 58:10 72:11 76:21,22,25 78:3,5,8 81:6 81:7,10
exhibits 4:1,13 20:2,4 28:9
expectation 65:21

experience 12:7 54:20 67:4 71:15
experienced 80:18
explain 26:11
explained 56:2 56:19
extent 37:2,13 40:22 76:4
Extorting 50:20
extortion 50:22
extractions 62:15
extremism 93:7,17,20

**F**

face-to-face 67:23,25 68:10 92:3,8
fact 50:25 63:12
factor 27:13
facts 22:14 32:24 51:7 51:23 59:20
failing 30:14
fair 52:1 66:22 70:3 82:1 90:9
fall 93:18
familiar 21:14 45:10,12 78:14 86:6 86:14
family 34:22
far 12:14 19:9 21:1 73:9 82:18
fashion 28:20 28:23
fast 54:3

**FBI** 38:3 39:24
40:12,23,24
41:2 42:2
77:8,25
**federal** 49:7
**fell** 55:8,16
71:9,10
**fellow** 64:19
**felt** 55:24
**female** 17:14
75:21 91:25
**file** 1:3 16:1,6
19:12,14,17
19:18 20:8
20:17,22
21:4 23:17
62:17 65:4
65:10,19
**files** 68:2,23
76:1
**fill** 20:21
**final** 70:10
**finally** 23:25
**financial** 95:17
**financials**
48:11
**find** 18:15 19:6
27:19 29:17
29:24 30:1
35:8,10 36:7
42:6 62:2
64:2
**finding** 27:8
**fine** 91:7
**finish** 6:5,7
88:25
**finished** 11:2
**first** 5:2,10
7:22 8:22,24
8:25 9:15
10:2,8,12,24
17:22 21:6
21:15,19,22
21:23 22:1
23:15 33:5

41:22 45:24
48:15 50:22
66:19 67:13
69:2 72:18
73:9 77:10
85:1 86:4
**five** 34:12
55:13,15
**flip** 58:14 66:2
**Floor** 2:5
**folks** 37:20
**follow-on**
10:17 11:3
30:21
**followed** 29:16
33:8
**following** 95:4
**follows** 5:3
**force** 40:24
**foregoing** 96:9
96:7
**forensic** 67:16
68:3,16
**forget** 20:13
55:22
**form** 31:14
41:25 42:6
60:21 81:18
**formed** 38:20
93:4
**Fort** 9:1,7,23
11:20 12:16
12:25 15:17
21:8 24:7
31:18 32:2
34:5 40:20
41:19 42:19
42:22 55:16
56:13,14
67:17 69:16
71:10 79:1,7
90:1 92:24
93:5
**forth** 16:15
62:8

**found** 18:16
64:5
**founded** 26:7
26:12,14,18
26:23,25
27:8
**founding** 27:8
**four** 12:4,5
36:25 37:12
38:11
**four-and-a-h...**
9:25
**four-person**
11:24
**fourth** 83:16
**Foxx** 24:10
32:9,20
33:17,23
34:8 62:13
64:2 65:21
79:16
**Foxx's** 34:3
**frame** 48:9
54:25 83:18
**freeze** 48:13
**freezing** 48:4
48:20 72:21
**friends** 33:7
33:13 34:10
34:22 36:2
38:8,25
60:25 63:5
63:19
**frozen** 48:23
48:24 49:13
73:7
**FSO** 68:15
**full-time** 9:20
**further** 61:1
94:10 96:12

——————
**G**
——————
**G-R-E-I-Z-E-R**
42:24
**gather** 23:25

**GBI** 38:2,4
91:13,17
92:18
**general** 9:10
9:11 10:4
18:22,24
34:23 44:16
44:17 81:20
**generally** 12:4
27:21 29:9
30:4 31:16
34:15 36:1
70:7,15
83:22 87:5
**generals** 11:13
**generated**
77:17 78:21
78:25
**Georgia** 1:18
11:21 12:25
75:23 91:17
95:2,4,5,6
96:3,4,7,16
**give** 5:20 6:11
9:17 21:20
27:10 31:9
39:2 51:1
67:5 89:11
94:6
**given** 7:9 12:6
28:12 40:10
53:25 95:17
96:8
**giving** 70:2
**go** 6:2,24 8:16
9:6 11:3
12:16 15:7
16:2,7 29:19
34:19,21
37:18 41:12
51:5 63:11
64:2 65:18
68:22 81:23
**goes** 30:2
**going** 5:11 6:6

16:13 23:1
40:5,7 47:21
53:2,10 54:4
54:25 57:25
59:17 60:7,8
62:14 79:11
84:25 91:3
92:15
**good** 5:6 23:21
30:14 31:9
57:23 72:19
**gratuity** 47:12
47:17 73:21
**Greizer** 42:23
43:4,9
**grew** 8:20
**group** 13:4,11
16:3 35:22
38:19 55:12
69:17 93:4
**groups** 81:19
**grow** 8:19
**guard** 79:10
79:11
**guess** 8:22
35:10 50:18
50:19 57:20
57:24 66:19
88:6
**guidance**
29:13 31:14
32:15 33:6
59:3 69:20
69:23 70:12
**guidelines**
83:19
**gun** 41:19 42:9
79:2,15
**guns** 39:2
**guys** 51:5

——————
**H**
——————
**Hadley** 45:9
**hall** 16:17
**hand** 8:11

96:15
**handled** 17:11
51:19
**hang** 36:2
**happen** 20:18
27:22 31:18
45:24 60:7
87:12
**happened**
52:15
**happens** 29:14
**hard** 31:21
67:2,7
**harmful** 37:15
**Hawaii** 10:3
**head** 24:22
31:20 71:6
78:19 85:13
85:19 87:10
**headquarters**
13:5,11,16
69:3
**hear** 21:6
**heard** 18:6
22:1 34:19
34:21 76:11
80:22
**hearing** 76:9
**helicopter**
8:25 9:11
**help** 34:25
35:12 37:8
**Henderson**
95:10
**high-profile**
44:12,13
**higher** 30:18
36:3 69:3
**highly** 52:10
52:12
**hold** 55:10
60:25
**holistic** 69:23
88:19
**home** 8:21

**homicide** 25:2
58:11 90:1,7
90:10
**honestly** 50:12
62:21
**hour** 57:25
**hours** 7:25
83:12
**huge** 89:2
**Hunter** 13:5
**hyphenated**
66:11

**I**
**i.e** 61:16
**ICI** 68:24
**identification**
76:23 78:6
81:8
**identified**
66:20
**identifies**
84:19
**identify** 92:22
**ignore** 54:2
**illegal** 39:13
**immediately**
41:23
**important** 5:20
6:6,10 28:18
61:20 80:18
**impression**
14:22
**inaudible**
93:22
**incentives**
29:2
**incident** 43:14
50:13 51:12
**include** 20:11
28:9
**inconclusive**
56:5
**incorrect** 75:9
80:3

**incriminate**
27:20
**incriminated**
27:25
**incriminating**
27:6 60:20
**indefinitely**
19:21,25
20:7
**INDEX** 3:1 4:1
**indicated**
68:15 93:3
**indicating**
59:17
**individual**
29:19,23
32:14 34:24
53:21 75:17
75:19
**individuals**
37:1 47:11
52:6 60:1
**infer** 66:22
**influence**
54:10
**inform** 48:1
**information**
22:9,11,12
22:13,17,21
23:10,14
27:3,7,11
36:8 41:6
55:25 56:21
57:20,21
84:23 85:8
85:17,20
86:1,2
**information-...**
73:23
**informed**
33:16 41:2
47:18 51:15
85:6
**initial** 68:25
69:4,8 83:11

83:14,22
**initiate** 52:18
**inspection**
67:25 68:1
68:25 69:4,6
69:9
**inspections**
69:21
**installation**
44:16
**instance** 31:8
31:10 32:3
33:5 44:18
**instances**
16:24 31:7
31:10 43:15
52:13 87:10
**instruction**
66:20
**instructions**
65:20 66:24
67:5
**instructs** 6:23
**insufficient**
26:6,13,22
**insurance**
60:5
**insurgents**
92:22
**intelligent**
79:9 80:7
**intent** 28:4
**interact** 36:7
91:20
**interacted**
91:18
**interaction**
15:24 16:4
**interactions**
52:2
**interchange...**
22:25
**interest** 9:16
22:5,8 23:4
35:2 47:19

48:1 54:8
73:17,20
74:1,5,6,9,12
74:21,23
75:11,25
76:2 95:8
**interested**
96:14
**interests** 9:13
**interning** 9:15
9:20
**internship**
9:18
**interview**
29:19,23
33:12 34:18
35:5 67:23
**interviewed**
60:25
**interviews**
33:7,10 34:9
34:14 35:19
38:5,6,8 60:1
61:1,3,7 87:2
88:20,21
**investigate**
50:9 51:18
52:17,21
53:14 88:24
93:17
**investigated**
50:10 53:24
76:11
**investigating**
39:18 93:7
93:12
**investigation**
8:11 14:5
18:18 20:16
20:16 22:20
25:3,17
26:20 28:8
33:18,19,21
39:9,11
45:22 50:4

Bauman, Donald

October 25, 2016

9

51:19 52:18
52:24 53:25
54:4 78:16
83:3 86:22
88:13,19
92:18 93:20
**investigations**
11:15 14:6
23:22 25:9
32:19 34:5
34:16 41:3
68:5 71:25
72:9 83:21
86:18 89:7
**investigative**
8:15 65:2,6
83:23
**investigator**
22:14 39:5
**investigators**
24:24
**involved** 18:10
32:1,4 37:1,3
37:6,10,12
37:19 38:2,3
38:11 40:17
42:8 44:5,8
44:11,14
45:2 46:9,18
52:8 54:8
79:14 85:22
**involvement**
25:21 37:14
38:14,15,18
40:22 55:20
79:19
**involving** 19:5
70:20
**IP** 65:1,3,8,9
65:16,22,25
66:21,23
67:5,6,8
**IPs** 65:13
**Isaac** 21:7
27:24 36:17

37:19 38:19
39:18 41:4
52:1 53:19
70:20 93:25
**Isabel** 91:14
**issue** 83:19
**Item** 60:24
61:11 62:14
63:1
**items** 65:8,9
65:16
**Ivery** 66:7,13
68:10
**Ivery-Morris**
24:12 66:10
66:13

———— **J** ————

**J** 1:20 95:24
96:6,24
**JAG** 44:14
**JAHR** 1:6
**JAHR0043386**
4:8 81:11
**JAHR0043515**
4:9 81:12
**JAHR0043521**
4:6 78:9
**JAHR0043529**
4:7 78:10
**Jeremy** 24:10
**job** 31:17
52:21 88:11
89:5
**Johnson** 2:9
7:23 18:4,25
32:23 42:17
51:6,22 58:1
59:19 60:12
60:21 67:1
71:19 80:9
81:2 89:11
91:1 94:14
94:18
**joining** 34:5

**joint** 40:23
49:11
**joked** 60:2,4
**journal** 81:11
81:16,18
82:13,22
**journals** 81:20
81:21
**judge** 44:4
**judgment**
74:24
**Judicial** 95:4
**juice** 6:14,15
**July** 83:25
84:2
**Justice** 2:10
52:23
**Justin** 79:7,20
80:4,6,19

———— **K** ————

**Kapinus** 23:20
24:13 32:6
32:14 79:7
79:17,20
80:7,13,22
**Kapinus's**
80:4,19
**keep** 18:2 29:1
31:17
**keeping** 19:10
**kept** 65:3
**kill** 25:14 60:5
**killed** 17:20
46:9,18
**kind** 13:14
**kinds** 16:18
**knew** 33:11
37:17 48:6
**know** 6:5
12:14 17:15
24:24 25:10
32:3 33:8
34:1,6,7
36:22,25

37:1,13
39:23 40:3
40:10,12
41:2,22
44:24 47:2
49:18 53:9
54:11,12
60:2,9,15
64:5,8,15
65:24 73:11
73:18 75:15
75:20,21
77:12,17,19
77:23 78:17
79:25 80:10
82:23,25
85:15 88:2
88:20,24
90:6 91:1
92:2
**knowing** 83:15
**knowledge**
12:15 23:21
40:13 61:6
65:15 74:8
74:11 80:3
83:4 93:19
**known** 37:2
61:15
**knows** 89:15
**Korea** 9:5,6
10:5,10,12
11:5 12:17
**Kristin** 2:9
94:12
**Kristin.b.joh...**
2:12
**Kuwait** 14:10

———— **L** ————

**lab** 55:1
**laboratory**
54:18,21
**lack** 56:3,4
57:14

**Lapsley** 86:5
**large** 12:22
35:24 40:4
**Larry** 55:5,6
55:17 72:15
84:8 85:6
**late** 47:23
**lawsuit** 7:16
17:23
**lawyer** 72:7
**lead** 22:13
39:5
**leader** 49:18
**leadership**
45:3 83:15
**leading** 62:1,3
**leads** 66:20
**learn** 17:22
38:18 39:8
39:17
**learned** 64:12
**leave** 39:21
41:24,25
42:5,6 45:19
63:3
**led** 26:2 50:13
**LEE** 1:6
**left** 29:4 31:24
40:14 47:2
48:17 63:11
63:12,16
65:4,6 90:8
92:13
**left-hand** 82:9
**legal** 22:16
41:1,10
44:15 92:8
95:10
**legally** 40:15
**length** 56:22
**let's** 8:16 15:7
27:5 41:12
76:20 78:3
81:5
**level** 32:4

Henderson Legal Services, Inc.

Bauman, Donald                                   October 25, 2016

35:25 36:5,6
36:9,11,12
44:10,14
45:3,16
55:11,12
69:17,21
71:1
**Lewis** 9:1
40:20 41:19
79:1
**Lexington** 2:5
**liaison** 13:15
21:21 42:2
**lie** 27:19
**Lieutenant**
45:9
**life** 21:4 64:19
64:23
**line** 30:22
72:17,18
82:24 84:4
**lines** 82:16
**lip** 57:12,19
**list** 22:9 24:1
56:8 59:9
65:7 85:10
85:18
**listed** 26:18
91:8
**listens** 54:1
**listing** 22:19
**litigation**
95:18
**little** 8:16 9:5
10:4
**load** 31:2
**local** 38:2 42:1
46:2 93:13
93:14
**locally** 39:1
**locals** 39:24
**location** 42:6,7
**locations**
61:17,17
**long** 9:2,24

10:15 14:15
19:18 20:16
51:3 54:14
54:20 56:17
56:21 66:16
**longer** 58:1
71:9,9 90:1
**look** 8:14
18:13 27:11
31:1 48:3
69:5 70:9
71:14 72:21
73:2,13 75:2
78:24 84:16
88:19,23
**looked** 8:9
38:24 40:24
48:19 71:21
73:12 75:25
**looking** 42:9
61:11 67:6
69:24
**looks** 68:5
77:7 84:18
**lost** 65:10,11
**lot** 35:16 36:7
38:4,6 52:2
85:15
**low** 22:12
**lower** 22:15

---

**M**

**main** 20:23
35:15 36:22
38:5 70:17
**maintained**
19:21,25
20:7,9,17,24
21:3,4
**maintains**
77:23
**major** 41:24
42:13,23
43:4,8 45:18
79:24

**making** 53:18
53:23 58:22
75:3 76:12
91:6
**male** 91:24
**man** 12:12
**managed**
55:14
**manner** 89:9
89:19 90:10
**manning** 12:3
12:11
**mark** 76:20
78:3 81:5
**marked** 58:10
76:22 78:5
81:7,10 82:8
**matter** 79:15
**matters** 25:4
42:16 51:21
**McClellan** 9:23
**McPherson**
11:20 12:16
**mean** 12:1
13:17 17:4
19:13 24:16
26:15,19,22
30:21,22
31:21 42:17
42:19,22
77:16 83:10
**meaning** 35:24
**meanings**
35:17
**means** 5:15,19
35:21 61:16
**meant** 31:13
57:20 88:7
**mechanic** 8:25
9:11
**mechanism**
85:19
**medical** 17:11
**meet** 21:17
**meetings** 16:2

43:12,22,23
**members** 28:5
34:22 35:5
36:18
**memorialize**
16:1
**memory** 1:20
62:16,23,24
62:25 89:13
95:6,7,9,11
95:13,16,24
96:6,24
**mentioned**
26:12
**messages**
60:10,16,19
62:19
**met** 7:24 21:18
21:22,24
52:22 55:24
63:8 86:1
92:10
**Michael** 18:8
19:2 24:5,9
36:16 43:17
47:4 61:8
92:16
**mid-2005**
11:20
**mid-Decemb...**
85:3
**middle** 1:1
58:18
**mild** 57:18
**militant** 79:9
**militants** 92:22
**military** 30:17
52:23
**mind** 21:23
23:6 38:23
63:15
**mindset** 34:24
**minute** 62:1,1
**minutes** 57:25
58:4

**misannotation**
75:10
**Mischaracte...**
51:7 71:20
81:3
**miscommun...**
75:8
**misconduct**
63:23
**missed** 70:17
**misspeaking**
87:22
**mistakes**
71:24
**misundersta...**
75:10
**misundersto...**
87:20
**moment** 57:14
**monetary** 46:4
**money** 38:25
47:23 48:4,4
48:7,11
49:22,25
50:20 51:1
59:18 60:3,6
**month** 10:18
29:8,12
32:21 47:24
**months** 9:3,17
9:25 14:16
17:24 23:15
48:18 55:2,4
91:12
**morning** 5:6
**move** 35:13
69:14
**moved** 12:25
69:13
**moving** 28:24
**MPI** 50:12
**MPs** 93:17
**multiple** 52:7,9
52:14,19,20
**murder** 22:3

Henderson Legal Services, Inc.

202-220-4158                   www.hendersonlegalservices.com

25:22 38:16
84:20
**murdered**
23:10 84:24
**murders** 19:2
34:2 36:25
37:23

**N**

**N** 2:1
**name** 5:7
17:25 21:6
21:15 42:25
43:2 44:24
45:5,11,18
49:14 66:11
75:20 86:6
91:19
**names** 91:16
91:24 92:1
**necessarily**
27:10,14
30:20 87:8
**need** 13:15
29:24 30:20
36:5 37:8
59:3 70:12
70:14 72:21
82:4 88:17
88:18 89:11
**needed** 31:23
32:2,10,15
32:16 59:13
69:23
**needs** 28:25
29:22 73:18
**neighbors**
34:20
**never** 15:2
21:18 40:10
40:13,14
93:20
**new** 2:5,5
23:13 69:1
85:11

**nodding** 5:23
**non-death**
20:1
**normal** 5:17
44:12
**normally**
16:11,15
65:15,23
89:19 93:13
**notified** 40:19
**notion** 6:12
**November**
73:4 82:14
82:15 84:3
85:14 96:17
**nowadays** 8:7
**number** 39:21
40:4 67:8
68:2,23
**numbered**
81:11 83:17
**numbers** 4:3,6
4:8 77:1 78:9

**O**

**O.C.G.A** 95:8
95:12
**oath** 5:13
**objected** 7:2
**Objection**
32:23 51:6
51:22 59:19
60:21 67:1
71:19 80:9
81:2
**objections**
6:21
**obligated**
52:17
**obtained**
41:25 82:23
**obviously** 46:7
**occurred**
37:24 38:20
51:4 72:2

83:25
**occurs** 6:3
**October** 1:15
21:13 23:16
58:19 69:1
**off-the-record**
15:9 41:14
94:16
**offense** 25:23
26:17 91:10
**office** 1:17
11:22,23,25
12:19,21
13:1,15,17
13:18 15:21
15:22,23
16:10,16
17:1,4,14
21:8,16 24:7
24:20 25:8
26:9 29:7
31:22 32:2
40:17,20
41:3 42:1,8
45:21 54:16
55:2,16 59:1
67:25 68:1
68:22 69:9
69:18,21
70:14 73:2
74:15 78:17
79:7,18 82:2
82:5 90:23
91:18 92:13
92:24 93:10
93:14
**officer** 10:14
10:16,22,22
11:1,1,2,13
13:7,9,25
14:4 50:19
55:7,8,15,18
67:17 68:3
68:16 71:12
84:7,22 86:7

86:12
**officers** 55:13
**offices** 12:22
13:12,19
14:7,8,11
28:18 35:20
55:15 69:19
78:20,22
91:21 95:10
**official** 15:25
96:15
**officially** 21:12
**Oh** 87:16,17
91:5
**OH58** 9:12
**okay** 5:11,23
6:7,8 7:5,7,9
8:8 13:22
15:6,15 21:1
21:6 27:5
30:1 41:18
50:17 57:4
58:14 59:6
61:6 64:1,12
64:22 66:12
66:16 68:24
72:16 76:15
77:10,15
78:17 81:21
84:19 85:5
85:11,22
86:9,17
87:13,17
90:13 93:17
94:5
**old** 65:13
**once** 13:23
29:8 44:7
52:8
**one-and-a-h...**
12:18
**ones** 49:5
**open** 20:15
25:3,8,19
29:1,4 41:3

43:13 65:5
79:11 92:14
**opening** 83:20
**operational**
22:18
**operations**
13:6,9,25
14:4 55:7,15
55:18 71:12
84:7,21
**opine** 92:7
**opined** 26:16
26:20
**opinion** 26:20
85:2 92:8
**option** 26:7
**orange** 6:14
6:15
**ordered** 34:15
**ordinarily** 30:2
**organization**
54:6
**original** 19:20
**outcome**
64:17 72:1
96:14
**outlying** 28:25
**outside** 16:22
17:4,4 39:18
42:15
**outsider** 88:8
**overall** 33:21
69:5

**P**

**P** 2:1,1
**P.O** 95:6
**page** 3:2 4:2
58:14,18
66:2 67:10
72:11,18,19
77:10,18
79:5 82:9,9
84:9
**pages** 96:9

paid 47:18,20
  47:21,24
  48:6 73:22
part 11:19
  13:12 36:23
  40:23
particular
  53:23
particularly
  32:17 34:4
parties 95:17
party 7:15
  95:14,18
  96:13
patriots 17:20
Pauly 91:14
paying 38:25
  47:11
payment 72:20
  73:10 74:2
  74:18 75:4,7
payments 46:4
  47:15 49:23
Peed 2:4
Pennsylvania
  11:7
people 12:4
  18:1 27:19
  33:11 35:20
  35:22 36:2
  37:10,12
  38:11 81:1
  91:20 93:22
people's 71:16
percent 12:12
period 15:16
  21:10,14
  55:7 92:15
permanently
  21:3
person 16:17
  17:2 22:5,7
  30:6 35:1,13
  43:20,23
  46:25 47:18

48:1 53:23
  60:4 66:14
  66:15 73:17
  73:20 74:1,5
  74:6,9,11,21
  74:23 75:11
  75:13,15,25
  76:2,17
  80:15 88:14
person's 80:19
personal
  11:12,16
  14:6
personally
  56:23 75:12
persons 23:4
PFC 79:8
  84:19,23
phone 17:9,12
  17:15 21:20
  43:21 47:13
  49:21 51:14
  56:12,15,22
  60:11,16,20
  61:17 62:7
  71:2 74:17
  75:14 85:5
phones 62:16
  62:23,25
photos 56:24
  57:1,3,4
physical 56:3
  57:15,15
pieces 35:15
PIERCE 95:3
  96:4
place 29:3
  56:9
Plaintiff 2:16
  15:11
Plaintiffs 1:8
  2:7
Plaintiffs' 4:1
  76:22 78:5
  81:7

plan 65:2,6
platoon 35:25
  36:5,9,10,12
platoons 36:7
play 24:13
please 5:6 7:4
  58:14 66:2
  67:10 79:4
  82:8 84:9
pocket 76:18
point 9:13 23:9
  33:19,23,24
  36:15 38:3
  39:20 45:25
  47:3,22
  56:25 63:2,8
  63:20 64:13
  64:16,24
  66:22 71:7
  71:13 78:24
  79:8 85:25
pop 51:21
position 13:6
  13:21 55:9
  69:13,14,15
  70:4,7
positive 53:11
positively
  26:24
possibility
  37:5 48:3
possible 92:22
possibly 27:9
  50:12 76:13
post 62:17
potentially
  17:8,9 37:10
  41:7 42:4
  44:13 75:3
practice 19:9
  83:2
precluded
  28:13
predecessor
  90:14

prefer 20:12
  20:15
preparation
  7:25 8:2
prepare 7:20
  61:13 62:11
Present 2:16
presented
  22:14
pretty 44:9
  89:1
previously
  58:9
primary 23:21
  24:11,23
  33:24 52:5
  62:12 79:17
print 19:16
Printed 19:16
prior 18:5 24:8
  25:4 28:11
  34:5,7 37:7
  38:20 39:17
  43:17 44:22
  53:6 55:25
  56:7 59:16
  61:7,14,23
  62:5
priority 33:18
  53:25
Private 17:19
  21:7,17 22:1
  23:8 25:4
  34:9 36:23
  49:20 53:4
  74:8,23 76:5
  76:16 86:8
probable
  22:15,16
  26:16
probably 6:1
  35:25 36:1
  48:15 58:3
  67:24
problem 6:3

problems
  69:25
process 81:24
produced 5:2
Professional
  95:5
progress
  18:18
progressed
  69:7
progresses
  65:14
prohibited
  95:12
promoted
  69:10
provide 28:2,7
  69:23 70:12
  83:2 95:10
  95:14
provided 33:6
  83:1,5
providing
  29:13 83:7
provisions
  95:8
pull 47:23
  48:10,10
  68:2,23
pulled 48:12
pulling 48:4
purchased
  25:14 28:3
  39:21,25
  40:14,16
  79:10
purchases
  38:24 39:13
  41:1,10,19
  42:9 79:2,15
purpose 67:22
purposes 26:2
  92:21
purview 93:8
  93:18

Bauman, Donald

October 25, 2016

13

**put** 15:25
  19:12,16
  20:22 29:3
  32:25 35:14
  55:22,24
  56:1 58:24
  59:5,13
  61:24 65:12
  65:17 67:7
  77:8 82:4
  85:20 94:12
**putting** 27:15
  56:11 68:5
  82:24

**Q**

**quality** 13:10
  13:13 69:22
  69:24 70:1
  70:11,19,22
  70:24 71:4
**quarterly** 68:1
  68:22
**question** 6:5
  6:11,24 7:6
  20:13 25:5
  54:23 67:21
  73:3,9 88:7
**questioning**
  63:17
**questions**
  6:25 7:2
  37:15 78:2
  94:10
**quickly** 54:1
  54:10
**quote** 59:6
  60:3,25 61:2
  61:12,12
  62:15,17
  63:1,5 68:12
  72:19

**R**

**R** 2:1

**rank** 10:7,11
  10:19,25
  11:1 30:18
**rates** 95:17
**rationale**
  80:11
**reach** 56:21
  57:19,21
**reached** 7:23
  17:24 18:4
  47:14
**read** 40:10
  62:6,22
  67:20 79:6
  79:21 84:25
  88:14 94:18
  96:6
**readily** 82:2
**reading** 67:20
**really** 8:10
  16:24 18:3
  32:2 67:2
**rear** 36:24
  44:23
**reason** 14:21
  29:18 30:1
  30:14 31:9
  35:15 36:20
  63:19,24
  64:2,6,9,10
  64:13 75:6
  75:22
**reasoning**
  29:18
**reasons** 52:15
  63:13,15
**recall** 18:11
  21:22,24
  23:7,13 24:2
  24:8,12 25:1
  25:3,16,18
  25:25 26:4
  27:23,24
  32:11,17
  33:4,9,14,16

34:3,8 36:15
36:19 37:11
37:25 38:7
38:10,13
39:2 40:1,5
41:5 42:11
42:12,15
43:6 44:1,20
44:24 45:8
45:18,25
47:9,12 48:5
48:9,19,21
49:11,14
50:3,7,8,12
50:15,16
51:3,9,13,19
51:20 52:14
53:5,18
55:19,21
56:18,23
57:7,10,12
59:21,23
60:17,18,22
61:9 62:24
63:6,14,21
63:24 64:7
64:15 66:1
68:13 71:6
72:23,24
75:20 76:4,7
76:8,9,16,19
77:21,22
78:1 79:3,19
79:21 80:16
80:24 81:4
81:17 82:24
83:5,7 85:13
85:18 86:6
90:25 91:6
91:15,16
92:1,11 93:6
**receive** 28:17
  28:17
**received** 18:12
  48:7 49:22

**receiving** 18:5
  74:17
**Recess** 58:5
  94:8
**recognize**
  58:12 77:2,9
**recollection**
  18:9 59:12
  62:18 73:5
  76:16 79:13
**Reconvened**
  58:6 94:9
**record** 5:7
  15:7,13
  32:25 41:12
  41:16 58:7
  79:6 94:13
**recorded**
  49:21
**records** 19:24
  20:7,25
**refer** 66:9
  80:22 89:4
**references**
  68:9
**referral** 95:15
**referred** 61:4
  72:15
**referring** 8:5
  19:15 47:3
  77:19 84:13
**refers** 82:14
**refresh** 62:18
  79:13
**refreshes**
  76:15
**refused** 63:4
**refusing** 63:18
**regarding** 16:5
  16:11,13,15
  17:19 18:2
  21:21 41:19
  42:16 45:21
  47:15 73:9
  73:14 79:18

93:21
**Registered**
  95:5
**regulation**
  86:14 87:11
  87:16,20
  88:4 89:1,8
  89:12 92:2
**regulations**
  87:14 95:3
**related** 25:4
  79:7 96:13
**relating** 18:7
  19:10 32:18
  33:22
**relation** 7:12
**relationship**
  95:8
**relatively**
  15:23
**released** 63:3
  63:4,4,9,13
  63:22,25
  64:11
**relevant** 8:11
  19:11 86:21
  86:23 87:3
**remember**
  17:13,13,25
  23:7 25:6
  26:5,7 33:12
  34:12 40:21
  41:20 43:3,7
  43:13 44:7,8
  44:23 45:18
  46:22 47:14
  47:23,24
  48:18 49:1,5
  51:14 54:24
  56:18,19,22
  57:1,2,3
  58:22 59:25
  60:7 61:21
  63:22 64:10
  64:17 73:8

Bauman, Donald                                                   October 25, 2016

14

73:15 75:14
75:16,18,24
79:24,25
86:13 91:10
91:24
reopen 70:14
reopened
70:13
repeat 87:11
repeated 87:6
rephrase 7:4
51:25
replaced 90:16
replaces 10:24
replacing
21:11
replied 18:16
report 20:19
56:5 77:8
82:15 83:8
83:10,11,14
83:20,22,24
84:15,19
89:17
report-writing
87:1 88:22
reported 1:20
76:17 83:13
96:8
reporter 5:18
36:10,13
46:15,24
93:23 94:1
95:5,5,14
96:7,16
reporting 95:3
95:5,6,7,9,10
95:11,13,14
95:15,16
reports 8:15
23:18 83:14
83:16,17
request 58:16
66:4 67:11
72:12 81:23

82:5,11
84:10
requested
95:18 96:11
requests 94:1
required 30:4
32:7
requirement
92:9
requirements
12:12 28:23
requires 92:3
92:8
reserve 34:6
reserved
94:20
resolution
53:11
respect 53:6
respond 30:6
responded
73:2 76:11
responsibilit...
13:8
responsibility
9:9 52:25
93:11
responsible
47:11 68:4
rest 84:25
results 54:15
54:22
retained 4:13
19:18,22
retraining
31:13
retrieved
60:10,16
return 11:17
14:12
returned 11:19
62:4
review 8:1
15:25 16:1,6
26:19 29:9

29:10,11,15
30:5,7,7 33:1
33:5 34:11
55:24 58:25
59:1,2,5 66:6
66:21 68:2,4
68:7,10 70:1
70:7,10,12
70:19,24,25
70:25 71:2,4
72:4 95:18
96:11
reviewed 8:4
15:24 21:16
23:16 25:7
32:18 55:22
56:24
reviewing 22:6
71:16 85:23
reviews 13:10
13:14 29:12
69:22,24
70:22,23
revolve 25:11
right 6:18
23:11 27:15
27:17 28:12
45:13 46:8
46:10 58:20
61:8 62:14
65:5 69:11
72:8 77:10
85:9 86:2
89:2 90:2
91:23 93:22
right-hand
19:17
ring 42:25 45:5
86:10
rings 43:2
Roark 1:7
17:20 18:8
19:2 24:5,9
36:16 43:18
47:4 61:8

92:16
ROI 82:14,19
83:5,10,20
84:14,17
92:21
ROIs 82:21
83:2
role 11:14
13:20 14:7
69:22 73:23
room 15:12
roughly 66:18
RPR 1:20
95:24 96:24
rule 22:7
running 65:16
rushing 28:22

**S**

S 2:1
SA 68:10 79:6
SAC 66:20
69:16 89:25
90:1,11
91:10 93:21
SAV 68:20
Savannah
1:18 13:6
saw 8:10 33:4
43:2
saying 60:7
77:11
says 62:15
66:6 72:19
77:14 78:13
83:8 84:14
84:19
scenario 30:23
scene 34:20
57:2,4
school 9:21
10:14,16,17
10:22 11:3,3
science 67:16
68:3,16

Scott 49:14
51:12
screw 72:20
73:10
script 6:2
seal 96:15
Seattle 1:2
2:11
second 9:4
15:8 41:13
52:11 66:6
79:4 82:15
83:8,10,16
83:19,24
84:12 94:7
security 11:13
11:16 40:8
79:10,11
see 18:13
34:20,22
41:11 48:11
69:6 70:16
82:5 88:17
seeing 57:10
78:9
seen 27:22
34:19,21
50:18,23
51:21 52:6
57:5,6 77:4,6
78:11 81:13
81:15
send 16:14
20:18
senior 43:4
44:14 45:3
54:7
seniority
44:11
sense 7:3 31:6
35:21 70:24
sent 18:19
19:1,24 20:6
55:1 82:25
83:12,22

Bauman, Donald                                            October 25, 2016

15

84:3
**Sentinel** 77:19
77:20
**Seoul** 12:21,24
**separate** 19:14
50:4
**September**
21:9 80:14
**sergeant** 10:9
10:12,24
33:7 41:24
42:13 45:17
47:19 49:14
49:17,22
53:11 56:4
74:12 86:4
**serious** 25:23
32:4 83:21
**services** 95:10
95:10,14
**seven** 10:16
**seven-week**
10:21
**sexual** 7:14
52:20 63:23
83:21
**SGLI** 47:12,20
73:21
**share** 41:8,9
**shared** 28:5,15
41:7
**sharing** 28:13
**she'll** 6:1
**Sheet** 96:10
**sheriff's** 38:2
**shift** 71:8
**shoot** 28:4
**short** 15:1
26:2
**shortly** 10:13
25:20 39:10
**show** 58:9
**showing** 23:17
49:24 76:25
78:8

**sic** 75:24
**side** 19:17
65:5,6 82:9
**signature**
94:20 96:18
**signed** 27:25
96:10
**significant**
64:18,22,25
**similar** 77:6
**simply** 54:18
**Simultaneous**
46:14
**sir** 5:10,14
7:17 11:16
14:18,25
15:1 19:8
45:8 47:8
68:11,14
69:12 77:3,5
81:14
**sit** 25:25 31:11
50:14 59:23
60:18 64:8
**sitting** 6:22
72:7
**six** 9:17
**SJA** 42:22,23
92:4
**slight** 57:10,11
**small** 15:23
**smaller** 36:24
**soldier** 31:11
35:1,23
50:18 51:20
52:14,18
53:24
**soldier's** 35:5
**soldiers** 31:25
50:25 52:15
93:3
**sole** 52:25
**somebody**
16:21 17:3
29:19 30:18

34:18 40:24
**soon** 48:7 56:7
59:18 60:3,8
**sorry** 20:3
33:21 46:15
60:12 67:21
73:5 74:3
87:20 90:5
90:16,19,20
91:5
**sort** 6:12 22:12
29:2 63:13
77:11 82:4
83:18 93:4
**sound** 45:12
80:2
**sounds** 45:10
**source** 27:3
**South** 8:18,20
61:22,23
62:5,8
**speak** 41:18
45:20 74:14
75:12 79:22
86:4 91:14
**speaking**
44:17 46:14
62:10
**special** 11:9
11:21 12:19
12:20 13:1
21:10 24:25
84:20 89:9
**specific** 10:18
13:17 23:6
43:13 44:1
64:10 80:16
86:13,24,25
**specifically**
6:23 24:16
24:22 28:15
40:3,9 50:8
61:14 72:24
75:23 79:20
91:19

**specifies** 89:8
**spell** 5:7
**spent** 12:17
48:8
**spoke** 21:18
43:14 44:21
44:25 75:19
**spoken** 73:14
86:11
**spouse** 38:13
**squad** 49:18
**staff** 10:9 44:4
68:21 79:24
81:11,16,18
81:20,21
82:13,22
**staffing** 12:9
**stand** 15:4
57:12 68:18
77:12
**standard**
22:19 55:25
56:21 57:20
57:21 58:25
59:4 68:7
86:1
**stands** 68:15
**start** 5:11
20:23 35:25
36:5 40:7
88:25
**started** 9:15
9:20
**state** 5:6 39:21
40:25 42:17
46:3 49:8
75:23 79:2
91:17 95:2
96:3,7,16
**stated** 59:6
79:11 87:5
**statement**
27:2,5,6 28:3
28:5,10,15
40:10 59:10

72:23 76:16
85:2
**statements**
19:23 20:2
27:25 59:16
59:24
**States** 1:1,10
1:17 2:10
**stationed** 11:8
15:17
**status** 82:15
83:8,10,16
83:20 84:14
**stay** 65:19
**stayed** 11:5
**Stewart** 2:11
12:25 15:17
21:8 24:7
31:19 32:2
34:5 42:20
42:22 55:16
56:14 69:16
79:7 90:1
92:24 93:5
**story** 63:18
**stovepipe** 54:5
**straw** 38:24
39:13
**Street** 1:17
2:11
**Strictly** 11:16
**structure** 17:7
44:21
**subject** 22:20
22:25 23:2,2
24:1 26:17
26:21 35:14
38:5 56:8
74:5 84:20
85:10 88:21
91:8
**subject/sus...**
22:10
**subjects** 52:7
87:2

Bauman, Donald

October 25, 2016

16

submitted
  20:6 85:23
subordinate
  13:12,19
  14:8 30:19
  55:13
subsequent
  38:7 69:6
  74:16 83:14
successfully
  73:7
successor
  90:17,18
Succone
  67:14,15
sufficient
  84:23 85:8
  86:2 88:14
Suite 2:11
summaries
  78:21
summary
  78:14,15,25
supervises
  69:18
supervising
  50:19
supervisor
  29:17 30:11
supervisors
  36:4 41:21
  49:18,19
supervisory
  14:7 29:9
  31:14 59:2,5
  69:15,20
  70:25
supporting
  27:7
supposed
  32:5 83:19
supposedly
  25:13
sure 7:4 20:13
  44:9 49:10

61:15 87:9
surrounding
  61:13
suspect 22:2,4
  22:24 23:3
  27:2 35:1,9
  35:14
sworn 5:2 27:2
  27:6,25
  28:10
systematic
  69:24

_____
T
take 20:21
  26:10 31:24
  36:3,6 39:2
  46:24 53:5
  54:21 55:1
  56:9 57:24
taken 39:7
  53:3 71:14
  82:19
talk 21:19
  34:22 35:19
  36:3 42:12
  46:11
talked 24:22
  40:12 41:23
  45:11 46:16
  46:19 47:9
  47:16 70:16
  72:6 74:20
  74:22 75:16
  75:21
talking 6:4
  17:1 35:22
  37:5,23
  38:15 44:7
  46:12 70:4
  87:16,18
TALON 77:8
task 31:5
  32:21 40:24
tasks 30:13

32:19
TC 66:6
TDY 15:1,4
team 10:3,4,6
  11:6 24:11
  24:23 25:13
  29:9 31:24
  33:17 67:4
technically
  6:17 69:19
telephone
  43:24 46:1
tell 26:8 28:14
  29:18 30:5
  62:21 73:25
  74:4,6 82:18
  87:9 90:23
telling 64:2
  70:2 74:25
  75:24
tells 29:15
  30:18 53:24
Temporary
  15:5
tenders 58:11
tenure 31:18
term 35:16
terms 57:8
terrorism
  40:23
terrorists
  92:23
testified 5:3
  7:11
testify 91:3
testimony
  5:13 7:9,21
  51:7 61:4
  81:3 91:7
  96:9,7,8
text 60:10,16
  60:19 62:7
  62:19 82:16
  82:18 83:9
  84:16 85:22

88:2
texts 61:18
Thank 36:13
  94:15
thereof 96:10
thing 5:24 6:9
  16:20 18:16
  33:3 38:23
  70:9 83:9
things 9:19
  16:18 19:23
  29:4,5 30:25
  54:16 68:9
  87:1,2,4
think 8:10
  14:21 16:20
  16:24 18:17
  24:21 31:20
  33:5 36:20
  45:13 46:2
  50:24 68:15
  71:24 77:7
thinking 34:13
third 44:3
  52:11 83:16
  84:14
Thomas 1:6
  2:16 15:11
thoroughly
  53:14
thought 18:10
  26:1 59:13
  88:7
threatened
  64:23
threatening
  64:19
three 7:25
  11:21,24
  12:5,17
  20:10,23
  21:5 26:12
  52:4,4 91:22
threshold
  22:13,15

85:17
tie 35:12
Tiffany 18:8
  19:2 24:5,9
  36:17 43:18
  47:4 61:8
  92:16
time 5:10 9:9
  10:7 11:14
  12:6 15:2,16
  18:24 21:19
  21:22 22:2,9
  23:24 24:10
  25:9 29:21
  30:17 31:4
  34:11,13
  36:15,23
  38:1 41:5,22
  41:25 42:10
  44:6 46:25
  47:7 48:6,9
  48:16 52:12
  54:14,25
  55:6,16,23
  56:22 57:24
  59:15 60:9
  60:15 61:17
  62:13,20
  63:7 64:13
  66:23 71:13
  74:7,9 78:24
  80:4,14
  83:18 84:6
  85:3,16
  89:25 91:11
  92:15
timeline 55:3
  61:13,25
  62:11
timely 28:20
  28:23
times 30:24
  52:7,9,14,19
TIMOTHY 1:6
tip 37:16

Bauman, Donald                                    October 25, 2016

title 9:10
titling 22:22
to-do 65:7
toast 6:14
today 6:13
  7:21 8:13
  17:17 25:25
  50:14 59:23
  60:18 61:4
  64:8
told 40:9 41:24
  63:7,10
  74:18,22
ton 50:25
Toole 47:17
  72:20 73:14
  74:14,20,22
  74:25 75:16
  76:1 90:15
top 24:21
  31:20 65:5
  71:6 72:19
  77:10 78:19
  83:14 85:13
  85:18 87:9
totality 23:23
  26:20 27:12
  31:1
town 8:21
toxicology
  23:19 54:15
  55:3 56:5
track 31:12,17
TRACY 1:6
trained 34:4
training 31:13
transcribe
  5:18
transcribed
  96:10
transcript
  95:18 96:10
  96:11
transcription
  96:8

transferred
  11:20 13:4
transition
  21:10,13
transpired
  85:14
trial 20:6 26:10
  26:15 28:16
  42:15 43:3,5
  53:1,8,16
tried 59:1
  71:16
triggering
  85:19,20
trips 15:1
trouble 52:11
  52:11
true 6:17 22:15
  96:10,7
trust 80:21
truth 6:12
  74:25
try 6:6 29:17
  30:22 31:11
  31:17 32:1
  34:19,21
  35:14 54:10
  73:2
trying 5:18 6:5
  25:18 31:20
  37:11,18
  49:1,22 51:5
  62:6 77:7
  88:10 92:7
  92:22
Tuesday 1:15
turn 63:4,18
  67:10 79:4
  82:8 84:9
turned 38:10
Turning 53:4
  72:11 77:18
Turso 55:5,6
  55:17 70:23
  72:15 84:8

85:6
Turso's 71:2
  73:3
twice 13:23
  44:8
two 7:23,24
  9:5,7,16,18
  11:5,8 12:5
  18:4 29:8,12
  29:12 32:21
  43:11 44:9
  56:10 62:7
  64:23 66:18
  91:22
two-week 21:9
type 7:15 41:6
  54:24 63:9
  81:18
typically 17:11
  50:25 54:21

_____
       U
U.S 2:10 13:13
uh-huh 5:23
ultimate 53:21
ultimately
  20:14
unborn 84:24
uncommon
  44:13 54:9
underneath
  55:13
understand
  5:15,21 6:19
  37:8 87:22
  88:10
understandi...
  17:16 80:6
  88:6
understood
  7:7 47:7 67:9
undetermined
  27:1
undisciplined
  79:10

unfounded
  26:5,13,19
  26:23,25
  70:16
Uniform 52:23
uniforms
  79:10
unit 9:17,19
  35:5,16,20
  35:24 36:18
  36:22 37:12
  41:23 43:4
  45:3,15
  52:25 53:5
  69:5
United 1:1,10
  1:17 2:10
unusual 43:24
  52:10,12
update 83:24
updated 65:9
  66:23
uploads 77:19
usual 19:9
  95:17
usually 12:5
  12:10,12
  30:17,22,24
  31:3,24
  43:11 54:11
  83:23

_____
       V
valid 29:18
vehicle 49:25
verbal 5:20
  30:10 31:16
victim 88:21
victims 52:7
  52:20
video 49:24
  50:2 51:14
visit 68:21
visits 68:22
voluntarily

63:3,11,12
vs- 1:9

_____
       W
W 1:6
W01 10:23
waiting 54:12
  55:2
walk 16:16
want 12:10
  37:15 48:5
  50:7 51:16
  53:24 58:9
  61:12 62:11
  64:15 72:17
  75:22 94:12
wanted 37:16
  42:5 51:18
  53:5,14
  60:24 61:12
  61:24 62:2
  63:11
warrant 10:13
  10:16,21,22
  10:25 11:2
Washington
  1:1 2:11 9:1
  39:21 40:21
  40:25 79:2
wasn't 18:3
  49:2,2 79:25
  85:25
way 31:5 45:2
  65:12 69:7
  88:2
ways 15:19
  30:9
we'll 65:16
  70:8,9,10,13
  94:18
we're 13:14
  17:17 28:13
  46:12 52:17
  54:4,12
  69:17,19

Case 2:14-cv-01884-BJR   Document 100-3   Filed 05/19/17   Page 43 of 44

92:7
**we've** 26:15
    47:7 57:24
**weapon** 25:14
    28:3
**weapons**
    38:25 39:22
    39:25 40:4
    40:13
**week** 15:2
**weekly** 16:2
    24:21
**weeks** 7:23
    10:17 18:4
    29:8,12
    43:11 66:18
**went** 9:21 10:5
    10:13 11:7
    39:20 40:12
    61:22,23
    69:7 71:17
    79:22 80:1
**weren't** 83:15
**West** 63:2,8,20
    64:16,23
    79:8
**whatsoever**
    73:22
**whereabouts**
    62:3
**wife** 17:21
    21:21 60:5
    84:24
**wife's** 22:3
    74:9
**willing** 9:19
**wish** 48:6
**Witness** 33:3
    36:12 42:19
    46:22 51:9
    58:16 59:21
    60:22 66:4
    67:2,11
    71:21 72:12
    80:10 81:4

82:11 84:10
89:16 94:3
96:15
**witnesses**
    59:16 87:2
**word** 22:24
    75:1 87:11
    87:11,19,19
    87:23,24
    89:19
**wording** 55:23
**work** 5:12 14:5
    28:20 49:24
    50:6 54:4,4
    91:11
**worked** 7:13
    9:12 10:5
    24:17,25
    49:3 50:3,4
    91:25
**working** 10:8
    28:19 30:24
    31:4 50:15
    89:6
**wouldn't** 18:10
    22:4 32:11
    35:17 37:2
    37:16 41:10
    43:24 69:19
    88:23
**wrapped** 53:25
**wrists** 57:11
    57:17,19
**writing** 85:23
**written** 31:16
**wrong** 71:17
    72:8

_____
**X**
_____

**Y**
_____
**y'all** 46:15,19
**Y-E-A-T-T-S**
    90:20
**yeah** 69:14

90:18,19
91:3
**year** 10:5 11:9
    13:2,3 14:19
    14:23 15:17
    48:15 69:6
    69:10
**year-and-a-h...**
    12:20
**years** 9:5,8,16
    9:18 11:5,8
    11:21 12:17
    12:18 20:10
    20:23 21:5
    34:12 52:5
    71:14
**Yeatts** 90:19
**yesterday** 7:24
    43:2
**Yongson**
    12:21
**York** 1:6 2:5,5
    17:20 18:8
    19:3 24:5,9
    36:17 43:18
    47:4 61:8
    92:16
**younger** 32:12

_____
**Z**
_____
**Zipp** 49:14,17
    49:22 51:5
    51:12
**Zonie** 45:5,6,7

_____
**0**
_____
**016** 78:18

_____
**1**
_____
**10** 12:23
**10:47** 58:5
**10022** 2:5
**10th** 38:12
**11** 63:1
**11:01** 58:6

**11:43** 1:16
    94:9,20
**11:51** 94:8
**12** 12:23 90:3
**120** 83:23
**13** 58:10 72:11
**130** 82:10 84:9
**13th** 2:5
**14** 9:3 84:14
**15-14-37** 95:12
**15th** 84:13
**16** 86:19,24
    87:6,15,18
    87:24 88:2,3
    88:14
**16-1** 86:17
**17** 8:21
**187** 58:15 66:3
**195-1** 86:15
    92:3
**1986** 9:1
**1997** 9:15,20
**1998** 9:21
**1st** 21:13
    96:17

_____
**2**
_____
**2:14-CV-018...**
    1:3
**20** 25:9
**2001** 10:13
**2003** 11:6,7
**2005** 11:19
**2011** 12:25
    15:16 19:7
    21:9,13 24:3
    47:5 54:25
    58:20 80:15
    82:14,15
    84:1,6,13,14
    85:3 91:9
**2012** 13:4,22
    71:7
**2014** 13:24
    14:14,24

15:3
**2016** 1:15
    96:17
**206.553.7970**
    2:12
**212.328.9559**
    2:6
**22** 1:17
**24** 83:12
**24th** 66:18
**25** 1:15
**29** 82:15

_____
**3**
_____
**3** 60:24
**30th** 80:14
    82:14
**31401** 1:18
**31516** 95:6
**33** 4:3 76:21
    76:22,25
**34** 4:6 78:4,5,8
**35** 4:8 81:6,7
    81:10

_____
**4**
_____
**4** 86:25 87:15
    87:19,23
    88:1,3
**40** 13:11 69:19
**45** 57:25 58:3
**453** 95:6
**4833** 20:19

_____
**5**
_____
**5** 3:4 88:20
**5220** 2:11
**56** 58:14
**59** 66:2
**5th** 46:20 47:5

_____
**6**
_____
**64** 67:10
**641** 2:5

Bauman, Donald

October 25, 2016

19

| 7 | | | | |
|---|---|---|---|---|
| **70** 82:9 | | | | |
| **700** 2:11 | | | | |
| **73** 84:9 | | | | |
| **75** 72:14 | | | | |
| **76** 4:3 72:18 | | | | |
| **77** 72:11,14,19 | | | | |
| **78** 4:6 | | | | |

| 8 |
|---|
| **8** 62:14 86:25 |
|   88:22 |
| **80** 12:12 25:8 |
| **81** 4:8 |
| **88** 9:1,2 |

| 9 |
|---|
| **9** 61:11 |
| **9-11-28(c)** 95:8 |
| **9:00** 1:15 |
| **90** 69:2 |
| **912.449.8486** |
|   95:6 |
| **98101** 2:11 |
| **9th** 58:19 |
|   66:18 |