The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TRACY JAHR, et al.,<br><br>   Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>   Defendant. | No. C14-1884-BJR<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANT'S SUPPLEMENTAL BRIEF [Amended][1]** |

Plaintiffs Brenda Thomas and Timothy York, parents of Tiffany York, respond to the Government's supplemental brief on issues of duty and causation.

## INTRODUCTION

The Government's supplemental brief both misunderstands our arguments and misapplies Georgia law. The Army had a duty to take reasonable steps to prevent Private Aguigui from committing violent acts against innocent victims, including by reporting his violent extremism up the chain of command. And the failure to properly report his violent extremist proximately caused Tiffany York's violent murder.

First, the Army had a duty—multiple duties, in fact—to prevent Private Aguigui, a violent extremist, from harming innocent people. Those duties arose not from federal regulations, as the Government claims that we argue, but rather from multiple requirements of

---

[1] This amended brief is filed at the request of the Government because of concerns raised that certain information cited in Exs. 33 and 34 may have been confidential. With the Government's consent, we have modified the brief's text to avoid redactions. In addition, we have updated and corrected certain exhibit citations.

PLAINTIFFS' RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF - 1
(C14-1884-BJR)

CLINTON BROOK & PEED
641 Lexington Avenue, 13th Floor
New York, NY 10022
(212) 328-9559

Georgia tort law, which requires employers to supervise their employees, organizations to prevent harm by people they control, landowners to prevent crimes on their land, and entities to mitigate harm when they have increased the risk of that harm. Any one of these relationships suffices to trigger a duty of care, and each of them are implicated by the failure to report Private Aguigui's extremist activity.

Second, the failure to report his extremist activity proximately caused the murder of Tiffany York. It was entirely foreseeable that Private Aguigui would commit violent crimes; after all, he told one of his superiors that he planned to "create an active shooter situation" at Fort Stewart. That he met his shooting victim on base and shot her off base does not change the analysis; Georgia courts have repeatedly refuse to split hairs this finely. Equally unavailing is the Government's backup argument that even if Private Aguigui's conduct had been properly reported, Army commanders would have failed to responded appropriately; that argument contradicts the deposition testimony of commanders, the decisions of Georgia courts, and the presumption of regularity that cloaks the acts of government agencies.

The Government has identified arguments that it may make to the factfinder, but has not found issues that keep this case from trial. Because a reasonable factfinder could easily conclude that the Government violated multiple duties to prevent harm by Private Aguigui and that the Government's failure proximately caused the death of Tiffany York, the case should proceed to trial.

## ARGUMENT

**I.    The Army had a duty to supervise Private Aguigui and police its premises in a manner that protected others from his foreseeable acts of violence.**

Plaintiffs have never argued that a federal statute or regulation creates a private right of action cognizable under the FTCA. Nevertheless, the Government devotes its entire duty argument to rebutting a federal regulatory argument that we did not make, and fails to address the arguments—under actual Georgia law—that we did. *See* Summ. J. Opp'n 18–23 (ECF No. 79). For that reason, the Government's blanket assertion that "courts have found that Army

PLAINTIFFS' RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF - 2
(C14-1884-BJR)

CLINTON BROOK & PEED
641 Lexington Avenue, 13th Floor
New York, NY 10022
(212) 328-9559

Regulations and federal statutes governing Army command authority cannot form the basis of a duty under the FTCA," Gov. Br. 4, is beside the point: We argue that the negligent failure to report, which violated a non-discretionary Army regulation, also amounted to tortious conduct under Georgia law—in a manner that applies to private and public actors alike.

Of course, while Georgia law supplies the Army's *duty* of care towards Tiffany York, the Army's mandatory-reporting regulation does inform the *standard* of care, including whether the Army acted reasonably. *See, e.g.*, *Govea v. City of Norcross*, 608 S.E. 2d 677, 683–84 (Ga. Ct. App. 2004) (statutory reporting requirement, even if not independently cognizable, may inform the standard of care under plaintiff's theory of state-law negligence). The regulation also assigns responsibilities among Army personnel, making individual soldiers responsible for carrying out the Army's stated objective of quashing extremism. And because the regulation comes from the Army to its soldiers, it more resembles a company policy telling employees how to do their jobs than a reporting statute regulating the relationship between private citizens and the government.[2]

The Government overlooks all this, dwelling on the independent effect of Army regulations instead of the basic requirements of Georgia tort law. And under Georgia law, the Army had a duty to prevent Private Aguigui from murdering innocent victims, because it (a) employed him; (b) had all-encompassing disciplinary authority over him; (c) allowed him to move freely on Fort Stewart; and (d) acquiesced in and financed his extremist plots.

**A. The Army had a duty as Private Aguigui's employer.**

Under Georgia law, an employer may be liable for negligent supervision: when "the employer reasonably knew or should have known of an employee's tendencies to engage in certain behavior relevant to the injuries allegedly incurred." *Leo v. Waffle House, Inc.*, 681 S.E.

---

[2] *See, e.g.*, *Youngblood v. All Am. Quality Foods, Inc.*, 792 S.E. 2d 417, 421 (Ga. Ct. App. 2016) (company policy may "illustrat[e] negligence (or lack thereof) under circumstances to which the policy would be applicable"); *Byrd v. Medical Ctr. of C. Ga., Inc.*, 574 S.E.2d 326 (Ga. Ct. App. 2002) (surgical department's service manual is "clearly relevant to the jury's determination of the standard of care"); *Spearman v. Ga. Bldg. Auth.*, 482 S.E. 2d 463, 465 (Ga. Ct. App. 1997) (violation of private guidelines is "admissible as illustrative of negligence") (quotation marks omitted).

PLAINTIFFS' RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF - 3
(C14-1884-BJR)

CLINTON BROOK & PEED
641 Lexington Avenue, 13th Floor
New York, NY 10022
(212) 328-9559

2d 258, 262 (Ga. Ct. App. 2009) (quotation marks omitted). Similarly, an employer may be liable for negligent retention, by "retaining an employee the employer knows or in the course of ordinary care should have known was not suited for the particular employment," *Munroe v. Universal Health Svcs., Inc.*, 596 S.E. 2d 604, 605 (Ga. 2004). These duties arise when, for instance, "the employer knew or should have known that the employee had dangerous propensities." *TGM Ashley Lakes, Inc. v. Jennings*, 590 S.E. 2d 807, 817 (Ga. Ct. App. 2003). And they apply even if the employee acted outside the scope of his employment, because Georgia law is concerned with "the dangerous nature of the person in general, not simply the person acting within the scope of his duties." *Id.* at 814.

While he was employed by the Army, Private Aguigui's dangerous nature was more than apparent. He "openly discussed" committing violent acts of extremism, including shooting people at Fort Stewart, Ex. 9 at 3 (ECF No. 79-7), with his Specialist Rosario, his superior. In the Army, specialists like Rosario manage and train lower-ranked soldiers, such as privates. *See, e.g.*, Daniels Dep. 18:24–22:15. Indeed, "military law has recognized no principle which is more firmly fixed than the rule that a military superior is responsible for the proper performance by his subordinates of their duties." *United States v. Waluski*, 6 C.M.A. 724, 733 (1956). Applying this principle, court-martials have held that non-superior officers may be accountable for negligent or criminal conduct by privates in their units. *See United States v. Pickett*, 22 C.M.R. 338, 342–43 (1956), *rev'd on other* grounds, 23 C.M.R. 233 (1957) (specialist who went on errand with private was accountable for private's misconduct during errand); *Waluski*, 6 C.M.A. at 733 (same, for a private first class supervising a private).

In addition to telling Specialist Rosario that he planned to shoot people at Fort Stewart, Private Aguigui discussed overthrowing the United States government with at least one non-commissioned officer, Sergeant Peden. Ex. 45 (FBI report) at 5–6. As a sergeant in Private Aguigui's Calvary Unit, he contributed to the supervision of Private Aguigui and other members of FEAR. And while Sergeant Peden eventually fell under Aguigui's sway, in the meantime he failed to report their activities up the chain of command.

PLAINTIFFS' RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF - 4
(C14-1884-BJR)

CLINTON BROOK & PEED
641 Lexington Avenue, 13th Floor
New York, NY 10022
(212) 328-9559

As "the first line of defense against extremist views, behaviors, and affiliations," "[j]unior leaders must pay attention to . . . indicators of possible extremist views, behaviors, or affiliations." *Extremist Activities*, DA Pam. 600–15, § 3-2b (2001). In addition to hearing his brazen threats of violence, anyone supervising Private Aguigui would have observed multiple symptoms of extremism, including "[s]urreptitious meetings," "tattoos," "[u]nusual book discussion groups (for example, discussion of 'Turner Diaries')," and "[u]se of extremist acronyms." *Id.* By nonetheless failing to report his extremist activity and violent plans to CID, Sergeant Peden, Specialist Rosario and other superiors in Aguigui's unit were negligent in their supervision. And since Aguigui's immediate superiors did not provide CID or commanders with information they should have, the Army negligently retained him.

Having negligently supervised and retained Private Aguigui, the Army can avoid liability only if the resulting harm to Tiffany York occurred "in a setting or under circumstances wholly unrelated to his employment." *TGM Ashley Lakes*, 590 S.E. 2d at 813. Georgia courts construe this exception narrowly: "neither the termination of the employment relationship nor the passage of time break the causal connection as a matter of law." *Underberg v. S. Alarm, Inc.*, 643 S.E. 2d 374, 379 (Ga. Ct. App. 2007). For instance,

- In *Graham v. City of Duluth*, 759 S.E. 2d 645 (Ga. Ct. App. 2014), an intoxicated off-duty police officer attacked a random driver with city-issued pepper spray. *See id.* at 650. The Georgia Court of Appeals held that the city could be liable for negligent hiring even though "it is absolutely undisputed that [the officer] was off duty, intoxicated, and not in any way engaged in his law enforcement duties at the time he attacked [the plaintiff]." *Id.*

- In *Underberg v. Southern Alarm, Inc.*, 643 S.E. 2d 374 (Ga. Ct. App. 2007), a former traveling salesman kidnapped a customer of his former employer after entering her home through an open garage door. *See id.* at 377. Although the kidnapper no longer worked for the company and did not use his role with company to gain access to the victim, the Georgia Court of Appeals held that a reasonable factfinder could hold the

PLAINTIFFS' RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF - 5
(C14-1884-BJR)

CLINTON BROOK & PEED
641 Lexington Avenue, 13th Floor
New York, NY 10022
(212) 328-9559

city liable for negligent hiring because that the kidnapper was acting "under color of employment." *Id.*

- In *Govea*, the Georgia Court of Appeals held that an off-duty police officer who provided his service weapon to a teenager, who then shot himself with it, was acting "under color of employment" since, among other things, he "used his status as a police officer to recruit members for the [teenager's] soccer team." 608 S.E. 2d at 688.

If anything, the Army had a closer relationship to Tiffany York than the defendants did with the victims in these cases. Tiffany met Private Aguigui and other FEAR members at Fort Stewart, when she was dating Michael Roark, at the time an active-duty soldier. On the day of the murders, Michael and Tiffany were invited to go "night [target] shooting" by four active-duty soldiers (including Aguigui), and gathered on base at Fort Stewart before going off-base to their deaths. Ex. 46 at 26. And Aguigui bought the gun used to kill Tiffany with money that the Army gave him after he killed his wife, herself an Army officer. *Id.* at 11–12.

On these facts, especially when construed most favorably to the Plaintiffs, a reasonable factfinder could certainly conclude that Tiffany's murder was not "wholly unrelated" to the killers' employment as soldiers—such that the failure to report Aguigui's extremist activities amounted to negligent supervision and retention.

**B. The Army had a duty given its control over its soldiers.**

Separate from its duties as Private Aguigui's employer, the Army had a duty to prevent people under its control from harming others. A person or entity "who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person from to prevent him from doing such harm." *Bradley Ctr., Inc. v. Wessner*, 287 S.E. 2d 716, 720 (Ga. Ct. App. 1982). For instance, a "therapist owes a legal duty not only to his patient, but also to his patient's would-be victim and is subject in both respects to scrutiny by judge and jury." *Id.* (quotation marks omitted). A government agency hosting a prisoner could be held liable after the prison took a pistol from an unlocked drawer in the agency officer and then assaulted and

PLAINTIFFS' RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF - 6
(C14-1884-BJR)

CLINTON BROOK & PEED
641 Lexington Avenue, 13th Floor
New York, NY 10022
(212) 328-9559

raped a third party. *See Tolbert v. Tanner*, 349 S.E.2d 463, 466 (Ga. Ct. App. 1986). And in an FTCA case invoking Georgia law, the government was liable after a Veterans hospital gave an unsupervised weekend pass to a dangerous patient, who then killed his mother—the duty to third parties arose from the "special relationship" between the patient and his treatment team, even without any special relationship between the decedent and the defendant. *See Spence v. United States*, 132 F. Supp. 2d 1061, 1076 (M.D. Ga. 2001).

Under this principle of Georgia law, the Government is liable here because it had the same type of special relationship with and control over its soldiers, including Private Aguigui. The relationship between the military and its soldiers is paradigmatically special and all-encompassing. *See Chappell v. Wallace*, 462 U.S. 296, 304–05 (1983) (describing military's special status arising from, among other things, separate justice system for military employees and the "special relationships that define military life"). By admitting and training Private Aguigui and exerting a level of control unheard of in civilian life, the Army also had a duty to properly supervise him, including by taking proper steps after learning that he planned to act violently. This duty included ensuring, as required by AR-381, that those responsible for deciding about Aguigui's employment and freedom were properly advised of his extremist activity and plans.

### C.  The Army had a duty as the landowner of Fort Stewart.

Georgia law also "imposes a nondelegable duty upon a landowner to keep his premises in a reasonably safe condition, and a landowner must use ordinary care to do so." *TGM Ashley Lakes*, 590 S.E. 2d at 462. As part of this duty, "[a] landowner can be liable for third-party criminal attacks if the landowner has reasonable grounds to apprehend that such a criminal act would be committed but fails to take steps to guard against injury." *Id.*

Because it owned Fort Stewart, the Army owed duties of care to persons on the land; those persons included Tiffany York. Tiffany met Private Aguigui on base at Fort Stewart as a guest of Michael Roark's. Further, on the night of the murders, Michael and Tiffany first met with Private Aguigui's extremist colleagues on-base, where the plot to kill them began. *See* Ex.

PLAINTIFFS' RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF - 7
(C14-1884-BJR)

CLINTON BROOK & PEED
641 Lexington Avenue, 13th Floor
New York, NY 10022
(212) 328-9559

43 (log showing Roark's car signed in through security), ECF No. 79-17; Ex. 46 at 25–26. By failing to report what they knew, Army employees allowed Aguigui's violent and extremist activities to continue on Army property until they culminated in the murders of December 5, 2011.

**D.   The Army had a duty to act after affirmatively increasing the risk that Private Aguigui would harm others.**

Finally, under Georgia law, "a person may be held liable for the negligent performance of a voluntary undertaking" if the voluntary act created "an increased risk of harm" to third-parties. *Dale v. Keith Built Homes, Inc.*, 620 S.E. 2d 455, 456 (Ga. Ct. App. 2005) (citations and quotation marks omitted). That increased risk of harm happened here, for two reasons.

First, by learning of and then failing to report Private Agugui's violent and extremist activity and plans, Army employees implicitly reinforced that he would face no consequences for planning that activity—and recruiting others to join him in it—thereby emboldening him to continue.

Second, even if the payment of death benefits to Private Aguigui is not itself actionable under the discretionary function exception, it nonetheless increased the risk of harm to others, including Tiffany York, by providing Aguigui the funds to recruit other soldiers and buy an arsenal. *See* Kapinus Dep. 88:04–14. Once the Army elevated the danger by paying Private Aguigui half-a-million dollars, it had a duty to supervise him even more closely and report his extremist activities even more faithfully. This increased danger would become yet more salient if the Court were to reinstate this theory of relief. *See* Pls.' Mot. for Partial Reconsideration (ECF No. 98). Regardless, by failing to report Aguigui's extremist activity, Army employees violated their duty to minimize the harm caused by the Army's own conduct.

**II.   Private Aguigui's extremist threats—including his plan to "conduct active shooter situations"—made it reasonably foreseeable that he would shoot and kill innocent people.**

The Government argues that the murder of Tiffany York was an intervening criminal act that breaks the causal chain, ignoring black letter tort law: "'The general rule that the

PLAINTIFFS' RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF - 8
(C14-1884-BJR)

CLINTON BROOK & PEED
641 Lexington Avenue, 13th Floor
New York, NY 10022
(212) 328-9559

intervening criminal act of a third person will insulate a defendant from liability for an original act of negligence does not apply when it is alleged that the defendant had reason to anticipate the criminal act.'" *Landis v. Rockdale County*, 427 S.E.2d 286, 290–91 (Ga. Ct. App. 1992) (quoting *Atlantic C.L.R. Co. v. Godard*, 86 S.E.2d 311, 315 (Ga. 1955)). Indeed, the argument overlooks the very reason why violent and extremist activity is supposed to be reported in the first place: to prevent soldiers from committing criminal acts of violence. Private Aguigui's violent crime did not break the chain; it completed it.

Remarkably, the Government argues that despite Private Aguigui's extremist activities—including his plans to "conduct active shooter situations" at Fort Stewart—his shooting and killing innocent people such as Tiffany York was unforeseeable, because Aguigui's threatened to shoot people at Fort Stewart (rather than to meet them at Fort Stewart and take them elsewhere before shooting them, as he did with Tiffany). Gov. Br. 8. The Government's argument flouts well-settled Georgia law on proximate causation.

For one, Georgia has more relaxed causation rules than most states: It is not a "but for" causation state, and requires only that a particular action was a "contributing factor," even if that factor was not "substantial." *John Crane, Inc. v. Jones*, 604 S.E. 2d 822, 824 (Ga. 2004). Perhaps most importantly, "for a party to be held liable for negligence, it is not necessary that he should have been able to anticipate the particular consequences which ensued. It is sufficient if, in ordinary prudence, he might have foreseen that some injury would result from his act or omission, and that consequences of a generally injurious nature might result." *Swofford v. Cooper*, 360 S.E. 2d 624, 628 (Ga. Ct. App. 1987) *aff'd*, 368 S.E. 2d 518 (Ga. 1988).

Far from requiring the violent person to itemize his individual victims or method of violence, then, the Georgia Supreme Court has rejected the "proposition that to [demonstrate foreseeability] on a negligent hiring/retention claim, a plaintiff must show the defendant employer knew or should have known of an employee's propensity to commit the tortious or criminal act that caused the plaintiff's injury." *Munroe*, 596 S.E. 2d at 606. As a result, the Government's "restrictive and inflexible approach does not square with common sense or tort

PLAINTIFFS' RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF - 9
(C14-1884-BJR)

CLINTON BROOK & PEED
641 Lexington Avenue, 13th Floor
New York, NY 10022
(212) 328-9559

law, and represents a significant departure from precedent of [the Georgia Supreme] Court." *Id.* at 864 (quotation marks omitted). At a minimum, when Private Aguigui threatened to create an "active shooter" situation at Fort Stewart, it became foreseeable that he would try to shoot and kill innocent people. That he met Michael and Tiffany and Fort Stewart and shot them off-base hardly made his eventual violent crime difficult to predict.

These principles are reiterated in multiple Georgia cases that the Government fails to cite in its causation analysis. In *Graham v. City of Duluth*, 759 S.E. 2d 645 (Ga. Ct. App. 2014), the city was sued after an off-duty police officer attacked and sprayed a woman with his department-issued pepper spray. *See id.* at 649–50. Although before he was hired the police officer had once brandished a weapon while drunk, the trial court granted summary judgment because he had never "inappropriately discharged his pepper spray or committed an assault on an innocent civilian prior to the [] incident." *Id.* at 505. The Court of Appeals reversed, however, holding that trial was required on causation because a factfinder could conclude that the officer's previous conduct "made him unsuitable to be placed in a position where he would be issued weapons, including pepper spray, which was used in the attack on [the plaintiff]." *Id.*

Similarly, in *Govea*, the Georgia Court of Appeals reversed the grant of summary judgment to a police department that fired a police officer for violating a variety of police regulations but allowed the officer to state that he had resigned voluntarily. After the officer joined a new department, a teenager shot and killed himself when the officer lent him his gun. *See* 608 S.E. 2d at 680–82. The defendant argued that "it could not have foreseen that [the officer] would 'let [the victim] play with a gun and ammunition.'" *Id.* at 685. But that was the wrong question under Georgia law, which "whether the particular incompetence, if any, that [the officer] demonstrated while working as a police officer at [the city] made it reasonably foreseeable by [the city] that [the officer] would cause personal harm to another through the negligent performance of his duties in future employment as a police officer." *Id.* The result was foreseeable even though none of the officer's previous misconduct "had resulted in bodily injury to another," *id.*; although he had once left his gun unattended in a car, he had never given

PLAINTIFFS' RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF - 10
(C14-1884-BJR)

CLINTON BROOK & PEED
641 Lexington Avenue, 13th Floor
New York, NY 10022
(212) 328-9559

it to another person, let alone a child, *see id*. No matter: "a jury might determine that it was foreseeable by [the city] that [the officer] would cause personal injury to another." *Id.* at 686.

And in *Spence v. United States*, 132 F. Supp. 2d 1061 (M.D. Ga. 2001), the FTCA plaintiff alleged that the victim was killed because the Government negligently granted a weekend pass to the victim's son, an inpatient at a psychiatric hospital. The court "concede[d] that these factors may not have enabled [the government doctor] to predict that [the killer] was going to murder his mother or that [he] was going to commit any specific act." *Id.* at 1078. But under Georgia law, that "is not the standard for foreseeability. Instead, liability for negligence attaches if *any harm* was foreseeable." *Id.* (emphasis added).

Given the obvious link between threatened shootings and actual shootings, the Government cannot establish that Private Aguigui's violence was unforeseeable. That he threatened to shoot innocent people at Fort Stewart made it foreseeable that he might shoot innocent victims too, including friends or significant others of people he met at Fort Stewart. Certainly, a reasonable factfinder could so conclude. *Cf.* Order re: Discovery 1 (ECF No. 72) ("[F]or the purposes of Defendant's pending motion for summary judgment, [the Court] will infer that the FBI and the U.S. Army were aware on September 30, 2011 that Pvt. Isaac Aguigui posed a substantial risk of committing a violent act *against members of the public* as a result of his purchase of over $30,000 in weapons using funds disbursed by the Army to Aguigui as benefits after his wife's death.") (emphasis added).

Finally, the Government asks the Court to hold—as a matter of law—that even if Private Aguigui's violent and extremist activity had been properly reported, Army officers would not have taken reasonable or appropriate steps to prevent him from executing his violent plans. Gov. Br. 9–10. But that is a question for the factfinder, who would consider testimony from Captain Daniels that Private Aguigui's violent plans "would have been important to know," Daniels Dep. 106:25–107:5, and Colonel Hadley's testimony that Aguigui's extremist activity would likely have led to his discharge, *see* Hadley Dep. 69:19–70:1 ("A. Why would we want that type of soldier under our command? . . . I can't think of any good reason."). Yes,

PLAINTIFFS' RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF - 11
(C14-1884-BJR)

CLINTON BROOK & PEED
641 Lexington Avenue, 13th Floor
New York, NY 10022
(212) 328-9559

Army commanders in theory had discretion to disregard the information, but there is no reason to assume that they would have done so. On the contrary, "a presumption of regularity attaches to the actions of Government agencies." *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001).

Again, the Government's argument also conflicts with cases applying Georgia law—cases that again the Government does not cite. For instance, in *Grabowski v. Radiology Assocs., P.A.*, 352 S.E. 2d 185 (Ga. Ct. App. 1986), the Georgia Court of Appeals considered a case in which a radiologist misread the patient's arteriogram, and thus did not report the findings to the surgeon, who in turn did not order a CT scan, which would have revealed that the patient had a surgical lesion in his brain. *See id.* at 187. The trial court had directed a verdict for the defendants, but the Court of Appeals reversed: trial was necessary on the issue of proximate cause. *See id.* at 187–88. The plaintiff could establish proximate causation despite several steps in the causal chain after the radiologist failed to report the necessary information to the surgeon—including the surgeon's decision whether to order a CT scan, the surgeon's interpretation of the CT scan, and the surgeon's decision about how to respond after interpreting the CT scan. Other cases applying Georgia law reflect the same approach. *See Govea*, 608 S.E. 2d at 685 (negligent failure to report by police officer's first employer was proximate cause of harm that officer committed at his new job, even though second employer made an independent decision to hire and retain him after he committed misconduct at second job).

Here, the causal chain is yet more straightforward. CID and commanders held several pieces of a jigsaw puzzle, but needed one more piece to recognize its image and see how the pieces fit together: An informant had reported that Aguigui spent $32,000 on assault weapons, Ex. 33 at 1, but was aware of "no threats to anyone" or "terrorist statements," Ex. 34 at 4.[3] Another witness said the same thing. *Id.* at 5. Aguigui himself "denied having any animosity

---

[3] Exhibits 33 and 34 were previously filed under seal in connection with the Government's motion for reconsideration. *See* ECF No. 83. A redacted version of Exhibit 34, prepared by the Army, is being filed with this amended supplemental brief; the Government seeks to seal Ex. 33 in its entirety, however. To complete the public record pending this Court's decision on the motion to seal, we are also filing the Army-redacted versions of Exs. 1, 5, 6, 7, 11, 13, 35, 37, 38, 39, 43, and 44 along with this brief.

PLAINTIFFS' RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF - 12
(C14-1884-BJR)

CLINTON BROOK & PEED
641 Lexington Avenue, 13th Floor
New York, NY 10022
(212) 328-9559

toward the military . . . [or] any intention to use the weapons for an unlawful purpose." Ex. 33 at 8. Had CID and commanders known that Aguigui was in fact threatening violent and extremist activity, the puzzle's image would have become clear—Aguigui's arsenal of weapons would have been viewed alongside his specific plans to terrorize innocent people and create an "active shooter situation." Thus, by failing to report Private Aguigui's violent and extremist threats, Army personnel deprived CID and commanders of the missing piece, and hence prevented both CID and commanders from taking steps that would have blocked him from carrying out his violent plans.

## CONCLUSION

The Government's remaining summary-judgment arguments should be rejected and the case should proceed to trial.

May 22, 2017

Respectfully submitted,

/s/ Brian C. Brook
BRIAN C. BROOK, admitted *pro hac vice*
CLINTON BROOK & PEED
641 Lexington Avenue, 13th Floor
New York, NY 10022
(212) 328-9559
(212) 328-9560 (fax)
brian@clintonbrook.com

*Counsel for Plaintiffs*

PLAINTIFFS' RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF - 13
(C14-1884-BJR)

CLINTON BROOK & PEED
641 Lexington Avenue, 13th Floor
New York, NY 10022
(212) 328-9559

# CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2017, I electronically filed this amended supplemental brief with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the defendant's counsel of record.

May 22, 2017

/s Brian C. Brook
BRIAN C. BROOK, admitted *pro hac vice*
CLINTON BROOK & PEED
641 Lexington Avenue, 13th Floor
New York, NY 10022
(212) 328-9559
(212) 328-9560 (fax)
brian@clintonbrook.com

*Counsel for Plaintiffs*

PLAINTIFFS' RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF - 14
(C14-1884-BJR)

CLINTON BROOK & PEED
641 Lexington Avenue, 13th Floor
New York, NY 10022
(212) 328-9559