1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TRACY JAHR, BRENDA THOMAS,      )
TIMOTHY LEE YORK, AND W. BRETT  )
ROARK,                          )
                                )
        Plaintiffs,             )
                                )
     vs.                        )   CIVIL ACTION
                                )   NO.2:14-cv-01884-MJP
                                )
UNITED STATES OF AMERICA,       )
                                )
        Defendant.              )


This matter coming on for deposition of Justin D. Hadley
on February 11, 2016, beginning at 2:52 p.m., at the
United States Attorney's Office, 227 West Trade Street,
Charlotte, North Carolina, before Lori McCoin Jones, RPR,
Court Reporter and Notary Public, the following
proceedings were had, to wit:


REPORTED BY:  Lori McCoin Jones, RPR

2

APPEARANCES:
ATTORNEYS FOR THE PLAINTIFFS:
  CLINTON, BROOK & PEED
  BY:  Brian C. Brook, Esq.
  and  Kari Parks, Esq.
  641 Lexington Avenue, 13th Floor
  New York, New York  10022
  212.328.9559
  Brian@clintonbrook.com

ATTORNEYS FOR THE DEFENDANT:
  UNITED STATES ATTORNEY'S OFFICE
  BY:  Kristin B. Johnson, Esq.
  700 Stewart Street, Suite 5220
  Seattle, Washington  98101
  206.553.7970
  kristin.b.johnson@usdoj.gov

ALSO PRESENT:

  Major David J. Krynicki, Esq.
  U. S. Army Litigation Division

3

I N D E X
                                    PAGE
JUSTIN D. HADLEY
    Examination by Mr. Brook              4


E X H I B I T S

Exhibit 26                          83
Exhibit 27                          99

    (All exhibits retained by Mr. Brook, Esq.,
    by agreement of counsel.)

4

Thursday, February, 4, 2016, (2:52 p.m.)
            P R O C E E D I N G S
Thereupon, Justin D. Hadley, having been called on behalf
of Plaintiff, was sworn by the Notary, and testified as
follows:

            EXAMINATION
BY MR. BROOK:
    Q.   Good afternoon.  Please state your name for the
record.
    A.   Justin David Hadley.
    Q.   Have you been deposed before?
    A.   I have not.
    Q.   I assume that you've spoken with counsel about
the general rules for the deposition, but nonetheless, I'm
going to go over the basic rules at the beginning.  If you
have any questions or if you don't understand something,
be sure and say it.  And that goes -- that's one of the
first things throughout this whole deposition is if I ask
a question and you answer it, I'm going to assume that you
understand it.  And if you don't understand it, you should
ask me to rephrase it, and I'll try to do so.  Do you
understand?
    A.   That's fair.
    Q.   So you're aware that you're being deposed in the
case of Jahr v. United States?

5

    A.   I am.
    Q.   And my name is Brian Brook, and I'm of the law
firm Clinton, Brook, and Peed, and I represent the
plaintiffs in the case.  Are you aware of that?
    A.   I am now.
    Q.   And my clients are the parents of Michael Roark
and Tiffany York.  Are you familiar with those
individuals?
    A.   I'm familiar with Roark, and I obviously know
the name of York.  I don't personally know either one of
them.
    Q.   Understood.  Now, have you ever testified under
oath before?
    A.   I'm sure I have, just not in a courtroom, not in
a setting like this.
    Q.   So you've never testified in a courtroom?
    A.   I'm thinking about maybe a speeding ticket or
something like that, but honestly, I don't think so.
    Q.   So in this deposition, I'm asking you questions,
and you're going to be answering them, and your answers
are under oath.
    A.   I understand.
    Q.   So you understand that it's very important to
tell the truth and for us to get everything that you know
that's responsive to my questions on the record, right?

**6**

1    A.  I do.
2    Q.  So, for example, if I were to ask you what you
3  had for breakfast today and you told me that you had
4  orange juice but you actually had orange juice, toast, and
5  a pear, that would not be an acceptable answer because I
6  would be left thinking you just drank orange juice when,
7  in fact, you had a pretty decent meal.  That's just an
8  example, but do you understand the example I just gave
9  you?
10    A.  I do.
11    Q.  Another thing that's really important is this is
12  an oral transcription of what we're talking about.  So we
13  can't get anything that's in the way of gestures or nods
14  or pointing and have that make any sense at all in the
15  transcript.  So it's really important that we both try to
16  remember to speak orally and to say everything clearly,
17  and in particular that means trying not to talk over each
18  other even when you're sure you know where I'm going or I
19  know where you're going.  And also preventing -- avoiding
20  saying uh-huh, uh-uh, instead saying, as you have been,
21  yes, no clearly.  Just keep that up and we'll be fine.
22  Understand?
23    A.  Sounds great.  Yes, I do.
24    Q.  I don't know about great.
25    A.  Must have a lot of people that sit there and lie

**7**

1  to you.  It's okay.  You don't need to answer that.
2    Q.  My opinion doesn't matter.  The most important
3  thing is that, as you're doing this, just tell me what you
4  know and, you know, that's -- if you don't know something,
5  say you don't know it.  If you're not certain of
6  something, you can say you're not certain, but if you
7  think you know the answer to a question, please say, you
8  know, you think you know the answer.  That will help us to
9  figure it out and maybe there is something I can show you
10  in the way of documents that can help you to remember.
11    A.  No, I understand.
12    Q.  And if you need a break at any time, just ask
13  for it and we can do that.  The only thing I'd ask is that
14  if I've asked a question, go ahead and answer it before we
15  take a break.
16    A.  I think we're good unless you keep me in here
17  for 12 hours.
18    Q.  I have no intention of doing that.
19      Have you ever been arrested?
20    A.  I have not.
21    Q.  Have you ever been a party to another lawsuit?
22    A.  No.
23    Q.  Okay.  And besides the lawyers sitting next to
24  you here, who else have you discussed this case with?
25    A.  Well, is there like a date and time?  I guess,

**8**

1  you know, after the events, a lot of people talked about
2  it after.
3    Q.  Let me be more specific.
4    A.  Yeah.
5    Q.  I'm speaking specifically about the lawsuit we
6  filed, the civil suit, Jahr v. United States, against the
7  government relating to the wrongful deaths of Michael
8  Roark and Tiffany York.
9    A.  I think the only other person that I've talked
10  to other than these two fine folks right here to my right
11  is a lady named Beth.
12      THE DEPONENT:  Does that sound right?
13      MS. JOHNSON:  Beth Johnson, my secretary?
14    A.  I think that's the only other person I've even
15  had a conversation about this with.
16    Q.  Have you spoken with anyone else about this
17  deposition?
18    A.  Well, my wife knows that I'm here.
19    Q.  And anyone else?
20    A.  No.
21    Q.  Tell me everything that you did to get ready for
22  today's deposition.
23    A.  Well, I drove two hours to get here.  I walked
24  about -- I'm being facetious.  No, I mean I didn't
25  prepare for anything.  I'm just going to tell you what I

**9**

1  know.
2    Q.  Okay.
3    A.  I did sit there and, you know, think about it a
4  little bit, but I didn't prepare.  I didn't write any
5  notes.
6    Q.  Did you review any document?
7    A.  I didn't have any documents to review.  I did
8  sit there and look at, you know, risk mitigation, just
9  remind myself of, you know, the Army's policy, what we do
10  about things like that.
11    Q.  Anything else besides risk mitigation?
12    A.  That's it.
13    Q.  Now I'm going to ask you a few background
14  questions.
15    A.  I know what you're looking for, you know, do I
16  have any documents at the house that I sat there and
17  pulled out.
18    Q.  No.
19    A.  I don't have anything.  I didn't look at that
20  nor did I ask for anything nor did I receive anything
21  whatsoever.
22    Q.  No need to worry about that.  I'm just asking
23  what you looked at to prepare for this.  Some of the
24  witnesses have been sent documents to prepare.
25    A.  Oh, I see.

Hadley, Justin D.

February 11, 2016

4 (Pages 10 to 13)

---

**10**

Q. Sounds like you did not receive any documents from the lawyers in this case?

A. No.

Q. And you did not bring any documents with you here today is what you're saying?

A. No.

Q. How old are you?

A. Well, that's not entirely true. I mean, I did bring one document.

MS. JOHNSON: Yes. For the record, he brought a document for me, and I have that document.

MR. BROOK: It was designated -- or I'm sorry.

Q. Just let me ask you about this, a few questions.

A. Okay.

Q. You brought a document for your lawyer?

A. No. I mean, yes. I gave it to her, but it's just --

MS. JOHNSON: No. Wait. Stop.

THE DEPONENT: Okay.

MS. JOHNSON: For the record, he brought a document for me to assist in our discussions so it is privileged information.

Q. Well, who created this document?

A. Oh, I have no idea. It's a -- it was a form.

---

**11**

It has no writing on it whatsoever. It's a common form you can get on Google.

Q. Okay. What was the form?

MS. JOHNSON: No. It's privileged.

MR. BROOK: Something isn't privileged just because he hands it to you.

MS. JOHNSON: It's work product that we discussed so it's privileged.

Q. When did you first discuss this document with Ms. Johnson here?

A. About ten minutes ago.

Q. So you had already decided to bring it to this deposition before that, correct?

A. Yeah. You asked me a question and I answered it.

MR. BROOK: So I'm going to put on the record, then, the request for a copy of the document that the witness brought to the deposition.

MS. JOHNSON: You can put that on the record.

Q. This doesn't involve you, it's just lawyer stuff.

So I just wanted to do some background questions. How old are you?

A. Forty-five.

---

**12**

Q. And where were you born?

A. Trenton, New Jersey.

Q. New Jersey.

A. Lived there about four months.

Q. Well, yeah, you're lucky.

What is your highest level of education?

A. Master's degree.

Q. Okay. What was your master's in?

A. Military science.

Q. Where did you get that?

A. The Army War College in Carlisle.

Q. When was that degree conferred on you?

A. It was back in the -- I just did it last year, so in May or June.

Q. When did you join the Army?

A. '92.

Q. What were you in before then?

A. I was in college.

Q. Where did you go to college?

A. Citadel.

Q. And did you have a major there?

A. I did.

Q. What was that?

A. Mathematics.

Q. And did you -- what was your first duty station

---

**13**

when you joined the Army?

A. Fort Benning.

Q. In Georgia. And how long were you at Fort Benning for?

A. I'm guessing right now, but I'd say right around nine months for schooling.

Q. So was that preparing you to be an officer?

A. It was, yes.

Q. And what was your first assignment after getting through schooling at Fort Benning?

A. I went to Korea.

Q. How long were you there for?

A. Fourteen months.

Q. What was your rank at that time?

A. Second lieutenant.

Q. Were you promoted at some point after that?

A. I was not.

Q. After Korea, where did you go?

A. 3rd Ranger Battalion, Fort Benning.

Q. How long were you there for?

A. Around two years. I don't remember exactly how long.

Q. Were you promoted at some point while you were there?

A. I was. I was promoted once or twice. I just

---

Hadley, Justin D.                                   February 11, 2016

5 (Pages 14 to 17)

---

**14**

can't remember if I was promoted -- I definitely was promoted once after I got there, for a little while after I got there.  And the second time was either right when I was leaving the unit or right after I left the unit.

Q.   Where did you go after Fort Benning for the second time?

A.   Well, I went -- I stayed on Benning because I went to another school for, like, a year.

Q.   Okay.

A.   And then after that, I went to -- I went to Alaska.  Make sure I get this right.  Yeah, Alaska.

Q.   And what was the school that you went to for a year at Fort Benning that you just described?

A.   Defense course.

Q.   And what is the purpose of that?

A.   Whenever you're a new captain in the Army, there is a variety of schools around the United States, depends on what your branch is, and you go there for advanced training for company grade officers.  It's usually anywhere from six months to a year depending on what your branch is.

Q.   And what was your particular branch?

A.   Element infantry officer.

Q.   So, I'm sorry.  So after that you were -- you went where after you finished up the school there?

---

**15**

A.   I went to Alaska.

Q.   How long were you in Alaska for?

A.   Three years.

Q.   Where in the Alaska was this?

A.   Down south in Anchorage.

Q.   Where did you go after Alaska?

A.   I went to Fort Polk, Louisiana.

Q.   How long were you in Fort Polk for?

A.   I think it was pretty close to three years again.

Q.   Just to keep us oriented, not all of us are math majors, so at that point when you were finishing up at Fort Polk, what year was that?

A.   Finishing at Fort Polk?

Q.   Yeah, when you were leaving Fort Polk.

A.   Okay.  So '96, '99, '99 to -- so it must have been right around 2002.

Q.   Okay.  Where did you go then?

A.   I went to Fort Drum.

Q.   And where was that?

A.   New York.  You really didn't know that?

Q.   I really didn't.  It's a lot of forts.

A.   It's okay.

Q.   How long were you at Fort Drum for?

A.   Only ten months.  I actually remember that one

---

**16**

very well.

Q.   Why do you remember it so well?

A.   I went to school right after that.

Q.   Where did you go to school?

A.   I went to Fort Leavenworth.

Q.   What did you study there?

A.   Well, it's called a command and general staff college, so you study -- you know, this is where you become a field grade officer.  They select a certain amount of officers of the major rank and they send you to formal schooling.  You could walk away with a major, but -- you know, but most don't.  I'm trying to characterize what you're looking for.  It's --

Q.   Well, let me ask you.

A.   It's a school for advanced studies on military science.  I guess that's probably the easiest way to explain it.

Q.   Does any of that have to do with sort of maintaining order in your ranks, disciplinary issues?

A.   I mean, you know, I would say everything that the Army does contributes to that, but if you're looking for that there is a specific spot that teaches you how to do, you know, a -- you know, because we -- I would say it's focused more on leadership and -- you know, than teaching you how to do something a particular way.

---

**17**

Q.   Right.  So at what stage of your time being an officer in the Army do they teach you about how to maintain order with soldiers and how to do with disciplinary issues with soldiers under your command?

A.   I think you learn that before you even become an officer in the United States Army.  I mean, if you spend four years going through ROTC, you know, and most of the time when you're recruited, they're even looking for certain characteristics and things like that.  I wouldn't say that -- you know, you probably get different perspectives over time and have a -- you know.  I mean it's probably not the answer you're looking for, but I don't think that it was some mythical moment that showed up when I joined the Army.  I would have thought that I would have started realizing some of those things back definitely during college, at least based off where I went to school, and things like that.

Q.   Was there any specific courses on understanding, for example, the Uniform Code of Military Justice?

A.   Well, there are.  The military has those course.

Q.   Did you take those?

A.   I have.

Q.   When was that?

A.   Well, the most formal one was in Charlottesville.  I can't remember the name of the course.

---

Hadley, Justin D.                                      February 11, 2016

6 (Pages 18 to 21)

18

1  It's called the -- I know two individuals to the right, he
2  probably knows exactly what I'm talking about.
3          THE DEPONENT:  Help me out and I'll tell
4  you if it's true.
5          You're not allowed to speak?
6      Q.  If you don't remember, just say you don't know.
7      A.  Well, the problem is I do, I just don't
8  remember.
9          MS. JOHNSON:  It will come to you.
10          THE DEPONENT:  Yeah.  Probably right in the
11  middle of some other question.
12      A.  But, yeah, that's probably the last most formal
13  version of what I think you're trying to get after.
14      Q.  And when was that?
15      A.  Let's see here, I said three years, and I said
16  three years, and I said one, seven.  Maybe 2002, '3,
17  somewhere in that neighborhood right there.
18      Q.  And so that's the last such course you remember
19  taking or the first?
20      A.  Well, no.  I mean, like I said, there is not --
21  that's the easiest example of what I think you're looking
22  for, for a course that's taught by lawyers on a variety of
23  subjects, but I wouldn't say that that's the last time.  I
24  mean, I'd say that the education that I just sat through
25  for the past year at the Army War College, you know, you

19

1  talk about things like that.  You might not sit there and
2  talk about this is exactly how you're going to prosecute a
3  case if you're a lawyer, I mean, but you sit there and
4  talk about judgment.  We talk about case studies of things
5  that have happened in history.  And, you know, all that
6  stuff is relevant as far as trying to put things in
7  context.
8      Q.  And just maybe it helps to focus on specific
9  things.  Like are you given any sort of, you know,
10  training or, you know, courses or -- something either
11  formal or informal regarding nonjudicial punishment
12  measures you can take?
13      A.  Yeah.  There are all types of those things that
14  are both informal -- it's everything from, you know, when
15  you show up to some new units, there are orientation
16  courses that you do for new officers and soldiers that
17  show up to it's embedded within the curriculum at the
18  lieutenant level, the captain's level, the major's level.
19  I just described one at the lieutenant colonel's level,
20  whatever that course was I just talked about.  And then,
21  you know, I just did it at the 06 level at the War
22  College.  I mean, that's five different formal ways, and
23  then there is all the informal ways in the units that
24  you're in in every organization.
25      Q.  Sure.

20

1      A.  I definitely wouldn't characterize it as there
2  is no -- you know, there is training.  It's just I think
3  some people want to think there has got to be a -- you
4  know, you went to college and you took 101UCMJ, and it's
5  not quite like that.
6      Q.  I understand.  The law is much the same way.
7  You go to school for three years to know nothing.
8      A.  I wouldn't say that.  You wouldn't have spent
9  all that money.
10      Q.  You would do it just to get a license.  Anyhow,
11  that shouldn't be on the record.  Obviously it still is.
12  Everything we say stays on the record.
13          So last we left, and just trying to get the
14  chronology, I just want to make sure I know where you
15  were.  So you were at Fort Leavenworth going to school
16  again.  When did you leave Fort Leavenworth?
17      A.  Well, I left Fort Leavenworth and I went to Fort
18  Hood, Texas.  I'm just trying to remember when I went to
19  Fort Hood, Texas.  Probably like '04 time frame, somewhere
20  around that time.
21      Q.  What was you your rank at that time?
22      A.  I was a major.
23      Q.  Just given the time period.  Were you deployed
24  at any point in this time period, 2003, 2004?
25      A.  Well, I've spent 52 months in Iraq and

21

1  Afghanistan since '05, and then there is a variety of
2  smaller deployments before that.  I don't even look at
3  those anymore.
4      Q.  We don't need to talk about all that.
5      A.  We don't?
6      Q.  Don't need to go through everything, but smaller
7  deployments before then --
8      A.  What if I only said I went on, like, a
9  deployment for six months or something like that?  Seems
10  like you didn't expect the answer that you got.
11      Q.  I don't think there is any need for you to try
12  to guess at anything, it's just a matter of I don't want
13  to keep you here all day talking about this stuff.
14      A.  I understand.
15      Q.  I'm trying to be respectful of your time on
16  that.  Just so I can understand, then, after Fort Hood,
17  where did you go?
18      A.  I went to Schofield, Hawaii.
19      Q.  How long were you there for?
20      A.  I -- well, I --
21      Q.  How long were you stationed there for?
22      A.  I was stationed for there for 20 months, but I
23  did not spend but, like, about 6 months actually
24  physically there because I was deployed during that time
25  too.

Hadley, Justin D.                                              February 11, 2016

7 (Pages 22 to 25)

22

1  Q.  Where were you stationed after Schofield?
2  A.  Fort Stewart.
3  Q.  When did you arrive at Fort Stewart.
4  A.  Let's see here, September -- let me try to get
5  this right here.  Change of command was September of, I
6  think, '11 if that sounds right.  So I would have showed
7  up a couple -- maybe a month or two before that.  That's
8  just a guess.  I honestly don't remember exactly when I
9  showed up.
10  Q.  Do you recall who you were replacing?
11  A.  A gentleman by the name of Reynolds.  Is that
12  what you're looking for?  I'm just trying to remember what
13  his first name was.
14  Q.  He was the lieutenant colonel before you?
15  A.  At Fort Stewart, yes.  I want to say it was Andy
16  Reynolds.  I honestly don't remember his first names.  It
17  was Reynolds, Lt. Col. Reynolds.
18  Q.  So you arrived before assuming command; is that
19  right?
20  A.  I did, but I don't remember -- it wasn't a long.
21  It wasn't like one of these people where you had --
22  because there are people that usually arrive to a post and
23  spend a year or something like that.  It wasn't like that.
24  I arrived, you know, just prior to taking command.  I just
25  don't remember.  It was months versus not a year type of

23

1  thing.  You know, like one or two months at the most
2  before I showed up.  I know I got there that summer.
3  Q.  Were you returning from deployment that summer?
4  A.  I did.  I came back from -- you know, I left
5  Hawaii straight off of deployment and then came to Fort
6  Stewart.
7  Q.  And you think you were there for approximately
8  two to three months before you assumed command; is that
9  right?
10  A.  I would say no more than that.  I mean, you
11  know, I think the earliest I can think of is maybe I
12  showed up in July, but I honestly don't remember.  I would
13  have expected that -- I would have thought that I would
14  have taken leave and then showed up closer to the, you
15  know, change-of-command date, but I just honestly don't
16  remember.
17  Q.  Do you recall whether, when you arrived at Fort
18  Stewart, had the deployed personnel from the 68 Cavalry
19  returned to Fort Stewart or were they still deployed?
20  A.  No.  Everybody that -- they had already come
21  back because they were -- while I was -- we were actually
22  pretty close deployed to the same spots.  You know, when I
23  was over there with Hawaii, this patch right here, I was
24  in a place called Diyala Salah al-Din, and the 68 Cav was
25  in the next province over in Ninewa province which is kind

24

1  of like saying they were in the next state.  You know, I
2  was in Delaware; they were in New Jersey.
3  Q.  That's helpful.  I just want to finish up with
4  the time line.  When did you leave Fort Stewart?
5  A.  Well, I went to the War College from Fort
6  Stewart, so I went to the War College last year.  So
7  around April of -- I want to say -- is it '13 or '14?
8  '14, April of '14.
9  Q.  And was that when you were promoted to colonel?
10  A.  I was promoted to colonel in June of -- I've
11  been a colonel now for a little over a year.  So June of
12  '14, yeah.  Yes.
13  Q.  Was your promotion connected with the fact that
14  you went to War College?
15  A.  No.  There is plenty of colonels that don't go
16  to War College.
17  Q.  Why did you want to go to War College?
18  A.  Because I was asked to go.
19  Q.  Who asked you?
20  A.  Selected to go, I guess, is the right way to say
21  it.
22  Q.  Who asked you?
23  A.  Who asked me?
24  Q.  Yes.
25  A.  I don't know.  Whatever board met and picked my

25

1  name out of, you know, my files and said -- I don't know
2  who was there.  I mean, the Army.  Well, maybe not the
3  Army, whoever.  There is a board that selects you.
4  Q.  Thank you.  One thing just to keep in mind is
5  although I've been in this case now for a few weeks, I am
6  still very much like -- I don't even know what you would
7  call me if I was in basic training, but I would be below
8  the guys in basic training in terms of knowledge of the
9  military.  So please forgive me.
10  A.  No, I understand.  No.  No.  I made a poor
11  assumption.  I figured you had actually been in the
12  military.
13  Q.  No.  I just recently got a hair cut.  That's the
14  closest I've been to being in the military.  Anyway, none
15  of this should be on the record.
16  A.  It's okay.  I'm tracking now.
17  Q.  We'll just hope the judge doesn't read that
18  part.
19  Let me ask you, with that in mind, that's a good
20  time to ask you just about some of the basics of the
21  structure of the command on Fort Stewart to help me
22  understand that.  So what was your official title when you
23  arrived there, like the full what you were a lieutenant
24  colonel in command of?
25  A.  I was -- it was very simple.  I was a battalion

Hadley, Justin D.                                                  February 11, 2016

8 (Pages 26 to 29)

## 26

1  commander.
2      Q.  Okay.  Was that of the 68 Cavalry?
3      A.  But I guess, you know what?  Actually, that's --
4  that's true but not true.  Battalion commander is what
5  we -- that's the generic title for all folks within --
6  that are -- that have these types of commands for this
7  type of structure.
8      Q.  Sure.
9      A.  Since you're looking for formal title, I was the
10  squadron commander because it was a reconnaissance
11  squadron.  But if you look at my official record, it says
12  battalion commander on it.
13      Q.  So squadron commander denotes that it was doing
14  reconnaissance work?
15      A.  It's just a lineage thing.  It goes back to, you
16  know, the Indian wars.
17      Q.  Just like cavalry --
18      A.  Cavalry.
19      Q.  -- riding around on horses.
20      A.  Exactly.
21      Q.  Are there even horses?
22      A.  There are.  There is a unit at Fort Hood, Texas,
23  that parade around on the field.
24      Q.  Probably not going into the battle, though.
25      A.  No, they're not.

## 27

1      Q.  That's good for the horses.  So in terms of
2  where you were in the chain of command at Fort Stewart,
3  who was immediately above you?
4      A.  All right.  Just to put some context, since
5  that's what you're looking for.
6      Q.  Absolutely.
7      A.  There are 36 battalion commanders on Fort
8  Stewart.  I was one of those 36.  The highest ranking
9  person on that post was a two star general.  There was
10  probably around 14 brigade commanders.  That is the level
11  right above me.  And so you have 36 battalion commanders,
12  you probably have around 8 to 14 brigade commanders that
13  are full-bird colonels, the rank that I wear now, and then
14  you have a couple of one star generals -- and if I
15  remember right, we had at least two, maybe three, I don't
16  really remember, you know, who they are -- and then you
17  had a two star division commander that was on the post.
18      Q.  And the two star general, was he responsible
19  just for the post or beyond?
20      A.  He was the commander of the 3rd Infantry
21  Division and Fort Stewart, so he had two titles.
22      Q.  Now, would he have been commanding any other
23  post in addition to that?
24      A.  He didn't command any other -- well, you know
25  what?  That's not true.  There is a place called Hunter

## 28

1  Army Airfield that is in downtown Savannah, and I don't
2  know this for a fact, but I believe he's the commander
3  because our units were on that post.  I believe he is
4  probably the overall commander for that too.  And I also
5  think there is a smaller installation somewhere else along
6  the coast that I always remember people talking about, and
7  I wouldn't be surprised if he owned that too.  Then he had
8  soldiers on Fort Benning, Georgia.  There was a brigade
9  plus that is part of the 3rd Infantry Division that is
10  there.
11      Q.  Okay.  So that's -- those are the guys who are
12  at that level now.  In terms of your actual chain of
13  command, did you report to a particular brigade commander?
14      A.  I did.
15      Q.  Who was that?
16      A.  Colonel -- let's make sure I get the right one
17  because I've worked for a few.  Colonel Gallahue at this
18  time.
19      Q.  Can you spell that?
20      A.  Kimo is his first name, K-I-M-O, Gallahue.
21          I'm not going to have to put my phone in the
22  record, am I?
23      Q.  Your phone is not going in the record.
24      A.  Okay.  That you.  Let me just see --
25      Q.  Let the record reflect he is checking his phone

## 29

1  contacts.
2      A.  -- if I can refresh my memory on how to spell
3  his last name because it isn't like a common spelling.
4  G-A-L-L-A-H-U-E.
5      Q.  And I only ask this just to cover my bases.
6  Now, in your phone, you don't have anything that might be
7  relevant to this case?
8      A.  Not that I'm aware of.
9      Q.  I'm just going to leave it at that.
10      A.  You never know, but honestly, I mean, like I
11  said, I didn't prepare.  I didn't sit there and go -- you
12  know, I don't have any files at the house or anything that
13  I might look for.  So if there is something in one of my
14  records on a computer or on a database or something like
15  that, I am just honestly unaware of it.
16      Q.  Now, has anyone prior to today ever contacted
17  you to ask whether you had any records relevant to this
18  case?
19      A.  No.
20      Q.  Are you aware of anyone else under your command
21  who has been asked for that sort of information?
22      A.  No.
23      Q.  Okay.  So now we've covered who is above.  Help
24  me understand the structure from below where you were at
25  in your squadron.  Who was immediately beneath you?

Hadley, Justin D.                                        February 11, 2016

9 (Pages 30 to 33)

---

**30**

A. Well --

Q. At least in terms of, you know, just ranks and number of people. Let's start with that.

A. Well, the organization has two majors. There is an operations officer and there is an executive officer. And then there are -- for our organization, there were five -- sometimes -- in normal terms they're called companies, but, once again, lineage thing, ours were called troops. It's just a cavalry thing. They mean the same thing.

Q. Okay. And the term unit is used a lot. What does the unit refer to?

A. It could be anything. It could be -- I mean, really, I mean, it could be the squadron. It could be the -- it's just another word for -- it's like organization. If you hit, what is it, synonym for organization, and it gives you ten different things, you could do the same thing for unit. So it could be a squad, a platoon, a company, a battalion, a regiment, division.

Q. So someone might say that their unit was a thousand people and they would be referring to, what, the squadron at that point?

A. Yeah. I think that's fair. It's -- I think most people refer to the unit based of what their rank is in the organization. You know, if you're a soldier and

---

**31**

you think about your unit, I think that most folks, when they say unit at the soldier level, they're probably thinking about their company that they're in or their platoon, one or of those two organizations. As you become a field grade, you know, one of the officers, you're probably spending more of your time talking about the battalion. And then the senior officers are obviously talking about the larger organizations, but it's just a -- it means different things to different people.

Q. Is part of the reason why that happens because you know, as, for example, a major or lieutenant colonel, you're not spending that much time interacting with the soldiers who are in the private rank?

A. No, I wouldn't say that. You spend a lot of time. You would be surprised how well you get to know people over time. And, no, I don't think I would go that direction. I would just sit there and say it's all in -- it's all perspective, you know, where you're at. Today, even though I wear this rank right here, there is a captain that's technically in charge of me. When you were trying to do your UCMJ question before, there is a -- I have a company commander. I have a first sergeant even though I am, you know, three or four ranks ahead of him. A general has a company commander. Everybody has a company commander in the Army.

---

**32**

Q. Is it always a captain?

A. It's always a captain -- well, I won't say it's always because I think the aviators sometimes have some majors. And there is exceptions to the rule, but, yes, it's predominantly a captain. So I think it's perspective.

Q. Sure. To the best of your ability, how big was the 68 Cavalry when you were commander?

A. It fluctuated, but it's around 500 folks, but it grew to almost a thousand during the deployment. Because, you -- you know, like a wiring harness, you plug things into it. You know, there is something that's a base and then you add to it based off the mission.

Q. So where would the other people come in from?

A. Different organizations.

Q. So, for example, maybe someone who had previously been deployed to Afghanistan would get reassigned to join you to go to Iraq?

A. Well, you could have individuals just like that. You could have organizations. You need more logistical, so they give you a logistical unit to plug into your organization to help out with whatever it happens to be. You could require more combat power. Like, for example, we had an extra infantry company attached to our squadron, and that was 150 people right just there.

---

**33**

Q. When that happens, is that a permanent change of station for those individuals or do they have sort of still affiliation with where they came from?

A. They're still affiliated with where they came from.

Q. But in terms of just the deployment, then, they're considered part of your command?

A. Yeah. We have different words in the military called tactical control, administrative control, operational control, and so they assign one of these types of relationships with that organization and each one is different in its unique way. Some of them you are just allowed to tell them what to do, and some of them you worry about everything from, you know, their families and welfare and all that. And it kind of depends on -- you know, everybody is characterized differently under different circumstances.

Q. So earlier you mentioned reviewing regulations on sort of risk assessment, right?

A. Uh-huh.

Q. Are you familiar with I think it's Regulation 195-2, Appendix F, Internal Control Evaluations?

A. No. I mean, I'm probably familiar with whatever you are going to tell me about, but I am not familiar with what you just read off.

---

Hadley, Justin D.                                    February 11, 2016

---

**34**

Q. Well, my job isn't to tell anything, just to ask. So if you don't know about it, we'll leave it at that.

A. Okay.

Q. Do you recall when you first learned about Isaac Aguigui?

A. Well, I mean, the first time I learned about him was about a week or two before I took command.

Q. What was the context in which you learned about him?

A. That he was a soldier that was getting in a lot of trouble.

Q. Who did you learn about that from?

A. From the guy I took over for, from Col. Reynolds.

Q. What specifically do you recall him telling you about Aguigui?

A. Well, he -- just to make sure to put some context here. It wasn't him coming up to me and having a conversation about Aguigui. It was in a formal setting. The week or two before I took over, he invited me over to the organization kind of as a -- I don't want to call it, maybe like an orientation, to be able to meet some of the folks that are there, sit through some of the major meetings that the organization has, and just kind of get a

---

**35**

chance to, you know, see what's going on before -- before you become responsible for everything there.

And so I remember the first time that I saw his name pop up on something, it was a meeting that was held usually every other week, sometimes every week, but usually it was more of an every other week kind of meeting where the commanders, the company commanders reviewed the soldiers that they -- that were at risk. You know, these are folks that are presenting challenges for a variety of reasons within the command. And, you know, each of the -- each of the company commanders would review those soldiers with the greater -- the greater organization and make sure that we could either find help for them or determine a way ahead.

And so I remember in that particular meeting, his name being brought up, along with dozens of others. So we're not saying that he was -- by no means was the focus, but you know, an organization of, at the time period was a little over 500 at that particular time, you know, he was one of those names that was on that list. And I would probably say there was probably about -- and I'm purely guessing right now -- maybe at 35 names on that list among different companies. Some companies had five or six names and some companies had eight or nine names. And they're all on there for a variety of reasons, and

---

**36**

they just kind of talked about them all.

Q. Do you recall any specifics that you heard about Aguigui at that instance?

A. Nothing that -- I mean obviously he presented himself as someone who got in more trouble than others. I mean that's why -- an honest answer to your question is I do remember his name from that meeting. There is lot of names from that meeting, but I do remember his. And the reason I remember his is because there were more disciplinary actions related to him than there were to many of the others. So when you see more things associated with a person, it just seems to stick out a little bit more.

Q. Do you remember what any of the specifics were that you heard about that day?

A. No. They were all random. They weren't anything that was like -- now I can't give you any specifics of what it was. I mean I -- I'm trying to think about that particular time and I'm trying to pull away from what I know --

Q. I appreciate that.

A. -- based of after the fact and what I remember on that particular day. You know, there were -- I don't remember anything particular. I just remember that there was quite a few and they weren't all of the same type.

---

**37**

They were -- it was broader in nature.

Q. So a jack of all misconducts kind of thing?

A. I guess that's a good way of putting it.

Q. Do you recall whether you were told about some of the open CID investigations that time?

A. Oh, I know I wasn't at that time. I wouldn't have been authorized to look at that stuff anyway at that particular time.

Q. And they didn't talk about it?

A. No. No. Remember, this is a meeting that happens between the senior leadership of the organization -- and you kind of asked me about it -- those majors and those colonels and then there is a senior noncommissioned officer for each one of these organizations, and then you've got the chaplain, any paralegals that might be associated with the organization, behavioral health. Any folks that somewhat have medical, legal command, anything in that kind of realm would have been in the room.

Q. And just so I'm clear, you don't remember who it was among those folks who talked about Aguigui or if it was multiple people?

A. Oh, it would have been the company commander. It wouldn't have been multiple people. I mean I personally don't remember the name of who it was, but it

---

Hadley, Justin D.

February 11, 2016

11 (Pages 38 to 41)

---

38

would have been the company commander of whatever
organization he was in talking to the battalion commander.
   Q.   Now, do you know Capt. Zonie Daniels?
   A.   I do.
   Q.   Was he still at that point, after the troops who
were deployed returned to Fort Stewart, in a command
position over Isaac Aguigui?
   A.   No.  He was the -- I thought.  I might be wrong,
but I could have swore he was the S4 at the time, the
logistical officer for the squadron, but I might be wrong,
or an S3.  He was either an operations -- he was one of
the operations officers or he was the logistic officer.
He was not in command when I showed up to the unit.
         The rear detachment commander is something new
to the Army.  It's not a formal command in the traditional
sense.  It is a command that we -- because of all -- it
really happened because of these deployments that are
going on.  There's folks that are either nondeployable or
for possibly even getting out of the Army or getting ready
to move on to another assignment so you don't want to
bring them forward just to send them back a month later.
And so you start discovering that there is this group of
folks that aren't going forward.  So I think we've learned
some lessons over the years that we need to have someone
in charge of them.

---

39

         So this new concept of a rear detachment
commander came about, you know, over the past decade.  And
so he is one of those folks that the battalion commander
picked.  And the difference between these type of commands
is that, you know, usually a company commander, the
brigade commander and the higher-ups, there is a very
regimented way for those guys to get there, and then your
rear detachment commander is usually the best guy that you
have within the organization, and you put them there
because, once again, it's a huge responsibility.
   Q.   And there is a lot of challenging soldiers in
that group, correct?
   A.   No, there's not supposed to be.
   Q.   I'm sorry.  In the rear detachment group?
   A.   Yeah.  There's not supposed to be, but it sure
seems like it's become that way but that's not what it's
supposed to be about.
   Q.   So --
   A.   Like, I mean, I told you how many times I just
deployed in the recent times, and I will tell you that
some units, it's very challenging.  There is a lot of
folks that have issues, challenges, and then there are
some units that there is no issues whatsoever.  So I mean
it's really a diverse thing.
   Q.   So I want to now talk about I guess it was after

---

40

you assumed command that the next time that you discussed
or thought about Isaac Aguigui and his situation.  Do you
recall when that was?  I'm actually making an assumption.
I'm assuming that it was after that you assumed command
that you next heard about him or discussed him; is that
correct?
   A.   Well, the next time it would have gotten
discussed would have been in that meeting that we would
have had routinely.  So, you know, I'm assuming I took
over -- which I believe was around the 22nd, 23rd of
September, somewhere in that time frame -- that plus or
minus a week or two after that we would have had another
discussion, and that would be the next time that his name
would have popped up.
   Q.   Do you recall the next time after that when you
first learned about the open CID investigations?
   A.   You know, the only -- you're trying to get --
you're trying to get after the time that Agent Foxx
visited me.
   Q.   Is that -- I'm trying to find out.
   A.   See, the problem is that I don't remember if --
I know that -- well, I don't know.  I just don't remember.
I believe that -- you know, Aguigui was talked about
routinely in those meetings as we go forward.  You know,
the time that Agent Foxx came to my office, whenever that

---

41

was, is probably the first time that, you know, there was
any formal discussion about Aguigui from what I think
you're trying to get after.
   Q.   Now, through any sort of informal discussions,
were you aware that he was being investigated?
   A.   No.  Well, I mean, I don't remember.
   Q.   Is it correct that there is a general policy of
reassigning a soldier out of certain security clearance
areas when they're under investigation by CID?
   A.   I'm not aware of that, but I will tell you what
I am aware of is this, is that, you know, one of the
rehabilitative tools, I guess that's probably a way of
characterizing it, is that you want to give every soldier,
you know, as many chances as you can.  I mean, no one
joins the Army to sit there and do bad things.  I mean, at
least I don't think they do.  I think everybody joins with
greater purpose and there is probably a reason for it in
their own personal way.  So I don't think anyone comes in
the Army to be pissed off at the Army.
         I'm sorry about that.
         But, you know, wants to do bad things.  So you
want to give people chances, and you want to give every
benefit of the doubt that you possibly can.  So sometimes
you try different things, you know, is it the environment
that that soldier is in, so we'll move him to another

---

42

platoon or another company, you know, just to see if this
is really about the soldier or is it just the leader, you
know, that could be causing some of this problem. I mean,
who knows what it could be. So that's one way. And I
know that's not exactly what you asked, but that's the way
I look at it when soldiers get moved.

Soldiers that are under investigation, the
command does have certain things that they do. There is
this thing called flag that you can put on a soldier.
Sometimes we bar to reenlist them and there are some other
conditional things that we can do. But it's all -- I
mean, there is no hard, fast rule on any of these things.

You know, if your security clearance is taken
away, you're obviously not allowed to be around those type
of networks, but, you know, we don't have those networks
in a garrison environment, you know, unless you're in a --

Q. Do you recall whether Aguigui was removed out of
the S2 section because he wasn't supposed to keep working
with a security clearance?

A. I wouldn't be surprised if his command, you
know, and his company commander and those did that.
That's probably the right thing. If he had his security
clearance revoked -- and I honestly don't remember whether
he did or not, but if he did, that was probably a -- that
makes a lot of sense. But I know you're trying to ask me

43

if I actually knew, and I really don't.

Q. That's fine. I don't know is a fine answer if
that's the truth. That's all that matters.

Let's talk about when Agent Foxx then came to
your office. What do you remember him telling you about
CID's perspective on Isaac Aguigui?

A. I really don't remember all of the specifics to
be honest with you.

Q. What do you remember?

A. The only thing I remember is when we talked the
other -- you know, we sat there and talked about some
things. That's my first recollection of any of that
stuff. I really don't remember the meeting itself. I
remember he came to my office. I remember
that I had the sergeant major in there with me. And I
remember he wanted to present some, you know, information
on Aguigui that he thought that I should know.

I don't remember whether someone sent them there
or whether -- I mean, I know I didn't ask for him to come.
So I know he came there of -- I don't want to say his own
free will. I don't know whether he came there because he
wanted to come there or whether he came there because
someone asked him to come there.

But either way, he was there. I know I talked
to him. I know that we talked about Aguigui. I

44

personally don't remember what I said. I know what a
transcript probably says and I don't disagree with that
whatsoever, but I don't -- and you'd have to read it for
me to validate that since we can't talk about things that
we can't see. I think that's what you're trying to get
after here.

Q. My question is what you remember. So that
you're telling me you don't remember anything.

A. I honestly don't, really. I don't remember the
conversation. I remember he brought up his concerns that,
hey, there's a lot of things you ought to know about. And
I'm positive that I probably went down the road of he's --
you know, these are some things I didn't know about, he's
already doing a bunch of other problems, and this is a
soldier that we need to continue to -- you know, continue
to go down the path of putting him out of the Army.

Q. So had that path already begun?

A. It had. It was started before I even took over.

Q. And that's referred to chaptering him out of
Army?

A. It is.

Q. Did you agree with the decision to keep on
chaptering him after you took over command?

A. I did. That meeting that I talked about, you
know, those things are on there. You know, what are we

45

doing for this soldier. Some things are good, you know,
where we're trying to get him help, we're trying to find
different ways, and some things are bad which are saying
we are going to put this soldier out. And he was in that
category of this is a soldier that the command
recommended, from the lowest level all the way to, you
know, everybody all the way up to me, that we've done
everything in our power to try to help him get to the
right path on things.

And he just continued to, you know -- well, you
don't know, but he continued to go down the -- you know,
continued to do the wrong things. So I was definitely
supportive of it. I wouldn't -- I'm pretty sure that that
meeting I was in, I probably advocated continuing down
that road.

Q. Now, again, this is something where I don't know
if there is something else on here, but I know that he
received -- and correct me if I'm wrong about what I'm
saying. I know there are a couple of Article 15s. Is
that the same thing as, you know, beginning the process of
chaptering him out of the Army?

A. No. In his case, I know he had a number of
them. I don't remember exactly what they were all for. I
know that he had -- he had -- you know, we don't chapter
people out just because they -- everybody is looked at

**46**

1  differently.  Everybody is looked at on who they are, what
2  they've done.  There is not a cookie-cutter solution for
3  the whole thing.  And, you know, there was a
4  well-documented, you know, case.  And I know that his
5  company commander tried to do things.  I believe he even
6  had a field grade from Col. Reynolds was one of them.  I
7  obviously wasn't there so I didn't read it and I don't
8  remember what it was about.  But there were plenty of
9  opportunities for this young man to get a second, third,
10  fourth, fifth -- fifth chance, and he just chose not to go
11  in that direction.
12      Q.  In your experience, how long, once someone has
13  been determined to be someone who should be chaptered out
14  of the Army, does it take before that person is actually
15  out of the Army?
16      A.  It really depends because there is -- and these
17  folks to the right of me know better than that because I
18  know there is a huge manual with a gazillion types of
19  chapters on them, and each one is different in their own
20  unique way.  And some of them are quick and some of them
21  are extremely lengthy.
22      Q.  Do you know why it was in the case of Pvt.
23  Aguigui that it seemed to take, I guess, months without it
24  being chaptered out?
25      A.  Well, I'm sure that it was based on the chapter

**47**

1  that he was put out on.  Like I said, there is a different
2  process for every single one of them.  It requires
3  different standards for each one of them.
4      But if you're trying to get after do I think
5  someone was dragging their feet on it, I'm not aware of
6  anybody that was purposefully, you know, keeping something
7  in their inbox or not processing something along the way.
8      Q.  Sure.  No.  I'm not trying to get at anything,
9  I'm just trying to understand what happened.
10      A.  Yeah.
11      Q.  I don't know.  That's why I'm asking.
12      So what is the paperwork like that has to be
13  filed, if any, that starts the chapter process, that like
14  designates the chapter that he's going to be removed from
15  the Army on?
16      A.  Well, like I said, it is slightly different for
17  most of them, but, you know, the parts that are similar --
18  like I said, I don't remember what his chapter was
19  exactly.  I'm going to guess it was for patterns of
20  misconduct is what his chapter was being used for because
21  that would fit his -- the things I remember about him
22  would probably be very accurate.  It's not to say that
23  there wouldn't be other things and other charges on that
24  particular thing.  But I would say obviously that there
25  are physicals that have to take place.  There is initial

**48**

1  paperwork that's got to make its way through the lawyer's
2  offices, the SJA's offices.  There are recommendations
3  that have to make their way up the chain of command at
4  different levels, company battalion brigade, sometimes the
5  command general of the insulation.
6      So there is a variety of checks and balances,
7  for lack of a better word, you know, throughout the
8  process to just make sure that we've given him, you know,
9  due process, and also, you know, make sure that we're
10  doing the right thing.  Because sometimes not everybody
11  gets it right, you know.  You have company commanders that
12  have been in the Army for 4 years and you've got battalion
13  commanders that have been in the Army for 16, 20 years,
14  and you've got brigade commanders that have been in the
15  Army for 24 years, and you've got generals that have been in
16  the office -- in the Army for over 30.  And a general
17  might look at something differently from that 4-year
18  company commander and go, you know, there is another way
19  to approach this.
20      And so there is many ways to off-ramp someone
21  from this process.
22      Q.  Sure.
23      A.  So it's not as clean-cut as --
24      Q.  Sure.  Right.  I think my question just so --
25  hopefully I can convey it -- is there a particular form or

**49**

1  something that is just signed to say this is the start of
2  all the process?
3      A.  Oh, I'm sure there is, but to be honest with
4  you, I couldn't tell you what that form is.
5      Q.  So this is not a form that you would have signed
6  at your level and rank?
7      A.  No.
8      Q.  Do you know if that form would be retained in
9  some way?
10      A.  I honestly don't know.  We're a bureaucracy so I
11  could give you a best guess, but I honestly don't know.
12      Q.  Please do.  What's your best guess as to where
13  the form is saying that Isaac Aguigui is being chaptered
14  out of the Army?
15      A.  Oh, where is it?
16      Q.  Where would that be retained?
17      A.  It's probably in a shredder right now, but who
18  knows.
19      Q.  No comment.
20      A.  No.  I mean, I honestly don't know.
21      Q.  Okay.  Is there a particular group of people
22  within a particular --
23      A.  Sorry about that.
24      Q.  -- battalion in charge of the documents?
25      A.  Sorry about that.

Hadley, Justin D.

February 11, 2016

14 (Pages 50 to 53)

---

**50**

In charge of documents?

Q.  Like an administrative group within the battalion.

A.  Sure, there is.

Q.  Are they involved in the chaptering process?

A.  You know, this might seem weird, but chapters are usually started at the company level, and then they go to the legal folks, and there aren't any legal folks at the battalion level.  They start at the brigade or the post.  So I would say that I'd be shocked if there were documents at the battalion level.

Q.  If someone is being chaptered out of the Army, is that something that the battalion commander has to approve?

A.  I would say yes.  I'm sure there is an exception out there, but I would say yes.

Q.  How does approval get noted for purposes of due process?

A.  Well, you obviously -- there is a packet, and it has why we're chaptering this soldier out, and you have to sign off on it.  But, you know, it's got everything in it.  You know, it's got the history of this soldier that's documented of why he is being chaptered for whatever his offense -- his or her offense, you know, would be.

Q.  Is that something that you would then sign off

---

**51**

on with a signature?

A.  You would, and you would have a recommendation on it.

Q.  And does this go to the soldier who is being chaptered out?

A.  Oh, I know it does, yes.  They have access to that.

Q.  They're given counsel through the judge advocate's office?

A.  They do, yes.  It wouldn't have even come to me unless they had already went to a thing -- I think it's called -- I think it's called TDS, trial defense services.

Q.  Now, for Isaac Aguigui, did it ever get to a point where a chapter packet came to you?

A.  I honestly don't remember.  I don't think so.  Because I don't think that -- I'm guessing, but -- I honestly don't remember, but based off of the events that -- you know, Monday morning quarterbacking, I wouldn't think that it made it to -- I don't know.  I honestly can't remember, but I'm sure he's probably got a copy of it.

Q.  You mentioned earlier that you had seen a -- what you referred to as a transcript of your meeting with Agent Foxx?

A.  No, I didn't.  I heard about it.  That's why I

---

**52**

said you have to refresh my memory.

Q.  So, again, I'm not asking you for anything that was said between you and your lawyer, I just want to make sure I understood some of the body language that occurred a few minutes ago.

Now, did you ever meet Kristen Johnson before today?

A.  No.  This is the first time I met her.

Q.  Have you spoken with her before today?  Again, not saying anything about what she told you.  Did you speak?

A.  We did.  We spoke before this.

Q.  When was the first time?

A.  I think Monday.

THE DEPONENT:  Is that fair?

MS. JOHNSON:  I don't know.

Q.  Your best recollection.  You don't have to ask her.

A.  The problem is I'm confusing her and Beth, and so those are the only two folks that I spoke to.  I think it was Monday.

MS. JOHNSON:  Yeah.

A.  One scheduled the meeting and the other one, you know.

Q.  Before that conversation, were you aware that

---

**53**

there was any sort of documentation of your meeting with Agent Foxx?

A.  Well, I think what you're -- I'm going to answer your question.  But I think you're -- the answer is yes, but the only reason it's yes is because after I had been reminded, I remember the meeting.  So I do remember him taking notes on his notepad.  But between him taking notes on his notepad and us having a conversation on Monday, I honestly, totally forgot about the whole meeting.  If it wasn't for it being reminded to me, I probably would have walked in here and said I don't know what you're talking about, and then it would eventually come to me.  Is that what you're looking for?

Q.  I don't normally answer questions from the witness, but I don't often depose an Army colonel, so I will say yes, sir.  Thank you.  It was very helpful.

So you had the meeting with Agent Foxx and he was taking notes on his notepad.  Do you recall about how long that meeting for?

A.  I guarantee it lasted at least 45 minutes to an hour.

Q.  Who else was at this meeting?

A.  I thought I already answered that question.

Q.  I'm just trying to see if there was anyone --

A.  Sgt. Major Powell, Command Sgt. Maj. Powell.

---

Hadley, Justin D.

February 11, 2016

15 (Pages 54 to 57)

---

**54**

1     Q.  Did you talk about what you learned at that
2 meeting with anyone else afterwards?
3     A.  You know, the only person I would have -- and
4 I'm not saying I did.  The only person that I would have
5 would have been the brigade commander, Col. Gallahue.
6     Q.  Did you speak with the staff judge advocate?
7     A.  I don't recall.  I'm not saying I didn't.
8     Q.  Well, why don't we take a look at that, the
9 notes that you were told about, and we'll see whether it
10 jogs your memory.
11     A.  Right.  If I had to guess, I would say I
12 probably did talk to an SJA at some point in time, but
13 once again, I can't remember when that would be.  His name
14 came up more and more, as you know, we got to where we're
15 at today.
16     Q.  I'm showing you what has previously marked at
17 Exhibit 11, page 42 of 46, please.  If you would, please,
18 sir, just take a look at that first full paragraph there
19 are the side of Foxx, Jeremy, and read that to yourself
20 and let me know when you're done.
21     A.  Yes.  That's the paragraph we're talking about.
22     Q.  Before today, you have not read that before?
23     A.  Yeah.  This is the first time I've seen it.
24     Q.  Does that refresh your recollection at all of
25 your conversation with Agent Foxx?

---

**55**

1     A.  No more than the first time I heard about this
2 the other day.
3     Q.  And does that sound like a correct description
4 of what you talked about with him?
5     A.  Oh, I do.  Honestly, I don't remember, but these
6 are things that -- yes, this looks and sounds just like me
7 right here.
8     Q.  Can you recall any other soldiers who presented
9 with as many problems as Aguigui did?
10     A.  Oh, yeah.
11     Q.  And in those cases, what did you do as a sort of
12 disciplinary step for them?
13     A.  No different than what I've done for any
14 soldier.  You have to take all -- you know, treat everyone
15 individually.  You have to look at it from a -- everybody
16 is different.  I mean, there is not a clear-cut -- I think
17 I said this before -- cookie-cutter answer to every one of
18 these challenges that presents itself.  Some of these guys
19 turn around, some of them choose not to.  This just
20 happened to be an example of a kid that, you know, decided
21 not to.
22     Q.  Have you had other soldiers under your command
23 who have been investigated for murdering other soldiers?
24     A.  No, I don't think so.  When you use the word
25 command, that's why I pause for a minute.  You know,

---

**56**

1 obviously no one during this time, but I've commanded two
2 battalions, commanded two companies and some others.  So,
3 no, I think he's the first.
4     Q.  And I want to ask you now just about a few
5 things that -- I know it's hard to try to remember what
6 you remembered back then versus what you know now, but to
7 the extent that you can, that's fine to say that you
8 can't.  Just let me know.
9     So do you recall whether Special Agent Foxx
10 showed you any documents during your meeting?
11     A.  Well, I mean I do remember he had a -- I know he
12 had a notepad.  And I remember we talked.  I don't
13 remember -- like you just handed me something and me
14 looking at it and reading something, I don't remember
15 that.  That not to say that he didn't have a packet in
16 front of him, you know, and he was looking at something,
17 you know, and he glanced over.
18     Q.  So have you ever seen -- not just then, but
19 since -- any of Aguigui's sworn statements that he gave to
20 CID?
21     A.  After he was arrested?
22     Q.  Either before or after.  I'm just trying to make
23 it easier so you don't have to place when you learned it.
24     A.  See, that's -- I would say no.  But I would have
25 if there was a packet in front of me for either a chapter

---

**57**

1 or some sort of other disciplinary action.  You know, he's
2 getting some sort of UCMJ or chapter function, sure, there
3 would have been counseling statements in there and I would
4 have read them.  You know, Aguigui was a unique case out
5 of all, you know, in my life that --
6     Q.  Thank God.
7     A.  -- you know, where he was arrested and then
8 discharged.  If I said that correctly.  Because I might be
9 wrong.  I know there was paperwork that was filed on him
10 after he was arrested.  We went through -- whether it was
11 a chapter or a discharge or whatever, there is obviously a
12 packet that's associated with that, and whatever was in
13 that packet, I obviously read.  Now, if one of those sworn
14 statements was in that packet, then I would have read it,
15 but if you're asking me whether I remember an Agent Foxx
16 sworn statement or something like that, I don't remember
17 anything like that.
18     Q.  And that's a fine answer.  Just if you don't
19 remember, you don't have to explain why you don't
20 remember, you can just say I don't remember.
21     A.  Well, I'm just trying to talk myself around it
22 because when you talk about it, you start to remember
23 some.
24     Q.  I appreciate that.  I appreciate you trying to
25 give me full answers.  It's hard to remember back so many

---

**58**

1    years.
2          Were you, perhaps, told about the fact that
3    Aguigui had signed a sworn statement about his conspiring
4    with two other soldiers to murder a drug dealer?
5          A.  I do remember the drug dealer thing popping back
6    up, and I would have been surprised if I saw some sort of
7    paperwork that was related to that, but I just don't
8    remember.
9          Q.  And do you remember whether you had been told
10   about this drug dealer incident prior to Aguigui being
11   arrested?
12         A.  I definitely don't remember being told before.
13   I mean, obviously, that's what this is about right here.
14   So I have actually thought about that for the last couple
15   of days trying to remember if that was the first time I
16   had heard it.  I believe it was very short -- see, October
17   17th.  I took over around the 22nd, 23rd, 24th, right in
18   that time frame.
19         I should know the exact date, but, like I said,
20   I didn't go back and look for the exact date.  I think
21   it's the 23rd or so.
22         I mean, that's just like three weeks, three or
23   four weeks after.  So I don't remember in between there
24   seeing anything.
25         Q.  And I guess my question, then, is:  So at that

**59**

1    meeting, did he tell you about the drug dealer conspiracy?
2          A.  I think that's what this is about right here,
3    and that's why I said this -- I buy what's written here.
4          Q.  Do you recall whether you were told about some
5    recent gun purchases that Aguigui had made?
6          A.  I don't remember ever hearing about guns until
7    after he was arrested.
8          Q.  Would that have been a significant fact in
9    considering what kind of measures to take with him?
10         A.  I mean, to be honest with you, I'd say no.  That
11   might say sound a little weird, but, remember, you're
12   looking at every individual.  You'd be surprised at how
13   many soldiers out there that have disciplinary -- that
14   we're talking about in this group of folks -- not in this
15   group, but in soldiers that we have challenges with that
16   have weapons.  You know, that's something that you think
17   about, do they have weapons at their house, do they have
18   weapons here, are they properly registered and things like
19   that.  Would I have put it down as another thing to be
20   concerned about?  Sure.  Because, you know, usually it's a
21   whole series of data points you have on an individual like
22   this, and that just would have been one more thing going.
23         Q.  Are you aware, as you sit here today, about the
24   volume of guns that has been reported as Aguigui buying
25   just a couple weeks before the report by Agent Foxx?

**60**

1          A.  See, the problem is that you're asking me
2    questions now about what I know after the fact.  I'm
3    trying to stick to -- I think you're trying to get me to
4    stick to what I knew about at this time.  Today I know --
5    I, you know, was shocked about what was going on because
6    no one knew about what he was truly doing until -- well,
7    maybe some folks did.  But no one that I -- no one that
8    was in the command knew what was going on until after he
9    was arrested with respect to what I think you're trying to
10   ask -- you're asking questions about.
11         Q.  My question is, you know, if you had known that
12   he had bought $35,000 worth of guns, would that have been
13   affecting -- would that have affected your decision as far
14   as, you know, how to deal with Isaac Aguigui?
15         A.  I think he probably would have been -- I don't
16   see why it wouldn't have been.  That's a significant,
17   significant purchase.
18         Q.  And relatedly -- sorry.
19         A.  I mean -- I'm sorry.
20         Q.  No.  No.  Do you have something to add to your
21   answer?
22         A.  I mean, you know, when you're looking at the
23   kid's rank, you'd go, well, how did he even get the money
24   to do that.
25         Q.  That was my next question.  When do you recall

**61**

1    first learning about the death of Isaac Aguigui's wife?
2          A.  And, you know, I didn't know about that for a
3    while.  It was something that happened before I took over,
4    before I was in the organization, and it never got brought
5    up.  So, I -- well, not brought up around me.  So I didn't
6    learn about that for quite some time, but it was -- I did
7    know about it before he got arrested.  I just don't
8    remember between the time he was arrested and this date
9    right over here.  It was somewhere in the middle that I
10   found out about his wife actually passing away.
11         Q.  And do you recall whether you knew that Isaac
12   Aguigui was a person of interest in that death?
13         A.  I definitely did not know about it before this
14   time right here.
15         Q.  Do you think that you knew about it after that
16   meeting but before he was arrested?
17         A.  I don't remember.  I don't remember.  The
18   problem is this is where things start getting muddled.
19   There is a lot of things that came out after he was
20   arrested, and I know that was brought up during that
21   period of time because I was allowed to listen in on as
22   they were building their case and all the different things
23   popping up because of the investigation once he was
24   arrested.  And it was amazing the literal laundry list of
25   things discovered on him and the other folks that no one

Hadley, Justin D.

February 11, 2016

17 (Pages 62 to 65)

## 62

1  knew about.  I mean, we already knew about all these other
2  things, but they were not -- they're not petty, but they
3  are not of the level that were discovered after he was
4  arrested.  I guess that's probably the only way I can
5  characterize it.  So I don't remember that being one of
6  those things before he was arrested, not to say that it
7  wasn't, but I just don't remember it.
8      Q.  So would it be -- is it fair to say that you
9  did not know he had received a half million dollars in
10 death benefits from his wife's death?
11     A.  You know, it's one of those things I should have
12 known based off of not -- not being told, but, once again,
13 I didn't put two and two together that his wife had
14 passed.  It's something that happened well before I took
15 over, and he actually had received -- once again, we're
16 talking about something that I did not know at the time.
17 I have since found out.  He received the money and all
18 that happened before I got there, so it was a nonstory
19 during the period of time that I was involved with him.
20 And it never came up as -- you know, his wife passing away
21 was not a factor in why we were putting him out of the
22 Army, if that makes sense.
23     Q.  But so it is a different issue but related.
24 Would it have been a concern to you if you had known that
25 this troubled soldier was spending thousands of dollars on

## 63

1  other soldiers?
2      A.  I think it would have been -- it definitely
3  would have been something -- I'll give you an example.
4  Traditionally, soldiers that I've seen -- family members
5  that have received SGLI, a lot of times you don't hear
6  about 95 percent of them out there.  Every once in a while
7  you'll hear about that one family member that goes out and
8  buys -- starts getting extravagant.  They'll start buying
9  some cars.  They'll start buying a whole bunch of fancy
10 things and things that they never did back when they were
11 married to that service member.  I've had some of those
12 experiences.  Like I said, I've had a number of commands,
13 so I've seen some of these things that have happened.
14     None of those unique things were -- were present
15 with Aguigui.  He, in my mind, kept his SGLI money to
16 himself, and it was not -- you know, it was not the talk
17 of the unit.  And I'm basing that off previous examples of
18 where -- where it was almost like someone won the lottery,
19 and they're doing something with it.  He did not present
20 that kind of -- I was not aware.  And that's why it was
21 never really -- it was something that never came up.  It
22 was never discussed because it was never an issue, never a
23 topic.
24     Q.  So I guess my question is:  If you had been made
25 aware of it, if someone had said, Isaac Aguigui is

## 64

1  spending $20,000 on other soldiers in his unit to go get
2  lap dances at a local strip club, would that have been a
3  concern for you?
4      A.  Every soldier gets looked at differently and
5  uniquely, and every case is different.  And, you know,
6  it's just pure speculation on the whole thing, and I'd
7  rather just stick with the facts.
8      Q.  I'm asking because, you know, what you knew and
9  what you thought is potentially important in this case,
10 and I'm trying to ask you, if you can, if you can think
11 back to, you know, your evaluative process when you're
12 trying to figure out what you're going do with this
13 soldier.  How would you have evaluated the information
14 that Isaac Aguigui, this troubled soldier, was spending
15 tens of thousands of dollars on his fellow soldiers to
16 engage in various sorts of debauchery?
17     A.  Well, he didn't do that or at least it wasn't
18 made -- I wasn't -- it wasn't a factor in our decisions.
19     Q.  I'm asking you hypothetically if you had learned
20 about that, how would that have affected your decision; if
21 at all?
22     A.  I mean, we focus on the facts that we have in
23 front of us, and, you know, that's just not one of them.
24     Q.  So are you telling me that you can't think back
25 and say how that would have affected you?

## 65

1      A.  I've never had an example like that, so I don't
2  have anything to base it off of.  It wasn't presented to
3  me with respect to him.  And we're trying to overinflate
4  what we had in front of us here.
5      Q.  So let me ask you this, you know, now as you sit
6  here based on everything you know:  Does the fact that
7  Isaac Aguigui was spending so much money on some of his
8  fellow soldiers sound like something that concerns you?
9      A.  Well, to be honest with you, I still to this day
10 don't -- I have never heard that he spent money on his
11 fellow soldiers.
12     Q.  Really?  This is new information?
13     A.  It is.  I do -- I am aware that he spent money
14 on a piece of property out in the northwest and then he
15 was basically building a camp, but that's -- you know,
16 that's about as far as it went.  It was what he was
17 spending money towards that, that thing, but I'm not aware
18 of what you're describing personally.  I'm not saying
19 others within the unit didn't.
20     Q.  No.  Sure.  No, of course.
21     Did you at any point in time get any information
22 from CID investigators or anyone else about some of the
23 recruiting activities that Isaac Aguigui was engaging in,
24 obviously the command did not know about, but you later
25 learned about?

Hadley, Justin D.                                    February 11, 2016

66

1    A.  No.  I would say that we were actually
2  surprised.  I mean, two of the four guys that were
3  arrested weren't -- we -- we -- they didn't even have a
4  parking ticket in our eyes.  I'm not saying that's true;
5  I'm just saying as an example.
6    Q.  Which two were those?
7    A.  Peden was one of them.  That one stands out.
8    Q.  He had been a hero?
9    A.  He was the biggest shock.  I don't want to say
10  shock.  He was the biggest -- you know, if you had to sit
11  there and look at the four of them, you'd go, I didn't see
12  that one coming.  I don't remember who the other guy was,
13  I'd have to -- off the top of my head.
14    Q.  Well, again, assuming --
15    A.  But I know two of the four that weren't on our
16  radar screen.
17    Q.  But assuming that the hypothetical that I gave
18  you was true, that Aguigui was spending thousands of
19  dollars on his fellow soldiers, would that help, in your
20  mind, to explain how soldiers like Anthony Peden might
21  have been corrupted by him?
22    A.  I think it's -- this group of kids, I mean all
23  of them, I mean they're all in it together at the end of
24  the day, but you're asking me what I knew after the fact,
25  not what we knew in the beginning.  I'll tell you in the

67

1  beginning, during this period of time that we're talking
2  about right here, you couldn't put a connection between
3  all these people.  So the whole hypothetical that you're
4  placing just wasn't there.
5    Q.  Right.  So, I'm not going to try again to ask.
6    A.  No.  But it's just a fact, though.
7    Q.  Okay.  So let me ask it a different way then.
8  Maybe this makes more sense.  If you had a connection
9  between Aguigui and a lot of other soldiers and you were
10  aware that he was telling them that he thought it was a
11  good idea to attack the US Government, what would you have
12  done?
13    MS. JOHNSON:  Objection.  He's already
14  testified he can't speculate about hypotheticals and facts
15  he didn't know at the time.
16    Q.  And one thing I guess I may not have covered at
17  the outset is objections in a deposition, because this is
18  just for the record, there is no judge to rule on them,
19  unless she instructs you not to answer, if you're able to
20  answer the question, I would ask that you do so.
21    So in this case, I am asking you for your
22  opinion and to guess a little bit about what would you
23  have done if you found out that a soldier under your
24  command was recruiting other soldiers to join an
25  antigovernment group.

68

1    A.  See, I don't -- first of.
2    MS. JOHNSON:  Same objection.  He's already
3  testified he's not going to speculate on hypotheticals.
4    MR. BROOK:  Please don't instruct the
5  witness not to speculate.  It's not admissible testimony
6  necessarily.  You can make those objections, but it is
7  perfectly permissible for discovery purposes.
8    MS. JOHNSON:  I'm not instructing him.  I'm
9  telling you he's testified three times he's not going to
10  speculate on hypotheticals.
11    MR. BROOK:  And you don't have --
12    MS. JOHNSON:  And you keep asking him.
13    MR. BROOK:  -- to keep repeating that
14  because it sounds like an instruction.
15    Q.  I just want to know.  Most people can think back
16  and say, This is how I would have done it.  If my
17  girlfriend had been really ugly, I would not have dated
18  her, you know, something like that.
19    I'm asking you something here.  Is it hard for
20  you to process, just hypothetically, what you would do if
21  you had found out that a soldier under your command was
22  encouraging other soldiers to join an antigovernment
23  militia?
24    MS. JOHNSON:  Same objection.
25    You can answer if you can.

69

1    A.  I'm just trying to figure out what you're trying
2  to get at.
3    Q.  Don't worry about what I'm trying to get at.
4  Just, please, if you can, just try to answer the question
5  I've asked rather than what you --
6    A.  But it's not a question.  You're asking me to
7  just have a dialogue about something that never happened.
8    Q.  Okay.  Let's talk about this differently.  If
9  today you were told that a soldier under your command is
10  trying to get other soldiers to agree with him to fight
11  against the US Government --
12    A.  Yeah, we have a process.  We actually -- we have
13  things in our Army.  We have investigations that happen.
14  We have, you know, 15-6 is a good example or a commander's
15  inquiry.  If something like that happened, then you would
16  conduct one of these things and you would find out the
17  facts.  There are processes and procedures that exist
18  within our structure.  That's probably what I would do.
19    Q.  Do you believe that a person who is in the Army
20  but is advocating to harm the US Government is someone
21  that should be under your command?
22    A.  Why would we want that type of soldier under our
23  command?
24    Q.  I am asking if you can think of any reason why
25  you would.

Hadley, Justin D.                                February 11, 2016

19 (Pages 70 to 73)

## 70

1   A.  I can't think of any good reason.

2   Q.  So just, again, we detoured a little bit, but I
3   want to go back to 2011.  You said that you do not recall
4   any specific conversations with the SJA, is that right,
5   about Aguigui?

6   A.  At this time period or are you talking about
7   the --

8   Q.  Prior the Roark and York deaths.

9   A.  Me, personally?  No.  I would have expected, you
10  know, that the company commander would have, but me,
11  personally, I don't remember.  I mean, remember, the
12  process that we have within our -- you know, these type of
13  things are usually done at the company level.  They are
14  the ones that have the interactions with these --

15  Q.  Now, is it correct to understand what you told
16  Agent Foxx as reflected in the document in front of you
17  that you wanted to see Aguigui in one of two situations,
18  either out of the Army or in pretrial detention if he was
19  going to be charged by the SJA?

20  A.  I agree with what's written.

21  Q.  So if neither of those two things was going to
22  happen, is that something that you were told about or
23  needed to be told about?

24  A.  What are you -- could you --

25  Q.  Let me rephrase that.  That was a bad question.

## 71

1       As what's written reflects, was it a requirement
2   that they either prefer charges against Aguigui or
3   continuing with the chaptering process?

4   A.  I mean, I apologize for not being able to -- I'm
5   a little bit unclear about what you're really trying to
6   ask.  What's written right here makes sense to me that I
7   would have said this.  That, you know, why would we not
8   continue to chapter him?  If you're not going to put him
9   in pretrial confinement, then we were going to continue to
10  chapter him.  I mean, it's as simple as that.

11  Q.  Did you express any sense of urgency to Special
12  Agent Foxx about making a decision on whether or not to
13  prefer charges against Aguigui?

14  A.  I'm sure that what I said was we're going to
15  proceed with the chapter and so you have whatever amount
16  of time that's going to take.

17  Q.  Are you aware of whether the chapter packet that
18  you initiated was put on hold at some point?

19  A.  I am not.

20  Q.  Again, I just want to ask a question about sort
21  of general authority and how it works.  So if you, as
22  lieutenant colonel, authorize the chaptering out of a
23  soldier, who can override that decision?

24  A.  Well, it goes to my boss, and then it goes to
25  the commanding general, and then sometimes I guess it

## 72

1   might go higher than that.  So I would say it's someone in
2   the chain of command that is above you.

3   Q.  Does the SJA have the authority to override your
4   decision?

5   A.  No.

6   Q.  Can the SJA put a chapter on hold so that they
7   can take more time to consider something?

8   A.  No, other than whatever I'm assuming the due
9   process is that it has to go through.

10       MR. BROOK:  Why don't we take a recess.
11  We've been going at this for a while.

12       (Recess, 4:21 p.m. to 4:27 p.m.)

13  BY MR. BROOK:

14  Q.  Were you, in connection with Pvt. Aguigui still
15  we're still talking about now before the Roark and York
16  murders, were you advised about Isaac Aguigui having a
17  drug problem?

18  A.  I didn't expect that.  I don't remember his name
19  coming up with drugs.

20  Q.  So you were not aware he was in the ASAP program
21  earlier in 2011?

22  A.  Remember, you can be in ASAP for drinking, and I
23  would have expected him to be in that category.

24  Q.  So the question then is:  Did you know he was in
25  ASAP for drinking earlier in the year?

## 73

1   A.  On that sheet that we're talking about, there
2   would have been a block that would have said whether he
3   was or not, so I would have been aware of it, but I don't
4   recall.

5   Q.  And do you recall whether at any point in time
6   you were informed by CID that Isaac Aguigui had signed a
7   sworn statement admitting to extensive use of illegal
8   narcotics?

9   A.  See, I don't recall, but, you know, one thing I
10  would like to say is that, you know, a lot of these
11  soldiers that we're talking about did have a couple of
12  things in common.  They were on the rear detachment which
13  was interesting.  Because one of the things that we didn't
14  realize for quite a while, it seemed like a lot of our
15  folks who were having challenges were on the rear
16  detachment, were left back from that previous deployment.
17  He was one of them.  And there was some drugs involved
18  with a lot of those soldiers.  So to sit there and say
19  that he might have been one of that group that was part of
20  that laundry list of infractions that he had is very
21  possible.  I just honestly don't remember exactly what his
22  charges were.  I just know that they were long and they
23  were very broad.  They weren't like --

24       You know, some soldiers are in a very small
25  category of, you know, they get literally three or four

**74**

DUIs.  It's always the same type of thing of thing.

He was in a category where he had a lot of mischief but -- but obviously it wasn't enough to put him in jail for pretrial confinement.  It was -- just didn't get quite to that level.  He managed to do enough wrong, but not be completely up there completely on the radar screen as the number one felon in the unit, that type of thing.

Q.  Is it fair to say that CID's role is to assist command with its decisions about discipline?

A.  Oh, I wouldn't say they assist the command with their decisions.  I would say they have their own function.  They're the investigators for the military whether it's MP or CID.  And I would -- I would not characterize it the way you did.

Q.  Okay.  So when do you believe that CID is required to inform command about its knowledge of misconduct or possible illegal activity by soldiers under the commander's command?

A.  I don't know what the official regulation is on that because some commands that I've been in, you're well informed, and then others, you know, not so well informed, but I think that's in any organization.

Q.  And do you know what the difference is, is just personalities in one place or another as to why you would

**75**

be well informed in one command and not in another?

A.  I wouldn't say it's personality.  I would say it's more -- you know, most -- everybody wants to be a learning organization and things happen and you change -- you change things.  And I would say that the units that I've been in that have had certain challenges during their time period have instituted processes and things that, you know, bring people together more.  And units that haven't had many of those type of things happen become more decentralized and stovepiped and they kind of get -- they're not as well nested because there has never really been a reason to be.  Like you compartmentalize certain things.  It's a very weird answer to what you had, but that's probably...

Q.  So can you recall any instances where CID has informed you about a soldier on your command having a drug problem?

A.  I would say yes.  Not in the way you characterized it.  I would say they --

Q.  How would you characterize it?

A.  -- they would inform me they're involved in drugs or they're, you know, an associate of someone or dealing in them themselves.  Just I've never had anyone say it the way you just said it.  I've had CID folks come to me and provide information about a soldier.

**76**

Q.  So to say it in a more clinical and exact way than I said it, no judgment about the problem; is that what you're saying?

A.  Correct.

Q.  I just want to make sure I understand the problem with my characterization.

And how would you receive that information?  Was it in an informational report or was it more informal in a conversation or briefing?

A.  I've had them both.  I've received an email from them that said, hey, this is a -- you know, this soldier is within your command and the following thing is happening to them, and then I've had more informal meetings where it got brought up.  It usually gets brought up as part of something, another reason that they need to see you.  But CID is not knocking on your door every day.

Q.  So what you're saying is if they were already coming to see you about someone else, they might mention, hey, this soldier has a problem, or is it they were coming to you about that soldier for another reason and they would add in the fact that there seems to be an association with drugs?

A.  The only thing I can answer properly is that I have had conversations with CID where they have presented me with what they view as facts about an individual doing

**77**

drugs.  I guess that's about the only way I can really put it.

Q.  Just so I'm clear, those were situations, at least in some of the instances, where they were not preferring charges against the soldier for those drugs; is that right?

A.  I guess that's true.

Q.  So do you believe that it's important for a commander to know, if it's possible to know, whether soldiers under his command have a -- have been using illegal drugs?

A.  Of course.

Q.  Can you think of any reason why someone who is aware that soldiers in the US Army are using illegal drugs would not report that to the appropriate chain of command?

A.  I'm not aware of anybody that's ever done that.

Q.  Has not reported or --

A.  That hasn't reported.  Remember, everybody has got a different chain of command.  So CID, I'm not in the CID agents chain of command.

Q.  So, again, my civilian language is probably confusing things.

A.  Yeah.

Q.  Let's say someone in your command, it's a private under your command, if that person is aware of

Hadley, Justin D.                                                    February 11, 2016

21 (Pages 78 to 81)

---

**78**

1    another soldier who is using illegal drugs while on
2    duty --
3        A.  Uh-huh.
4        Q.  -- should that soldier report that?
5        A.  I would hope that he would, but that's proven to
6    not be a fact.
7        Q.  Do you know if it's technically a requirement
8    for them to do so?
9        A.  It is not a requirement.
10       Q.  Do you know if there are any acts of misconduct
11   that a soldier could witness that are required to be
12   reported?
13       A.  Say that one more time.
14       Q.  So you said that as far as drug use goes, there
15   is not a requirement to report another soldier for drug
16   use; is that right?
17       A.  I'm not aware.  I'm not saying that there isn't.
18   I'm not aware that there is a law or a line within the
19   UCMJ Code of Conduct that says a soldier is going to be
20   prosecuted if he doesn't inform someone within the chain
21   of command that someone does drugs.  I think that's what
22   you're asking.
23       Q.  It's not, but I understand now what your answer
24   is.
25          There are regulations and codes of conduct

---

**79**

1    besides the UCMJ; is that right?
2        A.  There's tons of regulations out there.
3        Q.  Right.  So someone won't be prosecuted for not
4    reporting someone else using drugs; that's what you're
5    saying, right, as far as you know?
6        A.  I mean, I don't know.  I'm sure there is an
7    exception out there, but I'm not aware of any.  I'm sure
8    if you had a case file with a whole bunch of other things
9    and then you add on you knew about a whole bunch of drug
10   dealers and you didn't sit there and say something about
11   it in your unit, you know, maybe someone would take that
12   into consideration, but I'm not aware of an individual.
13       Q.  Are there any crimes that you can think of --
14   and I can give you examples if that's helpful -- where a
15   soldier does have a duty to report someone else for, say,
16   threatening or planning to do a criminal act?
17       A.  I'm sure that such a regulation exists, I've
18   just never seen anybody ever prosecuted under something
19   like that or I've never had that experience.  I don't have
20   any basis of that particular example.
21       Q.  Sure.  I'm going to show you just part of a
22   document that is currently Exhibit 9, page 3.
23          If you could, please, take a look at this.  This
24   is an agent's investigative report that has been used with
25   another witness in a prior deposition regarding interviews

---

**80**

1    that were taken by Agent Foxx after the Roark and York
2    murders.  I would like it if you could please read the
3    second paragraph on the page regarding Specialist Rosario
4    and let me know when you're done reading that to yourself.
5        A.  Finished.
6        Q.  Was this information that you previously knew
7    about before reading it?
8        A.  No.  I obviously -- the word security company
9    comes to mind.  Monday morning quarterbacking, I think I
10   remember him forming some, but I thought it was more of
11   a -- what do you call that?  I don't want to call it a
12   gang.  I don't know the right way to characterize it, but
13   that seems familiar, that piece of this.  Definitely had
14   never heard the map of the sewer system in the fourth BCT
15   area, never heard about the $20,000 at Temptations.  There
16   are some names on here that I never saw within this group
17   of folks that you have right over here and never had ever
18   seen that he constantly, the word constantly on here,
19   talked about anarchy or his dislike of the Army.  I
20   can't -- I've never heard that characterization of him.
21       Q.  So I know the last time I tried to ask you to
22   think back hypotheticals that it didn't quite work, and I
23   want to try to think of a way to ask the question so I can
24   understand just how this information works here.  You
25   know, because you've got a lot of specialized training

---

**81**

1    that the average civilian doesn't have, correct, based on
2    your experience as a --
3        A.  Well, a lot of civilians have a lot of
4    specialized training that I don't have.
5        Q.  So it goes both ways.  So you would agree with
6    my statement that you -- the role of being a commander is
7    something that, you know, involves a lot of specialized
8    knowledge?
9        A.  I wouldn't say specialized knowledge, but I
10   think I understand what you're trying to get at.
11       Q.  So based on your experience as a commander, have
12   you ever seen in any other situation a soldier who has
13   engaged in conduct like that which Rosario described as
14   Aguigui engaging in?
15       A.  No.
16       Q.  Do you believe that that's appropriate conduct
17   for a soldier to engage in?
18       A.  No.
19       Q.  Is that information that Rosario should have
20   reported to someone up the chain of command?
21       A.  You used the word should and that's the problem.
22   I mean I would hope that he would.  I don't know whether
23   legally he has to.
24       Q.  Putting aside legally, can you think of any
25   valid reason why a soldier in Rosario's position would not

---

Hadley, Justin D.

February 11, 2016

22 (Pages 82 to 85)

### 82

1  report that information?
2      A.  No.  I couldn't speculate on that.
3      Q.  Is there any sort of policy consideration you
4  can think of why a soldier would want to protect another
5  soldier from facing potential consequences of spouting off
6  anarchist ideology?
7      A.  No.  The military is about a team.  I mean, you
8  know, there is nothing for him to gain to not talk to
9  folks about this.  I mean, you're -- you're going to go
10  fight with one another.  You've got to live with each
11  other.  You know, you spend 24 hours a day sometimes with
12  each other.  Your families spend time together.  It's all
13  about readiness of an organization.  There is really no
14  benefit for him not to want to.  There is no policy that's
15  out there.  There is no edict.  There is no reason why you
16  wouldn't want to share stuff like that if you had
17  something.
18          It doesn't mean that he has to.  It doesn't
19  mean -- because I'm not aware that there is a law that
20  says you have to do that.  I might be wrong, but I'm just
21  not aware of it.
22      Q.  Okay.  If you want to hand that back, I'll go on
23  to the next exhibit just to keep it simple.
24          I'd like to ask you just about a few documents
25  that I'm not quite sure I know what I received.  Hopefully

### 83

1  you can help me figure out what these are and tell me a
2  little bit about it.
3          MR. BROOK:  I'd like to mark this one 26.
4          (Exhibit 26 marked.)
5      Q.  I'm handing you Exhibit 26.  Have you ever seen
6  a document like this before?
7      A.  I have not.
8      Q.  Have you heard of Armystudyguide.com?
9      A.  I have not.  I'll be very honest with you, the
10  only thing on here that is familiar is the words
11  University of Phoenix because I've seen the commercial on
12  TV.
13      Q.  Okay.  That's all the questions on that one.
14          Now I'm going to show you what's been previously
15  marked as Exhibit 18.  Do you recognize this document?
16      A.  I do actually.
17      Q.  What is this document?
18      A.  This was -- this was -- see, this is what --
19  this is good.  This is what we're talking about.  This is
20  the documents they obviously put together after he was --
21  after he was arrested that kind of chronologically laid
22  out, you know, what was discovered on these particular
23  soldiers.  It was -- you know, after he was arrested --
24  and there probably should be one for a variety of
25  individuals.  Yep.  Here we go.

### 84

1          As a collective organization, these are all the
2  things, in retrospect, that were gathered on each one of
3  these folks.  But if I'm correct, this was put together
4  after he was arrested if I remember right.
5      Q.  And have you seen this sort of document for
6  other situations prior --
7      A.  No.  This is the first time I'd ever seen it put
8  in this type of form.
9      Q.  Do you know who was the primary draftsman of
10  this?
11      A.  I know that I had a hand in it, but I was not
12  the originator of it.  I'm going to make the assumption
13  that the company commander was the primary draftsman, but
14  that's just speculation.
15      Q.  Was the intention to make a record of all of the
16  misconduct that you were aware of for each of these
17  soldiers in these packets?
18      A.  No.  I think we were -- there was a request for
19  what do you all know as they were putting together
20  information.  So I think that's probably how I would
21  characterize it.
22      Q.  And who did the request for information about
23  what you all know come from?
24      A.  I mean I know that I had to give it to the
25  brigade commander and the commanding general.  And who put

### 85

1  it together on behalf of them is just speculation.
2      Q.  And if you look at the bottom left, it has a
3  2015 date on it.  So do you know why it was that there is
4  such a recent date on it?
5      A.  This is the first time I've seen it since -- the
6  last time I saw this document was -- whether it was a
7  number of weeks or a number of months after he was
8  arrested, and there was just that period of time that I
9  actually saw it.  And since that period of time, I haven't
10  seen it since.
11      Q.  Well, let me ask you about on the second page,
12  there is something about Pvt. Salmon.  Do you recall
13  having to be involved at all with Pvt. Salmon's misconduct
14  prior to his arrest?
15      A.  I obviously remember his name being on that list
16  of folks that we're talking act.  That's all I remember at
17  this particular time.  I'm sure if I read this, I'll
18  refresh my memory because his name should be in here.
19      Q.  Does the submission of a fraudulent travel
20  voucher statement refresh your recollection?
21      A.  That's what it says right here, so I obviously
22  knew about it at the time.
23      Q.  Do you know whether he was being chaptered out
24  of the military?
25      A.  He was according to this, so it's true.

Hadley, Justin D.                                    February 11, 2016

23 (Pages 86 to 89)

**86**

1    Q.   But that was initiated before you assumed
2  command; is that right?
3    A.   It was.  This is an example of things that would
4  have been on that sheet that we're talking about, just not
5  in this format.
6    Q.   Understood.
7       So let me ask you about Anthony Peden.  You said
8  you were familiar with him prior to him being arrested?
9    A.   I was not.  Well, no.  Yeah.  Yeah.  That is the
10  correct way to characterize it.  I was not.  He is not
11  someone that I talked to, interacted with, or was in that
12  category of soldiers that would show up in meetings about,
13  hey, these are folks that we're having challenges with.
14    Q.   Were you familiar with him by reputation for any
15  other reason?
16    A.   No, not good, bad, or indifferent.
17    Q.   So it's fair to say that you did not receive any
18  report about an altercation between Anthony Peden and his
19  wife involving a shotgun; is that right?
20    A.   No, because it would have been on here.  You
21  should have gave me this in the beginning and my memory
22  would have been --
23    Q.   I've got to know what you actually remember.
24    A.   Yeah.  But that's why we have documents like
25  this so, you know, it's put down for the record.

**87**

1    Q.   Do you know whether the earlier draft of this
2  document would have been retained somewhere?
3    A.   I doubt it.  That's not to say that they
4  weren't -- they not sitting on someone's computer.  This
5  was obviously drafted on computer.  It was emailed to me.
6  But I'm not aware of anybody retaining them or anything
7  like that.
8    Q.   Do you know whether the Army has an email
9  retention policy of some kind?
10    A.   I am unaware of such a thing.  As many times as
11  they're crashed my email and they can't bring it back, I
12  would assume we don't have one.
13    Q.   I'm sorry to hear that.
14       Do you also experience problems with your
15  computer system crashing at -- when you were at Fort
16  Stewart?  Did you?
17    A.   There was one time that I did lose everything on
18  my computer, and I'm trying to remember if it was in this
19  command or my previous one.  There was one time where I
20  did lose everything.  It's only happened once in my Army
21  career, and I do remember that it happened when I was a
22  battalion commander, but I had two battalion commands and
23  I just can't remember which one was it was.
24    Q.   In terms of --
25    A.   Pretty long list, though, isn't it?

**88**

1    Q.   Are you talking about for Michael Roark?
2    A.   That's who we are in here for, right.
3    Q.   Well, let me ask you about that.  Did you ever
4  meet Michael Roark?
5    A.   I did not.
6    Q.   Did you have any involvement with his
7  discipline?
8    A.   I'm sure that I chaptered him out, so I will --
9  because he, you know, was chaptered.  This happened after
10  he was out of the Army, so I obviously was involved in his
11  chapter process, but I don't remember him coming in front
12  of me for -- it would have been on here.
13    Q.   Is it correct to say, then, that you do not
14  recall having an opinion of Michael Roark prior to --
15    A.   That's fair, yes.  I don't -- I did not
16  personally -- I mean all of these names that you have in
17  here, I did not have any, you know, personal knowledge or
18  interaction with any of these soldiers.
19    Q.   Have you ever spoken with Isaac Aguigui?
20    A.   I don't want to say that I haven't because, you
21  know, where he worked, I would -- I obviously walked in
22  there.  So to say that I never spoke with him, I think,
23  would be not true.  I do know that I never had a
24  conversation with him, you know, where I would remember.
25  I'm sure it was more professional like I either came in

**89**

1  there looking for something.  You know, we're talking
2  about a private and a lieutenant colonel, and it's not
3  that you don't talk to privates, it's just -- it's just
4  not -- usually they've got a whole chain of command and
5  you usually go through them.  I wouldn't say that I've
6  never spoken to him, but I don't recall ever having a
7  conversation with Pvt. Aguigui.
8    Q.   So just looking at this sheet and comparing Pvt.
9  Aguigui to Michael Roark, you commented it's a pretty long
10  list for Michael Roark.  Do you believe that Michael Roark
11  was a more problematic soldier than Isaac Aguigui?
12    A.   No.  I thought they were all pretty much the
13  same.
14    Q.   And --
15    A.   It's quite interesting that they all hang out
16  together too, isn't it?
17    Q.   Now, are you of the opinion that Michael Roark
18  was part of Isaac Aguigui's intended group of people?
19    A.   I didn't even know that they were associated
20  until after the event happened.
21    Q.   So what is your basis for believing -- for
22  saying that they all hung out together?
23    A.   That's what interesting afterwards.  It's
24  amazing.  Those are things -- that's was what was -- I
25  don't want to say shocking.  It's just we didn't expect

90

1    it. The connection between them all, it wasn't there, at
2    least, you know, in the command, the command level, nor
3    was it talked about within the organization.
4        Q.  Did you make any effort to try to determine how
5    it was that these individuals found each other and came to
6    be associated with each other in your opinion?
7        A.  What do you mean? Afterwards?
8        Q.  Yeah, after the fact. You said that, you know,
9    you now saw the pieces were putting together and you
10    didn't know that they were associated with each other.
11    Did you try to make an effort, either yourself or asking
12    others underneath your command, to determine how it was
13    that these guys got together?
14        A.  No. I mean that's what CID and everybody else
15    was doing after the facts. All we did was provide them
16    what happened, facts that we knew, not opinions, but
17    things that actually happened.
18        Q.  During the course of the investigation after the
19    Roark and York murders, did you come to learn about a
20    tattoo that was worn by some of the soldiers?
21        A.  Yeah. There was one -- one encounter I had with
22    someone that did describe a symbol that they had. Yeah.
23    I forgot about that.
24        Q.  Do you recall what the symbol was?
25        A.  No. I really don't. I'm going to imagine it

91

1    was some sort of circle or star, something like that. I
2    just remember briefly getting shown a picture. And for
3    some reason right now I remember it being something -- I
4    honestly don't remember what it was. That's what sticks
5    to my mind, it was either something round or some sort of
6    star or something like that.
7        Q.  Okay. So I just want to make sure I understand.
8    You have a pretty low opinion of Isaac Aguigui's job as a
9    soldier, correct?
10        A.  I would say yes, but I -- yeah. I think that's
11    fair.
12        Q.  And so just based upon reviewing the records, I
13    understand you did not directly supervise him, correct?
14        A.  No, I did not.
15        Q.  You have said before that you have an equally
16    low opinion of Michael Roark; is that right?
17        A.  I would say that at my level, the data that is
18    placed in front of me, the conversations that I had with
19    my commanders, that there, at that time period, they
20    probably would have been characterized pretty closely
21    together.
22        Q.  Now, does the fact that Isaac Aguigui has since
23    been convicted of murdering another soldier change you
24    opinion or do you still see them as pretty much the same
25    level?

92

1        A.  No. Oh, it's definitely different, but they
2    hung out together which is -- you know, they put
3    themselves -- you're talking about a group of folks that,
4    you know, Roark -- Roark is not an innocent bystander in
5    this whole thing.
6        Q.  What's your basis for believing that?
7        A.  You just asked my -- you know, based off of
8    afterwards, after what you learned. You know, this was
9    all -- apparently, they -- from my understanding of this
10    is that this group of folks, you know, hung out together,
11    made decisions together, were making plans for the future
12    together. And that they were a -- you know, I don't know
13    if you could use the word tight knit, but they were a
14    group of individuals that were more than casual
15    acquaintances.
16        Q.  And are you aware of the fact that Isaac Aguigui
17    has pleaded guilty to ordering killing Michael Roark?
18        A.  I am not aware of that.
19        Q.  Does that change your opinion of whether these
20    guys were good buddies?
21        A.  My only understanding of facts here were -- and
22    this is just what I've heard, don't know if it's true, is
23    that he was trying to leave the group and they killed him.
24    I don't know what the truth is. I wasn't there nor was I
25    privy to it, but it was just one of those conversations

93

1    that was laid out for me.
2        Q.  Has anyone -- so you were aware of the tattoo,
3    but you were never made aware of who had the tattoo and
4    who didn't have the tattoo?
5        A.  No.
6        Q.  So you never attempted to find out whether
7    Michael Roark did not have the tattoo?
8        A.  No. It was something I found out about well
9    after, you know, he was arrested.
10        Q.  Are you familiar with a video that Isaac Aguigui
11    made of Sgt. Zipp?
12        A.  Transaction with money.
13        Q.  That's a video you're familiar with?
14        A.  I am.
15        Q.  And have you seen that video?
16        A.  I have not.
17        Q.  Are you aware on whose phone the video was
18    recorded?
19        A.  I don't know.
20        Q.  Do you believe that Tiffany York was an innocent
21    bystander based on what you know?
22        A.  I don't know anything about her. It's another
23    one of those names that just showed up in this whole thing
24    I just wasn't aware of.
25        Q.  Are there a lot of 16- and 17-year-old girls

94

1  allowed on base without their parents?
2       A.  I'm not aware of any.  I'm not saying that it
3  doesn't happen, but I'm not aware of any.
4       Q.  Is it permitted under regulations?
5       A.  I don't -- I don't understand the regulation
6  part.  I mean it's whatever the policy is to get on the
7  post is what gets you on the post.  I mean my kid is 15,
8  and he can get on a post.  So, I mean, I don't know if
9  there is a regulation for that.  There is a -- you have to
10  prove -- different for every place.
11       Q.  Now, with respect to the page here involving
12  Michael Roark, did you have any input in its creation?
13       A.  I don't know if I'd say input.  I would say that
14  I'm sure that I wordsmithed this to make sure that what we
15  were going to pass higher was -- I mean, remember, when
16  these were created, we all knew that the, you know,
17  general officers of many stars and people outside the
18  organization were going to see it.  This is not something
19  that happens every day.  So I do know that I have sat
20  there and wordsmith this thing, but I know I didn't add
21  anything on here.  I mean, these were all things that were
22  in the record whether a chapter pact or a UCMJ action or a
23  counseling packet that happened to be on a soldier.  So I
24  think that's the only way I could really answer it.
25       Q.  Given the number of instances that are listed

95

1  here, can you explain why Pvt. Roark was promoted, I think
2  twice, to private first class?
3       A.  I think this goes back to what I said in the
4  beginning.  I mean, every soldier -- we truly do try to
5  figure out -- I mean, no one thinks that every soldier
6  just wants to be a criminal, and sometimes people go down
7  the wrong path and you want to sit there and bring them
8  back.  And look at this, underage drinking.  Okay.
9       And I'm not asking you to answer this.  You
10  know, you were 17 once or you were 18 once.  You know, how
11  many of your buddies that you hung out with in college
12  were probably drinking when they shouldn't have been?
13       And, you know, I'm just trying to sit there and
14  say that should we give this guy another chance.  I would
15  tell you that, you know, in our system, we try, you know,
16  we do.  And everybody gets looked at differently.  You
17  look at their work performance, what the offenses were,
18  you put all that stuff into context, and you just try to
19  make the best judgment.  But at the same time, you're not
20  trying to crucify everybody that's out there.  You're
21  trying to sit there and make sure you make a good judgment
22  on -- because, you know, this is someone's life.  This is
23  someone's future.
24       And you want to make sure that before you put
25  somebody out of the Army, like we did for this soldier

96

1  right here, that he is hurting the readiness of the unit.
2  He is not helping the benefit of the organization and
3  we've done everything in our power to rehabilitate him or
4  at least get him to meet the standards and obligations.  I
5  mean, they sign -- I mean, everybody knows what the
6  standard is.  And I think this is a good example of how
7  many chances an individual was given before he was --
8  before he was put out.
9       Q.  Do you recall whether Michael Roark agreed to
10  leave the Army or asked to leave the Army?
11       A.  I don't know of anybody that's ever asked to
12  leave the Army, so I can't answer that question, but there
13  are different chapters, and so some chapters are more
14  where you can leave more voluntarily.  You know, you're
15  given a choice, would you like this one -- in his defense,
16  lawyer or whoever that was -- because everybody has one
17  before this happens -- will sit there and say, hey, you
18  can do this one right here or you can do this one.  This
19  one right here allows you to leave the Army under
20  honorable of some sort of whatever that status happens to
21  be, and this one right over here, you're going -- it's
22  going to take a lot longer to do.  You might get off
23  scot-free, but you may go to jail.  I mean there is a
24  whole bunch of things that could happen right over here.
25  I'm sure that in that context he was given a choice, but

97

1  the way you phrased the question, I've never heard of a
2  soldier go down that road.
3       Q.  Is it fair to say that there are people who join
4  the Army who are not well suited to the Army and its way
5  of life?
6       A.  See, that's changed over time.  I would say as a
7  younger soldier, I would think I would probably say I
8  would agree with you, but I will tell you as the years go
9  on, I don't.
10       Q.  So what -- how would you explain it as to why
11  some people, then, don't make it in the Army if it's not
12  that they're --
13       A.  I think some people don't realize what they were
14  getting themselves into.  And then sometimes you hang out
15  with the wrong crowd.  Makes no different -- you know, but
16  I don't think that people deliberately go a certain way.
17  I think people join -- and that's why it's hard to answer
18  your first question.  That's why my opinion has changed
19  over time.  You know, I don't think people join the
20  military just to want to get out of the military.  I think
21  people join for good reasons.
22       Q.  Now, you said that sometimes you hang out with
23  the wrong crowd.  So in your experience, is it the case
24  that there some bad soldiers that they can influence
25  others to also have problems in the military?

Hadley, Justin D.                                    February 11, 2016

26 (Pages 98 to 101)

98

1    A.  I think that's fair.
2    Q.  Is that something that concerns you as a
3  commander?
4    A.  See, when you use the word concern, it's a
5  little bit different.  I think that it's something that we
6  have to -- as a leader, you want to make sure that the
7  environment -- you know, it's like reception.  When a new
8  soldier shows up, you want to make sure that, you know,
9  first impressions are right.  You want to make sure he's
10  got -- you know, the right soldiers are there.  That's why
11  we do sponsorship, and we have battle buddies, and we
12  have -- you know, we make sure that we put them in right
13  element when they show up based off of everybody's
14  initial -- give them the best chance within the
15  organization.  And I don't know what else to really say.
16    Q.  When a soldier is having problems in the
17  military and is having disciplinary issues, like, for
18  example, Michael Roark; you say he was given a lot of
19  chances, right?
20    A.  That's what it looks like.
21    Q.  And do you ever in that process, in your
22  experience, attempt to try to find out whether the
23  soldier, not necessarily Michael Roark here, but the
24  soldier in that situation is hanging out with other people
25  having problems or is under the influence of another

99

1  shoulder who might be a worse actor in the situation?
2    A.  Not the way -- not the way you describe it.
3    Q.  How would you describe it?
4    A.  I know, but it's -- you know, you used drugs
5  earlier as an example.  There, you know, if someone is
6  doing drugs, known, it's a fact, you know, because we've
7  got many procedures within the Army that can determine
8  that and so on and so forth, so it becomes a fact, you
9  obviously start looking at who does this individual hang
10  out with because there is a high probability that there
11  might a larger problem.  But that's probably as far as I
12  would go with your question.
13    MR. BROOK:  Go to Exhibit 27.
14    (Exhibit 27 marked.)
15    Q.  I'll show you what's been previously marked as
16  Exhibit 27, Bates number JHHR002163 through 68.  Do you
17  recognize this document?
18    A.  I do.
19    Q.  What is it?
20    A.  Well, it's saying that we are preferring charges
21  for conspiracy to commit murder.
22    Q.  So just if you can help me see that, where does
23  it say that you are preferring charges?
24    A.  Well, it says offense, it says that, number one,
25  basis, UCMJ Article 81 down here at the bottom.

100

1    Q.  So it says action taken, no.  What does that
2  mean?
3    A.  Well, what I take this is that we are -- me, I
4  did not -- I am not preferring these charges because he
5  is, you know -- he is a civilian.  The Army went in two
6  different directions whether we're going to prosecute him
7  under the military or we're going to have the civilians.
8  My understanding on this is that it was done in the
9  civilian court at this particular time we did this
10  thing.  That's the only thing that I can think of.
11  Obviously this was something that I needed to sign to move
12  the process along at the particular time.
13    Q.  Okay.
14    A.  I mean --
15    Q.  And this is not something that you were
16  presented with prior to him being arrested, right?
17    A.  No.  This is while he was in jail.
18    Q.  Prior to the arrest of Isaac Aguigui and after
19  your meeting with Agent Foxx, did you issue or become
20  aware of any orders with respect to Aguigui in terms of
21  trying to keep him confined in some way such as confining
22  him to base?
23    A.  No.
24    Q.  Is there a record kept of when that happens if
25  it does happen?

101

1    A.  I'm unaware of any formal way that that would be
2  done.
3    Q.  So how -- if someone, say, is ordered someone to
4  be confined to a particular section on base, how does that
5  order get disseminated?
6    A.  In a company or field grade Article 15, you
7  know, it would be part of the remarks or -- what do you
8  call that?  The judgment that was made.
9    Q.  Did you consider whether to impose any sort of
10  confinement on Aguigui prior -- during the period before
11  any decision was made on whether to put him in pretrial
12  confinement?
13    A.  He never was in pretrial confinement.
14    Q.  Well, wasn't he in --
15    A.  Oh, you're talking about after he was arrested.
16    Q.  Yeah.  Usually you're confined after arrest.
17    A.  Right.  Right.  I see what you're getting at.
18    Q.  In the earlier meeting with Agent Foxx, you had
19  said that you wanted him to be in pretrial confinement if
20  the SJA was going to file charges and keep him in the
21  Army, correct?
22    A.  No.  Your mischaracterizing what you're trying
23  to refer back to.  I mean, it wasn't my decision to arrest
24  him on that morning that he was arrested.  I don't
25  remember the exact day.  I mean, that order came down from

102

well above me for obviously whatever reasons that others knew about that I didn't at the time from their investigation from the murder and everything like that. That other conversation happened well before that. You know, that's in relation to, you know, the conversation that I had with Special Agent Foxx about, you know, for -- if you want to sit there and, you know, you have two choices, you either put him in pretrial confinement or he continues with his chapter. I mean, it's -- there is no real reason to do anything else. Why would we? But there wasn't enough. I mean, he wasn't a -- he wasn't an extremely high risk soldier, so no one was going to put him in pretrial confinement. He didn't meet any of the benchmarks that anybody would put him in.

Q.   What are the benchmarks that you are referring to?

A.   Like I said, it's different across the board. I mean, I just -- if he was -- if the command had seen him as needing to be in pretrial -- I mean if there was enough facts in front of everybody, I'm convinced he would have been in pretrial confinement, but there weren't. He had a long list of challenges, but they didn't rise to putting him in jail.

Q.   And just to make sure I'm understanding it right, so when you met with Foxx, you were primarily

103

talking about this conspiracy to commit murder and his possible drug -- coming from a drug dealer, correct?

A.   That was what the conversation was about.

Q.   So for that, unless and until there was a decision to prefer charges, you were okay with Isaac Aguigui remaining --

A.   Well, there weren't any facts. You know, he's building a case, but there are not like -- this is what he's working on. This is -- you know, that's the way I understood it. This is not like I'm going to be -- I'm like prefer the charge. If we have someone, let's just prefer the thing now and let's add it to this. If we're going to give him a court marshal, let's give him a court martial. If we're going to sit there and put him out, we're going to put him out. If we're going to put him in jail, let's put him in jail. If there is nothing here, then there is already all this other stuff and we're going to continue to go down this road.

Q.   How do you decide whether there are facts or not, as you put it? You know, what is the threshold?

A.   If an investigator that sits in front of me isn't willing to sit there and just let's go ahead and draw up a charge sheet, then you must not have facts. That doesn't mean in his opinion there is not some facts there. But to me it's very clear, if you have facts that

104

you have enough to go to trial with someone, then let's just put them in writing. And obviously we didn't have that at the time.

Q.   Do you recall at all what specific evidence he told you that they had or didn't have at the time?

A.   No. I just know that we walked about from that meeting with there is nothing, you're not going to put in pretrial confinement, so we're just going to continue with the chapter. And he was going to continue to pursue this avenue that he was bringing to our attention.

MR. BROOK:  Let's go off the record for a second.

(Discussion off the record.)

Q.   I'm going to show you what's been previously marked as Exhibit 7. This is a sworn statement signed by Isaac Aguigui on May 26, 2011. Do you recall having seen this document before, sir?

A.   I've never seen the document before.

Q.   Do you have an opinion about whether if a shoulder admits to something under penalty of perjury, that makes it a fact?

A.   I don't understand why it's even relevant. I've never seen this document before.

Q.   I'm just asking if a soldier under your command admits that he did something wrong, do you believe that



105

that makes it a fact that he did something wrong?

A.   No, I don't think that's a fact.

Q.   Why not?

A.   I don't know what to say. You asked me an opinion. I just sat there and gave you an answer.

Q.   And I'm asking you why. Why, if someone admits that they did something, does not make the thing that they admit to true in your opinion?

A.   It's just speculation, I mean.

Q.   Is it common for soldiers to lie to you as your commander?

A.   I don't think so. I'm not aware of any soldiers that deliberately lie to their commanders, whoever they happen to be.

Q.   So, again, have you ever had a soldier confess to you that he did something wrong?

A.   I can't recall any -- anytime that it would be something that would be punishable under UCMJ type offense. I'm sure there has been some, you know, administrative kind of thing or whatever.

Q.   And for those administrative matters, do you question whether the soldier is telling you the truth or not?

A.   No. I just sort of assume that they're telling me the truth unless they prove me wrong.

Hadley, Justin D.

February 11, 2016

---

### 106

1  Q.  Can you think of any reason why a soldier would
2  admit to doing something wrong if they didn't do that
3  thing wrong?
4      MS. JOHNSON:  Objection.  Speculation.
5      A.  I just answered.  I don't understand your
6  question.
7      Q.  Have you ever seen a solider admit to doing
8  something that you knew he did not do?
9      A.  Oh.  No, I don't recall that any time.
10     Q.  So as a general matter, can you think of any
11 reason why a soldier under your command admitting to
12 something would not be as good as having seen it happen
13 for yourself?
14     MS. JOHNSON:  Objection to form.
15         If you understand, you can answer.
16     A.  I'm trying -- I don't even understand the
17 questions that you're asking me.
18     Q.  If you see something firsthand, you believe
19 that's true, correct?
20     A.  I would say so.
21     Q.  Okay.  Is there anything reason why a soldier
22 admitting that he did something wrong wouldn't be just as
23 useful for your decision-making purposes as you having
24 seen it yourself?
25     MS. JOHNSON:  Object as to form.

---

### 107

1      A.  You know, when you have to make a decision on a
2  soldier, you're not taking into account hypotheticals and
3  stuff.  You're looking at the soldier's conduct.  You're
4  looking at actions that have happened.  You're taking in
5  the chain of command's recommendations and things like
6  that.  I don't see what you're getting at comes into --
7      Q.  So is it fair to say that when you're missing
8  information from your analysis that there is -- your view
9  is there no way to know how it would have been different
10 if that information had not been missing?
11     MS. JOHNSON:  Objection, mischaracterizes
12 his testimony.
13     A.  I'm sorry.  I just don't understand what you're
14 asking.
15     Q.  Why don't we do this, since you haven't seen
16 this before, why don't you read this document carefully,
17 and then I'll ask you some questions about it.
18         Have you had time to read it all?
19     A.  I have.
20     Q.  Having done so, have you had your memory
21 refreshed as to whether you've seen this before or not?
22     A.  No, still never seen it.
23     Q.  Were you aware of the facts that are in this
24 statement before today?
25     A.  No.  Obviously I know the name Lloyd, and so I

---

### 108

1  might have known about, you know, at the time, but -- the
2  answer to your question is no.
3      Q.  Do you see any problems -- and I may not be
4  phrasing this very correctly -- but the conduct that's
5  described in here, is that --
6      A.  You're asking me to comment about something that
7  happened even before I was in the unit.
8      Q.  I'm asking you to comment on it.  I'm not a
9  military commander, you are.  I'm asking you is the
10 conduct that is described in this statement conduct that
11 is becoming of a soldier under your command?
12     A.  Of course not.
13     Q.  Is it conduct that, as a commander, you would
14 want to be aware of if a solider under your command was
15 admitting to this?
16     A.  I think so, but, you know, is -- yeah.  I'll
17 just leave it that way.  I think so.
18     Q.  Can you think of any world in which you would
19 want to have someone who does something like this under
20 your command?
21     A.  No.  I don't think we would want that type of
22 soldier around our other soldiers.
23     Q.  Thank God you said that.
24         Have you ever heard of another soldier besides
25 Isaac Aguigui admitting to anything like this in a sworn

---

### 109

1  statement?
2      A.  No.  I've never seen a statement like this, you
3  know, from any other soldier.
4      Q.  As a commander, do you think it's significant
5  that the statement is sworn under oath?
6      A.  The problem with this statement is that, you
7  know, you're asking me to characterize something about the
8  solider that committed, you know, a heinous act.  And, you
9  know, you just don't know what's true on here.  I mean,
10 he's making references to all types of different people in
11 here.  Some might be true; some might not be true.  I
12 don't even know what his -- I dont' even know what his
13 motive was in all that.  So of course we wouldn't want a
14 soldier like this in our organization, but you're asking
15 me about -- you're asking me to speculate on something
16 that, a, I wasn't privy to, and, b, you know...
17     Q.  So as you sit here today, you can't say what you
18 would have done if you had been made privy to this while
19 Isaac Aguigui was still --
20     A.  We have a process.  I don't think it's -- you
21 know, there is a process you go through for soldiers.  I'm
22 sure this would have been placed in the record.  There
23 would have been an investigation that was done, and due
24 process would have happened.  Sure, it would have got
25 added to, you know, the things that we've got right over

---

Hadley, Justin D.

February 11, 2016

29 (Pages 110 to 113)

---

110

1  here at that particular time and place, and maybe it would
2  have expedited it, it's possible.  And I think that's what
3  you're trying to hint at.  I doubt it.  I think that based
4  off of the way -- you know, everything that I recall from
5  back in that time, I don't think that -- you know, I don't
6  think simply having this right here would have changed
7  things.  There is a lot of things that happened
8  afterwards, but no one knew about those things at the
9  time.
10      Q.  So, I mean, I asked you before how different
11  facts would have affected your opinion and you told me you
12  couldn't speculate, and now you're telling me you don't
13  think this would have changed things?
14      A.  I don't think so.
15      Q.  Isn't that speculation?
16      A.  It is.
17      Q.  Okay.
18      A.  But you presented a document in front of me, and
19  you said based off of this right here and what you have me
20  looking at right over here, I would have seen it as
21  another one of these lines right here.  And based on what
22  was written right here, I mean, you know, Pvt. Aguigui was
23  already looked at in a particular frame of light.  I don't
24  think it would have changed things that much.
25      Q.  Of any of the facts that you have learned about

---

111

1  Aguigui since he was arrested, would any of those facts
2  changed anything if you had known them?
3      A.  Definitely.
4      Q.  Which ones?
5      A.  Obviously if anybody actually knew he killed his
6  wife, I think that's a huge one.  That's a start point.
7  Things would have went much differently.
8      Q.  If a shoulder received a confession from Isaac
9  Aguigui, an active duty soldier was told by Isaac Aguigui,
10  I killed my wife, is that something the soldier had a duty
11  to report to anyone?
12      A.  I honestly don't know the answer to that
13  question.
14      Q.  That's fine.
15      Can you think of any reason why the soldier
16  would have to not report that information?
17      A.  Like I said, as I said before, I can't think of
18  any reason why someone wouldn't want to report that.
19      Q.  If that had been reported that Aguigui had
20  confessed to another soldier, would that have affected
21  your determination?
22      MS. JOHNSON:  Objection, calls for
23  speculation.
24      A.  Your -- I mean, I'm not sure how to really
25  answer that question.

---

112

1      Q.  Okay.  If you need more time to think about
2  it --
3      A.  No.  I just -- I mean, I don't know what you're
4  really looking for.
5      Q.  I'm asking you.  I'm not asking you to think
6  about what I'm looking for.  I'm asking you to give me the
7  answer that's true.
8      A.  Yeah.  The truthful answer is that -- I mean,
9  everybody can look -- play Monday morning quarterbacking
10  things.  There is a whole bunch of information that CID
11  and a lot of professional investigators uncovered after
12  the fact that, you know, of course if you knew that stuff
13  beforehand, things would probably be different.  But based
14  off of everything that the folks around me knew, and to
15  include CID members, you know, there just -- there wasn't
16  enough there to change the outcome that was already going
17  on right here.  I mean he was on the radar screen as an
18  individual that was -- that was having some significant
19  challenges, same as all these other folks -- well, not all
20  of them, but a number of these other folks that we've
21  talked about today.  And I'm sure there are specific
22  examples if people had known those items ahead of time,
23  I'm sure that would probably make a difference, but that's
24  just speculation.
25      Q.  All right.  Were you at all involved in

---

113

1  assessing whether there should be any disciplinary action
2  against Sgt. Zipp?
3      A.  I remember the event.  I'm just trying to
4  remember whether Sgt. Zipp was handled at the company
5  level or the brigade level.  He was either handled at one
6  level above me or one level below me.  I don't remember
7  personally adjudicating his -- his thing.  I'm sure that's
8  in the records someplace of who adjudicated, I just don't
9  remember.
10      MR. BROOK:  Let's go off the record just
11  for a second.
12      Q.  Just a couple more questions.  With respect to
13  the video that was made of Sgt. Zipp and Pvt. Aguigui, was
14  that something that was received by command prior to the
15  Roark and York deaths, to your knowledge?
16      A.  I honestly don't remember, but I want to say
17  yes, but I really don't remember.
18      Q.  Do you have any recollection of what happened
19  upon receiving the videos?
20      A.  I never personally saw the video, but I remember
21  the video was about a perceived transaction, a money
22  exchange that happened between an NCO and a solider.  And
23  if my recollection is correct, might not be, Aguigui
24  worked for Zipp in the supply room or a supply room like
25  area, and it was somewhere around the context of him

---

Hadley, Justin D.                               February 11, 2016

30 (Pages 114 to 117)

---

114

1  bribing his superior to not have to, you know, do work or
2  it was along that kind of lines.
3      Q.  Now, you were being updated regularly on the
4  fact that Isaac Aguigui was continuing to commit sort of
5  misconduct like not showing up for duty after the point
6  where you met with Agent Foxx; is that correct?
7      A.  I would say that's fair.  But I would say that's
8  no different than any other.  You know, I'm not receiving
9  special briefings on Pvt. Aguigui.  As an organization,
10 I'm being informed of these individuals that each of the
11 company commanders are concerned about and what is their
12 mitigation measures and what is their way ahead for each
13 one of these individuals on a larger scale.  And I would
14 say that's pretty much the case in every one of these
15 individuals, with respect to every one of these
16 individuals that we're talking about including the
17 conversation you just asked me about with Zipp.
18     Q.  Is it acceptable for an NCO to accept money from
19 a subordinate in order to not report misconduct?
20     A.  I think you know the answer to that question.
21 The answer is no.
22     Q.  Is there a specific regulation or anything on
23 that you can think of?
24     A.  I'm sure there is a line in UCMJ somewhere if
25 you open it up, but I can't name it, that says thou shalt

---

115

1  never, you know, do X, Y, Z.
2      Q.  So normally an NCO has a fair bit of discretion
3  in deciding whether to discipline a soldier for something
4  like not showing up for duty, correct?
5      A.  Right.  I'd be careful with the words a fair bit
6  of, but, yes, I would say that there are appropriate, you
7  know, methods or -- methods sounds terrible.  You know,
8  yeah, I mean, an NCO, if something happens, there are some
9  things he can do.
10     Q.  So you wouldn't agree with a fair bit of
11 discretion?
12     A.  I just don't think they're like really broad.
13     Q.  Where does that discretion end?  For example,
14 does an NCO have discretion to ignore a pattern of
15 misconduct?
16     A.  I don't think anybody ignores anything.  I
17 think --
18     Q.  Bad choice of words.
19     A.  No.  I understand why you're saying it.  But I
20 just wouldn't say that.  I don't think anybody ignores
21 anything.  I think people always think -- maybe I'm just a
22 little too optimistic -- that, you know, people deserve
23 another chance or that you want to give people the benefit
24 of the doubt on certain things.  And so not everything is
25 always written down because there are ways to counsel

---

116

1  people.  You know, verbal counseling counts for something.
2  And you want to -- you know, -- but every offense is
3  different.  Every individual is looked at differently.
4  You know, you look at their performance, you look at
5  everything, spouting judgment.
6      Q.  But there is no hard and fast rule about when an
7  NCO has an insubordinate who just repeatedly doesn't show
8  up for duty, what that NCO should do about it?
9      A.  I think that's fair.
10     Q.  Can you think of any reason why an NCO would not
11 report up the chain of command a private who doesn't show
12 up for duty multiple times a week?
13         MS. JOHNSON:  Objection, speculation.
14     A.  I have no idea why he would do that.
15     Q.  Is it a fair characterization, you can say yes
16 or no, that an NCO has the discretion to deal with a
17 problem solider at his level without sending it up the
18 chain of command if that NCO reasonably believes that he
19 can solve the problem at his level?
20     A.  I wouldn't completely agree with that.  I would
21 say that, you know, there are things that are handled at
22 that level, but that doesn't mean that you don't inform
23 your boss above you.  He's got an NCO that's right above
24 him.  Sgt. Zipp is an E-5; his NCO is an E-6.
25     Q.  Given the case of Sgt. Zipp and Pvt. Aguigui,

---

117

1  given Pvt. Aguigui's prior disciplinary history, what
2  impact does that have on his need for his NCO to report
3  further misconduct?  Does it make it more or less
4  important?
5      A.  I wouldn't say it makes it any more.  You treat
6  everybody the same no matter what their category is.  No,
7  I wouldn't think that there are -- because I think
8  what you're trying to get at is I've got a Pvt. Aguigui
9  here and I've got a Pvt. Jones over here, and I'm going to
10 treat Jones differently because I don't have this right
11 over here.  No, I don't think that's true.
12     Q.  Well, if Pvt. Aguigui has already received an
13 Article 15 company grade for not showing up for formation,
14 doesn't that make a subsequent failure on his part to show
15 up for formation more significant than someone who has
16 never before received an Article 15 for such conduct?
17     A.  I think that's fair.
18     Q.  So for someone who has already received two
19 Article 15s, as Aguigui has, the additional misconduct is
20 something that needs to be reported because of that prior
21 history, correct?
22     A.  No.  I wouldn't say that it needs to be
23 reported.
24     Q.  Okay.
25     A.  It's the judgment of his supervisor.  If that's

---

### 118

1  a -- like I said, every circumstance is different.  I
2  don't know why he didn't show up.
3      Q.  But is it fair to say that that's assuming that
4  the supervisor isn't being corrupted by money?
5      A.  No.  I don't think -- I think it's irrelevant.
6  I think you can have the greatest supervisor in the world,
7  and I think that's -- you have to look at that particular
8  event on its own merits.
9      Q.  I'm not sure my question was clear.  So do you
10  think that a solider has the same sort of discretion over
11  whether to report misconduct if that solider is being
12  corrupted by money from a soldier who he is not
13  potentially going to report?
14      MS. JOHNSON:  Objection as to form.
15      You can answer if you understand.
16      A.  I've never had that experience.  I mean, I don't
17  have anything to base an answer to that question.
18      Q.  But it is correct to say that a soldier should
19  not make command decisions, including disciplinary
20  decisions, based upon being paid by anyone other than the
21  government paying his paycheck?
22      A.  If you -- I don't really understand what you're
23  trying to get after.  I mean, I can say that there is
24  nothing right about a bribe happening between an NCO and a
25  soldier.  There is nothing right about that whatsoever,

### 119

1  and it was dealt with there, you know, through the
2  process that we have.  Like I said, I don't remember how
3  it was dealt with.  It was dealt with either above me or
4  below me, but I know that the action was adjudicated, and
5  there was a decision that came out of it.
6      MR. BROOK:  Nothing further.
7      MS. JOHNSON:  No questions.
8      (Deposition concluded, 5:42 p.m.)
9      (Signature reserved.)

### 120

ACKNOWLEDGMENT OF DEPONENT

I, _____, do hereby
acknowledge that I have read and examined the
foregoing testimony, and the same is a true, correct
and complete transcription of the testimony given by
me, and any corrections appear on the attached Errata
Sheet signed by me.


_____  _____
(DATE)        (SIGNATURE)

### 121

C E R T I F I C A T I O N
STATE OF NORTH CAROLINA
COUNTY OF FORSYTH

I, Lori McCoin Jones, RPR, do hereby certify that the
foregoing testimony was duly sworn to; that I reported in
machine shorthand the foregoing pages of the above-styled
cause, and that they were prepared by computer-assisted
transcription under my personal supervision and constitute
a true and accurate record of the proceedings;
I further certify that the witness requests to review the
transcript;
I further certify that I am not an attorney or counsel of
any parties, nor a relative or employee of any attorney or
counsel connected with the action, nor financially
interested in the action;
    WITNESS my hand in the County of Forsyth, North
Carolina.


_____
Lori McCoin Jones, RPR, Freelance
Court Reporter and Notary Public
No.: 201412800042
In and for Forsyth County,
North Carolina and the State at large.
My Notarial commission expires:  5/6/2019

Hadley, Justin D.                                    February 11, 2016

1

**A**

ability 32:7
able 34:23
  67:19 71:4
above-styled
  121:7
Absolutely
  27:6
accept 114:18
acceptable 6:5
  114:18
access 51:6
account 107:2
accurate 47:22
  121:10
acknowledge
  120:4
ACKNOWLE...
  120:1
acquaintanc...
  92:15
act 79:16
  85:16 109:8
action 1:8 57:1
  94:22 100:1
  113:1 119:4
  121:15,16
actions 36:10
  107:4
active 111:9
activities
  65:23
activity 74:18
actor 99:1
acts 78:10
actual 28:12
add 32:13
  60:20 76:21
  79:9 94:20
  103:12
added 109:25
addition 27:23
additional

117:19
adjudicated
  113:8 119:4
adjudicating
  113:7
administrative
  33:9 50:2
  105:20,21
admissible
  68:5
admit 105:8
  106:2,7
admits 104:20
  104:25 105:6
admitting 73:7
  106:11,22
  108:15,25
advanced
  14:18 16:15
advised 72:16
advocate 54:6
advocate's
  51:9
advocated
  45:14
advocating
  69:20
affiliated 33:4
affiliation 33:3
Afghanistan
  21:1 32:17
afternoon 4:8
Agent 40:18
  40:25 43:4
  51:24 53:2
  53:17 54:25
  56:9 57:15
  59:25 70:16
  71:12 80:1
  100:19
  101:18 102:6
  114:6
agent's 79:24
agents 77:20

ago 11:11 52:5
agree 44:22
  69:10 70:20
  81:5 97:8
  115:10
  116:20
agreed 96:9
agreement
  3:12
Aguigui 34:6
  34:17,20
  36:3 37:21
  38:7 40:2,23
  41:2 42:17
  43:6,17,25
  46:23 49:13
  51:13 55:9
  57:4 58:3,10
  59:5,24
  60:14 61:12
  63:15,25
  64:14 65:7
  65:23 66:18
  67:9 70:5,17
  71:2,13
  72:14,16
  73:6 81:14
  88:19 89:7,9
  89:11 91:22
  92:16 93:10
  100:18,20
  101:10 103:6
  104:16
  108:25
  109:19
  110:22 111:1
  111:9,9,19
  113:13,23
  114:4,9
  116:25 117:8
  117:12,19
Aguigui's
  56:19 61:1
  89:18 91:8

117:1
ahead 7:14
  31:23 35:14
  60:19 103:22
  112:22
  114:12
Airfield 28:1
al-Din 23:24
Alaska 14:11
  14:11 15:1,2
  15:4,6
allowed 18:5
  33:13 42:14
  61:21 94:1
allows 96:19
altercation
  86:18
amazing 61:24
  89:24
AMERICA 1:9
amount 16:10
  71:15
analysis 107:8
anarchist 82:6
anarchy 80:19
Anchorage
  15:5
Andy 22:15
answer 4:19
  6:5 7:1,7,8
  7:14 17:12
  21:10 36:6
  43:2 53:3,4
  53:14 55:17
  57:18 60:21
  67:19,20
  68:25 69:4
  75:13 76:23
  78:23 94:24
  95:9 96:12
  97:17 105:5
  106:15 108:2
  111:12,25
  112:7,8

114:20,21
  118:15,17
answered
  11:14 53:23
  106:5
answering
  5:20
answers 5:20
  57:25
Anthony 66:20
  86:7,18
antigovernm...
  67:25 68:22
anybody 47:6
  77:16 79:18
  87:6 96:11
  102:14 111:5
  115:16,20
anymore 21:3
anytime
  105:17
anyway 25:14
  37:7
apologize 71:4
apparently
  92:9
appear 120:7
APPEARAN...
  2:1
Appendix
  33:22
appreciate
  36:21 57:24
  57:24
approach
  48:19
appropriate
  77:15 81:16
  115:6
approval
  50:17
approve 50:14
approximately
  23:7

Hadley, Justin D.                                    February 11, 2016

2

**April** 24:7,8
**area** 80:15
   113:25
**areas** 41:9
**Army** 2:17
   12:11,15
   13:1 14:16
   16:21 17:2,6
   17:14 18:25
   25:2,3 28:1
   31:25 38:15
   38:19 41:15
   41:19,19
   44:16,20
   45:21 46:14
   46:15 47:15
   48:12,13,15
   48:16 49:14
   50:12 53:15
   62:22 69:13
   69:19 70:18
   77:14 80:19
   87:8,20
   88:10 95:25
   96:10,10,12
   96:19 97:4,4
   97:11 99:7
   100:5 101:21
**Army's** 9:9
**Armystudyg...**
   83:8
**arrest** 85:14
   100:18
   101:16,23
**arrested** 7:19
   56:21 57:7
   57:10 58:11
   59:7 60:9
   61:7,8,16,20
   61:24 62:4,6
   66:3 83:21
   83:23 84:4
   85:8 86:8
   93:9 100:16

101:15,24
   111:1
**arrive** 22:3,22
**arrived** 22:18
   22:24 23:17
   25:23
**Article** 45:19
   99:25 101:6
   117:13,16,19
**ASAP** 72:20,22
   72:25
**aside** 81:24
**asked** 7:14
   11:14 24:18
   24:19,22,23
   29:21 37:12
   42:5 43:23
   69:5 92:7
   96:10,11
   105:4 110:10
   114:17
**asking** 5:19
   9:22 47:11
   52:2 57:15
   60:1,10 64:8
   64:19 66:24
   67:21 68:12
   68:19 69:6
   69:24 78:22
   90:11 95:9
   104:24 105:6
   106:17
   107:14 108:6
   108:8,9
   109:7,14,15
   112:5,5,6
**assessing**
   113:1
**assessment**
   33:19
**assign** 33:10
**assignment**
   13:9 38:20
**assist** 10:22

74:9,11
**associate**
   75:22
**associated**
   36:12 37:16
   57:12 89:19
   90:6,10
**association**
   76:22
**assume** 4:13
   4:19 87:12
   105:24
**assumed** 23:8
   40:1,4 86:1
**assuming**
   22:18 40:4,9
   66:14,17
   72:8 118:3
**assumption**
   25:11 40:3
   84:12
**attached** 32:24
   120:7
**attack** 67:11
**attempt** 98:22
**attempted**
   93:6
**attention**
   104:10
**attorney**
   121:13,14
**Attorney's**
   1:14 2:9
**ATTORNEYS**
   2:2,8
**authority**
   71:21 72:3
**authorize**
   71:22
**authorized**
   37:7
**avenue** 2:4
   104:10
**average** 81:1

**aviators** 32:3
**avoiding** 6:19
**aware** 4:24 5:4
   29:8,20 41:5
   41:10,11
   47:5 52:25
   59:23 63:20
   63:25 65:13
   65:17 67:10
   71:17 72:20
   73:3 77:14
   77:16,25
   78:17,18
   79:7,12
   82:19,21
   84:16 87:6
   92:16,18
   93:2,3,17,24
   94:2,3
   100:20
   105:12
   107:23
   108:14

───────
**B**

**b** 2:9 3:7
   109:16
**back** 12:13
   17:15 23:4
   23:21 26:15
   38:21 56:6
   57:25 58:5
   58:20 63:10
   64:11,24
   68:15 70:3
   73:16 80:22
   82:22 87:11
   95:3,8
   101:23 110:5
**background**
   9:13 11:23
**bad** 41:15,21
   45:3 70:25
   86:16 97:24

115:18
**balances** 48:6
**bar** 42:10
**base** 32:12
   65:2 94:1
   100:22 101:4
   118:17
**based** 17:16
   30:24 32:13
   36:22 46:25
   51:17 62:12
   65:6 81:1,11
   91:12 92:7
   93:21 98:13
   110:3,19,21
   112:13
   118:20
**bases** 29:5
**basic** 4:15
   25:7,8
**basically**
   65:15
**basics** 25:20
**basing** 63:17
**basis** 79:20
   89:21 92:6
   99:25
**Bates** 99:16
**battalion**
   13:19 25:25
   26:4,12 27:7
   27:11 30:19
   31:7 38:2
   39:3 48:4,12
   49:24 50:3,9
   50:11,13
   87:22,22
**battalions**
   56:2
**battle** 26:24
   98:11
**BCT** 80:14
**becoming**
   108:11

Hadley, Justin D.                                    February 11, 2016

3

**beginning**
1:13 4:15
45:20 66:25
67:1 86:21
95:4
**begun** 44:17
**behalf** 4:3 85:1
**behavioral**
37:17
**believe** 28:2,3
40:10,23
46:5 58:16
69:19 74:16
77:8 81:16
89:10 93:20
104:25
106:18
**believes**
116:18
**believing**
89:21 92:6
**benchmarks**
102:14,15
**beneath** 29:25
**benefit** 41:23
82:14 96:2
115:23
**benefits** 62:10
**Benning** 13:2
13:4,10,19
14:5,7,13
28:8
**best** 32:7 39:8
49:11,12
52:17 95:19
98:14
**Beth** 8:11,13
52:19
**better** 46:17
48:7
**beyond** 27:19
**big** 32:7
**biggest** 66:9
66:10

**bit** 9:4 36:13
67:22 70:2
71:5 83:2
98:5 115:2,5
115:10
**block** 73:2
**board** 24:25
25:3 102:17
**body** 52:4
**born** 12:1
**boss** 71:24
116:23
**bottom** 85:2
99:25
**bought** 60:12
**branch** 14:18
14:21,22
**break** 7:12,15
**breakfast** 6:3
**BRENDA** 1:5
**BRETT** 1:5
**Brian** 2:3 5:2
**Brian@clint...**
2:6
**bribe** 118:24
**bribing** 114:1
**briefing** 76:9
**briefings**
114:9
**briefly** 91:2
**brigade** 27:10
27:12 28:8
28:13 39:6
48:4,14 50:9
54:5 84:25
113:5
**bring** 10:4,9
11:12 38:21
75:8 87:11
95:7
**bringing**
104:10
**broad** 73:23
115:12

**broader** 37:1
**Brook** 2:3,3
3:4,12 4:7
5:2,3 10:12
11:5,16 68:4
68:11,13
72:10,13
83:3 99:13
104:11
113:10 119:6
**brought** 10:11
10:16,21
11:18 35:16
44:10 61:4,5
61:20 76:14
76:14
**buddies** 92:20
95:11 98:11
**building** 61:22
65:15 103:8
**bunch** 44:14
63:9 79:8,9
96:24 112:10
**bureaucracy**
49:10
**buy** 59:3
**buying** 59:24
63:8,9
**buys** 63:8
**bystander**
92:4 93:21

———————
**C**
**C** 2:3 4:2 121:1
121:1
**call** 25:7 34:22
80:11,11
101:8
**called** 4:3 16:7
18:1 23:24
27:25 30:7,9
33:9 42:9
51:12,12
**calls** 111:22

**camp** 65:15
**Capt** 38:3
**captain** 14:16
31:20 32:1,2
32:5
**captain's**
19:18
**career** 87:21
**careful** 115:5
**carefully**
107:16
**Carlisle** 12:11
**Carolina** 1:14
121:2,18,22
**cars** 63:9
**case** 4:25 5:4
7:24 10:2
19:3,4 25:5
29:7,18
45:22 46:4
46:22 57:4
61:22 64:5,9
67:21 79:8
97:23 103:8
114:14
116:25
**cases** 55:11
**casual** 92:14
**category** 45:5
72:23 73:25
74:2 86:12
117:6
**cause** 121:8
**causing** 42:3
**Cav** 23:24
**cavalry** 23:18
26:2,17,18
30:9 32:8
**certain** 7:5,6
16:9 17:9
41:8 42:8
75:6,12
97:16 115:24
**certify** 121:5

121:11,13
**chain** 27:2
28:12 48:3
72:2 77:15
77:19,20
78:20 81:20
89:4 107:5
116:11,18
**challenges**
35:9 39:22
55:18 59:15
73:15 75:6
86:13 102:22
112:19
**challenging**
39:11,21
**chance** 35:1
46:10 95:14
98:14 115:23
**chances** 41:14
41:22 96:7
98:19
**change** 22:5
33:1 75:4,5
91:23 92:19
112:16
**change-of-c...**
23:15
**changed** 97:6
97:18 110:6
110:13,24
111:2
**chaplain** 37:15
**chapter** 45:24
46:25 47:13
47:14,18,20
51:14 56:25
57:2,11 71:8
71:10,15,17
72:6 88:11
94:22 102:9
104:9
**chaptered**
46:13,24

49:13 50:12
50:23 51:5
85:23 88:8,9
**chaptering**
44:19,23
45:21 50:5
50:20 71:3
71:22
**chapters**
46:19 50:6
96:13,13
**characteristi...**
17:9
**characteriza...**
76:6 80:20
116:15
**characterize**
16:13 20:1
62:5 74:15
75:20 80:12
84:21 86:10
109:7
**characterized**
33:16 75:19
91:20
**characterizing**
41:13
**charge** 31:20
38:25 49:24
50:1 103:11
103:23
**charged** 70:19
**charges** 47:23
71:2,13
73:22 77:5
99:20,23
100:4 101:20
103:5
**Charlotte** 1:14
**Charlottesvi...**
17:25
**checking**
28:25
**checks** 48:6

**choice** 96:15
96:25 115:18
**choices** 102:8
**choose** 55:19
**chose** 46:10
**chronologic...**
83:21
**chronology**
20:14
**CID** 37:5 40:16
41:9 56:20
65:22 73:6
74:14,16
75:15,24
76:16,24
77:19,20
90:14 112:10
112:15
**CID's** 43:6
74:9
**circle** 91:1
**circumstance**
118:1
**circumstanc...**
33:17
**Citadel** 12:20
**civil** 1:8 8:6
**civilian** 77:21
81:1 100:5,9
**civilians** 81:3
100:7
**class** 95:2
**clean-cut**
48:23
**clear** 37:20
77:3 103:25
118:9
**clear-cut**
55:16
**clearance** 41:8
42:13,19,23
**clearly** 6:16,21
**clients** 5:6
**clinical** 76:1

**Clinton** 2:3 5:3
**close** 15:9
23:22
**closely** 91:20
**closer** 23:14
**closest** 25:14
**club** 64:2
**coast** 28:6
**Code** 17:19
78:19
**codes** 78:25
**Col** 22:17
34:14 46:6
54:5
**collective** 84:1
**college** 12:11
12:18,19
16:8 17:16
18:25 19:22
20:4 24:5,6
24:14,16,17
95:11
**colonel** 22:14
24:9,10,11
25:24 28:16
28:17 31:11
53:15 71:22
89:2
**colonel's**
19:19
**colonels** 24:15
27:13 37:13
**combat** 32:23
**come** 18:9
23:20 32:14
43:19,22,23
51:10 53:12
75:24 84:23
90:19
**comes** 41:18
80:9 107:6
**coming** 1:13
34:19 66:12
72:19 76:18

76:19 88:11
103:2
**command** 16:7
17:4 22:5,18
22:24 23:8
25:21,24
27:2,24
28:13 29:20
33:7 34:8
35:10 37:18
38:6,13,15
38:16 40:1,4
42:8,20
44:23 45:5
48:3,5 53:25
55:22,25
60:8 65:24
67:24 68:21
69:9,21,23
72:2 74:10
74:11,17,19
75:1,16
76:12 77:10
77:15,19,20
77:24,25
78:21 81:20
86:2 87:19
89:4 90:2,2
90:12 102:18
104:24
106:11
108:11,14,20
113:14
116:11,18
118:19
**command's**
107:5
**commanded**
56:1,2
**commander**
26:1,4,10,12
26:13 27:17
27:20 28:2,4
28:13 31:22

31:24,25
32:8 37:23
38:1,2,14
39:2,3,5,6,8
42:21 46:5
48:18 50:13
54:5 70:10
77:9 81:6,11
84:13,25
87:22 98:3
105:11 108:9
108:13 109:4
**commander's**
69:14 74:19
**commanders**
27:7,10,11
27:12 35:7,7
35:11 48:11
48:13,14
91:19 105:13
114:11
**commanding**
27:22 71:25
84:25
**commands**
26:6 39:4
63:12 74:21
87:22
**comment**
49:19 108:6
108:8
**commented**
89:9
**commercial**
83:11
**commission**
121:23
**commit** 99:21
103:1 114:4
**committed**
109:8
**common** 11:1
29:3 73:12
105:10

Hadley, Justin D.                                    February 11, 2016

5

companies
30:8 35:23
35:23,24
56:2
company
14:19 30:19
31:3,22,24
31:25 32:24
35:7,11
37:23 38:1
39:5 42:1,21
46:5 48:4,11
48:18 50:7
70:10,13
80:8 84:13
101:6 113:4
114:11
117:13
comparing
89:8
compartmen...
75:12
complete
120:6
completely
74:6,6
116:20
computer
29:14 87:4,5
87:15,18
computer-as...
121:8
concept 39:1
concern 62:24
64:3 98:4
concerned
59:20 114:11
concerns
44:10 65:8
98:2
concluded
119:8
conditional
42:11

conduct 69:16
78:19,25
81:13,16
107:3 108:4
108:10,10,13
117:16
conferred
12:12
confess
105:15
confessed
111:20
confession
111:8
confined
100:21 101:4
101:16
confinement
71:9 74:4
101:10,12,13
101:19 102:8
102:13,21
104:8
confining
100:21
confusing
52:19 77:22
connected
24:13 121:15
connection
67:2,8 72:14
90:1
consequenc...
82:5
consider 72:7
101:9
consideration
79:12 82:3
considered
33:7
considering
59:9
conspiracy
59:1 99:21

103:1
conspiring
58:3
constantly
80:18,18
constitute
121:9
contacted
29:16
contacts 29:1
context 19:7
27:4 34:9,19
95:18 96:25
113:25
continue 44:15
44:15 71:8,9
103:18 104:8
104:9
continued
45:10,11,12
continues
102:9
continuing
45:14 71:3
114:4
contributes
16:21
control 33:9,9
33:10,22
conversation
8:15 34:20
44:10 52:25
53:8 54:25
76:9 88:24
89:7 102:4,5
103:3 114:17
conversations
70:4 76:24
91:18 92:25
convey 48:25
convicted
91:23
convinced
102:20

cookie-cutter
46:2 55:17
copy 11:17
51:21
correct 11:13
39:12 40:6
41:7 45:18
55:3 70:15
76:4 81:1
84:3 86:10
88:13 91:9
91:13 101:21
103:2 106:19
113:23 114:6
115:4 117:21
118:18 120:5
corrections
120:7
correctly 57:8
108:4
corrupted
66:21 118:4
118:12
counsel 3:12
4:13 51:8
115:25
121:13,15
counseling
57:3 94:23
116:1
counts 116:1
County 121:3
121:17,22
couple 22:7
27:14 45:19
58:14 59:25
73:11 113:12
course 14:14
17:20,25
18:18,22
19:20 65:20
77:12 90:18
108:12
109:13

112:12
courses 17:18
19:10,16
court 1:1,15
100:9 103:13
103:13
121:21
courtroom
5:14,16
cover 29:5
covered 29:23
67:16
crashed 87:11
crashing 87:15
created 10:24
94:16
creation 94:12
crimes 79:13
criminal 79:16
95:6
crowd 97:15
97:23
crucify 95:20
currently
79:22
curriculum
19:17
cut 25:13

_____
          D
D 1:13 3:1,3
4:2,3
dances 64:2
Daniels 38:3
data 59:21
91:17
database
29:14
date 7:25
23:15 58:19
58:20 61:8
85:3,4
120:12
dated 68:17

Hadley, Justin D.                                    February 11, 2016

6

**David** 2:16
 4:10
**day** 21:13
 36:15,23
 55:2 65:9
 66:24 76:16
 82:11 94:19
 101:25
**days** 58:15
**deal** 60:14
 116:16
**dealer** 58:4,5
 58:10 59:1
 103:2
**dealers** 79:10
**dealing** 75:23
**dealt** 119:1,3,3
**death** 61:1,12
 62:10,10
**deaths** 8:7
 70:8 113:15
**debauchery**
 64:16
**decade** 39:2
**decent** 6:7
**decentralized**
 75:10
**decide** 103:19
**decided** 11:12
 55:20
**deciding** 115:3
**decision** 44:22
 60:13 64:20
 71:12,23
 72:4 101:11
 101:23 103:5
 107:1 119:5
**decision-ma...**
 106:23
**decisions**
 64:18 74:10
 74:12 92:11
 118:19,20
**Defendant**

1:10 2:8
**defense** 14:14
 51:12 96:15
**definitely** 14:1
 17:16 20:1
 45:12 58:12
 61:13 63:2
 80:13 92:1
 111:3
**degree** 12:7,12
**Delaware** 24:2
**deliberately**
 97:16 105:13
**denotes** 26:13
**depending**
 14:20
**depends** 14:17
 33:15 46:16
**deployed**
 20:23 21:24
 23:18,19,22
 32:17 38:6
 39:20
**deployment**
 21:9 23:3,5
 32:10 33:6
 73:16
**deployments**
 21:2,7 38:17
**DEPONENT**
 8:12 10:20
 18:3,10
 52:15 120:1
**depose** 53:15
**deposed** 4:11
 4:24
**deposition**
 1:13 4:14,18
 5:19 8:17,22
 11:13,18
 67:17 79:25
 119:8
**describe** 90:22
 99:2,3

**described**
 14:13 19:19
 81:13 108:5
 108:10
**describing**
 65:18
**description**
 55:3
**deserve**
 115:22
**designated**
 10:12
**designates**
 47:14
**detachment**
 38:14 39:1,8
 39:14 73:12
 73:16
**detention**
 70:18
**determination**
 111:21
**determine**
 35:13 90:4
 90:12 99:7
**determined**
 46:13
**detoured** 70:2
**dialogue** 69:7
**difference**
 39:4 74:24
 112:23
**different** 17:10
 19:22 30:17
 31:9,9 32:15
 33:8,12,17
 35:23 41:24
 45:3 46:19
 47:1,3,16
 48:4 55:13
 55:16 61:22
 62:23 64:5
 67:7 77:19
 92:1 94:10

96:13 97:15
 98:5 100:6
 102:17 107:9
 109:10
 110:10
 112:13 114:8
 116:3 118:7
**differently**
 33:16 46:1
 48:17 64:4
 69:8 95:16
 111:7 116:3
 117:10
**direction**
 31:17 46:11
**directions**
 100:6
**directly** 91:13
**disagree** 44:2
**discharge**
 57:11
**discharged**
 57:8
**disciplinary**
 16:19 17:4
 36:10 55:12
 57:1 59:13
 98:17 113:1
 117:1 118:19
**discipline**
 74:10 88:7
 115:3
**discovered**
 61:25 62:3
 83:22
**discovering**
 38:22
**discovery** 68:7
**discretion**
 115:2,11,13
 115:14
 116:16
 118:10
**discuss** 11:9

**discussed**
 7:24 11:8
 40:1,5,8
 63:22
**discussion**
 40:13 41:2
 104:13
**discussions**
 10:22 41:4
**dislike** 80:19
**disseminated**
 101:5
**DISTRICT** 1:1
 1:1
**diverse** 39:24
**division** 2:17
 27:17,21
 28:9 30:19
**Diyala** 23:24
**document** 9:6
 10:9,11,11
 10:16,22,24
 11:9,17
 70:16 79:22
 83:6,15,17
 84:5 85:4,6
 87:2 99:17
 104:17,18,23
 107:16
 110:18
**documentati...**
 53:1
**documented**
 50:23
**documents**
 7:10 9:7,16
 9:24 10:1,4
 49:24 50:1
 50:11 56:10
 82:24 83:20
 86:24
**doing** 7:3,18
 26:13 44:14
 45:1 48:10

Hadley, Justin D.

February 11, 2016

7

60:6 63:19
76:25 90:15
99:6 106:2,7
**dollars** 62:9,25
64:15 66:19
**dont'** 109:12
**door** 76:16
**doubt** 41:23
87:3 110:3
115:24
**downtown**
28:1
**dozens** 35:16
**draft** 87:1
**drafted** 87:5
**draftsman**
84:9,13
**dragging** 47:5
**drank** 6:6
**draw** 103:23
**drinking** 72:22
72:25 95:8
95:12
**drove** 8:23
**drug** 58:4,5,10
59:1 72:17
75:16 78:14
78:15 79:9
103:2,2
**drugs** 72:19
73:17 75:22
76:22 77:1,5
77:11,14
78:1,21 79:4
99:4,6
**Drum** 15:19,24
**due** 48:9 50:17
72:8 109:23
**DUIs** 74:1
**duly** 121:6
**duty** 12:25
78:2 79:15
111:9,10
114:5 115:4

116:8,12

———— **E** ————

**E** 3:1,7 4:2,2
121:1
**E-5** 116:24
**E-6** 116:24
**earlier** 33:18
51:22 72:21
72:25 87:1
99:5 101:18
**earliest** 23:11
**easier** 56:23
**easiest** 16:16
18:21
**edict** 82:15
**education**
12:6 18:24
**effort** 90:4,11
**eight** 35:24
**either** 5:10
14:3 19:10
35:13 38:11
38:18 43:24
56:22,25
70:18 71:2
88:25 90:11
91:5 102:8
113:5 119:3
**element** 14:23
98:13
**email** 76:10
87:8,11
**emailed** 87:5
**embedded**
19:17
**employee**
121:14
**encounter**
90:21
**encouraging**
68:22
**engage** 64:16
81:17

**engaged** 81:13
**engaging**
65:23 81:14
**entirely** 10:8
**environment**
41:24 42:16
98:7
**equally** 91:15
**Errata** 120:7
**Esq** 2:3,4,9,16
3:12
**evaluated**
64:13
**Evaluations**
33:22
**evaluative**
64:11
**event** 89:20
113:3 118:8
**events** 8:1
51:17
**eventually**
53:12
**everybody**
23:20 31:24
33:16 41:16
45:7,25 46:1
48:10 55:15
75:3 77:18
90:14 95:16
95:20 96:5
96:16 102:20
112:9 117:6
**everybody's**
98:13
**evidence**
104:4
**exact** 58:19,20
76:1 101:25
**exactly** 13:21
18:2 19:2
22:8 26:20
42:5 45:23
47:19 73:21

**Examination**
3:4 4:6
**examined**
120:4
**example** 6:2,8
6:8 17:19
18:21 31:11
32:16,23
55:20 63:3
65:1 66:5
69:14 79:20
86:3 96:6
98:18 99:5
115:13
**examples**
63:17 79:14
112:22
**exception**
50:15 79:7
**exceptions**
32:4
**exchange**
113:22
**executive** 30:5
**exhibit** 3:9,10
54:17 79:22
82:23 83:4,5
83:15 99:13
99:14,16
104:15
**exhibits** 3:12
**exist** 69:17
**exists** 79:17
**expect** 21:10
72:18 89:25
**expected**
23:13 70:9
72:23
**expedited**
110:2
**experience**
46:12 79:19
81:2,11
87:14 97:23

98:22 118:16
**experiences**
63:12
**expires** 121:23
**explain** 16:17
57:19 66:20
95:1 97:10
**express** 71:11
**extensive** 73:7
**extent** 56:7
**extra** 32:24
**extravagant**
63:8
**extremely**
46:21 102:12
**eyes** 66:4

———— **F** ————

**F** 33:22 121:1
**facetious** 8:24
**facing** 82:5
**fact** 6:7 24:13
28:2 36:22
58:2 59:8
60:2 65:6
66:24 67:6
76:21 78:6
90:8 91:22
92:16 99:6,8
104:21 105:1
105:2 112:12
114:4
**factor** 62:21
64:18
**facts** 64:7,22
67:14 69:17
76:25 90:15
90:16 92:21
102:20 103:7
103:19,23,24
103:25
107:23
110:11,25
111:1

Hadley, Justin D.        February 11, 2016

8

**failure** 117:14
**fair** 4:23 30:23
  52:15 62:8
  74:9 86:17
  88:15 91:11
  97:3 98:1
  107:7 114:7
  115:2,5,10
  116:9,15
  117:17 118:3
**familiar** 5:7,9
  33:21,23,24
  80:13 83:10
  86:8,14
  93:10,13
**families** 33:14
  82:12
**family** 63:4,7
**fancy** 63:9
**far** 19:6 60:13
  65:16 78:14
  79:5 99:11
**fast** 42:12
  116:6
**February** 1:13
  4:1
**feet** 47:5
**fellow** 64:15
  65:8,11
  66:19
**felon** 74:7
**field** 16:9
  26:23 31:5
  46:6 101:6
**fifth** 46:10,10
**fight** 69:10
  82:10
**figure** 7:9
  64:12 69:1
  83:1 95:5
**figured** 25:11
**file** 79:8
  101:20
**filed** 8:6 47:13

  57:9
**files** 25:1
  29:12
**financially**
  121:15
**find** 35:13
  40:20 45:2
  69:16 93:6
  98:22
**fine** 6:21 8:10
  43:2,2 56:7
  57:18 111:14
**finish** 24:3
**finished** 14:25
  80:5
**finishing** 15:12
  15:14
**firm** 5:3
**first** 4:18 11:9
  12:25 13:9
  18:19 22:13
  22:16 28:20
  31:22 34:5,7
  35:3 40:16
  41:1 43:12
  52:8,13
  54:18,23
  55:1 56:3
  58:15 61:1
  68:1 84:7
  85:5 95:2
  97:18 98:9
**firsthand**
  106:18
**fit** 47:21
**five** 19:22 30:7
  35:23
**flag** 42:9
**Floor** 2:4
**fluctuated**
  32:9
**focus** 19:8
  35:18 64:22
**focused** 16:24

**folks** 8:10 26:5
  31:1 32:9
  34:24 35:9
  37:17,21
  38:18,23
  39:3,22
  46:17 50:8,8
  52:20 59:14
  60:7 61:25
  73:15 75:24
  80:17 82:9
  84:3 85:16
  86:13 92:3
  92:10 112:14
  112:19,20
**following** 1:15
  76:12
**follows** 4:5
**foregoing**
  120:5 121:6
  121:7
**forgive** 25:9
**forgot** 53:9
  90:23
**form** 10:25
  11:1,3 48:25
  49:4,5,8,13
  84:8 106:14
  106:25
  118:14
**formal** 16:11
  17:24 18:12
  19:11,22
  26:9 34:20
  38:15 41:2
  101:1
**format** 86:5
**formation**
  117:13,15
**forming** 80:10
**Forsyth** 121:3
  121:17,22
**Fort** 13:2,3,10
  13:19 14:5

  14:13 15:7,8
  15:13,14,15
  15:19,24
  16:5 20:15
  20:16,17,17
  20:19 21:16
  22:2,3,15
  23:5,17,19
  24:4,5 25:21
  26:22 27:2,7
  27:21 28:8
  38:6 87:15
**forth** 99:8
**forts** 15:22
**Forty-five**
  11:25
**forward** 38:21
  38:23 40:24
**found** 61:10
  62:17 67:23
  68:21 90:5
  93:8
**four** 12:4 17:7
  31:23 58:23
  66:2,11,15
  73:25
**Fourteen**
  13:13
**fourth** 46:10
  80:14
**Foxx** 40:18,25
  43:4 51:24
  53:2,17
  54:19,25
  56:9 57:15
  59:25 70:16
  71:12 80:1
  100:19
  101:18 102:6
  102:25 114:6
**frame** 20:19
  40:11 58:18
  110:23
**fraudulent**

  85:19
**free** 43:21
**Freelance**
  121:20
**front** 56:16,25
  64:23 65:4
  70:16 88:11
  91:18 102:20
  103:21
  110:18
**full** 25:23
  54:18 57:25
**full-bird** 27:13
**function** 57:2
  74:13
**further** 117:3
  119:6 121:11
  121:13
**future** 92:11
  95:23

**G**

**G** 4:2
**G-A-L-L-A-H...**
  29:4
**gain** 82:8
**Gallahue**
  28:17,20
  54:5
**gang** 80:12
**garrison** 42:16
**gathered** 84:2
**gazillion** 46:18
**general** 4:14
  16:7 27:9,18
  31:24 41:7
  48:5,16
  71:21,25
  84:25 94:17
  106:10
**generals** 27:14
  48:15
**generic** 26:5
**gentleman**

Hadley, Justin D.                                    February 11, 2016

9

22:11
**Georgia** 13:3
28:8
**gestures** 6:13
**getting** 13:9
34:11 38:19
38:19 57:2
61:18 63:8
91:2 97:14
101:17 107:6
**girlfriend**
68:17
**girls** 93:25
**give** 32:21
36:17 41:13
41:22,22
49:11 57:25
63:3 79:14
84:24 95:14
98:14 103:13
103:13 112:6
115:23
**given** 19:9
20:23 48:8
51:8 94:25
96:7,15,25
98:18 116:25
117:1 120:6
**gives** 30:17
**glanced** 56:17
**go** 4:15 7:14
12:19 13:18
14:5,18 15:6
15:18 16:4
20:7 21:6,17
24:15,17,18
24:20 29:11
31:16 32:18
40:24 44:16
45:11 46:10
48:18 50:7
51:4 58:20
60:19,23
64:1 66:11

70:3 72:1,9
82:9,22
83:25 89:5
95:6 96:23
97:2,8,16
99:12,13
103:18,22
104:1,11
109:21
113:10
**God** 57:6
108:23
**goes** 4:17
26:15 63:7
71:24,24
78:14 81:5
95:3
**going** 4:15,19
5:20 6:18,19
8:25 9:13
11:16 17:7
19:2 20:15
26:24 28:21
28:23 29:9
33:24 35:1
38:18,23
45:4 47:14
47:19 53:3
59:22 60:5,8
64:12 67:5
68:3,9 70:19
70:21 71:8,9
71:14,16
72:11 78:19
79:21 82:9
83:14 84:12
90:25 94:15
94:18 96:21
96:22 100:6
100:7 101:20
102:12
103:10,13,14
103:15,15,17
104:7,8,9,14

112:16 117:9
118:13
**good** 4:8 7:16
25:19 27:1
37:3 45:1
67:11 69:14
70:1 83:19
86:16 92:20
95:21 96:6
97:21 106:12
**Google** 11:2
**gotten** 40:7
**government**
8:7 67:11
69:11,20
118:21
**grade** 14:19
16:9 31:5
46:6 101:6
117:13
**great** 6:23,24
**greater** 35:12
35:12 41:17
**greatest** 118:6
**grew** 32:10
**group** 38:22
39:12,14
49:21 50:2
59:14,15
66:22 67:25
73:19 80:16
89:18 92:3
92:10,14,23
**guarantee**
53:20
**guess** 7:25
16:16 21:12
22:8 24:20
26:3 37:3
39:25 41:12
46:23 47:19
49:11,12
54:11 58:25
62:4 63:24

67:16,22
71:25 77:1,7
**guessing** 13:5
35:22 51:16
**guilty** 92:17
**gun** 59:5
**guns** 59:6,24
60:12
**guy** 34:14 39:8
66:12 95:14
**guys** 25:8
28:11 39:7
55:18 66:2
90:13 92:20

————————
**H**
**H** 3:7
**Hadley** 1:13
3:3 4:3,10
**hair** 25:13
**half** 62:9
**hand** 82:22
84:11 121:17
**handed** 56:13
**handing** 83:5
**handled** 113:4
113:5 116:21
**hands** 11:6
**hang** 89:15
97:14,22
99:9
**hanging** 98:24
**happen** 69:13
70:22 75:4,9
94:3 96:24
100:25
105:14
106:12
**happened**
19:5 38:17
47:9 55:20
61:3 62:14
62:18 63:13
69:7,15

87:20,21
88:9 89:20
90:16,17
94:23 102:4
107:4 108:7
109:24 110:7
113:18,22
**happening**
76:13 118:24
**happens** 31:10
32:22 33:1
37:11 94:19
96:17,20
100:24 115:8
**hard** 42:12
56:5 57:25
68:19 97:17
116:6
**harm** 69:20
**harness** 32:11
**Hawaii** 21:18
23:5,23
**head** 66:13
**health** 37:17
**hear** 63:5,7
87:13
**heard** 36:2,15
40:5 51:25
55:1 58:16
65:10 80:14
80:15,20
83:8 92:22
97:1 108:24
**hearing** 59:6
**heinous** 109:8
**held** 35:4
**help** 7:8,10
18:3 25:21
29:23 32:22
35:13 45:2,8
66:19 83:1
99:22
**helpful** 24:3
53:16 79:14

helps 19:8
hero 66:8
hey 44:11
  76:11,19
  86:13 96:17
high 99:10
  102:12
higher 72:1
  94:15
higher-ups
  39:6
highest 12:6
  27:8
hint 110:3
history 19:5
  50:22 117:1
  117:21
hit 30:16
hold 71:18
  72:6
honest 36:6
  43:8 49:3
  59:10 65:9
  83:9
honestly 5:18
  22:8,16
  23:12,15
  29:10,15
  42:23 44:9
  49:10,11,20
  51:15,17,20
  53:9 55:5
  73:21 91:4
  111:12
  113:16
honorable
  96:20
Hood 20:18,19
  21:16 26:22
hope 25:17
  78:5 81:22
hopefully
  48:25 82:25
horses 26:19

26:21 27:1
hour 53:21
hours 7:17
  8:23 82:11
house 9:16
  29:12 59:17
huge 39:10
  46:18 111:6
hung 89:22
  92:2,10
  95:11
Hunter 27:25
hurting 96:1
hypothetical
  66:17 67:3
hypothetically
  64:19 68:20
hypotheticals
  67:14 68:3
  68:10 80:22
  107:2

—— I ——

idea 10:25
  67:11 116:14
ideology 82:6
ignore 115:14
ignores
  115:16,20
illegal 73:7
  74:18 77:11
  77:14 78:1
imagine 90:25
immediately
  27:3 29:25
impact 117:2
important 5:23
  6:11,15 7:2
  64:9 77:8
  117:4
impose 101:9
impressions
  98:9
inbox 47:7

incident 58:10
include 112:15
including
  114:16
  118:19
Indian 26:16
indifferent
  86:16
individual
  59:12,21
  76:25 79:12
  96:7 99:9
  112:18 116:3
individually
  55:15
individuals 5:8
  18:1 32:19
  33:2 83:25
  90:5 92:14
  114:10,13,15
  114:16
infantry 14:23
  27:20 28:9
  32:24
influence
  97:24 98:25
inform 74:17
  75:21 78:20
  116:22
informal 19:11
  19:14,23
  41:4 76:8,13
information
  10:23 29:21
  43:16 64:13
  65:12,21
  75:25 76:7
  80:6,24
  81:19 82:1
  84:20,22
  107:8,10
  111:16
  112:10
informational

76:8
informed 73:6
  74:22,22
  75:1,16
  114:10
infractions
  73:20
initial 47:25
  98:14
initiated 71:18
  86:1
innocent 92:4
  93:20
input 94:12,13
inquiry 69:15
installation
  28:5
instance 36:3
instances
  75:15 77:4
  94:25
instituted 75:7
instruct 68:4
instructing
  68:8
instruction
  68:14
instructs
  67:19
insubordinate
  116:7
insulation 48:5
intended
  89:18
intention 7:18
  84:15
interacted
  86:11
interacting
  31:12
interaction
  88:18
interactions
  70:14

interest 61:12
interested
  121:16
interesting
  73:13 89:15
  89:23
Internal 33:22
interviews
  79:25
investigated
  41:5 55:23
investigation
  41:9 42:7
  61:23 90:18
  102:3 109:23
investigations
  37:5 40:16
  69:13
investigative
  79:24
investigator
  103:21
investigators
  65:22 74:13
  112:11
invited 34:21
involve 11:21
involved 50:5
  62:19 73:17
  75:21 85:13
  88:10 112:25
involvement
  88:6
involves 81:7
involving
  86:19 94:11
Iraq 20:25
  32:18
irrelevant
  118:5
Isaac 34:5
  38:7 40:2
  43:6 49:13
  51:13 60:14

Hadley, Justin D.                                              February 11, 2016

11

61:1,11
63:25 64:14
65:7,23
72:16 73:6
88:19 89:11
89:18 91:8
91:22 92:16
93:10 100:18
103:5 104:16
108:25
109:19 111:8
111:9 114:4
**issue** 62:23
63:22 100:19
**issues** 16:19
17:4 39:22
39:23 98:17
**items** 112:22

───────
**J**

**J** 2:16
**jack** 37:2
**Jahr** 1:5 4:25
8:6
**jail** 74:4 96:23
100:17
102:23
103:16,16
**Jeremy** 54:19
**Jersey** 12:2,3
24:2
**JHHR002163**
99:16
**job** 34:1 91:8
**jogs** 54:10
**Johnson** 2:9
8:13,13
10:10,19,21
11:4,7,10,19
18:9 52:6,16
52:22 67:13
68:2,8,12,24
106:4,14,25
107:11

111:22
116:13
118:14 119:7
**join** 12:15
32:18 67:24
68:22 97:3
97:17,19,21
**joined** 13:1
17:14
**joins** 41:15,16
**Jones** 1:14,24
117:9,10
121:5,20
**judge** 25:17
51:8 54:6
67:18
**judgment** 19:4
76:2 95:19
95:21 101:8
116:5 117:25
**juice** 6:4,4,6
**July** 23:12
**June** 12:14
24:10,11
**Justice** 17:19
**Justin** 1:13 3:3
4:3,10

───────
**K**

**K-I-M-O** 28:20
**Kari** 2:4
**keep** 6:21 7:16
15:11 21:13
25:4 42:18
44:22 68:12
68:13 82:23
100:21
101:20
**keeping** 47:6
**kept** 63:15
100:24
**kid** 55:20 94:7
**kid's** 60:23
**kids** 66:22

**killed** 92:23
111:5,10
**killing** 92:17
**Kimo** 28:20
**kind** 23:25
33:15 34:22
34:25 35:6
36:1 37:2,12
37:18 59:9
63:20 75:10
83:21 87:9
105:20 114:2
**knew** 43:1
60:4,6,8
61:11,15
62:1,1 64:8
66:24,25
79:9 80:6
85:22 90:16
94:16 102:2
106:8 110:8
111:5 112:12
112:14
**knit** 92:13
**knocking**
76:16
**know** 5:9,10
5:24 6:18,19
6:24 7:4,4,4
7:5,7,8,8 8:1
9:1,3,8,9,15
9:15 15:21
16:8,12,20
16:23,23,24
17:7,10,11
18:1,6,25
19:5,9,10,14
19:21 20:2,4
20:7,14
22:24 23:1,2
23:4,11,15
23:22 24:1
24:25 25:1,1
25:6 26:3,16

27:16,24
28:2 29:10
29:12 30:2
30:25 31:5
31:11,15,18
31:23 32:11
32:12 33:14
33:16 34:2
35:1,8,10,18
35:20 36:20
36:23 37:6
38:3 39:2,5
40:9,17,22
40:22,23,24
41:1,11,14
41:21,24
42:1,3,5,13
42:15,16,21
42:25 43:2
43:11,14,16
43:17,19,20
43:21,24,25
44:1,11,13
44:13,15,25
44:25 45:1,7
45:10,11,11
45:16,17,19
45:20,22,24
45:24 46:3,4
46:4,17,18
46:22 47:6
47:11,17
48:7,8,9,11
48:18 49:8
49:10,11,20
50:6,21,22
50:24 51:6
51:18,19
52:16,24
53:11 54:3
54:14,20
55:14,20,25
56:5,6,8,11
56:16,17

57:1,4,5,7,9
58:19 59:16
59:20 60:2,4
60:5,11,14
60:22 61:2,2
61:7,13,20
62:9,11,16
62:20 63:16
64:5,8,11,23
65:5,6,15,24
66:10,15
67:15 68:15
68:18 69:14
70:10,12
71:7 72:24
73:9,10,22
73:24,25
74:20,22,24
75:3,8,22
76:11 77:9,9
78:7,10 79:5
79:6,11 80:4
80:12,21,25
81:7,22 82:8
82:11,25
83:22,23
84:9,11,19
84:23,24
85:3,23
86:23,25
87:1,8 88:9
88:17,21,23
88:24 89:1
89:19 90:2,8
90:10 92:2,4
92:7,8,10,12
92:12,22,24
93:9,19,21
93:22 94:8
94:13,16,19
94:20 95:10
95:10,13,15
95:15,22
96:11,14

Hadley, Justin D.                                    February 11, 2016

97:15,19
98:7,8,10,12
98:15 99:4,4
99:5,6 100:5
101:7 102:5
102:5,6,7
103:7,9,20
104:6 105:4
105:19 107:1
107:9,25
108:1,16
109:3,7,8,9,9
109:12,12,16
109:21,25
110:4,5,22
111:12 112:3
112:12,15
114:1,8,20
115:1,7,7,22
116:1,2,4,21
118:2 119:1
119:4
**knowledge**
25:8 74:17
81:8,9 88:17
113:15
**known** 60:11
62:12,24
99:6 108:1
111:2 112:22
**knows** 8:18
18:2 42:4
49:18 96:5
**Korea** 13:11
13:18
**Kristen** 52:6
**Kristin** 2:9
**kristin.b.joh...**
2:11
**Krynicki** 2:16

**L**
**lack** 48:7
**lady** 8:11

**laid** 83:21 93:1
**language** 52:4
77:21
**lap** 64:2
**large** 121:22
**larger** 31:8
99:11 114:13
**lasted** 53:20
**laundry** 61:24
73:20
**law** 5:2 20:6
78:18 82:19
**lawsuit** 7:21
8:5
**lawyer** 10:16
11:21 19:3
52:3 96:16
**lawyer's** 48:1
**lawyers** 7:23
10:2 18:22
**leader** 42:2
98:6
**leadership**
16:24 37:11
**learn** 17:5
34:13 61:6
90:19
**learned** 34:5,7
34:9 38:23
40:16 54:1
56:23 64:19
65:25 92:8
110:25
**learning** 61:1
75:4
**leave** 20:16
23:14 24:4
29:9 34:2
92:23 96:10
96:10,12,14
96:19 108:17
**Leavenworth**
16:5 20:15
20:16,17

**leaving** 14:4
15:15
**LEE** 1:5
**left** 6:6 14:4
20:13,17
23:4 73:16
85:2
**legal** 37:18
50:8,8
**legally** 81:23
81:24
**lengthy** 46:21
**lessons** 38:24
**let's** 18:15
22:4 28:16
30:3 43:4
69:8 77:24
103:11,12,13
103:16,22
104:1,11
113:10
**level** 12:6
19:18,18,18
19:19,21
27:10 28:12
31:2 45:6
49:6 50:7,9
50:11 62:3
70:13 74:5
90:2 91:17
91:25 113:5
113:5,6,6
116:17,19,22
**levels** 48:4
**Lexington** 2:4
**license** 20:10
**lie** 6:25 105:10
105:13
**lieutenant**
13:15 19:18
19:19 22:14
25:23 31:11
71:22 89:2
**life** 57:5 95:22

97:5
**light** 110:23
**line** 24:4 78:18
114:24
**lineage** 26:15
30:8
**lines** 110:21
114:2
**list** 35:20,23
61:24 73:20
85:15 87:25
89:10 102:22
**listed** 94:25
**listen** 61:21
**literal** 61:24
**literally** 73:25
**Litigation** 2:17
**little** 9:4 14:2
24:11 35:19
36:13 59:11
67:22 70:2
71:5 83:2
98:5 115:22
**live** 82:10
**Lived** 12:4
**Lloyd** 107:25
**local** 64:2
**logistic** 38:12
**logistical**
32:20,21
38:10
**long** 13:3,12
13:20,22
15:2,8,24
21:19,21
22:20 46:12
53:19 73:22
87:25 89:9
102:22
**longer** 96:22
**look** 9:8,19
21:2 26:11
29:13 37:7
42:6 48:17

54:8,18
55:15 58:20
66:11 79:23
85:2 95:8,17
112:9 116:4
116:4 118:7
**looked** 9:23
45:25 46:1
64:4 95:16
110:23 116:3
**looking** 9:15
16:13,21
17:8,12
18:21 22:12
26:9 27:5
53:13 56:14
56:16 59:12
60:22 89:1,8
99:9 107:3,4
110:20 112:4
112:6
**looks** 55:6
98:20
**Lori** 1:14,24
121:5,20
**lose** 87:17,20
**lot** 6:25 8:1
15:22 30:11
31:14 34:11
36:7 39:11
39:21 42:25
44:11 61:19
63:5 67:9
73:10,14,18
74:2 80:25
81:3,3,7
93:25 96:22
98:18 110:7
112:11
**lottery** 63:18
**Louisiana** 15:7
**low** 91:8,16
**lowest** 45:6
**Lt** 22:17

lucky 12:5

**M**

machine 121:7
maintain 17:3
maintaining
   16:19
Maj 53:25
major 2:16
   12:21 16:10
   16:11 20:22
   31:11 34:24
   43:15 53:25
major's 19:18
majors 15:12
   30:4 32:4
   37:13
making 40:3
   71:12 92:11
   109:10
man 46:9
managed 74:5
manual 46:18
map 80:14
mark 83:3
marked 54:16
   83:4,15
   99:14,15
   104:15
married 63:11
marshal
   103:13
martial 103:14
master's 12:7
   12:8
math 15:11
Mathematics
   12:24
matter 1:13
   7:2 21:12
   106:10 117:6
matters 43:3
   105:21
McCoin 1:14

1:24 121:5
   121:20
meal 6:7
mean 8:24
   10:8,17
   16:20 17:6
   17:11 18:20
   18:24 19:3
   19:22 23:10
   25:2 29:10
   30:9,13,14
   33:23 34:7
   36:4,6,18
   37:24 39:19
   39:23 41:6
   41:14,15
   42:3,12
   43:19 49:20
   55:16 56:11
   58:13,22
   59:10 60:19
   60:22 62:1
   64:22 66:2
   66:22,23
   70:11 71:4
   71:10 79:6
   81:22 82:7,9
   82:18,19
   84:24 88:16
   90:7,14 94:6
   94:7,8,15,21
   95:4,5 96:5,5
   96:23 100:2
   100:14
   101:23,25
   102:9,11,18
   102:19
   103:24 105:9
   109:9 110:10
   110:22
   111:24 112:3
   112:8,17
   115:8 116:22
   118:16,23

means 6:17
   31:9 35:17
measures
   19:12 59:9
   114:12
medical 37:17
meet 34:23
   52:6 88:4
   96:4 102:13
meeting 35:4,6
   35:15 36:7,8
   37:10 40:8
   43:13 44:24
   45:14 51:23
   52:23 53:1,6
   53:9,17,19
   53:22 54:2
   56:10 59:1
   61:16 100:19
   101:18 104:7
meetings
   34:25 40:24
   76:14 86:12
member 63:7
   63:11
members 63:4
   112:15
memory 29:2
   52:1 54:10
   85:18 86:21
   107:20
mention 76:18
mentioned
   33:18 51:22
merits 118:8
met 24:25 52:8
   102:25 114:6
methods
   115:7,7
Michael 5:6
   8:7 88:1,4,14
   89:9,10,10
   89:17 91:16
   92:17 93:7

94:12 96:9
   98:18,23
middle 18:11
   61:9
military 12:9
   16:15 17:19
   17:20 25:9
   25:12,14
   33:8 74:13
   82:7 85:24
   97:20,20,25
   98:17 100:7
   108:9
militia 68:23
million 62:9
mind 25:4,19
   63:15 66:20
   80:9 91:5
minus 40:12
minute 55:25
minutes 11:11
   52:5 53:20
mischaracte...
   107:11
mischaracte...
   101:22
mischief 74:3
misconduct
   47:20 74:18
   78:10 84:16
   85:13 114:5
   114:19
   115:15 117:3
   117:19
   118:11
misconducts
   37:2
missing 107:7
   107:10
mission 32:13
mitigation 9:8
   9:11 114:12
moment 17:13
Monday 51:18

52:14,21
   53:8 80:9
   112:9
money 20:9
   60:23 62:17
   63:15 65:7
   65:10,13,17
   93:12 113:21
   114:18 118:4
   118:12
month 22:7
   38:21
months 12:4
   13:6,13
   14:20 15:25
   20:25 21:9
   21:22,23
   22:25 23:1,8
   46:23 85:7
morning 51:18
   80:9 101:24
   112:9
motive 109:13
move 38:20
   41:25 100:11
moved 42:6
MP 74:14
muddled
   61:18
multiple 37:22
   37:24 116:12
murder 58:4
   99:21 102:3
   103:1
murdering
   55:23 91:23
murders 72:16
   80:2 90:19
mythical 17:13

**N**

N 3:1 4:2 121:1
name 4:8 5:2
   5:10 17:25

Hadley, Justin D.                                   February 11, 2016

14

22:11,13
25:1 28:20
29:3 35:4,16
36:7 37:25
40:13 54:13
72:18 85:15
85:18 107:25
114:25
**named** 8:11
**names** 22:16
35:20,22,24
35:24 36:8
80:16 88:16
93:23
**narcotics** 73:8
**nature** 37:1
**NCO** 113:22
114:18 115:2
115:8,14
116:7,8,10
116:16,18,23
116:24 117:2
118:24
**necessarily**
68:6 98:23
**need** 7:1,12
9:22 21:4,6
21:11 32:20
38:24 44:15
76:15 112:1
117:2
**needed** 70:23
100:11
**needing**
102:19
**needs** 117:20
117:22
**neighborhood**
18:17
**neither** 70:21
**nested** 75:11
**networks**
42:15,15
**never** 5:16

29:10 61:4
62:20 63:10
63:21,21,22
63:22,22
65:1,10 69:7
75:11,23
79:18,19
80:14,15,16
80:17,20
88:22,23
89:6 93:3,6
97:1 101:13
104:18,23
107:22 109:2
113:20 115:1
117:16
118:16
**new** 2:5,5 12:2
12:3 14:16
15:21 19:15
19:16 24:2
38:14 39:1
65:12 98:7
**nine** 13:6
35:24
**Ninewa** 23:25
**NO.2:14-cv-...**
1:8
**nods** 6:13
**noncommis...**
37:14
**nondeploya...**
38:18
**nonjudicial**
19:11
**nonstory**
62:18
**normal** 30:7
**normally** 53:14
115:2
**North** 1:14
121:2,17,22
**northwest**
65:14

**Notarial**
121:23
**Notary** 1:15
4:4 121:21
**noted** 50:17
**notepad** 53:7
53:8,18
56:12
**notes** 9:5 53:7
53:7,18 54:9
**number** 30:3
45:22 63:12
74:7 85:7,7
94:25 99:16
99:24 112:20

---

**O**

**O** 4:2 121:1
**oath** 5:13,21
109:5
**Object** 106:25
**objection**
67:13 68:2
68:24 106:4
106:14
107:11
111:22
116:13
118:14
**objections**
67:17 68:6
**obligations**
96:4
**obviously** 5:9
20:11 31:7
36:4 42:14
46:7 47:24
50:19 56:1
57:11,13
58:13 65:24
74:3 80:8
83:20 85:15
85:21 87:5
88:10,21

99:9 100:11
102:1 104:2
107:25 111:5
**occurred** 52:4
**October** 58:16
**off-ramp** 48:20
**offense** 50:24
50:24 99:24
105:19 116:2
**offenses** 95:17
**office** 1:14 2:9
40:25 43:5
43:14 48:16
51:9
**officer** 13:7
14:23 16:9
17:2,6 30:5,5
37:14 38:10
38:12
**officers** 14:19
16:10 19:16
31:5,7 38:12
94:17
**offices** 48:2,2
**official** 25:22
26:11 74:20
**Oh** 9:25 10:25
37:6,23 49:3
49:15 51:6
55:5,10
74:11 92:1
101:15 106:9
**okay** 7:1,23
9:2 10:15,20
11:3 12:8
14:9 15:16
15:18,23
25:16 26:2
28:11,24
29:23 30:11
34:4 49:21
67:7 69:8
74:16 82:22
83:13 91:7

95:8 100:13
103:5 106:21
110:17 112:1
117:24
**old** 10:7 11:24
**once** 13:25
14:2 30:8
39:10 46:12
54:13 61:23
62:12,15
63:6 87:20
95:10,10
**ones** 70:14
111:4
**open** 37:5
40:16 114:25
**operational**
33:10
**operations**
30:5 38:11
38:12
**opinion** 7:2
67:22 88:14
89:17 90:6
91:8,16,24
92:19 97:18
103:24
104:19 105:5
105:8 110:11
**opinions**
90:16
**opportunities**
46:9
**optimistic**
115:22
**oral** 6:12
**orally** 6:16
**orange** 6:4,4,6
**order** 16:19
17:3 101:5
101:25
114:19
**ordered** 101:3
**ordering** 92:17

Hadley, Justin D.                                    February 11, 2016

15

orders 100:20
organization
  19:24 30:4,6
  30:16,17,25
  32:22 33:11
  34:22,25
  35:12,18
  37:12,16
  38:2 39:9
  61:4 74:23
  75:4 82:13
  84:1 90:3
  94:18 96:2
  98:15 109:14
  114:9
organizations
  31:4,8 32:15
  32:20 37:15
orientation
  19:15 34:23
oriented 15:11
originator
  84:12
ought 44:11
outcome
  112:16
outset 67:17
outside 94:17
overall 28:4
overinflate
  65:3
override 71:23
  72:3
owned 28:7

―――――― P ――――――

P 4:2
p.m 1:13 4:1
  72:12,12
  119:8
packet 50:19
  51:14 56:15
  56:25 57:12
  57:13,14

71:17 94:23
packets 84:17
pact 94:22
page 3:2 54:17
  79:22 80:3
  85:11 94:11
pages 121:7
paid 118:20
paperwork
  47:12 48:1
  57:9 58:7
parade 26:23
paragraph
  54:18,21
  80:3
paralegals
  37:16
parents 5:6
  94:1
parking 66:4
Parks 2:4
part 25:18 28:9
  31:10 33:7
  73:19 76:15
  79:21 89:18
  94:6 101:7
  117:14
particular 6:17
  14:22 16:25
  28:13 35:15
  35:19 36:19
  36:23,24
  37:8 47:24
  48:25 49:21
  49:22 79:20
  83:22 85:17
  100:9,12
  101:4 110:1
  110:23 118:7
parties 121:14
parts 47:17
party 7:21
pass 94:15
passed 62:14

passing 61:10
  62:20
patch 23:23
path 44:16,17
  45:9 95:7
pattern 115:14
patterns 47:19
pause 55:25
paycheck
  118:21
paying 118:21
pear 6:5
Peden 66:7,20
  86:7,18
Peed 2:3 5:3
penalty 104:20
people 6:25
  8:1 20:3
  22:21,22
  28:6 30:3,21
  30:24 31:9
  31:16 32:14
  32:25 37:22
  37:24 41:22
  45:25 49:21
  67:3 68:15
  75:8 89:18
  94:17 95:6
  97:3,11,13
  97:16,17,19
  97:21 98:24
  109:10
  112:22
  115:21,22,23
  116:1
perceived
  113:21
percent 63:6
perfectly 68:7
performance
  95:17 116:4
period 20:23
  20:24 35:19
  61:21 62:19

67:1 70:6
  75:7 85:8,9
  91:19 101:10
perjury 104:20
permanent
  33:1
permissible
  68:7
permitted 94:4
person 8:9,14
  27:9 36:12
  46:14 54:3,4
  61:12 69:19
  77:25
personal
  41:18 88:17
  121:9
personalities
  74:25
personality
  75:2
personally
  5:10 37:25
  44:1 65:18
  70:9,11
  88:16 113:7
  113:20
personnel
  23:18
perspective
  31:18 32:6
  43:6
perspectives
  17:11
petty 62:2
Phoenix 83:11
phone 28:21
  28:23,25
  29:6 93:17
phrased 97:1
phrasing
  108:4
physically
  21:24

physicals
  47:25
picked 24:25
  39:4
picture 91:2
piece 65:14
  80:13
pieces 90:9
pissed 41:19
place 23:24
  27:25 47:25
  56:23 74:25
  94:10 110:1
placed 91:18
  109:22
placing 67:4
Plaintiff 4:4
plaintiffs 1:7
  2:2 5:4
planning 79:16
plans 92:11
platoon 30:19
  31:4 42:1
play 112:9
pleaded 92:17
please 4:8 7:7
  25:9 49:12
  54:17,17
  68:4 69:4
  79:23 80:2
plenty 24:15
  46:8
plug 32:11,21
plus 28:9
  40:11
point 13:16,23
  15:12 20:24
  30:22 38:5
  51:14 54:12
  65:21 71:18
  73:5 111:6
  114:5
pointing 6:14
points 59:21

Hadley, Justin D.                                   February 11, 2016

16

**policy** 9:9 41:7
82:3,14 87:9
94:6
**Polk** 15:7,8,13
15:14,15
**poor** 25:10
**pop** 35:4
**popped** 40:14
**popping** 58:5
61:23
**position** 38:7
81:25
**positive** 44:12
**possible** 73:21
74:18 77:9
103:2 110:2
**possibly** 38:19
41:23
**post** 22:22
27:9,17,19
27:23 28:3
50:10 94:7,7
94:8
**potential** 82:5
**potentially**
64:9 118:13
**Powell** 53:25
53:25
**power** 32:23
45:8 96:3
**predominan...**
32:5
**prefer** 71:2,13
103:5,11,12
**preferring** 77:5
99:20,23
100:4
**prepare** 8:25
9:4,23,24
29:11
**prepared**
121:8
**preparing** 13:7
**present** 2:15

43:16 63:14
63:19
**presented**
36:4 55:8
65:2 76:24
100:16
110:18
**presenting**
35:9
**presents**
55:18
**pretrial** 70:18
71:9 74:4
101:11,13,19
102:8,13,19
102:21 104:8
**pretty** 6:7 15:9
23:22 45:13
87:25 89:9
89:12 91:8
91:20,24
114:14
**preventing**
6:19
**previous** 63:17
73:16 87:19
**previously**
32:17 54:16
80:6 83:14
99:15 104:14
**primarily**
102:25
**primary** 84:9
84:13
**prior** 22:24
29:16 58:10
70:8 79:25
84:6 85:14
86:8 88:14
100:16,18
101:10
113:14 117:1
117:20
**private** 31:13

77:25 89:2
95:2 116:11
**privates** 89:3
**privileged**
10:23 11:4,5
11:8
**privy** 92:25
109:16,18
**probability**
99:10
**probably**
16:16 17:10
17:12 18:2
18:10,12
20:19 26:24
27:10,12
28:4 31:2,6
33:23 35:21
35:21 41:1
41:12,17
42:22,24
44:2,12
45:14 47:22
49:17 51:20
53:10 54:12
60:15 62:4
69:18 75:14
77:21 83:24
84:20 91:20
95:12 97:7
99:11 112:13
112:23
**problem** 18:7
40:21 42:3
52:19 60:1
61:18 72:17
75:17 76:2,6
76:19 81:21
99:11 109:6
116:17,19
**problematic**
89:11
**problems**
44:14 55:9

87:14 97:25
98:16,25
108:3
**procedures**
69:17 99:7
**proceed** 71:15
**proceedings**
1:15 121:10
**process** 45:20
47:2,13 48:8
48:9,21 49:2
50:5,18
64:11 68:20
69:12 70:12
71:3 72:9
88:11 98:21
100:12
109:20,21,24
119:2
**processes**
69:17 75:7
**processing**
47:7
**product** 11:7
**professional**
88:25 112:11
**program** 72:20
**promoted**
13:16,23,25
14:1,2 24:9
24:10 95:1
**promotion**
24:13
**properly** 59:18
76:23
**property** 65:14
**prosecute**
19:2 100:6
**prosecuted**
78:20 79:3
79:18
**protect** 82:4
**prove** 94:10
105:25

**proven** 78:5
**provide** 75:25
90:15
**province** 23:25
23:25
**Public** 1:15
121:21
**pull** 36:19
**pulled** 9:17
**punishable**
105:18
**punishment**
19:11
**purchase**
60:17
**purchases**
59:5
**pure** 64:6
**purely** 35:22
**purpose** 14:15
41:17
**purposefully**
47:6
**purposes**
50:17 68:7
106:23
**pursue** 104:9
**put** 11:16,19
19:6 27:4
28:21 34:18
39:9 42:9
45:4 47:1
59:19 62:13
67:2 71:8,18
72:6 74:3
77:1 83:20
84:3,7,25
86:25 92:2
95:18,24
96:8 98:12
101:11 102:8
102:12,14
103:14,15,15
103:16,20

104:2,7
**putting** 37:3
44:16 62:21
81:24 84:19
90:9 102:22
**Pvt** 46:22
72:14 85:12
85:13 89:7,8
95:1 110:22
113:13 114:9
116:25 117:1
117:8,9,12

**Q**

**quarterbacki...**
51:18 80:9
112:9
**question** 4:19
7:7,14 11:14
18:11 31:21
36:6 44:7
48:24 53:4
53:23 58:25
60:11,25
63:24 67:20
69:4,6 70:25
71:20 72:24
80:23 96:12
97:1,18
99:12 105:22
106:6 108:2
111:13,25
114:20 118:9
118:17
**questions**
4:16 5:19,25
9:14 10:14
11:24 53:14
60:2,10
83:13 106:17
107:17
113:12 119:7
**quick** 46:20
**quite** 20:5

36:25 61:6
73:14 74:5
80:22 82:25
89:15

**R**

**R** 4:2 121:1
**radar** 66:16
74:6 112:17
**random** 36:16
**Ranger** 13:19
**rank** 13:14
16:10 20:21
27:13 30:24
31:13,19
49:6 60:23
**ranking** 27:8
**ranks** 16:19
30:2 31:23
**read** 25:17
33:25 44:3
46:7 54:19
54:22 57:4
57:13,14
80:2 85:17
107:16,18
120:4
**readiness**
82:13 96:1
**reading** 56:14
80:4,7
**ready** 8:21
38:19
**real** 102:10
**realize** 73:14
97:13
**realizing** 17:15
**really** 6:11,15
15:21,22
27:16 30:14
38:17 39:24
42:2 43:1,7
43:13 44:9
46:16 63:21

65:12 68:17
71:5 75:11
77:1 82:13
90:25 94:24
98:15 111:24
112:4 113:17
115:12
118:22
**realm** 37:18
**rear** 38:14 39:1
39:8,14
73:12,15
**reason** 31:10
36:9 41:17
53:5 69:24
70:1 75:12
76:15,20
77:13 81:25
82:15 86:15
91:3 102:10
106:1,11,21
111:15,18
116:10
**reasonably**
116:18
**reasons** 35:10
35:25 97:21
102:1
**reassigned**
32:18
**reassigning**
41:8
**recall** 22:10
23:17 34:5
34:16 36:2
37:4 40:3,15
42:17 53:18
54:7 55:8
56:9 59:4
60:25 61:11
70:3 73:4,5,9
75:15 85:12
88:14 89:6
90:24 96:9

104:4,16
105:17 106:9
110:4
**receive** 9:20
10:1 76:7
86:17
**received** 45:18
62:9,15,17
63:5 76:10
82:25 111:8
113:14
117:12,16,18
**receiving**
113:19 114:8
**reception** 98:7
**recess** 72:10
72:12
**recognize**
83:15 99:17
**recollection**
43:12 52:17
54:24 85:20
113:18,23
**recommend...**
51:2
**recommend...**
48:2 107:5
**recommended**
45:6
**reconnaissa...**
26:10,14
**record** 4:9
5:25 10:10
10:21 11:17
11:20 20:11
20:12 25:15
26:11 28:22
28:23,25
67:18 84:15
86:25 94:22
100:24
104:11,13
109:22
113:10

121:10
**recorded**
93:18
**records** 29:14
29:17 91:12
113:8
**recruited** 17:8
**recruiting**
65:23 67:24
**reenlist** 42:10
**refer** 30:12,24
101:23
**references**
109:10
**referred** 44:19
51:23
**referring** 30:21
102:15
**reflect** 28:25
**reflected**
70:16
**reflects** 71:1
**refresh** 29:2
52:1 54:24
85:18,20
**refreshed**
107:21
**regarding**
19:11 79:25
80:3
**regiment**
30:19
**regimented**
39:7
**registered**
59:18
**regularly**
114:3
**regulation**
33:21 74:20
79:17 94:5,9
114:22
**regulations**
33:18 78:25

Hadley, Justin D.                                          February 11, 2016

18

79:2 94:4
**rehabilitate**
  96:3
**rehabilitative**
  41:12
**related** 36:10
  58:7 62:23
**relatedly** 60:18
**relating** 8:7
**relation** 102:5
**relationships**
  33:11
**relative** 121:14
**relevant** 19:6
  29:7,17
  104:22
**remaining**
  103:6
**remarks** 101:7
**remember**
  6:16 7:10
  13:21 14:1
  15:25 16:2
  17:25 18:6,8
  18:18 20:18
  22:8,12,16
  22:20,25
  23:12,16
  27:15,16
  28:6 35:3,15
  36:7,8,9,14
  36:22,24,24
  37:10,20,25
  40:21,22
  41:6 42:23
  43:5,7,9,10
  43:13,14,14
  43:16,18
  44:1,7,8,9,10
  45:23 46:8
  47:18,21
  51:15,17,20
  53:6,6 54:13
  55:5 56:5,11

56:12,13,14
57:15,16,19
57:20,20,22
57:25 58:5,8
58:9,12,15
58:23 59:6
59:11 61:8
61:17,17
62:5,7 66:12
70:11,11
72:18,22
73:21 77:18
80:10 84:4
85:15,16
86:23 87:18
87:21,23
88:11,24
91:2,3,4
94:15 101:25
113:3,4,6,9
113:16,17,20
119:2
**remembered**
  56:6
**remind** 9:9
**reminded** 53:6
  53:10
**removed** 42:17
  47:14
**repeatedly**
  116:7
**repeating**
  68:13
**rephrase** 4:21
  70:25
**replacing**
  22:10
**report** 28:13
  59:25 76:8
  77:15 78:4
  78:15 79:15
  79:24 82:1
  86:18 111:11
  111:16,18

114:19
116:11 117:2
118:11,13
**reported** 1:24
59:24 77:17
77:18 78:12
81:20 111:19
117:20,23
121:6
**Reporter** 1:15
121:21
**reporting** 79:4
**represent** 5:3
**reputation**
  86:14
**request** 11:17
84:18,22
**requests**
121:11
**require** 32:23
**required** 74:17
78:11
**requirement**
71:1 78:7,9
78:15
**requires** 47:2
**reserved** 119:9
**respect** 60:9
65:3 94:11
100:20
113:12
114:15
**respectful**
21:15
**responsibility**
39:10
**responsible**
27:18 35:2
**responsive**
5:25
**retained** 3:12
49:8,16 87:2
**retaining** 87:6
**retention** 87:9

**retrospect**
84:2
**returned** 23:19
38:6
**returning** 23:3
**review** 9:6,7
35:11 121:11
**reviewed** 35:7
**reviewing**
33:18 91:12
**revoked** 42:23
**Reynolds**
22:11,16,17
22:17 34:15
46:6
**riding** 26:19
**right** 5:25 8:10
8:10,12 13:5
13:5 14:3,4
14:11 15:17
16:3 17:1
18:1,10,17
22:5,6,19
23:9,23
24:20 27:4
27:11,15
28:16 31:19
32:25 33:19
35:22 42:22
45:9 46:17
48:10,11,24
49:17 54:11
55:7 58:13
58:17 59:2
61:9,14 67:2
67:5 70:4
71:6 77:6
78:16 79:1,3
79:5 80:12
80:17 84:4
85:21 86:2
86:19 88:2
91:3,16 96:1
96:18,19,21

96:24 98:9
98:10,12,19
100:16
101:17,17
102:25
109:25 110:6
110:19,20,21
110:22
112:17,25
115:5 116:23
117:10
118:24,25
**rise** 102:22
**risk** 9:8,11
33:19 35:8
102:12
**road** 44:12
45:15 97:2
103:18
**Roark** 1:6 5:6
5:9 8:8 70:8
72:15 80:1
88:1,4,14
89:9,10,10
89:17 90:19
91:16 92:4,4
92:17 93:7
94:12 95:1
96:9 98:18
98:23 113:15
**role** 74:9 81:6
**room** 37:19
113:24,24
**Rosario** 80:3
81:13,19
**Rosario's**
81:25
**ROTC** 17:7
**round** 91:5
**routinely** 40:9
40:24
**RPR** 1:14,24
121:5,20
**rule** 32:4 42:12

Hadley, Justin D.                                        February 11, 2016

19

67:18 116:6
**rules** 4:14,15

**S**

**S** 2:17 3:7 4:2
**S2** 42:18
**S3** 38:11
**S4** 38:9
**Salah** 23:24
**Salmon** 85:12
**Salmon's**
  85:13
**sat** 9:16 18:24
  43:11 94:19
  105:5
**Savannah** 28:1
**saw** 35:3 58:6
  80:16 85:6,9
  90:9 113:20
**saying** 6:20,20
  10:5 24:1
  35:17 45:3
  45:19 49:13
  52:10 54:4,7
  65:18 66:4,5
  76:3,17
  78:17 79:5
  89:22 94:2
  99:20 115:19
**says** 26:11
  44:2 78:19
  82:20 85:21
  99:24,24
  100:1 114:25
**scale** 114:13
**scheduled**
  52:23
**Schofield**
  21:18 22:1
**school** 14:8,12
  14:25 16:3,4
  16:15 17:17
  20:7,15
**schooling**

13:6,10
  16:11
**schools** 14:17
**science** 12:9
  16:16
**scot-free**
  96:23
**screen** 66:16
  74:7 112:17
**Seattle** 1:2
  2:10
**second** 13:15
  14:3,6 46:9
  80:3 85:11
  104:12
  113:11
**secretary** 8:13
**section** 42:18
  101:4
**security** 41:8
  42:13,19,22
  80:8
**see** 9:25 18:15
  22:4 28:24
  35:1 36:11
  40:21 42:1
  44:5 53:24
  54:9 56:24
  58:16 60:1
  60:16 66:11
  68:1 70:17
  73:9 76:16
  76:18 83:18
  91:24 94:18
  97:6 98:4
  99:22 101:17
  106:18 107:6
  108:3
**seeing** 58:24
**seen** 51:22
  54:23 56:18
  63:4,13
  79:18 80:18
  81:12 83:5

83:11 84:5,7
  85:5,10
  93:15 102:18
  104:16,18,23
  106:7,12,24
  107:15,21,22
  109:2 110:20
**select** 16:9
**Selected** 24:20
**selects** 25:3
**send** 16:10
  38:21
**sending**
  116:17
**senior** 31:7
  37:11,13
**sense** 6:14
  38:16 42:25
  62:22 67:8
  71:6,11
**sent** 9:24
  43:18
**September**
  22:4,5 40:11
**sergeant**
  31:22 43:15
**series** 59:21
**service** 63:11
**services** 51:12
**setting** 5:15
  34:20
**seven** 18:16
**sewer** 80:14
**SGLI** 63:5,15
**Sgt** 53:25,25
  93:11 113:2
  113:4,13
  116:24,25
**shalt** 114:25
**share** 82:16
**sheet** 73:1
  86:4 89:8
  103:23 120:8
**shock** 66:9,10

**shocked** 50:10
  60:5
**shocking**
  89:25
**short** 58:16
**shorthand**
  121:7
**shotgun** 86:19
**shoulder** 99:1
  104:20 111:8
**show** 7:9
  19:15,17
  79:21 83:14
  86:12 98:13
  99:15 104:14
  116:7,11
  117:14 118:2
**showed** 17:13
  22:6,9 23:2
  23:12,14
  38:13 56:10
  93:23
**showing** 54:16
  114:5 115:4
  117:13
**shown** 91:2
**shows** 98:8
**shredder**
  49:17
**side** 54:19
**sign** 50:21,25
  96:5 100:11
**signature** 51:1
  119:9 120:12
**signed** 49:1,5
  58:3 73:6
  104:15 120:8
**significant**
  59:8 60:16
  60:17 109:4
  112:18
  117:15
**similar** 47:17
**simple** 25:25

71:10 82:23
**simply** 110:6
**single** 47:2
**sir** 53:16 54:18
  104:17
**sit** 6:25 9:3,8
  19:1,3 29:11
  31:17 34:24
  41:15 59:23
  65:5 66:10
  73:18 79:10
  95:7,13,21
  96:17 102:7
  103:14,22
  109:17
**sits** 103:21
**sitting** 7:23
  87:4
**situation** 40:2
  81:12 98:24
  99:1
**situations**
  70:17 77:3
  84:6
**six** 14:20 21:9
  35:24
**SJA** 54:12 70:4
  70:19 72:3,6
  101:20
**SJA's** 48:2
**slightly** 47:16
**small** 73:24
**smaller** 21:2,6
  28:5
**soldier** 30:25
  31:2 34:11
  41:8,13,25
  42:2,9 44:15
  45:1,4,5
  50:20,22
  51:4 55:14
  62:25 64:4
  64:13,14
  67:23 68:21

Hadley, Justin D.                                    February 11, 2016

20

| | | | | |
|---|---|---|---|---|
| 69:9,22 | 108:22 | speak 6:16 | 65:17 66:18 | 107:24 |
| 71:23 75:16 | 109:21 | 18:5 52:11 | spent 20:8,25 | 108:10 109:1 |
| 75:25 76:11 | solider 106:7 | 54:6 | 65:10,13 | 109:2,5,6 |
| 76:19,20 | 106:11 | speaking 8:5 | spoke 52:12 | statements |
| 77:5 78:1,4 | 108:14 109:8 | special 56:9 | 52:20 88:22 | 56:19 57:3 |
| 78:11,15,19 | 113:22 | 71:11 102:6 | spoken 4:13 | 57:14 |
| 79:15 81:12 | 116:17 | 114:9 | 8:16 52:9 | States 1:1,9,14 |
| 81:17,25 | 118:10,11 | Specialist 80:3 | 88:19 89:6 | 2:9 4:25 8:6 |
| 82:4,5 89:11 | solution 46:2 | specialized | sponsorship | 14:17 17:6 |
| 91:9,23 | solve 116:19 | 80:25 81:4,7 | 98:11 | station 12:25 |
| 94:23 95:4,5 | somebody | 81:9 | spot 16:22 | 33:2 |
| 95:25 97:2,7 | 95:25 | specific 8:3 | spots 23:22 | stationed |
| 98:8,16,23 | someone's | 16:22 17:18 | spouting 82:5 | 21:21,22 |
| 98:24 102:12 | 87:4 95:22 | 19:8 70:4 | 116:5 | 22:1 |
| 104:24 | 95:23 | 104:4 112:21 | squad 30:18 | status 96:20 |
| 105:15,22 | someplace | 114:22 | squadron | stayed 14:7 |
| 106:1,21 | 113:8 | specifically | 26:10,11,13 | stays 20:12 |
| 107:2 108:11 | somewhat | 8:5 34:16 | 29:25 30:14 | step 55:12 |
| 108:22,24 | 37:17 | specifics 36:2 | 30:22 32:24 | Stewart 2:10 |
| 109:3,14 | sorry 10:13 | 36:14,18 | 38:10 | 22:2,3,15 |
| 111:9,10,15 | 14:24 39:14 | 43:7 | staff 16:7 54:6 | 23:6,18,19 |
| 111:20 115:3 | 41:20 49:23 | speculate | stage 17:1 | 24:4,6 25:21 |
| 118:12,18,25 | 49:25 60:18 | 67:14 68:3,5 | standard 96:6 | 27:2,8,21 |
| soldier's 107:3 | 60:19 87:13 | 68:10 82:2 | standards | 38:6 87:16 |
| soldiers 17:3,4 | 107:13 | 109:15 | 47:3 96:4 | stick 36:12 |
| 19:16 28:8 | sort 16:18 19:9 | 110:12 | stands 66:7 | 60:3,4 64:7 |
| 31:13 35:8 | 29:21 33:2 | speculation | star 27:9,14,17 | sticks 91:4 |
| 35:11 39:11 | 33:19 41:4 | 64:6 84:14 | 27:18 91:1,6 | Stop 10:19 |
| 42:6,7 55:8 | 53:1 55:11 | 85:1 105:9 | stars 94:17 | stovepiped |
| 55:22,23 | 57:1,2 58:6 | 106:4 110:15 | start 30:3 | 75:10 |
| 58:4 59:13 | 71:20 82:3 | 111:23 | 38:22 49:1 | straight 23:5 |
| 59:15 63:1,4 | 84:5 91:1,5 | 112:24 | 50:9 57:22 | Street 1:14 |
| 64:1,15 65:8 | 96:20 101:9 | 116:13 | 61:18 63:8,9 | 2:10 |
| 65:11 66:19 | 105:24 114:4 | speeding 5:17 | 99:9 111:6 | strip 64:2 |
| 66:20 67:9 | 118:10 | spell 28:19 | started 17:15 | structure |
| 67:24 68:22 | sorts 64:16 | 29:2 | 44:18 50:7 | 25:21 26:7 |
| 69:10 73:11 | sound 8:12 | spelling 29:3 | starts 47:13 | 29:24 69:18 |
| 73:18,24 | 55:3 59:11 | spend 17:6 | 63:8 | studies 16:15 |
| 74:18 77:10 | 65:8 | 21:23 22:23 | state 4:8 24:1 | 19:4 |
| 77:14 83:23 | sounds 6:23 | 31:14 82:11 | 121:2,22 | study 16:6,8 |
| 84:17 86:12 | 10:1 22:6 | 82:12 | statement | stuff 11:22 |
| 88:18 90:20 | 55:6 68:14 | spending 31:6 | 57:16 58:3 | 19:6 21:13 |
| 97:24 98:10 | 115:7 | 31:12 62:25 | 73:7 81:6 | 37:7 43:13 |
| 105:10,12 | south 15:5 | 64:1,14 65:7 | 85:20 104:15 | 82:16 95:18 |

Hadley, Justin D.                                    February 11, 2016

103:17 107:3
112:12
**subjects** 18:23
**submission**
85:19
**subordinate**
114:19
**subsequent**
117:14
**suit** 8:6
**Suite** 2:10
**suited** 97:4
**summer** 23:2,3
**superior** 114:1
**supervise**
91:13
**supervision**
121:9
**supervisor**
117:25 118:4
118:6
**supply** 113:24
113:24
**supportive**
45:13
**supposed**
39:13,15,17
42:18
**sure** 4:17 5:14
6:18 14:11
19:25 20:14
26:8 28:16
32:7 34:18
35:12 39:15
45:13 46:25
47:8 48:8,9
48:22,24
49:3 50:4,15
51:20 52:4
57:2 59:20
65:20 71:14
76:5 79:6,7
79:17,21
82:25 85:17

88:8,25 91:7
94:14,14
95:21,24
96:25 98:6,8
98:9,12
102:24
105:19
109:22,24
111:24
112:21,23
113:7 114:24
118:9
**surprised** 28:7
31:15 42:20
58:6 59:12
66:2
**swore** 38:9
**sworn** 4:4
56:19 57:13
57:16 58:3
73:7 104:15
108:25 109:5
121:6
**symbol** 90:22
90:24
**synonym**
30:16
**system** 80:14
87:15 95:15

——— **T** ———
**T** 3:7 121:1,1
**tactical** 33:9
**take** 7:15
17:21 19:12
46:14,23
47:25 54:8
54:18 55:14
59:9 71:16
72:7,10
79:11,23
96:22 100:3
**taken** 23:14
42:13 80:1

100:1
**talk** 6:17 19:1
19:2,4,4 21:4
37:9 39:25
43:4 44:4
54:1,12
57:21,22
63:16 69:8
82:8 89:3
**talked** 8:1,9
19:20 36:1
37:21 40:23
43:10,11,24
43:25 44:24
55:4 56:12
80:19 86:11
90:3 112:21
**talking** 6:12
18:2 21:13
28:6 31:6,8
38:2 53:11
54:21 59:14
62:16 67:1
70:6 72:15
73:1,11
83:19 85:16
86:4 88:1
89:1 92:3
101:15 103:1
114:16
**tattoo** 90:20
93:2,3,4,7
**taught** 18:22
**TDS** 51:12
**teach** 17:2
**teaches** 16:22
**teaching** 16:25
**team** 82:7
**technically**
31:20 78:7
**tell** 5:24 7:3
8:21,25 18:3
33:13,24
34:1 39:20

41:10 49:4
59:1 66:25
83:1 95:15
97:8
**telling** 34:16
43:5 44:8
64:24 67:10
68:9 105:22
105:24
110:12
**Temptations**
80:15
**ten** 11:11
15:25 30:17
**tens** 64:15
**term** 30:11
**terms** 25:8
27:1 28:12
30:2,7 33:6
87:24 100:20
**terrible** 115:7
**testified** 4:4
5:12,16
67:14 68:3,9
**testimony** 68:5
107:12 120:5
120:6 121:6
**Texas** 20:18
20:19 26:22
**Thank** 25:4
53:16 57:6
108:23
**thing** 6:11 7:3
7:13 23:1
25:4 26:15
30:8,9,10,18
37:2 39:24
42:9,22
43:10 45:20
46:3 47:24
48:10 51:11
58:5 59:19
59:22 64:6
65:17 67:16

73:9 74:1,1,8
76:12,23
83:10 87:10
92:5 93:23
94:20 100:10
100:10
103:12 105:7
105:20 106:3
113:7
**things** 4:18
9:10 17:9,15
17:17 19:1,4
19:6,9,13
30:17 31:9
32:11 36:11
41:15,21,24
42:8,11,12
43:12 44:4
44:11,13,25
45:1,3,9,12
46:5 47:21
47:23 55:6
56:5 59:18
61:18,19,22
61:25 62:2,6
62:11 63:10
63:10,13,14
69:13,16
70:13,21
73:12,13
75:4,5,7,9,13
77:22 79:8
84:2 86:3
89:24 90:17
94:21 96:24
107:5 109:25
110:7,7,8,13
110:24 111:7
112:10,13
115:9,24
116:21
**think** 5:18 7:7
7:8,16 8:9,14
9:3 15:9 17:5

Hadley, Justin D.                                    February 11, 2016

17:13 18:13
18:21 20:2,3
21:11 22:6
23:7,11,11
28:5 30:23
30:23 31:1,1
31:16 32:3,5
33:21 36:18
38:23 41:2
41:16,16,18
44:5 47:4
48:24 51:11
51:12,15,16
51:19 52:14
52:20 53:3,4
55:16,24
56:3 58:20
59:2,16 60:3
60:9,15
61:15 63:2
64:10,24
66:22 68:15
69:24 70:1
74:23 77:13
78:21 79:13
80:9,22,23
81:10,24
82:4 84:18
84:20 88:22
91:10 94:24
95:1,3 96:6
97:7,13,16
97:17,19,20
98:1,5
100:10 105:2
105:12 106:1
106:10
108:16,17,18
108:21 109:4
109:20 110:2
110:3,5,6,13
110:14,24
111:6,15,17
112:1,5

114:20,23
115:12,16,17
115:20,21,21
116:9,10
117:7,7,11
117:17 118:5
118:5,6,7,10
**thinking** 5:17
  6:6 31:3
**thinks** 95:5
**third** 46:9
**THOMAS** 1:5
**thou** 114:25
**thought** 17:14
  23:13 38:8
  40:2 43:17
  53:23 58:14
  64:9 67:10
  80:10 89:12
**thousand**
  30:21 32:10
**thousands**
  62:25 64:15
  66:18
**threatening**
  79:16
**three** 15:3,9
  18:15,16
  20:7 23:8
  27:15 31:23
  58:22,22
  68:9 73:25
**threshold**
  103:20
**Thursday** 4:1
**ticket** 5:17
  66:4
**Tiffany** 5:7 8:8
  93:20
**tight** 92:13
**time** 7:12,25
  13:14 14:3,6
  17:1,8,11
  18:23 20:19

20:20,21,23
20:24 21:15
21:24 24:4
25:20 28:18
31:6,12,15
31:16 34:7
35:3,18,19
36:19 37:5,6
37:8 38:9
40:1,7,11,13
40:15,18,25
41:1 52:8,13
54:12,23
55:1 56:1
58:15,18
60:4 61:6,8
61:14,21
62:16,19
65:21 67:1
67:15 70:6
71:16 72:7
73:5 75:7
78:13 80:21
82:12 84:7
85:5,6,8,9,17
85:22 87:17
87:19 91:19
95:19 97:6
97:19 100:9
100:12 102:2
104:3,5
106:9 107:18
108:1 110:1
110:5,9
112:1,22
**times** 39:19,20
  63:5 68:9
  87:10 116:12
**TIMOTHY** 1:5
**title** 25:22 26:5
  26:9
**titles** 27:21
**toast** 6:4
**today** 6:3 10:5

29:16 31:18
52:7,9 54:15
54:22 59:23
60:4 69:9
107:24
109:17
112:21
**today's** 8:22
**told** 6:3 37:4
  39:19 52:10
  54:9 58:2,9
  58:12 59:4
  62:12 69:9
  70:15,22,23
  104:5 110:11
  111:9
**tons** 79:2
**tools** 41:12
**top** 66:13
**topic** 63:23
**totally** 53:9
**tracking** 25:16
**TRACY** 1:9
**Trade** 1:14
**traditional**
  38:15
**Traditionally**
  63:4
**training** 14:19
  19:10 20:2
  25:7,8 80:25
  81:4
**transaction**
  93:12 113:21
**transcript** 6:15
  44:2 51:23
  121:12
**transcription**
  6:12 120:6
  121:9
**travel** 85:19
**treat** 55:14
  117:5,10
**Trenton** 12:2

**trial** 51:12
  104:1
**tried** 46:5
  80:21
**troops** 30:9
  38:5
**trouble** 34:12
  36:5
**troubled** 62:25
  64:14
**true** 10:8 18:4
  26:4,4 27:25
  66:4,18 77:7
  85:25 88:23
  92:22 105:8
  106:19 109:9
  109:11,11
  112:7 117:11
  120:5 121:10
**truly** 60:6 95:4
**truth** 5:24 43:3
  92:24 105:22
  105:25
**truthful** 112:8
**try** 4:21 6:15
  21:11 22:4
  41:24 45:8
  56:5 67:5
  69:4 80:23
  90:4,11 95:4
  95:15,18
  98:22
**trying** 6:17
  16:12 18:13
  19:6 20:13
  20:18 21:15
  22:12 31:21
  36:18,19
  40:17,18,20
  41:3 42:25
  44:5 45:2,2
  47:4,8,9
  53:24 56:22
  57:21,24

58:15 60:3,3
60:9 64:10
64:12 65:3
69:1,1,3,10
71:5 81:10
87:18 92:23
95:13,20,21
100:21
101:22
106:16 110:3
113:3 117:8
118:23
**turn** 55:19
**TV** 83:12
**twice** 13:25
95:2
**two** 8:10,23
13:21 18:1
22:7 23:1,8
27:9,15,17
27:18,21
30:4 31:4
34:8,21
40:12 52:20
56:1,2 58:4
62:13,13
66:2,6,15
70:17,21
87:22 100:5
102:7 117:18
**type** 22:25
26:7 36:25
39:4 42:14
69:22 70:12
74:1,7 75:9
84:8 105:18
108:21
**types** 19:13
26:6 33:10
46:18 109:10

**U**

**U** 2:17
**UCMJ** 31:21

57:2 78:19
79:1 94:22
99:25 105:18
114:24
**ugly** 68:17
**uh-huh** 6:20
33:20 78:3
**uh-uh** 6:20
**unaware** 29:15
87:10 101:1
**unclear** 71:5
**uncovered**
112:11
**underage** 95:8
**underneath**
90:12
**understand**
4:16,20,20
4:22 5:22,23
6:8,22 7:11
20:6 21:14
21:16 25:10
25:22 29:24
47:9 70:15
76:5 78:23
80:24 81:10
91:7,13 94:5
104:22 106:5
106:15,16
107:13
115:19
118:15,22
**understandi...**
17:18 92:9
92:21 100:8
102:24
**understood**
5:12 52:4
86:6 103:10
**Uniform** 17:19
**unique** 33:12
46:20 57:4
63:14
**uniquely** 64:5

**unit** 14:4,4
26:22 30:11
30:12,18,20
30:24 31:1,2
32:21 38:13
63:17 64:1
65:19 74:7
79:11 96:1
108:7
**United** 1:1,9
1:14 2:9 4:25
8:6 14:17
17:6
**units** 19:15,23
28:3 39:21
39:23 75:5,8
**University**
83:11
**updated** 114:3
**urgency** 71:11
**use** 55:24 73:7
78:14,16
92:13 98:4
**useful** 106:23
**usually** 14:19
22:22 35:5,6
39:5,8 50:7
59:20 70:13
76:14 89:4,5
101:16

**V**

**v** 4:25 8:6
**valid** 81:25
**validate** 44:4
**variety** 14:17
18:22 21:1
35:9,25 48:6
83:24
**various** 64:16
**verbal** 116:1
**version** 18:13
**versus** 22:25
56:6

**video** 93:10,13
93:15,17
113:13,20,21
**videos** 113:19
**view** 76:25
107:8
**visited** 40:19
**volume** 59:24
**voluntarily**
96:14
**voucher** 85:20
**vs** 1:8

**W**

**W** 1:5
**Wait** 10:19
**walk** 16:11
**walked** 8:23
53:11 88:21
104:6
**want** 20:3,14
21:12 22:15
24:3,7,17
34:22 38:20
39:25 41:13
41:22,22
43:20 52:3
56:4 66:9
68:15 69:22
70:3 71:20
76:5 80:11
80:23 82:4
82:14,16,22
88:20 89:25
91:7 95:7,24
97:20 98:6,8
98:9 102:7
108:14,19,21
109:13
111:18
113:16
115:23 116:2
**wanted** 11:23
43:16,22

70:17 101:19
**wants** 41:21
75:3 95:6
**War** 12:11
18:25 19:21
24:5,6,14,16
24:17
**wars** 26:16
**Washington**
1:1 2:10
**wasn't** 22:20
22:21,23
34:19 37:6
42:18 46:7
53:10 62:7
64:17,18,18
65:2 67:4
74:3 90:1
92:24 93:24
101:14,23
102:11,11,11
109:16
112:15
**way** 6:13 7:10
16:16,25
20:6 24:20
33:12 35:13
37:3 39:7,16
41:12,18
42:4,5 43:24
45:6,7 46:20
47:7 48:1,3
48:18 49:9
62:4 67:7
74:15 75:18
75:24 76:1
77:1 80:12
80:23 86:10
94:24 97:1,4
97:16 99:2,2
100:21 101:1
103:9 107:9
108:17 110:4
114:12

Hadley, Justin D.                                February 11, 2016

24

**ways** 19:22,23
45:3 48:20
81:5 115:25
**we'll** 6:21
25:17 34:2
41:25 54:9
**we're** 6:12
7:16 35:17
45:2,2 48:9
49:10 50:20
54:14,21
59:14 62:15
65:3 67:1
71:14 72:15
73:1,11
83:19 85:16
86:4,13 89:1
100:6,7
103:12,14,15
103:15,17
104:8 114:16
**we've** 29:23
38:23 45:7
48:8 72:11
96:3 99:6
109:25
112:20
**weapons**
59:16,17,18
**wear** 27:13
31:19
**week** 34:8,21
35:5,5,6
40:12 116:12
**weeks** 25:5
58:22,23
59:25 85:7
**weird** 50:6
59:11 75:13
**welfare** 33:15
**well-docum...**
46:4
**went** 13:11
14:7,8,10,10

14:12,25
15:1,7,19
16:3,5 17:16
20:4,17,18
21:8,18 24:5
24:6,14
44:12 51:11
57:10 65:16
100:5 111:7
**weren't** 36:16
36:25 66:3
66:15 73:23
87:4 102:21
103:7
**West** 1:14
**WESTERN** 1:1
**whatsoever**
9:21 11:1
39:23 44:3
118:25
**wife** 8:18 61:1
61:10 62:13
62:20 86:19
111:6,10
**wife's** 62:10
**willing** 103:22
**wiring** 32:11
**wit** 1:15
**witness** 11:18
53:15 68:5
78:11 79:25
121:11,17
**witnesses**
9:24
**won** 63:18
**word** 30:15
48:7 55:24
80:8,18
81:21 92:13
98:4
**words** 33:8
83:10 115:5
115:18
**wordsmithed**

94:14,20
**work** 11:7
26:14 80:22
95:17 114:1
**worked** 28:17
88:21 113:24
**working** 42:18
103:9
**works** 71:21
80:24
**world** 108:18
118:6
**worn** 90:20
**worry** 9:22
33:14 69:3
**worse** 99:1
**worth** 60:12
**wouldn't** 17:9
18:23 20:1,8
20:8 28:7
31:14 37:6
37:24 42:20
45:13 47:23
51:10,19
60:16 74:11
75:2 81:9
82:16 89:5
106:22
109:13
111:18
115:10,20
116:20 117:5
117:7,22
**write** 9:4
**writing** 11:1
104:2
**written** 59:3
70:20 71:1,6
110:22
115:25
**wrong** 38:8,10
45:12,18
57:9 74:5
82:20 95:7

97:15,23
104:25 105:1
105:16,25
106:2,3,22
**wrongful** 8:7

**X**

**X** 3:1,7 115:1

**Y**

**Y** 115:1
**yeah** 8:4 11:14
12:5 14:11
15:15 18:10
18:12 19:13
24:12 30:23
33:8 39:15
47:10 52:22
54:23 55:10
69:12 77:23
86:9,9,24
90:8,21,22
91:10 101:16
108:16 112:8
115:8
**year** 12:13
14:8,13,20
15:13 18:25
22:23,25
24:6,11
72:25
**years** 13:21
15:3,9 17:7
18:15,16
20:7 38:24
48:12,13,15
58:1 97:8
**Yep** 83:25
**York** 1:5 2:5,5
5:7,10 8:8
15:21 70:8
72:15 80:1
90:19 93:20
113:15

**young** 46:9
**younger** 97:7

**Z**

**Z** 115:1
**Zipp** 93:11
113:2,4,13
113:24
114:17
116:24,25
**Zonie** 38:3

**0**

**04** 20:19
**05** 21:1
**06** 19:21

**1**

**10022** 2:5
**101UCMJ** 20:4
**11** 1:13 22:6
54:17
**12** 7:17
**13** 24:7
**13th** 2:4
**14** 24:7,8,8,12
27:10,12
**15** 94:7 101:6
117:13,16
**15-6** 69:14
**150** 32:25
**15s** 45:19
117:19
**16** 48:13
**16-** 93:25
**17** 95:10
**17-year-old**
93:25
**17th** 58:17
**18** 83:15 95:10
**195-2** 33:22

**2**

**2:52** 1:13 4:1

Hadley, Justin D.                                  February 11, 2016

| | |
|---|---|
| **20** 21:22 48:13 | **45** 53:20 |
| **20,000** 64:1 | **46** 54:17 |
| 80:15 | |
| **2002** 15:17 | **5** |
| 18:16 | **5/6/2019** |
| **2003** 20:24 | 121:23 |
| **2004** 20:24 | **5:42** 119:8 |
| **2011** 70:3 | **500** 32:9 35:19 |
| 72:21 104:16 | **52** 20:25 |
| **201412800042** | **5220** 2:10 |
| 121:21 | |
| **2015** 85:3 | **6** |
| **2016** 1:13 4:1 | **6** 21:23 |
| **206.553.7970** | **641** 2:4 |
| 2:11 | **68** 23:18,24 |
| **212.328.9559** | 26:2 32:8 |
| 2:5 | 99:16 |
| **227** 1:14 | |
| **22nd** 40:10 | **7** |
| 58:17 | **7** 104:15 |
| **23rd** 40:10 | **700** 2:10 |
| 58:17,21 | |
| **24** 48:15 82:11 | **8** |
| **24th** 58:17 | **8** 27:12 |
| **26** 3:9 83:3,4,5 | **81** 99:25 |
| 104:16 | **83** 3:9 |
| **27** 3:10 99:13 | |
| 99:14,16 | **9** |
| | **9** 79:22 |
| **3** | **92** 12:16 |
| **3** 18:16 79:22 | **95** 63:6 |
| **30** 48:16 | **96** 15:16 |
| **35** 35:22 | **98101** 2:10 |
| **35,000** 60:12 | **99** 3:10 15:16 |
| **36** 27:7,8,11 | 15:16 |
| **3rd** 13:19 | |
| 27:20 28:9 | |
| | |
| **4** | |
| **4** 3:4 4:1 48:12 | |
| **4-year** 48:17 | |
| **4:21** 72:12 | |
| **4:27** 72:12 | |
| **42** 54:17 | |