1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE


TRACY JAHR, BRENDA THOMAS,        )
TIMOTHY LEE YORK, AND W. BRETT    )
ROARK,                            )
                                  )
          Plaintiffs,             )
                                  ) CASE NO.:
vs.                               ) 2:14-cv-01884-MJP
                                  )
UNITED STATES OF AMERICA,         )
                                  )
          Defendant.              )
_____/


DEPOSITION OF WES TOOLE




February 26, 2016

9:52 a.m. to 2:57 p.m.


UNITED STATES OF ATTORNEY'S OFFICE

NASHVILLE, TENNESSEE




Michele Faconti, RPR, LCR (667)

**2**

APPEARANCES OF COUNSEL

On behalf of the Plaintiffs:
    BRIAN C. BROOK, ESQUIRE
    MATTHEW PEED, ESQUIRE
    Clinton, Brook & Peed
    641 Lexington Avenue, 13th Floor
    New York, NY 10022
    brian@clintonbrook.com
    212-328-9559

On behalf of Defendant:
    KRISTIN B. JOHNSTON, ESQUIRE
    Assistant United States Attorney
    700 Stewart Street, Ste. 5220
    Seattle, WA 98101-1271
    kristin.b.johnston@usdoj.gov

**4**

STIPULATION

    The deposition of Wes Toole, called as a
witness by the Plaintiffs, pursuant to all
applicable rules of the 26th day of February, 2016,
at the offices of United States of Attorney's
Office, Nashville, Tennessee, before Michele
Faconti, RPR, Licensed Court Reporter and Notary
Public in and for the State of Tennessee.
    It being agreed that Michele Faconti, a
Tennessee Licensed Court Reporter may report the
deposition in machine shorthand, afterwards reducing
the same to typewritten form.  All objections,
except as to the form of the question, are reserved
to on or before the hearing.
    It being further agreed that all formalities as
to notice, caption, certificate, transmission,
etcetera, are expressly waived, EXCLUDING the
reading of the completed deposition by the witness,
and the signature of the witness.

**3**

INDEX OF EXAMINATION
                                      Page
WITNESS:  WES TOOLE
Examination By Mr. Brook              5

INDEX TO EXHIBITS
                                      Page
Exhibit No. 28,
    JAHR0001475                       65

Exhibit No. 29,
    JAHR0002066-2068                  111
Exhibit No. 30,
    No Bates Numbers indicated        142

Exhibit No. 31,
    JAHR0001493-1494                  150
Exhibit No. 32,
    Staff Journal entry 127-130       151

(Exhibits retained by Mr. Brooks)

**5**

(09:52 a.m.)
            Wes M. Toole,
having been first duly sworn, as hereinafter
certified, testified as follows:
        MR. TOOLE:  I do.
            EXAMINATION
BY MR. BROOK:
    Q.  Would you please state your name for the
record?
    A.  Wes Toole.
    Q.  Is that short for Wesley?
    A.  No, sir, just Wes.
    Q.  Have you ever been deposed before?
    A.  No.
    Q.  Okay.  So let's start with the basic
ground rules, which you may have already been told a
little bit about.
        You're under oath, so that's the most
important thing.  That means you have to testify
truthfully and provide full answers to the best of
your ability and recollection.
        Do you understand that?
    A.  Yes.
    Q.  You'll notice there's a court reporter
here taking down your testimony.  She's the most

Toole, Wes                                    February 26, 2016

3 (Pages 6 to 9)

**6**

important person in the room.  So if she doesn't
understand what we are saying, it's not going to
ever end up on the transcript.  So we need to do our
best to do a couple of things.  One is to give only
verbal answers like yes as opposed to uh-huh or
gestures.  Do you understand that?

A.  Yes.

Q.  Perfect.  We also need to do our best not
to talk over each other.  Even if you think that you
know where I'm going with a question, if I'm still
trying to get it out, I ask for your patience to let
me try to finish my question and I'll do my best to
let you finish your answers.  Okay?

A.  Okay.

Q.  If you have any questions about a question
that I've asked, it's important that you state them
if you're not clear about what the question means or
what a word means.  But if you answer a question,
I'm going to assume that you understood my question.
Okay?

A.  Understood.

Q.  You can ask for a break at any time, just
the only thing I ask is that you do not insist on a
break while a question is still pending.  Okay?

A.  Understood.

**7**

Q.  Have you ever testified before?

A.  Yes.  In trials or court martial, yes.

Q.  But never in front of a court reporter
only?

A.  Never a deposition, no, sir.

Q.  Tell me everything you did to prepare for
your deposition today.

A.  I spoke with Ms. Johnston on the phone on
Tuesday, I believe.  We spoke for about an hour.
And then I was also able to review the CASs, or Case
Activity Summaries, from one of the cases.  I was
able to do that because we have an automated system.
I did not physically have the CASs, but I was able
to review them on our system.

Q.  Which case was that?

A.  It was the death of his wife.  I don't
recall the LER number, but it was that case in July.

Q.  Would the LER number be the three digit
number at the beginning of --

A.  Right, the Law Enforcement Report.  I
believe 0270 something.

Q.  0279?

A.  That sounds right.  Yeah.  And then the
conspiracy case that was 02 something.  I was -- I
had intended on reviewing those CASs, but we were

**8**

overcome by events.  I wasn't able to review all of
those CASs.  Because I did have involvement in that
one also.

Q.  Did you look at those other CASs at all?

A.  I started reviewing them and then I got
pulled away and wasn't able to get back to them.

Q.  Did you talk with anyone else besides Ms.
Johnston about this deposition?

A.  No.

Q.  Did you bring anything here with you
today?

A.  No.  Just my personal notebook.  I don't
have any notes in it.  I just carry it with me in
case I get a call or something like that.  And my
cell phone.  But that's it.  No notes, no CASs or
anything like that.

Q.  What is that you know about the reason for
this case and this deposition?

A.  I understand, or my understanding is that
the family of the deceased, and I apologize, I don't
know the deceased's name, but it was in a case that
occurred while I was deployed and involved Aguigui.
My understanding is that there's been a wrongful
death suit brought by the family.  So that's my
understanding of it.

**9**

Q.  And do you have an understanding of any of
the legal issues involved in this case?

A.  Somewhat.

Q.  What is that understanding?

A.  I believe the legal issues that were
brought to my attention, or if I could rephrase.
The questions that have been brought to my attention
revolve around how Aguigui was allowed to continue
to be on his own, if you will; and thus he carried
out the offense against the soldier and his
girlfriend.  That's kind of my understanding of it.

Q.  I'd like to ask you a little bit of
background questions about yourself first.
    When were you born?

A.  7 February 1975.

Q.  Where was that in?

A.  In Clarksburg, West Virginia.

Q.  Where did you grow up?

A.  I grew up in Marshall, Texas.

Q.  What is your highest level of education?

A.  Got a Bachelor's Degree and about 30 hours
in post graduate work.

Q.  What is the Bachelor's Degree in?

A.  It's a double major in sociology and
psychology.

Toole, Wes                                          February 26, 2016

4 (Pages 10 to 13)

---

10

1    Q.   When did you receive that degree?
2    A.   In 1997.  Yes.
3    Q.   What was the school?
4    A.   Austin College.  Located in Sherman,
5    Texas.
6    Q.   When do you take your graduate school
7    course work?
8    A.   Between 2000 and now.  It's been a slow
9    process.
10   Q.   What is the subject matter of your
11   graduate work?
12   A.   At one school I was enrolled in
13   organizational -- organizational leadership and
14   development.  In the program I'm in now, it's
15   organizational security management.
16   Q.   What was your first job out of college?
17   A.   Out of college.  U.S. Army.  I enlisted
18   shortly before graduation and three days after
19   graduation I was getting off a bus in Fort
20   McClellan.
21   Q.   And have you been in the U.S. Army ever
22   since?
23   A.   Yes, sir.
24   Q.   What was your first duty station?
25   A.   My first duty station after completion of

---

11

1    basic training and AIT, was Camp Casey, Korea.
2    Q.   When did you arrive there?
3    A.   1997.  I don't recall the month.
4    Q.   How long were you stationed there for?
5    A.   One year.
6    Q.   Where did you go next?
7    A.   After that went to Fort Leavenworth,
8    Kansas.
9    Q.   What was your job at that time or
10   assignment?
11   A.   At Fort Levinworth?
12   Q.   Yes.
13   A.   I was a military police soldier conducting
14   patrol work and also serving on a special reaction
15   team.
16   Q.   Okay.  And had that been the same role you
17   were in at Camp Casey?
18   A.   Not entirely.  At Camp Casey I was what
19   you would call a combat MP.  So we did some patrol,
20   like typical law and order work.  But then we did a
21   lot of also support in the field for maneuver units.
22   MPs have two different missions really.
23   They have a law and order mission, but they also
24   have a combat security and support role, you know,
25   in combat operations.  So it was kind of 50/50.

---

12

1    Q.   How long were you at Fort Levinworth for?
2    A.   About two years.
3    Q.   Where did you go next?
4    A.   After that I went to CID school.  And
5    after graduation from the academy, went to Germany.
6    Ansbach, Germany.
7    Q.   About when was that?
8    A.   I want to say that was in November of
9    2000.
10   Q.   How long were you in Germany for?
11   A.   We were there for almost five years.
12   Q.   When you say we?
13   A.   My wife and I.
14   Q.   She also in the Army?
15   A.   No, she's not.
16   Q.   What did you do after your station in
17   Germany?
18   A.   After I was stationed in Germany, I was
19   PCS or transferred to Fort Bellville, Virginia with
20   the Protective Services Battalion.
21   Q.   What was that responsibility?
22   A.   We did executive protection for senior DOD
23   leadership.  Chairman of the Joint Chief of Staff.
24   I culminated my time there as the Protective Service
25   Officer for the Secretary of Defense.

---

13

1    Q.   So is that different than law enforcement
2    work?
3    A.   Different -- different than -- CID kind of
4    has a dual mission of investigations and then
5    protection also.  So if you're assigned to that
6    unit, you're not conducting investigations, you're
7    doing personal security, Secret Service type work.
8    During my time there, I wasn't conducting
9    investigations, but I guess you would say it was law
10   enforcement but a different mission.
11   Q.   But it's still within the Criminal
12   Investigation Command?
13   A.   Yes, sir.
14   Q.   So is there any component of that job that
15   involved investigative work?
16   A.   At protective services?
17   Q.   Yes.
18   A.   No, sir.
19   Q.   And when you were doing law enforcement
20   work, was there any component of that that was
21   protective services?
22   A.   Sometimes.  We are typically tasked in the
23   field to help support.  So, you know, we may be
24   asked to, Hey, this mission they need an agent to go
25   out and support, because we have the training.  We

---

Toole, Wes

February 26, 2016

5 (Pages 14 to 17)

---

14

need you to go out for a week at this location to help provide support for this mission. But it's few and far between, so.

Q. Is it your understanding that CID has responsibility for crime prevention, as well as investigation?

A. Yes.

Q. Are there any other agencies or departments within the Army that have that responsibility?

A. Are there any other agencies --

Q. That are also responsible for crime prevention and investigation.

A. And for investigation. Not that I'm aware of. I mean, the Army is a huge organization. And each different activity or director it has a certain responsibility to prevent fraud, waste, abuse, loss, things like that. So everybody kind of has an inherent responsibility in ensuring crime prevention. Every unit is supposed to have what's called a crime prevention officer. Whether infantry unit or mechanized unit, to where they are responsible for making sure that the key control stuff is up to date. Everybody kind of shares a responsibility. Our crime prevention activity is

---

15

focused toward specific crimes that we are responsible for investigating.

Q. And is that the list of crimes that is on AR195-2, Appendix B?

A. Some of the crimes within that we have specific responsibility for crime prevention. Such as drug supression, frauds, loss, like through physical security, like general crimes, property loss. We assist with that crime prevention effort, yes, sir.

Q. Is there any other group or department within the Army that has responsibility for investigating into murders or conspiracy to commit murder?

A. No, sir.

Q. So how long were you in the protective services job at Fort Belvir.

A. I would say almost five years. Yes, sir.

Q. So until about 2010?

A. Until about that, yes, sir.

Q. What did you do next?

A. Next I was stationed at Fort Stewart, Georgia. I was initially assigned there as the Assistant Special Agent in Charge, and then was later appointed as Special Agent in Charge slash

---

16

Detachment Commander.

Q. What does that mean, Detachment Commander?

A. Okay. So the Special Agent in charge is the senior agent in the office responsible for, you know, the oversight of investigative operations. At Fort Stewart, every office has a military designation. Such as Fort Stewart it was the 30th Military Police Detachment parenthesis CID. As a military organization we also have to have a command authority. That person is responsible for the, you know, personnel, logistics. Basically has command authority over the soldiers that are assigned there. So it's a dual-hatted position.

Q. Did you have command over anyone other than the other people who were in the CID office at Fort Stewart?

A. No. Just the people at the office. People assigned to the 30th.

Q. Do you recall when you were promoted to the Special Agent in Charge?

A. I want to say it was May or June of 2010. I don't recall.

Q. So was it -- do you recall how long you had been at Fort Stewart before that happened, even if you don't recall the date?

---

17

A. Maybe about six months. Give or take.

Q. How long did you remain the Special Agent in Charge of Fort Stewart?

A. It was about four or five months. I would say about four or five months.

Q. What happened at the end of that time?

A. So the -- there was an inbound Chief Warrant Officer Don Boman who came into Fort Stewart and I was identified for deployment. Once he came in, we switched out, I want to say it was around September 2011. And around that time once we did our transition, then I started my pre-deployment training.

Q. Okay. I just want to give you the chance to maybe help me understand or correct your testimony. Because by my math you said you had been a SAC for four to five months, it stopped in September 2011, which is over a year after May or June of 2010.

A. I did not assume a command in 2010. No, it was the same year. I apologize, it was the same year.

Q. Earlier in 2011?

A. Earlier in 2011. Thank you.

Q. And were you already the SAC by the time

---

Toole, Wes                                February 26, 2016

6 (Pages 18 to 21)

### 18

you heard the name Isaac Aguigui?

A. I believe I was. I think so.

Q. And were you deployed at the end of your time at Fort Stewart?

A. At the time of my --

Q. You said you were scheduled for deployment?

A. Yes.

Q. Did that deployment happen?

A. Yes.

Q. Where were you deployed?

A. Camp Buehring, Kuwait.

Q. How long were you stationed there for?

A. We were there for almost 11 months.

Q. And where were you stationed next?

A. Once I came back from deployment I cleared out of Fort Stewart and was reassigned to Fort Campbell, Kentucky. My initial assignment there was with the 502nd CID Battalion where I served as Assistant Operations Officer.

Q. What does that job entail?

A. The 502nd CID Battalion is responsible for six different CID offices, certain geographic areas of responsibility. My responsibility there was to assist the Operations Officer in the oversight of

### 19

investigative operations across each one of those offices. Just basically provide an oversight of those offices and their investigations.

So we would go out and conduct visits of each one of those offices, doing quality control visits, case reviews and then assisting them with day-to-day requirements as well, as needed.

Q. So are you senior to the SACs in those offices?

A. Most of them I was, yes.

Q. When I say that, I meant actually in terms of the CID structure, not necessarily your rank.

A. CID structure, yes, sir.

Q. What is your current rank?

A. Chief Warrant Officer 3.

Q. And you have been at Fort Campbell, Kentucky ever since you were transferred there, correct?

A. That's correct.

Q. Has your position changed at all since you've been there?

A. Yes, it has. 28 March of 2015 I assumed command of the 31st Military Police Detachment CID, also serving as the Special Agent in Charge of the office.

### 20

Q. So you're now the SAC of a single CID office; is that right?

A. Yes.

Q. Is that a step down from the position you were in before?

A. It's not necessarily a step down. As Assistant Operations Officer -- the warrant officer career model, if you will for CID, is to move from a SAC office, a medium size office such as Fort Stewart. And what they like to see in order to progress CID leaders, is moving to a broadening assignment. Such as working in a battalion operations cell. And then grooming you, preparing you to move toward a larger CID office to move over to the SAC of that, which Fort Campbell is a larger office. They try to do that broadening type of assignment to prepare you for larger assignments.

Q. About how big was the Fort Stewart, CID office?

A. I think at any given time I had about 12 agents assigned or available. I can't remember the authorizations at that time. But it was right around 12.

Q. And that does not include MP investigators who assist you; is that right?

### 21

A. That's correct. Nor does it include civilian support personnel.

Q. What kind of civilian support personnel would you have at Fort Stewart?

A. We had a Criminal Intelligence Coordinator and then we also had an Investigative Support Technician. Also had a Civilian Sexual Assault Investigator assigned to my office at the time.

Q. Criminal Intelligence Coordinator and -- what was the second one, I'm sorry?

A. Investigative Support Technician or IST. You may see it referred to as several different things. IST or IOA, Investigative Operations Assistant.

Q. What is the responsibility of the CIC?

A. Criminal Intelligence Coordinator is responsible for reviewing each investigation from -- not from an investigative standpoint but looking to see what type of intelligence could be gleaned from that. And then pulling that intelligence together to see if it helps to inform other investigations, identify trends, things like that. They also compile statistics for the purpose of studies later on. Annual surveys. Things of that nature.

Q. So if there are two investigations going

Toole, Wes                                    February 26, 2016

7 (Pages 22 to 25)

**22**

1  on at the same time, it would be the CIC who might
2  sort of connect the dots between those two
3  investigations if there was an overlap?
4      A.  It's possible.
5      Q.  Is there anybody else that has that
6  responsibility of putting things together between
7  investigations?
8      A.  Sure.  We all do.  From the individual
9  agent to the Team Chief Supervisor to the Special
10 Agent in Charge to myself as the SAC.
11     Q.  Was the CIC stationed or -- he or she
12 actually located physically at the CIC offices?
13     A.  She was.
14     Q.  Who was that during your time in Fort
15 Stewart?
16     A.  Ms. Ellie Tolbert.
17     Q.  What does the Investigative Support
18 Technician do?
19     A.  Basically administrative.  Once the case
20 was closed, she would prepare copies, distribute
21 reports appropriately, and then she would also track
22 what we called DA4833, it's Commander's report of
23 disciplinary action.
24         Once a case was closed, she would send the
25 4833 out to the commanders and the SJAs.  And

**23**

1  whenever they took action or whatever action they
2  took, she would receive those reports back and
3  upload them to Crime Records Center.
4      Q.  Did you have direct access to the Crime
5  Records Center or CRC?
6      A.  Could you explain what you mean by direct
7  access?
8      Q.  If something was uploaded to the Crime
9  Records Center, is that something you could pull up
10 on your computer?
11     A.  No, sir.  At the time when we were at Fort
12 Stewart -- I mean, we had an automated system then,
13 what we called ACI2.  But that did not directly feed
14 into the Crime Records Center.
15         When I was at Stewart, we would have to
16 mail a copy of the report or we would actually mail
17 the originals of everything to the CRC once we were
18 completed and they processed it and archived it.
19     Q.  So, for example, if you did a status
20 report on an investigation, where would that go?
21     A.  So it would go to the CRC electronically,
22 and electronically be sent to all the other
23 authorized recipients.
24     Q.  And that typically included a lot of
25 people in command for the soldier at issue?

**24**

1      A.  Yes, sir.
2      Q.  Now, would a status report ever be issued
3  when there was no soldier that was titled yet?
4      A.  Yes, sir.
5      Q.  Who does that go to then?
6      A.  So it -- it all depends on who is under
7  investigation, what offense is being investigated,
8  and then what the -- what the status of that
9  investigation is.  So in a typical scenario, let's
10 say if I -- can I use an example?
11     Q.  Please.
12     A.  So for a hot urine analysis.  Say a
13 soldier comes up hot for marijuana or cocaine, that
14 report would go to CID recipients, such as the
15 battalion or the group headquarters.  U.S. Army
16 Crime Records Center would get a copy of any status
17 report that was sent.  But then we would also
18 dispatch that to the soldier's command authority and
19 then to the supporting SJA.  And then Garrison
20 leadership, as well.  So they have an understanding
21 on what's going on in their installation.  But,
22 again, every type -- it's all going to be case
23 dependent on who that report is going to go to.
24     Q.  Are status reports destroyed after they
25 have been created for any reason?

**25**

1      A.  Destroyed, do you mean -- can you clarify
2  what you mean by destroyed?
3      Q.  Are status reports deleted for any reason?
4      A.  Not that I'm aware of.
5      Q.  So what if you titled someone for an
6  offense and later determined it was unfounded?
7      A.  If someone were titled in a case and --
8  can I ask a clarifying question?  When you say
9  titled, I just want to make sure I have the same
10 understanding you do.  Do you mean somebody's name
11 is listed as the subject on that report?
12     Q.  Yes.  Been through too many of these
13 depositions.  I do have some knowledge.  I apologize
14 if I'm not making that clear, since I'm asking some
15 basic questions, too.
16         Someone is titled for an offense and it's
17 later determined to be unfounded, the status report
18 titling that person does not get deleted, though,
19 right?
20     A.  No, sir.
21     Q.  Do you recall when you first heard about
22 this case that's involving the wrongful death
23 allegations?
24     A.  I want to -- I want to say it was sometime
25 last month.  I was contacted by an attorney out of

26

1    Fort Belvir, U.S. Army, informing me that there was
2    an ongoing case and that I was probably going to be
3    contacted in the future for deposition.
4        Q.   Have you ever been asked to provide any
5    documents in connection with this case?
6        A.   No.
7        Q.   Do you have any documents in connection
8    with this case?
9        A.   No.  Only the CASs that I reviewed from
10   the automated system.  I did not carry anything with
11   me when I left Fort Stewart.
12       Q.   Did you use email to communicate about
13   this case?  Not this case.  Let rephrase that.
14           Did you ever use email to communicate
15   about cases you were investigating while you were
16   stationed at Fort Stewart?
17       A.   I routinely communicate via email during
18   the investigative process and during the
19   administrative operation of the whole gambit.
20       Q.   What is the system that's in place, if you
21   know, for retaining or deleting email within CID?
22       MS. JOHNSTON:  At Fort Stewart?
23       MR. BROOK:  At Fort Stewart.
24       THE WITNESS:  At Fort Stewart, I'm not
25   aware of any system that was in place at Fort

27

1    Stewart on retaining emails.  I'm unclear of
2    the question, sir.
3    BY MR. BROOK:
4        Q.   Do you still have any of your old emails
5    from back when you were at Fort Stewart?
6        A.   No, sir.
7        Q.   Are emails automatically deleted in CID
8    email accounts?
9        A.   If I can clarify.  When you say CID email
10   accounts, our email is the same as any other Army
11   unit.  We go through the NEC.  I don't know what
12   that acronym stands for, but basically there are
13   information guides for the post.  That's how we --
14   that's a dot mil account.
15           So ours is no different than any other
16   Army account where if you don't back it up or create
17   your own PST file, and then whenever you move and
18   that account is closed at Fort Stewart, and -- say,
19   for example, when I come to Fort Campbell, they
20   establish -- open up a new account under Fort
21   Campbell, it doesn't automatically repopulate.
22       Q.   You get a different account for each time
23   you have been PCS?
24       A.   My email name, the email address stays the
25   same, but they transfer the account from one

28

1    installation to another.  So they close it on their
2    end and then I get to another post and they have to
3    reactivate it.  But the emails don't carry forward.
4    From the user level, as far as I know, they don't.
5        Q.   You don't have any knowledge about whether
6    at a server level there's something?
7        A.   No, sir, I don't.
8        Q.   Do you know if there's any rules or
9    protocols in place for investigators within CID as
10   far as email retention goes, when you should save
11   something to the file?
12       A.   Not that I'm aware of.  We will
13   routinely -- I mean, there are certain things within
14   our regulation that talk about if you engage in
15   email traffic with say, the next of kin to a
16   deceased, or if you provide a Commander with a copy
17   of the CG memo, keep a copy of that email and post
18   it in the file.  But I'm not aware of any directive
19   that any email that's sent regarding a case has to
20   be retained within a file.
21       Q.   So the emails you described that should be
22   kept, are those just put into the CAS or are those
23   actually printed out and put into the case file?
24       A.   Sometimes the CAS will detail that they
25   sent an email to so and so.  But then depending

29

1    on -- if it's one of those emails that our
2    regulation requires to be printed out, then a copy
3    would be printed out and put in the file, as well.
4        Q.   Have you ever been asked to provide any
5    information with respect to this case before today?
6        A.   No, sir.  I mean, other than my discussion
7    with Ms. Johnston before, but no.
8        Q.   Right.  To your knowledge were there any
9    internal Army inquiries regarding Isaac Aguigui
10   after he was detained in December of 2011.
11       A.   Any internal Army inquiries?
12       Q.   Was there any attempt to try to
13   investigate how Isaac Aguigui got to where he was?
14       A.   I don't know, sir.  I was deployed at the
15   time.  And whenever I returned back from deployment,
16   I basically cleared out of Fort Stewart.  I was
17   somewhat aware of everything that had transpired,
18   but in terms of anything above CID's investigation,
19   I'm not aware.
20       Q.   Were you involved at all in the
21   investigation of Isaac Aguigui or any of his
22   possible co-conspirators in crimes after you started
23   your deployment?
24       A.   No, sir.
25       Q.   Were you ever contacted to answer

Toole, Wes                                    February 26, 2016

9 (Pages 30 to 33)

---

30

questions or anything?

A. No, sir. I was contacted not to answer questions, but one of my co-workers contacted me to let me know what had occurred with the murders while I was gone. But he just wanted to let me know.

Q. Did you find out anything else about those murders at that time?

A. No, sir.

Q. Did you make any inquiries?

A. Just from what I read in the media.

Q. Are you familiar with what has happened with Isaac Aguigui since then in terms of being prosecuted for any crimes?

A. I am, yes, sir.

Q. What are you aware of?

A. I'm aware that he was prosecuted for those offenses and currently serving time for them.

Q. Are you aware of his prosecution in connection with his wife's death?

A. I believe he was prosecuted for that as well, but I'm not familiar with what the sentencing was. And I don't know if it was concurrent with the other case being tried or if it was separate, I'm not aware.

Q. So you were not asked for any information

---

31

to help with that prosecution; is that right?

A. No, sir.

Q. Did you ever use personal email for CID work?

A. No, sir.

Q. Nowadays I have to ask. What is an Investigative Plan?

A. Investigative Plan is -- I'm glad you asked that. It's something that is a living, breathing document. It's a roadmap for the investigator to use in order to try to resolve the investigation in both a thorough and timely manner. The Investigative Plan is -- it's fluid. It's supposed to be used to identify investigative leads as they come up. Prioritize them and then track their completion or whether or not they are still probative.

Q. Is there always an Investigative Plan that's used in an open investigation?

A. There should be.

Q. Is that something that's required?

A. For law enforcement reports, yes, sir.

Q. Are there any requirements to retain those if an investigation is closed?

A. I don't know if there's a requirement to

---

32

retain them or not. And I'm thinking about during that time at Fort Stewart. I can't remember what the requirement was for the retention of the Investigative Plan. It would stay with the hard copy of the file that has to be retained at the office for at least three years, or depending on the type of offense, it may have to be retained longer than that. But in terms of like an electronic retention at CRC, I'm not aware of any requirement to retain it then.

Q. As a general matter, the hard copy case file has to be maintained for three years after a case closes?

A. As a general manner, yes, sir.

Q. Is that something that everyone knows or is that a policy?

A. It's a regulatory requirement.

Q. Do you know what the citation is for that by chance?

A. No, but -- no, I don't know.

Q. No is a perfectly good answer. Just thought I would ask.

What are the requirements or criteria that have to be met before someone can be titled for an offense?

---

33

A. Titling for an offense is an investigative determination independent of just judicial review that's based on credible information standard.

Q. So is it something less than probable cause?

A. Yes, sir.

Q. Credible information is the standard?

A. Yes, sir.

Q. So that's a pretty flexible standard?

A. It is, yes, sir.

Q. Now am I right in understanding a lot of CID investigative work involves getting sworn statements from soldiers?

A. Yes, sir.

Q. And CID agents are all authorized to administer oaths?

A. Yes, sir.

Q. You could have sworn yourself in here today?

A. I don't know about that.

Q. How common is it to get a sworn confession from a soldier that you're investigating?

A. I mean, we routinely obtain confessions and admissions. And I make a distinction between the two. Because even though we may obtain sworn

---

Toole, Wes                                      February 26, 2016

10 (Pages 34 to 37)

---

34

statements that have admissions of guilt on there, the confession I see it in a different category to where specific type intent offenses. I don't have any statistics I can pull off the top of my head we routinely get this percentage of, but it's a fairly common occurrence.

Q. So you would say maybe the difference in a confession, the person knows they committed a crime and an admission, they might not know they are admitting to a crime?

A. That's fair.

Q. Do you consider a sworn admission to be credible information?

A. Yes.

Q. Do you know anyone who disagrees with that point of view?

MS. JOHNSTON: Objection. Calls for speculation.

BY MR. BROOK:

Q. One thing I did not mention. Unless you're instructed not to answer -- there will be objections just for the record, because there's no Judge to rule on them.

Please go ahead and answer.

A. Can you state the question again, please?

---

35

MR. BROOK: Sure. Can you read it back?

MS. JOHNSTON: Same objection.

(Requested portion read.)

THE WITNESS: I don't know anybody that disagrees with it.

BY MR. BROOK:

Q. Is credible information something that has to be admissible in court in your view?

MS. JOHNSTON: Object as to form.

A. No. Credible information is in my opinion a subjective determination based upon all available information known to that person at the time.

Q. Are there any regulations or publications that help to explain what credible information is or how to apply the standard?

A. Yes.

Q. And what regulation is that?

A. CID regulation 195-1.

Q. Do you know about how much of that, in terms of pages, is devoted to the issue of credible information standards?

A. I know that credible information is -- a definition is provided within the definitions appendix, but I don't know how many times it's referred to within the regulations.

---

36

Q. Is credible information enough information or sufficient standard to detain a soldier?

A. To detain a soldier?

Q. Yes.

A. Yes. For detention, yes.

Q. How long can you detain someone based on credible information?

A. For a reasonable amount of time.

Q. And how do you determine what the reasonable amount of time is?

A. It's determined -- that determination is made on, you know, how long the interview takes. How long it takes to do processing. It's not to hold them any longer than what's absolutely necessary in order to conduct an interview and/or process that person.

Q. So that's different than putting someone in, for example, pretrial detention?

A. Yes, sir.

Q. What is the standard you need to meet in order to detain someone more for safety reasons based on your belief that probable cause exists for a crime?

MS. JOHNSTON: You mean CID detain someone?

---

37

BY MR. BROOK:

Q. Sorry. Let me rephrase the question.

What is the standard that CID needs in order to detain someone for reasons other than just questioning?

A. CID -- to the best of my knowledge and ability to answer that question, CID does not normally detain anyone aside from or outside of the need to either question them, execute a search or to process them. Any other detentions are outside of, you know, CID's normal operations.

Q. Those other detentions are made by the command, is that correct, for the individual soldier?

A. It could be, yes, sir.

Q. Who else could make those decisions?

A. Usually the command can make those decisions based on, you know, their discussions with the Staff Judge Advocate or another competent law enforcement authority could certainly. I'm sorry, can I add?

Q. Please.

A. Military police also have the authority to detain soldiers, like you said earlier, for safety reasons or when effecting a stop or this or that.

---

Toole, Wes

February 26, 2016

11 (Pages 38 to 41)

38

And then general military authority by an officer, a
non-commissioned officer if they witnessed something
that happened, they have the authority to, you know,
hold that soldier for safety purposes or questioning
until law enforcement can arrive. But that's my
understanding of detention.

Q. Is CID, or anyone else in the Army as far
as you know, able to detain a soldier while you are
investigating that soldier to determine whether to
press charges or prefer charges?

A. I mean, the command has the authority to
place a soldier in confinement if they believe that
there is, you know, probable cause that the soldier
committed an act and that there's information to
believe that they should be in confinement. But
when we are talking about detention and confinement,
I don't know if you're referring to both of those
synonymously.

Q. In terms of terminology, confinement is
more long term than detention?

A. Yes, sir. That's the way I see detention
and confinement.

Q. I'd like to ask you if you remember people
from the Fort Stewart's office; and if so, what you
remember about them. Andrew Dale?

39

A. Yes, sir.
Q. What was his role?
A. He was the Drug Supression Team Chief.
Q. Did he have any other role while you were
there?
A. Not while I was there, no, sir.
Q. Okay. Cassandra Ivory.
A. Yes. She was a Team Chief, as well.
Q. Is that for economic crimes?
A. It was for economic crimes. I think she
also oversaw some general crimes, also.
Q. Was that because -- just a need?
A. Need, yes, sir.
Q. Is it correct that the Fort Stewart CID
office was relatively short staffed while you were
there?
A. Yes, sir.
Q. Did you have to borrow some people from
other offices to fill --
A. We would have reserve agents come in and
augment us from time to time. I don't remember if
we ever got any agents from other offices to come
help. But reservists, yeah, we activated
reservists.
Q. Who are some of the reservists that you

40

recall?
A. One of them I remember his last name was
Fox.
Q. Anyone else?
A. I can't remember anyone else. Because
they would typically come in for shorter periods of
time. Some would come for a year. Some may just
come for a month or so.
Q. Were there differences in terms of the
capabilities between reserve agents and your regular
agents?
A. Can you -- is it possible to clarify what
type of differences?
Q. Well, were there any differences in terms
of the kind of work that they did or their training
or experience?
A. The reserve agents typically differed from
the active duty agents in that they weren't always
familiar with or comfortable with our automated
system. Some of our report writing. Some of the
isms in CID they are typically administrative. But
investigative-wise, they are all trained to the same
standard. And a lot of our reservists are actually
very well experienced in investigations in law
enforcement, depending on some of them served as

41

cops or detectives in other jurisdictions. Some of
them have careers outside of law enforcement, but
they are trained to the same standard.
Q. Did you have the opportunity to personally
observe Agent Fox's work when you were there?
A. I did. But, to be honest with you, I
don't -- I don't remember a lot about his work. I
can't even remember how long he was there to be
honest. So -- but, yes, I did.
Q. Did you ever observe any problems with the
work that he was performing?
A. Again, I can't remember any specific
issues with Agent Fox.
Q. Did you have problems with any of your
agents not performing their duties when you were
there?
A. Not that I can remember. I mean, there's
always, you know, people make mistakes or people
need assistance or correction in certain areas.
But, you know, consistent poor performance, I don't
remember any issues -- having any issues with any
agents when I was there.
Q. Did you ever put a flag on anyone under
your command while you were at Fort Stewart?
A. I did on a support soldier that I had.

42

1  She was a supply soldier, but she did not have
2  anything to do with investigations.
3      Q.  So no one having to do with
4  investigations?
5      A.  I'm trying to remember.  Not that I can
6  remember.  Not when I was there as the SAC.
7      Q.  Do you recall an MP Investigator Devon
8  Spencer?
9      A.  Spencer.  Yes, sir, I remember him.
10     Q.  What do you remember about him?
11     A.  He was the drug supression NCOIC, yes.
12     Q.  That means non-commissioned officer?
13     A.  Non-commissioned Officer in Charge, right.
14 I have a correction.  I do recall.  I had a DST
15 Investigator by the last name of Johnston.  When you
16 mentioned DST, it jogged my memory.  I don't recall
17 if he was flagged or not, but I removed him from
18 investigative duties for allegations of misuse of
19 his DST credentials.
20         Basically he got pulled over on a traffic
21 stop for being on a cell phone and whipped out his
22 credentials in order to try to get out of a ticket.
23 So I relieved him from investigative duties.
24     Q.  When was that?
25     A.  Shortly after I took over.  So I want to

43

1  say it was May or June of that year.  The joys of
2  command.
3      Q.  Did you ever while you were at Fort
4  Stewart, change personnel who were working on a case
5  because you wanted to have someone different do the
6  investigative work?
7      A.  I'm sure I did.
8      Q.  Can you think of any reason other than
9  making mistakes during an investigation as to why
10 you would remove someone from an investigation and
11 replace that person with someone else?
12     A.  As a matter of practice, you mean?
13     Q.  Yes.
14     A.  Sure.  Sometimes -- depending on the --
15 again, with each case being different, having
16 different circumstances or nuances, sometimes I'll
17 reassign a case because that agent who had that case
18 is overwhelmed with other cases that I can't
19 reassign those and this case needs attention.  So I
20 want to make sure that it goes over to someone who
21 can afford a little bit more time and energy into
22 it.  Or it could be I want a more senior agent to
23 investigate that case just because they have got
24 more experience and be able to navigate it more
25 successfully.

44

1      Q.  Was Justin Kapinus one of those more
2  senior agents?
3      A.  Yes, sir.
4      Q.  Would you say he was one of the top agents
5  you had there?
6      A.  Yes, sir.
7      Q.  Anyone you put above him?
8      A.  That would have been hard pressed at the
9  time.  He's a good solid investigator and he was a
10 good Team Chief, also.  So I thought very highly of
11 him.
12     Q.  When did you first hear the name Isaac
13 Aguigui, if you can recall?
14     A.  I believe that name came up during
15 conversation with Agent Dale when he was on the drug
16 team.  They were investigating, and I don't remember
17 how -- the genesis of it.  But they were
18 investigating some possible drug distribution or
19 drug incident and uncovered this alleged conspiracy.
20 So it was during that conversation that I remember
21 first hearing his name.
22     Q.  Okay.  What did you hear about him?  What
23 do you recall hearing about him?
24     A.  That he had information regarding an
25 alleged conspiracy.

45

1      Q.  So his name came up as a witness; is that
2  right?
3      A.  I don't recall how his name came up, in
4  what capacity, but I remember it was because of that
5  case.
6      Q.  Now, were you aware at that time that
7  Isaac Aguigui had had prior incidents with drugs or
8  alcohol?
9      A.  I wasn't aware at that time.  Because I --
10 as the SAC, I did not routinely get involved in the
11 day-to-day operations of the Drug Supression Team.
12 Mr. Dale would see it.  So he would see, you know,
13 common type offenders come through.  People that he
14 would recognize or this or that.  But the name did
15 not ring a bell with me when we first had this
16 conversation.
17     Q.  How much do you recall about the alleged
18 conspiracy that you referred to?
19     A.  So what I remember is that Agent Dale had
20 told me, Hey, we have got information about some
21 soldiers that may have conspired to rip off this
22 off-post drug dealer, a civilian.  That there was
23 talk about, you know, having a shotgun and possibly
24 going in and, you know, taking him out and then
25 taking the drugs and/or money.

46

So I told him -- I told Dale, I want this
investigation to stay with the Drug Supression Team.
Again, Agent Dale was one of my more senior agents
at the time.  And because of the drug nexus, I said,
You guys are going to continue to investigate this
conspiracy, too, because I don't want to segregate
the two.  I want this to stay focused and within the
same people that have the most amount of information
on it.  I told him to execute, go forward.

Q.  And do you recall how well that
investigation got off at the beginning?

A.  I remember that they were -- they
conducted several different interviews.  And I
believe they -- Aguigui was one of those people that
they interviewed.  And they grape-lipped, obtained a
statement from him where admissions were made.  And
then I have a hard time remembering how that case
progressed.  But I do remember that they were able
to kind of get at the fact that Aguigui is part of
this conspiracy.

Q.  Do you recall what happened after they got
at that fact?

A.  I believe we generated a status report
titling him as a subject and doing those normal
things.  Notifying the chain of command.  Back

47

briefing them.  Your soldier, we have information we
believe your soldier is involved with this, and
providing them with that report.

Q.  Did you speak with anyone in command about
Aguigui?

A.  I don't remember.

Q.  Were charges brought against Aguigui?

A.  I don't know.

Q.  Do you know what happened after you titled
him with respect to this charge in particular?

A.  With respect to --

Q.  I'm sorry.  With respect to the conspiracy
investigation after he was titled.

A.  I mean, I believe the investigation
continued, but I don't -- I don't have a whole lot
of knowledge on what occurred after that.

Q.  Do you recall any problems with the
investigation after that point?

A.  None that I'm aware of.

Q.  Who besides Agent Dale was involved in
that investigation, if you recall?

MS. JOHNSTON:  From CID?

BY MR. BROOK:

Q.  From anyone, who was involved in the
investigation?

48

A.  I don't know.  I assume Agent Dale and,
you know, his investigators, but I can't remember
what other agents were involved.  I think it would
be safe for me to assume Agent Greene, who was my
ASAC, would have been involved, also.  Because a lot
of the -- I would typically do more in-depth and
track -- obviously all of our death investigations,
SIR, Serious or Significant, trying to minimize
acronyms here.  But some of our SIR, SSI, sexual
assaults.  And I know that I was involved in
reviewing this one, but I believe Agent Greene did,
also.

Q.  Do you recall having any particular
concerns about the investigation into this alleged
conspiracy?

A.  I was obviously concerned about a
conspiracy, you know, to commit murder, that's a
significant offense.  So I was concerned generally
as, you know, as an agent, that we have got a
soldier conspiring here.  But concerns with the
investigation itself, I can't remember any.

Q.  Okay.  So the concerns were more about the
potential that the offense would be carried out?

A.  Sure, sure.

Q.  So is it correct that you took maybe more

49

of an interest in this drug-related case than others
because of that conspiracy to commit murder tie-in?

A.  Yes, sir.

Q.  Did you review every like drug possession
or use case that came through your office?

A.  No, sir.

Q.  Those are some of the -- are they
considered non-SSI cases?

A.  Yes, sir.

Q.  How did you first become involved in the
investigation regarding Sergeant Aguigui, Isaac
Aguigui's wife?

A.  All right.  So I don't remember who I was
called by.  It was either the Duty Agent or the Team
Chief.  I was informed that the soldier was found
deceased in her residence.  That they were en route
to the scene.  Started going through the normal
process.  Make sure the Team Chief is here.  Blah,
blah, blah.

So I got dressed.  Got in the truck.
Started leaving my house.  And then I was called
while I was en route and was given the name and I
automatically recognized it.

Q.  Okay.  What did you do when you recognized
the name?

Toole, Wes                                              February 26, 2016

14 (Pages 50 to 53)

50

1      A.   Proceeded as normal.  I believe I
2   contacted Agent Dale as well, because I knew that he
3   was familiar with Aguigui and that he would be an
4   invaluable source of knowledge, you know, if there
5   was any type of -- any type of wrongdoing.
6      Again, we -- the initial call that we got
7   was that -- that Sergeant Aguigui was found
8   unresponsive -- that he had contacted 911 about
9   finding her unresponsive in the residence.  That the
10   MPs showed up.  He was hysterical, had to be
11   restrained.  So it was kind of a mess when our
12   agents first got there, you know, just with the
13   emotion of what the MPs were dealing with at the
14   time.
15      But I contacted Agent Dale, because I
16   knew, Hey, if we -- we look at every death
17   investigation as if it's a homicide from the very
18   beginning and then make the determination on how the
19   person died as a rule of exclusion.  Ideally once
20   you rule out any type of criminality, then we can
21   fall on whether it was natural, accidental or
22   suicide.  That's kind of why I proceeded that way.
23      Contacted Agent Dale.  I wanted his
24   knowledge of Aguigui to be able to help inform the
25   investigative process.

51

1      Q.   Was Dale actually assigned to the case in
2   any capacity?
3      A.   I don't think he was.
4      Q.   Do you recall whether you ever saw his
5   name mentioned in the CAS when you reviewed it?
6      A.   I don't recall.
7      Q.   Did you ask Dale to speak with anyone in
8   particular that was working the homicide
9   investigation?
10      A.   I think I did.  I think I told him, plug
11   in with Agent Kapinus or Agent Fox.  Yeah.
12      Q.   Beside agents Kapinus and Fox, do you
13   recall anyone else who was heavily involved in
14   investigating it while you were at Fort Stewart?
15      A.   I know Agent Mahon was involved in at
16   least the preliminary or during the crime scene.  I
17   don't remember who else was really heavily involved.
18      Q.   Do you know the name of Elizabeth Dale?
19      A.   Sure.  Yes, sir.
20      Q.   Was she also involved in that?
21      A.   If her name was in the case, I would have
22   to say so.
23      Q.   Was there any relation between her and
24   Andrew Dale?
25      A.   No, no relation.  Coincidental and very

52

1   confusing at times.
2      Q.   As we have learned in this case.  Did you
3   have any involvement in the actual investigative
4   work for the Sergeant Aguigui homicide
5   investigation?
6      A.   So my involvement during the preliminary
7   phase, as I remember, I responded to the scene,
8   which I'm required to, and on any death
9   investigation, to ensure that the scene is being
10   processed adequately.  That roles and
11   responsibilities are assigned.  That evidence is
12   being identified and collected correctively and give
13   kind of overall guidance.
14      So aside from -- the only other -- the
15   normal duties of a SAC in terms of making certain
16   coordinations, conducting reviews, providing
17   guidance, the only investigative activity I can
18   recall in that.  I believe I had a conversation with
19   a mother, I think it was a mother of one of
20   Aguigui's friends that called with concern -- she
21   had concern that Aguigui may have bought some type
22   of medicine or something to cause -- to cause
23   Sergeant Aguigui to have an allergic reaction.
24      Q.   When was that call?
25      A.   I want to say it was a few days after,

53

1   something like that, yeah.
2      Q.   A few days after the death?
3      A.   Uh-huh.
4      Q.   Did you conduct any other interviews?
5      A.   Not that I'm aware of.
6      Q.   You spoke with Isaac Aguigui on several
7   occasions, correct?
8      A.   I think so.
9      Q.   Those were not interviews, right?
10      A.   No.
11      Q.   What were the purpose of those
12   conversations?
13      A.   What we call CLOers.  Casualty Liaison
14   Officers.  So CID has a requirement that the SAC
15   perform the role of a causal liaison for the
16   investigative process.  So we are required to keep
17   the primary next of kin informed on the progress of
18   the investigation.  But not necessarily conduct
19   interviews of them.
20      Q.   Is it something that you've done in other
21   cases where you have conducted a CLO interview or --
22      A.   Brief.
23      Q.   -- CLO brief with someone who is also a
24   person of interest in the investigation?
25      A.   I'm trying to think.  I feel like I have

54

1    done that before, but I can't remember a specific
2    example, no.
3        Q.  Is it fair to say it's relatively unusual?
4        A.  Yes, sir.
5        Q.  Were you involved in preparing the
6    Investigative Plan for this investigation?
7        A.  I don't remember if I was involved in
8    preparing the Investigative Plan, but I certainly
9    would have been involved in reviewing it.  Making
10   sure that no leads had been missed or trying to help
11   tailor it.  That's typically what I would do in any
12   investigation, I review -- any preliminary that I
13   review is review that Investigative Plan.  Make sure
14   that it's adequate.  Make sure they are on the right
15   track to identify the right type of leads.
16       Q.  I'm showing you what's been previously
17   marked as Exhibit 25.  Do you recognize that
18   document?
19       A.  I do.
20       Q.  And what is it?
21       A.  It's an Investigative Plan for CID ROY
22   279-11-CID093.
23       Q.  Okay.  And this indicates that the subject
24   victim was Deidre Aguigui, correct?
25       A.  That's what it says here.

55

1        Q.  And it says undetermined death?
2        A.  Yes, sir.
3        Q.  And the date in the upper left, does that
4    mean that's when the date when all of this was typed
5    up?
6        A.  That's usually -- the date in the upper
7    left is usually the day that the IP is developed.
8        Q.  So it's not the date of the --
9        A.  The date of the offense.  Date of
10   notification or date of events.
11       Q.  I see it continues on the second page and
12   it looks like it's then started fresh after that on
13   page three; is that right?
14       A.  On page three.  The page three that I'm
15   looking at appears to be the same leads.
16       Q.  There's different handwriting?
17       A.  Yes, sir.
18       Q.  And on page four, that seems to be the
19   continuation from page three; is that right?
20       A.  It seems that way, yes, sir.
21       Q.  Is this typical to see sort of the same
22   but somewhat different -- similar but different
23   Investigative Plans, you know, right next to each
24   other in a case file?
25       A.  It's not unusual, sir.  As I stated

56

1    earlier when we were talking about Investigative
2    Plans, it's a living, breathing document.  And
3    because every case is fluid and because a case will
4    sometimes be assigned to a different agent, they may
5    keep the Investigative Plan that they have but then
6    add to it or then supplement it with additional
7    leads of their own that they identify.
8        Q.  Is that something that happened in your
9    experience where something will be put on the
10   Investigative Plan to do but they decide not to do
11   it?
12       A.  Uh-huh.  Yes.
13       Q.  What happens to that?  What happens to
14   that, does the Investigative Plan get updated in
15   some way to reflect that?
16       A.  It can.
17       Q.  So let me ask you about, for example, on
18   the page one when there's a date on the right, am I
19   correct in saying that means that was completed on
20   that date?
21       A.  That typically means when that activity
22   was completed.
23       Q.  And what does it mean to you to see sort
24   of a line through the box next to, obtain MP report?
25       A.  What I take that to mean when I see the

57

1    line through is that it's either no longer an issue,
2    it's been resolved, or a supervisor had determined,
3    Hey, that's not required.
4        Q.  What about a blank space?
5        A.  When I see a blank space on an IP, I take
6    that to mean that hadn't been done yet.
7        Q.  And there's nothing to indicate when
8    there's a blank space and no line, that that's
9    something they no longer intend to do; is that
10   right?
11       A.  Not from just reading this Investigative
12   Plan, no, sir.
13       Q.  Now, if something was no longer part of
14   the Investigative Plan, would you expect to see that
15   noted on the Investigative Plan?
16       A.  Me, personally -- are you asking me
17   personally or a requirement?
18       Q.  Well, let me ask you that.  Is there a
19   requirement to note that on the Investigative Plan?
20       A.  Not that I'm aware of.
21       Q.  Is there a requirement to note that in the
22   CAS?
23       A.  If the case is being closed, what we call
24   a final C, meaning that there are additional leads
25   being done, but they are no longer required because

Toole, Wes                                          February 26, 2016

16 (Pages 58 to 61)

58

we have, you know, been able to prove or disprove either way, then there's a requirement to list those additional leads at the conclusion of the case in the CAS.

Q.   Now, having looked at this, do you recall now whether you were involved in preparing this or just reviewing it?

A.   Probably just reviewing it, sir.  I'm sure I had some level of involvement in helping develop it, because I'm sure I gave guidance.  We are going to make sure that this is in the IP, make sure that is here.  But in terms of sitting down with the person doing that, probably not.  I probably gave guidance and they acted on that.

Q.   I want to direct your attention to the middle of page one.  There are a couple of items there that are blank that are also blank on page three.  Those are the conduct candid interviews of D. Aguigui's unit and I. Aguigui's unit.  Do you recall any discussions about whether canvas interviews should be conducted in connection with the Deidre Aguigui investigation?

A.   I don't recall discussions about canvas -- let me rephrase that.

        I recall discussions about canvas

59

interviews of the neighborhood surrounding the death scene at the time.  Absolutely.  I don't recall additional discussion on canvas interviews aside from that.

Q.   Are canvas interviews of a person of interest's unit something that is standard practice?

A.   I wouldn't say standard practice.  It's one lead that could assist, but it's all depending on the situation and where the investigation is at that point.  You know, it's certainly a lead to consider, but it's not a though shalt, if you will.

Q.   If you as the SAC tell someone to conduct canvas interviews in a case and that person is below you --

A.   Sure.

Q.   -- does that person have to go do that if you tell them to do it?

A.   Yes.  But if, if, there's a reason why they think that it shouldn't be done, then we have that conversation.  I'll often put direction in a case file to, Hey, make sure that you do x, y and z, and that Team Chief or that agent will come, Hey, Chief, I saw you directed this, but here's a reason why I don't think we need to do this.  But I think we should, but we need to wait.  And we would

60

discuss their line of reasoning.  If I agree with it, good to go.

Q.   In you don't agree with it, can they just ignore the requirement?

A.   If they have been given guidance and don't do that, are they allowed to just ignore it, is that the question?

Q.   Yes.

A.   No, not without some type of overriding reasoning or discussion.  I mean, it's -- the Case Agent often has the most intimate knowledge of that case and the intricacies of it with each case being different and fluid.  You know, the Case Agent and Team Chief will often discuss leads.  And this is just what I see typically.  The Case Agent and Team Chief may discuss certain leads and the Team Chief is giving them guidance, but without going back to the SAC.  And I'm just using my own experience as an example here where I will see something -- so let's say I'm reviewing a case whenever it's getting ready for closure.  And I see on there, Hey, I identified this as a potential lead, you know, a couple of months ago, you guys haven't done that yet.  Well, Chief, it's because we found out x, y or z but we just never got back with you to explain that to you.

61

Okay.  I understand.  It's not done in a malicious or a way to just completely disregard guidances, because it was no longer relevant or they did not think it was relevant anymore.

Q.   Now, you said it wasn't standard practice to conduct canvas interviews of a unit for someone who is a person of interest.  But is it something that is usual?

A.   I wouldn't say that it's a standard or that it's unusual.  It's a lead.  It's something -- you know, there's two types of -- two types of general evidence that we also consider in any investigation; there's physical evidence and testimonial evidence.  And, you know, we try to identify all those leads within both categories that should be considered.  Doesn't mean they are always going to be done, but we should at least consider them.

Q.   So that I understand it.  When you talk about -- when this document, for example, talks about canvas interviews of a soldier's unit, how many people are we talking about getting canvased there?

A.   The term unit is ambiguous.  Because obviously someone is assigned to a 4,000 soldier

**62**

brigade or someone is in a squad.  Usually what that
means is those people that are in the unit with,
that they are closes to, who would have most
information in terms of their demeanor at work, but
also maybe their demeanor and behavior outside of
work.  So usually it's a squad or a platoon size.
    Q.  Is it possible that somebody in CID might
have seen this part of the Investigative Plan and
thought, darn, I've got to interview a thousand
people?
    MS. JOHNSTON:  Objection.  Calls for
speculation.
    A.  I highly doubt that any agent who saw that
on there, thought, darn, I've got to interview a
thousand people.  If I received this as a Case Agent
and said, Conduct canvas interviews of Aguigui's
unit, I would interpret that to mean those people
that that they work with on a regular routine base.
    Q.  For example, Aguigui was assigned to
something called the S-2 section or unit, would that
be the place to start?
    A.  If I were to be given that guidance to
interview Aguigui's unit, I would start with those
people that she worked with on a regular and routine
basis.

**63**

    Q.  As you sit here today, can you think of
any reason or recall any reason why canvas
interviews, such as those mentioned on this
Investigative Plan, were not conducted in this case?
    A.  Without the benefit of having the entire
case to look at, I don't know.
    Q.  When you spoke with Isaac Aguigui as part
of the CLO brief, did you notice any behavior that
you thought was suspicious?
    A.  Can you further define what you mean by
suspicious behavior?
    Q.  I would say whatever you define as.  Was
anything about his behavior something that made you
more or less suspicious about whether he was
involved in --
    A.  My interactions with Aguigui through these
CLO briefs were either in passing or telephonic.  By
in passing, you know, as he was there at the office
being interviewed during the preliminary phase of
this.  I would have briefly interacted with him,
explained to him who I was, what my role was and
kind of what the process is going to be in general
terms.
        After that, as far as I can remember, I
think all of our contact had been over the phone.

**64**

And it was short in duration.  Usually a minute or
so.  Because I made the decision that I'm not going
to provide in-depth details about the status of the
investigation, because we had not ruled him out.
Because we did not even know what the cause of death
was yet.  And we had not ruled him out.  So I
decided I was only going to brief him insofar to
tell him the investigation is still ongoing and the
autopsy has or has not been completed.  So they were
very brief interactions, not really not long enough
to develop any suspicions other than what I had
already formed about him.
    Q.  If he made any remarks that you thought
were suspicious, is that something you would have
noted in the CIS?
    A.  If he made any remarks that I felt were
suspicious, is that what you're saying?
    Q.  Yes.
    A.  It's possible that I would have put it
into the CAS.
    Q.  Can you think of any reason, besides
making remarks for a suspicious, as to why you would
quote things that Isaac Aguigui said to you in the
CAS?
    A.  I don't know.  Without the benefit of

**65**

having the CAS in front of me to look at, I'm not
entirely sure what you're asking.
    Q.  Did you ever interact with Isaac Aguigui
at the scene of the crime?
    A.  I think I did a couple of times.  Because
we were holding that scene basically indefinitely.
And there were some personal effects that he needed
to get out of there.  I remember at one time he
needed to get his dress uniform out for the memorial
service.  So I believe that I was present one of
those times in order to escort him into the
residence and escort him back out and resecure it.
    Q.  Was it standard practice to close off a
scene where there was a death investigation going
on?
    A.  Yes.
        (Exhibit 28 marked.)
BY MR. BROOK:
    Q.  I'm showing you what's been marked as
Exhibit 28.  It's bearing Bates number JAHR0001475.
Do you recognize this document?
    A.  I do.
    Q.  What is it?
    A.  This is a memorandum for Second Lieutenant
Andrea M. Ruth, Summary Court Martial Officer,

Toole, Wes                                    February 26, 2016

18 (Pages 66 to 69)

66

1    assigned by myself.
2         Q.   What was the purpose of this document?
3         A.   As I read this, this is the memorandum
4    generated to inform necessary parties of scene
5    control at that address, at the death scene.
6         Q.   Now, this is dated September 8th, 2011; is
7    that right?
8         A.   That's the date, yes, sir.
9         Q.   So this is almost two months after the
10   death occurred, correct?
11        A.   Yes, sir.
12        Q.   Now, why was the memo being generated at
13   that date?
14        A.   I'm trying to remember this.  I think this
15   was because, a way this is -- I'm trying to piece
16   together why the general -- I don't always have to
17   generate or don't always have a requirement to
18   generate a memorandum if we are keeping a scene.
19   But if I remember right, there was still personal
20   effects inside that house.  And it is unusual for us
21   to hold a -- have to hold a death scene for that
22   long.  But because of the fact that the cause of
23   Sergeant Aguigui's death was still undetermined, I
24   was not comfortable releasing anything.  And so I --
25   I want to say that this memo was generated to

67

1    basically explain to the Summary Court Martial
2    Officer, look, kind of as a cover for them -- not a
3    cover for them.  A way to absolve the Summary Court
4    Martial Office.  Because they are the ones
5    responsible for gathering up all the personal
6    effects, getting them back to next of kin.  Things
7    like that too.  So it's basically a way that she
8    could say, Look, the CID agents will not release the
9    scene, so I can't recover everything.
10        MR. BROOK:  Let's go off the record.
11        (Off the record.)
12   BY MR. BROOK:
13        Q.   I'd like you to look back at Exhibit 25,
14   which should still be in front of you.  Just, if you
15   can explain to me, what the purpose of the lower
16   right box investigative standard is.
17        A.   Okay.  So the investigative standards box
18   that's on this Investigative Plan, it's basically
19   kind of a quick reference for the case agents to
20   remind them of certain triggers.  These are
21   standards that are outlined in CID Regulations 195-1
22   for timeliness of investigative activity.  So it's
23   kind of used as like a quick reference card for
24   them.
25        Q.   Okay.  And what does it mean when it says

68

1    evidence deposit?
2         A.   So if an agent collects evidence, they
3    have to -- that evidence has to be processed into
4    the evidence room by the end of the next duty day.
5         Q.   And the lab results, does that include
6    things like DNA test on potential suspects or what?
7         A.   That's one example.  We are required to
8    submit a lab request to wherever it's going to be
9    tested at within five working days from when that
10   determination is made, that the request needs -- or
11   that the exam needs to be done.
12        Q.   And the next line it has the acronym RAF,
13   is that Request for Assistance?
14        A.   Yes.
15        Q.   And being sent out to other CID officers;
16   is that right?
17        A.   Yes, sir.
18        Q.   Is that term ever used to request
19   assistance from non-CID agencies?
20        A.   It could be another military criminal --
21   like NCIS or OSI, we may reach out to them to
22   request for assistance if they are closer to where
23   that activity is.
24        Q.   When it says meaningful inactivity, I
25   guess that's investigative activity?

69

1         A.   Yes, sir.
2         Q.   So ten duty days, does that mean ten duty
3    days from the date of the offense, what does that
4    mean?
5         A.   So what that means, the ten duty days,
6    that we have a requirement to accomplish what's
7    termed as meaningful investigative activity, at
8    least once every ten duty days in every
9    investigation.  So that's the maximum amount of time
10   that an agent can go without having done something
11   what they term as meaningful.  And I used air quotes
12   there, but meaningful in that case.  Sorry.
13        Q.   Great job with getting on the record as
14   far as the air quotes.
15            So meaningful, I think what you meant by
16   that, correct me if I'm wrong, is it's subject to
17   determination?
18        A.   Yes, sir.
19        Q.   But whether activity of any kind occurred
20   or not, that's something that you could objectively
21   say, right?
22        A.   Yes, sir.
23        Q.   Now, is it possible that there's
24   meaningful investigative activity that doesn't get
25   recorded in the CAS?

Toole, Wes                                    February 26, 2016

19 (Pages 70 to 73)

70

1    A.  It's absolutely possible, yes, sir.
2    Q.  Where would it be recorded or memorialized
3  if it was not on the CAS?
4    A.  If it was not on the CAS, it could be
5  recorded within the Case Agent's notes or within the
6  agent's investigative report, the AIR.
7    Q.  Now, if someone is supervising -- like the
8  Team Chief told the Case Agent that I guess that
9  there's a lack of information in the CAS for a given
10  period of time and that needs to be corrected or
11  explained, is that something that the Case Agent
12  would then have to put into the CAS if there was
13  meaningful activity in that period?
14    A.  Yes, sir.  If a case agent failed to
15  document something that they did within the CAS and
16  a supervisor brought it to their attention, that
17  agent would then need to go in, you know, either put
18  the entry in or provide a delayed entry in in order
19  to make sure that that information is captured.
20  It's a quite common occurrence as agents are going
21  out conducting investigative activity, sometimes
22  they forget to document something that they did and
23  they are reminded later, Hey, you did not document
24  that.  So it's not uncommon.
25    Q.  Is it possible within the ACI2 system two

71

1  weeks after an event, say, to go back in and put
2  something in with a date that is accurate in the
3  system?
4    A.  It is possible, yes, sir.
5    Q.  And so when would an agent do what I just
6  described in my last question versus labeling
7  something a delayed entry?
8    A.  So at the time of this case when I was at
9  Fort Stewart, there was no clear guidance on when
10  you could -- how long you had before it had to
11  become a delayed entry.  Okay.  So let's say, and
12  I'm just using an example here, if it's all right.
13    Q.  Please.
14    A.  Let's say I interviewed you yesterday, but
15  I was busy in five other cases, I did not have a
16  chance to sit down and document it.  If I document
17  it today and go in there, it's okay for me to put --
18  enter it on the date that it was actually done.
19    Now, before at this time, whenever I was
20  at Stewart, I think the term was a reasonable amount
21  of time.  That if the activity wasn't conducted in a
22  reasonable amount of time, then the agent would make
23  a delayed entry.  Again, the term reasonable, same
24  as meaningful, is a subjective standard.  So since
25  then CID has further clarified, I believe if it's

72

1  not documented within five duty days, it has to go
2  on as a delayed entry.
3    So it was really office by office, case by
4  case, supervisor by supervisor.  Different people
5  had different standards on what they wanted put in
6  as a delayed entry versus what was put in as an
7  actual time.
8    Q.  Did you set standards for the people
9  working in your office?
10    A.  On delayed entries, I'm confident I did.
11  But to be honest with you, I can't remember what
12  standard we had set there.  And usually the
13  standards that would be set, it wouldn't be by what
14  Wes Toole is comfortable with.  I would try to
15  generally get consensus from the Team Chiefs on what
16  they felt reasonable and then we would come to an
17  agreement, Yeah, I think that's reasonable to expect
18  an agent to put it in then.  But I can't remember
19  what our office standard was at the time.
20    Q.  Was it common practice for the Case Agent
21  or Team Chief to input investigative work that was
22  being done by other people into the CAS?
23    A.  Sure.  Yes, sir.  Well, I should clarify
24  that.  By common I mean, it's not unusual or it's
25  not unheard of it.  It's more common to see that

73

1  during the preliminary phase where I may have -- I'm
2  just using an example again.  I may have five agents
3  out doing five different things and I'm assisting by
4  kind of documenting.  As they are coming and telling
5  me things, Hey, you just keep going and I'll
6  document in here.  But you usually don't see it as
7  much after the preliminary phase.  It's not really
8  common, but it's not unusual to see it, either.
9    Q.  Have you ever seen it where a Team Chief
10  always inputs for investigative activity for someone
11  who is investigating underneath them?
12    A.  I have seen that before.  You will
13  typically see that with someone who has some type of
14  access issue with Alerts or -- I'm sorry, our new
15  system is Alerts.  The previous system then was
16  ACI2.  So if I had an agent who -- let's say a
17  reserve agent, for example.  Their ACS2 account may
18  not be activated yet.  You know, so they are more
19  than capable of doing the investigative activity,
20  but because it's taking time to get their account
21  activated, the Team Chief will often put the
22  information in for them.  And we see that with Drug
23  Supression Teams also, where the guys are just
24  waiting on their account to get activated but they
25  are actively doing work.

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

Toole, Wes                                February 26, 2016

20 (Pages 74 to 77)

---

74

Q. Using the ACI2 system, is it correct that each person had their own sort of dedicated log-in to it?

A. Yes.

Q. So you could not create an entry on the CAS for someone else's name; is that right?

A. Again, I'm putting myself back at the time of Fort Stewart, because it's a different system now. At the time an agent could not -- and you still can't, you can't log-in as someone else. But I believe at the time in ACS-2 I could go in and basically create activity for that person to where I'm logging in, but I'm saying that this agent conducted this activity. So if I remember correctly when you look in the system, it would still show that I entered it, but on behalf of someone else. I hated that system.

Q. When did the system change?

A. It changed over in April of 2015.

Q. You said that you're still able to access files that were created with that system, right?

A. Yes, sir.

Q. And have those been moved over to the new system?

A. Well, I mean, you can still retrieve

---

75

anything that was put in under that system or the one -- the Legacy system before that. You can still retrieve it because it's all within the same repository, but it's just -- there's a different interface. Yeah, a different interface.

Q. For example, when you were pulling up the CAS for the Deidre Aguigui investigation, you used the new system to do that?

A. Yes, sir.

Q. I'm going to hand you what's been previously marked as Exhibit 11. In previous depositions it's been established that this is the CAS or sometimes referred to as AAS for the conspiracy to commit murder investigation. Does that look correct to you?

A. Yes, sir, it looks correct.

Q. I'd like you to turn to the second page. This reflects that there were name checks done by Agent Dale for Nicholas Arranyos and Steven Lloyd, correct?

A. Yes.

Q. It does not reflect a name check being done for Isaac Aguigui?

MS. JOHNSTON: On page two?

---

76

BY MR. BROOK:

Q. On page two.

A. I don't see anything on page two referring to a name check on Isaac Aguigui.

Q. Do you recall any reason why a name check would not have been done on Isaac Aguigui?

A. I wasn't the one doing these checks or doing this investigation on page one, so I don't know why it would or would not have been done.

Q. Do you know whether Agent Dale had a previous relationship with Isaac Aguigui before this investigation began?

A. Can you define what you mean by relationship?

Q. Did he have knowledge of him as a person?

A. I believe that he did, but I can't recall exactly to what extent that was. I think he may have been involved in a previous drug investigation, but I could not tell you the details of that.

Q. Do you recall that there was a confidential informant that was involved in this case?

A. I'm looking on page one right now, and I see as the first CAS entry basis for investigation, that a CID source is registered. So based on

---

77

reading that, I would say, yes, there was some type of source involvement in this case.

Q. Do you have any recollection of that as we sit here today?

A. Yes, sir.

Q. Okay. Do you recall what the CID source's relationship was with Isaac Aguigui?

A. I don't recall.

Q. Do you recall that the CID source, though, was connected with Isaac Aguigui and not with the other individuals that were being investigated?

A. I don't recall what the source's connection was with any of these subjects of this case.

Q. Do you recall whether at some point you or others in your office developed concerns about the reliability of the CID resource?

A. Without the benefit of having reviewed the case, I don't recall having any concerns as I sit here today. But --

Q. I'd like to direct your attention to page three. This is the SAC review, right?

A. Yes, sir.

Q. Was it common for you to conduct a SAC review the day after an investigation begins?

---

Toole, Wes                                    February 26, 2016

---

**78**

1  A.  On -- again, depending on the type of
2  investigation, the type of offense that's under
3  investigation, I'll typically put a review in before
4  an initial report is sent out.
5  Q.  Now in an initial report, who was that
6  sent to?
7  A.  So as discussed earlier, the initial
8  report or any CID reports, it's all going to be
9  dependent upon the nature of the offense being
10 investigated.  The subject or suspects that are
11 under investigation.  It may also depend on
12 whether -- whether there's any type of undercover
13 activity or if we are concerned about the compromise
14 of information.  If that's the case, it would not be
15 uncommon to have a report restricted to CID only.
16 You know, and I'll give you an example.
17      If a soldier is under investigation but
18 does not know that CID is investigating them yet,
19 we'll restrict that report to CID only.  Just
20 so that someone else who is another authorized
21 recipient doesn't inadvertently make them aware of
22 it.  But then we'll unrestrict it once the person
23 knows they are under investigation.  So that's why I
24 say, it's really a situation dependent.
25      Q.  The line entry above SAC review, is

**79**

1  that -- it says send investigative report for
2  approval.  Is that referring to the initial report
3  you just mentioned?
4  A.  Yes, sir.  That's an automated message.
5  That's not something that I manually entered in.
6  Once I hit send on that report, it creates a CAS
7  entry for me basically saying that that report was
8  sent.  And then it looks like I put in my review
9  immediately thereafter or documented my review
10 immediately thereafter.
11 Q.  And up above the send investigative report
12 for approval, there's an entry referring to how
13 Andrew Dale drafted the initial report; is that
14 right?
15 A.  Yes, sir.
16 Q.  The last part of that says, file to SAC,
17 then CIC for review?
18 A.  That's right.
19 Q.  That's why you have SAC review here?
20 A.  Yes, sir.
21 Q.  At end of your review on page four, it
22 says that you sent it.  It says, to SA Dale for
23 continuation?
24 A.  Yes, sir.
25 Q.  Does that mean that you did not send it on

**80**

1  to the CIC?
2  A.  So the way that this reads, was that it
3  went right back to Agent Dale.  It doesn't look like
4  I documented that it was going over to the CIC.  And
5  I'm trying to see -- yeah.  So more than likely what
6  happened, and this is not unusual or uncommon,
7  either typically you would want the CIC to be able
8  to review the investigation right after the initial
9  report is.  That's typically how we try to make the
10 case flow through the office.  Again, because every
11 case is different, every case is unique, what will
12 often occur.  If I don't want that case to go over
13 to the CIC review yet, meaning that it's more time
14 away and out of the agent's hand, I will often get
15 it directly back to the agent so they continue
16 working that investigation and work the CIC review
17 in during the life of the case.
18 Q.  Are CIC reviews required under CID?
19 A.  Yes, sir.
20 Q.  How soon after a case begins is there a
21 CIC review required?
22 A.  The regulatory requirement for CIC reviews
23 is that at a minimum they will be conducted upon
24 initiation and then upon completion.  And then it's
25 suggested it should occur during the life of the

**81**

1  investigation, as well.
2  Q.  Okay.  So if a CIC review does not occur
3  say within the first month of an investigation, is
4  that something that is in violation of that
5  regulation?
6  A.  Well, as I said earlier, it says that it
7  should be reviewed upon the initiation and prior to
8  completion.  But then there's also everything is
9  case dependent.  If there's a reason, i.e., whether
10 the CIC is out of the office, whether or not she or
11 he is burdened with additional duties.  You know,
12 there's a number of reasons that would influence
13 that.  So while it is a requirement, there is always
14 exceptions to those requirements.  And if operations
15 necessitate that that CIC review not be done within
16 the first few days or first month or so, then it's
17 not the ideal, but it's not prohibited, either.
18 Q.  Let me ask you to go back briefly to
19 Exhibit 25.  It's the Investigative Plan.
20 A.  Yes, sir.
21 Q.  What does it mean at the bottom right of
22 that box we were looking at where it says, action
23 taken, 30 calendar days?
24 A.  Okay.  So what that means is this is
25 really for dispatch of DA Form 4833.  I mentioned

---

**82**

1 that earlier. That's the Commander's report of
2 disciplinary action taken. So once we close an
3 investigation and that 4833 is sent to a Commander,
4 we have 30 days to get a response back. If we don't
5 receive that 4833 back within 30 days, then we have
6 to issue second notice or reminder. Again, it's
7 another card, kind of a trigger to assist the IST,
8 Hey, I have 30 days to get this 4833 back.
9     Q.  And how about the line above that, unknown
10 subject, finals?
11     A.  So at the time of the investigation the
12 regulation required that final reports -- if you had
13 a subject in a case where it was an unknown or if
14 you had a case where there was an unknown subject,
15 once the determination was made that the case was
16 going to be closed, the agent had 30 days to get all
17 the final report built and all the exhibits together
18 for dispatch and final report to be sent 30 days
19 from the day the SAC said close it.
20     Q.  And what about unfounded finals?
21     A.  The same thing, sir. So if -- so if an
22 agent is conducting an investigation, they establish
23 or they determine that the offense did not occur,
24 then from the date that determination is made
25 usually in conjunction with an SJA opine or

**83**

1 concurrent, they have 15 days from the time that the
2 supervisor says close it to get the final report
3 dispatched. Again, that was the standard -- let me
4 rephrase that, sir. That's what's depicted on the
5 investigative standards here, but I don't know if
6 this Investigative Plan that the agent was using
7 was -- if that was a current timeliness standard or
8 not. It's since changed, that's why I say to where
9 every case is 30 days from the time they are told to
10 close it. But that's what that meant. I can't say
11 that that's what the standard was at the time this
12 IP was generated.
13     Q.  So that I'm sure I understand it. With
14 all these time frames, this is from the time when
15 it's determined that one of these things should be
16 happening; is that correct?
17     A.  From the time that a supervisor makes the
18 determination that one of these things is going to
19 happen, yes, sir.
20     Q.  So, for example, victim's interview, that
21 would be 24 hours after a victim is identified?
22     A.  Yes, sir.
23     Q.  And eyewitnesses interviewed, 24 hours
24 after being identified?
25     A.  Yes.

**84**

1     Q.  But not necessarily 24 hours after the
2 crime occurred?
3     A.  Yes, sir, that's correct.
4     Q.  And so for that, in that RFA follow up, it
5 says 15 duty days, that means 15 duty days after
6 sending the RFA?
7     A.  Yes, sir.
8     Q.  I'd like to now go back -- sorry to jump
9 around -- to page three of Exhibit 11, your SAC
10 review. It says that you believe there's credible
11 information to believe Boyd committed the offense of
12 communicating a threat and solicitation to commit
13 murder. So is it correct that you titled him for
14 the offense at that point?
15     A.  Without having the benefit of looking at
16 the report that was dispatched on 18 May, usually --
17 I'm reading here that I'm concurring there's
18 credible information. So typically that would be a
19 trigger for titling somebody.
20     Q.  If you wanted to get onto your computer
21 system and pull up that report that you sent, would
22 you be able to do that?
23     A.  Yes, sir.
24     Q.  Those are things that are accessible to
25 you?

**85**

1     A.  Yes, sir.
2     Q.  Can you pull that up on your phone right
3 now?
4     A.  No, sir.
5     Q.  Going down to -- there's a set of numbers
6 after the first paragraph. Is that basically your
7 contribution to the Investigative Plan for this case
8 or how would characterize what you're doing there?
9     A.  What I characterize here, this is part of
10 my review. Generally what I'll do in any type of
11 review or in most reviews, I'll put in a narrative
12 kind of explaining justification for a certain
13 decision. Explaining my decision making process on
14 certain things. And whenever I start doing the
15 numbered items, it's usually things to draw the
16 agent's attention to. Pointing out issues or
17 concerns or providing feedback on things. It's part
18 of the overall review. Things that I want them to
19 specifically look at and then address line by line.
20 Either respond to them or do it.
21     Q.  Like action items?
22     A.  Some things are actionable. It may be --
23 for their attention, for their situation. Something
24 I just want them to acknowledge.
25     Q.  And just, again, to make sure I understand

Toole, Wes

February 26, 2016

23 (Pages 86 to 89)

---

86

it right. The Investigative Plan doesn't have
anything on it other than a list of leads for the
investigator to follow or is there something else
that goes into the Investigative Plan?
    A.  Are we talking about this Investigative
Plan?
    Q.  The Investigative Plan in general, as a
concept.
    A.  Well, like I said, the Investigative Plan
is a living, breathing document.  So I'll give you
an example.  Two years ago -- because there's not a
standard Investigative Plan in CID, there's guidance
in terms of what is bare minimal required on an IP.
But I revised the IP that I use in my offices so
that it has prioritization, it has suspensions.
Although the intent of the Investigative Plan is to
identify investigative activity to be conducted,
it's also used for a number of things.  It's used
for tracking, like this one here.  It has the
investigative standard.  It's used to kind of help
the case moving forward as a quick reference for the
Case Agent so that they don't have to go through
every time they pick up the case to do something
they have to read through 20 pages of what happened
since the last review.  A quick reference for them.

---

87

    Q.  What is an OP plan?
    A.  So an OP plan is shortened version of
what's called an Operations Plan.  So if an agent or
a team is conducting a surveillance operation or if
they are going to conduct a controlled purchase or
conduct a raid somewhere, they will put together an
OP plan.  This was adopted -- several law
enforcement agencies use Operation Plans.  Ours
follows along that model that's also adopted for
military operations.  Any time we conduct a military
-- or an operation in the military, there's a five
paragraph OP order.  We don't keep to the same
standards as a military OP order, but that's the
purpose of it.
    Q.  And the next line after you mentioned OP
plan, you said, risk assessment will be of the
utmost importance on this, exclamation mark.  We
will, will in all caps, cover all of our bases and
discuss every contingency and develop measures to
mitigate each?
    A.  Sure.
    Q.  What were you concerned about?
    A.  Guns and drugs.  That's what I was
concerned about.  You know, we are talking about
some off-post civilian targets, also.  Fort Stewart

---

88

and the community around Fort Stewart at the time,
Hinesville, there were some gangs and there were
some type of violent crimes being created in the
drug arena around that time.  I just want to make
sure anytime we are talking about guns and drugs, I
wanted everything tight.  So that everybody is safe.
That includes suspects, sources and investigators.
    Q.  And what does -- the next line refers to a
TLE request.  What is that?
    A.  TLE is referred to or it's an acronym used
for Technical Listening Equipment.  So think in
terms of like a body wire.
    Q.  Do you recall who you were planning on
wearing a wire in this case?
    A.  I don't recall who the request was
going -- who the target of that request was going to
be, but I wanted them to start drafting it up.
Because there's an approval process it has to go
through for Army CID.  We have to -- any TLE request
has to be submitted through our battalion to our
group, ultimately to the Army General Council for
approval.  So that can often be a lengthy process.
I wanted him to start leaning forward, thinking
about that, again going back to the safety.
    Q.  Is that the same thing as memo five?

---

89

    A.  No.  That's a blast from the past.  Memo
five used to be required for conducting off-post
operations on a civilian target, if I remember
correctly.  They are different.  You would usually
see both of them being submitted at the same time,
you know, because if I'm doing an off-post operation
on a civilian target and I want to aware TLE, we
would send both of them up together.
    Q.  Turning to page four, item number six.
You said that anything that we do off-post will go
through MACE, M-A-C-E, first?
    A.  Yes, sir.
    Q.  Why did you say that?
    A.  So anytime we are conducting law
enforcement operations off the installation, we have
responsibility to coordinate with local law
enforcement just so that they know we are out there.
MACE was the counter narcotics task force that was
operating in that area.  We had a partnership with
them.  We did several joint operations.
    So going back to what I said earlier, guns
and drugs.  We want to make sure they are aware of
anything we are doing out there so that they can
either assist or respond as needed.  But also to
de-conflict information.  You typically wouldn't

---

Toole, Wes                                    February 26, 2016

24 (Pages 90 to 93)

---

90

1  want to start targeting a civilian and doing
2  something directed towards them if another agency is
3  also targeting them.  Now you're stepping all over
4  each other.  That's why I want to make sure,
5  de-conflict this with them and let them know.
6      Q.  Did you interact personally with MACE in
7  your time at Fort Stewart?
8      A.  I think maybe just in passing or over
9  emails.  I never really did any joint operations
10  with them.  But Agent Dale, as our Drug Team Chief,
11  he was our the primary conduit with MACE.
12      Q.  Were there ever occasions with CID when
13  you were in command at Fort Stewart, took a case
14  that it was investigating and gave it to MACE in
15  order for them to complete the investigation and
16  decision whether to prosecute anyone?
17      A.  I don't remember anything like that.  But
18  that's not to say that it did not occur, nor would
19  it be unusual.  I mean, if during the course of an
20  investigation we identify subject suspects that have
21  military affiliation, then we would share that
22  information with MACE, pass it off to them, because
23  we lack jurisdiction to pursue civilians where there
24  isn't an Army nexus.  If it was just strictly all
25  civilian, we would hand it off to them.

---

91

1      Q.  What if a soldier was implicated in
2  criminal activity that targeted civilians off base,
3  is that something that CID ever referred out?
4      A.  I don't know if we ever did or not.  Are
5  you asking if that's something that we did or for a
6  specific example or if it's something that we could
7  do?
8      Q.  It's something you could do?
9      A.  Right.
10      Q.  But in your experience, it's not something
11  CID did, correct?
12      A.  Not during my time there.  I can't
13  remember whether we did or didn't.  Because, like I
14  said, I didn't really have a whole lot of daily
15  interaction into the drug operations.  I would
16  oversee any of their operations, I would review
17  them.  But the day-to-day cases, I don't know if we
18  referred any soldiers to MACE or not.
19      Q.  I'd like you to move ahead to page ten of
20  Exhibit 11 in front of you.  At the bottom of this
21  page is an entry on behalf or by Andrew Dale.  And
22  it refers to advice that SA Toole gave to him on May
23  21st, 2011.
24      A.  Yes sir.
25      Q.  It says, SA Toole advised SA Dale to

---

92

1  prepare a status report adding Aguigui as a subject
2  and listing the offense of conspiracy.
3      Does that mean you told him to title
4  Aguigui for conspiracy?
5      A.  Yes, sir, that's the way it reads.
6      Q.  Do you know whether or not that was
7  followed through on?
8      A.  Without the benefit of seeing the status
9  report that followed that, I don't know.
10      Q.  If there was such a status report, would
11  that have been something that went through your
12  hands before it got distributed to others?
13      A.  It depends.  I mean, Team Chiefs they have
14  the same ability to dispatch status reports.  So
15  depending on what was going on at the office at the
16  time, I might have just said, Hey, let me take a
17  look at the stat or have Agent Greene take a look at
18  the stat.  You punch it out or, Hey, have Agent
19  Greene punch the status report.  So it may or
20  may not have come through my hands, I don't
21  remember.
22      Q.  Because it's an automated process, as you
23  mentioned earlier, is there any way that a status
24  report would have been sent without it showing up in
25  CAS?

---

93

1      A.  I don't know if it would or not.  I would
2  think that the CAS would show a status report was
3  sent.
4      Q.  We earlier talked about the OP plan.  Is
5  that something that was typically kept in the case
6  file?
7      A.  Yes, sir.
8      Q.  So on the next page, page 11, it's SAC
9  review by you, if I'm understanding it correctly.
10  Item number two it says, that you -- I see the CRM
11  and the risk assessment but not the OP plan that we
12  discussed and approved.  Was that something that was
13  unusual?
14      A.  I would typically want to see the OP plan
15  within the file whenever I'm reviewing it.  But it's
16  quite possible also that the OP plan could have been
17  kept on the shared drive and they just hadn't
18  printed it out and included it in the file.  An OP
19  plan, similar to an IP, it's kind of a living,
20  breathing thing.  As information changes or
21  situations dictate, that Operation Plan will have to
22  be revised, tweaked.  So it may have been it just
23  wasn't printed out.
24      Q.  When you performed this SAC review, who
25  was supposed to respond or acknowledge the numbered

---

Toole, Wes

February 26, 2016

25 (Pages 94 to 97)

---

94

items that you listed here?

    A.  Usually the agent to whom the case is returned or whoever the primary Case Agent was.

    Q.  So since this was a case that was being done through the Drug Supression Team, would that have been the same person as the Team Chief?

    A.  It would all depend.  If Agent Dale decided he wanted to respond to my review and then give it back to his investigator, he could certainly do that.  Or depending on the investigator and his level of comfort with the investigator, he would have him respond directly back to the SAC review.

    Q.  Putting aside who actually makes the response, who is responsible for making sure that someone responds?

    A.  Who is responsible?  I am.

    Q.  So in this instance, and you can correct me if I'm wrong, you can flip through the next few pages, I don't see a response within the next couple of weeks it seems, at least afterwards.  Is that commonplace for people to not respond to these things at all during your time at Fort Stewart?

    A.  So common.  No, sir, not common.  Is it unusual?  It's not unusual, either.  Because, you know, agents, investigators, what they will often do

---

95

is get that case back, see what guidance was given and then start actioning on that.  But then fail to go in and document it.  Or document it accordingly within CAS.  So it's something that's not preferred.  We like to see an immediate response or close to an immediate response in a reasonable -- air quotes again -- reasonable amount of time.  But sometimes people become overwhelmed with circumstances and aren't able immediately put that in.  It's not the preferred method but, unfortunately, it happens.  But I see that there was a response provided.

    Q.  When was that?

    A.  I'm sorry, I thought there was a response provided.  Response to SAC review.  11 July.

    Q.  Okay.

    A.  But it looks like it was in response to the 17 June review that I did.

    Q.  So there were a few SAC reviews before there was any response in here, correct?

    A.  There was one SAC review in between the first one and his response.

    Q.  Okay.  And so the one that -- the last one before the response was on the 17th of June; is that right?

    A.  Yes, sir, that's what it looks like.

---

96

    Q.  And then the 11th of July?

    A.  Yes, sir.

    Q.  Okay.  And did you consider that a timely response?

    A.  You know, I wouldn't consider it a timely entry into a CAS, but that doesn't always mean that the agent didn't receive and respond to -- or action the guidance that was given so there was -- I'll acknowledge that there was almost a month before any response was documented in the CAS, but I cannot look at that and immediately infer that that means they did not action something.

    Q.  Jump around a little bit here.  So I apologize for that in an advance.  Please go to the next page that you were just looking at, page 26.  And that's Team Chief review by Agent Dale?

    A.  Yes.

    Q.  That first line there it says, This ROI is outside the ten day investigative activity window.

    Is that referring to the same thing that you mentioned earlier about meaningful investigative activity being required to be done every ten duty days?

    A.  That's the way it looks, yes, sir.

    Q.  And he said, This is unacceptable.  Why is

---

97

it unacceptable to have it be outside of ten duty days?

    A.  So the CID Regulation 195-1 has an appendix that discusses what we commonly refer to as the three Ts.  Timeliness of investigative activity.  Thoroughness of investigative activity.  And timely reporting.

    Within timeliness of investigative activity one of the guidelines that's given is that a case should have meaningful investigative activity once every ten working days.  And these guidelines were provided kind of as a way to say, hey, when all else fails, if you can get meaningful investigative activity into your case once every ten days, it will keep the case moving forward.  So that's a standard that we have come to be held accountable to.  It doesn't -- but there's also what's called a reasonable application standard within the regulation.  Understanding that sometimes there are things that are going on within an office, within a certain team between agents.  Going TDY or on temporary duty, leaves, passes, prioritization of cases shifting or cases are simply not going to have activity in them once every ten days.

    I see on the review Agent Dale saying that

---

98

¹ it's unacceptable, it's certainly not in keeping
² with the standard what the regulation says, but it
³ happens.
⁴        Q.   Right.  Now in this instance, he said it
⁵ was unacceptable.  And Agent Dale said further, You
⁶ will ensure this case file has no further
⁷ investigative time gaps.
⁸        Is it correct to say in that instance
⁹ whoever is responding to it, should be doing
¹⁰ something within every ten days?
¹¹        A.   Agent Dale was the Team Chief and he's
¹² directing somebody to make sure there's no further
¹³ gaps.  So it would be reasonable that person would
¹⁴ want to comply with that.
¹⁵        Q.   At the end of that entry by Agent Dale, it
¹⁶ says file to Investigator Atkins.  Does that mean
¹⁷ you in the first part of that entry is referring to
¹⁸ Investigator Atkins or could it be referring to
¹⁹ someone else?
²⁰        A.   So the next entry after says, Follow
²¹ Investigator Atkins, is an AAS entry from me.  All
²² non-SSIs will be held in abeyance.  So this was an
²³ entry that I placed into every LER within the
²⁴ office.  Basically when we have significant type of
²⁵ cases that occur, I'll often place cases in

99

¹ abeyance.  Hey, this is an all hands on deck,
² everybody is helping out.  Allows them -- so they
³ don't get gigged, if you will, for not having
⁴ activity in the case every ten days.  I did not
⁵ actually receive the file back when that entry was
⁶ made.  I went in and put entries into the ACS2 in
⁷ every case.
⁸        Q.   I guess my question is, I'm trying to
⁹ understand if it says at the end of the previous
¹⁰ entry, file to Investigator Atkins, that means that
¹¹ Investigator Atkins was the one who was supposed to
¹² respond to the Team Chief review?
¹³        A.   It means the physical file went back to
¹⁴ Investigator Atkins.  I don't know how Mr. Dale
¹⁵ wanted to respond to his review.  But I read here
¹⁶ he's returning the file back to Investigator Atkins.
¹⁷        Q.   So it could have been someone else?
¹⁸        A.   It could have.
¹⁹        Q.   Is it typically the Case Agent if there is
²⁰ one specified who responds to a Team Chief review?
²¹        A.   Typically, yes, sir.
²²        Q.   Are records kept of who is the Case Agent
²³ on a given case?
²⁴        A.   The CAS is usually the best record on who
²⁵ the case is assigned to.  Even though the case may

100

¹ start out with one agent or investigator, it may be
² transferred to another because of leaves, schools,
³ those other considerations, caseload, etcetera.
⁴        Q.   Do you recall whether Investigator Spencer
⁵ left the Fort Stewart CID office at some point while
⁶ you were there?
⁷        A.   He did, yes, sir.  I remember he left.  I
⁸ am trying to remember if he PCS, permanent change of
⁹ station, or ended his active duty service.  I can't
¹⁰ remember.  I think it was one of those two.
¹¹        Q.   Do you know whether that had any
¹² relationship to some of the delays that may have
¹³ occurred in this case that we are looking at here?
¹⁴        A.   So with Investigator Spencer being the
¹⁵ drug team NCOC, non-commission officer in charge,
¹⁶ basically he was the right hand to Agent Dale, he
¹⁷ was his Team Chief.  Not his Team Chief, but they
¹⁸ were kind of a team.  So anytime that a Team Chief
¹⁹ loses their next senior person who they lean on to
²⁰ help with reviews, operations, it always affects
²¹ operations.  I'm going through it right now.
²²        MR. BROOK:  Off the record for a second.
²³        (Lunch recess taken.)
²⁴ BY MR. BROOK:
²⁵        Q.   Agent Toole, I'd like to direct your

101

¹ attention back to Exhibit 13 that we were looking
² at -- I'm sorry, 11.  Page 12.  It's the second part
³ of -- it's the second part of the June 1st, 2011 SAC
⁴ review that you conducted.
⁵        A.   Okay.
⁶        Q.   The very last paragraph there, you said
⁷ that you were going to dispatch the status report to
⁸ add Aguigui as a subject and to add the offense of
⁹ conspiracy.  And we talked about before that refers
¹⁰ to titling him for the event, correct?
¹¹        A.   Yes, sir.
¹²        Q.   And then adds, Aguigui made admissions to
¹³ smoking Spice, however I'm not inclined to title him
¹⁴ for this offense as I believe it was previously
¹⁵ investigated in a separate ROI by this office.  Make
¹⁶ sure we document that case number for future
¹⁷ reference.
¹⁸        A.   Uh-huh.
¹⁹        Q.   Do you remember making that statement?
²⁰        A.   I don't remember making that statement,
²¹ but I'm reading this, and that sounds like something
²² I would say.
²³        Q.   Okay.  To whom were you making this
²⁴ statement, Make sure we document that case number?
²⁵        A.   To the drug team.  To the team that this

Toole, Wes                                          February 26, 2016

27 (Pages 102 to 105)

---

102

1  is going back to.
2      Q.  Now, were you ever given any information
3  about whether there was, in fact, such a previous
4  ROI for Auguigi smoking Spice?
5      A.  I would have to assume there was.  If
6  I'm -- because I would not have inherently known
7  that, not having day-to -- familiarity with the drug
8  cases or the drug -- simple possession or use cases.
9  So I would have had to known that in order to make
10  that statement that he made admissions to Spice.
11  But I understand this was already investigated in
12  another case, so we are not going to title him for
13  that in this case because it's already been
14  investigated.
15      Q.  Did anyone tell you that there wasn't a
16  prior case?
17      MS. JOHNSTON:  That there was not a prior
18  case?
19  BY MR. BROOK:
20      Q.  Right.  Did anyone ever say something like
21  that to you?
22      A.  Not that I remember, no.
23      Q.  If there was a prior case, or ROI, it
24  would have a case number on it, right?
25      A.  Yes, that would be reasonable.

---

103

1      Q.  Can you think of any reason why, if there
2  was a separate ROI that was previously investigated,
3  there would be no case number associated with it?
4      A.  If there was a case that was done on a --
5  by our office, it would either be assigned what we
6  call a target analysis file or an ROI number, but
7  there would be some type of case number associated
8  with that documenting that activity.
9      Q.  Based on your instruction here, if the
10  drug team determined that there was no such case
11  number, is that something that they had to make note
12  of?
13      A.  If there was no such case number, then it
14  would either be documented within this -- within
15  this case or a separate number would be generated as
16  a result.  So just a scenario -- trying to play out
17  the scenario that, okay, if I said, Hey, he was
18  already investigated for Spice before, if they came
19  back to me and said, No, Chief, actually we don't
20  have another ROI on that.  I would say, Okay,
21  generate another case number, because it's separate
22  from this or we would just include it in this and
23  have multiple offenses.
24      Q.  As you sit here today, do you know whether
25  there was a separate ROI?

---

104

1      A.  I have no idea.
2      Q.  Can you think of any circumstances in
3  which someone who is responding to this SAC review
4  could have just found out that there was no separate
5  ROI and kept that to themselves and that action
6  being proper?
7      A.  And that action being proper?  I can't
8  think of any scenario to where if someone saw this,
9  this review, and knew that there was not an ROI and
10  then ensuring that there was one, I can't -- I can't
11  think of a scenario where that would be appropriate.
12      Q.  Am I correct that in that scenario, if it
13  happened, without at least an ROI or anything like
14  that, the fact that Auguigi made admissions to
15  smoking Spice would not reach the chain of command?
16      MS. JOHNSTON:  Objection as to form.  If
17  you can understand, you can answer.
18      A.  Can you restate it?
19      Q.  Sure.  In the scenario that I just
20  described, which I can repeat if you want me to --
21      A.  That's fine.
22      Q.  If that occurred, then how would the chain
23  of command learn about the fact that Auguigi made
24  admissions to smoking Spice?
25      A.  It would either be provided with a copy of

---

105

1  a report or they would be briefed in person by the
2  agent or investigator that their soldier made
3  admissions to smoking Spice.
4      Q.  When you were the SAC at Fort Stewart, did
5  you believe that it was important that if Auguigi --
6  that because Auguigi made admissions to smoking
7  Spice that there be some sort of report on that made
8  to his chain of command?
9      A.  I felt that -- it's not necessarily I felt
10  important that it be reported to as chain of
11  command, because everything that we do a report of
12  investigation on is reported to the chain of
13  command.  It's almost like an automatic trigger.
14  That's why I put on there, I felt it was important
15  we document the fact that he had been previously
16  investigated for that offense.
17      Q.  His offense of smoking Spice, something
18  that was of concern generally at Fort Stewart when
19  you were there?
20      A.  Yes, it was.
21      Q.  Why is that?
22      A.  Because Spice was a new substance.  We
23  were seeing quite a surge of Spice activity and,
24  obviously, health concerns with soldiers that, you
25  know, have smoked Spice and the impact that could

---

Toole, Wes                                                      February 26, 2016

28 (Pages 106 to 109)

---

106

1  have.  So we were having a hard push on trying to
2  shut down the supply of Spice off post, and helping
3  identify soldiers that were using it for risk
4  reduction.
5      Q.  At the time that you made this SAC entry
6  on June 1st, 2011, did you have any knowledge of
7  Private Aguigui's security clearance?
8      A.  No.
9      Q.  Is that something that would be relevant
10 in determining whether it was important to do an ROI
11 on a soldier admitting to smoking Spice?
12     A.  No.
13     Q.  Are you aware of any regulations that
14 prohibit people with top security clearance from
15 using any kind of drugs?
16     A.  I'm aware in order to retain a clearance
17 you have to keep a clean criminal history, which you
18 know, is something that's checked during periodic
19 reviews, but -- I really not -- I'm
20 really not tracking with -- if you're looking for a
21 regulation that has to do with top secret clearances
22 and criminal --
23     Q.  Would it surprise you that after you made
24 this notation in this report if Isaac Aguigui
25 obtained a top security clearance for a

---

107

1  month-and-a-half or more?
2      A.  No, it wouldn't surprise me.  Insofar as,
3  you know, most of the times -- once these reports
4  are dispatched and a soldier is listed as a subject
5  and they are titled, you know, there's a requirement
6  for the Commanders to flag that soldier.  And part
7  of the flagging is suspension for favorable actions
8  and suspension of their security clearance.  But
9  that's not -- that's incumbent upon the chain of
10 command to make sure those flags are initiated.
11 Sometimes commands -- it's not an automatic process
12 to where the Commander can just turn on his computer
13 and flip a switch and flag somebody.  There's a
14 process that the command authority and SJA can speak
15 toward.  But, unfortunately, for my slice of the
16 pie, if you will, I'm not familiar with that
17 mechanism.  So to say that it would take a month, I
18 can't say that it surprises me, because I'm not
19 familiar with what the normal, you know, how long it
20 would normally take, you know.
21     Q.  If you would go to page nine of Exhibit
22 11.  You mentioned before that you remembered there
23 was a number of interviews that were conducted in
24 connection with this case, the conspiracy to commit
25 murder, correct?

---

108

1      A.  Uh-huh.
2      Q.  Is that a yes?
3      A.  Yes, sir.
4      Q.  And do you recall, if you would, please,
5  take a look at the first few sentences in this
6  Andrew Dale, June 16th at 16:00 hours.  In
7  particular it says, From review of the statements it
8  almost seems as if Aguigui is the main conspirator
9  behind the conspiracy to commit murder.  Lloyd still
10 seems to be the main drug pusher, but has denied all
11 involvement.
12         Do you remember this involvement in the
13 case?
14     A.  Somewhat, yes, sir.  I remember Dale
15 coming to me with concern that, hey, it looks like
16 Aguigui was trying to underplay his level of
17 involvement in the conspiracy.  Yeah, I do remember
18 that, yes, sir.
19     Q.  Did that change your opinion of Aguigui
20 and how cooperative he was being?
21     A.  It didn't necessarily change my opinion
22 because I was looking at all three of them as
23 conspirators to commit murder.  Who was the ring
24 leader or the main conspirator, I used air quotes,
25 was really in my opinion inconsequential, they were

---

109

1  all being looked at as subjects of this
2  investigation.  It was definitely interesting and
3  something that would be of note and of interest to
4  make sure the command and the SJA were aware of, but
5  it did not really surprise me.
6      Q.  Did Agent Dale relate to you any specific
7  statements that were made about Aguigui by some of
8  the witnesses who were interviewed that led him to
9  that conclusion?
10     A.  I'm sure that he did, but I don't remember
11 that conversation verbatim.
12     Q.  Do you recall any -- do you recall whether
13 he told you about statements that were made by
14 Solider Arranyos's wife, Jessica Valdez?
15     A.  I don't remember that at all.  I'm not
16 saying we did not have a conversation, but I don't
17 remember.
18     Q.  Is it significant if a soldier threats the
19 life of another soldier?
20     A.  So if a soldier threatens the life of
21 another soldier, I guess it would depend on that
22 type of threat.  Whether it's something like simple
23 communication of a threat, you know, verbal; or
24 whether it's presentation of actual deadly force.
25 Again, it all depends on the circumstances and

---

Toole, Wes

February 26, 2016

29 (Pages 110 to 113)

---

110

severity.

If two soldiers are arguing in the barracks and one of them makes the statement, quote, I'm going to kill you, end quote, that doesn't carry the same severity in my opinion as someone pointing a loaded weapon at someone else and threatening to kill them.

Q. Aside from threats, what about if a soldier talks about killing other soldiers?

A. If a soldier talks about killing other soldiers?

Q. Right. With third parties.

A. Right. It's a concern in my opinion, this is Wes Toole's opinion, it's obviously a concern. But then, you know, in the absence of an overt act, then, you know, that is something that may not rise to the conspiracy level. But would still be enough concern to make people aware of.

Q. I know there's a bunch of notes here, but as you sit here today, do you recall whether any of the witnesses that were interviewed by CID gave an alternative target for conspiracy to commit murder that that witness claimed Isaac Aguigui was trying to kill or planning to kill with the shotgun that he purchased?

---

111

A. With the shotgun that he purchased. I'm not aware of any other target. And, again, like you said, without reviewing everything, and as I sit here today, that does not -- that does not ring any bells.

(Exhibit 29 marked.)

BY MR. BROOK:

Q. Now, Exhibit 29 bears Bates numbers JAHR0002066 through 2068.

A. I was handed two of these.

Q. Do you recognize this document?

A. I recognize this insofar as it's a sworn statement. It is marked with file number -- CID 204-11-CID-093. And appears to be a sworn statement of an indiscernible first name, last name Valdez. But that's the only way I recognize it.

Q. Do you recall whether you in conducting your SAC review on this case ever looked at actual sworn statements that had been signed by any witnesses?

A. I would assume that I had, but I don't recall this statement specifically.

Q. I'd like to specifically direct your attention to the second page right in the middle. There's a statement in the Q and A, it says, When

---

112

did Aguigui talk about killing his wife? A, After he bought his shotgun. It looks like he says, He cracked a joke and said we all can split the money if we keep quiet.

Does it look like I read that correctly?

A. It looks like that's correct, yes, sir.

Q. Were you aware that this statement was made by a witness?

A. I don't know that I was aware at the time of this statement, and I don't recall this being brought to my attention afterward. I don't remember it.

Q. In light of the date here, this is June 15th, 2011, correct?

A. Yes, sir.

Q. Knowing now what happened a month later, do you consider that statement to have been significant?

MS. JOHNSTON: Happened at the time or now?

BY MR. BROOK:

Q. Or do you consider that statement significant in light of what you learned a month later?

A. Looking back in hindsight, it's certainly

---

113

of interest. Looking at it at the time, I have no way to know what Jessica Vadelz's credibility is, what her motivation in rendering statements are or motivations toward Aguigui or the wife or any of the other conspirators. So, again, this would have been something that would have been noteworthy and something to consider. There was no way at the time to consider this to have been significant without the benefit of hindsight.

Q. I'm actually talking about after -- obviously at the time the statement was made, you had no idea that Aguigui was going to kill his wife?

A. No.

Q. But once his wife ended up dead, how is it possible that no one from CID recognized that this statement was in the file?

A. I can't say that no one from CID recognized it was in the file. All I can say is I did not know it was in there.

Q. Whose responsibility would it have been to make sure this statement in this 204 file was known to those who were investigating the homicide?

A. The Case Agent to whom the case was assigned or that was managing the investigation.

Q. Case Agent. Would the Team Chief also

---

Toole, Wes                                          February 26, 2016

30 (Pages 114 to 117)

114

1  have responsibility if he was aware of it?
2      A.  The Team Chief would have the
3  responsibility to review the statements to evaluate
4  them as evidence.
5      Q.  And you testified earlier that you brought
6  Agent Dale, Andrew Dale, to be involved in the
7  homicide investigation of Deidre Aguigui
8  specifically because he was familiar with this case
9  file?
10     A.  Yes, sir.
11     Q.  Besides Agent Andrew Dale, can you think
12  of anyone else who might have knowledge about
13  whether this statement was or was not communicated
14  to those that were investigating the homicide?
15     A.  Besides Agent Dale and Investigator Atkins
16  who took the statements, the only other person that
17  I would know whether or not this information was
18  relayed to the investigating team for Deidre's death
19  would be Agent Kapinus and Agent Fox.  They would
20  know whether or not this information was
21  communicated to them.
22     Q.  Is that the kind of information that a CIC
23  is supposed to notice during a review?
24     A.  It's something that a CIC would -- we
25  would want a CIC to review and extrapolate.  But,

115

1  again, it all depends when in the review process the
2  CIC looks at the case.  As I stated earlier, CIC,
3  you know, it's -- CIC is supposed to look at a case
4  at the initiation and prior to the closure, but then
5  is encouraged to look at the life cycle of the case,
6  as well.  Depending on when the statement was
7  obtained, when the CIC saw that case again, or if
8  they were able to see it again, unknown whether or
9  not they would have seen that or not.
10     Q.  If you would, please, turn to the next
11  page on Exhibit 11 to page 20.  And the continuation
12  of the entry by Andrew Dale that we were looking at
13  earlier.  It says -- first full paragraph, Also, we
14  need to interview Aguigui's wife and determine what
15  all she knows about the drugs and conspiracy.
16         Who was that statement directed to, as far
17  as you can tell?
18     A.  I would -- it seems that the statement was
19  directed towards investigators Spencers and Atkins.
20  And I'm saying that because he returned the file --
21  or he noted that he was returning the file back to
22  those two, so I assume that's who he directed it to.
23     Q.  When a statement like that is made, are
24  there any of the time frame requirements that we
25  were talking about earlier that are applicable to

116

1  getting that done?
2      A.  No, sir.  There's a saying that we have in
3  the Army, it's all met T.  It all depends on the
4  mission, troops, terrain.  So it's situation
5  dependent.  It would all depend on her availability.
6  What all was going on, current operations, timing of
7  things.  Do we want to talk to someone else before
8  we talk to her?  Are there other things that we need
9  to gather?  So there's not an automatic trigger
10  that's put on that.  Unless a supervisor says, By
11  this date I want you to do it.  That's outside of
12  those things that we discussed on the Investigative
13  Plan where you have to identify -- interview
14  eyewitnesses or victims within 24 hours.
15     Q.  So in this instance, it's not someone who
16  was an eyewitness or victim as far as this was
17  concerned?
18     A.  As far as this was concerned, no, sir.
19     Q.  Towards the end of this, it says, Brief
20  Commander and SJA, provide high risk memo to
21  command.
22         So is that telling investigators Spencer
23  and Atkins to brief the SJA?
24     A.  That's the way that appears, yes, sir.
25     Q.  And which Commander, which Commander does

117

1  that refer to?
2      A.  That would refer to his immediate chain of
3  command, and also up to the battalion.
4      Q.  And is it your understanding that's
5  referring to Aguigui's chain of command?
6      A.  Yes, sir.
7      Q.  And it also refers to provide high risk
8  memo to chain command?
9      A.  Yes, sir.
10     Q.  How would you characterize the purpose of
11  the high risk memo?
12     A.  So what's referred to here, is high risk
13  memo.  What I believe that he's referring to is the
14  memorandum pertaining to monitorship of --
15  monitorship of persons under investigation.  That's
16  a memorandum that was published by the Commander of
17  CID, and it's required for CID agents to provide it
18  to commander subject to anytime we bring them into
19  our office for questioning, you know, they are
20  advised of their rights.  The purpose of this
21  memorandum, it was initiated after an Army study,
22  and I can't quote the study, but they basically
23  found what they believed to have been a -- some type
24  of significance or a significant statistical link
25  between persons under investigation and being higher

Toole, Wes                                    February 26, 2016

31 (Pages 118 to 121)

---

118

1   risk for suicide and self-harm.  Because the CID --
2   commanding general of the CID was aware of this
3   study, he deemed it appropriate that a memorandum be
4   provided to all Commanders, anytime someone is under
5   investigation, brought in, advised of their rights
6   and put in the title block.  This memorandum be
7   provided to them to remind them about the fact
8   soldiers under CID will often experience stress.  We
9   would encourage you to take appropriate steps to
10  make sure that they did not harm themselves.  So it
11  was a suicide prevention tool.
12       Q.  Doesn't the memo also refer to the
13  possibility of soldiers under investigation harming
14  others?
15       A.  I don't know if that memorandum that was
16  issued did or not, because that was a previous
17  commanding general at the time.  And without the
18  benefit of having that memorandum, I can't say
19  whether that did or not.
20       Q.  Was this a standardized memorandum?
21       A.  Yes, sir.
22       Q.  If I wanted to find a copy of that
23  memorandum, or if you wanted to find a copy of that
24  memorandum now, where would you go look for that?
25       A.  A copy of that memorandum now?  I don't

---

119

1   know.  Because the only version that I have now is
2   the current version under our current Commander.  I
3   don't know that I have any historical record of what
4   it was in 2011.  U.S. Army Criminal Investigation
5   Command, I don't know if they have historical
6   archives of what that memo looked like then.
7       Q.  But because it's a standardized memo, it's
8   not something that was kept in the case file when it
9   was issued, correct?
10      A.  I don't know if it was kept in the case
11  file or not.  Because we issue it to the Commander,
12  we give them the memorandum.
13           MR. BROOK:  Go off the record for a
14  second.
15           (Off-the-record.)
16           MR. BROOK:  Back on.
17  BY MR. BROOK:
18      Q.  If you could turn to page 27 of Exhibit
19  11.  And this is a continuation of an entry by
20  Andrew Dale that we were looking at earlier before
21  lunch today.  The entry that is -- starts with --
22  where it's supposed to be coordinate, says,
23  Coordinate with Captain Daniels.  Obtain a list of
24  all Rear-D 6-8 CAV soldiers since January 11th to
25  current.  And then conduct canvas interviews of all

---

120

1   of them.
2           We were talking earlier about canvas
3   interviews of a unit?
4       A.  Yes, sir.
5       Q.  Do you know how many people it was that
6   were being specified for canvas interviews in this
7   instance?
8       A.  I have no idea, sir.  I mean, it's hard
9   for me to say.  I'm reading Rear-D, which means rear
10  detachment, 6-8 CAV.  Each unit, depending on the
11  type of unit they are, a calvary unit, say a company
12  size element or what they would call a troop, they
13  are not all standard across every Army installation.
14  And then a rear detachment, I mean, that could be
15  anywhere from 15 soldiers to 38.  I have no idea
16  so --
17      Q.  As you read this, this is something that
18  was given as an instruction to the investigator by
19  the Team Chief, correct?
20      A.  That's the way this looks, yes, sir.
21      Q.  So if he was not going to complete the
22  task, there would have had to have been something
23  like the conversation that you mentioned earlier you
24  would expect to have?
25      A.  Yes, sir.

---

121

1       Q.  If Investigator Atkins, for example, got
2   this and he was not able to get the list from
3   Captain Daniels that this refers to, what should he
4   have done next?
5       A.  You're asking me what should
6   Investigator -- what should the investigator have
7   done if he wasn't able to get the list?
8       Q.  The list from Captain Daniels as
9   instructed.
10      A.  Well, I can't really say what Atkins would
11  have done.  There's any number of different
12  recourses from that point.  I could tell you what I
13  would do if I were given that task.  Is either try
14  to obtain a list, otherwise.  But if the list could
15  not be obtained, then I would go back to my
16  supervisor and we'd look at a different approach.
17      Q.  Can you think of any reason why you would
18  just ignore it when you couldn't get the list and
19  move on to other things without mentioning it to
20  your supervisor?
21      A.  I mean, I can think of any number of
22  things that could happen in any given scenario, but
23  the most likely thing that happened here, which
24  occurs in investigations every day, is the person
25  tries to accomplish the task to the best of their

---

Toole, Wes                                                    February 26, 2016

32 (Pages 122 to 125)

122

1    ability.  If they encounter resistance or inability
2    to do so, they adjust.  They either adjust on the
3    fly or they adjust under the advice of their Team
4    Chief.  That's part of the -- part of what we want.
5    And we try to foster in investigators, is the
6    ability to think independently.  Yes, we give
7    guidance and direction every single day, but we also
8    expect them to exercise discipline initiative.  So I
9    don't need somebody that's necessarily going to come
10   back to me every five minutes and say, "Hey, Chief,
11   I tried to do this but I couldn't."  And now I have
12   to tell them what to do.  I can get a whole company
13   of privates to do that for me.
14        So I know that's a long answer, but it's
15   kind of difficult to answer that question, because I
16   don't know what Atkins tried to do or did not try to
17   do or what he may have said or did not say.
18        Q.  I understand that you don't know what
19   happened.  But if what happened was that Atkins
20   tried to get a list, was unable to do so after one
21   attempt, and then never made another attempt again
22   for five months, would that be acceptable in your
23   view?
24        A.  Again, it all depends on the circumstances
25   and the situation.  If he tried to get the list and

123

1    wasn't able to in the scenario that you described,
2    and then did not try again for another five months,
3    I want to know, okay, what was he doing that five
4    months.  If he was sitting in an office playing
5    Brick Breaker on a computer; yes, that would be
6    unacceptable.  But if he's going out catching bad
7    guys and solving other felony investigations while
8    still perusing this one, it's understandable.
9        Q.  The next line it says, "Get a red case
10   file folder for this ROI and get this case file all
11   in order."  What is the significance of a red case
12   file folder?
13       A.  It's just an administrative thing.
14   There's not a standardized way across CID on the
15   colors of folders and what they mean or anything
16   like that.  I think what he's -- and I'm trying to
17   put myself in what he would try to say by saying at
18   the time at that office, the red case folders were
19   multi-file folders, so they had dividers in them.
20   The Greene folders that we had, they were the
21   cheaper, single thing.  I think what he's trying to
22   say, what I would be trying to say in that, we are
23   starting to accumulate a lot of documents here, we
24   want to make sure they are organized well.  Move it
25   over into another folder.

124

1        Q.  So red did not have anything to do with
2    the type of case or how far along it was?
3        A.  No.
4        Q.  I'm going to hand you what's been
5    previously marked as Exhibit 13.  This is the case
6    activity summary for the Deidre Aguigui homicide?
7        A.  Yes.
8        Q.  This is what you reviewed to prepare for
9    this deposition?
10       A.  Yes, sir.
11       Q.  How carefully did you review it?
12       A.  I'll be honest with you, I made several
13   valent efforts to read through the entire thing.  I
14   went through and reviewed as many of the entries
15   that had my name mentioned in there, but I wasn't
16   able to read every single page.  And kind of been
17   going to midnight the last past three nights, so
18   it's been kind of hard.
19       Q.  In doing so, did that refresh your
20   recollection of what went on in this case?
21       A.  Somewhat, yes.
22       Q.  I'd like to direct your attention to page
23   three.  There's an entry by you on July 17th, 2011.
24   Says, Created new entity, entity ID number 2331691
25   with data copied from Aguigui, Isaac Glenn, entity

125

1    ID number 2318915.  What was going on?
2        A.  So what it appears was going on there,
3    this entry was made at 22:40 on the night of the
4    17th, which is the night we were notified about the
5    death.  This is an automated type entry, it's
6    nothing that I manually entered in.  So I was logged
7    into ACS2 at the time, and while the agents were
8    still conducting scene investigation and interviews,
9    I started building the file.  Started building the
10   file in Alert.  So I was migrating information we
11   already had in the file to create a new entity.
12   Basically populating the system.
13       Q.  So is this indicating that there were --
14   there was a new entity ID number that also referred
15   to Isaac Aguigui?  I'm trying to understand, what is
16   an entity ID number?
17       A.  Okay.  So any entity that we input --
18   let's say I go into alerts or ACS or our automated
19   system and I type in someone's name, I enter it in
20   and hit apply.  It assigns a specific entity ID
21   number.  It's an automatic generated number.  If I
22   go back in -- let's say this was in a case two
23   months ago.  If I go back in and I'm building a new
24   case and that person is also an entity in mind and I
25   go to enter their name, I can copy the information

126

that was already inputted so I don't have to go
through and write down -- type in everything else,
they are already captured in there.  I can just copy
it over and it assigns a new entity number, because
it's a separate investigation.

Q.  So just as there's a different case number
for each investigation, each individual would have a
separate entity number for each investigation they
appear in?

A.  Yes, sir.  Because they will show up as
what we call unique offenders.  If one soldier is
the subject of five different CID LERs over time,
every time they are entered in they will be assigned
a different entity number.

Q.  Turning to page five, in the middle there,
it refers to an interview you conducted of Sergeant
First Class Sean Waldron?

A.  Yes, sir.

Q.  You previously testified that you did not
recall any interviews other than the phone call that
you received from a friend of Aguigui's mother?

A.  Yes, sir.

Q.  Looking at this entry now, do you recall
this interview?

A.  Vaguely.  And I don't believe this was

127

really an in-depth interview.  Not like sitting down
in a room together.  This was happening, again, you
see the time that it took, about ten minutes.
Because he was PSE Aguigui's Acting First Sergeant,
just trying to determine what information he might
know that would be helpful to us.  I did not
specifically remember at the time.  But looking at
that now, I remember talking to Sean Waldron.

Q.  What was the significance of noting that
Private First Class Aguigui was friends with
Specialist Schaefer?

A.  We typically want to -- we want to
identify people who are close to anyone in an
investigation.  Basically trying to develop a list
of possible leads so we can evaluate it later and
prioritize them to see whether or not, interview of
this person, Schaefer, his friend, etcetera,
etcetera, is something that we need to pursue.

Q.  Now, the designation NFI after Specialist
Schaefer, does that indicate that you know no
further information about this specialist?

A.  It meant that at the time when I entered
this in, I did not know his first name or unit,
Social Security number, things like that.  Just
Specialist Schaefer was all I was told.

128

Q.  Okay.  Please turn to page 11 at the top
on July 18th.  There's an entry by you referring to
a call received from Mrs. Angie Bowen.  Is this the
phone call you referred to earlier in your testimony
about a mother of a friend of Aguigui's?

A.  Yes, sir, I believe it is.

Q.  Was Ms. Bowen actually associated with the
Beaufort County Sheriff's Office?

A.  I think the reason why I put in there --
associated with her Beaufort County Sheriff, I think
whenever she called, she was saying, Hey, I'm a
dispatcher with Beaufort County Sheriff's Office, I
just want to let you know.  She identified herself
with Beaufort County Sheriff's Office.

Q.  So she wasn't just a witness calling from
the sheriff's office?

A.  She was -- she was a person reporting
information to us, who also told us that she
happened to be employed by the Beaufort County
Sheriff's Office.  She wasn't calling like in an
official capacity that, Hey, this is so and so with
the Beaufort County Sheriff's Office.

Q.  And you made note here that she had told
you Aguigui made statements indicating that he
planned on moving to Columbia, South Carolina and

129

was in the process of obtaining an undetermined
amount of money through unknown means.

What significance did that statement have
to you at the time?

A.  At the time what it meant to me was
that -- yeah, at the time, it was suspicious to me,
that he was planning on moving.  So I did not -- I
did not take too much -- I did not take that to mean
too much, because that could either mean, he plans
on getting out, whatever, that he's in the process
of obtaining an amount of money.  I don't know if
that means because he wanted to rip off this drug
dealer that we were already investigating, or that
he planned on getting out of the Army and getting a
new job.  But looking at it all in its totality at
that time, I found it suspicious and that's why we
wanted to action this and look into it further.

Q.  Do you recall whether you took any
specific action with respect to Aguigui regarding
his attempts to get insurance benefits or death
benefits as a result of his wife's death?

A.  If I took specific actions?

Q.  Yes.

MS. JOHNSTON:  To Aguigui?

Toole, Wes                                        February 26, 2016

34 (Pages 130 to 133)

---

**130**

BY MR. BROOK:

Q.  With anyone.  If you took any actions.

A.  So I recall a conversation that I had with Casualty Affairs Office with regard to death gratuity benefits.

Q.  Does death gratuity benefits include the SGLI?

A.  Yes, sir.

Q.  When did that conversation take place?

MS. JOHNSTON:  You can look.

A.  All right.  I'm reviewing my CAS.  So looking at the Case Activity Summary at 08:30 on the morning of the 19th, I had a conversation with Ms. Oates, Casualty affairs Office regarding the call.

Q.  And do you remember that conversation?

A.  Somewhat.  I remember having the conversation.  I remember certain details of it. But I remember it.

Q.  Who initiated the call?

A.  Says that Mrs. Oates contacted us.  Says, contacted by Mrs. Oates.

Q.  Is that consistent with your recollection?

A.  I mean, that's -- I recall the conversation, but I don't remember who picked up the phone first, so that's why I'm going off the CAS

---

**131**

that says I was contacted by Mrs. Oates.

Q.  Do you recall having any conversations with other agents at the CID office before having this conversation with Mrs. Oates?

A.  I don't recall the sequence of events that were going on beforehand or after whenever I had this call.  You know, this again, this was in 19 July, 2011.  I remember the phone call, because I remember it had to do with the SGLI of Aguigui.  But the events and circumstances surrounding it, I don't recall.

Q.  Specifically do you recall talking about Aguigui's attempting to get death gratuity benefits with Special Agent Greene?

A.  Do I remember it?  I don't remember a specific conversation, but that doesn't mean that we did not.  In fact, I'm pretty confident I had conversations with Agent Greene about it, he was my Assistant Special Agent in charge so we had a lot of different conversations.  Especially about this case, yes, sir.

Q.  Did you talk with Agent Greene about proactively contacting the Casualty Assistance Office, telling them not to make death benefit payments to Private Aguigui?

---

**132**

A.  I don't remember -- can you rephrase -- not rephrase it, can you restate the question? (Requested portion read.)

THE WITNESS:  And, again, I don't know whether we had a conversation -- I do remember having a conversation with Greene about the death gratuity and benefits, I don't recall if it was before this conversation with Ms. Oates or afterward.  But I remember us having a conversation about, you know, whether or not the CAO's office would be paying those benefits or those -- the SGLI, whether or not they would withhold paying it until we could figure things out better.  Also the fact that we don't have any control over that mechanism either way.  I remember a conversation about that, but I don't remember it in sequence.  I don't remember what triggered what, if that helps.

BY MR. BROOK:

Q.  Why were you concerned about trying to have the pay withheld from Private Aguigui?

A.  Because we had suspicion about Aguigui's involvement in his wife's death.  Naturally, I did not want to see until we could either exonerate him

---

**133**

completely or determine that he did cause the death, did not want to see the government pay out SGLI to somebody we later determined had killed her.  That was the only concern there.

Q.  Had you ever encountered this potential situation before with any of your death investigations?

A.  No.

Q.  Have you encountered it since?

A.  Yes.  No, actually I was incorrect in that.  I had encountered it once before with an investigation we had at Fort Stewart a few months prior when I was the Assistant Special Agent in charge.  We had a spouse that stabbed her husband to death and she was immediately listed as the subject in the case.  And the benefits were withheld until we were able to exonerate her.  Long story short, it was ruled as justifiable homicide because he was attacking her, attempting to rape her.

So I was somewhat familiar, but I was the ASAC at the time, so I had some little level of, okay, so there's a whole process here on CAO can only pay it out whenever a -- or they can't pay it out if somebody is listed as a subject.

Q.  Now, is it only if a person is listed as a

---

134

1    subject, what if a person is a person of interest?
2         A.  If a person is a person of interest.  What
3    was -- and, again, reviewing back to the CAS entry
4    detailing this conversation, she contacted -- she
5    contacted us asking if he was -- if he was a suspect
6    or if he was a person of interest.  What I explained
7    to her was that Aguigui had not been listed as the
8    subject of our case, which is that title block, but
9    that we had not ruled him out either.  And we
10   suggested that the payment be withheld until we can
11   either, you know, rule him out or include him as our
12   primary suspect.  That's the way that I recall that
13   conversation going.
14        Q.  And how did Ms. Oates respond when you
15   told her that?
16        A.  She seemed okay with that.  She said,
17   Okay, that seems reasonable.  We can withhold
18   payment until we get word that he's either cleared;
19   or, Yes, he's the subject.
20        Q.  Did you speak with Ms. Oates again after
21   that?
22        A.  I don't remember if I do or not.  Or if I
23   did or not.
24        Q.  If you did speak with her, is that
25   something you would have also noted in the CAS?

135

1         A.  It's possible, yes, sir.
2         Q.  Is it possible that you would not have
3    noted it in the CAS?
4         A.  That's possible, also.
5         Q.  How would you decide whether or not to
6    note it in the CAS?
7         A.  It probably wouldn't have been a decision.
8    It probably would have been based on the fact we're
9    overseeing 140 different investigations and I get a
10   two-minute call from somebody while someone else is
11   walking in the door.  It could have been one of
12   those where we talked and I just did not document
13   it.
14        Q.  Do you recall at any point in time telling
15   her that Private Aguigui was not a person of
16   interest in the death of his wife?
17        A.  No.
18        Q.  Is it possible that you may have said
19   something like that to her?
20        A.  Anything is possible, but I would find it
21   highly, highly unlikely.  Because by the time I was
22   deploying, he had not been ruled out.  By the time I
23   left that office, he had not been ruled out.
24   Because to the best of my recollection we still
25   hadn't been provided with a cause of death, so we

136

1    could not say whether he could be ruled out or not.
2    So it would seem extremely, extremely unlikely that
3    I had a conversation to say, Yeah, we ruled him out.
4         Q.  Do you recall whether you promised Ms.
5    Oates to get back in touch with her after the
6    autopsy of Deidre Aguigui?
7         A.  Did you ask is it possible?
8         Q.  Can you recall whether --
9         A.  I don't recall if I did or not.  But that
10   sounds like -- if she says that we had said that --
11   or I said that, that sounds something that's
12   reasonable.  Because that would be my full intent.
13   I can't really tell you anything -- I'm not going to
14   know anything until after the autopsy.
15        Q.  And as you sit here today, you're not sure
16   whether you had a conversation with her after the
17   autopsy or not?
18        A.  Well, I'm trying to remember.  The autopsy
19   was completed, but we still did not have a report or
20   any results or anything.  I think even up until the
21   time I left.  So, again, I don't remember another
22   conversation with Ms. Oates, but I don't think we
23   would have had any conversation about the results of
24   autopsy or anything like that.
25        Q.  In your experience, how long does it

137

1    typically take for an autopsy report to be received
2    by CID?
3         A.  So based on my experience, it really all
4    depends on the type of death, the event and
5    circumstances surrounding it.  You know, I'll give
6    two examples.
7              One, if a person is in a car, witnesses,
8    and, you know, they get into a traffic accident,
9    usually you would expect that autopsy would come
10   back relatively soon.  Within a month or two.
11   Something else where someone died under, you know,
12   unusual circumstances, it could take months.  More
13   than months.  Possibly up to a year depending on the
14   complexity of it.  But, you know, at a minimum it's
15   going to take a few months.
16        Q.  Is CID required to wait for an official
17   autopsy report before making someone a subject of a
18   report of investigation for homicide?
19        A.  No.
20        Q.  Does CID typically wait for an autopsy
21   report before doing so?
22        A.  We typically try to have all available
23   evidence in order to review in its totality so we
24   can make an intelligent decision on credible
25   information for titling purposes.

Toole, Wes                                    February 26, 2016

36 (Pages 138 to 141)

138

1      Q.  The note on -- I think we were looking at
2   it's page 16 for July 19th, 2011 regarding Ms.
3   Oates.  At the end it says, Ms. Oates provided a
4   contact number, I guess for herself and also a
5   number for the appointed casualty affairs office
6   Sergeant First Class Lapsley.
7          Did you ever speak with Sergeant First
8   Class Lapsley?
9      A.  I'd have to look through the AESs to
10  confirm that.  I assume that I did, by I'll have to
11  confirm it.
12     Q.  Direct your attention to the top of page
13  25.
14     A.  Yes, sir.  Thank you.  Review of the CAS,
15  I contacted Sergeant Lapsley on 19 July.
16     Q.  Do you recall that conversation at all?
17     A.  I don't specifically recall that
18  conversation.  But, you know, I can tell you most of
19  the Casualty Affairs -- the CAO coordinations that
20  are done before a CLO brief, if you will, they are
21  typically designed to -- the intent is to make sure
22  that I have good points of contact with the family,
23  with them to explain -- and also to explain CID
24  roles and responsibilities and what me, as the SAC,
25  what my responsibilities are in keeping the family

139

1   informed.
2      Q.  Did you inform Sergeant Lapsley that
3   Private Aguigui was a person of interest in the
4   investigation?
5      A.  I don't know if I did or not.
6      Q.  Do you know what happened with the death
7   gratuity benefit for Deidre Aguigui after your
8   conversation with Ms. Oates?
9      A.  I heard after the fact that they had paid
10  out.  That Private Aguigui was paid SGLI at some
11  point.  I don't know when, but I heard about that
12  after the fact.
13     Q.  Who did you hear about that from?
14     A.  I don't remember.  I don't know if it was
15  from another agent or -- I can't remember.
16     Q.  Do you remember if it was before or after
17  the reporting of the Roark and York murders that
18  Aguigui was implicated in at the end of 2011?
19     A.  I don't remember.
20     Q.  Were you ever contacted about that for
21  purposes of CID determining what you said to the
22  insurance -- or to the death gratuity benefits
23  people?
24     A.  I don't remember.  I don't remember if I
25  was -- if I was contacted by anybody about that or

140

1   not.  It's quite possible, but I can't remember.
2   Because I remember having a conversation with
3   another agent about the death gratuities.  But I
4   can't remember if it was whenever I was already
5   deployed.  I don't recall.
6      Q.  I know this is a time period after you
7   were already deployed, but if you could turn to page
8   75, Exhibit 13.
9      A.  Yes, sir.
10     Q.  At the bottom there's a quality control
11  entry on December 7th, 2011 by Larry Turso.  Did you
12  know Larry Turso?
13     A.  Yes, sir, I did.
14     Q.  Who is he?
15     A.  Larry Turso was the Assistant Operations
16  Officer for the Benning CID Battalion.
17     Q.  So you reported to him?
18     A.  No, sir.  I reported to the operations
19  officer and the Battalion Commander.  Mr. Turso was
20  an assistant to the Operations Officer.  I say that
21  to say he was not in my rating chain in military
22  parlance.
23     Q.  So he occupied the same position that you
24  did when you first got to your current post?
25     A.  Yes, sir.

141

1      Q.  Now, I'd like you to look at the bottom of
2   page 76, it's a continuation of a fairly long entry.
3   Remarks, Good call by Mr. Toole on delaying payment.
4   How did we screw this up?  Continues on the next
5   page.  Perhaps we need to look into freezing his
6   accounts.
7          Were you aware of this statement by
8   Mr. Turso?
9      A.  I was made aware of that entry by
10  Mr. Turso after the fact, yes, sir.
11     Q.  And how were you made aware of it?
12     A.  I recall -- I had a conversation with an
13  agent who was here at the time.  And I don't
14  remember who I had the -- who told me about it, but
15  they told me about this review that he put in there.
16     Q.  And did you attempt to try to answer the
17  question that he had posed?
18     A.  No.  I had my own office in Kuwait that I
19  was worried about whenever he put that review in.
20     Q.  I'd like you to turn to page 78.  What
21  appears to be a response by Case Agent Jeremy Fox to
22  the entry by Mr. Turso that we looked.  On the
23  middle of page 78, a third of the way down, Mr. Fox
24  wrote, Discussed with CAO.  Their records indicate
25  the exact time and date of the coordination

142

documented in this case file by SAC Toole. However, their notes stated he was not a person of interest.

Were you aware that that was what their notes showed?

A. I was made aware of that after reviewing these CAS entries.

Q. Recently you mean?

A. Yes, sir.

Q. Were you aware of that before preparing for this deposition?

A. No, sir.

Q. Does that surprise you that was in their notes?

A. Yes.

Q. Were those notes incorrect?

A. I can't say what those notes said or not, all I can tell you is what they conveyed to Agent Fox that he documented here. I will say that if their notes depicted that he was not a person of interest, if those notes said that, then those notes would not be correct.

(Exhibit 30 marked.)

Q. Let's take a look the Exhibit 30.

Before we get to this, I want to follow up on something you said before. You had a

143

conversation with an agent about the remarks made by Mr. Turso, which agent was that?

A. I don't remember which agent it was. I remember I had a conversation -- either while I was deployed or whenever I came back. It was just one of those things, catching up things, how's this case going. And someone made a comment about that review.

Q. And as you sit here today, do you know what Private Aguigui did with the money that he received?

A. I don't know what he did with that money. I know what I've been told what he did with it, but I don't know what he did with it.

Q. What were you told he did with it?

A. I was told that people have suggested that he used the money to purchase weapons.

Q. And who told you that?

A. I don't remember. I don't remember if it was another agent or if it was something that I read in the news. Any number of sources.

Q. While you were a SAC in Fort Stewart, were you aware of any purchase of weapons by Private Aguigui?

A. I don't remember if I found out about

144

purchasing weapons either while I was the SAC or while I was deployed. I can't remember the timeline when I learned that information or when I did not.

Q. Looking at this Exhibit 30, page nine. The numbers are at the bottom left of each page.

A. Yes, sir.

Q. For whatever reason this printed out without a Bates number on it. Page 9 of 130 it says. At the top there's an entry that is dated July 19th, 2011. That's the same date that we were just looking at in the CAS, correct?

A. Yes, sir.

Q. If you would, please, read through that paragraph entry at the top referring to Agent Toole and Mr. Plumey by Rosa Oates. And when you're done, let me know.

A. Okay, sir.

Q. Having now seen the notes from staff journal Rosa M. Oates, is there anything in there that you just read incorrect?

A. The information that I see that's inconsistent is that the depiction saying that I said the spouse was not a person of interest. I told them that the spouse was not listed as a subject at this time; however, we had not ruled him

145

out on whether or not he is a person of interest. It appears that there was miscommunication here. Either that or a misunderstanding on the part of the person that entered this information.

Q. Do you recall whether you told her, the person that you were speaking to, that there was an autopsy that was going to be performed that morning and that upon review of the results you would be able to state whether or not the spouse is a person of interest?

A. I don't remember saying that specifically. But that seems very unreasonable considering we are not given the results of an autopsy at completion of the exam itself. When we leave an autopsy suite, sometimes it jumps right out at you, There's two bullet holes in somebody. Other times in a case like this, we are not going to know what the results are, so we can't say whether someone still has been ruled out or not. So it would seem highly unusual that I would make any assurances that, Hey, once they are done with the autopsy this morning, I'll be able to tell you what happened.

Q. How long was the phone call between you and Ms. Oates?

A. I can't recall. But if I look at the

Toole, Wes                                    February 26, 2016

38 (Pages 146 to 149)

146

CASs, it might give me an indication of the time. I mean, I'm going to go out on a limb and say it was brief. Yeah, so approximately five minutes according to the CASs that I entered into. About a five-minute conversation.

Q. And that entry would have been made relatively quickly after the call?

A. I would think so.

Q. Aside from what you have mentioned before about not being able to say whether the spouse was a person of interest, is there anything else that you noted -- and what else we talked about, about the autopsy, is there anything else about that that you think is incorrect in these notes?

A. I don't know. Because most of the information contained with this note also has internal conversations between other people that I did not have a conversation with, so aside from what's -- where it mentions me, I can't say whether something is accurate or not.

Q. Now, if you would, please, turn to page 15. There's a bottom entry, again by a Rosa Oates dated July 21st, 2011. And if you would, please, read through that and let me know when you're done.

A. Yes, sir.

147

Q. Having seen these notes, does this refresh your recollection about a subsequent conversation?

A. Yes, sir, it does.

Q. And what do you recall about that conversation?

A. I recall them contacting -- contacting me again several days later. Again, asking, Have you guys been able to make a determination? I said, No, there has not been any change, we are still waiting on, you know, to determine what the cause was so that we can see whether -- you know, Mr. Aguigui is -- whether he's still a person of interest, but we haven't been able to rule him out.

What I recall from the conversation say, Well, a soldier has to be, you know -- they have to be listed as a subject or if they are not -- if they are not charged -- I forget the verbiage that she used, but it was something that did not apply to us and CID reporting. Well, if a soldier is not charged or arrested within a certain amount of time, the payment is going to go through. I said, All I can tell you is we have had no change. I can't tell you that he is the offender, but I can't rule it out either yet.

So I do recall that conversation. The

148

conversation did not take place as it was depicted here. Not exactly. Because, you know, she's again saying the spouse-- that I'm saying that Agent West, I don't know who that is, stated that the spouse is not considered a person of interest. I never had that conversation, saying that someone is not a person of interest. So I probably said that the spouse is not listed as a subject at this time, but we haven't been able to rule it out. That seems more consistent with what the conversation would have been.

Q. Okay. Just to confirm. This is your first time seeing these notes?

A. Yes, sir.

Q. And your testimony is that these notes are quite inaccurate; is that right?

A. I don't know that I would characterize them as quite. Because, again, a lot of the information within this note -- this is referring to other people that aren't me. But the portion that does refer to me, is not the conversation that I recall having with the CAO's office.

Q. Having read this, do you recall whether you spoke with anyone at the CAO office besides Ms. Oates?

149

A. No. The only person I can remember talking to was Ms. Oates and then Sergeant Lapsley is referred to as a CAO, but he's not assigned to the CAO's office. It's usually the Casualty Affairs Officer appointed to the family. It's usually someone from a different unit and they are appointed a temporary appointment order. So those two individuals are the only two I can remember from the CAO representation that I talked to.

Q. CAO is separate from CID, correct?

A. Yes, sir.

Q. To your knowledge, is there any amount of official coordination between the CAO and CID office?

A. Only during a death investigations we'll normally coordinate with the CAO's office to figure out, Hey, have you appointed a Casualty Affairs Officer yet, can you provide me with their contact information so that I can do those CLO briefs that we discussed. And also, if there's issues with returning property back to the next of kin, property that we might have collected as evidence, making sure that gets back to the next of kin. But that's kind of the extent of the involvement that CID and CAO normally have.

150

1      Q.   Do you know whether in recent years
2   there's been any sort of change in the process of
3   how CAO confirms whether or not someone is a person
4   of person of interest before making death gratuity
5   payments?
6      A.   I'm not familiar with CAO's policies or
7   practices.
8          MR. BROOK:  Okay.  Show you what we are
9   going to mark as Exhibit 31.
10         (Exhibit 31 marked.)
11  BY MR. BROOK:
12     Q.   This is a document bearing Bates
13  JAHR0001493 through 1494.  And I know this document
14  is not addressed to you in any way, but is this a
15  form document along the lines of something that you
16  have seen?
17     A.   I've never seen this document before.
18     Q.   Are you familiar with the Thrift Savings
19  Plan?
20     A.   Yes, sir.
21     Q.   What is that?
22     A.   It's -- I mean, it's a plan for soldiers,
23  other Federal employees, in order to pay into --
24  toward retirement.
25     Q.   Is that a private institution or is that

151

1   part of the Army?
2      A.   I don't know if -- I know that it's a
3   program that the Army uses that -- benefits that a
4   soldier can elect in order to pay into the TSP,
5   similar to an IRA.  I don't know that it's Federally
6   or government administered or whether it's
7   contracted privately.  I don't know.  I know some of
8   my money every month goes out into my TSP.
9      Q.   Although you haven't seen this form, have
10  you seen any form of any kind relating to confirming
11  whether individuals are under investigation in
12  relation to death gratuity benefits?
13     A.   No.  I can't remember any forms that CID
14  comes across.  And I don't know that this is
15  something that's instituted locally or installation
16  by installation, I don't know.  I can tell you, this
17  is the first time I've seen this form.
18         MR. BROOK:  Exhibit 32.
19         (Exhibit 32. marked.)
20  BY MR. BROOK:
21     Q.   So showing you what's been marked as
22  Exhibit 32.  And this is pages 127 and 128 out of
23  130 also taken from the staff journal from the
24  Casualty Assistance Office.  If you would, please, I
25  know it's relatively lengthy, just read through this

152

1   and let me know when you're done.
2      A.   Okay, sir.
3          All right, sir.
4      Q.   Starting first at the top, this is what
5   appears to be a copy of an email from Kirk Knoll,
6   K-n-o-l-l, to a Curtis Brunsting, B-r-u-n-s-t-i-n-g.
7   Do you recognize either of those names?
8      A.   No, sir.
9      Q.   And this is dated May 6th, 2014.  And do
10  you think it's a fair characterization to say that
11  this is basically a report generated by someone that
12  took the notes that we were just looking at and
13  accepted all those notes as the truth?
14     A.   That's the way -- some of the information
15  that I read within this email creates the appearance
16  that the information that they are relating was
17  derived from or from something similar to the notes
18  that we reviewed earlier.
19     Q.   And prior to seeing this, did you have any
20  knowledge that there was an inquiry like this that
21  went on?
22     A.   No, sir.
23     Q.   And you were never contacted by anyone to
24  try to confirm or deny whether you made the
25  statements reflected in these notes?

153

1      A.   Not that I remember, no.
2      Q.   Can you think of any way you possibly would
3   have forgot something like that?
4      A.   I mean, I've never had a formal
5   conversation sitting down and being interviewed by
6   anybody having to do with anything regarding this
7   case or these circumstances until now.  I've had
8   conversations with people about, you know, the fact
9   that the money that was paid out.  But, again, those
10  were conversations that I had with other agents
11  where we were discussing circumstances around the
12  case, whether I was deployed or came back from
13  deployment.
14     Q.   And none of them ever told you that you
15  were the guy who they were saying said that Aguigui
16  was not a person of interest?
17     A.   I don't remember anybody saying that I was
18  the guy that told them that.  I mean, cops get
19  accused of stuff all the time.  Hey, they said you
20  did this.  That's why I'm saying -- I'm not trying
21  to be dodgy in my response.  Because it's possible
22  that someone could have said, Hey, did you hear that
23  this -- it's possible someone could have said that.
24  But it did not really register as a significant
25  event for me, because I did not see it as an issue,

154

because I know what I did and did not say. I know,
so --
    Q.   So you had no knowledge at the very least
of any sort of formal decision being made?
    A.   No, sir. I wasn't involved in anything
like that. And especially this date of 2014, I
mean, I was already here at Fort Campbell working
over at the battalion. And the first contact that I
had regarding this was whenever I was called a few
weeks ago.
    Q.   So have you ever heard of anything
relating more generally to an attempt by the family
of Deidre Aguigui, her parents, to get death
gratuity benefits paid to them?
    A.   No. Not until -- this is for Deidre
Aguigui. No, I haven't --
    Q.   I may have misspoke. Okay. But did you
ever speak to Deidre Aguigui's parents?
    A.   I did. Again, the CASs would reflect
those formal casually liaison briefings that were
provided. But, you know, I spoke with them once
whenever they were at the quarters I believe,
whenever I had to allow them in, escort them in to
get a few personal effects out. I don't remember
how many times I had -- I engaged with them, but,

155

you know --
    MR. BROOK:  We can go off the record for a
second.
    (Off-the-record.)
BY MR. BROOK:
    Q.   In December of 2011, were you deployed to
Kuwait at that time, right?
    A.   Yes, sir.
    Q.   Do you know what CID regulation 195-1
Appendix D is?
    A.   Yes, sir.
    Q.   What is that?
    A.   Investigative standards.
    Q.   And is there regular training on Appendix
D for CID agents?
    A.   At least every quarter whenever we go
through staff assistance reviews, initial command
inspections, subsequent command inspections, and
then on-the-spot training is provided. So most
agents are pretty familiar with Appendix D.
    Q.   And when there's training on Appendix D,
is that something that the whole office shuts down
for?
    A.   It depends on the office. Who is in
charge of the office. What type of training is

156

being conducted. It may be on-the-fly a team chief
huddling his guys together and going over certain
aspects of Appendix D. It might be one-on-one
mentorship. It's not set an in stone format on how
it's going to be done every single time.
    Q.   Is training on that ever done based upon a
perception that people in the office need it?
    A.   Sure. Yes, sir.
    Q.   Do you know whether any such training was
ordered in connection with the Isaac Aguigui cases?
    A.   I don't know.
    Q.   Do you recall whether you had an opinion
as the SAC in Fort Stewart that the special agents
could use additional training on Appendix D?
    A.   Every agent can use additional training on
Appendix D. Whenever I come into my office in the
morning, there's two things I open up. CID reg
195-1 and my email on two different screens.
Because I've been doing this for 19 years, and I'm
constantly having to go through the regs. Every
agent needs continual refresher. By reviewing cases
you identify, Hey, we need to draw this person back
to. Hey, we need to do this. So it's an ongoing
process.
    Q.   Do you know what it means to have a raw

157

data file that's called Extremist RDF?
    A.   Yes, sir. I know what the raw data file
is.
    Q.   Can you describe that for me?
    A.   A raw data file, it's a sequence action
that you open in alerts or ASC2 and then you create
a physical file. So if -- I'll give you an example.
In my office, I keep several different raw data
files. I keep one for general crimes, for economic,
for drugs suppression activity. As we get
information that may not be actionable or credible
yet, we'll put it in a raw data tab and then the
agent -- whoever is responsible for that raw data
file will then evaluate it and see if it's
actionable. If we need to open up an investigation
or not.
    Q.   Okay. And have you ever had an Extremist
raw data file?
    A.   Extremist raw data file. So you're asking
me as the SAC at Fort Stewart or me right now
whether I've had an Extremist raw data file?
    Q.   I'm asking in general, have you ever heard
of an Extremist raw data file?
    A.   Sure.
    Q.   What is put into an Extremist raw data

158

1  file?
2     A.  Any information that -- my interpretation
3  of what an Extremist, using air quotes, raw data
4  file would be, anything having to do with hate bias
5  groups, gangs, you know, counter-establishment
6  organizations that undermine law enforcement,
7  government.  Any of those type of things.  Extremist
8  organizations, hate bias.  I call it something
9  different.  We have a gang RDF at my office.  But
10  that's what I would put in that.
11     Q.  Were you aware whether or not there was an
12  Extremist raw data file that mentioned Isaac Aguigui
13  in 2011?
14     A.  I don't know.
15     Q.  Do you have any recollection of that?
16     A.  I don't remember.
17     Q.  Is that something that could be
18  significant when you're investigating someone for
19  potential crimes that there's a raw data file open
20  on them?
21     A.  You're asking me about something I don't
22  even know existed was significant.  I don't know.
23     Q.  Is it something that could be significant?
24     A.  Sure.  I mean, if -- anything could be
25  significant when reviewed in its totality.  So it's

159

1  just very difficult to answer if I don't know that
2  there was something like that.  And then considering
3  when that information was known, what the quality
4  and type of information there was, there's just a
5  lot of ifs in that to see whether or not it would be
6  significant or I would think it's significant.
7     Q.  In order to know you would have to see the
8  raw data?
9     A.  I would have to see it and then review it
10  in terms of what the information said.  When that
11  information was obtained.  What it was in regards
12  to.  It would have to be evaluated in its totality.
13     Q.  Do you know if someone is mentioned in an
14  Extremist or raw data file in general, is that
15  something that comes up when you run a name check on
16  that individual?
17     A.  So if you were to conduct a search of
18  alerts or ACI2, yes, that would come up if that
19  person was entered in as an entity.  If you went on
20  and did like a typical NCIC, law enforcement
21  criminal background, it would not show up.  There's
22  no conviction associated with it, it's just an
23  indexing like database.
24     Q.  For CID name check procedures, for someone
25  who is a person of interest, are you supposed to

160

1  check the big criminal databases and the internal
2  CID stuff?
3     A.  Yes, sir.
4     Q.  Is that something that's specified by
5  regulations?
6     A.  It states that law enforcement record
7  checks will be done for people who are suspects of a
8  criminal offense.  So there's several different
9  databases.  The regulation doesn't specify -- it
10  does specify at a minimum the NCIS checks will be
11  done.  But it does not specify further or doesn't
12  dictate further what law enforcement record checks
13  are.  So, you know, obviously NCIS.  There are
14  number of other law enforcement databases that an
15  individual can query.  I mean, a laundry list could
16  be the length of your arm.  So to try to hit every
17  single database, you know what I'm saying, it all
18  depends on the nature and circumstances.  At a
19  minimum, we would do NCIS checks and then Crime
20  Records Center checks through our own internal
21  system there.  But otherwise, it doesn't say you
22  will check this and you will check that.
23     Q.  And you mentioned name checks have to be
24  done on suspects, was the word that you used.  Does
25  suspect equal a person of interest or a subject?

161

1     A.  The term suspect and person of interest
2  are in my opinion kind of interchangeable.  More
3  terms of art versus technical terms.  A subject is
4  someone, hey, we have credible information they are
5  going in the title block, they are the subject of
6  our investigation.  A person of interest or suspect
7  is someone that we have information about, but we
8  are still trying to evaluate that and either confirm
9  it or rule it out.
10     Q.  Just one last question.  Ms. Tolbert was
11  with CIC; is that correct.
12     A.  That's correct.
13     Q.  Let's go to page 7 of Exhibit 13.
14     A.  Seven you said?
15     Q.  Yes.  And there is a continuation of the
16  entry we were looking at earlier by Larry Turso.
17  After the question that we looked at where you asked
18  about the payment to Aguigui.  He asked, How is it
19  possible that Ms. Tolbert cites, quote, no
20  information was identified to assist the Case Agent,
21  end quote, during a criminal review when Aguigui is
22  listed as a person of interest in 204-11-093
23  exclamation mark.
24     A.  Yes, sir.
25     Q.  Do you know how that's possible?

---

162

1     A.  I believe you probably would have to ask
2  Mr. Turso or Ms. Tolbert, because I'm sure they had
3  a question about it.  I know how it's possible due
4  to the fact -- there's any number of ways that it
5  can be possible.  If a person just simply overlooks
6  it or they make assumptions because the other case
7  is still ongoing.  I mean, both of these cases were
8  opened simultaneously, so it's possible.  I use the
9  word possible, that she may not have included that
10 or cited that in her criminal review because she
11 knew that both cases were ongoing simultaneously,
12 and knew that both of those teams were
13 communicating.  Mr. Dale, Mr. Kapinus, me, the ASAC.
14 So it might not have registered to her to highlight
15 that, because it would be almost like stating the
16 obvious.
17     Q.  Now, as far as this reference goes,
18 Mr. Turso described Aguigui as a person of interest
19 in 204.  But wasn't your testimony earlier that
20 based on these notes and your recollection, that he
21 was actually more than that, he was a subject?
22     A.  In 204?
23     Q.  In 204, that's the --
24     A.  The conspiracy.  Yes, sir.  It was my
25 testimony.  But I can't tell you why Mr. Turso used

---

163

1  the term person of interest in here.  Aguigui was
2  listed as a subject in LER-204.
3     Q.  You mentioned that you keep open on your
4  computer a copy of the Regulation 195-1?
5     A.  Yes.
6     Q.  Is that because it's too much to memorize?
7     A.  Yes, sir.
8     Q.  How big is it?
9     A.  The current version on PDF is 784 pages,
10 before and including appendices and whatnot.  It's
11 impossible to memorize.  It's impossible to comply
12 with the letter of a regulation 100 percent of the
13 time at any given time.  So that's the reason why we
14 are constantly providing training on it.  Trying to
15 reinforce it.  And why we had those quick reference
16 guides on there, etcetera, etcetera.
17     Q.  Now, you mentioned earlier there's a -- a
18 reasonableness component to Regulation 195-1?
19     A.  Yes, sir.
20     Q.  Does that apply to the entire regulation
21 or is it specific to the timing thing --
22     A.  Specific to Appendix D.  I mean, there are
23 certain things throughout the regulation the
24 reasonable application standard applies.  There are
25 some things such as anything where they are

---

164

1  referring to Federal Law.  Like arrest authority or
2  reasonable searches and seizures.  That's not
3  reasonable application insofar as CID standard.
4  This is what we have to comply with.  But those
5  internal policies that we as in CID place on
6  ourselves through the reg, there's a reasonableness
7  of application.  And specific to Appendix D, there's
8  a caveat in there that explains, you know,
9  reviewers, auditors, etcetera, etcetera, will apply
10 reasonable application or reasonable -- I'm sorry
11 I'm getting stuck here.  Based on a number of
12 factors.  Whether it's manpower, operational tempo,
13 etcetera, etcetera.
14     Q.  And does -- and that applies to every
15 level of CID agent, is that right, so that each --
16 every CID agent no matter what their level of
17 responsibility applies to reasonable application
18 standards?
19     A.  Sure.  Yes, sir.  Yes, sir.  And I'm
20 again, using an example as a way to try to explain
21 this.  So if the regulation says that a case will be
22 reviewed by a supervisor once every ten working
23 days, and if it's day 11 and it's supposed to come
24 to me and that case isn't there, I'm not going to go
25 and give that agent a reprimand or a counseling

---

165

1  because it was one day late.  Because I also know
2  they stayed up 48 hours doing this or they had this
3  case going on or they had this.  So it's looking at
4  everything in totality and trying to balance the
5  fact that this is an art versus a science.  And
6  there has to be a reasonable expectation on certain
7  things.
8     Q.  In your opinion, would it be reasonable
9  for a Team Chief not to know that there was no Case
10 Agent assigned to a case?
11     A.  There's no way that a Case Agent would not
12 be assigned to somebody.  If a case was not assigned
13 to an agent or investigator subordinate to that Team
14 Chief, it's investigated by the Team Chief.  It's
15 assigned to that Team Chief.  So there's -- I don't
16 know how that's possible.
17     MR. BROOK:  Okay.  I have no further
18 questions.
19     MS. JOHNSTON:  Nothing from me.  We'll
20 reserve.
21     COURT REPORTER:  Do you want it typed up?
22     MR. BROOK:  Yes.
23     MS. JOHNSTON:  I'll take Etran.
24     MR. BROOK:  Yes.
25     (Deposition concluded at 2:51 p.m.)

---

166

1          ACKNOWLEDGMENT OF DEPONENT

2

3          I, _____, do hereby

4     acknowledge that I have read and examined the

5     foregoing testimony, and the same is a true, correct

6     and complete transcription of the testimony given by

7     me, and any corrections appear on the attached Errata

8     Sheet signed by me.

9

10

11    _____   _____

12     (DATE)           (SIGNATURE)

13

14

15

16

17

18

19

20

21

22

23

24

25

167

1          REPORTER CERTIFICATE

2     STATE OF TENNESSEE

3     COUNTY OF KNOX

4          I, Michele Faconti, RPR, Licensed Court

5     Reporter, LCR #667, in and for the State of

6     Tennessee, do hereby certify that the deposition of

7     Wes Toole taken on February 26th, 2016, was reported

8     by me and that the foregoing transcript, pages 1

9     through 167, inclusive, is a true and accurate

10    record to the best of my knowledge, skills and

11    ability.

12          I further certify that I am not related to, nor

13    an employee or counsel of any of the parties to the

14    action as defined under T.C.A. Section 24-9-136, nor

15    am I financially interested in the outcome of this

16    case.  Read and sign reserved.

17          In witness thereof, I have hereunto set my hand

18    on this 8th day of March, 2016.

19

20

21

22          _____

23          Michele Faconti: 03/08/16

            22:32:01 AM; Knoxville

24          Tennessee; TN LCR 667

            expires: 6-30-2016

25

**A**

**a.m** 1:16 5:1
**AAS** 75:13
98:21
**abeyance**
98:22 99:1
**ability** 5:21
37:7 92:14
122:1,6
167:11
**able** 7:10,12
7:13 8:1,6
38:8 43:24
46:18 50:24
58:1 74:20
80:7 84:22
95:9 115:8
121:2,7
123:1 124:16
133:17 145:9
145:22
146:10 147:8
147:13 148:9
**absence**
110:15
**absolutely**
36:14 59:2
70:1
**absolve** 67:3
**abuse** 14:17
**academy** 12:5
**acceptable**
122:22
**accepted**
152:13
**access** 23:4,7
73:14 74:20
**accessible**
84:24
**accident** 137:8
**accidental**
50:21
**accomplish**

69:6 121:25
**account** 27:14
27:16,18,20
27:22,25
73:17,20,24
**accountable**
97:16
**accounts** 27:8
27:10 141:6
**accumulate**
123:23
**accurate** 71:2
146:20 167:9
**accused**
153:19
**ACI2** 23:13
70:25 73:16
74:1 159:18
**acknowledge**
85:24 93:25
96:9 166:4
**ACKNOWLE...**
166:1
**acronym** 27:12
68:12 88:10
**acronyms** 48:9
**ACS** 125:18
**ACS-2** 74:11
**ACS2** 73:17
99:6 125:7
**act** 38:14
110:15
**acted** 58:14
**Acting** 127:4
**action** 22:23
23:1,1 81:22
82:2 85:21
96:7,12
104:5,7
129:17,19
157:5 167:14
**actionable**
85:22 157:11
157:15

**actioning** 95:2
**actions** 107:7
129:22 130:2
**activated**
39:23 73:18
73:21,24
**active** 40:18
100:9
**actively** 73:25
**activity** 7:11
14:16,25
52:17 56:21
67:22 68:23
68:25 69:7
69:19,24
70:13,21
71:21 73:10
73:19 74:12
74:14 78:13
86:17 91:2
96:19,22
97:5,6,9,10
97:14,24
99:4 103:8
105:23 124:6
130:12
157:10
**actual** 52:3
72:7 109:24
111:18
**add** 37:21 56:6
101:8,8
**adding** 92:1
**additional**
56:6 57:24
58:3 59:3
81:11 156:14
156:15
**address** 27:24
66:5 85:19
**addressed**
150:14
**adds** 101:12
**adequate**

54:14
**adequately**
52:10
**adjust** 122:2,2
122:3
**administer**
33:16
**administered**
151:6
**administrative**
22:19 26:19
40:21 123:13
**admissible**
35:8
**admission**
34:9,12
**admissions**
33:24 34:1
46:16 101:12
102:10
104:14,24
105:3,6
**admitting**
34:10 106:11
**adopted** 87:7
87:9
**advance** 96:14
**advice** 91:22
122:3
**advised** 91:25
117:20 118:5
**Advocate**
37:19
**AESs** 138:9
**affairs** 130:4
130:14 138:5
138:19 149:4
149:17
**affiliation**
90:21
**afford** 43:21
**afterward**
112:11 132:9
**agencies** 14:8

14:11 68:19
87:8
**agency** 90:2
**agent** 13:24
15:24,25
16:3,4,20
17:2 19:24
22:9,10 41:5
41:13 43:17
43:22 44:15
45:19 46:3
47:20 48:1,4
48:11,19
49:14 50:2
50:15,23
51:11,11,15
56:4 59:22
60:11,13,15
62:13,15
68:2 69:10
70:8,11,14
70:17 71:5
71:22 72:18
72:20 73:16
73:17 74:9
74:13 75:19
76:10 80:3
80:15 82:16
82:22 83:6
86:22 87:3
90:10 92:17
92:18 94:2,3
94:7 96:7,16
97:25 98:5
98:11,15
99:19,22
100:1,16,25
105:2 109:6
113:23,25
114:6,11,15
114:19,19
131:14,18,19
131:22
133:13

Toole, Wes

February 26, 2016

2

139:15 140:3
141:13,21
142:17 143:1
143:2,3,20
144:14 148:3
156:15,21
157:13
161:20
164:15,16,25
165:10,11,13
**agent's** 70:5,6
80:14 85:16
**agents** 20:21
33:15 39:20
39:22 40:10
40:11,17,18
41:15,22
44:2,4 46:3
48:3 50:12
51:12 67:8
67:19 70:20
73:2 94:25
97:21 117:17
125:7 131:3
153:10
155:15,20
156:13
**ago** 60:23
86:11 125:23
154:10
**agree** 60:1,3
**agreed** 4:9,15
**agreement**
72:17
**Aguigui** 8:22
9:8 18:1 29:9
29:13,21
30:12 44:13
45:7 46:14
46:19 47:5,7
49:11 50:3,7
50:24 52:4
52:21,23
53:6 54:24

58:22 62:19
63:7,16
64:23 65:3
75:7,23 76:4
76:6,11 77:7
77:10 92:1,4
101:8,12
102:4 104:14
104:23 105:5
105:6 106:24
108:8,16,19
109:7 110:23
112:1 113:4
113:12 114:7
124:6,25
125:15
127:10
128:24
129:19,24
131:9,25
132:22 134:7
135:15 136:6
139:3,7,10
139:18
143:10,24
147:11
153:15
154:13,16
156:10
158:12
161:18,21
162:18 163:1
**Aguigui's**
49:12 52:20
58:19,19
62:16,23
66:23 106:7
115:14 117:5
126:21 127:4
128:5 131:13
132:23
154:18
**ahead** 34:24
91:19

**air** 69:11,14
70:6 95:6
108:24 158:3
**AIT** 11:1
**alcohol** 45:8
**Alert** 125:10
**alerts** 73:14,15
125:18 157:6
159:18
**allegations**
25:23 42:18
**alleged** 44:19
44:25 45:17
48:14
**allergic** 52:23
**allow** 154:23
**allowed** 9:8
60:6
**Allows** 99:2
**alternative**
110:22
**ambiguous**
61:24
**AMERICA** 1:9
**amount** 36:8
36:10 46:8
69:9 71:20
71:22 95:7
129:2,11
147:20
149:12
**analysis** 24:12
103:6
**and/or** 36:15
45:25
**Andrea** 65:25
**Andrew** 38:25
51:24 79:13
91:21 108:6
114:6,11
115:12
119:20
**Angie** 128:3
**Annual** 21:24

**Ansbach** 12:6
**answer** 6:18
29:25 30:2
32:21 34:21
34:24 37:7
104:17
122:14,15
141:16 159:1
**answers** 5:20
6:5,13
**anybody** 22:5
35:4 139:25
153:6,17
**anymore** 61:4
**anytime** 88:5
89:14 100:18
117:18 118:4
**apologize** 8:20
17:21 25:13
96:14
**appear** 126:9
166:7
**appearance**
152:15
**APPEARAN...**
2:1
**appears** 55:15
111:14
116:24 125:2
141:21 145:2
152:5
**appendices**
163:10
**appendix** 15:4
35:24 97:4
155:10,14,20
155:21 156:3
156:14,16
163:22 164:7
**applicable** 4:4
115:25
**application**
97:18 163:24
164:3,7,10

164:17
**applies** 163:24
164:14,17
**apply** 35:15
125:20
147:18
163:20 164:9
**appointed**
15:25 138:5
149:5,6,17
**appointment**
149:7
**approach**
121:16
**appropriate**
104:11 118:3
118:9
**appropriately**
22:21
**approval** 79:2
79:12 88:18
88:22
**approved**
93:12
**approximately**
146:3
**April** 74:19
**AR195-2** 15:4
**archived** 23:18
**archives** 119:6
**area** 89:19
**areas** 18:23
41:19
**arena** 88:4
**arguing** 110:2
**arm** 160:16
**Army** 10:17,21
12:14 14:9
14:15 15:12
24:15 26:1
27:10,16
29:9,11 38:7
88:19,21
90:24 116:3

117:21 119:4
120:13
129:14 151:1
151:3
**Arranyos**
75:19
**Arranyos's**
109:14
**arrest** 164:1
**arrested**
147:20
**arrive** 11:2
38:5
**art** 161:3 165:5
**ASAC** 48:5
133:21
162:13
**ASC2** 157:6
**aside** 37:8
52:14 59:3
94:13 110:8
146:9,18
**asked** 6:16
13:24 26:4
29:4 30:25
31:9 161:17
161:18
**asking** 25:14
57:16 65:2
91:5 121:5
134:5 147:7
157:19,22
158:21
**aspects** 156:3
**Assault** 21:7
**assaults** 48:10
**assessment**
87:16 93:11
**assigned** 13:5
15:23 16:12
16:18 20:21
21:8 51:1
52:11 56:4
61:25 62:19

66:1 99:25
103:5 113:24
126:13 149:3
165:10,12,12
165:15
**assignment**
11:10 18:18
20:12,17
**assignments**
20:17
**assigns**
125:20 126:4
**assist** 15:9
18:25 20:25
59:8 82:7
89:24 161:20
**assistance**
41:19 68:13
68:19,22
131:23
151:24
155:17
**assistant** 2:9
15:24 18:20
20:7 21:14
131:19
133:13
140:15,20
**assisting** 19:6
73:3
**associated**
103:3,7
128:7,10
159:22
**assume** 6:19
17:20 48:1,4
102:5 111:21
115:22
138:10
**assumed**
19:22
**assumptions**
162:6
**assurances**

145:20
**Atkins** 98:16
98:18,21
99:10,11,14
99:16 114:15
115:19
116:23 121:1
121:10
122:16,19
**attached** 166:7
**attacking**
133:19
**attempt** 29:12
122:21,21
141:16
154:12
**attempting**
131:13
133:19
**attempts**
129:20
**attention** 9:6,7
43:19 58:15
70:16 77:21
85:16,23
101:1 111:24
112:11
124:22
138:12
**attorney** 2:9
25:25
**Attorney's**
1:18 4:5
**auditors** 164:9
**augment** 39:21
**Austin** 10:4
**authority**
16:10,12
24:18 37:20
37:23 38:1,3
38:11 107:14
164:1
**authorizations**
20:22

**authorized**
23:23 33:15
78:20
**automated**
7:12 23:12
26:10 40:19
79:4 92:22
125:5,18
**automatic**
105:13
107:11 116:9
125:21
**automatically**
27:7,21
49:23
**autopsy** 64:9
136:6,14,17
136:18,24
137:1,9,17
137:20 145:7
145:13,14,21
146:13
**availability**
116:5
**available**
20:21 35:11
137:22
**Avenue** 2:4
**aware** 14:14
25:4 26:25
28:12,18
29:17,19
30:15,16,18
30:24 32:9
45:6,9 47:19
53:5 57:20
78:21 89:7
89:22 106:13
106:16 109:4
110:18 111:2
112:7,9
114:1 118:2
141:7,9,11
142:3,5,9

143:23
158:11

**B**

**B** 2:9 15:4
**B-r-u-n-s-t-i-...**
152:6
**Bachelor's**
9:21,23
**back** 8:6 18:16
23:2 27:5,16
29:15 35:1
46:25 60:17
60:25 65:12
67:6,13 71:1
74:7 80:3,15
81:18 82:4,5
82:8 84:8
88:24 89:21
94:9,12 95:1
99:5,13,16
101:1 102:1
103:19
112:25
115:21
119:16
121:15
122:10
125:22,23
134:3 136:5
137:10 143:5
149:21,23
153:12
156:22
**background**
9:13 159:21
**bad** 123:6
**balance** 165:4
**bare** 86:13
**barracks**
110:3
**base** 62:18
91:2
**based** 33:3

Toole, Wes

February 26, 2016

4

| | | | | |
|---|---|---|---|---|
| 35:11 36:6 36:22 37:18 76:25 103:9 135:8 137:3 156:6 162:20 164:11 **bases** 87:18 **basic** 5:15 11:1 25:15 **basically** 16:11 19:2 22:19 27:12 29:16 42:20 65:6 67:1,7 67:18 74:12 79:7 85:6 98:24 100:16 117:22 125:12 127:14 152:11 **basis** 62:25 76:24 **Bates** 3:12 65:20 111:8 144:8 150:12 **battalion** 12:20 18:19 18:22 20:12 24:15 88:20 117:3 140:16 140:19 154:8 **bearing** 65:20 150:12 **bears** 111:8 **Beaufort** 128:8 128:10,12,14 128:19,22 **began** 76:12 **beginning** 7:19 46:11 50:18 **begins** 77:25 80:20 | **behalf** 2:2,8 74:16 91:21 **behavior** 62:5 63:8,11,13 **belief** 36:22 **believe** 7:9,21 9:5 18:2 30:20 38:12 38:15 44:14 46:14,23 47:2,14 48:11 50:1 52:18 65:10 71:25 74:11 76:16 84:10 84:11 101:14 105:5 117:13 126:25 128:6 154:22 162:1 **believed** 117:23 **bell** 45:15 **bells** 111:5 **Bellville** 12:19 **Belvir** 15:17 26:1 **benefit** 63:5 64:25 77:18 84:15 92:8 113:9 118:18 131:24 139:7 **benefits** 129:20,21 130:5,6 131:13 132:7 132:11 133:16 139:22 151:3 151:12 154:14 **Benning** 140:16 **best** 5:20 6:4,8 6:12 37:6 | 99:24 121:25 135:24 167:10 **better** 132:15 **bias** 158:4,8 **big** 20:18 160:1 163:8 **bit** 5:17 9:12 43:21 96:13 **blah** 49:18,19 49:19 **blank** 57:4,5,8 58:17,17 **blast** 89:1 **block** 118:6 134:8 161:5 **body** 88:12 **Boman** 17:8 **born** 9:14 **borrow** 39:18 **bottom** 81:21 91:20 140:10 141:1 144:5 146:22 **bought** 52:21 112:2 **Bowen** 128:3,7 **box** 56:24 67:16,17 81:22 **Boyd** 84:11 **break** 6:22,24 **Breaker** 123:5 **breathing** 31:10 56:2 86:10 93:20 **BRENDA** 1:5 **BRETT** 1:5 **BRIAN** 2:3 **brian@clint...** 2:5 **Brick** 123:5 **brief** 53:22,23 63:8 64:7,10 | 116:19,23 138:20 146:3 **briefed** 105:1 **briefing** 47:1 **briefings** 154:20 **briefly** 63:20 81:18 **briefs** 63:17 149:19 **brigade** 62:1 **bring** 8:10 117:18 **broadening** 20:11,16 **Brook** 2:3,4 3:4 5:7 26:23 27:3 34:19 35:1,6 37:1 47:23 65:18 67:10,12 76:1 100:22 100:24 102:19 111:7 112:21 119:13,16,17 130:1 132:20 150:8,11 151:18,20 155:2,5 165:17,22,24 **Brooks** 3:16 **brought** 8:24 9:6,7 47:7 70:16 112:11 114:5 118:5 **Brunsting** 152:6 **Buehring** 18:12 **building** 125:9 125:9,23 **built** 82:17 **bullet** 145:16 | **bunch** 110:19 **burdened** 81:11 **bus** 10:19 **busy** 71:15 ___ **C** **C** 2:3 57:24 **calendar** 81:23 **call** 8:14 11:19 50:6 52:24 53:13 57:23 103:6 120:12 126:11,20 128:3,4 130:19 131:7 131:8 135:10 141:3 145:23 146:7 158:8 **called** 4:2 14:21 22:22 23:13 49:14 49:21 52:20 62:20 87:3 97:17 128:11 154:9 157:1 **calling** 128:15 128:20 **Calls** 34:17 62:11 **calvary** 120:11 **Camp** 11:1,17 11:18 18:12 **Campbell** 18:18 19:16 20:15 27:19 27:21 154:7 **candid** 58:18 **canvas** 58:20 58:23,25 59:3,5,13 61:6,21 62:16 63:2 119:25 120:2 |

120:6
canvased
61:22
CAO 133:22
138:19
141:24
148:24 149:3
149:9,10,13
149:25 150:3
CAO's 132:11
148:22 149:4
149:16 150:6
capabilities
40:10
capable 73:19
capacity 45:4
51:2 128:21
caps 87:18
Captain
119:23 121:3
121:8
caption 4:16
captured
70:19 126:3
car 137:7
card 67:23
82:7
career 20:8
careers 41:2
carefully
124:11
Carolina
128:25
carried 9:9
48:23
carry 8:13
26:10 28:3
110:4
CAS 28:22,24
51:5 57:22
58:4 64:20
64:24 65:1
69:25 70:3,4
70:9,12,15

72:22 74:6
75:7,13
76:24 79:6
92:25 93:2
95:4 96:6,10
99:24 130:11
130:25 134:3
134:25 135:3
135:6 138:14
142:6 144:11
case 1:7 7:10
7:15,17,24
8:14,18,21
9:2 19:6
22:19,24
24:22 25:7
25:22 26:2,5
26:8,13,13
28:19,23
29:5 30:23
32:11,13
43:4,15,17
43:17,19,23
45:5 46:17
49:1,5 51:1
51:21 52:2
55:24 56:3,3
57:23 58:3
59:13,21
60:10,12,12
60:13,15,20
62:15 63:4,6
67:19 69:12
70:5,8,11,14
71:8 72:3,4
72:20 76:22
77:2,14,19
78:14 80:10
80:11,11,12
80:17,20
81:9 82:13
82:14,15
83:9 85:7
86:21,22,23

88:14 90:13
93:5 94:2,3,4
95:1 97:10
97:14,15
98:6 99:4,7
99:19,22,23
99:25,25
100:13
101:16,24
102:12,13,16
102:18,23,24
103:3,4,7,10
103:13,15,21
107:24
108:13
111:18
113:23,23,25
114:8 115:2
115:3,5,7
119:8,10
123:9,10,11
123:18 124:2
124:5,20
125:22,24
126:6 130:12
131:21
133:16 134:8
141:21 142:1
143:6 145:16
153:7,12
161:20 162:6
164:21,24
165:3,9,10
165:11,12
167:16
caseload
100:3
cases 7:11
26:15 43:18
49:8 53:21
71:15 91:17
97:23,23
98:25,25
102:8,8

156:10,21
162:7,11
Casey 11:1,17
11:18
CASs 7:10,13
7:25 8:2,4,15
26:9 146:1,4
154:19
Cassandra
39:7
casually
154:20
casualty 53:13
130:4,14
131:23 138:5
138:19 149:4
149:17
151:24
catching 123:6
143:6
categories
61:15
category 34:2
causal 53:15
cause 33:5
36:22 38:13
52:22,22
64:5 66:22
133:1 135:25
147:10
CAV 119:24
120:10
caveat 164:8
cell 8:15 20:13
42:21
Center 23:3,5
23:9,14
24:16 160:20
certain 14:16
18:23 28:13
41:19 52:15
60:16 67:20
85:12,14
97:21 130:17

147:20 156:2
163:23 165:6
certainly 37:20
54:8 59:10
94:9 98:1
112:25
certificate
4:16 167:1
certified 5:4
certify 167:6
167:12
CG 28:17
chain 46:25
104:15,22
105:8,10,12
107:9 117:2
117:5,8
140:21
Chairman
12:23
chance 17:14
32:19 71:16
change 43:4
74:18 100:8
108:19,21
147:9,22
150:2
changed 19:20
74:19 83:8
changes 93:20
characteriza...
152:10
characterize
85:8,9
117:10
148:17
charge 15:24
15:25 16:3
16:20 17:3
19:24 22:10
42:13 47:10
100:15
131:19
133:14

Toole, Wes                                           February 26, 2016

6

| | | | | |
|---|---|---|---|---|
| 155:25 | 114:22,24,25 | **CID's** 29:18 | 63:8,17 | 164:23 |
| **charged** | 115:2,2,3,7 | 37:11 | 138:20 | **comes** 24:13 |
| 147:17,20 | 161:11 | **circumstanc...** | 149:19 | 151:14 |
| **charges** 38:10 | **CID** 12:4 13:3 | 43:16 95:8 | **CLOers** 53:13 | 159:15 |
| 38:10 47:7 | 14:4 16:8,15 | 104:2 109:25 | **close** 28:1 | **comfort** 94:11 |
| **cheaper** | 18:19,22,23 | 122:24 | 65:13 82:2 | **comfortable** |
| 123:21 | 19:12,13,23 | 131:11 137:5 | 82:19 83:2 | 40:19 66:24 |
| **check** 75:22 | 20:1,8,11,14 | 137:12 153:7 | 83:10 95:5 | 72:14 |
| 76:4,5 | 20:18 24:14 | 153:11 | 127:13 | **coming** 73:4 |
| 159:15,24 | 26:21 27:7,9 | 160:18 | **closed** 22:20 | 108:15 |
| 160:1,22,22 | 28:9 31:3 | **CIS** 64:15 | 22:24 27:18 | **command** |
| **checked** | 33:12,15 | **citation** 32:18 | 31:24 57:23 | 13:12 16:9 |
| 106:18 | 35:18 36:24 | **cited** 162:10 | 82:16 | 16:11,14 |
| **checks** 75:18 | 37:3,6,7 38:7 | **cites** 161:19 | **closer** 68:22 | 17:20 19:23 |
| 76:7 160:7 | 39:14 40:21 | **civilian** 21:2,3 | **closes** 32:13 | 23:25 24:18 |
| 160:10,12,19 | 47:22 53:14 | 21:7 45:22 | 62:3 | 37:13,17 |
| 160:20,23 | 54:21 62:7 | 87:25 89:3,7 | **closure** 60:21 | 38:11 41:24 |
| **chief** 12:23 | 67:8,21 | 90:1,25 | 115:4 | 43:2 46:25 |
| 17:7 19:15 | 68:15 71:25 | **civilians** 90:23 | **co-conspira...** | 47:4 90:13 |
| 22:9 39:3,8 | 76:25 77:6,9 | 91:2 | 29:22 | 104:15,23 |
| 44:10 49:15 | 77:17 78:8 | **claimed** | **co-workers** | 105:8,11,13 |
| 49:18 59:22 | 78:15,18,19 | 110:23 | 30:3 | 107:10,14 |
| 59:23 60:14 | 80:18 86:12 | **clarified** 71:25 | **cocaine** 24:13 | 109:4 116:21 |
| 60:16,16,24 | 88:19 90:12 | **clarify** 25:1 | **Coincidental** | 117:3,5,8 |
| 70:8 72:21 | 91:3,11 97:3 | 27:9 40:12 | 51:25 | 119:5 155:17 |
| 73:9,21 | 100:5 110:21 | 72:23 | **collected** | 155:18 |
| 90:10 94:6 | 111:13 | **clarifying** 25:8 | 52:12 149:22 | **commander** |
| 96:16 98:11 | 113:15,17 | **Clarksburg** | **collects** 68:2 | 16:1,2 28:16 |
| 99:12,20 | 117:17,17 | 9:17 | **college** 10:4 | 82:3 107:12 |
| 100:17,17,18 | 118:1,2,8 | **Class** 126:17 | 10:16,17 | 116:20,25,25 |
| 103:19 | 123:14 | 127:10 138:6 | **colors** 123:15 | 117:16,18 |
| 113:25 114:2 | 126:12 131:3 | 138:8 | **Columbia** | 119:2,11 |
| 120:19 122:4 | 137:2,16,20 | **clean** 106:17 | 128:25 | 140:19 |
| 122:10 156:1 | 138:23 | **clear** 6:17 | **combat** 11:19 | **Commander's** |
| 165:9,14,14 | 139:21 | 25:14 71:9 | 11:24,25 | 22:22 82:1 |
| 165:15 | 140:16 | **clearance** | **come** 27:19 | **commanders** |
| **Chiefs** 72:15 | 147:19 | 106:7,14,16 | 31:15 39:20 | 22:25 107:6 |
| 92:13 | 149:10,13,24 | 106:25 107:8 | 39:22 40:6,7 | 118:4 |
| **CIC** 21:15 22:1 | 151:13 155:9 | **clearances** | 40:8 45:13 | **commanding** |
| 22:11,12 | 155:15 | 106:21 | 59:22 72:16 | 118:2,17 |
| 79:17 80:1,4 | 156:17 | **cleared** 18:16 | 92:20 97:16 | **commands** |
| 80:7,13,16 | 159:24 160:2 | 29:16 134:18 | 122:9 137:9 | 107:11 |
| 80:18,21,22 | 164:3,5,15 | **Clinton** 2:4 | 156:16 | **comment** |
| 81:2,10,15 | 164:16 | **CLO** 53:21,23 | 159:18 | 143:7 |

commit 15:13
48:17 49:2
75:14 84:12
107:24 108:9
108:23
110:22
committed
34:8 38:14
84:11
common 33:21
34:6 45:13
70:20 72:20
72:24,25
73:8 77:24
94:23,23
commonly
97:4
commonplace
94:21
communicate
26:12,14,17
communicat...
114:13,21
communicat...
84:12 162:13
communicat...
109:23
community
88:1
company
120:11
122:12
competent
37:19
compile 21:23
complete
90:15 120:21
166:6
completed
4:18 23:18
56:19,22
64:9 136:19
completely
61:2 133:1

completion
10:25 31:16
80:24 81:8
145:13
complexity
137:14
comply 98:14
163:11 164:4
component
13:14,20
163:18
compromise
78:13
computer
23:10 84:20
107:12 123:5
163:4
concept 86:8
concern 52:20
52:21 105:18
108:15
110:13,14,18
133:4
concerned
48:16,18
78:13 87:22
87:24 116:17
116:18
132:21
concerns
48:14,20,22
77:16,19
85:17 105:24
concluded
165:25
conclusion
58:3 109:9
concurrent
30:22 83:1
concurring
84:17
conduct 19:4
36:15 53:4
53:18 58:18

59:12 61:6
62:16 77:24
87:5,6,10
119:25
159:17
conducted
46:13 53:21
58:21 63:4
71:21 74:14
80:23 86:17
101:4 107:23
126:16 156:1
conducting
11:13 13:6,8
52:16 70:21
82:22 87:4
89:2,14
111:17 125:8
conduit 90:11
confession
33:21 34:2,8
confessions
33:23
confident
72:10 131:17
confidential
76:21
confinement
38:12,15,16
38:19,22
confirm
138:10,11
148:12
152:24 161:8
confirming
151:10
confirms
150:3
confusing
52:1
conjunction
82:25
connect 22:2
connected

77:10
connection
26:5,7 30:19
58:21 77:13
107:24
156:10
consensus
72:15
consider
34:12 59:11
61:12,17
96:3,5
112:17,22
113:7,8
consideratio...
100:3
considered
49:8 61:16
148:5
considering
145:12 159:2
consistent
41:20 130:22
148:10
conspiracy
7:24 15:13
44:19,25
45:18 46:6
46:20 47:12
48:15,17
49:2 75:14
92:2,4 101:9
107:24 108:9
108:17
110:17,22
115:15
162:24
conspirator
108:8,24
conspirators
108:23 113:5
conspired
45:21
conspiring

48:20
constantly
156:20
163:14
contact 63:25
138:4,22
149:18 154:8
contacted
25:25 26:3
29:25 30:2,3
50:2,8,15,23
130:20,21
131:1 134:4
134:5 138:15
139:20,25
152:23
contacting
131:23 147:6
147:6
contained
146:16
contingence
87:19
continual
156:21
continuation
55:19 79:23
115:11
119:19 141:2
161:15
continue 9:8
46:5 80:15
continued
47:15
continues
55:11 141:4
contracted
151:7
contribution
85:7
control 14:23
19:5 66:5
132:16
140:10

controlled
87:5
conversation
44:15,20
45:16 52:18
59:20 109:11
109:16
120:23 130:3
130:9,13,15
130:17,24
131:4,16
132:5,6,8,10
132:17 134:4
134:13 136:3
136:16,22,23
138:16,18
139:8 140:2
141:12 143:1
143:4 146:5
146:18 147:2
147:5,14,25
148:1,6,10
148:21 153:5
conversations
53:12 131:2
131:18,20
146:17 153:8
153:10
conveyed
142:17
conviction
159:22
cooperative
108:20
coordinate
89:16 119:22
119:23
149:16
coordination
141:25
149:13
coordinations
52:16 138:19
Coordinator

21:5,9,16
copied 124:25
copies 22:20
cops 41:1
153:18
copy 23:16
24:16 28:16
28:17 29:2
32:5,11
104:25
118:22,23,25
125:25 126:3
152:5 163:4
correct 17:15
19:18,19
21:1 37:13
39:14 48:25
53:7 54:24
56:19 66:10
69:16 74:1
75:15,16,20
83:16 84:3
84:13 91:11
94:17 95:19
98:8 101:10
104:12
107:25 112:6
112:14 119:9
120:19
142:21
144:11
149:10
161:11,12
166:5
corrected
70:10
correction
41:19 42:14
corrections
166:7
correctively
52:12
correctly
74:14 89:4

93:9 112:5
Council 88:21
counsel 2:1
167:13
counseling
164:25
counter 89:18
counter-esta...
158:5
County 128:8
128:10,12,14
128:19,22
167:3
couple 6:4
58:16 60:22
65:5 94:19
course 10:7
90:19
court 1:2 4:7
4:10 5:24 7:2
7:3 35:8
65:25 67:1,3
165:21 167:4
cover 67:2,3
87:18
cracked 112:3
CRC 23:5,17
23:21 32:9
create 27:16
74:5,12
125:11 157:6
created 24:25
74:21 88:3
124:24
creates 79:6
152:15
credentials
42:19,22
credibility
113:2
credible 33:3,7
34:13 35:7
35:10,14,20
35:22 36:1,7

84:10,18
137:24
157:11 161:4
crime 14:5,12
14:19,21,25
15:6,9 23:3,4
23:8,14
24:16 34:8
34:10 36:23
51:16 65:4
84:2 160:19
crimes 15:1,3
15:5,8 29:22
30:13 39:9
39:10,11
88:3 157:9
158:19
criminal 13:11
21:5,9,16
68:20 91:2
106:17,22
119:4 159:21
160:1,8
161:21
162:10
criminality
50:20
criteria 32:23
CRM 93:10
culminated
12:24
current 19:14
83:7 116:6
119:2,2,25
140:24 163:9
currently
30:17
Curtis 152:6
cycle 115:5

─────── D ───────

D 58:19 155:10
155:15,20,21
156:3,14,16

163:22 164:7
DA 81:25
DA4833 22:22
daily 91:14
Dale 38:25
44:15 45:12
45:19 46:1,3
47:20 48:1
50:2,15,23
51:1,7,18,24
75:19 76:10
79:13,22
80:3 90:10
91:21,25
94:7 96:16
97:25 98:5
98:11,15
99:14 100:16
108:6,14
109:6 114:6
114:6,11,15
115:12
119:20
162:13
Daniels 119:23
121:3,8
darn 62:14
data 124:25
157:1,2,5,8
157:12,13,18
157:19,21,23
157:25 158:3
158:12,19
159:8,14
database
159:23
160:17
databases
160:1,9,14
date 14:24
16:25 55:3,4
55:6,8,9,9,10
56:18,20
66:8,13 69:3

71:2,18
82:24 112:13
116:11
141:25
144:10 154:6
166:12
**dated** 66:6
144:9 146:23
152:9
**day** 4:4 55:7
68:4 77:25
82:19 96:19
121:24 122:7
164:23 165:1
167:18
**day-to** 102:7
**day-to-day**
19:7 45:11
91:17
**days** 10:18
52:25 53:2
68:9 69:2,3,5
69:8 72:1
81:16,23
82:4,5,8,16
82:18 83:1,9
84:5,5 96:23
97:2,11,14
97:24 98:10
99:4 147:7
164:23
**de-conflict**
89:25 90:5
**dead** 113:14
**deadly** 109:24
**dealer** 45:22
129:13
**dealing** 50:13
**death** 7:16
8:24 25:22
30:19 48:7
50:16 52:8
53:2 55:1
59:1 64:5

65:14 66:5
66:10,21,23
114:18 125:5
129:20,21
130:4,6
131:13,24
132:7,24
133:1,6,15
135:16,25
137:4 139:6
139:22 140:3
149:15 150:4
151:12
154:13
**deceased** 8:20
28:16 49:16
**deceased's**
8:21
**December**
29:10 140:11
155:6
**decide** 56:10
135:5
**decided** 64:7
94:8
**decision** 64:2
85:13,13
90:16 135:7
137:24 154:4
**decisions**
37:16,18
**deck** 99:1
**dedicated** 74:2
**deemed** 118:3
**Defendant**
1:10 2:8
**Defense** 12:25
**define** 63:10
63:12 76:13
**defined** 167:14
**definitely**
109:2
**definition**
35:23

**definitions**
35:23
**degree** 9:21,23
10:1
**Deidre** 54:24
58:22 75:7
114:7 124:6
136:6 139:7
154:13,15,18
**Deidre's**
114:18
**delayed** 70:18
71:7,11,23
72:2,6,10
**delaying** 141:3
**delays** 100:12
**deleted** 25:3
25:18 27:7
**deleting** 26:21
**demeanor**
62:4,5
**denied** 108:10
**deny** 152:24
**department**
15:11
**departments**
14:9
**depend** 78:11
94:7 109:21
116:5
**dependent**
24:23 78:9
78:24 81:9
116:5
**depending**
28:25 32:6
40:25 43:14
59:8 78:1
92:15 94:10
115:6 120:10
137:13
**depends** 24:6
92:13 109:25
115:1 116:3

122:24 137:4
155:24
160:18
**depicted** 83:4
142:19 148:1
**depiction**
144:22
**deployed** 8:22
18:3,11
29:14 140:5
140:7 143:5
144:2 153:12
155:6
**deploying**
135:22
**deployment**
17:9 18:7,9
18:16 29:15
29:23 153:13
**DEPONENT**
166:1
**deposed** 5:13
**deposit** 68:1
**deposition**
1:12 4:2,11
4:18 7:5,7
8:8,18 26:3
124:9 142:10
165:25 167:6
**depositions**
25:13 75:12
**derived** 152:17
**describe** 157:4
**described**
28:21 71:6
104:20 123:1
162:18
**designation**
16:7 127:19
**designed**
138:21
**destroyed**
24:24 25:1,2
**detachment**

16:1,2,8
19:23 120:10
120:14
**detail** 28:24
**detailing** 134:4
**details** 64:3
76:19 130:17
**detain** 36:2,3,6
36:21,24
37:4,8,24
38:8
**detained** 29:10
**detectives**
41:1
**detention** 36:5
36:18 38:6
38:16,20,21
**detentions**
37:10,12
**determination**
33:2 35:11
36:11 50:18
68:10 69:17
82:15,24
83:18 147:8
**determine**
36:9 38:9
82:23 115:14
127:5 133:1
147:10
**determined**
25:6,17
36:11 57:2
83:15 103:10
133:3
**determining**
106:10
139:21
**develop** 58:9
64:11 87:19
127:14
**developed**
55:7 77:16
**development**

10:14
**Devon** 42:7
**devoted** 35:20
**dictate** 93:21
160:12
**died** 50:19
137:11
**differed** 40:17
**difference**
34:7
**differences**
40:9,13,14
**different** 11:22
13:1,3,3,10
14:16 18:23
21:12 27:15
27:22 34:2
36:17 43:5
43:15,16
46:13 55:16
55:22,22
56:4 60:13
72:4,5 73:3
74:8 75:4,5
80:11 89:4
121:11,16
126:6,12,14
131:20 135:9
149:6 156:18
157:8 158:9
160:8
**difficult**
122:15 159:1
**digit** 7:18
**direct** 23:4,6
58:15 77:21
100:25
111:23
124:22
138:12
**directed** 59:23
90:2 115:16
115:19,22
**directing**

98:12
**direction**
59:20 122:7
**directive** 28:18
**directly** 23:13
80:15 94:12
**director** 14:16
**disagrees**
34:15 35:5
**disciplinary**
22:23 82:2
**discipline**
122:8
**discuss** 60:1
60:14,16
87:19
**discussed**
78:7 93:12
116:12
141:24
149:20
**discusses**
97:4
**discussing**
153:11
**discussion**
29:6 59:3
60:10
**discussions**
37:18 58:20
58:23,25
**dispatch** 24:18
81:25 82:18
92:14 101:7
**dispatched**
83:3 84:16
107:4
**dispatcher**
128:12
**disprove** 58:1
**disregard** 61:2
**distinction**
33:24
**distribute**

22:20
**distributed**
92:12
**distribution**
44:18
**DISTRICT** 1:2
1:2
**dividers**
123:19
**DNA** 68:6
**document**
31:10 54:18
56:2 61:20
65:21 66:2
70:15,22,23
71:16,16
73:6 86:10
95:3,3
101:16,24
105:15
111:11
135:12
150:12,13,15
150:17
**documented**
72:1 79:9
80:4 96:10
103:14 142:1
142:18
**documenting**
73:4 103:8
**documents**
26:5,7
123:23
**DOD** 12:22
**dodgy** 153:21
**doing** 13:7,19
19:5 46:24
58:13 73:3
73:19,25
76:7,8 85:8
85:14 89:6
89:23 90:1
98:9 123:3

124:19
137:21
156:19 165:2
**Don** 17:8
**door** 135:11
**dot** 27:14
**dots** 22:2
**double** 9:24
**doubt** 62:13
**drafted** 79:13
**drafting** 88:17
**draw** 85:15
156:22
**dress** 65:9
**dressed** 49:20
**drive** 93:17
**drug** 15:7 39:3
42:11 44:15
44:18,19
45:11,22
46:2,4 49:4
73:22 76:18
88:4 90:10
91:15 94:5
100:15
101:25 102:7
102:8 103:10
108:10
129:12
**drug-related**
49:1
**drugs** 45:7,25
87:23 88:5
89:22 106:15
115:15
157:10
**DST** 42:14,16
42:19
**dual** 13:4
**dual-hatted**
16:13
**due** 162:3
**duly** 5:3
**duration** 64:1

**duties** 41:15
42:18,23
52:15 81:11
**duty** 10:24,25
40:18 49:14
68:4 69:2,2,5
69:8 72:1
84:5,5 96:22
97:1,22
100:9

**E**

**earlier** 17:23
17:24 37:24
56:1 78:7
81:6 82:1
89:21 92:23
93:4 96:21
114:5 115:2
115:13,25
119:20 120:2
120:23 128:4
152:18
161:16
162:19
163:17
**economic** 39:9
39:10 157:9
**education**
9:20
**effecting**
37:25
**effects** 65:7
66:20 67:6
154:24
**effort** 15:9
**efforts** 124:13
**either** 37:9
49:14 57:1
58:2 63:17
70:17 73:8
80:7 81:17
85:20 89:24
94:24 103:5

Toole, Wes                                          February 26, 2016

11

103:14
104:25
121:13 122:2
129:9 132:16
132:25 134:9
134:11,18
143:4 144:1
145:3 147:24
152:7 161:8
**elect** 151:4
**electronic**
32:8
**electronically**
23:21,22
**element**
120:12
**Elizabeth**
51:18
**Ellie** 22:16
**else's** 74:6
**email** 26:12,14
26:17,21
27:8,9,10,24
27:24 28:10
28:15,17,19
28:25 31:3
152:5,15
156:18
**emails** 27:1,4
27:7 28:3,21
29:1 90:9
**emotion** 50:13
**employed**
128:19
**employee**
167:13
**employees**
150:23
**en** 49:16,22
**encounter**
122:1
**encountered**
133:5,9,11
**encourage**

118:9
**encouraged**
115:5
**ended** 100:9
113:14
**energy** 43:21
**enforcement**
7:20 13:1,10
13:19 31:22
37:20 38:5
40:25 41:2
87:8 89:15
89:17 158:6
159:20 160:6
160:12,14
**engage** 28:14
**engaged**
154:25
**enlisted** 10:17
**enrolled** 10:12
**ensure** 52:9
98:6
**ensuring**
14:19 104:10
**entail** 18:21
**enter** 71:18
125:19,25
**entered** 74:16
79:5 125:6
126:13
127:22 145:4
146:4 159:19
**entire** 63:5
124:13
163:20
**entirely** 11:18
65:2
**entity** 124:24
124:24,25
125:11,14,16
125:17,20,24
126:4,8,14
159:19
**entries** 72:10

99:6 124:14
142:6
**entry** 3:15
70:18,18
71:7,11,23
72:2,6 74:5
76:24 78:25
79:7,12
91:21 96:6
98:15,17,20
98:21,23
99:5,10
106:5 115:12
119:19,21
124:23 125:3
125:5 126:23
128:2 134:3
140:11 141:2
141:9,22
144:9,14
146:6,22
161:16
**equal** 160:25
**Equipment**
88:11
**Errata** 166:7
**escort** 65:11
65:12 154:23
**especially**
131:20 154:6
**ESQUIRE** 2:3
2:3,9
**establish**
27:20 82:22
**established**
75:12
**etcetera** 4:17
100:3 127:17
127:18
163:16,16
164:9,9,13
164:13
**Etran** 165:23
**evaluate** 114:3

127:15
157:14 161:8
**evaluated**
159:12
**event** 71:1
101:10 137:4
153:25
**events** 8:1
55:10 131:5
131:10
**everybody**
14:18,24
88:6 99:2
**evidence**
52:11 61:12
61:13,14
68:1,2,3,4
114:4 137:23
149:22
**exact** 141:25
**exactly** 76:17
148:2
**exam** 68:11
145:14
**Examination**
3:1,4 5:6
**examined**
166:4
**example** 23:19
24:10 27:19
36:18 54:2
56:17 60:19
61:20 62:19
68:7 71:12
73:2,17 75:6
78:16 83:20
86:11 91:6
121:1 157:7
164:20
**examples**
137:6
**exceptions**
81:14
**exclamation**

87:17 161:23
**EXCLUDING**
4:17
**exclusion**
50:19
**execute** 37:9
46:9
**executive**
12:22
**exercise** 122:8
**Exhibit** 3:9,10
3:12,13,15
54:17 65:17
65:20 67:13
75:11 81:19
84:9 91:20
101:1 107:21
111:6,8
115:11
119:18 124:5
140:8 142:22
142:23 144:4
150:9,10
151:18,19,22
161:13
**exhibits** 3:7,16
82:17
**existed** 158:22
**exists** 36:22
**exonerate**
132:25
133:17
**expect** 57:14
72:17 120:24
122:8 137:9
**expectation**
165:6
**experience**
40:16 43:24
56:9 60:18
91:10 118:8
136:25 137:3
**experienced**
40:24

**expires** 167:24
**explain** 23:6
  35:14 60:25
  67:1,15
  138:23,23
  164:20
**explained**
  63:21 70:11
  134:6
**explaining**
  85:12,13
**explains** 164:8
**expressly** 4:17
**extent** 76:17
  149:24
**extrapolate**
  114:25
**extremely**
  136:2,2
**Extremist**
  157:1,17,19
  157:21,23,25
  158:3,7,12
  159:14
**eyewitnesses**
  83:23 116:14
  116:16

**F**

**Faconti** 1:22
  4:7,9 167:4
  167:23
**fact** 46:19,22
  66:22 102:3
  104:14,23
  105:15 118:7
  131:17
  132:15 135:8
  139:9,12
  141:10 153:8
  162:4 165:5
**factors** 164:12
**fail** 95:2
**failed** 70:14

**fails** 97:13
**fair** 34:11 54:3
  152:10
**fairly** 34:5
  141:2
**fall** 50:21
**familiar** 30:11
  30:21 40:19
  50:3 107:16
  107:19 114:8
  133:20 150:6
  150:18
  155:20
**familiarity**
  102:7
**family** 8:20,24
  138:22,25
  149:5 154:12
**far** 14:3 28:4
  28:10 38:7
  63:24 69:14
  115:16
  116:16,18
  124:2 162:17
**favorable**
  107:7
**February** 1:15
  4:4 9:15
  167:7
**Federal** 150:23
  164:1
**Federally**
  151:5
**feed** 23:13
**feedback**
  85:17
**feel** 53:25
**felony** 123:7
**felt** 64:16
  72:16 105:9
  105:9,14
**field** 11:21
  13:23
**figure** 132:14

149:16
**file** 27:17
  28:11,18,20
  28:23 29:3
  32:5,12
  55:24 59:21
  79:16 93:6
  93:15,18
  98:6,16 99:5
  99:10,13,16
  103:6 111:13
  113:16,18,21
  114:9 115:20
  115:21 119:8
  119:11
  123:10,10,12
  125:9,10,11
  142:1 157:1
  157:2,5,7,14
  157:18,19,21
  157:23 158:1
  158:4,12,19
  159:14
**files** 74:21
  157:9
**fill** 39:19
**final** 57:24
  82:12,17,18
  83:2
**finals** 82:10,20
**financially**
  167:15
**find** 30:6
  118:22,23
  135:20
**finding** 50:9
**fine** 104:21
**finish** 6:12,13
**first** 5:3 9:13
  10:16,24,25
  25:21 44:12
  44:21 45:15
  49:10 50:12
  76:24 81:3

81:16,16
  85:6 89:11
  95:21 96:18
  98:17 108:5
  111:15
  115:13
  126:17 127:4
  127:10,23
  130:25 138:6
  138:7 140:24
  148:13
  151:17 152:4
  154:8
**five** 12:11
  15:18 17:4,5
  17:17 68:9
  71:15 72:1
  73:2,3 87:11
  88:25 89:2
  122:10,22
  123:2,3
  126:12,15
  146:3
**five-minute**
  146:5
**flag** 41:23
  107:6,13
**flagged** 42:17
**flagging** 107:7
**flags** 107:10
**flexible** 33:9
**flip** 94:18
  107:13
**Floor** 2:4
**flow** 80:10
**fluid** 31:13
  56:3 60:13
**fly** 122:3
**focused** 15:1
  46:7
**folder** 123:10
  123:12,25
**folders** 123:15
  123:18,19,20

**follow** 84:4
  86:3 98:20
  142:24
**followed** 92:7
  92:9
**follows** 5:4
  87:9
**force** 89:18
  109:24
**foregoing**
  166:5 167:8
**forget** 70:22
  147:17
**forgot** 153:3
**form** 4:12,13
  35:9 81:25
  104:16
  150:15 151:9
  151:10,17
**formal** 153:4
  154:4,20
**formalities**
  4:15
**format** 156:4
**formed** 64:12
**forms** 151:13
**Fort** 10:19
  11:7,11 12:1
  12:19 15:17
  15:22 16:6,7
  16:16,24
  17:3,8 18:4
  18:17,17
  19:16 20:9
  20:15,18
  21:4 22:14
  23:11 26:1
  26:11,16,22
  26:23,24,25
  27:5,18,19
  27:20 29:16
  32:2 38:24
  39:14 41:24
  43:3 51:14

71:9 74:8
87:25 88:1
90:7,13
94:22 100:5
105:4,18
133:12
143:22 154:7
156:13
157:20
**forward** 28:3
46:9 86:21
88:23 97:15
**foster** 122:5
**found** 49:15
50:7 60:24
104:4 117:23
129:16
143:25
**four** 17:4,5,17
55:18 79:21
89:9
**Fox** 40:3 41:13
51:11,12
114:19
141:21,23
142:18
**Fox's** 41:5
**frame** 115:24
**frames** 83:14
**fraud** 14:17
**frauds** 15:7
**freezing** 141:5
**fresh** 55:12
**friend** 126:21
127:17 128:5
**friends** 52:20
127:10
**front** 7:3 65:1
67:14 91:20
**full** 5:20
115:13
136:12
**further** 4:15
63:10 71:25

98:5,6,12
127:21
129:17
160:11,12
165:17
167:12
**future** 26:3
101:16

_____ G _____

**gambit** 26:19
**gang** 158:9
**gangs** 88:2
158:5
**gaps** 98:7,13
**Garrison** 24:19
**gather** 116:9
**gathering** 67:5
**general** 15:8
32:11,14
38:1 39:11
61:12 63:22
66:16 86:7
88:21 118:2
118:17 157:9
157:22
159:14
**generally**
48:18 72:15
85:10 105:18
154:12
**generate**
66:17,18
103:21
**generated**
46:23 66:4
66:12,25
83:12 103:15
125:21
152:11
**genesis** 44:17
**geographic**
18:23
**Georgia** 15:23

**Germany** 12:5
12:6,10,17
12:18
**gestures** 6:6
**getting** 10:19
33:12 60:20
61:22 67:6
69:13 116:1
129:10,14,14
164:11
**gigged** 99:3
**girlfriend** 9:11
**give** 6:4 17:1
17:14 52:12
78:16 86:10
94:9 119:12
122:6 137:5
146:1 157:7
164:25
**given** 20:20
49:22 60:5
62:22 70:9
95:1 96:8
97:9 99:23
102:2 120:18
121:13,22
145:13
163:13 166:6
**giving** 60:17
**glad** 31:8
**gleaned** 21:19
**Glenn** 124:25
**go** 11:6 12:3
13:24 14:1
19:4 23:20
23:21 24:5
24:14,23
27:11 34:24
46:9 59:16
60:2 67:10
69:10 70:17
71:1,17 72:1
74:11 80:12
81:18 84:8

86:22 88:18
89:10 95:3
96:14 107:21
118:24
119:13
121:15
125:18,22,23
125:25 126:1
146:2 147:21
155:2,16
156:20
161:13
164:24
**goes** 28:10
43:20 86:4
151:8 162:17
**going** 6:2,10
6:19 21:25
24:21,22,23
26:2 45:24
46:5 49:17
58:10 60:17
61:17 62:9
63:22 64:2,7
65:14 68:8
70:20 73:5
75:10 78:8
80:4 82:16
83:18 85:5
87:5 88:16
88:16,24
89:21 92:15
97:20,21,23
100:21 101:7
102:1,12
110:4 113:12
116:6 120:21
122:9 123:6
124:4,17
125:1,2
130:25 131:6
134:13
136:13
137:15 143:7

145:7,17
146:2 147:21
150:9 156:2
156:5 161:5
164:24 165:3
**good** 32:21
44:9,10 60:2
138:22 141:3
**government**
133:2 151:6
158:7
**graduate** 9:22
10:6,11
**graduation**
10:18,19
12:5
**grape-lipped**
46:15
**gratuities**
140:3
**gratuity** 130:5
130:6 131:13
132:7 139:7
139:22 150:4
151:12
154:14
**Great** 69:13
**Greene** 48:4
48:11 92:17
92:19 123:20
131:14,18,22
132:6
**grew** 9:19
**grooming**
20:13
**ground** 5:16
**group** 15:11
24:15 88:21
**groups** 158:5
**grow** 9:18
**guess** 13:9
68:25 70:8
99:8 109:21
138:4

guidance
  52:13,17
  58:10,14
  60:5,17
  62:22 71:9
  86:12 95:1
  96:8 122:7
guidances
  61:2
guidelines
  97:9,11
guides 27:13
  163:16
guilt 34:1
guns 87:23
  88:5 89:21
guy 153:15,18
guys 46:5
  60:23 73:23
  123:7 147:8
  156:2

**H**
hand 75:10
  80:14 90:25
  100:16 124:4
  167:17
handed 111:10
hands 92:12
  92:20 99:1
handwriting
  55:16
happen 18:9
  83:19 121:22
happened
  16:24 17:6
  30:11 38:3
  46:21 47:9
  56:8 80:6
  86:24 104:13
  112:16,19
  121:23
  122:19,19
  128:19 139:6

145:22
happening
  83:16 127:2
happens 56:13
  56:13 95:10
  98:3
hard 32:4,11
  44:8 46:17
  106:1 120:8
  124:18
harm 118:10
harming
  118:13
hate 158:4,8
hated 74:17
head 34:4
headquarters
  24:15
health 105:24
hear 44:12,22
  139:13
  153:22
heard 18:1
  25:21 139:9
  139:11
  154:11
  157:22
hearing 4:14
  44:21,23
heavily 51:13
  51:17
held 97:16
  98:22
help 13:23
  14:2 17:15
  31:1 35:14
  39:23 50:24
  54:10 86:20
  100:20
helpful 127:6
helping 58:9
  99:2 106:2
helps 21:21
  132:19

hereinafter 5:3
hereunto
  167:17
hey 13:24
  45:20 50:16
  57:3 59:21
  59:22 60:21
  70:23 73:5
  82:8 92:16
  92:18 97:12
  99:1 103:17
  108:15
  122:10
  128:11,21
  145:20
  149:17
  153:19,22
  156:22,23
  161:4
high 116:20
  117:7,11,12
higher 117:25
highest 9:20
highlight
  162:14
highly 44:10
  62:13 135:21
  135:21
  145:19
hindsight
  112:25 113:9
Hinesville 88:2
historical
  119:3,5
history 106:17
hit 79:6 125:20
  160:16
hold 36:14
  38:4 66:21
  66:21
holding 65:6
holes 145:16
homicide
  50:17 51:8

52:4 113:22
  114:7,14
  124:6 133:18
  137:18
honest 41:6,9
  72:11 124:12
hot 24:12,13
hour 7:9
hours 9:21
  83:21,23
  84:1 108:6
  116:14 165:2
house 49:21
  66:20
how's 143:6
huddling
  156:2
huge 14:15
husband
  133:14
hysterical
  50:10

**I**
i.e 81:9
ID 124:24
  125:1,14,16
  125:20
idea 104:1
  113:12 120:8
  120:15
ideal 81:17
Ideally 50:19
identified 17:9
  52:12 60:21
  83:21,24
  128:13
  161:20
identify 21:22
  31:14 54:15
  56:7 61:15
  86:17 90:20
  106:3 116:13
  127:13

156:22
ifs 159:5
ignore 60:4,6
  121:18
immediate
  95:5,6 117:2
immediately
  79:9,10 95:9
  96:11 133:15
impact 105:25
implicated
  91:1 139:18
importance
  87:17
important 5:19
  6:1,16 105:5
  105:10,14
  106:10
impossible
  163:11,11
in-depth 48:6
  64:3 127:1
inability 122:1
inaccurate
  148:16
inactivity
  68:24
inadvertently
  78:21
inbound 17:7
incident 44:19
incidents 45:7
inclined
  101:13
include 20:24
  21:1 68:5
  103:22 130:6
  134:11
included 23:24
  93:18 162:9
includes 88:7
including
  163:10
inclusive

167:9
inconseque...
108:25
inconsistent
144:22
incorrect
133:10
142:15
144:20
146:14
incumbent
107:9
indefinitely
65:6
independent
33:2
independently
122:6
INDEX 3:1,7
indexing
159:23
indicate 57:7
127:20
141:24
indicated 3:12
indicates
54:23
indicating
125:13
128:24
indication
146:1
indiscernible
111:15
individual 22:8
37:13 126:7
159:16
160:15
individuals
77:11 149:8
151:11
infantry 14:21
infer 96:11
influence

81:12
inform 21:21
50:24 66:4
139:2
informant
76:21
information
27:13 29:5
30:25 33:3,7
34:13 35:7
35:10,12,14
35:21,22
36:1,1,7
38:14 44:24
45:20 46:8
47:1 62:4
70:9,19
73:22 78:14
84:11,18
89:25 90:22
93:20 102:2
114:17,20,22
125:10,25
127:5,21
128:18
137:25 144:3
144:21 145:4
146:16
148:19
149:19
152:14,16
157:11 158:2
159:3,4,10
159:11 161:4
161:7,20
informed
49:15 53:17
139:1
informing 26:1
inherent 14:19
inherently
102:6
initial 18:18
50:6 78:4,5,7

79:2,13 80:8
155:17
initially 15:23
initiated
107:10
117:21
130:19
initiation
80:24 81:7
115:4
initiative 122:8
input 72:21
125:17
inputs 73:10
inputted 126:1
inquiries 29:9
29:11 30:9
inquiry 152:20
inside 66:20
insist 6:23
insofar 64:7
107:2 111:12
164:3
inspections
155:18,18
installation
24:21 28:1
89:15 120:13
151:15,16
instance 94:17
98:4,8
116:19 120:7
instituted
151:15
institution
150:25
instructed
34:21 121:9
instruction
103:9 120:18
insurance
129:20
139:22
intelligence

21:5,9,16,19
21:20
intelligent
137:24
intend 57:9
intended 7:25
intent 34:3
86:16 136:12
138:21
interact 65:3
90:6
interacted
63:20
interaction
91:15
interactions
63:16 64:10
interchange...
161:2
interest 49:1
53:24 61:7
109:3 113:1
134:1,2,6
135:16 139:3
142:2,20
144:23 145:1
145:10
146:11
147:12 148:5
148:7 150:4
153:16
159:25
160:25 161:1
161:6,22
162:18 163:1
interest's 59:6
interested
167:15
interesting
109:2
interface 75:5
75:5
internal 29:9
29:11 146:17

160:1,20
164:5
interpret 62:17
interpretation
158:2
interview
36:12,15
53:21 62:9
62:14,23
83:20 115:14
116:13
126:16,24
127:1,16
interviewed
46:15 63:19
71:14 83:23
109:8 110:21
153:5
interviews
46:13 53:4,9
53:19 58:18
58:21 59:1,3
59:5,13 61:6
61:21 62:16
63:3 107:23
119:25 120:3
120:6 125:8
126:20
intimate 60:11
intricacies
60:12
invaluable
50:4
investigate
29:13 43:23
46:5
investigated
24:7 77:11
78:10 101:15
102:11,14
103:2,18
105:16
165:14
investigating

26:15 33:22
38:9 44:16
44:18 51:14
73:11 78:18
90:14 113:22
114:14,18
129:13
158:18
**investigation**
13:12 14:6
14:13,14
21:17 23:20
24:7,9 29:18
29:21 31:12
31:19,24
43:9,10 46:2
46:11 47:13
47:14,18,21
47:25 48:14
48:21 49:11
50:17 51:9
52:5,9 53:18
53:24 54:6
54:12 58:22
59:9 61:13
64:4,8 65:14
69:9 75:7,14
76:8,12,18
76:24 77:25
78:2,3,11,17
78:23 80:8
80:16 81:1,3
82:3,11,22
90:15,20
105:12 109:2
113:24 114:7
117:15,25
118:5,13
119:4 125:8
126:5,7,8
127:14
133:12
137:18 139:4
151:11

157:15 161:6
**investigations**
13:4,6,9 19:3
21:21,25
22:3,7 40:24
42:2,4 48:7
121:24 123:7
133:7 135:9
149:15
**investigative**
13:15 16:5
19:1 21:6,11
21:13,18
22:17 26:18
31:7,8,13,14
31:18 32:4
33:1,12
42:18,23
43:6 50:25
52:3,17
53:16 54:6,8
54:13,21
55:23 56:1,5
56:10,14
57:11,14,15
57:19 62:8
63:4 67:16
67:17,18,22
68:25 69:7
69:24 70:6
70:21 72:21
73:10,19
79:1,11
81:19 83:5,6
85:7 86:1,4,5
86:7,9,12,16
86:17,20
96:19,21
97:5,6,8,10
97:13 98:7
116:12
155:13
**investigativ...**
40:22

**investigator**
21:8 31:11
42:7,15 44:9
86:3 94:9,10
94:11 98:16
98:18,21
99:10,11,14
99:16 100:1
100:4,14
105:2 114:15
120:18 121:1
121:6,6
165:13
**investigators**
20:24 28:9
48:2 88:7
94:25 115:19
116:22 122:5
**involved** 8:22
9:2 13:15
29:20 45:10
47:2,20,24
48:3,5,10
49:10 51:13
51:15,17,20
54:5,7,9 58:6
63:15 76:18
76:21 114:6
154:5
**involvement**
8:2 52:3,6
58:9 77:2
108:11,12,17
132:24
149:24
**involves** 33:12
**involving**
25:22
**IOA** 21:13
**IP** 55:7 57:5
58:11 83:12
86:13,14
93:19
**IRA** 151:5

**Isaac** 18:1
29:9,13,21
30:12 44:12
45:7 49:11
53:6 63:7
64:23 65:3
75:23 76:4,6
76:11 77:7
77:10 106:24
110:23
124:25
125:15
156:10
158:12
**isms** 40:21
**issue** 23:25
35:20 57:1
73:14 82:6
119:11
153:25
**issued** 24:2
118:16 119:9
**issues** 9:2,5
41:13,21,21
85:16 149:20
**IST** 21:11,13
82:7
**item** 89:9
93:10
**items** 58:16
85:15,21
94:1
**Ivory** 39:7

---

**J**

**JAHR** 1:5
**JAHR0001475**
3:9 65:20
**JAHR0001493**
150:13
**JAHR00014...**
3:14
**JAHR0002066**
111:9

**JAHR00020...**
3:11
**January**
119:24
**Jeremy** 141:21
**Jessica**
109:14 113:2
**job** 10:16 11:9
13:14 15:17
18:21 69:13
129:15
**jogged** 42:16
**Johnston** 2:9
7:8 8:8 26:22
29:7 34:17
35:2,9 36:24
42:15 47:22
62:11 75:24
102:17
104:16
112:19
129:24
130:10
165:19,23
**joint** 12:23
89:20 90:9
**joke** 112:3
**journal** 3:15
144:19
151:23
**joys** 43:1
**Judge** 34:23
37:19
**judicial** 33:2
**July** 7:17
95:14 96:1
124:23 128:2
131:8 138:2
138:15
144:10
146:23
**jump** 84:8
96:13
**jumps** 145:15

Toole, Wes

February 26, 2016

**June** 16:21
17:19 43:1
95:17,23
101:3 106:6
108:6 112:14
**jurisdiction**
90:23
**jurisdictions**
41:1
**justifiable**
133:18
**justification**
85:12
**Justin** 44:1

**K**

**K-n-o-l-l** 152:6
**Kansas** 11:8
**Kapinus** 44:1
51:11,12
114:19
162:13
**keep** 28:17
53:16 56:5
73:5 87:12
97:15 106:17
112:4 157:8
157:9 163:3
**keeping** 66:18
98:1 138:25
**Kentucky**
18:18 19:17
**kept** 28:22
93:5,17
99:22 104:5
119:8,10
**key** 14:23
**kill** 110:4,7,24
110:24
113:12
**killed** 133:3
**killing** 110:9
110:10 112:1
**kin** 28:15

53:17 67:6
149:21,23
**kind** 9:11
11:25 13:3
14:18,24
21:3 40:15
46:19 50:11
50:22 52:13
63:22 67:2
67:19,23
69:19 73:4
82:7 85:12
86:20 93:19
97:12 100:18
106:15
114:22
122:15
124:16,18
149:24
151:10 161:2
**Kirk** 152:5
**knew** 50:2,16
104:9 162:11
162:12
**Knoll** 152:5
**know** 6:10
8:17,21
11:24 13:23
16:5,11
26:21 27:11
28:4,8 29:14
30:4,5,22
31:25 32:18
32:20 33:20
34:9,15 35:4
35:19,22,24
36:12 37:11
37:18 38:3,8
38:13,17
41:18,20
45:12,23,24
47:8,9 48:1,2
48:10,17,19
50:4,12

51:15,18
55:23 58:1
59:10 60:13
60:22 61:11
61:14 63:6
63:18 64:5
64:25 70:17
73:18 76:9
76:10 78:16
78:18 81:11
83:5 87:24
89:6,17 90:5
91:4,17 92:6
92:9 93:1
94:25 96:5
99:14 100:11
103:24
105:25
106:18 107:3
107:5,19,20
109:23
110:15,16,19
112:9 113:2
113:19
114:17,20
115:3 117:19
118:15 119:1
119:3,5,10
120:5 122:14
122:16,18
123:3 127:6
127:20,23
128:13
129:11 131:7
132:4,10
134:11
136:14 137:5
137:8,11,14
138:18 139:5
139:6,11,14
140:6,12
143:9,12,13
143:14
144:16

145:17
146:15,24
147:10,11,15
148:2,4,17
150:1,13
151:2,2,5,7,7
151:14,16,25
152:1 153:8
154:1,1,21
155:1,9
156:9,11,25
157:2 158:5
158:14,22,22
159:1,7,13
160:13,17
161:25 162:3
164:8 165:1
165:9,16
**Knowing**
112:16
**knowledge**
25:13 28:5
29:8 37:6
47:16 50:4
50:24 60:11
76:15 106:6
114:12
149:12
152:20 154:3
167:10
**known** 35:12
102:6,9
113:21 159:3
**knows** 32:15
34:8 78:23
115:15
**KNOX** 167:3
**Knoxville**
167:23
**Korea** 11:1
**KRISTIN** 2:9
**kristin.b.joh...**
2:11
**Kuwait** 18:12

141:18 155:7

**L**

**lab** 68:5,8
**labeling** 71:6
**lack** 70:9
90:23
**Lapsley** 138:6
138:8,15
139:2 149:2
**larger** 20:14
20:15,17
**Larry** 140:11
140:12,15
161:16
**late** 165:1
**laundry** 160:15
**law** 7:20 11:20
11:23 13:1,9
13:19 31:22
37:19 38:5
40:24 41:2
87:7 89:14
89:16 158:6
159:20 160:6
160:12,14
164:1
**LCR** 1:22
167:5,24
**lead** 59:8,10
60:22 61:10
**leader** 108:24
**leaders** 20:11
**leadership**
10:13 12:23
24:20
**leads** 31:14
54:10,15
55:15 56:7
57:24 58:3
60:14,16
61:15 86:2
127:15
**lean** 100:19

Henderson Legal Services, Inc.

leaning 88:23
learn 104:23
learned 52:2
   112:23 144:3
leave 145:14
Leavenworth
   11:7
leaves 97:22
   100:2
leaving 49:21
led 109:8
LEE 1:5
left 26:11 55:3
   55:7 100:5,7
   135:23
   136:21 144:5
Legacy 75:2
legal 9:2,5
length 160:16
lengthy 88:22
   151:25
LER 7:17,18
   98:23
LER-204 163:2
LERs 126:12
let's 5:15 24:9
   60:19 67:10
   71:11,14
   73:16 125:18
   125:22
   142:23
   161:13
letter 163:12
level 9:20 28:4
   28:6 58:9
   94:11 108:16
   110:17
   133:21
   164:15,16
Levinworth
   11:11 12:1
Lexington 2:4
liaison 53:13
   53:15 154:20

Licensed 4:7
   4:10 167:4
Lieutenant
   65:24
life 80:17,25
   109:19,20
   115:5
light 112:13,23
limb 146:2
line 56:24 57:1
   57:8 60:1
   68:12 78:25
   82:9 85:19
   85:19 87:15
   88:8 96:18
   123:9
lines 150:15
link 117:24
list 15:3 58:2
   86:2 119:23
   121:2,7,8,14
   121:14,18
   122:20,25
   127:14
   160:15
listed 25:11
   94:1 107:4
   133:15,24,25
   134:7 144:24
   147:16 148:8
   161:22 163:2
Listening
   88:11
listing 92:2
little 5:17 9:12
   43:21 96:13
   133:21
living 31:9
   56:2 86:10
   93:19
Lloyd 75:19
   108:9
loaded 110:6
local 89:16

locally 151:15
located 10:4
   22:12
location 14:1
log-in 74:2,10
logged 125:6
logging 74:13
logistics 16:11
long 11:4 12:1
   12:10 15:16
   16:23 17:2
   18:13 36:6
   36:12,13
   38:20 41:8
   64:10 66:22
   71:10 107:19
   122:14
   133:17
   136:25 141:2
   145:23
longer 32:7
   36:14 57:1,9
   57:13,25
   61:3
look 8:4 50:16
   63:6 65:1
   67:2,8,13
   74:15 75:15
   80:3 85:19
   92:17,17
   96:11 108:5
   112:5 115:3
   115:5 118:24
   121:16
   129:17
   130:10 138:9
   141:1,5
   142:23
   145:25
looked 58:5
   109:1 111:18
   119:6 141:22
   161:17
looking 21:18

55:15 76:23
   81:22 84:15
   96:15 100:13
   101:1 106:20
   108:22
   112:25 113:1
   115:12
   119:20
   126:23 127:7
   129:15
   130:12 138:1
   144:4,11
   152:12
   161:16 165:3
looks 55:12
   75:16 79:8
   95:16,25
   96:24 108:15
   112:2,6
   115:2 120:20
loses 100:19
loss 14:17
   15:7,9
lot 11:21 23:24
   33:11 40:23
   41:7 47:15
   48:5 91:14
   123:23
   131:19
   148:18 159:5
lower 67:15
lunch 100:23
   119:21

――――――
       M
――――――
M 5:2 65:25
   144:19
M-A-C-E 89:11
MACE 89:11
   89:18 90:6
   90:11,14,22
   91:18
machine 4:11
Mahon 51:15

mail 23:16,16
main 108:8,10
   108:24
maintained
   32:12
major 9:24
making 14:23
   25:14 43:9
   52:15 54:9
   64:22 85:13
   94:14 101:19
   101:20,23
   137:17
   149:22 150:4
malicious 61:1
management
   10:15
managing
   113:24
maneuver
   11:21
manner 31:12
   32:14
manpower
   164:12
manually 79:5
   125:6
March 19:22
   167:18
marijuana
   24:13
mark 87:17
   150:9 161:23
marked 54:17
   65:17,19
   75:11 111:6
   111:13 124:5
   142:22
   150:10
   151:19,21
Marshall 9:19
martial 7:2
   65:25 67:1,4
math 17:16

Toole, Wes                                                    February 26, 2016

**matter** 10:10
32:11 43:12
164:16
**MATTHEW** 2:3
**maximum** 69:9
**McClellan**
10:20
**mean** 14:15
16:2 23:6,12
25:1,2,10
28:13 29:6
33:23 36:24
38:11 41:17
43:12 47:14
55:4 56:23
56:25 57:6
60:10 61:16
62:17 63:10
67:25 69:2,4
72:24 74:25
76:13 79:25
81:21 90:19
92:3,13 96:6
98:16 120:8
120:14
121:21
123:15 129:8
129:9 130:23
131:16 142:7
146:2 150:22
153:4,18
154:7 158:24
160:15 162:7
163:22
**meaning** 57:24
80:13
**meaningful**
68:24 69:7
69:11,12,15
69:24 70:13
71:24 96:21
97:10,13
**means** 5:19
6:17,18

42:12 56:19
56:21 62:2
69:5 81:24
84:5 96:11
99:10,13
120:9 129:2
129:12
156:25
**meant** 19:11
69:15 83:10
127:22 129:5
**measures**
87:19
**mechanism**
107:17
132:16
**mechanized**
14:22
**media** 30:10
**medicine**
52:22
**medium** 20:9
**meet** 36:20
**memo** 28:17
66:12,25
88:25 89:1
116:20 117:8
117:11,13
118:12 119:6
119:7
**memorandum**
65:24 66:3
66:18 117:14
117:16,21
118:3,6,15
118:18,20,23
118:24,25
119:12
**memorial** 65:9
**memorialized**
70:2
**memorize**
163:6,11
**memory** 42:16

**mention** 34:20
**mentioned**
42:16 51:5
63:3 79:3
81:25 87:15
92:23 96:21
107:22
120:23
124:15 146:9
158:12
159:13
160:23 163:3
163:17
**mentioning**
121:19
**mentions**
146:19
**mentorship**
156:4
**mess** 50:11
**message** 79:4
**met** 32:24
116:3
**method** 95:10
**Michele** 1:22
4:6,9 167:4
167:23
**middle** 58:16
111:24
126:15
141:23
**midnight**
124:17
**migrating**
125:10
**mil** 27:14
**military** 11:13
16:6,8,9
19:23 37:23
38:1 68:20
87:10,10,11
87:13 90:21
140:21
**mind** 125:24

**minimal** 86:13
**minimize** 48:8
**minimum**
80:23 137:14
160:10,19
**minute** 64:1
**minutes**
122:10 127:3
146:3
**miscommun...**
145:2
**missed** 54:10
**mission** 11:23
13:4,10,24
14:2 116:4
**missions**
11:22
**misspoke**
154:17
**mistakes**
41:18 43:9
**misundersta...**
145:3
**misuse** 42:18
**mitigate** 87:20
**model** 20:8
87:9
**money** 45:25
112:3 129:2
129:11
143:10,12,17
151:8 153:9
**monitorship**
117:14,15
**month** 11:3
25:25 40:8
81:3,16 96:9
107:17
112:16,23
137:10 151:8
**month-and-...**
107:1
**months** 17:1,4
17:5,17

18:14 60:23
66:9 122:22
123:2,4
125:23
133:12
137:12,13,15
**morning**
130:13 145:7
145:21
156:17
**mother** 52:19
52:19 126:21
128:5
**motivation**
113:3
**motivations**
113:4
**move** 20:8,14
20:14 27:17
91:19 121:17
123:24
**moved** 74:23
**moving** 20:11
86:21 97:15
128:25 129:7
**MP** 11:19
20:24 42:7
56:24
**MPs** 11:22
50:10,13
**multi-file**
123:19
**multiple**
103:23
**murder** 15:14
48:17 49:2
75:14 84:13
107:25 108:9
108:23
110:22
**murders** 15:13
30:4,7
139:17

**N**

**name** 5:8 8:21
  18:1 25:10
  27:24 40:2
  42:15 44:12
  44:14,21
  45:1,3,14
  49:22,25
  51:5,18,21
  74:6 75:18
  75:22 76:4,5
  111:15,15
  124:15
  125:19,25
  127:23
  159:15,24
  160:23
**names** 152:7
**narcotics**
  89:18
**narrative**
  85:11
**Nashville** 1:19
  4:6
**natural** 50:21
**Naturally**
  132:24
**nature** 21:24
  78:9 160:18
**navigate** 43:24
**NCIC** 159:20
**NCIS** 68:21
  160:10,13,19
**NCOC** 100:15
**NCOIC** 42:11
**NEC** 27:11
**necessarily**
  19:12 20:6
  53:18 84:1
  105:9 108:21
  122:9
**necessary**
  36:15 66:4

**necessitate**
  81:15
**need** 6:3,8
  13:24 14:1
  36:20 37:9
  39:12,13
  41:19 59:24
  59:25 70:17
  115:14 116:8
  122:9 127:18
  141:5 156:7
  156:22,23
  157:15
**needed** 19:7
  65:7,9 89:24
**needs** 37:3
  43:19 68:10
  68:11 70:10
  156:21
**neighborhood**
  59:1
**never** 7:3,5
  60:25 90:9
  122:21 148:5
  150:17
  152:23 153:4
**new** 2:5 27:20
  73:14 74:23
  75:8 105:22
  124:24
  125:11,14,23
  126:4 129:15
**news** 143:21
**nexus** 46:4
  90:24
**NFI** 127:19
**Nicholas**
  75:19
**night** 125:3,4
**nights** 124:17
**nine** 107:21
  144:4
**non-CID** 68:19
**non-commis...**

  100:15
**non-commis...**
  38:2 42:12
  42:13
**non-SSI** 49:8
**non-SSIs**
  98:22
**normal** 37:11
  46:24 49:17
  50:1 52:15
  107:19
**normally** 37:8
  107:20
  149:16,25
**Notary** 4:7
**notation**
  106:24
**note** 57:19,21
  103:11 109:3
  128:23 135:6
  138:1 146:16
  148:19
**notebook** 8:12
**noted** 57:15
  64:15 115:21
  134:25 135:3
  146:12
**notes** 8:13,15
  70:5 110:19
  142:2,4,13
  142:15,16,19
  142:20,20
  144:18
  146:14 147:1
  148:13,15
  152:12,13,17
  152:25
  162:20
**noteworthy**
  113:6
**notice** 4:16
  5:24 63:8
  82:6 114:23
**notification**

  55:10
**notified** 125:4
**Notifying**
  46:25
**noting** 127:9
**November**
  12:8
**Nowadays**
  31:6
**nuances** 43:16
**number** 7:17
  7:18,19
  65:20 81:12
  86:18 89:9
  93:10 101:16
  101:24
  102:24 103:3
  103:6,7,11
  103:13,15,21
  107:23
  111:13
  121:11,21
  124:24 125:1
  125:14,16,21
  125:21 126:4
  126:6,8,14
  127:24 138:4
  138:5 143:21
  144:8 160:14
  162:4 164:11
**numbered**
  85:15 93:25
**numbers** 3:12
  85:5 111:8
  144:5
**NY** 2:5

**O**

**Oates** 130:14
  130:20,21
  131:1,4
  132:8 134:14
  134:20 136:5
  136:22 138:3

  138:3 139:8
  144:15,19
  145:24
  146:22
  148:25 149:2
**oath** 5:18
**oaths** 33:16
**Object** 35:9
**objection**
  34:17 35:2
  62:11 104:16
**objections**
  4:12 34:22
**objectively**
  69:20
**observe** 41:5
  41:10
**obtain** 33:23
  33:25 56:24
  119:23
  121:14
**obtained**
  46:15 106:25
  115:7 121:15
  159:11
**obtaining**
  129:1,11
**obvious**
  162:16
**obviously** 48:7
  48:16 61:25
  105:24
  110:14
  113:11
  160:13
**occasions**
  53:7 90:12
**occupied**
  140:23
**occur** 80:12,25
  81:2 82:23
  90:18 98:25
**occurred** 8:22
  30:4 47:16

Toole, Wes

February 26, 2016

21

66:10 69:19
84:2 100:13
104:22
**occurrence**
34:6 70:20
**occurs** 121:24
**off-post** 45:22
87:25 89:2,6
89:10
**Off-the-record**
119:15 155:4
**offender**
147:23
**offenders**
45:13 126:11
**offense** 9:10
24:7 25:6,16
32:7,25 33:1
48:18,23
55:9 69:3
78:2,9 82:23
84:11,14
92:2 101:8
101:14
105:16,17
160:8
**offenses** 30:17
34:3 103:23
**office** 1:18 4:6
16:4,6,15,17
19:25 20:2,9
20:9,14,16
20:19 21:8
32:6 38:24
39:15 49:5
63:18 67:4
72:3,3,9,19
77:16 80:10
81:10 92:15
97:20 98:24
100:5 101:15
103:5 117:19
123:4,18
128:8,12,14

128:16,20,22
130:4,14
131:3,24
132:11
135:23 138:5
141:18
148:22,24
149:4,14,16
151:24
155:22,24,25
156:7,16
157:8 158:9
**officer** 12:25
14:21 17:8
18:20,25
19:15 20:7,7
38:1,2 42:12
42:13 65:25
67:2 100:15
140:16,19,20
149:5,18
**officers** 53:14
68:15
**offices** 4:5
18:23 19:2,3
19:5,9 22:12
39:19,22
86:14
**official** 128:21
137:16
149:13
**okay** 5:15 6:13
6:14,20,24
11:16 16:3
17:14 39:7
44:22 48:22
49:24 54:23
61:1 67:17
67:25 71:11
71:17 77:6
81:2,24
95:15,22
96:3 101:5
101:23

103:17,20
123:3 125:17
128:1 133:22
134:16,17
144:17
148:12 150:8
152:2 154:17
157:17
165:17
**old** 27:4
**on-the-fly**
156:1
**on-the-spot**
155:19
**once** 17:9,11
18:16 22:19
22:24 23:17
50:19 69:8
78:22 79:6
82:2,15
97:11,14,24
107:3 113:14
133:11
145:20
154:21
164:22
**one-on-one**
156:3
**ones** 67:4
**ongoing** 26:2
64:8 156:23
162:7,11
**OP** 87:1,2,7,12
87:13,15
93:4,11,14
93:16,18
**open** 27:20
31:19 156:17
157:6,15
158:19 163:3
**opened** 162:8
**operating**
89:19
**operation**

26:19 87:4,8
87:11 89:6
93:21
**operational**
164:12
**operations**
11:25 16:5
18:20,25
19:1 20:7,13
21:13 37:11
45:11 81:14
87:3,10 89:3
89:15,20
90:9 91:15
91:16 100:20
100:21 116:6
140:15,18,20
**opine** 82:25
**opinion** 35:10
108:19,21,25
110:5,13,14
156:12 161:2
165:8
**opportunity**
41:4
**opposed** 6:5
**order** 11:20,23
20:10 31:11
36:15,21
37:4 42:22
65:11 70:18
87:12,13
90:15 102:9
106:16
123:11
137:23 149:7
150:23 151:4
159:7
**ordered**
156:10
**organization**
14:15 16:9
**organizational**
10:13,13,15

**organizations**
158:6,8
**organized**
123:24
**originals**
23:17
**OSI** 68:21
**outcome**
167:15
**outlined** 67:21
**outside** 37:8
37:10 41:2
62:5 96:19
97:1 116:11
**overall** 52:13
85:18
**overcome** 8:1
**overlap** 22:3
**overlooks**
162:5
**overriding**
60:9
**oversaw** 39:11
**oversee** 91:16
**overseeing**
135:9
**oversight** 16:5
18:25 19:2
**overt** 110:15
**overwhelmed**
43:18 95:8

**P**

**p.m** 1:16
165:25
**page** 3:2,8
55:11,13,14
55:14,18,19
56:18 58:16
58:17 75:17
75:24 76:2,3
76:8,23
77:21 79:21
84:9 89:9

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

91:19,21
93:8,8 96:15
96:15 101:2
107:21
111:24
115:11,11
119:18
124:16,22
126:15 128:1
138:2,12
140:7 141:2
141:5,20,23
144:4,5,8
146:21
161:13
**pages** 35:20
86:24 94:19
151:22 163:9
167:8
**paid** 139:9,10
153:9 154:14
**paragraph**
85:6 87:12
101:6 115:13
144:14
**parenthesis**
16:8
**parents**
154:13,18
**parlance**
140:22
**part** 46:19
57:13 62:8
63:7 79:16
85:9,17
98:17 101:2
101:3 107:6
122:4,4
145:3 151:1
**particular**
47:10 48:13
51:8 108:7
**parties** 66:4
110:12

167:13
**partnership**
89:19
**pass** 90:22
**passes** 97:22
**passing** 63:17
63:18 90:8
**patience** 6:11
**patrol** 11:14
11:19
**pay** 132:13,22
133:2,23,23
150:23 151:4
**paying** 132:11
132:14
**payment**
134:10,18
141:3 147:21
161:18
**payments**
131:25 150:5
**PCS** 12:19
27:23 100:8
**PDF** 163:9
**Peed** 2:3,4
**pending** 6:24
**people** 16:15
16:17,18
23:25 38:23
39:18 41:18
41:18 45:13
46:8,14
61:22 62:2
62:10,15,17
62:24 72:4,8
72:22 94:21
95:8 106:14
110:18 120:5
127:13
139:23
143:16
146:17
148:20 153:8
156:7 160:7

**percent**
163:12
**percentage**
34:5
**perception**
156:7
**Perfect** 6:8
**perfectly**
32:21
**perform** 53:15
**performance**
41:20
**performed**
93:24 145:7
**performing**
41:11,15
**period** 70:10
70:13 140:6
**periodic**
106:18
**periods** 40:6
**permanent**
100:8
**person** 6:1
16:10 25:18
34:8 35:12
36:16 43:11
50:19 53:24
58:13 59:5
59:13,16
61:7 74:2,12
76:15 78:22
94:6 98:13
100:19 105:1
114:16
121:24
125:24
127:17
128:17
133:25 134:1
134:1,2,2,6
135:15 137:7
139:3 142:2
142:19

144:23 145:1
145:4,6,9
146:11
147:12 148:5
148:7 149:1
150:3,4
153:16
156:22
159:19,25
160:25 161:1
161:6,22
162:5,18
163:1
**personal** 8:12
13:7 31:3
65:7 66:19
67:5 154:24
**personally**
41:4 57:16
57:17 90:6
**personnel**
16:11 21:2,3
43:4
**persons**
117:15,25
**pertaining**
117:14
**perusing**
123:8
**phase** 52:7
63:19 73:1,7
**phone** 7:8 8:15
42:21 63:25
85:2 126:20
128:4 130:25
131:8 145:23
**physical** 15:8
61:13 99:13
157:7
**physically**
7:13 22:12
**pick** 86:23
**picked** 130:24
**pie** 107:16

**piece** 66:15
**place** 26:20,25
28:9 38:12
62:21 98:25
130:9 148:1
164:5
**placed** 98:23
**Plaintiffs** 1:7
2:2 4:3
**plan** 31:7,8,13
31:18 32:4
54:6,8,13,21
56:5,10,14
57:12,14,15
57:19 62:8
63:4 67:18
81:19 83:6
85:7 86:1,4,6
86:7,9,12,16
87:1,2,3,7,16
93:4,11,14
93:16,19,21
116:13
150:19,22
**planned**
128:25
129:14
**planning** 88:13
110:24 129:7
**plans** 55:23
56:2 87:8
129:9
**platoon** 62:6
**play** 103:16
**playing** 123:4
**please** 5:8
24:11 34:24
34:25 37:22
71:13 96:14
108:4 115:10
128:1 144:13
146:21,23
151:24
**plug** 51:10

Plumey 144:15
point 34:16
  47:18 59:10
  77:15 84:14
  100:5 121:12
  135:14
  139:11
pointing 85:16
  110:5
points 138:22
police 11:13
  16:8 19:23
  37:23
policies 150:6
  164:5
policy 32:16
poor 41:20
populating
  125:12
portion 35:3
  132:3 148:20
position 16:13
  19:20 20:4
  140:23
possession
  49:4 102:8
possibility
  118:13
possible 22:4
  29:22 40:12
  44:18 62:7
  64:19 69:23
  70:1,25 71:4
  93:16 113:15
  127:15 135:1
  135:2,4,18
  135:20 136:7
  140:1 153:21
  153:23
  161:19,25
  162:3,5,8,9
  165:16
possibly 45:23
  137:13 153:2

post 9:22
  27:13 28:2
  28:17 106:2
  140:24
posted 141:17
potential
  48:23 60:22
  68:6 133:5
  158:19
practice 43:12
  59:6,7 61:5
  65:13 72:20
practices
  150:7
pre-deploym...
  17:12
prefer 38:10
preferred 95:4
  95:10
preliminary
  51:16 52:6
  54:12 63:19
  73:1,7
prepare 7:6
  20:17 22:20
  92:1 124:8
preparing
  20:13 54:5,8
  58:6 142:9
present 65:10
presentation
  109:24
press 38:10
pressed 44:8
pretrial 36:18
pretty 33:9
  131:17
  155:20
prevent 14:17
prevention
  14:5,13,20
  14:21,25
  15:6,9
  118:11

previous 73:15
  75:11 76:11
  76:18 99:9
  102:3 118:16
previously
  54:16 75:11
  101:14 103:2
  105:15 124:5
  126:19
primary 53:17
  90:11 94:3
  134:12
printed 28:23
  29:2,3 93:18
  93:23 144:7
prior 45:7 81:7
  102:16,17,23
  115:4 133:13
  152:19
prioritization
  86:15 97:22
prioritize
  31:15 127:16
private 106:7
  127:10
  131:25
  132:22
  135:15 139:3
  139:10
  143:10,23
  150:25
privately 151:7
privates
  122:13
proactively
  131:23
probable 33:4
  36:22 38:13
probably 26:2
  58:8,13,13
  135:7,8
  148:7 162:1
probative
  31:17

problems
  41:10,14
  47:17
procedures
  159:24
proceeded
  50:1,22
process 10:9
  26:18 36:16
  37:10 49:18
  50:25 53:16
  63:22 85:13
  88:18,22
  92:22 107:11
  107:14 115:1
  129:1,10
  133:22 150:2
  156:24
processed
  23:18 52:10
  68:3
processing
  36:13
program 10:14
  151:3
progress
  20:11 53:17
progressed
  46:18
prohibit
  106:14
prohibited
  81:17
promised
  136:4
promoted
  16:19
proper 104:6,7
property 15:8
  149:21,21
prosecute
  90:16
prosecuted
  30:13,16,20

prosecution
  30:18 31:1
protection
  12:22 13:5
protective
  12:20,24
  13:16,21
  15:16
protocols 28:9
prove 58:1
provide 5:20
  14:2 19:2
  26:4 28:16
  29:4 64:3
  70:18 116:20
  117:7,17
  149:18
provided
  35:23 95:11
  95:14 97:12
  104:25 118:4
  118:7 135:25
  138:3 154:21
  155:19
providing 47:3
  52:16 85:17
  163:14
PSE 127:4
PST 27:17
psychology
  9:25
Public 4:8
publications
  35:13
published
  117:16
pull 23:9 34:4
  84:21 85:2
pulled 8:6
  42:20
pulling 21:20
  75:6
punch 92:18
  92:19

**purchase** 87:5
143:17,23
**purchased**
110:25 111:1
**purchasing**
144:1
**purpose** 21:23
53:11 66:2
67:15 87:14
117:10,20
**purposes** 38:4
137:25
139:21
**pursuant** 4:3
**pursue** 90:23
127:18
**push** 106:1
**pusher** 108:10
**put** 28:22,23
29:3 41:23
44:7 56:9
59:20 64:19
70:12,17
71:1,17 72:5
72:6,18
73:21 75:1
78:3 79:8
85:11 87:6
95:9 99:6
105:14
116:10 118:6
123:17 128:9
141:15,19
157:12,25
158:10
**putting** 22:6
36:17 74:7
94:13

**Q**

**quality** 19:5
140:10 159:3
**quarter** 155:16
**quarters**

154:22
**query** 160:15
**question** 4:13
6:10,12,15
6:17,18,19
6:24 25:8
27:2 34:25
37:2,7,9 60:7
71:6 99:8
122:15 132:2
141:17
161:10,17
162:3
**questioning**
37:5 38:4
117:19
**questions**
6:15 9:7,13
25:15 30:1,3
165:18
**quick** 67:19,23
86:21,25
163:15
**quickly** 146:7
**quiet** 112:4
**quite** 70:20
93:16 105:23
140:1 148:16
148:18
**quote** 64:23
110:3,4
117:22
161:19,21
**quotes** 69:11
69:14 95:6
108:24 158:3

**R**

**RAF** 68:12
**raid** 87:6
**rank** 19:12,14
**rape** 133:19
**rating** 140:21
**raw** 156:25

157:2,5,8,12
157:13,18,19
157:21,23,25
158:3,12,19
159:8,14
**RDF** 157:1
158:9
**reach** 68:21
104:15
**reaction** 11:14
52:23
**reactivate** 28:3
**read** 30:10
35:1,3 66:3
86:24 99:15
112:5 120:17
124:13,16
132:3 143:20
144:13,20
146:24
148:23
151:25
152:15 166:4
167:16
**reading** 4:18
57:11 77:1
84:17 101:21
120:9
**reads** 80:2
92:5
**ready** 60:20
**really** 11:22
51:17 64:10
72:3 73:7
78:24 81:25
90:9 91:14
106:19,20
108:25 109:5
121:10 127:1
136:13 137:3
153:24
**rear** 120:9,14
**Rear-D** 119:24
120:9

**reason** 8:17
24:25 25:3
43:8 59:18
59:23 63:2,2
64:21 76:5
81:9 103:1
121:17 128:9
144:7 163:13
**reasonable**
36:8,10
71:20,22,23
72:16,17
95:6,7 97:18
98:13 102:25
134:17
136:12
163:24 164:2
164:3,10,10
164:17 165:6
165:8
**reasonablen...**
163:18 164:6
**reasoning**
60:1,10
**reasons** 36:21
37:4,25
81:12
**reassign** 43:17
43:19
**reassigned**
18:17
**recall** 7:17
11:3 16:19
16:22,23,25
25:21 40:1
42:7,14,16
44:13,23
45:3,17
46:10,21
47:17,21
48:13 51:4,6
51:13 52:18
58:5,20,23
58:25 59:2

63:2 76:5,16
76:20 77:6,8
77:9,12,15
77:19 88:13
88:15 100:4
108:4 109:12
109:12
110:20
111:17,22
112:10
126:20,23
129:18 130:3
130:23 131:2
131:5,11,12
132:7 134:12
135:14 136:4
136:8,9
138:16,17
140:5 141:12
145:5,25
147:4,6,14
147:25
148:22,23
156:12
**receive** 10:1
23:2 82:5
96:7 99:5
**received** 62:15
126:21 128:3
137:1 143:11
**recess** 100:23
**recipient**
78:21
**recipients**
23:23 24:14
**recognize**
45:14 54:17
65:21 111:11
111:12,16
152:7
**recognized**
49:23,24
113:15,18
**recollection**

5:21 77:3
124:20
130:22
135:24 147:2
158:15
162:20
**record** 5:9
34:22 67:10
67:11 69:13
99:24 100:22
119:3,13
155:2 160:6
160:12
167:10
**recorded**
69:25 70:2,5
**records** 23:3,5
23:9,14
24:16 99:22
141:24
160:20
**recourses**
121:12
**recover** 67:9
**red** 123:9,11
123:18 124:1
**reducing** 4:11
**reduction**
106:4
**refer** 97:4
117:1,2
118:12
148:21
**reference**
67:19,23
86:21,25
101:17
162:17
163:15
**referred** 21:12
35:25 45:18
75:13 88:10
91:3,18
117:12

125:14 128:4
149:3
**referring** 38:17
76:3 79:2,12
96:20 98:17
98:18 117:5
117:13 128:2
144:14
148:19 164:1
**refers** 88:8
91:22 101:9
117:7 121:3
126:16
**reflect** 56:15
75:22 154:19
**reflected**
152:14
**reflects** 75:18
**refresh** 124:19
147:1
**refresher**
156:21
**reg** 156:17
164:6
**regard** 130:4
**regarding**
28:19 29:9
44:24 49:11
129:19
130:14 138:2
153:6 154:9
**regards**
159:11
**register**
153:24
**registered**
76:25 162:14
**regs** 156:20
**regular** 40:10
62:18,24
155:14
**regulation**
28:14 29:2
35:17,18

81:5 82:12
97:3,19 98:2
106:21 155:9
160:9 163:4
163:12,18,20
163:23
164:21
**regulations**
35:13,25
67:21 106:13
160:5
**regulatory**
32:17 80:22
**reinforce**
163:15
**relate** 109:6
**related** 167:12
**relating**
151:10
152:16
154:12
**relation** 51:23
51:25 151:12
**relationship**
76:11,14
77:7 100:12
**relatively**
39:15 54:3
137:10 146:7
151:25
**relayed** 114:18
**release** 67:8
**releasing**
66:24
**relevant** 61:3,4
106:9
**reliability**
77:17
**relieved** 42:23
**remain** 17:2
**remarks** 64:13
64:16,22
141:3 143:1
**remember**

20:21 32:2
38:23,25
39:21 40:2,5
41:7,8,12,17
41:21 42:5,6
42:9,10
44:16,20
45:4,19
46:12,18
47:6 48:2,21
49:13 51:17
52:7 54:1,7
63:24 65:8
66:14,19
72:11,18
74:14 89:3
90:17 91:13
92:21 100:7
100:8,10
101:19,20
102:22
108:12,14,17
109:10,15,17
112:11 127:7
127:8 130:15
130:16,17,18
130:24 131:8
131:9,15,15
132:1,5,9,17
132:18,18
134:22
136:18,21
139:14,15,16
139:19,24,24
140:1,2,4
141:14 143:3
143:4,19,19
143:25 144:2
145:11 149:1
149:8 151:13
153:1,17
154:24
158:16
**remembered**

107:22
**remembering**
46:17
**remind** 67:20
118:7
**reminded**
70:23
**reminder** 82:6
**remove** 43:10
**removed** 42:17
**rendering**
113:3
**repeat** 104:20
**rephrase** 9:6
26:13 37:2
58:24 83:4
132:1,2
**replace** 43:11
**repopulate**
27:21
**report** 4:10
7:20 22:22
23:16,20
24:2,14,17
24:23 25:11
25:17 40:20
46:23 47:3
56:24 70:6
78:4,5,8,15
78:19 79:1,2
79:6,7,11,13
80:9 82:1,17
82:18 83:2
84:16,21
92:1,9,10,19
92:24 93:2
101:7 105:1
105:7,11
106:24
136:19 137:1
137:17,18,21
152:11
**reported**
105:10,12

167:7
**reporter** 4:7,10
5:24 7:3
165:21 167:1
167:5
**reporting** 97:7
128:17
139:17
147:19
**reports** 22:21
23:2 24:24
25:3 31:22
78:8 82:12
92:14 107:3
**repository**
75:4
**representati...**
149:9
**reprimand**
164:25
**request** 68:8
68:10,13,18
68:22 88:9
88:15,16,19
**Requested**
35:3 132:3
**required** 31:21
52:8 53:16
57:3,25 68:7
80:18,21
82:12 86:13
89:2 96:22
117:17
137:16
**requirement**
31:25 32:3,9
32:17 53:14
57:17,19,21
58:2 60:4
66:17 69:6
80:22 81:13
107:5
**requirements**
19:7 31:23

32:23 81:14
115:24
**requires** 29:2
**resecure** 65:12
**reserve** 39:20
40:10,17
73:17 165:20
**reserved** 4:13
167:16
**reservists**
39:23,24,25
40:23
**residence**
49:16 50:9
65:12
**resistance**
122:1
**resolve** 31:11
**resolved** 57:2
**resource**
77:17
**respect** 29:5
47:10,11,12
129:19
**respond** 85:20
89:24 93:25
94:8,12,21
96:7 99:12
99:15 134:14
**responded**
52:7
**responding**
98:9 104:3
**responds**
94:15 99:20
**response** 82:4
94:14,19
95:5,6,11,13
95:14,16,19
95:21,23
96:4,10
141:21
153:21
**responsibilit...**

52:11 138:24
138:25
**responsibility**
12:21 14:5
14:10,17,19
14:25 15:6
15:12 18:24
18:24 21:15
22:6 89:16
113:20 114:1
114:3 164:17
**responsible**
14:12,23
15:2 16:4,10
18:22 21:17
67:5 94:14
94:16 157:13
**restate** 104:18
132:2
**restrained**
50:11
**restrict** 78:19
**restricted**
78:15
**result** 103:16
129:21
**results** 68:5
136:20,23
145:8,13,17
**retain** 31:23
32:1,10
106:16
**retained** 3:16
28:20 32:5,7
**retaining**
26:21 27:1
**retention**
28:10 32:3,9
**retirement**
150:24
**retrieve** 74:25
75:3
**returned** 29:15
94:3 115:20

**returning**
99:16 115:21
149:21
**review** 7:10,14
8:1 33:2 49:4
54:12,13,13
77:22,25
78:3,25 79:8
79:9,17,19
79:21 80:8
80:13,16,21
81:2,15
84:10 85:10
85:11,18
86:25 91:16
93:9,24 94:8
94:12 95:14
95:17,20
96:16 97:25
99:12,15,20
101:4 104:3
104:9 108:6
108:7 111:18
114:3,23,25
115:1 124:11
137:23
138:14
141:15,19
143:8 145:8
159:9 161:21
162:10
**reviewed** 26:9
51:5 77:18
81:7 124:8
124:14
152:18
158:25
164:22
**reviewers**
164:9
**reviewing** 7:25
8:5 21:17
48:11 54:9
58:7,8 60:20

93:15 111:3
130:11 134:3
142:5 156:21
**reviews** 19:6
52:16 80:18
80:22 85:11
95:18 100:20
106:19
155:17
**revised** 86:14
93:22
**revolve** 9:8
**RFA** 84:4,6
**right** 7:20,23
20:2,22,25
25:19 29:8
31:1 33:11
42:13 45:2
49:13 53:9
54:14,15
55:13,19,23
56:18 57:10
66:7,19
67:16 68:16
69:21 71:12
74:6,21
76:23 77:22
79:14,18
80:3,8 81:21
85:2 86:1
91:9 95:24
98:4 100:16
100:21
102:20,24
110:12,13
111:24
130:11
145:15
148:16 152:3
155:7 157:20
164:15
**rights** 117:20
118:5
**ring** 45:15

108:23 111:4
**rip** 45:21
129:12
**rise** 110:16
**risk** 87:16
93:11 106:3
116:20 117:7
117:11,12
118:1
**roadmap**
31:10
**Roark** 1:6
139:17
**ROI** 96:18
101:15 102:4
102:23 103:2
103:6,20,25
104:5,9,13
106:10
123:10
**role** 11:16,24
39:2,4 53:15
63:21
**roles** 52:10
138:24
**room** 6:1 68:4
127:2
**Rosa** 144:15
144:19
146:22
**route** 49:16,22
**routine** 62:18
62:24
**routinely**
26:17 28:13
33:23 34:5
45:10
**ROY** 54:21
**RPR** 1:22 4:7
167:4
**rule** 34:23
50:19,20
134:11
147:13,23

148:9 161:9
**ruled** 64:4,6
133:18 134:9
135:22,23
136:1,3
144:25
145:19
**rules** 4:4 5:16
28:8
**run** 159:15
**Ruth** 65:25

––––––––––––
**S**

**S-2** 62:20
**SA** 79:22 91:22
91:25,25
**SAC** 17:17,25
20:1,9,15
22:10 42:6
45:10 52:15
53:14 59:12
60:18 77:22
77:24 78:25
79:16,19
82:19 84:9
93:8,24
94:12 95:14
95:18,20
101:3 104:3
105:4 106:5
111:18
138:24 142:1
143:22 144:1
156:13
157:20
**SACs** 19:8
**safe** 48:4 88:6
**safety** 36:21
37:24 38:4
88:24
**save** 28:10
**Savings**
150:18
**saw** 51:4 59:23

62:13 104:8
115:7
**saying** 6:2
56:19 64:17
74:13 79:7
97:25 109:16
115:20 116:2
123:17
128:11
144:22
145:11 148:3
148:3,6
153:15,17,20
160:17
**says** 54:25
55:1 67:25
68:24 79:1
79:16,22,22
81:6,22 83:2
84:5,10
91:25 93:10
96:18 98:2
98:16,20
99:9 108:7
111:25 112:2
115:13
116:10,19
119:22 123:9
124:24
130:20,20
131:1 136:10
138:3 144:9
164:21
**scenario** 24:9
103:16,17
104:8,11,12
104:19
121:22 123:1
**scene** 49:17
51:16 52:7,9
59:2 65:4,6
65:14 66:4,5
66:18,21
67:9 125:8

**Schaefer**
127:11,17,20
127:25
**scheduled**
18:6
**school** 10:3,6
10:12 12:4
**schools** 100:2
**science** 165:5
**screens**
156:18
**screw** 141:4
**Sean** 126:17
127:8
**search** 37:9
159:17
**searches**
164:2
**Seattle** 1:3
2:10
**second** 21:10
55:11 65:24
75:17 82:6
100:22 101:2
101:3 111:24
119:14 155:3
**secret** 13:7
106:21
**Secretary**
12:25
**section** 62:20
167:14
**security** 10:15
11:24 13:7
15:8 106:7
106:14,25
107:8 127:24
**see** 20:10
21:12,19,21
34:2 38:21
45:12,12
55:11,21
56:23,25
57:5,14

60:15,19,21
72:25 73:6,8
73:13,22
76:3,24 80:5
89:5 93:10
93:14 94:19
95:1,5,11
97:25 115:8
127:3,16
132:25 133:2
144:21
147:11
153:25
157:14 159:5
159:7,9
**seeing** 92:8
105:23
148:13
152:19
**seen** 62:8 73:9
73:12 115:9
144:18 147:1
150:16,17
151:9,10,17
**segregate**
46:6
**seizures** 164:2
**self-harm**
118:1
**send** 22:24
79:1,6,11,25
89:8
**sending** 84:6
**senior** 12:22
16:4 19:8
43:22 44:2
46:3 100:19
**sent** 23:22
24:17 28:19
28:25 68:15
78:4,6 79:8
79:22 82:3
82:18 84:21
92:24 93:3

Toole, Wes                                                    February 26, 2016

28

| | | | | |
|---|---|---|---|---|
| **sentences** 108:5 | 133:2 139:10 | **significant** 48:8,18 | 68:17 69:1 69:18,22 | 164:19,19 **sit** 63:1 71:16 |
| **sentencing** 30:21 | **shalt** 59:11 **share** 90:21 | 98:24 109:18 112:18,23 | 70:1,14 71:4 72:23 74:22 | 77:4,19 103:24 |
| **separate** 30:23 101:15 103:2 | **shared** 93:17 **shares** 14:24 | 113:8 117:24 153:24 | 75:9,16 77:5 77:23 79:4 | 110:20 111:3 136:15 143:9 |
| 103:15,21,25 104:4 126:5 | **Sheet** 166:8 **Sheriff** 128:10 | 158:18,22,23 158:25 159:6 | 79:15,20,24 80:19 81:20 | **sitting** 58:12 123:4 127:1 |
| 126:8 149:10 **September** | **sheriff's** 128:8 128:12,14,16 | 159:6 **similar** 55:22 | 82:21 83:4 83:19,22 | 153:5 **situation** 59:9 |
| 17:11,18 66:6 | 128:20,22 **Sherman** 10:4 | 93:19 151:5 152:17 | 84:3,7,23 85:1,4 89:12 | 78:24 85:23 116:4 122:25 |
| **sequence** 131:5 132:18 | **shifting** 97:23 **short** 5:11 | **simple** 102:8 109:22 | 91:24 92:5 93:7 94:23 | 133:6 **situations** |
| 157:5 **Sergeant** | 39:15 64:1 133:17 | **simply** 97:23 162:5 | 95:25 96:2 96:24 99:21 | 93:21 **six** 17:1 18:23 |
| 49:11 50:7 52:4,23 | **shortened** 87:2 | **simultaneou...** 162:8,11 | 100:7 101:11 108:3,14,18 | 89:9 **size** 20:9 62:6 |
| 66:23 126:16 127:4 138:6 | **shorter** 40:6 **shorthand** | **single** 20:1 122:7 123:21 | 112:6,15 114:10 116:2 | 120:12 **SJA** 24:19 |
| 138:7,15 139:2 149:2 | 4:11 **shortly** 10:18 | 124:16 156:5 160:17 | 116:18,24 117:6,9 | 82:25 107:14 109:4 116:20 |
| **Serious** 48:8 **served** 18:19 | 42:25 **shotgun** 45:23 | **sir** 5:12 7:5 10:23 13:13 | 118:21 120:4 120:8,20,25 | 116:23 **SJAs** 22:25 |
| 40:25 **server** 28:6 | 110:24 111:1 112:2 | 13:18 15:10 15:15,18,20 | 124:10 126:10,18,22 | **skills** 167:10 **slash** 15:25 |
| **service** 12:24 13:7 65:10 | **show** 74:15 93:2 126:10 | 19:13 23:11 24:1,4 25:20 | 128:6 130:8 131:21 135:1 | **slice** 107:15 **slow** 10:8 |
| 100:9 **services** 12:20 | 150:8 159:21 **showed** 50:10 | 27:2,6 28:7 29:6,14,24 | 138:14 140:9 140:13,18,25 | **smoked** 105:25 |
| 13:16,21 15:17 | 142:4 **showing** 54:16 | 30:2,8,14 31:2,5,22 | 141:10 142:8 142:11 144:6 | **smoking** 101:13 102:4 |
| **serving** 11:14 19:24 30:17 | 65:19 92:24 151:21 | 32:14 33:6,8 33:10,14,17 | 144:12,17 146:25 147:3 | 104:15,24 105:3,6,17 |
| **set** 72:8,12,13 85:5 156:4 | **shut** 106:2 **shuts** 155:22 | 36:19 37:15 38:21 39:1,6 | 148:14 149:11 | 106:11 **Social** 127:24 |
| 167:17 **Seven** 161:14 | **sign** 167:16 **signature** 4:19 | 39:13,17 42:9 44:3,6 | 150:20 152:2 152:3,8,22 | **sociology** 9:24 **soldier** 9:10 |
| **severity** 110:1 110:5 | 166:12 **signed** 111:19 | 48:8,9 49:3,6 49:9 51:19 | 154:5 155:8 155:11 156:8 | 11:13 23:25 24:3,13 |
| **sexual** 21:7 48:9 | 166:8 **significance** | 54:4 55:2,17 55:20,25 | 157:2 160:3 161:24 | 33:22 36:2,3 37:14 38:4,8 |
| **SGLI** 130:7,14 131:9 132:12 | 117:24 123:11 127:9 129:3 | 57:12 58:8 66:8,11 | 162:24 163:7 163:19 | 38:9,12,13 41:25 42:1 |

Henderson Legal Services, Inc.

47:1,2 48:20
49:15 61:25
78:17 91:1
105:2 106:11
107:4,6
109:18,19,21
110:9,10
126:11
147:15,19
151:4
**soldier's** 24:18
61:21
**soldiers** 16:12
33:13 37:24
45:21 91:18
105:24 106:3
110:2,9,11
118:8,13
119:24
120:15
150:22
**solicitation**
84:12
**solid** 44:9
**solider** 109:14
109:20
**solving** 123:7
**somebody**
62:7 84:19
98:12 107:13
122:9 133:3
133:24
135:10
145:16
165:12
**somebody's**
25:10
**someone's**
125:19
**somewhat** 9:3
29:17 55:22
108:14
124:21
130:16

133:20
**soon** 80:20
137:10
**sorry** 21:10
37:2,20
47:12 69:12
73:14 84:8
95:13 101:2
106:19
164:10
**sort** 22:2 55:21
56:23 74:2
105:7 150:2
154:4
**sounds** 7:23
101:21
136:10,11
**source** 50:4
76:25 77:2,9
**source's** 77:6
77:12
**sources** 88:7
143:21
**South** 128:25
**space** 57:4,5,8
**speak** 47:4
51:7 107:14
134:20,24
138:7 154:18
**speaking**
145:6
**special** 11:14
15:24,25
16:3,20 17:2
19:24 22:9
131:14,19
133:13
156:13
**specialist**
127:11,19,21
127:25
**specific** 15:1,6
34:3 41:12
54:1 91:6

109:6 125:20
129:19,22
131:16
163:21,22
164:7
**specifically**
85:19 111:22
111:23 114:8
127:7 131:12
138:17
145:11
**specified**
99:20 120:6
160:4
**specify** 160:9
160:10,11
**speculation**
34:18 62:12
**Spencer** 42:8
42:9 100:4
100:14
116:22
**Spencers**
115:19
**Spice** 101:13
102:4,10
103:18
104:15,24
105:3,7,17
105:22,23,25
106:2,11
**split** 112:3
**spoke** 7:8,9
53:6 63:7
148:24
154:21
**spouse** 133:14
144:23,24
145:9 146:10
148:4,8
**spouse--**
148:3
**squad** 62:1,6
**SSI** 48:9

**stabbed**
133:14
**staff** 3:15
12:23 37:19
144:18
151:23
155:17
**staffed** 39:15
**standard** 33:3
33:7,9 35:15
36:2,20 37:3
40:23 41:3
59:6,7 61:5,9
65:13 67:16
71:24 72:12
72:19 83:3,7
83:11 86:12
86:20 97:15
97:18 98:2
120:13
163:24 164:3
**standardized**
118:20 119:7
123:14
**standards**
35:21 67:17
67:21 72:5,8
72:13 83:5
87:13 155:13
164:18
**standpoint**
21:18
**stands** 27:12
**start** 5:15
62:21,23
85:14 88:17
88:23 90:1
95:2 100:1
**started** 8:5
17:12 29:22
49:17,21
55:12 125:9
125:9
**starting**

123:23 152:4
**starts** 119:21
**stat** 92:17,18
**state** 4:8 5:8
6:16 34:25
145:9 167:2
167:5
**stated** 55:25
115:2 142:2
148:4
**statement**
46:16 101:19
101:20,24
102:10 110:3
111:13,14,22
111:25 112:7
112:10,17,22
113:11,16,21
114:13 115:6
115:16,18,23
129:3 141:7
**statements**
33:13 34:1
108:7 109:7
109:13
111:19 113:3
114:3,16
128:24
152:25
**states** 1:2,9,18
2:9 4:5 160:6
**stating** 162:15
**station** 10:24
10:25 12:16
100:9
**stationed** 11:4
12:18 15:22
18:13,15
22:11 26:16
**statistical**
117:24
**statistics**
21:23 34:4
**status** 23:19

Toole, Wes

February 26, 2016

30

| | | | | |
|---|---|---|---|---|
| 24:2,8,16,24 | 42:21 | **successfully** | **supression** | **surveys** 21:24 |
| 25:3,17 | **stopped** 17:17 | 43:25 | 15:7 39:3 | **suspect** 134:5 |
| 46:23 64:3 | **story** 133:17 | **sufficient** 36:2 | 42:11 45:11 | 134:12 |
| 92:1,8,10,14 | **Street** 2:10 | **suggested** | 46:2 73:23 | 160:25 161:1 |
| 92:19,23 | **stress** 118:8 | 80:25 134:10 | 94:5 | 161:6 |
| 93:2 101:7 | **strictly** 90:24 | 143:16 | **sure** 14:23 | **suspects** 68:6 |
| **stay** 32:4 46:2 | **structure** | **suicide** 50:22 | 22:8 25:9 | 78:10 88:7 |
| 46:7 | 19:12,13 | 118:1,11 | 35:1 43:7,14 | 90:20 160:7 |
| **stayed** 165:2 | **stuck** 164:11 | **suit** 8:24 | 43:20 48:24 | 160:24 |
| **stays** 27:24 | **studies** 21:23 | **suite** 145:14 | 48:24 49:18 | **suspension** |
| **Ste** 2:10 | **study** 117:21 | **Summaries** | 51:19 54:10 | 107:7,8 |
| **step** 20:4,6 | 117:22 118:3 | 7:11 | 54:13,14 | **suspensions** |
| **stepping** 90:3 | **stuff** 14:24 | **summary** | 58:8,10,11 | 86:15 |
| **steps** 118:9 | 153:19 160:2 | 65:25 67:1,3 | 58:11 59:15 | **suspicion** |
| **Steven** 75:19 | **subject** 10:10 | 124:6 130:12 | 59:21 65:2 | 132:23 |
| **Stewart** 2:10 | 25:11 46:24 | **supervising** | 70:19 72:23 | **suspicions** |
| 15:22 16:6,7 | 54:23 69:16 | 70:7 | 83:13 85:25 | 64:11 |
| 16:16,24 | 78:10 82:10 | **supervisor** | 87:21 88:5 | **suspicious** |
| 17:3,8 18:4 | 82:13,14 | 22:9 57:2 | 89:22 90:4 | 63:9,11,14 |
| 18:17 20:10 | 90:20 92:1 | 70:16 72:4,4 | 94:14 98:12 | 64:14,17,22 |
| 20:18 21:4 | 101:8 107:4 | 83:2,17 | 101:16,24 | 129:6,16 |
| 22:15 23:12 | 117:18 | 116:10 | 104:19 | **switch** 107:13 |
| 23:15 26:11 | 126:12 | 121:16,20 | 107:10 109:4 | **switched** |
| 26:16,22,23 | 133:15,24 | 164:22 | 109:10 | 17:10 |
| 26:24 27:1,5 | 134:1,8,19 | **supplement** | 113:21 | **sworn** 5:3 |
| 27:18 29:16 | 137:17 | 56:6 | 118:10 | 33:12,18,21 |
| 32:2 39:14 | 144:25 | **supply** 42:1 | 123:24 | 33:25 34:12 |
| 41:24 43:4 | 147:16 148:8 | 106:2 | 136:15 | 111:12,14,19 |
| 51:14 71:9 | 160:25 161:3 | **support** 11:21 | 138:21 | **synonymou...** |
| 71:20 74:8 | 161:5 162:21 | 11:24 13:23 | 149:23 156:8 | 38:18 |
| 87:25 88:1 | 163:2 | 13:25 14:2 | 157:24 | **system** 7:12 |
| 90:7,13 | **subjective** | 21:2,3,6,11 | 158:24 162:2 | 7:14 23:12 |
| 94:22 100:5 | 35:11 71:24 | 22:17 41:25 | 164:19 | 26:10,20,25 |
| 105:4,18 | **subjects** 77:13 | **supporting** | **surge** 105:23 | 40:20 70:25 |
| 133:12 | 109:1 | 24:19 | **surprise** | 71:3 73:15 |
| 143:22 | **submit** 68:8 | **supposed** | 106:23 107:2 | 73:15 74:1,8 |
| 156:13 | **submitted** | 14:20 31:14 | 109:5 142:12 | 74:15,17,18 |
| 157:20 | 88:20 89:5 | 93:25 99:11 | **surprises** | 74:21,24 |
| **Stewart's** | **subordinate** | 114:23 115:3 | 107:18 | 75:1,2,8 |
| 38:24 | 165:13 | 119:22 | **surrounding** | 84:21 125:12 |
| **STIPULATION** | **subsequent** | 159:25 | 59:1 131:10 | 125:19 |
| 4:1 | 147:2 155:18 | 164:23 | 137:5 | 160:21 |
| **stone** 156:4 | **substance** | **suppression** | **surveillance** | |
| **stop** 37:25 | 105:22 | 157:10 | 87:4 | **T** |

Toole, Wes                                February 26, 2016

31

**T** 116:3
**T.C.A** 167:14
**tab** 157:12
**tailor** 54:11
**take** 10:6 17:1
  56:25 57:5
  92:16,17
  107:17,20
  108:5 118:9
  129:8,8
  130:9 137:1
  137:12,15
  142:23 148:1
  165:23
**taken** 81:23
  82:2 100:23
  151:23 167:7
**takes** 36:12,13
**talk** 6:9 8:7
  28:14 45:23
  61:19 112:1
  116:7,8
  131:22
**talked** 93:4
  101:9 135:12
  146:12 149:9
**talking** 38:16
  56:1 61:22
  86:5 87:24
  88:5 113:10
  115:25 120:2
  127:8 131:12
  149:2
**talks** 61:20
  110:9,10
**target** 88:16
  89:3,7 103:6
  110:22 111:2
**targeted** 91:2
**targeting** 90:1
  90:3
**targets** 87:25
**task** 89:18
  120:22

121:13,25
**tasked** 13:22
**TDY** 97:21
**team** 11:15
  22:9 39:3,8
  44:10,16
  45:11 46:2
  49:14,18
  59:22 60:14
  60:15,16
  70:8 72:15
  72:21 73:9
  73:21 87:4
  90:10 92:13
  94:5,6 96:16
  97:21 98:11
  99:12,20
  100:15,17,17
  100:18,18
  101:25,25
  103:10
  113:25 114:2
  114:18
  120:19 122:3
  156:1 165:9
  165:13,14,15
**teams** 73:23
  162:12
**technical**
  88:11 161:3
**Technician**
  21:7,11
  22:18
**telephonic**
  63:17
**tell** 7:6 59:12
  59:17 64:8
  76:19 102:15
  115:17
  121:12
  122:12
  136:13
  138:18
  142:17

145:22
  147:22,22
  151:16
  162:25
**telling** 73:4
  116:22
  131:24
  135:14
**tempo** 164:12
**temporary**
  97:22 149:7
**ten** 69:2,2,5,8
  91:19 96:19
  96:22 97:1
  97:11,14,24
  98:10 99:4
  127:3 164:22
**Tennessee**
  1:19 4:6,8,10
  167:2,6,24
**term** 38:20
  61:24 68:18
  69:11 71:20
  71:23 161:1
  163:1
**termed** 69:7
**terminology**
  38:19
**terms** 19:11
  29:18 30:12
  32:8 35:20
  38:19 40:9
  40:14 52:15
  58:12 62:4
  63:23 86:13
  88:12 159:10
  161:3,3
**terrain** 116:4
**test** 68:6
**tested** 68:9
**testified** 5:4
  7:1 114:5
  126:19
**testify** 5:19

**testimonial**
  61:14
**testimony** 5:25
  17:16 128:4
  148:15
  162:19,25
  166:5,6
**Texas** 9:19
  10:5
**Thank** 17:24
  138:14
**thereof** 167:17
**thing** 5:19 6:23
  34:20 82:21
  88:25 93:20
  96:20 121:23
  123:13,21
  124:13
  163:21
**things** 6:4
  14:18 21:13
  21:22,24
  22:6 28:13
  46:25 64:23
  67:6 68:6
  73:3,5 83:15
  83:18 84:24
  85:14,15,17
  85:18,22
  86:18 94:22
  97:20 116:7
  116:8,12
  121:19,22
  127:24
  132:14 143:6
  143:6 156:17
  158:7 163:23
  163:25 165:7
**think** 6:9 18:2
  20:20 39:10
  43:8 48:3
  51:3,10,10
  52:19 53:8
  53:25 59:19

59:24,24
  61:4 63:1,25
  64:21 65:5
  66:14 69:15
  71:20 72:17
  76:17 88:11
  90:8 93:2
  100:10 103:1
  104:2,8,11
  114:11
  121:17,21
  122:6 123:16
  123:21 128:9
  128:10
  136:20,22
  138:1 146:8
  146:14
  152:10 153:2
  159:6
**thinking** 32:1
  88:23
**third** 110:12
  141:23
**THOMAS** 1:5
**thorough**
  31:12
**Thoroughne...**
  97:6
**thought** 32:22
  44:10 62:9
  62:14 63:9
  64:13 95:13
**thousand** 62:9
  62:15
**threat** 84:12
  109:22,23
**threatening**
  110:6
**threatens**
  109:20
**threats** 109:18
  110:8
**three** 7:18
  10:18 32:6

Toole, Wes                                    February 26, 2016

32

32:12 55:13
55:14,14,19
58:18 77:22
84:9 97:5
108:22
124:17,23
**Thrift** 150:18
**ticket** 42:22
**tie-in** 49:2
**tight** 88:6
**time** 6:22 11:9
12:24 13:8
17:6,11,25
18:4,5 20:20
20:22 21:8
22:1,14
23:11 27:22
29:15 30:7
30:17 32:2
35:12 36:8
36:10 39:21
39:21 40:7
43:21 44:9
45:6,9 46:4
46:17 50:14
59:2 65:8
69:9 70:10
71:8,19,21
71:22 72:7
72:19 73:20
74:7,9,11
80:13 82:11
83:1,9,11,14
83:14,17
86:23 87:10
88:1,4 89:5
90:7 91:12
92:16 94:22
95:7 98:7
106:5 112:9
112:19 113:1
113:7,11
115:24
118:17

123:18 125:7
126:12,13
127:3,7,22
129:4,5,6,16
133:21
135:14,21,22
136:21 140:6
141:13,25
144:25 146:1
147:20 148:8
148:13
151:17
153:19 155:7
156:5 163:13
163:13
**timeline** 144:2
**timeliness**
67:22 83:7
97:5,8
**timely** 31:12
96:3,5 97:6
**times** 35:24
52:1 65:5,11
107:3 145:16
154:25
**timing** 116:6
163:21
**TIMOTHY** 1:5
**title** 92:3
101:13
102:12 118:6
134:8 161:5
**titled** 24:3 25:5
25:7,9,16
32:24 47:9
47:13 84:13
107:5
**titling** 25:18
33:1 46:24
84:19 101:10
137:25
**TLE** 88:9,10,19
89:7
**TN** 167:24

**today** 7:7 8:11
29:5 33:19
63:1 71:17
77:4,20
103:24
110:20 111:4
119:21
136:15 143:9
**Tolbert** 22:16
161:10,19
162:2
**told** 5:16 45:20
46:1,1,9
51:10 70:8
83:9 92:3
109:13
127:25
128:18,23
134:15
141:14,15
143:13,15,16
143:18
144:24 145:5
153:14,18
**tool** 118:11
**Toole** 1:12 3:3
4:2 5:2,5,10
72:14 91:22
91:25 100:25
141:3 142:1
144:14 167:7
**Toole's** 110:14
**top** 34:4 44:4
106:14,21,25
128:1 138:12
144:9,14
152:4
**totality** 129:15
137:23
158:25
159:12 165:4
**touch** 136:5
**track** 22:21
31:15 48:7

54:15
**tracking** 86:19
106:20
**TRACY** 1:5
**traffic** 28:15
42:20 137:8
**trained** 40:22
41:3
**training** 11:1
13:25 17:13
40:15 155:14
155:19,21,25
156:6,9,14
156:15
163:14
**transcript** 6:3
167:8
**transcription**
166:6
**transfer** 27:25
**transferred**
12:19 19:17
100:2
**transition**
17:12
**transmission**
4:16
**transpired**
29:17
**trends** 21:22
**trials** 7:2
**tried** 30:23
122:11,16,20
122:25
**tries** 121:25
**trigger** 82:7
84:19 105:13
116:9
**triggered**
132:19
**triggers** 67:20
**troop** 120:12
**troops** 116:4
**truck** 49:20

**true** 166:5
167:9
**truth** 152:13
**truthfully** 5:20
**try** 6:12 20:16
29:12 31:11
42:22 61:14
72:14 80:9
121:13 122:5
122:16 123:2
123:17
137:22
141:16
152:24
160:16
164:20
**trying** 6:11
42:5 48:8
53:25 54:10
66:14,15
80:5 99:8
100:8 103:16
106:1 108:16
110:23
123:16,21,22
125:15 127:5
127:14
132:21
136:18
153:20 161:8
163:14 165:4
**Ts** 97:5
**TSP** 151:4,8
**Tuesday** 7:9
**turn** 75:17
107:12
115:10
119:18 128:1
140:7 141:20
146:21
**Turning** 89:9
126:15
**Turso** 140:11
140:12,15,19

Toole, Wes

February 26, 2016

33

141:8,10,22
143:2 161:16
162:2,18,25
**tweaked** 93:22
**two** 11:22 12:2
21:25 22:2
33:25 46:7
61:11,11
66:9 70:25
75:24 76:2,3
86:11 93:10
100:10 110:2
111:10
115:22
125:22 137:6
137:10
145:15 149:7
149:8 156:17
156:18
**two-minute**
135:10
**type** 13:7
20:16 21:19
24:22 32:7
34:3 40:13
45:13 50:5,5
50:20 52:21
54:15 60:9
73:13 77:1
78:1,2,12
85:10 88:3
98:24 103:7
109:22
117:23
120:11 124:2
125:5,19
126:2 137:4
155:25 158:7
159:4
**typed** 55:4
165:21
**types** 61:11,11
**typewritten**
4:12

**typical** 11:20
24:9 55:21
159:20
**typically** 13:22
23:24 40:6
40:17,21
48:6 54:11
56:21 60:15
73:13 78:3
80:7,9 84:18
89:25 93:5
93:14 99:19
99:21 127:12
137:1,20,22
138:21

——————
**U**
**U.S** 10:17,21
24:15 26:1
119:4
**uh-huh** 6:5
53:3 56:12
101:18 108:1
**ultimately**
88:21
**unable** 122:20
**unacceptable**
96:25 97:1
98:1,5 123:6
**unclear** 27:1
**uncommon**
70:24 78:15
80:6
**uncovered**
44:19
**undercover**
78:12
**undermine**
158:6
**underneath**
73:11
**underplay**
108:16
**understand**

5:22 6:2,6
8:19 17:15
61:1,19
83:13 85:25
99:9 102:11
104:17
122:18
125:15
**understanda...**
123:8
**understandi...**
8:19,23,25
9:1,4,11 14:4
24:20 25:10
33:11 38:6
93:9 97:19
117:4
**understood**
6:19,21,25
**undetermined**
55:1 66:23
129:1
**unfortunately**
95:10 107:15
**unfounded**
25:6,17
82:20
**unheard** 72:25
**uniform** 65:9
**unique** 80:11
126:11
**unit** 13:6 14:20
14:22,22
27:11 58:19
58:19 59:6
61:6,21,24
62:2,17,20
62:23 120:3
120:10,11,11
127:23 149:6
**United** 1:2,9
1:18 2:9 4:5
**units** 11:21
**unknown** 82:9

82:13,14
115:8 129:2
**unreasonable**
145:12
**unresponsive**
50:8,9
**unrestrict**
78:22
**unusual** 54:3
55:25 61:10
66:20 72:24
73:8 80:6
90:19 93:13
94:24,24
137:12
145:19
**updated** 56:14
**upload** 23:3
**uploaded** 23:8
**upper** 55:3,6
**urine** 24:12
**use** 24:10
26:12,14
31:3,11 49:5
86:14 87:8
102:8 156:14
156:15 162:8
**user** 28:4
**uses** 151:3
**usual** 61:8
**usually** 37:17
55:6,7 62:1,6
64:1 72:12
73:6 82:25
84:16 85:15
89:4 94:2
99:24 137:9
149:4,5
**utmost** 87:17

——————
**V**
**Vadelz's** 113:2
**Vaguely**
126:25

**Valdez** 109:14
111:15
**valent** 124:13
**verbal** 6:5
109:23
**verbatim**
109:11
**verbiage**
147:17
**version** 87:2
119:1,2
163:9
**versus** 71:6
72:6 161:3
165:5
**victim** 54:24
83:21 116:16
**victim's** 83:20
**victims** 116:14
**view** 34:16
35:8 122:23
**violation** 81:4
**violent** 88:3
**Virginia** 9:17
12:19
**visits** 19:4,6
**vs** 1:8

——————
**W**
**W** 1:5
**WA** 2:10
**wait** 59:25
137:16,20
**waiting** 73:24
147:9
**waived** 4:17
**Waldron**
126:17 127:8
**walking**
135:11
**want** 12:8
16:21 17:10
17:14 25:9
25:24,24

42:25 43:20
43:22 46:1,6
46:7 52:25
58:15 66:25
80:7,12
85:18,24
88:4 89:7,22
90:1,4 93:14
98:14 104:20
114:25 116:7
116:11 122:4
123:3,24
127:12,12
128:13
132:25 133:2
142:24
165:21
**wanted** 30:5
43:5 50:23
72:5 84:20
88:6,17,23
94:8 99:15
118:22,23
129:12,17
**warrant** 17:8
19:15 20:7
**WASHINGT...**
1:2
**wasn't** 8:1,6
13:8 45:9
61:5 71:21
76:7 93:23
102:15 121:7
123:1 124:15
128:15,20
154:5 162:19
**waste** 14:17
**way** 38:21
50:22 55:20
56:15 58:2
61:2 66:15
67:3,7 80:2
92:5,23
96:24 97:12

111:16 113:2
113:7 116:24
120:20
123:14
132:13,16
134:12
141:23
150:14
152:14
164:20
165:11
**ways** 162:4
**we'll** 78:19,22
149:15
157:12
165:19
**we're** 135:8
**weapon** 110:6
**weapons**
143:17,23
144:1
**wearing** 88:14
**week** 14:1
**weeks** 71:1
94:20 154:10
**went** 11:7 12:4
12:5 80:3
92:11 99:6
99:13 124:14
124:20
152:21
159:19
**weren't** 40:18
**Wes** 1:12 3:3
4:2 5:2,10,12
72:14 110:14
167:7
**Wesley** 5:11
**West** 9:17
148:3
**WESTERN** 1:2
**whatnot**
163:10
**whipped** 42:21

**wife** 7:16
12:13 49:12
109:14 112:1
113:4,12,14
115:14
135:16
**wife's** 30:19
129:21
132:24
**window** 96:19
**wire** 88:12,14
**withheld**
132:22
133:16
134:10
**withhold**
132:14
134:17
**witness** 3:3
4:3,18,19
26:24 35:4
45:1 110:23
112:8 128:15
132:4 167:17
**witnessed**
38:2
**witnesses**
109:8 110:21
111:20 137:7
**word** 6:18
134:18
160:24 162:9
**work** 9:22 10:7
10:11 11:14
11:20 13:2,7
13:15,20
31:4 33:12
40:15 41:5,7
41:11 43:6
52:4 62:4,6
62:18 72:21
73:25 80:16
**worked** 62:24
**working** 20:12

43:4 51:8
68:9 72:9
80:16 97:11
154:7 164:22
**worried**
141:19
**wouldn't** 59:7
61:9 72:13
89:25 96:5
107:2 135:7
**write** 126:2
**writing** 40:20
**wrong** 69:16
94:18
**wrongdoing**
50:5
**wrongful** 8:23
25:22
**wrote** 141:24

___

**X**

**x** 59:21 60:24

___

**Y**

**y** 59:21 60:24
**yeah** 7:23
39:23 51:11
53:1 72:17
75:5 80:5
108:17 129:6
136:3 146:3
**year** 11:5
17:18,21,22
40:7 43:1
137:13
**years** 12:2,11
15:18 32:6
32:12 86:11
150:1 156:19
**yesterday**
71:14
**York** 1:5 2:5
139:17

___

**Z**

**z** 59:21 60:24

___

**0**

**02** 7:24
**0270** 7:21
**0279** 7:22
**03/08/16**
167:23
**08:30** 130:12
**09:52** 5:1

___

**1**

**1** 167:8
**100** 163:12
**10022** 2:5
**11** 18:14 75:11
84:9 91:20
93:8 95:14
101:2 107:22
115:11
119:19 128:1
164:23
**111** 3:11
**11th** 96:1
119:24
**12** 20:20,23
101:2
**127** 151:22
**127-130** 3:15
**128** 151:22
**13** 101:1 124:5
140:8 161:13
**130** 144:8
151:23
**13th** 2:4
**140** 135:9
**142** 3:12
**1494** 150:13
**15** 83:1 84:5,5
120:15
146:22
**150** 3:14
**151** 3:15

Toole, Wes

February 26, 2016

35

| | | | |
|---|---|---|---|
| **15th** 112:14 | 144:10 | **30** 3:12 9:21 | **784** 163:9 |
| **16** 138:2 | 146:23 155:6 | 81:23 82:4,5 | **7th** 140:11 |
| **16:00** 108:6 | 158:13 | 82:8,16,18 | |
| **167** 167:9 | **2014** 152:9 | 83:9 142:22 | **8** |
| **16th** 108:6 | 154:6 | 142:23 144:4 | **8th** 66:6 |
| **17** 95:17 | **2015** 19:22 | **30th** 16:7,18 | 167:18 |
| **17th** 95:23 | 74:19 | **31** 3:13 150:9 | |
| 124:23 125:4 | **2016** 1:15 4:4 | 150:10 | **9** |
| **18** 84:16 | 167:7,18 | **31st** 19:23 | **9** 144:8 |
| **18th** 128:2 | **204** 113:21 | **32** 3:15 151:18 | **9:52** 1:16 |
| **19** 131:7 | 162:19,22,23 | 151:19,22 | **911** 50:8 |
| 138:15 | **204-11-093** | **38** 120:15 | **98101-1271** |
| 156:19 | 161:22 | | 2:10 |
| **195-1** 35:18 | **204-11-CID-...** | **4** | |
| 67:21 97:3 | 111:14 | **4,000** 61:25 | |
| 155:9 156:18 | **2068** 111:9 | **48** 165:2 | |
| 163:4,18 | **212-328-9559** | **4833** 22:25 | |
| **1975** 9:15 | 2:6 | 81:25 82:3,5 | |
| **1997** 10:2 11:3 | **21st** 91:23 | 82:8 | |
| **19th** 130:13 | 146:23 | | |
| 138:2 144:10 | **22:32:01** | **5** | |
| **1st** 101:3 | 167:23 | **5** 3:4 | |
| 106:6 | **22:40** 125:3 | **50/50** 11:25 | |
| | **2318915** 125:1 | **502nd** 18:19 | |
| **2** | **2331691** | 18:22 | |
| **2:14-cv-018...** | 124:24 | **5220** 2:10 | |
| 1:8 | **24** 83:21,23 | | |
| **2:51** 165:25 | 84:1 116:14 | **6** | |
| **2:57** 1:16 | **24-9-136** | **6-30-2016** | |
| **20** 86:24 | 167:14 | 167:24 | |
| 115:11 | **25** 54:17 67:13 | **6-8** 119:24 | |
| **2000** 10:8 12:9 | 81:19 138:13 | 120:10 | |
| **2010** 15:19 | **26** 1:15 96:15 | **641** 2:4 | |
| 16:21 17:19 | **26th** 4:4 167:7 | **65** 3:9 | |
| 17:20 | **27** 119:18 | **667** 1:22 167:5 | |
| **2011** 17:11,18 | **279-11-CID093** | 167:24 | |
| 17:23,24 | 54:22 | **6th** 152:9 | |
| 29:10 66:6 | **28** 3:9 19:22 | | |
| 91:23 101:3 | 65:17,20 | **7** | |
| 106:6 112:14 | **29** 3:10 111:6 | **7** 9:15 161:13 | |
| 119:4 124:23 | 111:8 | **700** 2:10 | |
| 131:8 138:2 | | **75** 140:8 | |
| 139:18 | **3** | **76** 141:2 | |
| 140:11 | **3** 19:15 | **78** 141:20,23 | |

Henderson Legal Services, Inc.